STATE OF SOUTH CAROLINA COURT OF COMMON PLEAS
FOR THE FIFTH JUDICIAL CIRCUIT
COUNTY OF RICHLAND CASE NO. 2022-CP-40-05526

RAYMOND S. RIGHTMIER, AND HIS LAWFUL WIFE, ANGIE RIGHTMIER,

Plaintiffs,

vs.

RICO BLANCHETT, AN INDIVIDUAL, AMERICAN ITALIAN PASTA COMPANY, A FOREIGN CORPORATION, AND NORFOLK SOUTHERN RAILWAY COMPANY, A FOREIGN CORPORATION,

Defendants.

VIDEO TELECONFERENCE
DEPOSITION OF: RAYMOND S. RIGHTMIER
DATE: January 11, 2024
TIME: 10:14 A.M.

LOCATION: Law Offices of Burr & Forman, LLP
1221 Main Street, Suite 1800
Columbia, SC

TAKEN BY: Counsel for the Defendants Rico Blanchett and American Italian Pasta Company

REPORTED BY: LORI S. MORTGE, Certified Court Reporter, CCR

APPEARANCES OF COUNSEL:
ATTORNEYS FOR THE PLAINTIFFS
RAYMOND S. RIGHTMIER, AND HIS LAWFUL
WIFE, ANGIE RIGHTMIER:
ROSSMAN, BAUMBERGER, REBOSO & SPIER, PA
BY: HOWARD A. SPIER
9155 South Dadeland Boulevard
Suite 1200
Miami, FL 33156
(305) 900-5493
spier@rbrlaw.com
and
HITE & STONE
BY: HEATHER HITE STONE
100 East Pickens Street
Abbeville, SC 29620
(864) 366-5400
heather@hiteandstone.com

ATTORNEYS FOR THE DEFENDANTS
RICO BLANCHETT, AN INDIVIDUAL,
AMERICAN ITALIAN PASTA COMPANY,
A FOREIGN CORPORATION:
BURR & FORMAN, LLP
BY: TRACEY C. GREEN
LAURALEE ANDREWS, PARALEGAL
1221 Main Street
Suite 1800
Columbia, SC 29201
(803) 799-9800
tgreen@burr.com

and

BURR & FORMAN, LLP
BY: TURNER WILLIAMS (Appearing by VTC)
420 North 20th Street
Suite 3400
Birmingham, AL 35203
(205) 251-3000
twilliams@burr.com



APPEARANCES OF COUNSEL (CONCLUDING):
ATTORNEYS FOR THE DEFENDANT
NORFOLK SOUTHERN RAILWAY COMPANY, A
FOREIGN CORPORATION:
GALLIVAN, WHITE & BOYD, PA
BY: RONALD K. WRAY, II
One Liberty Square
55 Beattie Place
Suite 1200
Greenville, SC 29601
(864) 271-9580
rwray@gwblawfirm.com

ATTORNEYS FOR DAVID E. SMALL, JR.:

JOHN D. STEEL, PC
BY: JOHN D. STEEL
3495 Piedmont Road, NE
Building II, Suite 905
Atlanta, GA 30305
(404) 307-3785
jsteel@johnsteel-law.com

ALSO PRESENT:

R. Wayne Freeman, Norfolk Southern
Senior Claims Agent

(INDEX AT REAR OF TRANSCRIPT)



* * * * * * * * * * *
RAYMOND S. RIGHTMIER
being first duly sworn, testified as follows:
EXAMINATION
BY MR. GREEN:
Q. I was going to clarify the pronunciation just to make sure my understanding was right. Mr. Rightmier, my name is Tracey Green. I'll be taking your deposition today. I'll be asking you some questions. Have you ever given a deposition before?
A. Yes.
Q. Was that in the car wreck case that you had?
A. No.
Q. It was in a different case?
A. Yes.
Q. All right. We'll get to that in a little bit so you're a little familiar with it, though. Just if I say something that is unclear, which is probably likely, just ask me to clarify. Otherwise I'll assume that you understand what I'm asking you.
If you need a break, just let me know. It's not an endurance contest. I'm not trying to,



you know, keep you here forever. Just let me know if you need to take a break and that's fine. I would only ask that if I've got a question out there that you answer the question and then we'll take the break.
Your attorney may object to something I say from time to time. You should generally answer the question unless for some reason he raises a question of privilege. I'm not going to be trying to ask about any of the contents of your conversations with your attorneys. Just assume that my questions are asking that. I may be asking times and dates, but I won't be asking about the content of your conversations so I just want to make that clear from the start.
Do you have any questions for me before we get started as far as the format?
A. No, sir.
Q. Are you on any medicines today?
A. Yes.
Q. Can you tell me which ones?
A. I take Ritalin Extended Release. I'm on Ozempic -- or not -- correction, correction. Not Ozempic. Omeprazole, it's for antacid. I'm also on Allegra and Zoloft and Welchol.

Q. What was the last one?
A. Welchol.
Q. W-E-L-L-C-O-L?
A. Sir, I honestly --
Q. Close enough?
A. I don't know.
Q. How long have you been taking each of those medicines?
A. The -- all the medi -- all the medications, except for the Ritalin, I've been taking for over a year.
Q. Okay. And how long for the Ritalin?
A. I started that prescription -- I'm on my second bottle, so approximately a month and a half ago.
Q. Are you taking any over-the-counter medicines?
A. I have -- during the evenings I take a Pepcid AC Maximum.
Q. I think I saw in some of the notes of your records you've been taking Melatonin. Do you still take that to sleep?
A. I've been helping to take that to sleep. I did not take any last night.
Q. Would any of those medicines, do you



think, impair your ability to provide truthful and complete answers today?
A. No, sir.
Q. Were you on any medicines before the accident?
A. I was on all of those medications except Zoloft. That was after the accident.
Q. Okay.
A. And the Ritalin and the over-the-counter Melatonin.
Q. Okay.
A. I did not take that one as well.
Q. What did you do to prepare for this deposition today? What documents did you review, if any?
A. I -- I reviewed over some of my medical records, and that was the extent of it.
Q. Did you meet with your attorneys -- not about what you talked about, but just did you meet with your attorneys to prepare for the deposition?
A. I did meet with him.
Q. And I want to ask you --
MR. GREEN: Interrogatories. Bear with me just a moment. I'm going to show you -- let's mark that as Exhibit 1.



(EXHIBIT 1, Plaintiffs' Answers to Defendant American Italian Pasta Company's First Set of Interrogatories, dated January 8, 2024, was marked for identification.)
BY MR. GREEN:
Q. I'm going to show you, Mr. Rightmier, what's marked as Exhibit 1 and ask you if you're familiar with that document.
A. (Reading.)
Q. Take your time to look through it, please.
A. (Reading.) Yes, I do recall seeing this before.
Q. Did you assist in preparing that document?
A. Yes, I did prepare it.
Q. Okay. And you provided the Answers -- not completely, but along those Answers to your attorneys?
A. Yes, sir.
MR. GREEN: Okay. If y'all can provide us a verification, I don't think we've gotten one.
MS. STONE: Sure.
MR. GREEN: If we did I've overlooked



it.
MS. STONE: No, I don't think we did that.
MR. GREEN: No worries.
MS. STONE: I'll be glad to.
MR. GREEN: No worries.
(This page contains information to be supplied by counsel and/or the deponent.)
BY MR. GREEN:
Q. When did you retain -- you can put that aside, I'm not going to look at it now.
When did you retain Mr. Spier?
MR. SPIER: Object to the form of the question. I'm not instructing him not to answer, but I objected to the form.
MR. GREEN: Okay.
THE WITNESS: I don't remember exactly when it was but it was, obviously, after the accident.
BY MR. GREEN:
Q. Sure.
A. But I don't know the exact date.
Q. Do you remember what month?
A. It was in July.
Q. Okay. Okay. What's your date of birth?

Page 10

A. June 2nd, 1977.
Q. And where were you born?
A. Billings, Montana.
Q. I think in Interrogatory 1 you said that right now you live at 740 Gross Avenue in Moncks Corner?
A. That's correct.
Q. And you still live there?
A. Yes, sir.
Q. You've lived there since 2019?
A. Yes, sir.
Q. And then before that you had lived here in -- excuse me, lived in Ladson on Columbia Drive from 2007 to 2019?
A. Correct.
Q. Do you own a home there?
A. Yes, sir.
Q. I think we have your driver's license number, I don't need to ask that. And your cell phone number is (843) 509-1776?
A. That's correct.
Q. And I think you said that you have two social media accounts, Facebook Raymond S. Rightmier and Instagram is R.Rightmier?
A. Correct.

Page 11

Q. Did you make any posts about the accident on those accounts?
A. No, sir.
Q. And I think you said in our response -- no, that was the Response to the Request for Production. You filed bankruptcy in 2003?
A. That's correct.
Q. Have you ever filed bankruptcy at any other time?
A. No, sir.
Q. Just one. Have you ever brought a lawsuit before?
A. No, sir.
Q. Now, you say in Interrogatory 26 that you brought a claim against the driver who struck your vehicle on that accident in 2017. When you say you brought a claim, that wasn't a lawsuit?
A. No, sir.
Q. It was just a claim against the insurance company?
A. Yes, sir.
Q. Okay. And I think you told me before you had given depositions before. How many times have you given a deposition?
A. I've given one.

Page 12

Q. And what did that involve?
A. It involved the case with a union member. I do believe his name was Rick Jerome.
Q. J-E-R-O-M-E?
A. Honestly, sir, I don't know.
Q. Fair enough. And do you remember what case he had brought -- what was the nature of the case he brought?
A. He -- he fell through a storm grate while working as a conductor up at Bowater Paper Mill in Catawba, South Carolina.
Q. He brought that against Bowater or NS or...
A. Bowater was on the video Zoom and it was brought against NS as well, so both I do believe.
Q. In Interrogatory 2 I think you say you went to high school at Huntley Project School in Montana.
A. That's correct.
Q. Graduated in '96?
A. Yes, sir.
Q. What did you do -- I may bounce around here a little bit. What did you do right after high school? Did you go in the Air Force immediately after high school?

