EXHIBIT 6



STATE OF SOUTH CAROLINA
COURT OF COMMON PLEAS
COUNTY OF RICHLAND

DAVID E. SMALL, JR.,
Plaintiff,
vs. CASE NO. 2023-CP-40-02115
NORFOLK SOUTHERN CORPORATION,
TREEHOUSE FOODS, INC., AND
AMERICAN ITALIAN PASTA COMPANY,
Defendants.

VIDEO TELECONFERENCE
DEPOSITION OF: DAVID E. SMALL, JR.
DATE: January 11, 2024
TIME: 1:31 P.M.

LOCATION: Law Offices of Burr & Forman, LLP
1221 Main Street, Suite 1800
Columbia, SC

TAKEN BY: Counsel for the Defendants Rico
Blanchett and American Italian
Pasta Company

REPORTED BY: LORI S. MORTGE,
Certified Court
Reporter, CCR

Job No. CS6376531

APPEARANCES OF COUNSEL:
ATTORNEYS FOR THE PLAINTIFF DAVID E. SMALL, JR.:

JOHN D. STEEL, PC
BY: JOHN D. STEEL
3495 Piedmont Road, NE
Building II, Suite 905
Atlanta, GA 30305
(404) 307-3785
jsteel@johnsteel-law.com

ATTORNEYS FOR THE DEFENDANT NORFOLK SOUTHERN RAILWAY COMPANY, A FOREIGN CORPORATION:

GALLIVAN, WHITE & BOYD, PA
BY: RONALD K. WRAY, II
One Liberty Square
55 Beattie Place
Suite 1200
Greenville, SC 29601
(864) 271-9580
rwray@gwblawfirm.com

ATTORNEYS FOR THE DEFENDANTS RICO BLANCHETT, AN INDIVIDUAL, AMERICAN ITALIAN PASTA COMPANY, A FOREIGN CORPORATION:

BURR & FORMAN, LLP
BY: TRACEY C. GREEN
LAURALEE ANDREWS, PARALEGAL
1221 Main Street
Suite 1800
Columbia, SC 29201
(803) 799-9800
tgreen@burr.com
and
BURR & FORMAN, LLP
BY: TURNER WILLIAMS (Appearing by VTC)
420 North 20th Street
Suite 3400
Birmingham, AL 35203
(205) 251-3000
twilliams@burr.com



APPEARANCES OF COUNSEL (CONCLUDING):
ATTORNEYS FOR RAYMOND S. RIGHTMIER, AND HIS LAWFUL WIFE, ANGIE RIGHTMIER:

ROSSMAN, BAUMBERGER, REBOSO & SPIER, PA
BY: HOWARD A. SPIER
9155 South Dadeland Boulevard
Suite 1200
Miami, FL 33156
(305) 900-5493
spier@rbrlaw.com

and

HITE & STONE
BY: HEATHER HITE STONE
100 East Pickens Street
Abbeville, SC 29620
(864) 366-5400
heather@hiteandstone.com

ALSO PRESENT:
R. Wayne Freeman, Norfolk Southern Senior Claims Agent

(INDEX AT REAR OF TRANSCRIPT)



* * * * * * * * * * *
DAVID E. SMALL, JR.
being first duly sworn, testified as follows:
EXAMINATION
BY MR. GREEN:
Q. Mr. Small, can you state your full name for the record, please?
A. David Emanuel Small, Jr.
Q. Thank you. You know, you were here earlier for the first deposition but my name is Tracey Green, I'm with Burr Forman, and I'll just be here today to ask you some questions about what happened on the events that are alleged in your complaint.
Have you ever given a deposition before?
A. I've been a witness in a deposition.
Q. Okay. So one time?
A. Yes.
Q. So you're a little familiar with it?
A. Yes.
Q. Well, just a few ground rules. If you don't understand a question ask me to clarify, I'll do the best I can. If you need a break just let me know. Like I said before, it's not an endurance contest. I'll just ask if I've got a question out



there and we finish that up before we take the break but, otherwise, let me know if you need a break.
Your attorney may lodge an objection from time to time. You should answer the question. I may ask you questions to talk about meetings or things with your attorneys. I'm not asking you about conversations with them. Don't -- you shouldn't interpret my question that way and I may reiterate it, but if you're unsure ask me just to be sure but I won't be asking about the nature of conversations that you had with your attorneys.
Are you on any medicines -- well, excuse me. Do you have any questions about the format of the deposition?
A. No.
Q. Are you on any medicines today?
A. No, not today.
Q. Okay. And when you say not today, do you take medicine sometimes?
A. Yes.
Q. What do you take?
A. I can't give you the name but I do have a list on my phone.
MR. STEEL: He took pictures of his bottles and put it on his phone.

MR. GREEN: Okay.
MR. STEEL: Is it okay if he refers to that?
MR. GREEN: That's perfectly fine.
THE WITNESS: (Reading.) Tramadol. Aripiprazole.
MR. STEEL: Spell it, man.
BY MR. GREEN:
Q. Yeah. Please.
A. A-R-I-P-I-P-R-A-Z-O-L-E.
Q. Okay.
A. Tizanidine.
Q. Spell that one, please.
A. T-I-Z-A-N-I-D-I-N-E.
Q. Okay. Is that all?
A. No. Trazodone.
Q. Spell that one, please.
A. T-R-A-Z-O-D-O-N-E.
Q. Okay.
A. Meloxicam.
Q. Spell that one, please.
A. Meloxicam. M-E-L-O-X-I-C-A-M.
Q. One more time, please. I'm sorry.
A. M-E-L-O-X-I-C-A-M.
Q. Okay.



A. And the Duloxetine.
Q. Spell that one, please.
A. D-U-L-O-X-E-T-I-N-E.
Q. Okay.
A. That's it.
Q. So six?
A. That's six.
Q. Let's talk through those. The Tramadol, what is that for?
A. Tramadol is for sleep.
Q. And when were you prescribed that?
A. I was prescribed that shortly after the accident.
Q. How often do you take it?
A. Nightly.
Q. So you just take that at night before you go to sleep?
A. Yes.
Q. I'm going to mess this up here. Aripiprazole, what do you take that for?
A. That is for muscle spasms.
Q. Okay. And when did you start taking that?
A. That's been recent. Maybe a couple of weeks ago.



Q. Okay. Who prescribed that?
A. Dr. Jason Leonard.
Q. Can you spell his last name?
A. L-E-N-O-R-A-D (sic).
Q. Okay. And so have you recently started suffering muscle spasms?
A. Well, I've been having back pain and the medications -- the Meloxicam that I was on for that, it wasn't working.
Q. Okay.
A. So he gave me that to make it a little better.
Q. Okay. And is that in addition to the Meloxicam?
A. Yes.
Q. What is -- is the Meloxicam for muscle spasms as well?
A. It's just pain.
Q. Pain?
A. Pain medication.
Q. And how long have you been on the Meloxicam?
A. It's been about five months now.
Q. Who prescribed that?
A. Dr. Leonard.



Q. What about the Tizanidine? What is that for?
A. That is for anxiety -- no, the Meloxicam is for anxiety. Sorry.
Q. That's okay. And how long have you been on that?
A. That's been ever since the accident.
Q. Was it fairly soon after the accident, a few months?
A. A few months afterwards.
Q. Who prescribed that?
A. Dr. Ornelas.
Q. Spell that, please, best you can.
A. O-R-N-E-A-L-A-I-S (sic).
Q. And that's for pain. What about the Tizanidine?
A. And that is also for pain.
Q. Okay. And how long have you been on that?
A. I've only been on that for a couple of weeks.
Q. Did Dr. Leonard prescribe that?
A. Yes. It's actually for schizophrenia, but he prescribed --
Q. Sort of an off brand -- I mean, or off

Page 10

label type thing?
A. Yes.
Q. He prescribed it for pain?
A. Yes.
Q. How often -- sorry. What about the Trazodone?
A. The Trazodone, that's definitely pain.
Q. That one is for pain, too?
A. Mm-hmm.
Q. And how long have you been on that?
A. About two weeks.
Q. Dr. Leonard again?
A. Yes.
Q. How often -- you take the Tramadol at night?
A. Mm-hmm.
Q. What about the Aripiprazole?
A. As -- as needed.
Q. As needed?
A. Yes.
Q. And what about the Tizanidine?
A. As needed.
Q. Trazodone?
A. As needed.
Q. The Meloxicam?

Page 11

A. I take that probably once a day.
Q. Once a day?
A. Yes.
Q. Is it prescribed once a day or is it prescribed as needed and you take it?
A. Yeah, it's prescribed as needed or once a day.
Q. Okay. And then -- excuse me -- the Duloxetine?
A. Once a day.
Q. Okay. Do you take any over-the-counter medicines?
A. No.
Q. Would any of those medicines impair your ability to provide truthful and complete answers today?
A. No.
Q. Are you on any medicines -- prescribed medicines regularly before the accident?
A. No.
Q. What did you do to prepare for this deposition today?
A. Just meet with my lawyer.
Q. Did you review any documents?
A. No.

Page 12

MR. GREEN: I need the interrogatories.
(EXHIBIT 1, Plaintiff's Responses to Defendant American Italian Pasta Company's First Set of Interrogatories, dated July 5, 2023, was marked for identification.)
BY MR. GREEN:
Q. You'll get the stamped copy, Mr. Small. I'll show you what's been marked as Exhibit 1, which is interrogatories that were provided to us and your interrogatory responses. Did you assist in preparing that document?
A. Yes.
Q. And you worked through the attorneys with the answers?
A. Yes.
MR. GREEN: Okay. Same as I asked before. Can we get verification? I don't think we received one.
MR. STEEL: Should have, sorry. Of course.
MR. GREEN: And I may have overlooked it, I don't remember seeing it.
MR. STEEL: I've already been corrected once by Ron today, so I'm not going out on any more limbs.

