EXHIBIT 7



STATE OF SOUTH CAROLINA IN THE COURT OF COMMON PLEAS
COUNTY OF RICHLAND FOR THE FIFTH JUDICIAL CIRCUIT

RAYMOND S. RIGHTMIER, and his lawful wife, ANGIE RIGHTMIER, CIVIL ACTION NO. 2022-CP-40-05526

Plaintiffs,

-vs.-

RICO BLANCHETT, an individual, AMERICAN ITALIAN PASTA COMPANY, a foreign corporation, and NORFOLK SOUTHERN RAILWAY COMPANY, a foreign corporation,

Defendants.
______________________________ /

DAVID E. SMALL, JR.,

Plaintiff, CIVIL ACTION NO. 2023-CP-40-02115

-vs.-

NORFOLK SOUTHERN CORPORATION, and AMERICAN ITALIAN PASTA COMPANY,

Defendants.
______________________________ /

VIDEOTAPED DEPOSITION OF CHARLENE ANNE HOLLAND
Taken on behalf of Plaintiffs
Pursuant to Notice of Videotaped Deposition

SUSAN B. WILSON, INC.
14015 Ivylgail Drive North
Jacksonville, Florida 32225
(904) 994-6133
SWLSN1@yahoo.com



DATE TAKEN: Thursday, April 10, 2025
TIME: 1:32 p.m. - 4:45 p.m.
PLACE: By videoconference

Examination of the witness taken before:
Susan B. Wilson, RPR, CRR, CRC, FPR

SUSAN B. WILSON, INC.
14015 Ivylgail Drive North
Jacksonville, Florida 32225
(904) 994-6133
SWLSN1@yahoo.com



A P P E A R A N C E S

HOWARD A. SPIER, Esquire

Rossman, Baumberger, Reboso & Spier, P.A.
9155 South Dadeland Boulevard, Suite 1200
Miami, Florida 33156
spier@rbrlaw.com
305-373-0708,

appearing on behalf of Plaintiffs
Raymond S. Rightmier and Angie Rightmier.

JOHN D. STEEL, Esquire

John Steel Law
3495 Piedmont Road NE
Building 11, Suite 905
Atlanta, Georgia 30305
jsteel@johnsteel-law.com
404-260-9634,

appearing on behalf of Plaintiff
David E. Small, Jr.

WILLIAM E. WHITNEY, III, Esquire

Gallivan, White & Boyd, P.A.
55 Beattie Place, Suite 1200
Greenville, South Carolina 29601
wwhitney@gwblawfirm.com
864-271-5362,

appearing on behalf of Defendant
Norfolk Southern Railway Company.



A P P E A R A N C E S (C O N T I N U E D)

TRACEY C. GREEN, Esquire

Burr & Forman LLP
1221 Main Street, Suite 1800
Columbia, South Carolina 29201
tgreen@burr.com
803-753-3224

-and-

KERMIT L. KENDRICK, Esquire

Burr & Forman LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203
kkendrick@burr.com
205-458-5393

-and-

JOHN O. RADECK, JR., Esquire

Hood Law Firm, LLC
172 Meeting Street
Charleston, South Carolina 29401
john.radeck@hoodlaw.com
843-577-1203,

appearing on behalf of Defendants
Rico Blanchett and American Italian
Pasta Company.

ALSO PRESENT:

ED FERNANDEZ

Executive Video & Photographic Services
12627 San Jose Boulevard, Suite 902
Jacksonville, Florida 32223
execvideo@gmail.com

- - -

A Yes.
Q As we look over to the right-hand side, do we see what time he came in?
A Yes.
Q What time is that?
A 5:58? 5:56?
Q It says 5:58 a.m., is that --
A 5:58.
Q Okay. And then when it comes out, do you see the out? We see 7:39 a.m. See that?
A Yes.
Q Now, you may or may not know this, but I'm under the belief -- and you tell me if I'm wrong -- that he did not clock out in the ordinary routine way that employees clock out, did he, on that day, July 11, '22, did he?
A That's correct.
Q So somebody must have gone into this Kronos and put that 7:39 in there. Was that you?
A I don't believe so.
Q Who was it?
A I believe it was my HR specialist at the time.
Q Did you authorize her to put a time frame in the out box of Kronos?
A I did.



