# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION
C.A. NO. 3:25-cv-6618-SAL

| | | |
|---|---|---|
| NORFOLK SOUTHERN RAILWAY COMPANY, | ) | VIDEO-RECORDED |
| PLAINTIFF, | ) | 30(b)(6) DEPOSITION |
| VS. | ) | OF |
| AMERICAN ITALIAN PASTA COMPANY, | ) | AMERICAN ITALIAN PASTA COMPANY |
| DEFENDANT. | ) | (RHEN MARSHALL, III) |

PURSUANT TO NOTICE AND/OR AGREEMENT, THE VIDEO-RECORDED 30(b)(6) DEPOSITION OF AMERICAN ITALIAN PASTA COMPANY (RHEN MARSHALL, III) WAS CALLED BY THE PLAINTIFF ON THE 17TH DAY OF APRIL, 2026, COMMENCING AT THE HOUR OF 9:48 A.M., AT THE LAW OFFICES OF GALLIVAN, WHITE & BOYD, P.A., 1201 MAIN STREET, SUITE 1200, COLUMBIA, SOUTH CAROLINA, ATTENDED BY COUNSEL AS FOLLOWS:

TIMMI A. PARRISH
VERBATIM REPORTER

Job No. CS8009006

Q. On the date of this incident -- and let me state this to clarify. When I'm asking you questions today about policies and procedures and information, I'm asking about what was in place back in 2022 unless I direct you otherwise. And I may ask you about some changes that have been made and things that have happened since then, but for the most part I'm interested in what was in place at the time the event occurred, okay?
A. Understood.
Q. All right. At the time of this event, am I correct that Rico Blanchett was an employee of AIPC?
A. That is correct. Rico was an employee of the mill.
Q. Mr. Blanchett was authorized as part of his duties as an employee to operate the AIPC locomotive and move rail cars at that facility, correct?
A. That is correct. Rico had been trained to run the locomotive.
Q. On the morning this accident occurred, Mr. Blanchett was acting in the course and scope of his duties as an employee of AIPC, correct?
A. Yes.
Q. And does AIPC agree that Mr. Blanchett and his activities that morning violated AIPC policies and procedures in terms of how he handled the locomotive

in moving those rail cars?
A. We agree that Mr. Blanchett's activities that morning caused our locomotive to run through the derail.
Q. And I appreciate that answer, but I don't think you quite answered my question, so I'm going to ask it again. Do you agree that Mr. Blanchett violated certain policies and procedures that you had put in place at AIPC regarding the operation of that locomotive and movement of rail cars?
A. I agree that Mr. Blanchett -- ask me the question one more time. Let me make sure I understand what you're asking me.
Q. Does AIPC agree that Mr. Blanchett, on the morning of this accident, violated AIPC policies and procedures in connection with his operation of the locomotive and movement of rail cars there at the facility?
A. Yes.
Q. Okay. And many of these you were asked about at your prior deposition, so I'm not trying to trick you. But, for example, AIPC had a policy that in operating the locomotive you were to ride on the lead end of the engine and not the rear, correct?
A. That's how Rico was trained. That is correct.

Q. And you understand that Mr. Blanchett testified in this case -- you said you were at the trial, so you heard him testify at the trial -- that he operated the locomotive on the day of this accident from the rear, correct?
A. That is correct.
Q. That was a violation of AIPC policies and procedures, correct?
A. That is correct.
Q. AIPC also had a policy that before the locomotive and rail cars were to be moved the air was to be applied throughout the train, correct?
A. That is correct, also.
Q. And in this case, there was evidence presented that the air was not fully applied to the train.
A. The angle ---
Q. Were you aware of that?
A. The angle cock was not completely opened.
Q. And if the angle cock was not completely opened and air applied to the full train before movement, that would be a violation of AIPC policies and procedures, correct?
A. That is correct.
Q. AIPC also had a policy that you were to keep the locomotive and any rail cars the locomotive was

