# EXHIBIT 2

STATE OF SOUTH CAROLINA
COURT OF COMMON PLEAS
COUNTY OF RICHLAND

\- - -

DAVID E. SMALL, JR., :
: CIVIL ACTION NO.:
Plaintiff, :
: 2023-CP-40-02115
vs. :
:
NORFOLK SOUTHERN CORPORATION; :
TREEHOUSE FOODS, INC.; AND :
AMERICAN ITALIAN PASTA COMPANY, :
:
Defendants. :

---

RAYMOND S. RIGHTMIER, AND HIS :
LAWFUL WIFE, ANGIE RIGHTMIER, : CIVIL ACTION NO.:
:
Plaintiffs, : 2022-CP-40-05526
:
vs. :
:
RICO BLANCHETT, AN INDIVIDUAL; :
TREEHOUSE FOODS, INC., A :
FOREIGN CORPORATION; AMERICAN :
ITALIAN PASTA COMPANY, A :
FOREIGN CORPORATION; AND :
NORFOLK SOUTHERN RAILWAY :
COMPANY, A FOREIGN CORPORATION, :
:
Defendants. :

---

VIDEOTAPED DEPOSITION OF RICO BLANCHETT

---

DATE TAKEN: Tuesday, February 20, 2024

TIME BEGAN: 11:04 a.m.

TIME ENDED: 1:54 p.m.

LOCATION: Burr & Forman, LLP
1221 Main Street, Suite 1800
Columbia, South Carolina

REPORTED BY: Deidre Osborne, RPR

A. Not to my knowledge.

**Q. Let me ask you this. We'll jump ahead a little bit. When this incident occurred and the aftermath occurred, my client's train, Mr. Steel's client's train, crashed. You're familiar with that; aren't you?**

A. Yes.

**Q. You've seen the pictures; haven't you?**

A. I have.

**Q. Probably saw the news on your local television station; didn't you?**

A. I seen it, yeah, but I -- on a phone, but, yeah.

**Q. Would you say it was pretty catastrophic?**

A. Yes, it looked to be.

**Q. Okay. Did your management team ever call you in for an interview and ask you, "All right, Blanchett. Tell us about it. What happened?" Did they do that?**

A. They did.

**Q. And did they give you any results of their investigation, without talking to lawyers? I don't want to know what you talked with lawyers about. I want to know: Did your employer ever share with you what they thought of your behavior that day?**

A. They did.
**Q. What did they tell you?**
A. I think -- well, obviously, it -- I was the cause of that incident. And then they said, the derailer, because it broke and didn't work -- the way they explained it, it was a lot of things that just went wrong.
**Q. Some of your fault but some not your fault.**
A. Correct.
**Q. Is that what your employer told you?**
A. Correct.
**Q. What was your fault, if you don't mind me asking?**
A. Going through the derailers.
**Q. So your train -- so you admit that your train that you were -- pulling or shoving?**
A. I was pushing.
**Q. You were shoving.**
A. Correct.
**Q. Which means your engine was behind the cars? Or was your engine in the lead of the cars?**
A. I was -- I was pulling. Sorry.
**Q. You do know what pulling and shoving are, right?**
A. Right, right. I was -- just lost track. I

**Q. You made a service reduction to slow your train down. How fast was your train going?**

A. I don't know.

**Q. What did you intend to do?**

A. I intended to stop short of the derail and head back to the plant.

**Q. So your contention here today is that your brakes failed. Now, we haven't read that in anything that we've read in this case.**

A. No. I was -- well, you cut me off.

**Q. Oh, I apologize.**

A. The brakes failed because --

**Q. Don't let me do that.**

A. I didn't realize it at the time, but whenever -- whenever we would hook up to the rail cars -- and, like you said, it's air brakes. It's a lot of air. We would always couple up and then crack the air and let it build up because I've always been told if you open it all the way, there's a chance the O-rings would blow and get your legs.

**Q. You talking about the angle cock?**

A. I don't know what that is.

**Q. You don't know what it's called; do you?**

A. No, I don't.

**Q. All right. So -- so tell me what happened.**

A. When I coupled up with the cars, I hooked up the air brakes, excuse me, and I just cracked the air to let it build up.

