# EXHIBIT 1

PERCEPTIO FORENSICS

March 23, 2026

Mr. John O. Radeck
Hood Law Firm, LLC
172 Meeting Street
Charleston, SC 29401

**RE: Norfolk Southern Railway Company v. American Italian Pasta Company and Treehouse Foods, Inc.**
**Case No. 3:25-cv-06618-SAL**
**PF File No. D.26007**

Dear Mr. Radeck,

Pursuant to your request, I conducted a human factors investigation of the collision involving two locomotives on July 11, 2022. As part of my investigation, case-related documents provided by your office were reviewed, in addition to applicable research. It should be noted that I was initially retained as part of the litigation related to the injuries sustained by the operators of Norfolk Southern Railway Company locomotive and reviewed documents provided during that engagement as part of my analysis presented here.

It is my understanding that discovery in this matter is ongoing and as a result, I reserve the right to supplement and amend my opinions as additional information becomes available. The following report is a summary of my findings.

**DESCRIPTION AND BACKGROUND**

On July 11, 2022, a Norfolk Southern Railway Company (NS) locomotive was traveling east from Columbia to Charleston. Prior to the arrival of the NS locomotive at the 122 milepost along the NS mainline, a locomotive operated by American Italian Pasta Company (AIPC) derailed at a split point with the main track, causing the AIPC locomotive to be in the *foul*[1] of the main track. The NS locomotive ultimately struck the derailed AIPC locomotive.

---

[1] Per National Transportation Safety Board (NTSB) Safety Alert 78, a locomotive is in the *foul* when it is "close enough to a track to be struck by a moving train or, in any case, within 4 feet of the nearest rail."

www.perceptioforensics.com
info@perceptioforensics.com
2245-C Ashley Crossing Dr. #147
Charleston, SC 29414

**DOCUMENT REVIEW**

*All documents reviewed, considered, and/or in my possession, may be used as exhibits as necessary.*

Documents reviewed in total or in part for this investigation to date are as follows:

Provided documents

1. Complaint;
2. Dash cam videos;
3. Depositions of Rico Blanchett, Raymond Rightmier, and David Small;
4. Document production by American Italian Pasta Company and Norfolk Southern, including but not limited to:
    a. Incident report;
    b. Photographs;
    c. South Carolina Office of Regulatory Staff FOIA;
5. Secretariat report authored by Foster Peterson and Dustin Bell.

Peer-reviewed and/or published literature, standards, regulations, and texts

1. Cogan, B., Bosch, E., Thomas-Friedrich, B., Wasle, H., Schackmann, D., Klotz, C., & Milius, B. (2025). Evaluating train drivers' performance to inform the development of automatic train operation. *Applied Ergonomics, 129*, 1-10;
2. Cutting, J.E., Vishton, P.M., & Braren, P.A. (1995). How we avoid collisions with stationary and moving obstacles. *Psychological Review, 102*(4), 627-651;
3. Gibson, J.T., & Crooks, L.E. (1938). A theoretical field-analysis of automobile-driving. *The American Journal of Psychology, 51*(3), 453-471;
4. Olson, P.L., Dewar, R., & Farber, E. (2010). *Forensic aspects of driver perception and response* (3rd ed.). Lawyers & Judges Publishing Company, Inc.

Independent research and file materials

1. National Transportation Safety Board. (2019). *Fouling other railroad tracks.* Safety Alert 078, March 2019.

**OBSERVATIONS**

1. According to the NS incident report, the subject collision occurred at approximately 8:14 am on July 11, 2022 along the SC-Line near Columbia. The NS train was traveling east towards Charleston with NS personnel David Small (Small) and Ray Rightmier (Rightmier) operating the locomotive.

2. On the morning of the incident, Rico Blanchett (Blanchett) was operating an AIPC locomotive, traveling east on the plant's tracks towards the NS mainline. As Blanchett approached the mainline, the AIPC locomotive derailed and came to a stop with the outermost point of the locomotive 19 inches from the outside of the NS mainline rail (see **Figure 1**).