Page 13

A. It wasn't immediately. It was -- January of 1997 is when I left for boot camp, so I was delayed entry program.
Q. What did you do in the, I guess, six months between graduating and entering the Air Force? What kind of work?
A. Worked little odd jobs.
Q. Nothing permanent?
A. No, sir.
Q. And no college?
A. No, sir.
Q. What do you like to do for fun? I think in your interrogatories you mentioned boating and kayaking and restoring vehicles, play sports with your grandchildren, fishing in Intracoastal Waterway. I think you mentioned those things.
A. Yes.
Q. Where do you -- I'm just curious. Where do you access Lake Moultrie?
A. I could access it from Short Stay, which is a naval recreational facility, or access it from numerous other boat ramps around the Moncks Corner area.
Q. I've never been on Lake Moultrie so I was just curious. And you say restoring vintage

Page 14

vehicles. Do you still have one?
A. I currently own a 1963 F100.
Q. That's interesting. I sort of like cars like that. My mom restored a 1972 340 Duster, so I kind of like old vintage vehicles.
Are you still working on it or is it in pretty good shape?
A. No, it's currently sitting out back in my garage because I cannot do any work on it.
Q. Okay. Okay. Let's see. So you are married; right?
A. That is correct.
Q. And what's your wife's name?
A. Angela. She goes by Angie Rightmier.
Q. How long have y'all been married?
A. We've been married since 2020 and we've been together for 16 -- roughly 16 years.
Q. And I think I saw in the records you were married previously?
A. Yes, sir.
Q. What was her name?
A. Katherine.
Q. About when did y'all get divorced?
A. I'm going to say approximately April of 2005.

Page 15

Q. Were you -- were you still in the Air Force or were you getting out of the Air Force then?
A. I was still in the Air Force.
Q. Do you know where she lives now?
A. Yes, sir.
Q. Where does she live?
A. Columbus, Montana.
Q. Was she originally from there?
A. She was from a town 40 miles away called Laurel.
Q. Had you met her when you were in high school?
A. I have known her since I was knee high.
Q. And I think you said you have children. How many?
A. I have two biological children.
Q. And what are their names and ages?
A. Nathaniel, he is 24 -- in one month he'll turn 24. And my youngest is Austin, and he will be 20 years old.
Q. Where do they live?
A. Austin lives with his mother in Columbus and my son Nathaniel owns a house in Columbus.
Q. Are they -- either one of them married?
A. No.

Page 16

Q. And do you have grandchildren?
A. Yes, sir. I do.
Q. How old are they?
A. The ones in South Carolina, they are -- I have a granddaughter who is 13, a grandson who is ten, another grandson that is four months old. And I have two granddaughters in Montana.
Q. And the grandchildren here, where are they located?
A. They -- the two older grandchildren live three-quarters of a mile up the road from me.
Q. Okay. And they are the children of -- who are they the children of?
A. That's Angie's oldest daughter.
Q. How many kids does Angie have?
A. Two.
Q. And where do they live -- obviously one lives not far from you.
A. The other one lives 15 minutes away from us.
Q. Are your parents living?
A. No, sir.
Q. Do you have any relatives in Richland County, here?
A. No, sir.

Page 17

Q. Any close friends around Richland County?
A. No, sir.
Q. Norfolk Southern, you started in 2006?
A. That is correct.
Q. Was that right after you got out of the Air Force?
A. It was -- there was approximately four or five months in between.
Q. Now, you're originally from Montana. How did you end up in South Carolina? What was that journey?
A. The Air Force.
Q. Air Force? Were you at Shaw?
A. No, sir. I was at Charleston Air Force Base.
Q. Okay. And what did you do in the Air Force?
A. I was an aircraft mechanic and a flight mechanic.
Q. What did that entail?
A. Aircraft maintenance entailed refueling the aircraft, checking all the fluids, hydraulic fluid, engine oil, changing out major components. Integrated flight control modules. Reconfiguring

Page 18

the configuration of the aircraft for whether it was air drop, medivac, rolling on cargo such as helicopters, tanks, things of that nature. Changing tires.
Q. Was that a C-17?
A. Yes, sir.
Q. And were you always stationed at Charleston?
A. Yes, sir.
Q. Okay. And then you were discharged honorably in 2006?
A. Yes, sir.
Q. So Norfolk Southern -- so you started in 2006 and then I think, if I saw right, you started the conductor -- and don't let me -- you answer the question, you correct me if I'm wrong. You started the conductor training program right after that?
A. Conductor training program began in September of 2006.
Q. And where did that happen?
A. McDonough, Georgia.
Q. And then you're also certified as an engineer; is that right?
A. Yes, sir.
Q. And when did you do that?

Page 19

A. That was in 2016. I believe I started training in March of 2016.
Q. Since that time has most of your work for NS been as a conductor or engineer, or was it a mix?
A. I -- I made the choice to spend most of my time as a conductor. I did what was called flow back.
Q. Tell me what flow back is.
A. Flow back is where you submit an application to request to stay as a conductor rather than an engineer.
Q. Okay.
A. So I had better seniority as a conductor to stay on higher paying jobs.
Q. When was -- if you recall, when was the last time you worked as an engineer?
A. I do not recall.
Q. Okay. Let's talk a little bit about what was going on the day of the incident. When were you on duty that day? I think you said in Interrogatories at ten o'clock?
A. It was -- it was approximately ten to 11 p.m. the day before the accident.
Q. Okay. And I think you said Greenville

Page 20

Yard?
A. It was in Greenville is where we got on, yes.
Q. Now, how did -- you live in Charleston. How did you get there? Did you just go up there, deadhead? How did that work?
A. I -- we proceeded up there on a previous trip, so we took a train out of Charleston and took it to Greenville and then we stayed overnight in Greenville.
Q. What time did y'all get out of Greenville Yard?
A. Honestly, sir, I cannot give an exact time. I documented everything on what was called trip reports.
Q. Sure.
A. It was every departure, every delay. A change in consist and everything. And the date of the accident, I'm assuming it's still in the locomotive.
Q. I was just -- I wasn't trying to get a specific so much as a general time as to how long you spent.
A. I cannot give you an exact time, sir.
Q. Okay. Fair enough. You said in the

Page 21

Interrogatories that you were held up for about three hours on the W Line?
A. That's correct.
Q. Where were y'all -- you were in Columbia?
A. No, sir.
Q. Where were you?
A. We were outside Columbia.
Q. Okay.
A. And we were hoping for train traffic to clear.
Q. Okay. Was it up over there at the Amtrak station or further back towards Spartanburg?
A. It was somewhere on the W Line. I don't know exactly where. They only give you to a certain mile post to stop.
Q. Understood. Okay. And I gathered from some of the notes I saw you were frustrated by that delay?
A. It was frustrating. Any time you receive a delay your job, as a conductor, is to get the commodity to Point A and B the most efficient way, you and your engineer.
Q. And what happened when y'all arrived over here -- and I guess it's Andrews Yard, what did

you do once you finally got there?
A. I received a setoff and pickup. So we got to set cars out of the train, we've got to pick cars up to take to Charleston, and I performed that task.
Q. Okay. And then the trip report that you told us would say sort of how long you spent doing that and what time you left the yard?
A. That's correct.
Q. I think there were three engines in the consist. Were all three in that consist from Greenville or did you pick any up in Columbia?
A. They came out of Greenville.
Q. After you finished the work in the yard did you have to wait further before you got clearance that day? Do you recall?
A. I do not recall.
Q. Were there any hazardous materials in that -- on that train?
A. Honestly, I -- I don't recall the exact consist.
Q. That should be in the NS records?
A. That's correct.
Q. How many times -- that was NS 238; is that right?



A. That is correct.
Q. How many times had you worked that? I'm not looking for -- just sort of over time.
A. In my career, it's been numerous times. Numerous times.
Q. More than 100?
A. I'm not -- I honestly don't have an exact number, sir.
Q. Okay. No, I'm just trying to get an idea. Maybe I can ask how long had you been working on that route?
A. That particular ID route -- I do believe I put the bid in on that job, that would have been in October -- approximately October of the previous year.
Q. Okay. Do you recall when you were first qualified on that route -- I guess the Spartanburg to Columbia and then the Columbia to Charleston route? Do you recall when you first qualified on that?
A. I do not recall the exact time.
Q. Had it been several years?
A. On -- on that particular line segment on the W Line it had not been several years. It was -- it would have been after I went to that job in



approximately October the year before.
Q. How many times had you previously worked with Mr. Small?
A. We -- we worked together a good bit of time on that -- that pool.
Q. Did y'all have a friendly relationship?
A. Yes, sir.
Q. And you still talk with him, don't you?
A. I have not spoke with him since -- it was shortly after my surgery of January of 2023.
Q. Did y'all talk before that?
A. We -- we talked to see, you know, how -- how things were going between us. And it's very difficult to go through such a traumatic event and try to talk to someone that's never been through it.
Q. Before your surgery I guess how often were you speaking?
A. I honestly don't recall the exact amount of times.
Q. Maybe once a month, just an estimate?
A. I've -- maybe once a month. I'm not 100 percent sure.
Q. At the location of the incident had you ever experienced any problems or concerns before?
A. At that particular location? As in the



switch -- is that what you're asking?
Q. Yeah, where that switch is, sort of that location. I think, you know, there was a leads up, there's a siding and then there's the switch and stuff. Had you ever had any problems or concerns at that location before?
A. No, sir.
Q. Okay. And so, then, you never made any complaints or heard of any complaints about that location?
A. No, sir.
Q. Did NS -- do you know did NS crews work that siding in addition to the switch or crews for AIPC? Do you know if NS picked up those cars from the siding?
A. Yes, sir.
Q. Did you ever work that siding?
A. Yes, sir.
Q. Did you do that as part of 238?
A. No, sir.
Q. Was it a part of a local?
A. Yes, sir.
Q. How many times had you worked that siding?
A. I honestly don't have a guess on that,

Page 26

sir.
Q. Okay. More than ten?
A. Yes.
Q. Okay. I'm just curious. What local was that? Was it coming out of Columbia?
A. It is a Charleston district local out of Columbia, P66.
Q. Okay. Were you assigned at that local for -- as part of your career, I guess, with NS?
A. As the extra board employee, I did work as an extra board.
Q. Explain to me what the extra board is.
A. The extra board is a board that they put a set amount of personnel on, that is on-call 24/7. And if another extra train comes up or a conductor gets sick or calls out for some reason, then they pick the first person that's at the top of that extra board and they call them to go to work.
Q. And what if they don't answer? They just go down the list?
A. You get in trouble.
Q. See, I don't know these things. That's why I asked, so I'm curious.
A. You get in trouble and they go to the next person on the list.