Page 13

MR. GREEN: Well, it won't hurt my feelings if you tell me no, here it is. That's fine.
(This page contains information to be supplied by counsel and/or the deponent.)
BY MR. GREEN:
Q. Okay. Where were you born, Mr. Small?
A. Myrtle Beach, South Carolina.
Q. And what was your date of birth?
A. 9/19/74.
Q. And I think, according to your Interrogatory Number 1, you live right now at 1433 Loner Road in Blythewood?
A. That is correct.
Q. Do you own a house there or rent?
A. Own a house.
Q. Okay. And who lives there with you?
A. My wife.
Q. And you lived for a little bit in Conway in 2022?
A. Mm-hmm. Yes.
Q. About how long?
A. Roughly from May of '22 to the date of the accident. July 11th.

Q. Okay. And you moved back here after the accident -- back to Blythewood?
A. I actually went to live in Atlanta for a little while.
Q. Okay. Why did you move to Conway for a short period of time?
A. We sold the house -- the 2045 Mower Street.
Q. Uh-huh.
A. We sold that house and was preparing to build a new house, the 1433. And we didn't expect it to sell that soon so, yeah, I had to live with my sister for a while.
Q. Got you. Okay. I was going to ask you if you had family in Conway and Myrtle Beach. Okay. I have your driver's license number. Your cell phone number is (803) 318-1137?
A. That's correct.
Q. And social media accounts I believe you said you had two, Facebook David Small, Instagram smald324?
A. That's correct.
Q. Did you make any posts about the accident on either of those?
A. No.



Q. Do you actively post on either one?
A. No.
Q. I think you said in your interrogatories you've never been arrested?
A. No.
Q. Have you ever filed for bankruptcy?
A. No.
Q. Have you ever brought a lawsuit before?
A. No.
MR. GREEN: Bear with me just a moment. (Reading.) I'll be right back.
(A recess transpired.)
BY MR. GREEN:
Q. You went -- you graduated high school from Myrtle Beach High School in 1993, Mr. Small?
A. That is correct.
Q. And I think you said you ran football -- or played football and ran track in high school?
A. Yes.
Q. What size high school was Myrtle Beach? 3A or 4A?
A. 3A.
Q. 3A. And then did you do any technical training after high school?
A. No, I went to the military.



Q. I think -- I thought I saw in one of the records that -- a reference to Jefferson Community College. Did you ever go --
A. That was while I was in the military.
Q. While in the military? Okay. How long did you go there?
A. I don't recall. Roughly six months.
Q. What did you go there for?
A. Numerous things to build up points for promotion in the military, basically. So I just took different classes.
Q. And then for NS you trained as a conductor and as an engineer; is that right?
A. That's right.
Q. Any -- excuse me -- technical or vocational training other than those?
A. No.
Q. I think you said in your interrogatories that you like to go hunting and fishing?
A. Yes.
Q. Where do you like to go hunting and fishing?
A. Before my father passed I used to go hunting all the time. Now since he passed, we don't. But we did have a hunting club at -- called



Moncena in the Georgetown area. And I go fishing usually around Columbia -- Lake Murray, Lake Monticello, Cedar Creek.
Q. Been fishing all your life?
A. Yes.
Q. What do you go hunting for?
A. Deer.
Q. Do you go hunting anymore?
A. No.
Q. What about fishing? Do you still go fishing some?
A. I would like to, but it's just hard getting out now.
Q. Have you been fishing any since the accident?
A. No.
Q. I thought I saw a reference somewhere to you used to do weight lifting?
A. Yes.
Q. Where did you do that? Home?
A. That was at the high school.
Q. That was in high school?
A. Yes.
Q. You don't do that anymore?
A. No.

Page 18

Q. Like gym work or anything like that?
A. No.
Q. That's what I wasn't clear on the time reference for that.
Okay. You're married; correct?
A. Yes.
Q. What's your wife's name?
A. Debbie Small.
Q. What does she do?
A. She's chief division clerk for maintenance away in Norfolk Southern.
Q. How long has she worked for NS?
A. About 16 years.
Q. Did you meet her there?
A. Yes.
Q. And you were married previously?
A. Yes.
Q. What was her name?
A. Alicia Small.
Q. Where does she live, if you know?
A. As far as I know she's still in Columbia.
Q. You don't have any ongoing contact with her?
A. No.

Page 19

Q. Do you have children?
A. Yes.
Q. How many?
A. Two.
Q. Sons or daughters?
A. One son, one daughter.
Q. How old?
A. Actually, today my son is 24 and my daughter is 28.
Q. And what are their names?
A. David and Dashea.
Q. Spell her name.
A. D-A-S-H-E-A.
Q. Are they married?
A. Dashea is.
Q. And who is she married to?
A. I've never met her husband.
Q. You've never met her husband?
A. Never met her husband.
Q. Where does she live?
A. Myrtle Beach.
Q. So you don't have much contact with her?
A. No.
Q. And what about your son David?
A. He lives in Columbia.

Page 20

Q. Is he -- he's not married?
A. No.
Q. Okay. What's his address in Columbia?
A. I don't know the exact address or the number, but he lives off of Two Notch Road.
Q. Off Two Notch Road?
A. Yes.
Q. And do you have grandchildren?
A. Yes.
Q. How many?
A. Six.
Q. Okay.
A. Two from David and four from Dashea.
Q. How old are they?
A. The two from David is one and two-year-old. And Dashea ranged -- ranges from I want to say six on down. Like I said, I don't have contact with her, so...
Q. Sorry. Are your parents living?
A. My mother.
Q. Where does she live?
A. In Myrtle Beach.
Q. What's her name?
A. Rosa Jackson.
Q. How old is she?

Page 21

A. Seventy-three.
Q. Your wife's parents, where do they live?
A. Her mother lives in Atlanta.
Q. Okay. Father?
A. He's passed. He's deceased.
Q. And do you know where your ex-wife's parents live?
A. No, I don't.
Q. Do you have -- other than what we've discussed -- any relatives living in Richland County, South Carolina? Here in Columbia?
A. No.
Q. It looked like from your records you were hired by Norfolk Southern on July 28, 2003. Does that sound about right?
A. That's correct.
Q. And you worked for them continuously since then?
A. Yes.
Q. I read that you transferred to Atlanta for a short period of time in 2011?
A. Yes, I did.
Q. Why was that?
A. Just a different scenery and something different to do, and wanted to learn more than just

Page 22

my -- my territory.
Q. Okay.
A. And Atlanta was an opportunity so I took it.
Q. Did you work out of Inman Yard down there?
A. Yes.
Q. What did you do down there?
A. I worked in the yard. I did some through train work from Inman to Chattanooga, to Debutts Yard.
Q. Were you a conductor then or had you qualified as engineer?
A. I was a conductor -- I was a qualified engineer but I was working conductor.
Q. How long were you down there for? It looks like about eight months?
A. Yeah, about eight months.
Q. Had you -- what other geographic -- excuse me -- geographic locations have you worked for NS?
A. That's about it -- well, Charleston, Rock Hill. Rock Hill, Shelby, North Carolina, Atlanta, and that was it.
Q. How long were you in Shelby for?

Page 23

A. I only went up there when they needed an extra engineer.
Q. It looked like somewhere along the way you had some issues about paying your union dues?
A. I didn't think I had to pay union dues at one point, but I was told you have to pay union dues.
Q. The union was not pleased with that?
A. I guess not.
Q. Did you ultimately end up paying union dues?
A. Yes.
Q. Did you get to keep your seniority then?
A. Yes.
Q. Did you do any work after high school before you entered the Army?
A. No.
Q. And so you entered the Army sometime later in 1993 after you graduated; is that right?
A. I graduated in June, left for the Army in July.
Q. Where did you do basic?
A. In Fort Leonard Wood, Missouri.
Q. Okay. And then I think I saw your duties were ENT and fire support?