Q On what basis did you come up -- what's the basis upon which you came up with the 7:39 a.m.?
A I reviewed camera footage.
Q Tell us about that. What kind of camera footage, where was it at, what did you see.
A Camera footage, we had just a few -- at the time it was just a few areas, the employee entrance, and then it showed like the driveway coming in and out of the mill facility. So I tracked him on those cameras and then saw he left the property at 7:39.
Q Let me ask you -- I'm sorry, go ahead. I didn't mean to interrupt you. Go ahead.
A That's just -- that's why we put that in as the punch-out.
Q So at best, that punch-out is an estimate that you made; correct?
A Yes, but based on when he was pulling out of the property.
Q Whether he sat in his car for 20 minutes collecting his thoughts, thinking about what he had done, do you have that on film, or you did not look for that?
A We didn't have camera footage of that.
Q Well, let me ask you about your camera footage. First of all, most companies that are engaged



in manufacturing like yours, I would imagine they have fixed-based video cameras for purposes of security; is that fair?
A Yes, that's fair.
Q And does AI- -- and in the time frame of July 11, '22, did AIPC have its complement of such video cameras?
A We did have some, yes.
Q And as HR manager, where you sit in your office, is there a monitor screen that has all cameras showing real time so you can turn your chair any way you want and you can see what's going on on this side of the building, that side of the building, this side of the property? Can you do that from your office at HR?
A No. It's not up full-time. I have access to a program that I can look at at any time, but it's not up all day every day.
Q In other words, let's see if we understand what happened here. At some point in time you didn't -- well, let me ask you this: You didn't see on a real-time video him walking to his car and leaving at the time he did it; you weren't looking at a video footage of him doing that at the moment he did it, were you?
A That is correct. No, I was not.



Q So something must have triggered your interest to do this, to go back to the archives of your video footage and you could bring it up, couldn't you?
A I was -- yes, I was able to bring up the footage at the time.
Q Let me ask you this as a matter of curiosity. I don't know where your cameras are, quite frankly. I'm not sure I'm even entitled to know where they all are. But can you tell us whether or not you sought to look at video footage of him derailing the yellow-colored locomotive engine?
A No, I did not look at that footage, but it's not available.
Q When you say it's not available -- I'm sorry, go ahead.
A The cameras -- the cameras were only -- at the mill just showed kind of straight down from the employee entrance and then the driveway area. We did not have camera footage down by the rail track.
Q Can you tell us why you don't have footage, you don't have surveillance video, security videos in your train yard? Why didn't you have them at the time? If you know. If you don't know, you don't know.
A I do not know. I was -- I was not over where the cameras were or where we would place them. I do not

**Timeline of Events:**

Monday (7/11/22)

6:29am – employee left out employee entrance to the track

7:27am – employee went back in the employee entrance

~7:30am – Rico told Mike Thompson the engine was derailed. He asked if Rhen was at the Mill yet. Per Rico, he went to Rhen's office and saw he wasn't in, he then left as he knew he would be fired.

7:39am – employee pulls truck out of parking lot and leaves (does not punch out)

~8:20am – Rhen walks to track to find Rico and sees there was an incident. Calls Richard.

9:07am – Richard calls Anne to let her know about the incident and Rico cannot be located nor is answering Rhen's calls or text.

~10:30am – Anne calls Rico's phone, doesn't allow for a VM to be left.

~3:30pm – Anne calls Rico's phone, doesn't allow for a VM to be left.

Tuesday (7/12/22)

~2:45pm – Anne calls Rico's phone, doesn't allow for a VM to be left.

Wednesday (7/13/22)

~10:32am – Anne calls Rico's phone, doesn't allow for a VM to be left.

10:33 – Anne sends Rico a Text "Hi Rico, this is Anne (HR Manager) at Treehouse foods. Please give me a call back as soon as possible.

NOTES:

25 Ft of track

~$1.5/engine

Winston (outside council)

FRA certified? On private track?