moving off the Norfolk Southern derail, correct?
BY MR. RADECK:
Object. I'm sorry; can you say that again? I'm sorry, Ron. Just make sure I need to object.
BY MR. WRAY:
Okay.
EXAMINATION RESUMED BY MR. WRAY:
Q. AIPC also had a policy and you instructed Mr. Blanchett and others operating the locomotive that they were to keep the locomotive and rail cars off the Norfolk Southern derail, correct?
A. I don't know that there's a policy to keep us off the derail. They knew that they were not supposed to go near the derail, yes.
Q. Right. Well, why were they not supposed to go near the derail?
A. Because it would derail our locomotive.
Q. And it makes sense to me, but you can disagree with it if you want. You don't want a locomotive to be derailed, correct?
A. That is correct.
Q. You don't want rail cars, in this case that were full of grain, to be derailed, correct?
A. That is correct.
Q. And so, AIPC trained Mr. Blanchett to keep the

locomotive and rail cars off the Norfolk Southern derail, correct?
A. We trained Rico Blanchett to control -- keep his locomotive under control; that is correct.
Q. And we know in this case that the locomotive did, in fact, go over the derail and foul the Norfolk Southern main line, correct?
A. That is correct.
Q. And that was a violation of AIPC policies, wasn't it?
A. Mr. Rico made some bad decisions that morning, yes.
Q. Right. But one of them would be allowing the equipment to get through the derail? He wasn't supposed to do that?
A. That is correct.
Q. And him doing that was a violation of your training to him and the instructions and policies of AIPC?
A. That is correct.
Q. And Mr. Blanchett was also trained and instructed by you that if for some reason something happened, an accident occurred, he was to immediately notify you or others in management that an event had occurred, correct?
A. That is correct.
Q. And that, certainly, would include his equipment

getting through the derail and fouling the main line, correct?
A. That is correct. However, I do not know that he knew he was in the foul.
Q. Right. But Mr. Blanchett, regardless of whether he knew it or didn't know it, he knew he had gotten through the derail?
A. That is correct.
Q. And your expectation would have been for him to verify did he have a problem or not?
A. My expectation would have been for him to notify me immediately.
Q. Right. And whether he was in the foul or not, he should have notified you immediately?
A. I agree.
Q. And if Mr. Blanchett had done what AIPC's policies required and what you had instructed him to do and he had called you that morning, you would have contacted Norfolk Southern right away, wouldn't you?
A. If I had realized that the rail cars were in the foul, definitely. If he had called me and said that the locomotive had gone off the derail, I don't know that I would have notified the Norfolk Southern immediately because of the fact that being off the derail is a lot different than being in the foul.

There's a huge difference there. And being off the derail means that AIPC has a locomotive they have to get back on track. Being in the foul is a lot bigger deal.
Q. And just so the record is clear, tell me what you mean when you say being in the foul. What does that mean to you?
A. Being in the foul is being down -- anyplace where there's a switch where a car coming -- or a locomotive or any equipment coming one way will hit the other equipment. They're fouling each other.
Q. And does AIPC agree in this case that the Norfolk Southern equipment that was coming down the main line track did, in fact, strike the nose or impact the AIPC engine that was in the foul of the track this morning, the morning of this accident?
A. Yes, the Norfolk Southern locomotive did strike the AIPC locomotive at that point.
Q. So am I correct, then, Mr. Marshall that regardless of whether Mr. Blanchett knew he was in the foul or was uncertain whether he was in the foul, he still should have called you?
A. That is correct.
Q. And his failure to do so was a violation of AIPC policies and procedures and his training, correct?

A. That is correct.
Q. Does AIPC agree that Mr. Blanchett's violation of one or more of those policies that I just named and we just went through caused this accident to occur?
BY MR. RADECK:
Object to the form.
WITNESS ANSWERS:
A. No. AIPC denies that that Rico Blanchett -- that one incident caused the incident to occur. There are several things that led to the incident occurring.
EXAMINATION RESUMED BY MR. WRAY:
Q. Okay. And we'll talk more about those in a minute, what other causes you may think exist. But does AIPC deny that it played at least a part or a role as one of the causes of this accident?
A. It is a piece of the puzzle.
Q. Okay. That's a way of dancing around my question. Does AIPC agree that its actions caused, in whole or in part, this accident to occur?
A. That's a legal -- I don't -- that -- I'd have to talk to Counsel. That's a legal interpretation of it. I think that his actions were a piece of the puzzle that caused the accident, but there was a lot of things in motion that morning.