**Q. The way you always do.**

A. Yeah. The same as every other morning.

**Q. Okay. So anything happen there that's improper?**

A. No.

**Q. All right. So now you're making your move.**

A. And I walked down and, you know, broke my six off. Make sure the air was cut off on that sixth one and let it build up to the pressure. You know, the train won't move until it gets to whatever pressure it should be at --

**Q. Okay.**

A. -- and that's when I headed up the hill from, like you said, the back of the sixth car. I didn't walk back past the engine, so I completely forgot about that air valve being cracked instead of open all the way like it should have been.

**Q. You're saying that you did not open the angle cock or the valve, as you call it, all the way to do what?**

A. To give it the full air pressure it needed from the engine.

**Q. Were you trained to do it the way you did it?**
A. I was. Everybody --
**Q. You were?**
A. -- I've ever seen done it that way.
**Q. The way you did it.**
A. Yeah.
**Q. So why do you fault what you did if you were trained to do it that way?**
A. I don't fault the way I did it. I fault not going back to open it all the way.
**Q. So you were trained to go back and open it all the way, but you didn't do that.**
A. Correct.
**Q. That's what you say you did wrong.**
A. Right.
**Q. So you don't think you had enough air brake on that train to stop it.**
A. I didn't.
**Q. And you didn't realize that you didn't have air brake sufficiently on that train to stop it.**
A. Until it was too late.
**Q. You still had brakes available to you; didn't you?**
A. I did.

it was supposed to be stopping, and it wasn't.

**Q. It says, "This measurement was taken from the rear left wheel considering the visible skid marks on the surface of the rail, and the skid marks continued another 33 feet through the end of the split switch derail."**

**He's -- according to this report, there's a lot of skidding going on. Skidding doesn't happen unless the wheels are locked and not rotating.**

A. Right.

**Q. Do you agree with that?**

A. Yeah.

**Q. Can you explain this report or you can't?**

A. No.

MR. TEEL: Object to the form.

BY MR. SPIER:

**Q. All right. You never were presented with any of this?**

A. No.

**Q. No.**

**Do you recognize, Mr. Blanchett, that by leaving the derailment site as you did, the way you described, going home, not reporting this to anyone, although you had the means, the capacity to do it, that that is the height of recklessness on your part?**

MR. TEEL: Object to the form.
THE WITNESS: It was careless.
BY MR. SPIER:
**Q. Careless or reckless?**
MR. TEEL: Object to the form.
BY MR. SPIER:
**Q. Tell me.**
A. You tell me.
**Q. Well, depends on how you define these things, I guess.**
A. Right.
**Q. I'm not trying to push you into the mud, but I'm trying to understand a guy who's got a high school education, as you say you do -- you had some trouble with the law, but nothing you couldn't -- and nothing that was serious that resulted in felonies or anything of that sort. Responsible fellow, apparently. Held jobs, never fired, left because of your own doing. I don't understand your behavior when you would leave a derailment site and not report it. So I'll give you one last chance to tell me. Why did you leave the site without reporting it?**
MR. TEEL: Object to the form, asked and answered.
MR. SPIER: Fair enough. He'll do it

to need to be done in the following days.

**Q. Did they ask you to come in again back to the mill?**

A. I don't think they did at that point. I don't remember.

**Q. Did they ask you to submit to a drug test?**

A. Then? No, they didn't.

**Q. Did they at some other time?**

A. No.

**Q. Just when you said "then," that's why I asked. Did they ever submit you to a drug test?**

A. Other than pre-employment drug tests.

**Q. Gotcha. But with regard to this incident, you were never asked by anyone to submit to a drug test at any point in time.**

A. I wasn't.

**Q. Okay. When you worked at -- is it Circle S? Your prior employer, Circle S? Have I got that right?**

A. Correct.

**Q. When you worked at Circle S, even though it wasn't a remote control job, you still had to open an angle cock, right?**

A. Correct.

**Q. Put air into cars. So that was something**

**you were familiar with doing.**

A. Right.

**Q. But on this day, you just did it incorrectly.**

A. I did.

**Q. Would you agree that at any time that any equipment gets past the derail at the mill location that that would be an unsafe condition?**

A. Yeah. At this time, I -- yeah, I would agree with you.

**Q. Well, you knew that on the day that it happened, right?**

MR. TEEL: Object to the form.

THE WITNESS: I knew I had screwed up. I didn't know anybody was in danger.

BY MR. STEEL:

**Q. You certainly knew there was a main line right there.**

A. I did.

(The stenographer asks for clarification.)

THE WITNESS: I did.

BY MR. STEEL:

**Q. Has Mr. Marshall ever called you since this incident?**

A. He may have after it happened but not that I