**Figure 1** – Screenshot from NS dash camera showing the position of the AIPC locomotive approximately 3-4 seconds prior to impact between the two locomotives.

3. Small testified in his deposition that he "could see clearly" as they approached the switch where the incident occurred and that he first noticed the AIPC train fouling the mainline "roughly around 600 feet from it" (pg. 34). Small later testified that the distance at which he appreciated the AIPC train's position was shorter than this, indicating an inconsistent recollection of events.

4. Small indicated in his deposition that he did not believe he applied the brake at any time prior to the impact (pg. 69). He also testified that Rightmier did not tell him to brake nor did Small tell Rightmier to apply the emergency brakes (pg. 71).

5. Rightmier testified in his deposition that he "[didn't] remember exactly when [he] saw" that the AIPC locomotive was going to present a problem for them (pg. 29). He also agreed that the dash camera footage depicted him doing paperwork as they traveled the mainline approaching the incident area (pg. 76).

6. Rightmier did not recall telling Small to apply the emergency brake but knew he did not apply the emergency brake himself (pg. 79).

7. According to the Secretariat expert report prepared for NS by Foster Peterson and Dustin Bell, the AIPC locomotive was visible approximately 22-23 seconds before impact, but in their opinion "it is not yet obvious that [the AIPC locomotive has] been run through the derail." They opined that approximately 9 seconds prior to the collision, Small and Rightmier

displayed "visible signs of recognition and an increased focus ahead, consistent with determining that the AIPC locomotive and cards are in a position close to the NS main track."

**DISCUSSION**

Perceptual information available in the environment directly determines operators' ability to successfully navigate their environment. Locomotion is primarily accomplished through reliance on visual information, with the *field of safe travel* being delineated by perception of objects or environmental features that pose potential obstacles to be avoided (Gibson & Crooks, 1938). Thus, successful navigation is governed by reactions of the operator that keep them "headed into the middle of the field of safe travel" (Gibson & Crooks, pg. 456), moving away from objects with which a collision is likely.

Visual information about the location and movement of other objects in the environment informs wayfinding of operators. Specifically, the retinal image of objects provides valuable context as to whether other objects are (a) stationary or in motion, and (b) moving toward or away from the observer (Cutting, Vishton, & Braren, 1995). The change in image size is an important cue indicating the distance between the observer and an object, allowing the observer to judge whether the space between themselves and the object is opening or closing (Olson, Dewar, & Farber, 2010). Changes in the change in retinal image size then allows an observer to discern the speed at which they are closing on the object and whether impact is likely. For example, an object whose retinal size decreases as the observer approaches the object indicates that the object is moving away from the observer and a collision is therefore unlikely to occur.

Cutting, et al. concluded that "retinal displacement information from looking at stationary objects in one's surround during locomotion is adequate to yield information both about guiding one's path through it and about avoiding collisions with those objects" (pg. 644). In other words, objects that are nearer to the observer appear to be moving farther and in the opposite direction of more distance objects. The data gathered by Cutting, et al. also revealed that observers were considerably better at wayfinding and collision detection when looking at a stationary object. Observers rely upon the information conveyed by changes in the retinal image of a static object to localize the object in the environment, determine if a collision is possible, and adjust their path of travel accordingly.

Perception response time (PRT) refers to an interval that begins when an object or condition first becomes possible for an operator to detect and ends when the operator initiates a discernible response to the object or condition (Olson, et al.). Upon detection of a potential hazard, the operator must (1) identify the object and its position relative to their path, (2) decide what action is necessary, and (3) begin the sequencing of actions required to avoid the object. Obviously, having adequate visual information about the existence and positioning of a potential hazard is a prerequisite for the commencement of the PRT interval.

A review of evidence related to the subject collision indicates that visual information was available to the NS personnel regarding the AIPC locomotive's encroachment into their path in advance of impact. Both the NS dash camera footage and deposition testimony from Rightmier and Small revealed that they had an unobstructed view of the AIPC train as the NS train approached the incident area. The AIPC train's location relative to the main track would have been readily perceivable at least 22-23 seconds before impact and available visual information would have indicated that the AIPC locomotive was stationary.