Page 27

Q. So two things happen. You get in trouble and they go to the next person on the list?
A. Yes, sir.
Q. How long did you do the extra board?
A. I -- I do not have an exact amount of time on that, but I was on the conductor extra board as well as the engineering extra board at one point in time.
Q. Okay. Do you recall what working that siding entailed? Did you just pick up and drop off cars and go back to Charleston? Again, don't let me put words in your mouth.
A. That -- that particular assignment you set cars off on the furthest track from the main track. It's a sub track. You set loads in there and then the customer would put empties next to the main track and you would pick those up while you're going back to Columbia.
Q. And I guess the time that it would take you to work that siding would depend upon how many cars there were to drop off and pick up?
A. That is correct.
Q. What is -- at the spot of the incident with the switch what -- in your view what is the visibility like for the crew as they're approaching

Page 28

that location?
A. Could you clarify that a little bit?
Q. Fair enough. When you're approaching that location is anything obscuring your vision as you're approaching it on the track?
A. For a certain direction?
Q. Well, y'all were going, I guess, south?
A. East.
Q. Excuse me, east. So y'all were going east?
A. Yes, sir.
Q. Were you able to see down the track? Was there anything impairing -- big trees or anything like that?
A. There were no trees down the track that was hanging over it or anything.
Q. And you can see on the video some -- y'all start to see the switcher and react. Was the switcher sticking far out into the main or was it jutting over? Your words, not mine.
A. It -- it was not sitting on top of the switcher, but it was fouling the main track.
Q. But was it completely into the main track or was just the nose? Best of your recollection.

Page 29

A. Honestly, I don't know how to -- could you restate that? I mean...
Q. Sure. How do I want to say this? No, what I'm trying to get -- where I'm trying to go with it is at what point, I guess, did y'all realize the locomotive -- the switcher was going to present a problem for you as you're moving east? You started to see it as you're passing the cars on the siding?
A. I -- I don't remember exactly when I saw it.
Q. Okay.
A. I -- I will say that by that horrible video I obviously jumped out of my seat when I saw something was wrong.
Q. Yes.
A. Because the impact would have been on my side.
Q. Okay. Okay. Was there -- as you're approaching the location of the switch is it flat, is there a grade? Do you recall?
A. I do not recall the track dynamics, the grades. I do not recall.
Q. Okay.
A. Exactly what they were.

Page 30

Q. Once the incident has happened I think you say in your Interrogatories, Number 3, that some -- there are some people that come to the site of the incident. Do you remember any conversations that you may have had with any of these people? We can go one by one.

You say David -- excuse me, Mr. Small. You said Reggie Jenkins, Assistant Trainmaster. Do you recall any conversations there you might have had with him?

A. I vaguely -- I do not remember any conversations exactly in -- let's see here. Could -- could you rephrase that exactly? Was it inside the wreckage or --

Q. No. At any point -- you know, at any point, either inside the wreckage or outside the wreckage, but at that site did you have any -- do you recall any conversations with Mr. Jenkins?

A. The -- outside he -- he asked -- he asked about my wife's phone number and he called my wife, that's how I know he was there. He notified her.

Q. Okay. Okay. And you say that Dustin Connell, Track gang leader, was at the site?

A. He -- he did go out to the site. He was

Page 31

a track gang leader who's in charge of doing repairs.

Q. Okay. Let me ask you this. C -- were any of those people -- do you recall any of those people listed in response to 3C on your Interrogatories as being there with you when you were there, or did they come after you had left the scene?

A. It -- Mr. Connell, Mr. Jett would have been after. And then the fire department, obviously those individuals were there while I was at the scene.

Q. Do you recall any conversations with those individuals?

A. I don't recall any exact conversations. I do remember saying my body hurt all over, my body was hurting all over. I was dazed. I do -- I do remember that part.

Q. Okay. Were you able to get out of the locomotive on your own?

A. Yes, sir.

Q. I think you said in your Interrogatory Answer that Marcus Landy did an investigation for, I think, the FRA?

A. He did call me over the phone and asked

Page 32

me questions.

Q. What kind of questions -- well, what did y'all discuss?

A. The same thing we're discussing today.

Q. And what did you say to him?

A. The same thing. We departed Greenville, we stopped on the W Line for a delay. I did a setoff and a pickup. I got back on the locomotive and we departed Andrews east headed to Charleston.

Q. Did he make any comments to you about the accident?

A. I do not recall him making any comments, no, sir.

Q. He just asked questions?

A. Yes, sir.

Q. Did you know Rico Blanchett?

A. No, sir.

Q. Never met him that you know of?

A. No, sir. I've never met him.

MR. GREEN: Let's take a short break if we can.

(A recess transpired.)

BY MR. GREEN:

Q. We'll talk -- turn now to your medical history. Major surgeries before the accident, I

Page 33

think you said you had surgery -- right and left carpal tunnel release surgery?

A. Yes, sir.

Q. Do you know what was causing that, how that happened?

A. It was actually a combined surgery. It was a cubital tunnel/carpal tunnel release and I was losing feeling in my hands as my arms were bent at 90 degrees. And after complaining to my wife she finally told me I needed to go see a doctor.

And I went to a doctor and they did nerve conduction tests and other physical tests and made the determination that the best way to help my situation was perform an ulnar nerve submuscular transposition and a carpal tunnel and a Guyon's tunnel release.

Q. And you had one September of that year and then another in December, if I remember right?

A. I don't remember the exact dates. You would have to refer to my medical records.

Q. Understood.

A. It was -- it was approximately six months I was out of work during that because they did one month and let it heal and then did the next one.



Veritext Legal Solutions
800.743.DEPO (3376) calendar-carolinas@veritext.com www.veritext.com

Page 34

Q. Did that surgery -- did those surgeries clear most of it up?
A. It cleared everything up. I was able to hold my hands at 90 degrees and read a book while laying in bed, you know, perform my duties as a conductor, holding on the side rail cars and able to turn wrenches on my classic truck I was trying to work on.
Q. Okay. And you're not claiming that the accident aggravated either of those issues, are you?
A. No, sir.
Q. And I believe you said there was the removal of a cyst in 2021?
A. I have not had it removed. I did go to the doctor and he said that if I wanted to opt for surgery I could but it was not a necessity.
Q. Okay. And you have not done that?
A. I have not.
Q. Okay. Any other major surgeries? Prior to your neck surgery, which we'll get to.
A. In my medical record you should see where I had a deviated septum, sinus surgery, and my tonsils removed.
Q. What was -- strike that.
Okay. I think I read from your records

Page 35

that you were treated for depression by a military doctor during your time in the service; is that right?
A. Yes, sir. That was while I was in service.
Q. And then on separation you received a service-connected disability at 50 percent?
A. Yes, sir.
Q. Explain to me what 50 percent disability was in that context.
A. Could you clarify that, sir?
Q. Well, I'm trying to understand. What does 50 percent disabled mean?
A. I honestly, sir, cannot answer that question because I do not understand the process.
Q. Uh-huh.
A. It is done through the Department of Veterans Affairs and they put certain percentages on your records. I honestly do not understand how it works.
Q. Okay. And did -- did you receive -- did you receive money from the Government as a result of the disability?
A. Yes, sir.
Q. Do you still receive that?

Page 36

A. Yes, sir.
Q. How much money do you receive?
A. Approximately $1100.
Q. Per month?
A. Per month.
Q. Do you know if that was calculated as a percentage of your service pay?
A. No, sir. I do not understand anything about how they do that.
Q. And were you -- were you experiencing, I guess, at any level depressive symptoms at any time before the accident?
A. No, sir.
Q. I think you told one of your providers, Psych Specialist -- Psychologist Specialist in early 2023 that your depressant symptoms began when you were going through a divorce?
A. That's correct.
Q. And I think you said your divorce was 2003?
A. No, sir. I did not. It was approximately 2005.
Q. Sorry, I misread that. I'm not trying to -- I'm trying to make sure I understand the timeline.

Page 37

A. Okay.
Q. 2005. Okay. And do you contend that the accident aggravated your depression?
A. Yes, sir. It has.
Q. How -- how has it changed since the accident?
A. Since the accident I prefer to stay at home. I do not want to go out and socialize as I did before. I am more of a recluse. It's affected my anger abilities, mood swings were going up and down extremely.
Q. Has it improved since the accident?
A. It has improved some with prescription medication. It was a process of trying to get the right mixture to go, but it has improved some. I still have days where I get down in a real low slump and I just lay in bed for hours in the morning trying to find motivation to get up and do stuff.
Q. I think you -- are you still seeing Dr. Ballenger?
A. Yes, sir.
Q. Had you seen Dr. Ballenger before the accident?
A. No, sir.
Q. How were you -- how did you come to go

Page 38

to Dr. Ballenger?
A. I was recommended by a friend of mine. He had spoke to Dr. Ballenger and he said he was really good at talking with people. I didn't know any psychologist personally, so I took the recommendation and spoke to him.
Q. Who was the friend?
A. His name is Ry Bates.
Q. Did Dr. Ballenger refer you to Psychia -- Psychiatry Specialists?
A. No, sir.
Q. Why did you go see Psychiatry Specialists while you were seeing Dr. Ballenger?
A. I was referred to take a neuropsychological test from my neurologist.
Q. Okay. What did you see the neuropsychologist for?
A. I was going through a neuropsychological test for evaluation because I was still having issues with memory and trying to find the right words to say -- cognitive trouble.
Q. I think you mentioned, I believe, in the Interrogatories -- I think you referenced, I may pronounce this wrong, idiopathic hypersomnia?
A. It's close, I guess.

Page 39

Q. What is that?
A. The layman terms for it, it is third shift syndrome. It's basically you -- your internal clock is opposite of most people where you want to stay up all night, sleep all day. And most people would get it from working odd shifts.
Q. And what symptoms did you have -- were you experiencing from it?
A. I was tired all the time and I would want to sleep during the day, take naps every afternoon. So I spoke to my doctor and some friends and I was going to go get a sleep study for sleep apnea. They thought possibly that sleep apnea was causing me to be tired.
So I did the sleep study, and I passed the sleep study with just snoring issues. And that's when the neurologist diagnosed me with idiopathic hypersomnia.
Q. Yes, sir. And that was before the accident?
A. Yes, sir.
Q. And so, otherwise, you didn't really have any treatment for that?
A. No, sir.
Q. Okay. Did the accident cause any

Page 40

problems with -- in other words, are you experiencing symptoms from that now?
A. With the...
Q. I guess what would be attributed to the hyper -- the idiopathic hypersomnia?
A. No, sir.
Q. Did that cause you any problems with work given your schedule? In other words, I think it sounds like you were running trains in the evenings at night?
A. That's when most trains operate, sir.
Q. Right. Did they cause you any problems with that?
A. No, sir.
Q. And I think you said you suffered from hypertension?
A. Yes, sir. I do.
Q. And that preceded the incident; right?
A. Yes, sir.
Q. Did the accident aggravate that condition as well?
A. I'm currently at a stable point. My doctor is happy with where my blood pressure is.
Q. You stated you had allergies before the accident and I believe you said you're taking