Page 24

A. Yes.
Q. Where were you -- what places were you stationed while you were in the military?
A. Fort Jackson -- Fort Jackson, Fort Sill, Oklahoma for some training. I was actually stationed in Alaska for Wainwright and Fort Drum, New York.
Q. And then you were discharged honorably in September 2000?
A. Yes.
Q. And then what did you do between the time you were discharged and the time you began working for Norfolk Southern?
A. I did a short stint at UPS and left there and did security at Westinghouse up at Bluff Road. And from there came to the railroad.
Q. Those were your two full-time jobs between...
A. Yes.
Q. Discharge and NS?
A. Yes.
Q. Why did you decide to apply for a job at NS?
A. At the time my ex-wife, she had a friend that her husband worked for NS and she said I might

Page 25

want to apply. And that's what I did and got the job.
Q. Did you do training at McDonough?
A. Yes.
Q. When you talk about your duties in the military, ENT, what does that entail?
A. Ear, nose and throat specialist.
Q. How long did you do that for?
A. Right at six years.
Q. Was that at the last part of your service?
A. Well, the last part.
Q. So it was the last part, and what did that involve?
A. That involves field training, basically walk in with a map and giving coordinates to a firefighter. Drop the bomb or something.
Q. Okay. Were you deployed at any time overseas?
A. No.
Q. Okay. On the day of the incident -- you heard us talking earlier today. I believe I understand that y'all were on duty at ten o'clock in Greenville?
A. I don't recall the on-duty time. All I

Page 26

recall is departing Greenville around 12 a.m.
Q. Departing?
A. Yes.
Q. Okay. And you had stayed the night before in Greenville?
A. Yes.
Q. And I asked this. Do you recall when y'all -- where y'all were on the W Line when you got held up for a while?
A. Yes.
Q. Where were you at?
A. It wasn't at Amtrak. I'm trying to think of mile posts. I can't recall.
Q. And that's fair. Let me ask you this. Was it closer to Spartanburg or was it closer --
A. It was closer to Columbia.
Q. Closer to Columbia?
A. Roughly five to ten minutes out of Columbia, yeah.
Q. Okay. And do you recall if there were any hazardous cars in the consist?
A. I don't recall.
Q. How many times have you been the engineer on NS 238?
A. Numerous times. Many times. I've been

Page 27

on that SG run almost three years.
Q. Okay. That's -- and I think that's it. Would you do that run once or twice a week? Was there sort of a general frequency as to how much you would run?
A. It was like a rotation.
Q. Right.
A. Where you fall in line for one train you take that train, and the next train and it's -- basically yes, a general rotation.
Q. So would you take a train -- I think you said empty. You take empties out of Charleston to Greenville and then the next night you bring a load in from Greenville to Charleston?
A. Right.
Q. Okay. And then how many days would you typically be off before you made that circuit again?
A. I've already said, 12 hours pretty much.
Q. As long as you get the 12 hours off --
A. Yes.
Q. -- you're subject to call?
A. They give you ten hours a day.
Q. And you had done that for about -- you made that route for about three years?
A. Yes.

Page 28

Q. Before you worked as an engineer on that segment -- or that train what other areas had you worked as an engineer?
A. Rock Hill, Columbia, and within the yard in Charleston.
Q. Were you running locals out of Rock Hill and Columbia?
A. Yes.
Q. Which locals?
A. The P57 and P55 in Rock Hill, and the locals in Columbia were P66 and P28.
Q. Did any of the Columbia locals ever work the -- the siding out near where the incident happened?
A. Yes, P66.
Q. P66 did. But you had worked that side as an engineer before?
A. As an engineer, yes.
Q. Not as a conductor?
A. I have.
Q. You have both?
A. Yes.
Q. Okay. Had you ever had or expressed any concerns about the setup out there, the track or anything like that?

Page 29

A. Not at the time of working.
Q. Never made any complaints or anything like that?
A. Not at the time of working.
Q. Were you aware of any complaints that had been made?
A. No.
Q. How many times did you work with Mr. Rightmier, crewed with him?
A. We'd been paired together for almost a month before the time of the incident, and before then we hardly ever worked together because he was working in the yard.
Q. Got it. Do they tend to do it, like, sort of a conductor and an engineer, they make a team and they're regularly assigned together, or is it just happenstance?
A. No, it's -- usually a regular -- if something don't happen to the Board, you stay with that conductor.
Q. Okay.
A. For a certain period of time.
Q. Okay. Y'all have a friendly relationship?
A. Yes.

Q. Did y'all do anything outside of work before the accident?
A. No.
Q. And not since the accident?
A. No.
Q. How many times have you talked to Mr. Rightmier since the accident?
A. Maybe a handful of times. About five times, maybe.
Q. What did y'all discuss?
A. Just to check to see how each other were doing. That's about it.
Q. And had you talked to him recently?
A. No.
Q. To be able to be the engineer on that run for 238 did you have to go through a qualification process?
A. Yes.
Q. What did that involve?
A. The qualification process is running the line -- the actual lines from Charleston, the SC line and then the W Line and then what we call the big main line. And, you know, know your signals and grades and that's what consists of the training.
Q. Did you ride with a crew that's already



done it before when you did it?
A. Yes. While you're qualifying you are riding with a qualified engineer to do it.
Q. Do you recall when you first qualified on those?
A. I don't recall when I first qualified. I don't recall the year that I left Rock Hill. As soon as I left Rock Hill is when I went and qualified on the SC, because that's the job.
Q. So whatever the NS records show from your file would be when you left Rock Hill would be when you qualified on those lines?
A. Yes.
Q. Do you recall how long you had been awake when the incident happened?
A. All night.
Q. All night. When do you think you woke up -- you had to report for duty.
A. Repeat that question.
Q. Fair.
MR. STEEL: I think he meant you weren't sleeping on the train.
MR. GREEN: I wasn't getting to that.
Q. No. When the incident happened how long had you been wake? In other words, you had to get



up, report to duty, then you had to bring a train to Columbia and do all that. How long had you been awake when that happened, to the best of your recollection?
A. About ten hours, I would imagine. About ten hours.
Q. When y'all were approaching where the accident happened were you coming off a grade? Do you recall?
A. Knowing the grade of the track, yes, we were going downgrade towards the accident.
Q. I noticed as -- it looked to me like from the video, and you watched it with us, it looked like the speed was increasing. So had you come off of upgrade and headed down? Do you recall?
A. It's pretty much a flat grade, then going down.
Q. Okay. Were you controlling the speed? Was some computer system controlling the speed?
A. The computer system.
Q. What's that called?
A. Trip optimizer.
Q. Trip optimizer. What does it do?
A. It runs the train. It -- you set it up and once it's set, you let it do its thing. That's



what it was doing.
Q. Does it just know -- does it use GPS to know where it's at?
A. Yes.
Q. So it just follows?
A. Yes.
Q. So when you approached you weren't controlling the speed?
A. No.
Q. Okay. I've read PTC, I guess Policy Train Control. Is that Policy Train Control territory?
A. Yes.
Q. I guess all the parts are now?
A. Yes.
Q. What does that -- like when you're operating the train, how does PTC impact what you're doing?
A. From my understanding of PTC it's supposed -- it's supposed to prevent accidents. It's supposed to let you know when something is in the bottom of the track. From my interview with the FRA, it lets you know if something is following the track -- if something is out of the switch, which in that case it wasn't so it didn't warn us.

Page 34

Q. Is -- strike that.
What is -- at the spot where you're passing the siding and you're approaching the switch area where the spur line where the accident happened, what's your visibility like? Were you able to see clearly?
A. Yes, you could see clearly.
Q. When did you -- we watched the video. When did you sort of see when -- start to see the train -- excuse me, the switcher sticking out onto the track?
A. Roughly around 600 feet from it, maybe. When we got to the rear of the cars that were behind that -- that engine is when I noticed it sticking out.
Q. Mm-hmm.
A. And it was really close.
Q. Mm-hmm.
A. Yeah, we're going to hit it.
Q. Mm-hmm.
A. I was -- if I shot the brakes, that wouldn't have mattered.
Q. Mm-hmm.
A. We were at that point, so...
Q. Did you -- a lot going through your head, I understand. Did you think about blowing the air, blowing the brake?

Page 35

A. Yeah.
Q. You just decided --
A. I -- I think in my mind that I need to shoot the brakes and I -- I hate to say that I froze. When I was on the -- on the brakes because my life was...
Q. Yes, sir. When you first saw the switch or did you think you might be able to get past it?
A. Not -- the closer we got, no.
Q. No, I just say when you first saw it up in the distance. Did you think maybe...
A. No.
Q. Once you saw it you knew there was going to be a problem?
A. Yeah.
Q. Once the accident has happened are you able to get out of the locomotive on your own?
A. When it happened, when we hit -- I know we were going over on the side. And it's, like, we slid because I was in my chair and everything was hitting me in my face. The front windshield came out and just -- and I was just being pinned back, pinned back and buried at the same time.

Page 36

Once we finally stopped, seemed like it was -- I was pinned. I couldn't move and I couldn't breathe. I tried to take a breath, I took a lot of mud in my mouth and I started choking. I was, like, I've got to get out, got to get out. So I started wiggling, wiggling and finally felt my hand come up. And Ray, he was already out so he kind of pulled me up.

And then after that I -- everything just started coming out, I started throwing up. It was just dripping out of my nose and everything. Once I got my bearings we tried to get somebody on the radio and the radio wasn't working. So the next thing, we got to find a phone.

And my bag was visible where my phone was and we were able to call Tim at the tower to get help. And once I done that Ray -- he said he saw smoke and we need to get out of the engine. So the only way out was through the conductor's window and I'm -- I'm too short to get up there. So he put his knee up and I stood on his knee and I grabbed and wrapped my arm -- my left arm around that seal of the window and pulled myself out. And once I got out, I just walked off the engine because the engine was the same level as the ground. It was so buried.

Page 37

And once I walked off I went over to a field that was to the right and just laid there and I still had my phone on me. I called my wife and told her to come -- to come quick, that I was in an accident.

And then after that I gave Ray my phone and told him if you want to call your wife, call her. And that's it.
Q. Did your wife come out there?
A. She didn't come there, but she did come to the hospital. She was in Atlanta at the time.
Q. Okay. I was going to ask, is her normal duty place Andrews Yard or is it Atlanta?
A. Her?
Q. Yes.
A. She works from home.
Q. She works from home. Okay. Do you recall having any discussions that were with the people there?
A. I don't recall discussions.
Q. You don't recall any? Okay. And you went to the hospital in an ambulance; is that right?
A. That's correct.
Q. Okay. So you don't recall discussions, you don't recall who came to the location?