Q. Well, let's break that down, then, because I'm not understanding your answer. Do we agree that the Norfolk Southern equipment locomotive could not have struck the AIPC locomotive if the AIPC locomotive was not in the foul of the Norfolk Southern tracks?
A. If the -- if the AIPC locomotive was not in the foul, the Norfolk Southern locomotive would not have hit it.
Q. So there's no way this accident could have occurred if the AIPC locomotive was not in the foul of the Norfolk Southern main line tracks, correct?
A. That is correct.
Q. And the only reason that locomotive was in the foul of the tracks is because Mr. Rico Blanchett, your employee, acting in the course and scope of his duties as an employee, as you've already told me, lost control of it and allowed it to get through the derail?
A. That ---
BY MR. RADECK:
Object -- hold on. Let me object, and then you can answer. Objection.
EXAMINATION RESUMED BY MR. WRAY:
Q. Go ahead. You can answer.
A. That's part of the reason, it was in the foul.

Q. Mr. Marshall, prior to that break I was asking you about the ConAgra Rail Policies manual, and you told me the hand signal section, in particular, did not apply, and I'd asked you were there any others that didn't apply to your training or instructions given Mr. Blanchett. Did you have a chance to review the document?
A. I did.
Q. Are there other aspects that you would say, well, this just doesn't apply to what we're doing at AIPC?
A. No, the rest of the document we -- we did go over.
Q. Okay; great. And was it your expectation that Mr. Blanchett would follow the rules and instructions set forth in this document?
A. Yes, that was our expectation.
Q. If you don't mind, flip over to page three. And consistent with what you just told me, the second sentence says, "Employees are required to have knowledge of all rules pertaining to their assigned duties and to be governed thereby," correct? Is that what it says?
A. That's what it says.
Q. And part of the duties that Mr. Blanchett was to be governed by was compliance with instructions in this manual and what you taught him, right?

A. That is correct.
Q. Then the next sentence says, "Employees must cooperate and assist in carrying out the rules and instructions and must promptly report to the proper office," number one, "any violation of the rules or instructions," correct?
A. Correct.
Q. Number two, "any condition or practice which may imperil the safety of employees or trains," correct?
A. Correct.
Q. And, number three, "any misconduct or negligence affecting the interest of the company," correct?
A. That is what it says.
Q. In this case, as we already talked about, Mr. Blanchett violated several company rules and instructions, right?
A. That is correct.
Q. And he did, in this case, engage in practices that imperiled the safety of employees or trains, didn't he?
BY MR. RADECK:
Object to the form. You can answer.
WITNESS ANSWERS:
A. Rico derailed our locomotive. He did not notify me or anyone. However, I don't -- the safety -- I

don't believe he knew anybody was at risk.
EXAMINATION RESUMED BY MR. WRAY:
Q. I'm not asking you what he knew. But the fact of derailing a locomotive imperils safety, doesn't it?
BY MR. RADECK:
Object to form.
EXAMINATION RESUMED BY MR. WRAY:
Q. You can -- do you disagree with that statement?
A. It became a safety -- I'm not sure how to answer that. The -- again, Rico did not realize that he had done anything that was going to -- he did not realize he'd fouled the track. So the safety piece of it is -- I mean, there was a lot of things at play that morning. Yes, he didn't contact me when he derailed the locomotive, but I'm not sure how to answer your question.
Q. Well, let's unpack that. You don't know what Mr. Blanchett knew or didn't know because you never talked to him after this accident to ask him what he knew or didn't know that morning, right?
BY MR. RADECK:
Objection. You can answer.
WITNESS ANSWERS:
A. I did not know at the time, no.
EXAMINATION RESUMED BY MR. WRAY:

Q. Well, you don't know now. You still haven't spoken to him directly; you just know what somebody's told you?
A. I know what he -- what he said at the injury case.
Q. And the policy does not say that he has to know it will imperil the safety of employees or trains; it say which may imperil the safety of employees or trains. Isn't that correct?
A. That's what it says, yes.
Q. And derailing a train, whether he knew it or not, may imperil the safety of employees or trains. You would agree with that, wouldn't you?
A. It may.
Q. And fouling operating main line railroad track may imperil the safety of employees or trains?
A. May contribute to it.
Q. You would agree with that, right?
A. Yes.
Q. Was that yes? I'm sorry.
A. Yes.
Q. All right. The next paragraph says, "Accidents do not just happen, but are caused." Do you see that?
A. I do see that.
Q. Does AIPC agree with that?
A. Yes.