As the NS train traveled east on the main track, the retinal image of the AIPC train would have continued to increase for Rightmier and Small, indicating that they were approaching a locomotive that was either stationary or moving towards the mainline. The AIPC train's proximity to the main track would have been visually apparent and should have indicated that the NS train's *field of safe travel* was constrained by the AIPC train. As a result, Rightmier and Small should have appreciated that contact between the two trains was imminent and a response (e.g., braking) would be required.

The Secretariat report noted that Rightmier and Small exhibited "visible signs of recognition and an increased focus ahead" approximately 9 seconds before impact. A review of visualizations of the view from the Norfolk train cab depicted in the report of Allen Powers (Powers), an expert retained by the Defendants, revealed the AIPC train's position in the foul was perceivable from at least 1000 feet away, in my opinion. It is my understanding that Powers concluded that Small reached for the brakes approximately 9.4 seconds before impact. However, there was no braking exhibited by Small or Rightmier until after the locomotives collided.

Cogan, et al. (2025) measured train operators' reaction times when encountering high and low contrast objects (bright orange and orange-brown, respectively) on the simulated train tracks. The size of the objects ranged in size from that of the relative heights of a child to an adult. When operators encountered a high contrast, adult-sized object while traveling at a speed of ~25 mph and visually monitoring the track ahead, the mean reaction time was 1.36 seconds. The authors concluded that "stimulus intensity, such as size and differences in brightness or [color] between the object and its background, influences reaction time" (pg. 7). It should be noted that the AIPC locomotive was considerably larger than an adult human and the cab closest to the main line was yellow.

The lack of pre-impact response by Small or Rightmier is inconsistent with the visual information available from at least 1000 feet away indicating that the AIPC train obstructed the main line. When consideration is given to the distance at which this would have been perceivable, Small and/or Rightmier had an opportunity to initiate a response to the train in the foul prior to the collision. Braking over 9 seconds after apparent recognition of the large, high contrast hazard is inconsistent with the aforementioned reaction time data.

Multiple resource theory (MRT; Wickens, 2002) provides a framework for understanding the changes in performance when attempting to perform multiple tasks simultaneously. The theory posits that four dimensions of resources account for these changes: (1) stages (perceptual/cognitive activities vs. response selection and execution); (2) perceptual modalities (visual vs. auditory); (3) visual channels (focal vision vs. ambient vision); and (4) processing codes (analogue/spatial processes vs. categorical/symbolic processes). Wickens writes that "all other things being equal (i.e. equal resource demand or single task difficulty), two tasks that both demand one level of a given dimension (e.g. two tasks demanding visual perception) will interfere with each other more than two tasks that demand separate levels on the dimension (e.g. one visual, one auditory task)" (pg. 163).

Based upon the dash camera video and Rightmier's testimony, he was completing paperwork during the NS locomotive's approach to the incident area. This would have required Rightmier to take his eyes away from the track to look at the document(s). Review of the document(s) would have required perceptual/cognitive processing resources and focal vision. These are the same dimensions that are required to monitor the environment and obstacles in the environment during locomotion. Thus, engaging in a secondary task likely reduced Rightmier's opportunity to appreciate that the AIPC train was in the foul.

**CONCLUSION**

Visual information indicative of the AIPC locomotive's position relative to the main track would have been available to the operators of the NS locomotive as they approached the incident area. This visual information was sufficient to provide the NS personnel with context of their course as it related to the stopped locomotive and that an action response was necessary to avoid or minimize an impact between the two locomotives. Rightmier engaging in a secondary task that drew on the same resources required to monitor the track ahead may have contributed to a reduction in his ability to appreciate the hazard posed by the derailed AIPC train and slowed his response to the hazard.

This report has been prepared based on information available at the time and in accordance with generally accepted Human Factors consulting practices and standards. I reserve the right to supplement this report and opinions contained herein as additional information becomes available. Opinions are based on my education, experience, and review of available materials. All opinions are stated to a reasonable degree of scientific certainty.

If you have any questions regarding my opinions, feel free to contact me.

Sincerely,



Stephanie Whetsel Borzendowski, PhD

Attachments