Page 41

Allegra to treat those?
A. I do use Allegra as well as I've received vaccinations for allergies.
Q. And you mentioned you suffered from G-E-R-D, GERD/IBS. Did the accident impact that? Did it make it worse, has it been worse since the accident?
A. No, sir.
Q. You mentioned because of the accident you suffered cervical injuries?
A. Yes, sir.
Q. You believe those are permanent?
A. Yes, sir.
Q. What symptoms do you experience from the cervical problems?
A. To this day, sir?
Q. To this day.
A. I now have pain that radiates down my shoulders and arms to my hands. I feel like I'm being poked with pins and needles in my hands and the -- the pain is a burning sensation. I have pain that goes down to my legs, both sides, and it feels like pins and needles are being stabbed into my feet.
Q. Doctors tend to ask on a scale of one to

Page 42

ten, so I'll ask you that question. If you can answer sort of on a scale of one to ten, what is the pin sensation like?
A. The pin sensation? I would say it's -- it's approximately a five to six. It feels like a giant needle is pushing in your fingers.
Q. What about the pain?
A. The pain is -- is a five to six.
Q. Pain is five to six?
A. Yes.
Q. You had -- if I remember right you had surgery on your neck?
A. Yes, sir.
Q. Did that provide any relief from the problems you were suffering?
A. It did provide some relief. When I woke up I did -- I did get feeling in my fingers where before it wasn't there, but I did get feeling so now I can feel the pins and needles that stab me.
Q. And you said the pins and needles sensation is a five to six right now. Has that remained pretty constant over the last several months?
A. It has been that way for -- since probably around February of 2023. It's -- it's been

Page 43

coming.
Q. You also state that you had permanent injuries to your lumbar spine. That's different than the cervical injuries; right?
A. Yes, sir.
Q. What -- what are those injuries, to the best of your understanding?
A. The -- the lumbar has two little tears. I don't know the exact medical term for it, annular fissure or something similar, and they're bulging in two -- two points. I do believe it was L-3 and 4 and L-4 and 5. I would have to refer to my medical records.
Q. No, that's okay. I was trying to get sort of what your understanding of it was. Is that your lower back?
A. It is in the lower back.
Q. Okay. And did you have lower back problems before the accident?
A. I did -- I did have a visit to an emergency room and I may have not put it on my interrogatories. It was -- it was approximately in 2018, because that's when I purchased the house -- the new house but we didn't move into it yet. But I went to the emergency for some muscle pain and it

Page 44

was a spasm or a sprain.
Q. In your lower back?
A. Yes.
Q. And then so that was in roughly 2018. Did you have any lower back symptoms after that?
A. No, sir.
Q. Okay. So you didn't go back to a doctor or anything for it?
A. No, sir.
Q. You may have covered this, but I think I saw a reference you experience sciatica now. Were you referencing that as part of the pins and needles you're feeling, or is the sciatica different?
A. The sciatica is different.
Q. Okay.
A. Currently today it's fired up on the right buttocks cheek and that's why I'm shifting quite a bit, and I do apologize, but it's -- it's a burning sensation and it's like someone took a rope and put it on your skin and lit it on fire.
Q. Did that start after the accident?
A. Yes, sir.
Q. You never had any experience with that before?
A. No, sir.

Page 45

Q. And let me say again if you need to take a break, if you need to stand up feel -- I understand, feel free to. Just let me know.
But other than that time when you went to the ER you didn't really suffer any back pain before the accident?
A. No, sir.
Q. And the same with your neck area, no real problems there either?
A. No, sir. No problems.
Q. You referenced in the Interrogatory Responses permanent brain trauma and cognitive decline. What symptoms are you reflecting from those?
A. I have headaches, I get floaters that come across my eyes. I have a hard time finding the right words to say things. I have an issue with being able to sit down and read something and comprehend it. It usually takes numerous times of trying to read it to understand.
My thought process isn't -- is not as fast as it was previously. Not so quick on my feet anymore, which is extremely unusual for me and the people that knew me. They knew how witty and quick I was on doing things.

Q. Have those symptoms improved any since the accident?
A. Mildly. From Day 1 to today they're minor -- minor changes. I still have a hard time doing everything that I mentioned.
Q. I think I saw in your records that you -- I think you had been to an eye doctor before the accident, you had some vision issues?
A. I did go to an eye doctor when I was up in Rock Hill.
Q. Okay.
A. And I would -- I did receive a prescription and it didn't -- I didn't feel any benefits from it. So I -- I went to another walk-in place and they checked my vision and they said you don't need glasses, what's the issue?
Q. What symptoms were you experiencing that made you think you ought to go see an eye doctor?
A. It was -- in the long distance it was -- things weren't really blurry but I just thought it could have been a little more clear. I've always had really decent eyesight.
Q. And did the accident impact anything with your vision?
A. I currently wear bifocals. And I've



been seeing the doctor for the floaters that have been coming by, doing peripheral vision tests. Then she prescribed me glasses.
Q. And you didn't wear glasses before?
A. No, sir.
Q. I can't remember exactly -- I know you mentioned -- I think there was some mention in the records about dizziness and vertigo. Did you have any experience with that -- strike that.
Did you have any symptoms of dizziness and vertigo before the accident?
A. No, sir. I did not.
Q. But you have had since the accident?
A. Yes, sir.
Q. Do you still have problems with dizziness and vertigo?
A. Yes, sir.
Q. Just generally describe for me sort of what those symptoms are.
A. It's -- you feel a little bit off your feet, your equilibrium is off. The heights, I will say I'm not a fan of your floor here. It's not the best place to have a meeting in my book, but it's -- it's a visual effect on you so it's -- it's challenging.



Q. Yes, sir.
A. But that's about the gist of it.
Q. Okay. Has that improved, stayed the same since the accident?
A. It stayed about the same.
Q. All right. And another word I'm probably not going to get right, apparently while we're talking about it, either tinnitus or tinnitus?
A. It was ringing in my ears.
Q. Was that pre-accident?
A. I -- I did have a little bit prior. It was minor. After the accident it was a lot louder rings. I did see an ENT and an audiologist, and I was prescribed hearing aids which I'm wearing today. They -- they help with the ringing in the ears. They're state-of-the-art technology. It does help, but there is still some ringing. If I'm in a quieter room and there's no carpet and it's just tile floor and walls, it is very unbearable to have. It drives you a little crazy hearing that noise in your head -- in your ears like that.
Q. Okay. So it's -- it is more pronounced when you are in an empty room with no carpet?
A. Correct.
Q. Okay. Let me be clear. You had some



issues with tinnitus before the accident; is that right?
A. It was mild ringing. I always thought it was, like, hearing the TV on or something like that.
Q. Okay. And the level -- can you compare the level of sound then on that one to ten scale versus now?
A. It would be a ten compared to what it was.
Q. Ten compared to what it was?
A. Yes.
Q. What would you rate it before?
A. Before it was mild, one or two.
Q. Okay. And you say it's a ten now. Do the hearing aids drop that level?
A. They do. It's approximately a two, maybe a three.
Q. If you have those in?
A. That is correct. They have a noise cancelling feature in them that helps minimize somehow. I'm not a scientist.
Q. No, that's -- is there anything I have not talked about here that you are claiming physical or emotional or psychological injuries that you're

Page 50

claiming arose from the accident?
A. I do believe everything that I have was submitted to you, sir.
Q. Okay.
A. Yes.
Q. And you can't think of, right now, any that I didn't ask you about?
A. Not off the top of my head. It may come to me when I can get my thoughts together more.
Q. If you think of it as we go on that's fine, let me know. I'm just -- I'm just trying to make sure I'm being thorough on asking you about --
A. Okay.
Q. -- things you claim.
MR. SPIER: Do you want any help in that regard?
MR. GREEN: If you want to make a suggestion, because I'm trying to be clear.
MR. SPIER: He did record PTSD, but you haven't asked him about that.
MR. GREEN: True enough. And I was going to get to that, but let's get to that.
Q. Talk to me about the PTSD.
A. It -- it's challenging to live with daily. I didn't want to be near any train activity.

Page 51

When it first really noticed it was trying to go across a set of train tracks. My heart rate elevated, it was pumping really quick. My body felt like it was just getting hotter and hotter, my palms get sweaty. It's -- it was turning into a panic attack.
The next time was in the store, standing in the checkout line and people start trapping you inside. And there's no way to escape in a vehicle in heavy traffic. There was no escape route, so I prefer not to drive in heavy traffic. That's why I have my wife with me most of the time.
Loud noises. If we go to Walmart was one place that it happened, somebody dropped something in lawn and garden and it was a big, loud metal crushing sound. It started making my heart rate go up and all the symptoms come in.
Train horns. People think it's cool nowadays to put train horns on their vehicles. It's not. It puts me in a tailspin and I can't twist and jerk my head around a lot much anymore. It is -- it's extremely high -- I have extremely high vigilance. Always looking for something that's going to get me here or that I want to be more alert than normal. It's living with it every day.

Page 52

Q. Before the accident had you ever been diagnosed or consulted with medical people about PTSD?
A. No, sir.
Q. Not during your military service?
A. No, sir.
Q. So all those arose as a result of the accident?
A. Yes, sir.
Q. Have any of those conditions improved since the accident?
A. I've been doing extensive -- what's it called -- exposure therapy with Dr. Ballenger and I have seen improvements. Am I cured? No, but I have improvements. My stepson, he purchased a house across the railroad tracks so it has been a good exposure to have to go across train tracks to access his house if I want to see my grandbaby. But it -- it's mild improvements. I don't know how long it will take, but I feel that I have made some improvement, yes.
Q. Do you drink alcohol?
A. I do not anymore, no, sir. It's a very rare occasion.
Q. And do you smoke?

Page 53

A. No, sir.
Q. Do you use marijuana or other narcotics?
A. No, sir.
Q. And following up on that, so do you -- on a typical day I think you mentioned sometimes you may go across the tracks and drive to see your grandchild. Do you drive any other places?
A. I try to keep it within a short distance of my home. It's less traffic in that area, so I'm more comfortable on the venturing in the short distance like that where there's less traffic. Most of the stuff can be done within five miles of my home.
Q. Okay. And you mentioned in that discussion about going to Walmart. Are you going to Walmart any now?
A. We -- my wife and I, we shop weekly so we do it as a Saturday morning event. And it gets me out of the house and exposes me to people to try and adjust my fearness of being in crowds.
Q. Any other places y'all go shopping?
A. We may go into Lowe's to pick something up but, I mean, it's usually Walmart, sometimes Publix because Publix is approximately two and a half miles from the house. So whatever we don't

pick up at Walmart if we have to get real quick or she wants pepperoni for that week, we go to the deli at Publix.

Q. And you touched on this today and in your interrogatories. What about your train exposure? Are you getting more exposure to tracks?