A. No.
Q. Okay. You said you talked to the FRA investigator. Was that Marcus Landy, do you recall?
A. Yes.
Q. What did you tell him in response to his -- when he's asking you about what happened?
A. Basically the same thing I'm telling you now and any questions that he asked I had to answer. That should be on record.
Q. Did he make any comments to you about the accident, what happened or anything?
A. I don't recall making any comments, no.
Q. How many times did you talk to him?
A. Just once.
Q. Do you recall about when that was, approximately?
A. Approximately mid-August.
Q. Do you know Rico Blanchett?
A. No.
Q. Had you ever met him or talked to him that you know of?
A. No.
Q. I think I'm going to switch a little bit to your medical history. Do you want to take a break or are you okay?



A. I'll take a break.
MR. GREEN: Take a few minutes break.
(A recess transpired.)
THE COURT REPORTER: Mr. Spier, do you want a copy?
MR. SPIER: Absolutely.
THE COURT REPORTER: Okay.
(Please note at this time Mr. Spier has left the deposition room.)
BY MR. GREEN:
Q. Back on the record. Mr. Small, before the accident did you have any major surgeries?
A. The only major surgery was appendectomy.
Q. Was that in 2000?
A. No. I want to say that was in '9 -- '98, '99 maybe.
Q. Okay.
A. I don't really recall.
Q. Over 20 years ago?
A. Yeah.
Q. Any other major surgeries?
A. No.
Q. I saw, I think, you went to the doctor, got medical treatment at -- I think it was Dorn in October or November of 2000. There were x-rays of



your tibia and fibula and spine lumbosacral.
A. Mm-hmm.
Q. Do you remember that?
A. Yes.
Q. What were you being treated for then?
A. That was for some lower back pain and stress fractures.
Q. What was the nature of the stress fractures?
A. Basically a lot of stress from drill marching as a fire support specialist --
Q. Right.
A. -- with a lot of weight on me.
Q. So it was military-related?
A. Yes.
Q. What -- what treatment -- what treatment did you go -- undergo for that?
A. They really didn't do any treatment for that. They did an x-ray -- x-ray and see if I had stress fractures in my tibia and that was it.
Q. And you did have stress fractures?
A. There were some small fractures they found in my ankle.
Q. Right. But not your --
A. But not my tibia.



Q. So you didn't get any prescriptions for that or anything like that?
A. No.
Q. And what about your ankle? You said there were stress fractures in there?
A. Yeah, but I still didn't get any prescriptions for it.
Q. Does the ankle bother you still?
A. Not really.
Q. So once you quit marching quite as much it quit being a problem?
A. Yes.
Q. It says November of 2020, if I read that right, you had a telehealth visit with Dorn for low back pain, right shoulder pain and sleep apnea.
A. Mm-hmm.
Q. I guess my first question is, that's about a 20-year gap in the dates I have on -- I think on the record. Did you -- did you just not go to the doctor very much during that time period?
A. I shouldn't be like that, but I rarely ever went to the doctor.
Q. Well, I think I did see in one of the notes -- yeah. It says you hadn't seen an M.D. for over eight years I think when you went for the -- so

Page 42

you just didn't go to the doctor very much?
A. No.
Q. You didn't go for regular checkups or anything like that?
A. Only for a physical for a job or the annual checkup for...
Q. Did NS require annual physicals?
A. Yes.
Q. So you went to see for low back pain. What symptoms were you suffering from that?
A. Just slight pain, like from moving in certain ways. I could feel some pain in my back.
Q. Was it -- on a one to ten scale what level would you give that pain you suffered then?
A. Maybe a four.
Q. Maybe a four. And it says you declined the need for medication?
A. Yes.
Q. Do you not like to take medication either?
A. I don't.
Q. What -- and then the right shoulder pain, what symptoms were you experiencing with that?
A. In the rotator cuff you could hear a pop, and when that pop hits it's spent. I've gotten

Page 43

a Cortisone shot in that shoulder and it's been fine since then.
Q. Okay. And then there was also apparently a diagnosis for sleep apnea?
A. Yeah. I have mild sleep apnea.
Q. When you say mild what do you mean?
A. When I did a sleep study -- it was an at-home sleep study and they diagnosed it as a mild.
Q. What treatment did they prescribe or...
A. They said I didn't need any treatment.
Q. So you didn't do any treatment for it?
A. No.
Q. Do you still have sleep apnea?
A. I don't know. I don't know.
Q. Okay. And then after that it looks like you didn't go -- after that process, the treatment and some occupational therapy, you didn't go to the doctor again until the accident. You were transported from the accident?
A. Mm-hmm.
MR. STEEL: You need to say yes or no out loud for the court reporter --
THE WITNESS: I'm sorry.
BY MR. GREEN:
Q. I should have instructed you.

Page 44

A. Yes.
Q. And then I think that -- that and the July 11th event there was -- said you had midline neck and back, pelvis and right shoulder pain?
A. Yes.
Q. Is your right shoulder still bothering you after the accident?
A. No.
Q. What about your neck and back?
A. Yes.
Q. And what symptoms are you experiencing from that?
A. From sitting long periods of time, my back rarely can straighten it up. And from laying, like, on my right side, there's a pain in my neck that it -- it sometimes comes, sometimes goes, but it's not always there. But the back pain is.
Q. The back pain is always there?
A. Yes.
Q. When you're sitting? What about when you're sleeping?
A. Yes.
Q. What level pain is it on the one to ten scale?
A. I'd give it a five.

Page 45

Q. And when you experience it what about the neck pain? What level?
A. Neck pain maybe a two.
Q. And so -- and then the medicines we talked about earlier, so if you experience any of those pains and it gets to be a point you'll take some of those medicines as needed?
A. Right.
Q. It says in the notes from Prisma Health that when you got there the C collar was in place. There was, I guess, one of those collars to make sure your neck stayed secure?
A. I guess they put it on for the ambulance.
Q. You don't recall?
A. No.
Q. What is your first clear memory after the accident?
A. Getting -- being in the emergency room.
Q. So you don't really remember the transport or any of that process?
A. No.
Q. I think in August, kind of what we're talking about August 3rd, you had an MRI of your right shoulder and lower back?

A. Yes.
Q. What did those show? Do you recall?
A. They're in the records. I don't recall.
Q. Okay. I think you visited CPS on August 22nd that you were having panic attacks, anxiety and irritability?
A. Yes.
Q. And that you had a hypersensory response?
A. Yes.
Q. Said you --
A. I --
Q. -- at that time -- I'm sorry. I didn't mean to interrupt you.
A. Fight or flight. Yeah, I didn't want to be around anybody, and any little thing just set me off and it still happens. It still happens. If I'm -- if I don't do the medication it definitely -- I could go off. I want to seek help and I've been trying. My doctor, he's actually had a referral for a mental health evaluation. I went to one and that I don't think was the place -- the right place for me. It was at Columbia Area Mental Health.
Q. Mm-hmm.
A. Going in there it was, like, a drug



rehab place. And the staff there, to me, was worse than the patients. And I was like, no, I can't do this. So I called my doctor to see if he could get me a referral somewhere else, but this was recent. And -- but shortly after the accident I was referred to Dr. Ornelas.
Q. Mm-hmm.
A. And he started me on the Duloxetine and I had a counsel -- counseling with Cheryl Garden. That's when I went to Atlanta. I wish I could still be in contact with her, but she can't practice in South Carolina. But I think that was giving me some help so I feel if I -- once I get to the right counsel it will help.
Q. When you said Columbia Area Mental Health, about when did you go to that place? About when, I'm not looking for...
A. A couple of days ago, yes.
Q. And the doctor that made that referral, was that Dr. --
A. Leonard.
Q. Leonard?
A. Yes.
Q. Where does he practice? It's probably in the records.



A. Colonial -- I have his card.
Q. Where is his office at?
A. Forest Drive.
Q. I'm sure it's in the records. I say that...
MR. STEEL: He's still part of Prisma.
MR. GREEN: Yeah. I don't -- I was not showing any records after November 2022.
MR. STEEL: He's been to see Dr. --
MR. GREEN: Maybe we just need a record --
MR. STEEL: It's all through Prisma.
MR. GREEN: No, that's fine.
MR. STEEL: That's the place that has all the records anyway.
MR. GREEN: And we may have had them and I just didn't see them.
Q. Okay. So you went there just a few days ago and now you're trying to see if you can't figure out some other place to go?
A. Yeah.
Q. You said you're seeing Dr. Leonard right now. I guess on a regular or somewhat regular basis?
A. He's my primary, yes.



Q. Who else are you seeing on a -- not a primary but --
A. Just saw Dr. Conrail (phonetic).
Q. Dr. Conrail. And you mentioned the doctor before, Dr. ...
A. Ornelas.
Q. Yes. Do you not see him anymore?
A. No. He -- he doesn't take insurance and that was getting real expensive.
Q. Is he a medical doctor?
A. He's a psychiatrist or...
Q. Okay. And the panic attacks, anxiety and irritability, are all those new since the accident?
A. Yes.
Q. Did you experience anything like that before the accident?
A. I'm sure I had, you know, not panic attacks or anxiety, but I did get angry before that but not the way I do now after the accident. It's pretty intense. It's to the point where family don't like to be around me and I kind of distance myself from people now so I don't put anybody through that. And it's hard right now. It's hard.
Q. Are you -- yeah. Sorry. Disregard

Page 50

that.

I think, based on Interrogatory 17, you are claiming that the accident injured your lower back?

A. It aggravated what was going on with my lower back.

Q. And how is it -- does your lower back feel worse than before the accident?

A. Yes.

Q. How so?

A. From the pain level, have pain level four up to five and sometimes beyond.

Q. And how has it aggravated your right shoulder problems?

A. No.

Q. It has not?

A. No.

Q. So right shoulder is about the same as it was before the accident?

A. Yes.

Q. And you say headaches. Is that new since the accident?

A. Yes.

Q. Did you experience headaches regularly before the accident?

Page 51

A. I had, you know, headaches every now and again, but now it's, like, a constant. Don't want to say every day but -- actually every other day I have headaches.