Q. The next sentence says, "It is the duty of each employee to eliminate the cause." Did I read that correctly?
A. You read it correctly.
Q. Does AIPC agree with that?
BY MR. RADECK:
Object to the form. You can answer.
WITNESS ANSWERS:
A. Within reason I agree that employees should try and eliminate the cause of safety issues.
BY MR. WRAY:
I'm sorry; could you read back his answer there for me?
BY THE COURT REPORTER:
I'm getting a not responding right now. It's going to take it a minute.
BY MR. WRAY:
You mean the technology is not responding?
BY THE COURT REPORTER:
Yes.
BY MR. WRAY:
Oh, okay. That's all right. If I had remembered to turn my phone off and somebody hadn't dinged me, I would have had the answer, but somebody distracted me, so I didn't catch his answer. Have

you got the video paused, or is it still going?
BY THE VIDEOGRAPHER:
It's still going.
BY MR. WRAY:
Let's just go off the record until she's able to get it.
BY THE VIDEOGRAPHER:
Off the record at 11:10 a.m.
(OFF THE RECORD)
BY THE VIDEOGRAPHER:
On the record at 11:11 a.m.
EXAMINATION RESUMED BY MR. WRAY:
Q. So, Mr. Marshall, I asked you whether AIPC agreed with the statement in its own policy manual that it's the duty of each employee to eliminate the cause of accidents, and you said you agreed with that within reason. Was that your testimony?
A. Yes.
Q. Was it within reason for Mr. Blanchett to ride on the lead of the movement instead of on the rear?
A. Yes.
Q. Was it within reason for him to apply the air completely to the full train?
A. Yes.
Q. Was it within reason for him to call and notify

somebody that he had had an accident out there and he might need help?

A. Yes, it was.

Q. And then the last sentence in this introduction section says, "Common sense should prevail in the absence of specific rules." Does AIPC agree with that?

A. Yes, it does.

Q. And would you agree with me that common sense in this circumstance would have been, whether Mr. Blanchett knew or didn't know that he was fouling the track, that he should let somebody know so it could be investigated?

A. We agree that Mr. Blanchett should have let me know.

Q. Then the next -- if you'll flip over to page four, there's a series of 15 safety rules. Do you see that?

A. I do.

Q. Number one says, "In case of doubt or uncertainty, take the safe course." Do you agree with that?

A. I do.

Q. Do you believe that on the date of this accident Mr. Blanchett took the safe course?

A. I believe that Mr. Blanchett took shortcuts that morning.

Q. Number three says, "Employees must be alert and attentive when performing their duties and plan their work to avoid injury and report by the first means of communication any accidents or personal injuries." Do you see that?
A. I do see that.
Q. And we agree Mr. Blanchett didn't comply with that rule, correct?
A. We do agree with that.
Q. Number four says, "Employees must comply with all rules, policies, and outstanding instructions." And you've already agreed Mr. Blanchett did not comply with that, right?
A. We do.
Q. 1.7 says, "Report, correct, or protect any unsafe condition or practice and use good judgment in fulfilling job responsibility safety." Does AIPC agree Mr. Blanchett didn't comply with that safety rule?
A. Yes, we agree.
Q. If you flip over to page five, section two on rules, 2.3 says, "Employees must be familiar with and obey all rules, regulations, and instructions." I'm going to stop there first. Was that the expectation of AIPC for Mr. Blanchett on the date of this

on him while he was working, right?

A. That is correct.

Q. And that was allowed by AIPC policy?

A. Yes.

Q. Was one of the reasons for that so that if Mr. Blanchett had an issue and, perhaps, the radio wasn't working, he could use his cell phone to communicate?

A. Yes.

Q. Other than, perhaps, a restriction on him using his cell phone while he was actually operating the locomotive, were there any other restrictions on Mr. Blanchett's use of his cell phone while on duty?

A. No. They're not supposed to use them for non-work purposes, but we didn't -- we do not restrict them from carrying them in case they need them.