A. It -- it started as -- there's a park in Moncks Corner and it started as sitting at a picnic table and listening to Amtrak come through. I will say it's short, sweet, not a long train. But -- it helped a little. I have worked my way to be able to be up near a track in a vehicle at a crossing while CSX goes down with a freight train or something of that nature. I can expose myself to that.

It does elevate my heart rate and I do get clammy hands, but I'm not trying to run from it. I'm trying to do the best I can at moving further up. I don't want to be stuck in a rut and end up becoming a statistic from PTSD.

Q. And most days during the week do you just stay home, do you go out some? What do you do on most days?

A. Most days I prefer to stay home. If my wife gives me errands to do, such as -- example would be -- it was in the last couple of days, I



went over to my mother-in-law's house and got some paperwork and scanned it and e-mailed it for her. And she lives about ten minutes.

Q. I should have asked you this, but what does your wife do?

A. My wife is an office manager of a dental practice.

Q. There's discussion in the records about your reactions, I guess, to your wife's driving. Has that improved?

A. She -- she gets -- she's getting better with it. It's like she forgets I'm there sometimes. She's been driving a long time and she's a safe driver, but she could slow it down a little bit for me. I mean, it's -- it's hard to truthfully explain. I mean, until you've been in a major accident where metal is crushing around you and now you're going to be in a vehicle with -- my truck is made out of aluminum and it's going to crush around me if something happens. It's -- it's difficult to navigate travel and not have them thoughts in your head.

Q. If I understood your interrogatories correctly, you've had that one motor vehicle accident we touched on before. Is that -- were



there other motor vehicle accidents?

A. Me, personally?

Q. Yes. You, personally.

A. That is the only vehicle accident I have been in.

Q. Okay. I gather from some of the notes that I saw you have been -- you were on -- can't talk today.

You were the crew on some trains that had crossing incidents; is that right?

A. Crossing accidents, yes. That's part of the job.

Q. How many of those were there?

A. I had a fatality in St. George. I had a semi-truck in Orangeburg. A drunk driver in Orangeburg. And then an accident in Union. That's all I can really pick out off the top of my head.

Q. Which ones of those -- you said there was a fatality in St. George. Were any others fatalities?

A. Not to my knowledge, no.

Q. I'm not going to put these in the deposition.

MR. GREEN: I need the notes.

Q. These are medical notes -- I'm not going



to mark them for the deposition, I'm going to refer to them by Bates number. And what I'm going to ask you about, Mr. Rightmier, is at the bottom of that page, that last paragraph.

A. (Reading.) Okay.

Q. And I think there's a little bit more at the top of the next page so, for the record, I'm referring to 508-000572 and 508-000573. Are those references to crossing incidents that you've had?

A. That is the fatality in St. George.

Q. Okay. Explain to me -- I see the firefighters. Was that St. George?

A. Yes, sir.

Q. Okay. Were there two fatalities?

A. It was one. He was a volunteer firefighter.

Q. And what about the semi-truck driver in Orangeburg?

A. He was taken by the ambulance.

Q. And was the drunk driver a fatality as well?

A. No, sir.

Q. What about the Union incident?

A. They evaded, so they drove off and disappeared. They didn't want to get a ticket, I

Page 58

guess.
Q. So the train struck them but they drove off?
A. Yes, sir.
Q. Okay. Do you recall about when each one of these happened -- the St. George?
A. I -- I do not recall. I -- I recall -- my engineer and I recall that we were just two engines, no cars behind us. But as far as the time, I do not know that.
Q. Were you going west or east?
A. We were going to Columbia, so we were going west.
Q. And semi-truck in Orangeburg, do you remember?
A. Engineer was Chris Clements. We were traveling east with the intermodal train.
Q. You don't remember when that --
A. No, sir. It had rained that morning.
Q. And same for the drunk driver in Orangeburg, you don't remember when?
A. I -- I do not remember exactly when. It would have been in late 2021 to 2022, prior to the accident.
Q. And if I understood you right, the one

Page 59

in Union was a few months before the accident we're here for today.
A. Yes.
Q. What happened in that one?
A. We struck the rear of a vehicle. The vehicle was spun and the individual evaded. And I was walking back to check the scene of the accident with a trainee.
Q. Mm-hmm. You say in the interrogatories you applied for short-term benefits from RRB; is that right?
A. That's correct.
Q. Are you receiving those anymore?
A. Yes, sir. I am.
Q. How much? What amount is that?
A. It's -- it's approximately $820 every 14 days.
Q. Okay. And I think there was also a reference to a long-term disability?
A. Yes, sir.
Q. Have you received that?
A. Yes, sir. I am.
Q. How much is that?
A. It is $4,000 every month.
Q. Do either of those expire?

Page 60

A. The RRB short-term disability, the first round expired and I'm on a second round that will expire I'm assuming within three months or so. I'm not definitely sure.
Q. Okay.
A. The long-term disability is for five years.
Q. Can the short-term be renewed for another round?
A. No, sir. It cannot.
Q. Two rounds?
A. It's determined by the income that you received the previous year. So in 2022 I received over the allocated money that they determined. I do not know that amount. And the agent I spoke with said that I could start another session of short-term July 1st of 2023.
Q. And then the long-term is for five years?
A. That is correct.
Q. Can that renew?
A. No, sir.
Q. We talked earlier about your military disability. Are you receiving any other sick or disability benefits?

Page 61

A. No, sir.
Q. Okay. We've covered all those?
A. Yes.
Q. When you left the railroad -- or at the accident, rather, how many years of service did you have?
A. I would like to go back to the other question if you don't mind.
Q. Feel free.
A. I don't know if you wrote down the short-term that was from the union. I did receive that.
Q. Okay. How much was that?
A. Honestly, I do not remember.
Q. You're not receiving that anymore?
A. No, sir. I do not receive it currently.
Q. But other than that, to the best of your recollection right now, no short-term or long-term disability benefits?
A. That's correct. It's just the RRB short-term, the short-term that the union had which expired, and then the long-term I'm on now.
Q. Okay. Plus the military?
A. Yes, sir. That is a VA.
Q. Right. Understood. Okay. At the time

Page 62

of the accident how many years of service did you have?
A. Well, I started in September of 2007 so I honestly -- approximately 15 years.
Q. About 15, 16 years? What is retirement -- I'm not familiar. At what age can you retire -- or, excuse me, what years of service can you retire from the railroad?
A. You -- you have to have -- so at the current retirement program they have -- at the age when I started, your retirement age is 67 which is the same around Social Security. You can retire at the age of 60 if you have 30 years of service, which you have to have a set amount of months to receive that possibility of retiring early.
I, myself, was going to stay until 67. I loved my job, I loved being a conductor, I loved the exercise and walking the trains and thinking of building trains in a certain order. It was -- it was enjoyable to me, like a puzzle.
I was a union representative. I loved helping people. I -- I've done many investigations, from Birmingham, Alabama to Rock Hill, South Carolina to Columbia. I've done many investigations in different places representing union brothers and

Page 63

sisters that get in trouble and I enjoyed it. I enjoyed the excitement of being able to know you've helped someone.
I didn't receive a lot of pay for it. I didn't want it for the pay, I wanted it because it was helping someone. And it's all been taken from me. I loved my job and I'm afraid to even go work at a job with the railroad like that. And I'll never be the same person being able to ask questions similar to a deposition like this. You're asking the company officers questions, you're asking your union member questions and trying to help them, you know, the best you can and get them out of a sticky situation, you know. I loved it.
I mean, I enjoyed working with the company officers and making sure that we were a safe place to work. It was -- it was a benefit that I absolutely enjoyed.
Q. When you say investigation were these, like, people who had been charged with railroad infractions?
A. Yes, sir.
Q. And you'd go wherever -- travel to Birmingham or wherever to work with them?
A. If that 's where the infraction was. He

Page 64

had an infraction in Birmingham and requested me.
Q. Uh-huh.
A. They had numerous infractions up in Rock Hill and requested me to go up there. I've even been contacted by other railroads, South Carolina Public Railroad. I've had those guys request for me to come to -- the one thing I was good at was helping people through that situation. I understood what you needed to get the right information out because the company is -- they make mistakes and the whole point of the investigation is to find out the truth, what happened.
And I enjoyed it. I enjoyed the investigation of knowing the information and doing the research of Federal regulations and things like that, trying to understand it better. It was an honor.
Q. How long did you do that, serve in the union capacity?
A. I served as the local chairman for ten years -- nine to ten years. I served as a local legislative rep for approximately two years, I think it was.
Q. What did that involve?
A. The legislative rep of the local was

Page 65

they helped, you know, try to push State laws and stuff, and the one that most people know about is a two-man crew. That it's safer to have two men on a train than one. But they helped push through legislation to pass laws like that in your state levels and they do have people that work up in Washington, D.C. in the national level.
Q. Okay. So you did the union work for about ten years?
A. It was approximately -- it may have been nine. I'm not 100 percent sure, but I could get the records.
MR. GREEN: That's okay. I was just trying to get a general idea. Okay. I may be close to done with my questions. Mr. Wray may have some for you, but let me -- let's take a break. Let me go back and look and see what else I might have, if anything.
(A recess transpired.)
BY MR. GREEN:
Q. Just a few more questions from me. Have you applied for permanent disability with the RRB?
A. Yes, sir.
Q. Where are you in that process?
A. Limbo.

Page 66

Q. Could you --
A. I --
Q. -- expand on that a little bit for me?
A. Sir, that's honestly the best answer I know. The current -- I applied. I received a phone call on June 1st doing an over-the-phone process through RRB with an agent. They were finishing completing the packet and he said it would be submitted that day.
The standard -- the standard time frame is anywhere from nine to 12 months is the rough estimate they gave me for an application process to go through.
Q. And nine to 12 months from when he called you or from when you first applied?
A. It would -- it would have been from when he submitted the application which should have been on June 1st.
Q. When did you submit the application, roughly?
A. I -- I mailed it to him. I do believe it was in May, I'm not exactly accurate on that. But he reviewed it and then we went through and did a phone interview and he asked questions and filled out some more information.