Q. And then you said scarring on the back of the head. Is that what's depicted in the photographs that y'all provided?

A. Yes.

Q. Did you take -- did you take those photographs or did your wife take those photographs?

A. My wife.

Q. And then PTSD. How -- what symptoms are you incurring from PTSD?

A. I feel like the anxiety -- anxiety, panic attacks, the dreams. Not being able to sleep. I don't think I've had a good night sleep since the accident. I could take the Tramadol to go to sleep, it will put me to sleep and I'm up maybe three to four hours later, wide awake. And it's been like that since the accident.

Q. Had you ever -- you were in the military. Had you ever been treated for PTSD before the accident?

A. No.

Q. Okay. The -- other than the lower back,

Page 52

right shoulder, headache, scarring and the PTSD, are there any injuries that you're claiming as a result of the accident that we've not talked about?

A. Not that I recall.

Q. You answered an interrogatory that you had some lower back and depressive symptoms due to military service. You underwent evaluations for that and that you were awarded a five and then later a ten percent disability. What was the disability award for?

A. Depression and -- I'm sorry, the lower back.

Q. Lower back?

A. Yes.

Q. And so they started a lower back five percent and then decided it was a little bit more than that?

A. Yes.

Q. And so you get a payment for that?

A. Yes.

Q. How much?

A. At that time it was a hundred-and-some-odd dollars.

Q. Do you still get it?

A. Yes.

Page 53

Q. How much?

A. I'm at $3900 now.

Q. So it's $3900 a month?

A. Yes. That's the payment that I get now.

Q. Okay. So $3900 a month?

A. Yes.

Q. Okay. What was --

MR. STEEL: That's from being re-evaluated since this incident, just so you understand. That's not off the original evaluation.

MR. GREEN: Okay. So now --

MR. STEEL: I just didn't want to leave you with that impression.

MR. GREEN: That's fair. Let's explore that a little bit.

Q. So when were you re-evaluated for this?

A. I went back for re-evaluation November of '23.

Q. So not long ago --

A. Sorry, October and I got awarded in November '23.

Q. And so at that point in time they increased the award?

A. Yes.

Q. And what percentage is it now?

A. At 100.
Q. 100 percent?
A. Yes.
Q. Prior to that you were receiving about 900?
A. It was right at 1300 a month.
Q. While we're talking about the monthly income or whatever in addition to that, so are you getting short-term disability from RRB now?
A. No, I'm not now.
Q. Not now. You did for a while?
A. Just for a short while.
Q. About how long?
A. A month -- no, about two months. Two months.
Q. What amount was that, roughly?
A. $820, I think.
Q. Per?
A. Per month.
Q. Per month?
MR. STEEL: That's a half. 820 is a half.
BY MR. GREEN:
Q. So 1600 and change every month?
A. Yes.



Q. What about long-term RRB?
A. I never got anything.
Q. Never got anything from them?
A. No.
Q. So the military gave you 100 percent disability after this, but RRB did not give you any long-term disability?
A. No.
Q. Did you -- you applied for it?
A. I applied.
Q. And you were denied?
A. I -- well, let me go back. I think I applied for full -- full disability.
Q. Okay.
A. Total disability. And I haven't heard from that yet.
Q. Okay. So the permanent you applied for, you don't know yet?
A. No.
Q. When did you apply for that?
A. I put the paper in January of 2023.
Q. So you applied about a year ago?
A. Yes.
Q. Have you heard from an investigator or --



A. No.
Q. -- whatever they call them?
A. Haven't heard anything.
Q. You haven't heard anything?
A. No.
Q. And that would have been for permanent?
A. Yes.
Q. But a long-term disability you never got anything from them?
A. No.
Q. Are you receiving any other payments right now for anything?
A. I do receive a loan from a loan company, monthly loan.
Q. But that's -- you just applied for those on your own?
A. Yes.
Q. That's not related to the union or NS or RRB or anything like that?
A. No.
Q. And you can look if you want to. In Interrogatory 21 you said you applied and received sick benefits and in August of '22 you applied for a disability annuity. That's different -- just to be clear for me, that would be different than permanent disability?



MR. STEEL: No.
MR. GREEN: It's the same?
MR. STEEL: Yes.
MR. GREEN: So you applied for that in August of '22?
MR. STEEL: Yes. Total and permanent disability. He doesn't have sufficient months of service to apply for occupational disability, so he has to apply for total and permanent. And that -- the RRB calls that a disability annuity.
MR. GREEN: Okay. And that's just what I'm trying to get on.
MR. STEEL: There's not some other source.
MR. GREEN: Okay.
Q. Do you use alcohol, Mr. Small?
A. Every now and then.
Q. How often would you say?
A. Maybe while watching a game, once a week.
Q. There was something in one of the things you turned over that suggested eight shots a week. It was on Small 055. That doesn't sound right, though?

A. No.
MR. GREEN: Can you pull that up real quick? Let the record reflect I'm going to show you what is marked as Plaintiff Small 0055 and right there in the middle of the screen is why I was asking that question. (Handing laptop to the witness.)
MR. STEEL: He's looking right here. (Indicating.)
MR. GREEN: Right.
THE WITNESS: That's definitely -- no.
MR. GREEN: I just --
MR. STEEL: I didn't see that either.
BY MR. GREEN:
Q. What kind of alcohol? Just beer during the game?
A. I have a small glass of whiskey.
Q. Do you smoke?
A. No.
Q. Marijuana or other narcotic?
A. No.
Q. What's a typical day like for you now, Mr. Small?
A. Whenever I can get some sleep I get up, it's always early. I go to my man cave, meditate in



the morning. And then go outside, walk my dog. Come back in, I'll make breakfast for the wife and myself, straighten up the house if it needs to be straightened up. And I'm looking into doing some research on home inspection and appraisals, because that's something I kind of want to get into.
And, also, I want to start a car wash so I want to come up with a business plan to eventually open a car wash and finding an area to open it in. And it's been a lot of, you know, studying going on to do that. And I do that whenever I'm of sound mind and have rest to do so.
After that, I maybe watch a little bit of TV and try to go to sleep and take a pill and see what happens -- what sleep I can get.
Q. Other than you said you walk your dog and things like that, how often do you get out of the house?
A. I really don't. I have no -- no desire to go out of the house.
Q. Do you go shopping with your wife any, go to the grocery store, anything like that?
A. I may sometimes, and then a lot of times when I do I stay in the car. But I just don't -- I just feel like an introvert now. I just want to be



to myself.
Q. And so you said your wife works from home. Is it just the two of you there?
A. Yes.
Q. How -- just have one dog?
A. Yes.
Q. When you say a car wash you're talking, like, a physical location that people will take their car to? Or is this, like, one of those services where people come around and do detailing it at businesses or homes or stuff like that?
A. No. Stationary, people come run their car through and vacuum it out. And then I wanted to kind of top other car washes so it would -- it's something that I always wanted to do.
Q. Okay. You said in the Answer I think to Interrogatory 23 that you've been in one motor vehicle accident?
A. Yes.
Q. Was a hydroplane?
A. Yes.
Q. And that was in 2006?
A. Yes.
Q. Any other car accidents you've been involved in?



A. No.
Q. Have you ever been involved in, I guess, grade crossing incidents while you were serving as a conductor or engineer?
A. Yes.
Q. About how many?
A. Right off the top of my head maybe five, I believe.
Q. Were you a conductor or -- which one were you in each?
A. One as a conductor and the other four engineer.
Q. Where did those occur? Do you recall?
A. One in Orangeburg, one in Charleston -- well, actually three in Charleston and one in Rock Hill.
Q. Was the one in Rock Hill earlier in your career?
A. Yes.
Q. And what about the others? Were they more recent? Do you recall when they were, roughly? Not holding you to the specific date.
A. Maybe 2015 -- no, not that -- say about 2020, because they were, like, close in vicinity when they happened.

Page 62

Q. And what about the one in Orangeburg?
Was it also pretty recent?
A. Yes.
Q. Was Mr. Rightmier on any of those with
you?
A. Yes.
Q. Which ones?
A. The one in -- did I say Union?
Q. You did not.
A. The one in Union and one in Charleston.
Q. I can't remember what he said. Did the
one in Union have fatalities?
A. No. That was the one that we hit the
tail end of the car and the guy took off.
Q. Okay. Were any of the others
fatalities?
A. Just one.
Q. Which one?
A. It was one in Charleston and I was
riding with John Turpie on that one.
Q. Spell his last name.
A. T-U-R-P-I-E.
Q. Okay. Does he still work for NS?
A. I believe he does.
Q. Did you take time off after any of those

Page 63

incidents or anything like that?
A. No.
Q. I think you may have answered this, but
just to be clear do you drive any now?
A. I do.
Q. How often?
A. Not often. I drive up the street to get
something to eat. And pretty much everywhere else I
go with my wife, she drives.
Q. What concerns you about driving too far?
A. The last time I had a panic attack was
in the -- driving a car. We were coming from
Atlanta and a semi-truck started to come over on us.
And it was like the same thing as in the engine, I
froze and just got real anxious. And I just slowed
all the way down on the highway and my wife, she's
like, what are you doing? And I said, I don't know.
It's -- I can't control what I'm feeling right now.
And after that, I kind of stayed off the highway.
Q. About when was that?
A. That was closer to the accident. It was
close around September -- September.
Q. Right after the accident?
A. Yes.
Q. Had you ever had any instances where

Page 64

you -- prior to the accident where you froze or
something happened that just made you freeze like
that?
A. Before -- say that again.
Q. It wasn't very clear. Before the
accident, when you were operating either a car or
whether you were operating a locomotive, did you
have anything that made you freeze --
A. No.
Q. -- like that? That was the first time
you had experienced it?
A. Yes.
Q. How long did you plan to work for NS or
the railroad?
A. My wife, she's been there less time than
me and we were planning on retiring at the same
time. So I was planning on working -- I think it
was seven years over, so she would catch up with me
and we'd retire at the same time.
Q. And when you say seven years over, what
do you mean?
A. I was able to retire -- I hired at 29 so
I was able to retire at 60, so I would work till 60.
Q. Got you.
A. Six or seven -- 67.