Q. Would you consider reporting of a locomotive potentially fouling the main line track to be a work purpose?

A. If Rico realized that he had fouled the main line and used his cell phone to call, that would be work purpose, yes.

Q. If Mr. Blanchett took the equipment over or the equipment passed over the derail and he wasn't certain one way or the other if it reached the main

line and was fouling the track, what would be your expectation for him, based on your training of him?
A. Based on my training?
Q. Yeah.
A. To -- as soon as that locomotive went off the track, my expectation is to notify me.
Q. Would you expect him to walk out there and verify one way or the other, or does that matter?
A. I would have expected him to be on the front so he wouldn't have had to walk out there.
Q. Right. Leaving that aside, though, we know he wasn't here. But once he went through there, you've said a couple times that you don't have information that Rico knew he was fouling the track; is that your testimony today?
A. That is my testimony.
Q. One way to know whether it was or wasn't would be to walk out there and look and see, right?
A. Yes, if he understood the main line and the fouling of the main line. Our locomotive was not very far across the foul of the main line, as you know. And so in looking at it, I'm not sure he would have known if he was fouled. That said, he should have notified me.
Q. Right. You're talking about he should have notified

you. But he should have gone and looked to see whether it was or wasn't, shouldn't he?
A. That is correct. But what I'm saying is, I don't know if he would have known even looking at it if it was fouling the main line.
Q. Is there anything that you know of that prohibited Mr. Blanchett from walking out there and confirming one way or the other whether his locomotive was in the foul?
A. No.
Q. Now, there was some testimony in the prior case that Mr. Blanchett, after the event occurred, walked back up to the mill, to the facility, and he spoke with somebody, and I may have the name wrong. Was it Mike Thompson?
A. That is correct.
Q. And who is Mike?
A. Mike is one of my mill operators.
Q. So he had the same position that Mr. Blanchett had before he became the elevator operator?
BY MR. RADECK:
Object to form.
WITNESS ANSWERS:
A. He had the mill operator position.
EXAMINATION RESUMED BY MR. WRAY:

Let's mark these two agreements. We'll mark the original agreement as 10 and the supplemental as 11.

(MARKED FOR IDENTIFICATION, PLAINTIFF'S EXHIBIT 10, ORIGINAL SIDING AGREEMENT, ATTACHED.)

(MARKED FOR IDENTIFICATION, PLAINTIFF'S EXHIBIT 11, SUPPLEMENTAL SIDING AGREEMENT, ATTACHED.)

EXAMINATION RESUMED BY MR. WRAY:

Q. Mr. Marshall, do you have Exhibits 10 and 11 in front of you?

A. I have exhibit 10.

Q. Oh, I'm sorry. You need -- sorry.

A. Yes, I have Exhibits 10 and 11 in front of me.

Q. And I think we're going to spend our time on 10, but we'll mark 11, as well. So, you said what you did to prepare for this topic was to just read through it yourself?

A. That is correct.

Q. And as you read through it, did you have any provisions that you thought were unclear or uncertain as to what they meant?

A. From a legal aspect, yes. I'm not -- I'm not an attorney. I don't understand -- I don't understand all of it, no.

Q. Right. I'm not asking you from a legal standpoint.

But just was there something that you read this paragraph and said I have no idea what's expected of us or -- being AIPC or the railroad ---
A. No, sir.
Q. --- with respect to this?
BY MR. RADECK:
Object to the form.
WITNESS ANSWERS:
A. No, sir.
EXAMINATION RESUMED BY MR. WRAY:
Q. Let me ask you to flip over to page four, and this is in a section that's labeled Liability back on page two, paragraph ten, and then it's got several subsections, but I'm looking at subparagraph G. Are you with me?
A. Yes.
Q. Subparagraph G says, "In the event that this agreement authorizes industry to move or industry does move any rail cars on the track, then, notwithstanding any other provisions of this agreement, industry shall indemnify, protect, and hold railway harmless from and against any and all claims, demands, suits, judgments, liabilities, costs, including attorney's fees, and expenses occasioned by any death, personal injury, or loss of