Page 67

Q. Okay. So based on his timeline you would not expect a decision until early 2025?
A. If -- if his -- by what he stated it could be anywhere from, you know, March of this year to 2025 like you said. It's a government organization.
MR. GREEN: Okay. I don't have any more questions right now. Please answer any Mr. Wray may have or, obviously, your attorney. Thank you.
EXAMINATION
BY MR. WRAY:
Q. Mr. Wray, good afternoon. My name is Ron Wray. I represent Norfolk Southern Railway Company in this lawsuit you filed. I first just wanted to ask you, how was it that you came to be interested in a career with the railroad?
A. I -- growing up in Montana we had Burlington Northern out there at that time. And the City of Laurel is one of the largest rail yards between, like, Chicago and Washington State. And I -- I really never thought about it a whole lot at that time. I knew people that worked out there and I knew they got paid well.
When the prospect of it came back to me was a friend of mine was employed at Norfolk

Page 68

Southern at the time as a conductor trainee and he talked to me about it. And at that time I went and applied and was invited to a hiring session where we sat in and took some tests and listened to what the job entailed. And then after doing that, they selected people to work on the railroad.
It's -- it's a rewarding job. It was outdoors, I enjoyed being outdoors and I enjoyed making money.
Q. Who was the friend that suggested that you might apply to Norfolk Southern?
A. His name was Jeffrey Thompson.
Q. Is Mr. Thompson still with the railroad?
A. No, sir. He's deceased.
Q. Other than Mr. Thompson did you have any other friends who worked with the railroad prior to the time you applied?
A. Nobody that I knew personally, no.
Q. Anybody in your family ever work for Norfolk Southern or any other railroad?
A. A long, long time ago my grandfather worked on a track department for a summer he told me.
Q. Was that for the BNSF?
A. It was in Oregon. He was from Oregon,

Page 69

so whatever they had out there.
Q. When you were hired on at Norfolk Southern did they send you to school at McDonough, Georgia?
A. Yes, sir.
Q. How long was that training program?
A. I -- I'm not exactly 100 percent sure. The training program has changed since I've been in it. I do not recall exactly, but it was one or two weeks of McDonough and then we came to our on-the-job training and then we went back to McDonough and then you went back to your on-the-job training. But I don't know the exact times of that.
Q. Did your training at McDonough include a focus on the railroad operating rules?
A. Yes, sir.
Q. And did it also include training on what they refer to as the general conduct or safety rules?
A. Yes, sir.
Q. You also mentioned that you had a period of on-the-job training; is that correct?
A. Yes, sir.
Q. Did you do that in the Charleston area?
A. I was in Charleston, Columbia and Rock

Page 70

Hill.
Q. As part of your training, either at McDonough or out in the field on the job, were you trained that as a locomotive conductor that you were to maintain a vigilant lookout as you're operating down the tracks?
A. Yes, sir.
Q. Is that something that you did during your career with the railroad?
A. Yes, sir.
Q. Prior to the accident that we're here about today, this lawsuit concerns, had you ever had any on-the-job injuries with the railroad?
A. No, sir.
Q. How old were you when the accident occurred?
A. I do believe I was 45 at the time of the accident.
Q. I think you told Mr. Green earlier your plan was to work till age 67?
A. Yes, sir. Possibly longer.
Q. You testified earlier that you had worked inside this American pasta industry where this incident occurred prior to the date of this incident; is that correct?

Page 71

A. Yes, sir. I have.
Q. I think you said multiple times?
A. Yes, sir.
Q. In the times you worked there, on each of those occasions were you working as a conductor?
A. I -- I was a conductor all but one time that I recall. I was an engineer one time on a relief job.
Q. As part of your work in that industry did you ever have to deal with the derail located at that industry lead?
A. Yes, sir.
Q. What type of involvement did you have with derail?
A. Every conductor and engineer has a switch key assigned to them and there's a lock on that derail that you had to unlock and move to the position of movement and then resecure with the lock so you can switch your cars around.
Q. So when you would go to work at that industry you would come off of the main line and then onto the industry lead?
A. Yes, sir.
Q. And to service the industry did you have to unlock and disengage the derail to allow you in?

Page 72

A. Yes, sir.
Q. And as you came back out, once you cleared the derail, did you have to lock it back in place?
A. Yes, sir.
Q. And had you done that on each of the occasions that you worked the job as a conductor?
A. Every time I touched it I restored it to the regular position.
Q. Do you know what type of derail was at the location there at American Pasta?
A. It's a double point switch derail, otherwise known as a runoff derail.
Q. At any time, prior to this incident when you were working at that location, did you ever report to anybody at Norfolk Southern that you thought that a derail was not appropriate for that particular location?
A. Sir, that -- I'm not an expert in that derail. I just know from my experience of installing -- turning it on and off to allow traffic through. That's the extent of my knowledge of it. It's supposed to deviate traffic away from the main line. I have experienced and seen derailments that involved a similar type of derail and cars ended up

Page 73

deviating away from the industry that it was protecting from going down to a chemical area.
Q. And my question, Mr. Rightmier, I wasn't asking you to be an expert or provide any expertise. My question, more directly that I'd like for you to answer, is had you ever complained about the sufficiency of that derail to anyone prior to the date of this accident?
A. If -- if I was to make a complaint, sir, it would be for a hard to throw derail and whether it's safe to manually throw it back and forth without someone injuring their back. That's the only complaint that you would make as conductor. That's the only thing we do with it, is we throw it on and off. And that -- if you were to make a complaint, if I was to make one, it would be because it was hard to throw.
Q. All right. You're saying if you were to make complaint. My question is, did you ever make such a complaint of any type?
A. I do not recall making any complaint.
Q. Did you ever have any concern, based upon your use or work with that derail, that it would not be sufficient to prevent cars from getting onto the main line track?

Page 74

A. I -- I don't -- could you clarify that a little? Say that again.
Q. I can try. My question was, you were there and you unlocked and operated the derail. Did you ever have any concerns yourself, looking at it, that it would not be sufficient to prevent cars from getting onto the main line track?
A. With the amount of times that I've been in that industry, as a visual inspection I figured we were safe on the main line. That it would deviate traffic away from the main line.
Q. During the course of your career with Norfolk Southern did you ever make any safety complaints about any other work conditions that you encountered?
A. As a local chairman, I did notify individuals of safety concerns from the union membership. Yes.
Q. What type of complaints did you make to Norfolk Southern in your role as local chair?
A. An example would be trimming trees away from signals. Lubricating switches that are hard to throw. Finding a broke rail and reporting it.
Q. Any others that you recall?
A. Not off the top of my head.

Page 75

Q. Did you understand, as a Norfolk Southern employee, that if you saw a condition that you felt was unsafe it was your obligation to report it?
A. Yes, I do know that.
Q. And did you take that obligation seriously?
A. Yes, I did.
Q. You mentioned to me at least three different examples, and there may be others, but the three you can think of today were things that you either were alerted to yourself or you observed yourself that you thought needed to be reported to Norfolk Southern; correct?
A. Yes.
Q. And you did that because you wanted to make sure that both you and your fellow workers were not exposed to something that you thought might be an unsafe condition; is that fair to say?
A. That's correct.
Q. Now, on the date of this incident, the accident that we're here on today, you were working as the conductor and Mr. Small, who's here with us today, was the engineer; correct?
A. That's correct.

Page 76

Q. As you were coming down the main line into the location where the accident ultimately occurred, it looked to me from the video like you were doing some paperwork inside the cab; is that accurate?
A. That's correct.
Q. What were you doing there?
A. I was documenting the trip report. I was ensuring that all proper paperwork was in order.
Q. It appeared that at some point prior to your engine striking the entry that was fouling the main line, you saw it and observed that there was possibly going to be an impact; is that fair to say?
A. I jumped out of my seat, so yes.
Q. Approximately how long do you think it was from the time that you first saw it and realized we might strike this engine before the actual impact occurred?
A. I -- I really don't have a definite answer on that time.
Q. Okay. On the video, as you told me a minute ago, we see you get up out of your seat and kind of brace yourself; is that fair to say?
A. Yes.
Q. Do you think that's about the time that

Page 77

you realized there might be an impact or did you realize it earlier than that?
A. That would have been the time when I realized, I jumped out of the seat, the impact would have been on my side. As a union representative I've had the unfortunate experience of seeing locomotives damaged and seen them tear off a whole entire side of a locomotive. So the safest thing to do was to get from that side.
Q. Now, as you were operating at this location, immediately prior to the incident occurring, was your train operating under optimized train control?
A. That is for the engineer. As a conductor, I do not use the optimized train control. I, honestly, don't even really know what you're talking about.
MR. SPIER: Then why are you answering the damn thing?
THE WITNESS: It's the engineer's responsibility. I -- there -- all right. It's the engineer's responsibility.
MR. SPIER: Good answer.
BY MR. WRAY:
Q. That's fair. If you don't know, you can

Page 78

always tell me that. So as I understand your answer, that would be a question better to ask Mr. Small?
A. He's the engineer.
Q. So that would be yes?
A. Yes.
Q. All right. The engineer, as I understand it, is the man kind of at the controls of the locomotive; correct?
A. He -- he's the one that goes forward and backwards when I tell him to.
Q. He handles the throttle, he handles the operating functions of moving that engine up and down?
A. That's correct.
Q. Having said that do you, as the conductor, also have the ability to do things like put a train in emergency if necessary?
A. Yes.
Q. As you and Mr. Small approached the location where the accident occurred, do you recall saying anything to him between the time you realized we may have an accident here to when the accident actually occurred?
A. I'm sure there's some foul language that

Page 79

came out of my mouth, yes.
Q. Do you remember saying anything to him about applying the emergency brake?
A. I do not recall.
Q. Did you attempt to apply the emergency brake at any time prior to impact?
A. I did not. I braced for impact.
Q. So I asked you do you remember saying anything to Mr. Small, I'm going to ask it the other way. Do you remember Mr. Small saying anything to you --
A. I --
Q. -- up until the point of impact?
A. I do not recall any conversation between us.
Q. After the impact looks like your engine went off to the side and I guess along the ballast line next to the track?
A. That is correct.
Q. You told Mr. Green earlier that you were able to get out of the engine on your own; is that fair to say?
A. Yes.
Q. Do you have an idea of how much time you actually spent in the engine from the time it

Page 80

toppled over to when you were able to get yourself out?
A. I, honestly, don't have a recollection of time. I was extremely dazed, so I really didn't have any way to track time.
Q. Between the time when the engine went over on its side and you got out, do you recall any conversation between you and Mr. Small?
A. I -- I vaguely remember -- I've had some memories come back that I had dug myself out and I yelled for him and asked if he was okay. And not realizing where I was at in the locomotive at the time, but he was actually right beside me.
And then I remembered trying to use a radio and I kept yelling emergency, emergency, emergency over the radio and no transmission was being received by anyone. I said, we need help. And David was able to get to his cell phone and called the yardmaster, the tower, and yelled that we needed help, we had been in a train wreck.
And then there was -- it looked like smoke in the cab and I said, we've got to get out of here. And, I mean, at that point you're in a metal casket, now you're going to get burned on top of it if there's a fire. You've got electronics behind

Page 81

you, there's water inside the cab, you've been buried. You've got junk up your nose and in your mouth, your eyes are stinging from sand and dirt.
And so I don't know exactly the order that we got out. We both went out through a window that was on the top, which was a conductor window. We both crawled out on that and on top of the locomotive.
Q. As we were looking at the video in the direction of travel your train was going down the track, it looked like you were on the left side and Mr. Small was on the right; is that correct?
A. Traveling east I was on the left, yes.
Q. And you told me a second ago that after the event you realized you and Mr. Small were in fairly close proximity to each other inside the cab; correct?
A. Correct.
Q. Did you know -- did you go over to his side or did he come over to your side?
A. I was thrown around like a rag doll inside there and ended up on his side behind him.
Q. And the engine, when it was on its side, did it go right towards Mr. Small's side of the cab?
A. Yes.