Page 65

Q. Okay. So you'd work till 67?
A. Yes.
Q. I didn't mean to interrupt. So you'd
work till 67 and then y'all would retire together?
A. Yes.
Q. So you planned to work for whatever more
years that was?
A. Yes.
Q. Bear with me a minute, please.
(Reading.) You went to CPS in August of 2022 for
your initial assessment. I think they said you
rated your depression a ten and your anxiety a
seven?
A. Mm-hmm. Yes.
Q. Would you still rate them about the same
or different?
A. No, different.
Q. They're better than that now?
A. No. No.
Q. They're worse?
A. Yes.
Q. So whatever it was then, you feel it's
worse now?
A. Yes.
Q. Do you still feel claustrophobic?

A. Yes.
Q. Did you at one time smoke?
A. I used to have an occasional cigar, but I don't do cigars anymore.
Q. So you just smoked cigars?
A. Yes.
Q. Didn't smoke cigarettes?
A. No. That's if I was only at a birthday party or something. That was it.
Q. It looks like on August 31st you had a visit to Prisma Health Internal Medicine. From what I see from the notes, they said you were clear to work without restrictions from your -- from their standpoint and you had received a note to that effect, but due to PTSD you did not feel you were ready to return to work; is that correct?
A. Yes.
Q. Is that still true today?
A. Yes.
MR. GREEN: Mr. Small, I think those are all the questions I have. Please answer anything Mr. Wray has or your attorney. I might have a few follow-up, but we'll see.
MR. WRAY: Do you want to take a break?
MR. STEEL: Let's take a real short



break; is that okay?
MR. WRAY: Yes.
MR. GREEN: I was going to ask, Mr. Small may need one.
(A recess transpired.)

EXAMINATION

BY MR. WRAY:
Q. Mr. Small, my name is Ron Wray. I introduced myself prior to your deposition today. I represent Norfolk Southern Railway Company. I'm going to follow up on a few items. I'm going to try not to be repetitive, but we may touch upon a few things that you already talked about.
First, I just want to understand. You've worked as both a conductor and engineer for Norfolk Southern?
A. Yes.
Q. Over the course of your career what percentage or what number of years have you worked in each craft?
A. Maybe seven years as a conductor and the rest as an engineer. And I've been there a total of 19 years.
Q. You went to McDonough for your training?
A. Yes.



Q. At McDonough you were trained in Norfolk Southern's operating rules, safety rules, general conduct rules -- all that?
A. Yes.
Q. Did you have any on-the-job training when you came out of McDonough?
A. Yes.
Q. One of the aspects of that training included the responsibility to keep a visual lookout while you're operating the train?
A. Yes.
Q. Did you abide by that rule when you were on the train operating?
A. Yes.
Q. Did you abide by that rule on the day this accident happened?
A. Yes.
Q. You told us a little bit earlier that at the time of the incident the train was actually being controlled by the optimized train control system.
A. Yes.
Q. Now, when we watched the video earlier today it looked like to me that you did have your hand either on the throttle or the brake as you were



going down the tracks; am I correct about that or am I wrong?
A. You're right.
Q. So even though it's in OTC mode, do you still adjust the throttle if necessary?
A. No -- if necessary, yes, yes. If necessary, if something comes up that I need to take control I'm always ready to take control.
Q. So as we were watching the video and we see your hand on the throttle, what is it actually that we're seeing?
A. I don't recall. I don't recall. From that moment I -- I guess what -- whatever instincts I had took place to do whatever, but I just don't recall what I was doing at the time.
Q. As I understood your testimony earlier, you did not apply the brake at any point prior to impact; is that correct?
A. Not that I know of.
Q. Tell me a little bit about how OTC, or optimized train control, works. Is it similar to a cruise control on an automobile where you punch a button and once you hit that button it takes it from there?
A. It's very similar.

Q. So as you're going down the track and the throttle speed adjusts increasingly from one to whatever number it gets to, that's all being done by the computer?
A. Yes.
Q. You told us earlier that you believe when you first saw that the engine was fouling your track you were about 600 feet away. Do you remember that?
A. Yes.
Q. Between that point and the point where your engine struck the engine coming off the industry lead, you recall Mr. Rightmier saying anything to you about the potential for an incident occurring?
A. Yes.
Q. What did he say?
A. When he jumped up and he said, I think it's in the foul. And my exact words was, oh, shit. And by that time we were hitting.
Q. Is that everything you remember about the conversation between you --
A. Yes.
Q. -- seeing the engine on -- in the foul and when the impact occurred?



A. Yes.
Q. You don't recall Mr. Rightmier ever saying to you, shoot the brakes, hit the emergency or anything like that?
A. No.
Q. Did you direct him to do anything, to apply emergency brakes or to take any type of action to try to stop or slow the train?
A. No.
Q. Following the impact Mr. Rightmier told me earlier, and you were here in the room, he said the engine fell onto its right side which would have been in the direction where you were sitting. Is that what you remember as well?
A. That's correct.
Q. Did you remain in that side of the cab where you had been sitting prior to the impact?
A. Yes.
Q. You didn't get thrown out of the engine itself?
A. I -- no, I was still in the engine. Yes.
Q. And then Mr. Rightmier told us, and you testified earlier, there was some point Mr. Rightmier made a comment about seeing some



smoke.
A. Yes.
Q. Did you see any smoke in the cab?
A. No.
Q. Did you ever see any fire or flames?
A. No.
Q. Did you sustain any broken bones as a result of the incident?
A. No.
Q. Did you have any visible signs of cuts or bleeding on any part of your body?
A. Bruises and abrasions on my face and elbow and the back of my head. I think there was maybe a scar on my back.
Q. A scar on the back of your head. Do you know what your head struck that caused that injury?
A. No.
Q. You said you had some scarring on your back. Do you know what you hit that caused that injury?
A. No.
Q. Did either your head injury or your back injury require stitches?
A. No.
Q. You never had any surgeries following



this accident, did you?
A. No.
Q. Do you have any surgeries currently scheduled or recommended by any of your doctors?
A. No.
Q. Like Mr. Green, medical records that I have cut off in 2022. I think it's November of 2022 is the last records I have. But I understood your testimony earlier to be that you have received some treatment in 2023; is that right?
A. Yes.
Q. Who did you see in 2023?
A. Dr. Jason Leonard.
Q. What type of doctor is Dr. Leonard?
A. He's a primary care doctor.
Q. What type of treatment did you receive from Dr. Leonard in 2023?
A. The first visit was the initial to let him know what was going on with me. And from there he proceeded to continue my medications for the anxiety and pain that I was having in my back.
Q. What is the name of Dr. Leonard's practice?
A. Colonial -- I don't know the exact name of it.

Q. Do you think it has Colonial in the name?
A. Yes.
Q. Is it in Charleston or Columbia?
A. Columbia.
Q. How many times do you think you saw Dr. Leonard in 2023?
A. Three times.
Q. Did Dr. Leonard refer you to further medical practices or physicians for treatment?
A. He did refer me for another MRI.
Q. Did you have the MRI?
A. Yes.
Q. Where was that done?
A. At Imaging -- it's right here on Assembly. Imaging -- I can't recall the name of it.
Q. Other than Dr. Leonard and the MRI that was done in 2023, any other treatment that you had in 2023?
A. No.
Q. You said at one point you got some treatment from Ms. Cheryl Gardner, a counselor that you found very helpful.
A. Yes.
Q. How many times did you see her?