or damage to property arising or growing out of the movement of rail cars by industry or its agents, regardless of whether the negligence of railway may have caused or contributed to such injury, death, damage, or loss."  Did I read that correctly?
A.  Yes.
Q.  Did you read that paragraph as part of your preparation for today?
A.  Yes, I did.
Q.  Is there any question in this case that the agreement between AIPC and Norfolk Southern authorized AIPC to move rail cars on the industry track out there at AIPC?
BY MR. RADECK:
Object to the form.  You can answer.
BY THE WITNESS:
Ask the question again.
EXAMINATION RESUMED BY MR. WRAY:
Q.  Is there any question that the agreement between AIPC and Norfolk Southern authorized AIPC to move rail cars on the industry track out there?
A.  No.  We were authorized to move rail cars on our track.
Q.  And then it says authorized industry to move or industry does move any rail cars.  And there's no

question AIPC, as part of its regular business, moved rail cars on the industry track at this facility, right?
A. That is correct.
Q. On the morning this accident occurred, Mr. Blanchett was, in fact, moving rail cars from the JO2 track, was he not -- or wasn't he?
A. He was moving -- yeah, Mr. Blanchett was moving rail cars.
Q. And it was in the process of moving those rail cars that he lost control for whatever reason and went through the derail, correct?
A. Mr. -- Mr. Blanchett was moving rail cars and went through the derail with our locomotive.
Q. And there's no question in this case, and I think AIPC admitted in some other things we served, that there was damage caused out there as a result of this accident, right?
BY MR. RADECK:
I'd just object to the form, but go ahead.
WITNESS ANSWERS:
A. There was -- there was no damage caused by Rico going through the derail.
EXAMINATION RESUMED BY MR. WRAY:
Q. Well, as a result of the accident that occurred

involving the Norfolk Southern employees that came along, there was damage to ---
A. As a result of ---
Q. --- property?
A. As a result of the Norfolk Southern locomotive striking our locomotive, there was damage.
Q. Right. And the Norfolk Southern locomotive couldn't have struck the AIPC locomotive if the AIPC locomotive wasn't in the foul of the track, could it?
A. If the -- if our locomotive was not in the foul, the Norfolk Southern locomotive would not have hit it.
Q. Does AIPC have anyone employed by it that has experience or training in railroad engineering? And let me be a little clearer. When I say railroad engineering, I'm talking about track engineering, constructing track, constructing derails, that sort of engineering.
A. No. They defer to experts.
Q. To your knowledge, has AIPC ever installed or constructed railroad track itself, not through contractors, but through AIPC itself ---
A. Not ---
Q. --- doing the work?
A. Not to our knowledge.

Q. When Mr. Blanchett picked up the cars, point to the jury where he picked up the cars on the JO2 track.
A. This is JO2 right here.
Q. And that's where he made his mistake of getting on the rear of the move instead of the front of the move, right?
A. I don't know where he got on the rear, but he was on the rear when he got down here, yes.
Q. Well, you wouldn't expect him to have jumped on the rear as the train was going through the derail towards the Norfolk Southern main line, would you?
A. No, but I wouldn't expect him to ride on the rear either. So ---
Q. Right.
A. --- I don't know what he did.
Q. But logically it makes sense that he got on the rear before he started the movement towards the Norfolk Southern derail, correct?
A. That is correct.
Q. And if he didn't apply the air before that movement began, he did that back at the JO2 location where he picked up the cars, as well, correct?
A. If he didn't fully apply the air, correct.
Q. So, he made mistakes at a lot of different places that day, right?

A. That is correct.
Q. And we all understand that they weren't physically unloading grain from the rail car when the equipment went through the derail, but those cars can't be unloaded unless Mr. Blanchett moves them from the JO2 track where he picks them up to where -- to the pit where they're going to be unloaded, correct?
A. Correct. We unload at the pit.
Q. And that's what he was in the process of doing and would have completed if the accident hadn't occurred, right?
BY MR. RADECK:
Object to form.
EXAMINATION RESUMED BY MR. WRAY:
Q. Isn't that what he was doing?
A. He was moving rail cars.
Q. He was moving -- he was moving loaded cars from where he picked them up and he, ultimately, was going to shove them back into the pit so they could be unloaded, right?
A. He was moving cars back up to the -- yes.
Q. For what purpose?
A. To unload them.
Q. Mr. Radeck asked you a series of questions about the brake inspections and the mechanical work on it.