Page 82

Q. You told me that it looked like there might be some smoke in the cab. Did you actually see a fire?
A. I did not see any flames. I don't know if David saw any flames.
Q. Did you and Mr. Small manage to get out of the cab before any emergency medical staff had arrived at the scene?
A. We both were out and up on a hill. And I know I collapsed. I'm not sure if David collapsed at the same time, but I ended up collapsing once we got up away from the wreckage.
Q. You mentioned some sand and dirt in your mouth and in your eyes.
A. Yes, sir.
Q. Did you have any cuts or visible signs of bleeding anywhere on your body?
A. I had cuts on my hand and my elbow -- on my right elbow.
Q. Did you suffer any broken bones as a result of the accident?
A. No broken bones.
Q. Did you observe any visible signs of injury on Mr. Small?
A. I -- I don't recall observing anything.

Page 83

My eyes were stinging and burning and gritty. I was more -- it's sad to say this. I was more focused on getting myself, you know, once I got up on the hill getting myself a little further away.
Q. Who was the first person you remember being on the scene other than you and Mr. Small?
A. I vaguely remember Assistant Trainmaster Jenkins. I vaguely remember him. And the definite answer I got off of that was he called my wife, because he had asked for her phone number. And he was able to contact her and tell her that I was in a train wreck.
Q. How long were you there at the scene following the accident until someone transported you to the hospital?
A. I was dazed at that time. I don't know -- have a real recollection of time.
Q. Do you remember who took you to the hospital? Was it by ambulance or did somebody by Norfolk Southern take you?
A. It was by ambulance.
Q. Were you actually admitted?
A. No, sir.
Q. Where were you taken?
A. It was -- the records are through Prisma

Page 84

Health. I don't know the exact name of the hospital. Honestly, it would be in the medical records.
Q. But it was here in Columbia?
A. It was in Columbia and I'm not from here.
Q. So we know Mr. Jenkins came to the scene and you said you recalled speaking with him briefly and him calling your wife. Do you recall any conversations with any other Norfolk Southern employees who came to the scene of the accident that day?
A. I do not.
Q. Following the accident, after you got out of the hospital and all this had -- or that day passed, did you ever speak with anybody at Norfolk Southern about the accident?
A. I -- I don't recall any conversations with anybody about the accident.
Q. Has anyone at Norfolk Southern ever told you that they felt like the accident was the responsibility of the railroad?
A. I have not spoke to anybody so, therefore, nobody has said anything that I recall.
Q. Other than Mr. Small who, obviously, was

Page 85

a witness to what happened, have you ever spoken to anybody else who claimed they actually witnessed the accident as it occurred?
A. No, sir.
Q. In your lawsuit, Mr. Rightmier, you allege that Norfolk Southern failed to provide you with a reasonably safe place in which to work. Do you believe that to be true?
A. On the date of that incident, yes, sir, I do.
Q. In what respects or what did the railroad do or fail to do that you believe failed to provide you with a reasonably safe place to work on that particular date and time?
A. I personally feel that they failed to have the derail installed properly to where the traffic would deviate from the main line. It should have went left and got further away from the main line.
Q. Other than that, some issue with the derail and where it directed equipment, any other aspects that you believe Norfolk Southern failed to provide you with a reasonably safe place to work?
A. That's the only particular incident when I did have a safety concern they weren't prompt to

Page 86

make the repairs.
Q. You're talking about historically?
A. Yes.
Q. Through the railroad? So if I understood you, correct me if I'm wrong, what you're saying is in the past when you had a complaint or issue the railroad would promptly address that?
A. Yes.
Q. You told us earlier about your career with the Air Force. I appreciate your service to the country. Did you ever seek active combat duty?
A. Yes, sir.
Q. Where did you see active combat?
A. I was in Afghanistan and all the other stans -- Turkmenistan, Kyrgyzstan, Uzbekistan. If it's a stan, I've been there.
Q. How many tours did you do that actually involved combat?
A. I was a flight mechanic, so my job was to fly in and out of combat zones. Take in paratroopers, infantry. We performed secret operations and delivered cargo.
Q. You also testified earlier that during your time with the Air Force you were treated for depression?

Page 87

A. Yes.
Q. Were you prescribed Zoloft during that period of time?
A. They did prescribe Zoloft at that time and I did take it for a short time.
Q. Do you remember when was the last time you were on prescription medication for depression prior to our accident?
A. It would have been right before I got out of the service.
Q. So is that roughly 15 years?
A. Approximately, yes.
Q. So from the time you left the military until this incident occurred, your testimony is you weren't on any type of prescription medication for depression?
A. No, because I have a great woman in my life now.
Q. Were you seeking any type of treatment or counseling for depression at any time between your discharge from the military and when our accident occurred?
A. No, sir.
Q. Mr. Green, he went through some of these medical issues before. I just want to pin down some

Page 88

of the dates maybe. Perhaps you said these but I may have missed it. You had carpal tunnel surgery in 2019?
A. Yes.
Q. That was on both the left and right?
A. Yes.
Q. Both hands?
A. Yes, both hands.
Q. And you said you had sinus surgery. Was that 2009?
A. Approximately it was in 2009. I did submit records for Dr. Scarlett, Matthew Scarlett, that gave the right date.
Q. Other than those two surgeries no other surgeries prior to 2020 -- 2022 accident?
A. The only thing that would be classified as a surgery they consider is a colonoscopy, and that's it.
Q. You said at the outset of the deposition you currently take Ritalin?
A. Yes, sir.
Q. What is that for?
A. It -- it was prescribed to me by Dr. Ballenger. It helps -- it helps me try to focus and accomplish tasks at hand. It's controlling the

Page 89

urge to try to wander, you can say.
Q. And you're taking antacid, is that for the GERD?
A. Yes, sir.
Q. Allegra is for allergies?
A. Yes, sir.
Q. Zoloft is a depressant medication; correct?
A. Yes, sir.
Q. You've been on that since this accident up through the current date?
A. I don't know the exact date. Dr. Ballenger prescribed it, but he was the one that prescribed it.
Q. I wasn't real clear, I think -- but was it Welchol?
A. Yes.
Q. What is that for?
A. Welchol is actually a medication for cholesterol and blood sugar; however, they use it for treatment of IBS. So there's a side effect that IBS people benefit from.
Q. And Pepcid AC, is that antacid as well?
A. That's the evening antacid.
Q. You did have the cervical surgery?

Page 90

A. Yes, sir.
Q. Is that the only surgery you've had related to this event?
A. Yes, sir.
Q. As we sit here today, do you have any other surgeries currently planned?
A. No, sir.
Q. Have any of your doctors recommended to you that you consider further surgery?
A. At this current moment of time, in October Dr. Poletti did not recommend any further surgeries. He did recommend further imaging which will be conducted in approximately two weeks.
Q. Who did your neck surgery?
A. His name was Dr. Anderson. He's a neurosurgeon.
Q. Was that done in Charleston?
A. It was done in East Cooper in Mt. Pleasant.
Q. Have all of your medical bills to date been paid through your medical insurance?
A. They have.
Q. Do you have any out-of-pocket expenses that you're claiming as part of your damages in this case?

Page 91

A. I have not submitted any at this time.
Q. Whether you submitted or not, do you have any?
A. I will have some, yes.
Q. What will that be for? You have some co-pays or deductibles?
A. The co-pays, possibly deductibles. And I've been paying out-of-pocket for Dr. Ballenger.
Q. Do you know roughly how -- how much you paid out-of-pocket?
A. The last number I knew for Dr. Ballenger it was approximately $1200. The hearing aids I paid out-of-pocket, insurance covered 2,000 of that, and then I had to cover 5,000.
Q. Any other out-of-pocket medical expenses that you have?
A. Not off the top of my head at this time, but there may be more to come.
Q. You see Dr. Ballenger still?
A. Yes, sir.
Q. And what's your frequency of appointments with him?
A. I had an appointment with him this past week and we scheduled for the next one to be in approximately six weeks, I believe.

Page 92

Q. Other than Dr. Ballenger are you seeing anybody else for psychological depression, those type issues?
A. No, sir.
Q. Have you had any counseling with anyone? Maybe we throw Ballenger in that mix, so let's leave him out. But have you sought counseling post this accident?
A. Not -- not one-on-one counseling, no, sir.
Q. Who are you currently treating with other than Ballenger?
A. I currently see Dr. Stickler who's a neurologist, Dr. Poletti who is a spine specialist, Dr. Whittington, who is my ophthalmologist. And, of course, Dr. Ballenger. Those are the ones that relate to the accident. And then the primary care doctor just for three-month checkups.
Q. Who was your primary care doctor as of the time this accident occurred?
A. It's Palmetto Primary Care.
Q. Is that who you still see?
A. Yes.
Q. The records with Dr. Ballenger refer to periodic nightmares that you were having over a

Page 93

time. Is that accurate?
A. Yes, sir.
Q. It looked to me like his records referenced sometimes those related to this accident and sometimes they related to other events in your life. Is that fair to say?
A. Yes, sir.
Q. How would you describe the frequency between the two? How often were the nightmares about this event and then about other events?
A. After the accident just about all my nightmares related to the accident. Being buried alive, riding on the side of a rail car and being crushed, different near death experiences.
As time has gone on I've had other dreams about near death experiences that have come up. Some of them I've even launched myself out of my own bed. To my understanding, it's standard to slowly get them down. I have maybe one a month at this time. It just depends if there's a trigger that day. I don't like watching movies with railroads and stuff.
Q. To the extent that you had nightmares that didn't involve this accident what did they relate to? Was it military service? Was it

Page 94

something else?
A. Previously I didn't have nightmares. I enjoyed working so much that you get tired from working.
Q. I wasn't asking about prior. You told me that post-accident you, on occasion, had nightmares that didn't involve this accident. On those occasions what were the nightmares about?
A. They were about being involved in a car accident and being entrapped in a car. That's usually the one that comes up. That's -- I have a fear of being involved in a vehicle accident. That's about it.
Q. Have you done any type of work for compensation since this incident occurred?
A. No, sir.
Q. Have you applied for any jobs outside of the railroad?
A. I have not. I -- I did put -- I was starting a resume on Indeed and I was working on that. And then in October I was notified by Dr. Poletti, my surgeon, that with the spinal cord damages that he has rated me disabled from any and all employment. So my next step is to get guidance on -- from him this next visit to see where we go.