A. Every Thursday -- once a week.
Q. For how long?
A. Eight weeks.
Q. Did you have to travel to -- I think she was in Decatur?
A. Yes, I was in Georgia at the time. We did over the video call.
Q. Why were you in Georgia at that time?
A. We were having a house built so we were staying in Georgia.
Q. When did you first see Ms. Gardner?
A. Maybe December of...
Q. That would be December of '22?
A. Yes.
Q. You saw her about one time a week for eight weeks beginning December till maybe early March?
A. Yes.
Q. The reason you stopped seeing her was she practiced in Georgia and did you move back to South Carolina?
A. Yes.
Q. Why couldn't you still do that by telephone?
A. She said she's not certified in South



Carolina so she wouldn't be able to do it.
Q. But to make sure I understand, this is what Dr. Gardner told you? Because you moved back to South Carolina she didn't feel like she could continue to treat you?
A. Right.
Q. Then you went to this other place here in Columbia that you said just wasn't the right fit for you?
A. Yes.
Q. Other than Ms. Gardner and the place you saw here one time, any other counseling that you saw to deal with the PTSD issues?
A. That's Dr. Ornelas.
Q. Dr. Ornez as well and that's the one you said --
MR. STEEL: Ornelas.
BY MR. WRAY:
Q. Ornelas. That's the one you said you didn't continue with because he didn't take insurance?
A. Yes.
Q. How many times did you actually see him?
A. Twice.
Q. Okay. Anyone else for counseling



PTSD-related issues?
A. No.
Q. Prior to the date of the incident that's involved in this lawsuit had you ever reported any injury on the job with Norfolk Southern?
A. When I was training as a conductor I did pull a muscle in my left shoulder.
Q. Any other?
A. That's it.
Q. And you said you had worked briefly at UPS and Westinghouse in addition to your time in the military. Any injuries working at any of those locations?
A. No.
Q. Never had any prior lawsuits?
A. No.
Q. The prior car wreck you told Mr. Green about, where your car hydroplaned, in the interrogatory you said you weren't injured in that?
A. No.
Q. Did you ever at any time, while working on Norfolk Southern, make a complaint about anything that you saw or observed that you thought was a safety issue?
A. Only when grass was high at an industry

Page 78

I was working and maybe a hard to throw switch or derail. That's pretty much it.
Q. Did you understand, as a Norfolk Southern employee, that if you saw a condition you thought was unsafe it was your responsibility to report it?
A. Yes.
Q. Did you take that responsibility seriously?
A. Yes.
Q. And to the extent you saw safety issues while you were working for Norfolk Southern did you report it?
A. Yes.
Q. Mr. Green had asked you whether you had ever reported anything regarding the American Pasta when this accident occurred, and I wrote down you said not while you were working. Maybe I misunderstood that.
Did you ever, at any time, make a complaint about anything with American Pasta?
A. No.
Q. And you had actually handled the derail that leads from there leading out to the southern main line; correct?

Page 79

A. Yes.
Q. Never had any issues with that or reported anybody having problems you had with that derail?
A. No.
Q. Did you ever see anything about that that suggested to you that that derail was improper or unsafe to perform its intended function?
A. No.
Q. In your lawsuit you allege that Norfolk Southern failed to provide you with a reasonably safe place to work. Is that a belief that you hold?
A. As far as with the -- my biggest gripe was with the PTC, when they state that it would pick up something falling on the track that's what it should do I think. Whether it's a switch or not.
Q. Okay. So you kind of jumped ahead in my questioning. My first question was, do you believe that Norfolk Southern failed to provide you with a reasonably safe place in which to work?
A. Up until that accident, no, I don't believe.
MR. STEEL: He's asking as a result of the accident.
THE WITNESS: Yes.

Page 80

BY MR. WRAY:
Q. At the time --
A. Yes.
Q. Okay. You brought a lawsuit against Norfolk Southern for some reason. I'm assuming --
MR. STEEL: Could have been based upon conversations with me so be careful on that, too.
BY MR. WRAY:
Q. Well, you don't have to tell me anything that your lawyer has told you.
MR. STEEL: There you go.
BY MR. WRAY:
Q. But you've brought a lawsuit and you've alleged that Norfolk Southern should pay you money for injuries and damages you're claiming in this lawsuit; is that fair to say?
A. That's fair to say, yes.
Q. And you agree with me that in order to proceed in that lawsuit that you should have some reason to believe that Norfolk Southern is responsible to you for the injuries and damages you're claiming; correct?
A. Yes.
Q. My question to you is, in what ways do you think Norfolk Southern failed to provide you

Page 81

with a reasonably safe place to work which entitles you to recover against Norfolk Southern?
A. What the PTC should be doing and is clearly not.
Q. Okay. So PTC, I'll talk about that in a second. Anything else that you felt in terms of Norfolk Southern and the workplace it provided you that you thought was not reasonably safe?
A. No.
Q. Do you consider yourself to be a PTC expert?
A. No.
Q. Have you ever been trained or instructed in what PTC does or does not do?
A. I've been trained. On my training I -- from the training I understand that it would detect anything that's falling on the main line.
Q. Do you know how it does that?
A. No.
Q. Do you know anything about the technology behind PTC?
A. No.
Q. Do you know -- do you have any expertise or training yourself in terms of when something has to be or how far into the ballast something has to

Page 82

be before PTC will pick it up?
A. No.
Q. Do you know if your engine was even equipped with PTC on the date this incident occurred?
A. Yes.
Q. How do you know that?
A. We had to log into it.
Q. So when you started your trip that day you had to log into the PTC system?
A. Yes.
Q. Any time that day did you ever get any alert or warning from the system?
A. No.
Q. Who trained you on how PTC operates or functions?
A. They gave us a video to watch.
Q. Other than the video any other in-person training -- classroom training, anything like that?
A. No.
Q. Do you recall what the video was called?
A. I don't recall.
Q. Just watched it one time?
A. Yes.
Q. Do you have any evidence that any

Page 83

employee of Norfolk Southern was aware that the industry engine that was found on the track was in the foul of the track prior to the time your train struck it?
A. No.
Q. Following the accident did anyone with Norfolk Southern come to the scene?
A. Not that I know -- I don't know.
Q. To the extent they came did you have any conversation with any officers, managers, employees of Norfolk Southern?
A. No.
Q. Have you had any discussions since the accident with anybody affiliated with Norfolk Southern about what happened that day?
A. Only my wife.
Q. I forgot your wife is an employee.
MR. STEEL: That was a good answer. That was a good answer.
BY MR. WRAY:
Q. But your wife -- am I correct she doesn't have any factual knowledge about what happened that day other than what you told her?
A. That's correct.
Q. She wasn't there, she didn't come to the

Page 84

scene; is that right?
A. No.
Q. She didn't do any type of investigation herself?
A. No.
Q. Has anybody, affiliated with Norfolk Southern, ever said anything to you about how or why this accident occurred?
A. No.
Q. Has anyone with Norfolk Southern ever said to you that they felt that the company was responsible for this accident occurring?
A. No.
Q. Have you done any investigation yourself to try to figure out why this happened or how it happened?
A. No.
Q. You said you spoke with Mr. Landy at the FRA, I believe; is that right?
A. I spoke with -- yes, someone with that name.
Q. Do you know whether that conversation was recorded?
A. Yes.
Q. Do you have a copy of the recording or

Page 85

statement or whatever you gave?
A. He said he was going to send it to me and I never received it.
Q. Other than Mr. Landy anyone else interview you about what happened that day?
A. No.
Q. Did you ever give any type of written statements where you wrote out an account of what happened that day?
A. No.
Q. You took out a litigation loan following this event?
A. Yes.
Q. Who is that with?
A. I can't recall the name off the top of my head.
Q. How much are you receiving a month from that group?
A. $4500.
Q. How long have you been receiving the $4500 payments?
A. It's been about a year now.
Q. Is your obligation to pay that back contingent on whether you win this lawsuit?
A. I've got to pay it back regardless.

Page 86

Q. That's what I wanted to know. So you think whether you win or lose you're going to pay back whatever money they've paid you?
A. Yes.
Q. Do you know what the interest rate is they're charging?
A. It's eight percent, I think.
Q. Mr. Green asked you some questions earlier about your union involvement. It sounds like you're not active at all; is that accurate?
A. At the time he was talking, that was when I was first hired. But I was the president of the -- of BLE.
Q. So you did hold the position of officer?
A. Yes.
Q. Did you say president?
A. Yes.
Q. Is that local?
A. Local.
Q. I usually call that the local chair, but is that something different?
A. Yeah, different office.
Q. How long did you hold that position?
A. For a year. I don't know if I'm still currently in it, but yeah.

Page 87

Q. When did you take that position?
A. In 2021.
Q. Any other positions with the union?
A. No.
MR. WRAY: If you can mark that.
THE COURT REPORTER: This will be Defendant's Exhibit 2.
(EXHIBIT 2, Consult Requests, Bates Stamp Number 507-000076, was marked for identification.)
BY MR. WRAY:
Q. Mr. Small, we provided you with Exhibit 2 and I will tell you this is a record we got from the VA. And if you look about somewhere towards the middle of the document, maybe towards the bottom where it says: Clinically Ind. Dated -- or Date, sorry, it says December 10, 2020.
Do you see that?
A. Yes.
Q. That would have been a little bit less than two years prior to this accident we're here on today?
A. Yes.
Q. And at the top it's got a section that says: Service Connected/Related -- or Rated

Page 88

Disabilities.
Do you see that?
A. Yes.
Q. And the first column says: SC Percent: 100 percent.
See that?
A. Yes.
Q. It's got Rated Disabilities and it's got a series of things over to the right.
Do you see that?
A. Yes.
Q. Did you have these disability ratings prior to the date of the accident that we're here on?
A. No.
Q. Did you have any of them prior to the date of this accident?
A. I had some of them.
Q. Okay. Let's kind of walk through them. The first one says Chronic Adjustment Disorder, and it says 70 percent next to that.
Do you see that?
A. Yes.
Q. Do you even know what that is?
A. Yes. The anxiety and not being able to

Page 89

adjust and depression.
Q. Had the VA rated you with a chronic adjustment disorder prior to the date of this accident?
A. Yes.
Q. And do you know what the percentage was prior to the accident?
A. That was at ten percent.
Q. What was the issue that you were dealing with prior to the accident that led to a ten percent is what you told us as a rating?
A. It was marriage problems and I did have a best friend that was killed.
Q. Were you on any medications to treat the anxiety and depression prior to the date of our accident?
A. No.
Q. The next one then says Flat Foot Condition. Did you have that before this event?
A. Yes.
Q. And was it at 50 percent?
A. No.
Q. What was it before the incident?
A. That was at zero percent.
Q. So you had the condition but no rating

Page 90

for that time is your testimony?
A. Right.
Q. Next one says, Paralysis of Sciatic Nerve. Did you have that condition before our accident?
A. Yes.
Q. Did you have a disability rating for that?
A. Yes.
Q. What was it?
A. It was still at 20.
Q. So that stayed the same?
A. Yes.
Q. The next one says Paralysis of Interior -- Crural Nerve maybe? C-R-U-R-A-L. I'm not sure what that is, but did you have that condition previously?
A. Yes.
Q. What is that? Where is that nerve?
A. Down the back of my leg -- that's the sciatic. Interior.
Q. If you don't know, that's fine. I'm not familiar with that.
A. Yeah, but that's the same rating that I had for that.