The reason AIPC brings in a third-party contractor to do these inspections and repairs is because you don't have qualified mechanics on staff; fair to say?
A. That's fair to say.
BY MR. RADECK:
Object to form.
WITNESS ANSWERS:
A. We don't -- we don't have -- yeah, we're not -- we're not a rail company; we are a pasta company.
EXAMINATION RESUMED BY MR. WRAY:
Q. Right. And you hire a company with expertise in locomotive inspections and locomotive repairs to do that work for you, right?
A. That is correct.
Q. Mr. Radeck asked you about the derail and AIPC's expectations. You don't know how fast the locomotive was going when it went over the derail that day, do you?
A. I do not.
Q. You don't know what throttle position Mr. Blanchett had the locomotive in as it went over the derail, do you?
A. I do not.
Q. It is on a descending grade, correct?

A. That is correct.
Q. And you don't have any expertise yourself in terms of how speed, grade, and those type of forces might impact the performance of a derail, do you?
A. No, I don't.
Q. You were, also, asked about the training that was done on operating this locomotive, and you talked a little bit about what was done that you participated in. There are no videos related to that training that AIPC has, are there?
A. No.
Q. There are no policies that were handed out by the trainers that were used to train you and others at AIPC, are there?
A. No.
Q. And you said there's no doubt in your mind that Rico Blanchett was trained properly. Is that what I understood you to say?
A. Yes.
Q. If Mr. -- assuming Mr. Blanchett was trained properly, it would stand to reason that on the time -- at the time this accident occurred he either intentionally wrecked this train or he made a series of horrible mistakes, correct?
BY MR. RADECK:

Object to the form.
WITNESS ANSWERS:
A. He made a series of mistakes.
EXAMINATION RESUMED BY MR. WRAY:
Q. And you were, also, asked -- I was really confused by this. The ConAgra policy, I thought you told me earlier that you used that ConAgra policy to train Mr. Blanchett. Is that right?
A. I used it to supplement my training. I went through it with him. It is not an AIPC policy; it is something I use to supplement the training.
Q. Right. I understand AIPC didn't create the document, but you and I went through it. You're not changing your testimony -- I asked you earlier, there's a specific statement that says employees are required to be familiar with this document, and you told me they were.
BY MR. RADECK:
Object to the form.
EXAMINATION RESUMED BY MR. WRAY:
Q. Correct?
BY MR. RADECK:
Misstates testimony.
WITNESS ANSWERS:
A. Rico was familiar with that -- with those

procedures.

EXAMINATION RESUMED BY MR. WRAY:

Q. Whether AIPC wrote this document up or ConAgra wrote it up, Mr. Blanchett was expected to comply with it, right?

BY MR. RADECK:

Object to the form.

WITNESS ANSWERS:

A. Rico was expected to comply with our safety standards.

EXAMINATION RESUMED BY MR. WRAY:

Q. And your safety standards are reflected in part by this document, right?

BY MR. RADECK:

Object to form.

WITNESS ANSWERS:

A. Yes.

EXAMINATION RESUMED BY MR. WRAY:

Q. Otherwise, you wouldn't train him on it; there would be no point, right?

BY MR. RADECK:

Object to form.

WITNESS ANSWERS:

A. Well, there's lots of reasons to train people.

EXAMINATION RESUMED BY MR. WRAY:

Q. Right. And part of it is so that they understand what they're supposed to do, right?
A. That's why we train people, so they know what to do.
Q. And part of it is so they'll do their job safely, right?
A. A piece of it, yes.
Q. And you used this policy as one of those tools to help Mr. Blanchett perform those tasks, correct?
A. I used that policy to help me train him, yes.
Q. The ticket list that Mr. Radeck asked you about, have you got that in front of you again? I think that was Exhibit 7. Do you have that?
A. I do.
Q. And you said the first series of items on here reflect when you were operating the locomotive and Mr. Blanchett was riding with you, correct?
A. That is correct.
Q. And the second series reflects some moves where Mr. Blanchett was operating and you were riding with him, correct?
A. Yes.
Q. And the last date referenced on here where you were riding with Mr. Blanchett was July 11, 2022?
A. So this is all the cars unloaded. So, let me clarify. This is all the cars -- the first ticket