Page 95

Q. So based on that last answer am I correct that you believe currently you're physically unable to do the job of a railroad conductor?
A. That is correct.
Q. You did mention that in the military I think your job involved mechanical work?
A. Yes, sir.
Q. I assume you were trained to do that work by the Air Force?
A. Yes, sir.
Q. Were you a good mechanic?
A. I was.
Q. Is there anything about your current medical conditions that would prevent you from doing any type work in that field if you chose to do it?
A. I -- I'm not able to stand for long periods of time. I lose feeling in my hands so I drop things. And you don't want to drop things inside of airplanes because eventually it brings them out of the sky. So it's a necessity to be able to have dexterity and feeling in your hands.
Q. What other technical skills or training do you have beyond the mechanical training you had with the Air Force and the training you got with the railroad?

Page 96

A. That is the only technically trained skills I ever received.
Q. Have you had any contact from Norfolk Southern's vocational rehabilitation department since this incident occurred?
A. I have.
Q. Was that from Mr. Jones?
A. I honestly -- I honestly don't recall who was on the letter but I have read the letter, yes.
Q. And the letter that you received, was it offering services that the railroad was willing to provide you to retrain you or get you back to the work force if that was something you wanted to pursue?
A. Yes.
Q. Did you follow up with that at all?
A. I did receive another letter because the contact was made with him, then he said it was still available to me if I need him in the future and that he would be there if I need him to help go through some vocational needs.
Q. You said you were informed that. Who informed you of that?
A. The letter.

Page 97

Q. It was in writing, you didn't talk to anybody?
A. No, it was in the letter.
Q. Have you had any verbal communications with Mr. Jones, or anyone else at Norfolk Southern, about the vocational rehabilitation program?
A. No, sir.
Q. Is that something you're interested in pursuing if they can get you back to work at the railroad or somewhere else?
A. I will leave all doors open as possibilities. I'm currently still under medical treatment. I prefer to get medically up to where I need to be before I dedicate myself to doing other things like that at this time, but I'm always available for options.
Q. If at some point your medical provider cleared you from a medical standpoint is it your intent to go back to work in some field, whether it was with the railroad or in the private sector?
A. Yes.
Q. You were honorably discharged from the military?
A. Yes, sir.
Q. No type of criminal record?

A. No, sir.
Q. You told us you were a union local chair, I believe?
A. Local chairman.
Q. Was that for SMART?
A. Yes, sir.
Q. You also served as the legislative rep for SMART?
A. As the local legislator rep.
Q. Who's your best friend?
MR. SPIER: His lawyer. Excuse me.
THE WITNESS: My wife.
BY MR. WRAY:
Q. Your wife. How about outside your immediate family? Any friend you do activities with outside?
A. No, sir. I do not.
Q. Did you have a best friend at the time of this accident that you just no longer keep in touch with or --
A. Not one that I've been on a regular basis, no.
Q. You referenced one of your hobbies as being boating. You just do that on your own now?
A. My wife and I.



Q. Primarily Lake Moultrie?
A. Yes.
Q. And I saw you like to do kayaking. Where do you do that?
A. Lake Moultrie. I'd like to do it around my house, but...
Q. I thought I saw -- I may be confusing you with Mr. Small here so you can correct me if I'm wrong. Did you go on a vacation sometime following this accident?
A. I did travel, yes.
Q. Where did you go?
A. Montana.
Q. Was that to visit family?
A. It was.
Q. How long were you out there?
A. I don't recall the exact amount of time I was out there. I do believe it took place over a two-week period.
Q. Other than that trip to Montana to see family have you done any other vacations since this event occurred?
A. No, sir.
Q. Did you drive here for the deposition?
A. I did drive with my wife.



Q. So she accompanied you in the car but you actually operated the vehicle?
A. I was operating it for my exposure therapy.
Q. Speaking of which, I did see in Dr. Ballenger's records that is the exposure -- that's something he recommended you do; correct?
A. Yes, sir.
Q. I think I saw a reference that said you had talked to somebody at Norfolk Southern about doing it and they said no way. Is that --
A. I mentioned it to a State railroad about being able to go close to where they are and they said no.
Q. Okay. That's what I wanted to clarify. You didn't talk to somebody at Norfolk Southern and say, hey, I'd like to do this and somebody at Norfolk Southern said stay away?
A. No.
Q. There was a reference to the Palmetto Railroad. Is that who --
A. That's probably --
Q. -- you were talking about?
A. -- yes.
Q. It's a State group?



A. It's a State run railroad.
Q. The crossing accident that involved the fatality with the firefighter, was he actually on duty or in a private vehicle?
A. He was in his private vehicle.
Q. Was he determined to be under the influence of alcohol at the time?
A. No, sir.
Q. So the drunk driver, that was a separate incident?
A. That was.
Q. Did you ever talk with anybody at the track department about this derail or the type of derail that was used at American Pasta?
A. No, sir.
Q. In your response to some questions that we served on you and your lawyers asking about witnesses, you listed Travis Bailey as a potential witness. Who is Mr. Bailey and what does he know about this case?
A. Mr. Bailey was the on-duty trainmaster at Seven Mile Yard. And he knew that we were departing and we were going to end up lawed out. We wanted to make it all the way to Charleston, so he had a crew on the way to relieve us wherever we

Page 102

stopped.

Q. But in terms of the accident itself responding to --

A. He did not witness it, no.

Q. Mr. Kennedy, you say, is the NS yardmaster. Is he the one that actually approved you to move along the main line track?

A. He approves -- he gave us permission to approach Atlas Road. And at Atlas Road we have to speak to a dispatcher to get permission to proceed on the main line.

Q. You also listed Tim Tucker, the terminal superintendent. What knowledge does he have about this incident?

A. He was the terminal superintendent that was there and -- for the day of the accident.

Q. Did you talk to him at all about the accident?

A. I have not.

Q. And to the extent, if any, you had any discussions with him at Norfolk Southern about the accident itself have you told me about those today?

A. I would -- could you repeat that again?

Q. Yes. To the extent you had any discussions with anyone at Norfolk Southern about

Page 103

what happened, how it happened, you mentioned to me you talked to the assistant trainmaster who called your wife. Is that the only discussion you ever had with anybody?

A. That I recall, yes.

Q. And no one at Norfolk Southern has ever said anything to you about how this happened or why it happened?

A. No, sir.

MR. WRAY: Let me speak with Mr. Freeman and see what I missed and get ready to conclude.

(A recess transpired.)

MR. WRAY: Mr. Rightmier, I do not have any further questions. I give permission to pass the baton to this side of the table or, if not, back to Mr. Green.

MR. SPIER: No questions from the Plaintiff.

MR. GREEN: No questions for me.

(The witness, after having been advised of his right to read and sign this transcript, does not waive that right.)

(The deposition was concluded at 1:02 p.m.)

MR. SPIER: We'll reserve signature.

Page 104

Thank you very much. We'll take a copy, e-mail it to us.

THE COURT REPORTER: With the exhibit attached?

MR. SPIER: Yeah, okay. You should send it to me and my paralegal, Vicky, V-I-C-K-Y, @rbrlaw.com.

THE COURT REPORTER: Got you. Mr. Steel, do you want a copy of his deposition?

MR. STEEL: I do.

THE COURT REPORTER: Do you want e-tran, hard copy?

MR. STEEL: E-tran is fine.

THE COURT REPORTER: With the exhibit?

MR. STEEL: Please.

THE COURT REPORTER: Mr. Wray, do you want a copy?

MR. WRAY: Yes.

THE COURT REPORTER: E-tran and exhibit?

MR. WRAY: Yes.

THE COURT REPORTER: And Mr. Green, you'll get the original.

MR. GREEN: Yes.

THE COURT REPORTER: Do you want hard copy, e-tran, exhibit?

Page 105

MR. GREEN: The original and e-tran is fine.

THE COURT REPORTER: And exhibit?

MR. GREEN: Yes.

THE COURT REPORTER: Do you need this expedited?

MR. GREEN: I do not.

Howard A. Spier, Esq.
spier@rbrlaw.com

January 29, 2024

RE: Rightmier, Raymond S. & Angie v. Blanchett, Rico, Et Al.
1/11/2024, Raymond S. Rightmier (#6376528)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-carolinas@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions



Rightmier, Raymond S. & Angie v. Blanchett, Rico, Et Al.
Raymond S. Rightmier (#6376528)

E R R A T A S H E E T

Page_____ Line_____ Change______________________
_______________________________________________
REASON_________________________________________
Page_____ Line_____ Change______________________
_______________________________________________
REASON_________________________________________
Page_____ Line_____ Change______________________
_______________________________________________
REASON_________________________________________
Page_____ Line_____ Change______________________
_______________________________________________
REASON_________________________________________
Page_____ Line_____ Change______________________
_______________________________________________
REASON_________________________________________
Page_____ Line_____ Change______________________
_______________________________________________
REASON_________________________________________

______________________________ _______________
Raymond S. Rightmier Date



Rightmier, Raymond S. & Angie v. Blanchett, Rico, Et Al.
Raymond S. Rightmier (#6376528)

ACKNOWLEDGEMENT OF DEPONENT

I, Raymond S. Rightmier, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_______________________ ________________
Raymond S. Rightmier Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF ________________, 20____.

_____________________________
NOTARY PUBLIC



CERTIFICATE OF REPORTER

I, Lori S. Mortge, Certified Court Reporter and Notary Public for the State of South Carolina at Large, do hereby certify that the foregoing transcript is a true, accurate, and complete record.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal this 29th day of January, 2024 at West Columbia, Lexington County, South Carolina.




Lori S. Mortge
Certified Court
Reporter, CCR
My Commission expires
December 13, 2026

INDEX


| | Page | Line |
|---|---|---|
| RAYMOND S. RIGHTMIER | 4 | 2 |
| EXAMINATION BY MR. GREEN | 4 | 4 |
| EXAMINATION BY MR. WRAY | 67 | 10 |
| CERTIFICATE OF REPORTER | 109 | 1 |


REQUESTED INFORMATION INDEX


| | Page | Line |
|---|---|---|
| Verification | 9 | 7 |


EXHIBITS


| DEFENDANT EXHIBITS | Page | Line |
|---|---|---|
| EXHIBIT 1, Plaintiffs' Answers to Defendant American Italian Pasta Company's First Set of Interrogatories, dated January 8, 2024 | 8 | 1 |