Page 91

Q. Okay. Same rating before and after?
A. Yes.
Q. Next one says, Intervertebral Disc Syndrome, ten percent. Did you have that before?
A. Yes.
Q. So it was at ten percent?
A. Yes.
Q. Superficial Scars. Did you have some other scarring prior to this incident?
A. That's the appendectomy.
Q. Okay. So you had that for the appendectomy --
A. Yes.
Q. -- procedure? Limited Motion of Ankle, you told us about that. Was that at ten percent before?
A. Yes.
Q. Paralysis of sciatic nerve, we already talked about. I'm not sure why they've got that in there twice. And then I see that other nerve a second time, too. And the last one says, 2nd Degree Burns, zero.
What was that?
A. Second degree burns -- I don't know. I don't recall that.

Page 92

Q. Other than what we see on Exhibit 2 did you have any other disability ratings from the VA prior to the date of this accident?
A. No.
Q. Since this accident occurred have you applied for any work?
A. No.
Q. You mentioned that you're trying to put together a business plan for the car wash and you also have some interest in maybe doing home inspections?
A. Yes.
Q. Have you done anything, other than your own individual research, to try to develop a career in either of those fields?
A. Not yet.
Q. You did get a couple of letters from the Norfolk Southern Voc Rehab Department offering to assist you; is that correct?
A. I did.
Q. Did you respond to either of those?
A. No.
Q. Why not?
A. I really don't think I want to do anything with Norfolk Southern if I have to get on

Page 93

the engine. I'm not doing it.
Q. Did you inquire whether they could help you find a job outside the railroad if that's something you wanted to pursue?
A. I did not inquire, but I doubt it. I'll look into that.
Q. You mentioned you had some concerns about getting back on the engine. If they could help you get a job outside the railroad industry would you be interested in that?
A. Yes, of course.
Q. Do you have any physical limitations currently that would prevent you from returning to active employment with the railroad or some other capacity?
A. The only physical limitations is my back, but I don't think that would stop me from working.
Q. Do you have any type of lifting restrictions or anything that your doctors imposed on you as we sit here today?
A. No.
Q. From a mental health standpoint you told us you still have some strong PTSD. Do you think that would currently inhibit you from returning to

Page 94

the work force at the railroad or some other capacity?
A. Yes.
Q. So is it fair to say if you can get that resolved you can return to gainful full-time employment?
A. Yes.
Q. Is that your intent?
A. That is my intent.
Q. And in the Interrogatories we served we asked about witnesses to the case, and the only person you listed was Mr. Rightmier who we actually spoke with earlier today. I just want to confirm, you don't know of anybody that's a witness to any of the events that happened to you that day?
A. No.
Q. What have you come out-of-pocket in terms of any expenses you've incurred related to this incident?
A. I try not to come out-of-pocket at all, but it's been roughly $800.
Q. And what did you -- what kind of treatment or what were those expenses related to?
A. Mainly from Dr. Ornelas' office and the co-pays and prescriptions.

Page 95

Q. Fair to say, then, with the exception of that $800, approximately, to the extent you sought medical care, got medical treatment since this accident the railroad has paid for all that?
A. Yes.
Q. Other than your wife, who would you consider to be your best friend?
A. That's it.
Q. Are there any other folks outside of immediate family members that you hang out with, do things with, go to ball games with, anything like that?
A. No.
Q. Is that true before the accident?
A. I had a buddy I used to hang out with before the accident. We don't really talk anymore.
Q. Who was that friend?
A. Kevin Mitchell.
Q. Is he with the railroad?
A. Yes.
Q. Where does Mr. Mitchell live?
A. Columbia.
Q. What is the reason that you no longer hang out with him?
A. Just pretty much lost interest.

Page 96

Q. Did you and he have a falling out over anything or just stopped contacting?
A. Just stopped contacting.
MR. WRAY: Let me see what Mr. Freeman has to tell me and we'll wrap it up.
(A recess transpired.)
MR. WRAY: Thank you, Mr. Small. Mr. Freeman says he doesn't have anything else for me to do so I'll turn it to over to your attorney.
MR. STEEL: Thank you. Just a couple of things.

EXAMINATION

BY MR. STEEL:
Q. Just so the timeline is straight, you mentioned getting Cortisone shots in your shoulder?
A. Yeah.
Q. Was that before or after this collision?
A. That was after.
Q. Okay.
A. That was after.
Q. So did you injure -- injure your shoulder in this collision?
A. I did.
Q. And did you receive treatment for that?
A. Yes.

Page 97

Q. But did it improve?
A. It did.
Q. Okay. As I understand it, you simply have no memory of and don't remember whether or not you applied any braking to the locomotive before the collision.
A. Correct.
Q. Would you defer to whatever the engine download shows or any other material that's out there?
A. Yes.
Q. All right. Prior to this collision did you ever mark off or miss any days of work at the railroad for any issues related to those that you had reported to the VA?
A. No.
Q. You were able to work your job full-time and had no problems?
A. Yes.
MR. STEEL: All right. Thanks. That's all I have.
MR. GREEN: Let me ask just a couple of quick follow-ups questions. I think Mr. Wray spoke -- touched on this. Physical abrasions.

EXAMINATION

BY MR. GREEN:
Q. You submitted -- I asked you about the pictures that you submitted as part of the discovery responses that you said your wife took.
A. Yes.
Q. Did you have any physical impacts that were not included -- represented in those photographs?
A. No.
Q. Okay. And there was some discussion at the first deposition about problems with exposure to trains. Do you have any problems if you were going down the road and see a train on -- does that bother you?
A. That doesn't bother me.
MR. GREEN: That's all I have.
EXAMINATION
BY MR. WRAY:
Q. Mr. Small, when you watched the video earlier today did you see at any point in the video where you activated or engaged the emergency brake?
A. No.
MR. WRAY: That's all I have.
MR. STEEL: That was -- that was his only way to remember, was by looking at that thing.



It wasn't something else here. Thank you.
THE COURT REPORTER: Does everyone else want the same transcript requests as in the first one?
(Please note all attorneys were in agreement.)
THE COURT REPORTER: Thank you, everybody.
(The witness, after having been advised of his right to read and sign this transcript, does not waive that right.)
(The deposition was concluded at 4:01 p.m.)



David E. Small, Jr. vs. Norfolk Southern Corporation, et al.
David E. Small, Jr. (#6376531)

E R R A T A S H E E T

Page_____ Line_____ Change______________________
_______________________________________________
REASON_________________________________________
Page_____ Line_____ Change______________________
_______________________________________________
REASON_________________________________________
Page_____ Line_____ Change______________________
_______________________________________________
REASON_________________________________________
Page_____ Line_____ Change______________________
_______________________________________________
REASON_________________________________________
Page_____ Line_____ Change______________________
_______________________________________________
REASON_________________________________________
Page_____ Line_____ Change______________________
_______________________________________________
REASON_________________________________________

________________________________ ________________
David E. Small, Jr. Date
Job No. CS6376531



David E. Small, Jr. vs. Norfolk Southern Corporation, et al.
David E. Small, Jr. (#6376531)

ACKNOWLEDGEMENT OF DEPONENT

I, David E. Small, Jr., do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

________________________ _________________
David E. Small, Jr. Date
*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
_____ DAY OF _________________, 20____.

______________________________
NOTARY PUBLIC

Job No. CS6376531

CERTIFICATE OF REPORTER

I, Lori S. Mortge, Certified Court Reporter and Notary Public for the State of South Carolina at Large, do hereby certify that the foregoing transcript is a true, accurate, and complete record.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal this 29th day of January, 2024 at West Columbia, Lexington County, South Carolina.




Lori S. Mortge
Certified Court
Reporter, CCR
My Commission expires
December 13, 2026



INDEX


| | Page | Line |
|---|---|---|
| DAVID E. SMALL, JR. | 4 | 2 |
| EXAMINATION BY MR. GREEN | 4 | 4 |
| EXAMINATION BY MR. WRAY | 67 | 6 |
| EXAMINATION BY MR. STEEL | 96 | 12 |
| EXAMINATION BY MR. GREEN | 97 | 25 |
| EXAMINATION BY MR. WRAY | 98 | 17 |
| CERTIFICATE OF REPORTER | 103 | 1 |


REQUESTED INFORMATION INDEX


| | Page | Line |
|---|---|---|
| Verification | 13 | 5 |




EXHIBITS


| DEFENDANT EXHIBITS | Page | Line |
|---|---|---|
| EXHIBIT 1, Plaintiff's Responses to Defendant American Italian Pasta Company's First Set of Interrogatories, dated July 5, 2023 | 12 | 2 |
| EXHIBIT 2, Consult Requests, Bates Stamp Number 507-000076 | 87 | 8 |




JOHN D. STEEL
jsteel@johnsteel-law.com

January 29, 2024

RE: Small, Jr., David E. v. Norfolk Southern Corporation, Et Al.
1/11/2024, David E. Small , Jr. (#6376531)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Erratas-CS@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions