# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

_________________________________

NORFOLK SOUTHERN RAILWAY COMPANY,
Plaintiff,
v.
AMERICAN ITALIAN PASTA COMPANY,
Defendant.

C.A. No. 3:25-cv-06618-SAL

_________________________________

DEPOSITION OF STEPHANIE BORZENDOWSKI

DATE: Wednesday, September 9, 2026
TIME: 9:59 a.m.
LOCATION: Remote Proceeding
Summerville, SC 29483
REPORTED BY: F.C. Brammer II
JOB NO.: 8394834

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF NORFOLK SOUTHERN RAILWAY COMPANY:

WILLIAM E. WHITNEY III, ESQUIRE (by videoconference)
Gallivan White & Boyd, PA
1201 Main Street
Columbia, SC 29201
wwhitney@gwblawfirm.com
(803) 724-1755

ON BEHALF OF DEFENDANT AMERICAN ITALIAN PASTA COMPANY:

JOHN RADECK, ESQUIRE (by videoconference)
Hood Law Firm, LLC
172 Meeting Street
Charleston, SC 29401
john.radeck@hoodlaw.com
(843) 577-4435

INDEX


| EXAMINATION: | | PAGE |
|---|---|---|
| By Mr. Whitney | | 5 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Borzendowski CV | 11 |
| Exhibit 2 | Signed Consulting Agreement | 14 |
| Exhibit 3 | Borzendowski Report | 14 |
| Exhibit 4 | Paul L. Olson Article | 18 |
| Exhibit 5 | Cogan Study | 19 |
| Exhibit 6 | Allen Powers Final Report | 40 |
| Exhibit 7 | Rico Blanchett Excerpt | 40 |
| Exhibit 8 | Borzendowski Fee Schedule | 43 |
| Exhibit 9 | Borzendowski Testimony List | 48 |

P R O C E E D I N G S

THE REPORTER: Good morning. My name is F.C. Brammer II; I'm the reporter assigned by Veritext to take the record of this proceeding. We are now on the record at 9:59 a.m.

This is the deposition of Ms. Stephanie Borzendowski taken in the matter of United States District Court for the District of South Carolina Columbia Division, civil action No. 3:25-cv-06618-SAL Norfolk Southern Railway Company v. American Italian Pasta Company on Wednesday, September 9, 2026, in Summerville, South Carolina.

I'm a notary authorized to take acknowledgments and administer oaths in South Carolina. Parties agree that I will swear in the witness remotely.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded

by stenographic means; and
- shall constitute written stipulation
of such.

At this time, will all counselors in attendance please identify yourself for the record, beginning with the noticing attorney.

MR. WHITNEY: William Whitney for Norfolk Southern.

MR. RADECK: John Radeck for American Italian Pasta Company.

THE REPORTER: Thank you. Hearing no objection, I'll now swear in the witness.
Ms. Borzendowski, if you would please raise your right hand.

WHEREUPON,

STEPHANIE BORZENDOWSKI,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: Thank you, ma'am.

Mr. Whitney, you may proceed.

MR. WHITNEY: Thank you.

EXAMINATION

BY MR. WHITNEY:

Q Good morning, Ms. Borzendowski, I know

you're familiar with depositions. We just talked off the record. You're familiar with the rules, so I'll just reiterate, given that this is a virtual deposition, we may have some internet problems at points or my question may not come through clearly. If that happens, please just ask me and I'll restate it or clarify if needed. Is that fair?

A It is.

Q And we'll plan to take breaks roughly every hour or so, but if you need a break sooner, just let me know. If there's a question pending, I'll just ask that you answer the question and then we'll take that break. Is that fair?

A It is.

Q Okay. So let's get right into it. Can you please tell me about your degrees and the fields of study that they are in?

A Sure. I have a BA in Psychology from Hartwick College. From there I earned a master's in applied psychology with a concentration in human factors from Clemson University and then I ultimately earned a PhD in human factors psychology also from Clemson University.

Q What certifications do you currently hold?

A I am a certified playground safety

inspector. I am a certified XL Tribometrist and then I have 30 hour OSHA cards and general industry and construction.

Q Which of those require continuing education or training to maintain?

A The Certified Playground Safety Inspector credential requires either continuing education or that you pass the certification exam every three years I believe, and then the XL Tribometrist certification requires documentation of like continuing education and involvement in the field basically.

Q And none of your certifications are rail related; correct?

A Correct.

Q Can you please just briefly walk us through your employment history since I guess since you graduated from your last degree?

A Yeah, super easy. I was with a company called the Applied Building Sciences for about eight and a half years, serving as a human factors consultant before co-founding Perceptio Forensics with my business partner Dr. Leah Hartman, and I do the same type of work there.

Q Have you ever operated a locomotive?

A No.

Q Have you ever ridden in a locomotive cab while it was in service?
A I'm assuming by cab you mean part of the locomotive that allows for control of the locomotive?
Q Yes. Applying to this case where Mr. Rightmier and Mr. Small were located?
A I don't believe so.
Q Have you ever received any training in railroad operations or crew procedures?
A No.
Q Before this engagement, had you ever analyzed a train on train collision?
A I don't believe so.
Q On your CV, you list your publications. It seemed like you have published on I guess pedestrians and how visible they are, headlight glare, slips and falls and driving. I'm sure I left out some categories, but can you confirm that none of those relate to railroad or locomotive operations?
A I would agree that I have not published or presented anything that would be directly related to locomotive operation.
Q I just asked you about train on train collisions. What about a train on car collision? Have you ever been involved in a matter involving a

train on car collision?

A I have a vague memory of reviewing a case that involved train on car, but I really couldn't tell you the specifics. I think it was very early on in my career and I didn't offer any deposition testimony in that matter.

Q Has any court ever limited or excluded your testimony in whole or in part?

A Yes. To my knowledge, my opinions have been excluded in two cases.

Q Can you tell me about those please?

A Sure. The first was a collision involving a vehicle versus pedestrians and my opinions kind of related to where drivers allocate their visual attention when they are attempting a right hand turn and how that would contribute to a failure to perceive the pedestrians.

And as I understand it, the opinions were excluded on the basis of not being beyond the understanding of a jury. And then the second one, it involved a driver who rear-ended a tractor trailer and my opinions had to do with how engaging in a secondary distracting task, which in this instance was cell phone usage affects driver's perception and response to hazards.

And similarly, the judge in that one said that my opinions were not beyond the understanding of the jury. I think as I understand it, in part because my opinion was sort of misrepresented and identified as being duplicative with other experts.
Q Do you recall the names of those cases?
A The first one is Koenig, K-O-E-N-I-G, and Everett vs. Johnson. And then the second one is Winter vs. Cowart, C-O-W-A-R-T.
Q Have you ever been the subject of any disciplinary action or censured by a licensing body of any type?
A Not to my knowledge.
Q I'm going to introduce your CV as Exhibit 1. Before I do that, do you have access, virtual access to your file and materials? I can share it on my screen if that's helpful, but I just wanted to see if you had the ability to pull it up as well.
A I do.
MR. WHITNEY: Okay. I'm having to send a request for sharing.
THE REPORTER: I'm doing it right as we speak. I'm sorry.
MR. WHITNEY: No problem.
THE REPORTER: All right.

BY MR. WHITNEY:

Q Can you see that?

(Exhibit 1 was marked for identification.)

A I can.

Q Is this CV a complete and accurate statement of your qualifications, publications and background?

A Yes, I will note, I am not positive it's the most recent version of it, but it's substantially the same. I would imagine.

Q I believe this one, I pulled this one. It was previous at the same time as your report, so that would have been, I guess in March I think. Can you recall anything on top of your head that would have been added?

A Yes, I do have one additional presentation that was added.

Q What was that regarding?

A Give me one second. I can just read off the title for you. It is entitled "Proceeding and Navigating the Field of Safe Travel Forensic Applications of Ecological Psychology for Collision Cases."

Q And do you believe that presentation is relevant to the opinions that you're presenting in

this case?
A Yes. It discussed similar concepts to what I imagine we'll talk about today.
Q Who first contacted you about this matter?
A Mr. Radeck.
Q When was that?
A As I think I noted in my report, I was originally retained in the underlying personal injury matter and so that would have been in, sorry, bear with me. I'm just trying to give you a precise date. Looks like around August 20th of 2025.
Q What were you asked to do?
A -- the original matter.
Q Sorry.
A Sorry.
Q What were you asked to do by Mr. Radeck?
A I think at the outset of the first case, just to take a look at the videos that captured the incident and see if I felt that there were any human factors opinions I could offer related to the perception of in response to the stopped locomotive on the split rail.
Q And has that task changed at any point during either the prior litigation or the current litigation?

A No, I don't believe so.
Q What issues were you specifically asked not to analyze?
A I was not given any instruction as to what not to analyze.
Q So just you were asked to take a look at the videos and render opinions based on them?
A Well initially take a look at the videos and see if that helped me identify anything that I could address from the human factors perspective and then obviously I reviewed additional materials subsequent to that.
Q Did you evaluate AIPC employee Rico Blanchett's conduct as part of your human factors investigation?
A I think the best I can answer that is I reviewed his deposition testimony and you know I'm generally familiar with his account of the events leading up to the collision, if that answers your question.
Q Somewhat. So you reviewed his deposition testimony, did you reach any expert opinions about what he could have received based on that?
A Specifically, no.
Q No. I'm going to pull up the signed

consulting agreement, which I will mark as Exhibit 2. Does this appear to be the signed agreement between you and AIPC and Mr. Radeck?

(Exhibit 2 was marked for identification.)

A Mr. Radeck specifically, yes.

Q Here in section 2 you have a retainer of $3,500; correct?

A Correct.

Q We'll talk more about compensation later, but do you know if you've exhausted this retainer at this point?

A Based on what's been invoiced thus far I don't believe so, but obviously I haven't invoiced my time preparing for today, so I believe that will exhaust it.

Q Okay. I'm going to pull up your report now, which will be Exhibit 3. Is this March 23, 2026, report the complete statement of the opinions you intend to offer in this case?

(Exhibit 3 was marked for identification.)

A It is.

Q So there are no opinions that you have reached and plan to offer at trial that are not

contained; correct?
A Correct.
Q I noted in the second paragraph you reserve the right to supplement and amend your opinions as additional information becomes available. As of today, have you or do you anticipate reaching any supplemental opinions and issuing a supplemental report?
A Not at this time, no.
Q Have you reviewed the Secretariat supplemental report and specifically Foster Peterson's portion of that that was dated July 17, 2026?
A I have.
Q Does it change any of your opinions?
A No.
Q Looking at the document review section of your report, is this a complete list of the materials that you have reviewed?
A I would say it's not exhausted, but I think it generally encompasses what I've been provided. I mean certainly there are a few things that I've been provided subsequent to the report that wouldn't be included in the list.
Q To the extent something is not included in the list, am I safe in assuming it was included in

your expert file production that we received prior to this deposition?
A Correct.
Q So in terms of the total universe of documents you reviewed, it's either in this list or in your file. Is that fair?
A It is fair.
Q Did you request anything that you did not receive?
A I don't believe so.
Q Did you visit the site where the accident occurred?
A I did not.
Q Did you conduct any reenactment for this matter?
A I did not.
Q What about a sight line study?
A I did not.
Q Other than the documents listed in your report or contained in your file, did you rely on or consider any other facts, data or materials?
A Beyond my own education experience and training, no.
Q Do you perform any type of eye tracking experiment or measurement in this case?

A No.
Q So your opinions rests entirely on, I guess document review plus your training, experience, education, the published literature and other experts work in the case; correct?
A Correct. With -- which is consistent with, you know, normal practice as a human factors expert.
Q I want to talk about the publications peer reviewed or published literature that you listed in report and cited starting with the Gibson and Crooks article from 1938.
A Okay.
Q This was a paper study published in 1938 about automobile driving; correct?
A It is in the context of automobile driving, yeah.
Q And regarding the concept of the field of safe travel, a car is able to change its path by steering; correct?
A Yeah. In terms of actually changing its heading, yes.
Q Can locomotive steer in the same matter?
A In this instance, no, I don't believe so.
Q And then the Cutting article, "How we avoid collisions with stationary and moving obstacles," this

was derived from pedestrian studies; correct?
A The -- the -- I guess the visual stimuli that was shown to participants was from the perspective of a pedestrian, yes.
Q And I can pull up if I need to, but the title on at the top of some of the pages reads "How pedestrians detect and avoid collisions," correct?
A I am sure it may say that at least in some places, yes.
Q Moving on to the Olson article or I guess chapter excerpt.
A Okay.
Q Which I'll actually mark as Exhibit 4. I'm going to share my screen.
Here in numbered paragraph 1, "Detection." It reads "There are frequent cases where the hazard is in the driver's field of view for a substantial period of time under conditions where a reasonably alert driver would not be expected to detect it." Did I read that correctly?
(Exhibit 4 was marked for identification.)
A Yes.
Q Do you agree with that statement?
A I would agree that there are certainly

instances where a hazard is within the field of view, but for one reason or another is not detected by an operator or a driver.

Q Well, the statement says wouldn't be detected by a reasonably alert driver, they would not be expected to detect it. Do you agree with that?

A Again, I would agree that there are circumstances where that is the case.

Q Do you agree that there's a difference between detecting an object and making a determination about whether or not it poses a hazard?

A I do.

Q I want to talk about the Cogan study next, which I will mark as Exhibit No. 5. This study was conducted by researchers based in Germany, is that right?

(Exhibit 5 was marked for identification.)

A Yes.

Q And the study participants were instructed to react to stationary objects on the tracks at the outset; correct?

A Yes.

Q I'm sorry, I didn't hear your answer.

A I apologize. I said yes.

Q Okay. And here, well first, any highlighting that appears in these articles, was this done by you?
A It was.
Q Okay. This highlighted portion that my mouse was on, on the under 3.1 study design, is it correct that their reaction speed was measured by how quickly they pressed the train horn?
A Correct.
Q And here in the final paragraph it reads, "Participants were instructed to react to every recognized obstacle as quickly as possible without needing to evaluate their hazard potential. This approach enabled us to measure sensory perception time without considering further cognitive processing time." Did I read that correctly?
A Yes.
Q So this study measured their ability to detect an object, not how fast they could determine whether or not it was a hazard; is that right?
A That is what that says. Yes.
Q Moving to Bates, page 10, under 3.5 procedure it reads, "Participants were informed that there was no risk of collision or need to alter the train's operation due to the displayed objects." Did I

read that correctly?
A You did.
Q So in addition to not being asked to determine whether a detected object was hazardous before pressing the train horn, the study participants also knew that there was no risk of collision; right?
A Right. Well also they were completing this in a simulator, so at worst they would experience a simulated collision.
Q Right. Moving to Bate, page 14.
A Sorry. If you can tell me the -- thank you. Obviously, I don't have these Bates labeled.
Q Okay. Got you. I'll refer to the study page numbers from now on.
A I appreciate that. Thank you.
Q Looking at the second to last paragraph on the left column here.
A Okay.
Q Do you agree that reaction times and practical settings would likely be longer due to the additional time needed to process information and determine an appropriate response?
A It does say that, yes.
Q Do you agree with that statement?
A I have no basis to disagree.

Q In your reports discussion of the study, you state that the AIPC locomotive was considerably larger than an adult human and the cab closest to the mainline was yellow. Is that an accurate representation of your opinion as I just described it?
A I wouldn't -- I wouldn't say it was necessarily an opinion so much as just a statement of fact based on the available evidence.
Q So do you believe the entire AIPC locomotive was yellow?
A No, I don't believe so.
Q What portions were not yellow?
A I'm happy to pull up the video if you would like and we can go through that. But that is specifically referring to the leading cab. Again, that was closest to the mainline.
Q I'll pull up your report. I'm looking look at figure 1 there that might be quicker. What color is the portion of the AIPC locomotive that is I guess in closest proximity to the Norfolk Southerns mainline track?
A Yeah. What in -- from what perspective? Like basically closest to the mainline or closest to --
Q Yes.

A The vantage point of the camera?
Q Physically closest to the mainline.
A So in figure one it's the yellow cab.
Q Do you see that the bottom of the cab is black?
A I do.
Q And the black portion is what is in close proximity or overhanging then over to the mainline; correct?
MR. RADECK: Object to form.
You can answer.
THE WITNESS: That is my -- that there are black portions of the cabs that are close to the mainline. Yes.
BY MR. WHITNEY:
Q Regarding the last I guess, article or study in your report, the "Multiple Resource Theory" by Wickens, your report states that this applies when attempting to perform multiple tasks simultaneously; correct?
A Yes.
Q Does this apply if someone engaged in a task and then engaged in a different task after stopping that, let's say 30 seconds later?
A I would say that generally it's discussing

individuals engaging into tasks simultaneously. I will say that's from a distraction perspective, that there is oftentimes some lag in time in terms of like performance decrements between stopping a secondary "distracting task" and then switching to the primary task.

But I don't -- I don't know that offhand I've seen an identification of exactly how long of a lag we'd expect there. I think it would depend on the -- the tasks and what information needed to be attended to upon switching from one to the other.

Q So you aren't able to quantify that lag in this case?

A Not explicitly, no.

Q Your report says that it follows generally accepted human factors consulting practices and standards and that your opinions are to a reasonable degree of scientific certainty. What types of resources can I review to determine what's generally accepted in your field?

A I would say that I believe there is some kind of white paper or similar document available from the human factors in ergonomic society that kind of generally outlines the standards for human factors practitioners. Beyond that, I would say it's

consistent with my years of experience encountering other human factors professionals in the manner in which they analyze all types of human factors cases.

Q Please define reasonable degree of scientific certainty as you use it in your report.

A I would say that it means to me that my opinions are based on scientific principles and literature and, you know, held to a standard of effectively, you know, 51 percent as far as the data that I'm relying upon.

Q Let's turn to, I guess, the opinions in your report.

A Sure.

Q And I can share my screen if that's helpful. Otherwise I'll just refer to, you know, pages and paragraphs and we'll go from there.

A Whatever you are comfortable with is fine with me.

Q And the final paragraph of page 4, you mentioned that the AIPC --

A I'm sorry, did you say the -- just want to make sure I heard you correctly. You said the final paragraph?

Q Yeah. I'll just do this so we can make through it more quickly. The final paragraph here on

page 4.
A Okay.
Q Let me say that the AIPC trains location relative to the main track would have been readily perceivable at least 22 to 23 seconds before impact and available visual information would have indicated that the a AIPC locomotive was stationary. Where does that 22 to 23 seconds figure come from?
A I would say a combination of the Secretariat report as well as Mr. Power's report and analysis and the video captured from the Norfolk Southern Locomotive.
Q Did you do your own timing analysis based on that video?
A I am -- I guess applying my analysis in the context of the other materials that I just listed.
Q So you, I guess, reviewed what Secretariat and Powers determined it to be and that seemed reasonable to you?
A I reviewed the conclusions that each of those entities reached and compared that to the -- the available information that we have, which in this case namely would be the video. And in my opinion, those three pieces of information allowed me to reach the conclusion that, you know, the stopped locomotive's

position was readily perceivable at minus 22 to minus 23 seconds.

Q Foster Peterson of Secretariat and you just said was I guess one of your sources for the 22 to 23 second figure said that at that moment the equipment was visible but it was not yet obvious that they had run through the derail. Do you agree that perceivable is not the same as recognizable as a hazard?

A [No audible response.]

Q I can't hear you.

(Discussion held off the record.)

THE WITNESS: I guess let me know the last thing you heard from me.

BY MR. WHITNEY:

Q I'll just restate the question. I don't think we got any of the answer. So the question was, do you agree that perceivable is not the same as recognizable as a hazard?

A I would agree that an operator can perceive an object without identifying it as a hazard depending on the circumstances.

Q In this case is it your opinion that the Norfolk Southern crew should have been able to determine that the AIPC engine was fouling the mainline track at the 22 or 23 second mark?

A In my opinion, yes.
Q Moving to the next page.
A Okay.
Q The second paragraph, you say that the AIPC's trains position in the foul was perceivable from at least a thousand feet away, in your opinion, relying on visualizations from the report of Allen Powers; is that correct?
A Yes.
Q I'm going to pull up his report. Is that statement in your report relying on figure 5 in Power's report?
A In part, yes.
Q Did you create any visualization yourself?
A I did not.
Q To reach this opinion did you look at the visualization depicted in figure 5 and determine when you believed the AIPC engine was perceivable as being in the foul?
A In my opinion, it is perceivable as being in the foul based on this image as well as a comparison with the exterior camera view from the Norfolk Southern locomotive.
Q And then that leads into my next question, which is that you had access to those RailView

videos; correct?
A I'm sorry, I missed the middle of that question --
Q You had access to the locomotive videos both outward facing and inward facing?
A I did.
Q Why did you rely on, I guess, the still shot from Power's animation instead of the actual video from the locomotive?
A Well, as I stated before, it was both. That reviewing the powers visualizations and not just the still images, but the actual, I guess animations for lack of a better term, as well as the video from the actual locomotive.
Q Well the reason why I ask the question that way is your report just refers to visualizations in Power's report. So is it your testimony that you also relied on the RailView video?
A Right. I -- I guess maybe to clarify that in my assessment the rail videos are, the quality is definitely not spectacular both in terms of the imagery itself as well as the -- the frames per second kind of contributing to not the smoothest video. And so the Power's visualizations I think just more clearly highlight this particular aspect of my

opinion, but it is consistent with what I observed in the rail video.

Q So you prefer the Power's visualization because of, I guess it had improved clarity. Is that fair?

A I'm not saying I preferred it, I am just saying that it is a clearer image than what we can gather in the video.

Q Do you know Power's methodology that he used to create these visualizations?

A Not beyond what he used identified in his report since he has not yet been deposed.

Q I know you said he reviewed Foster Peterson's Secretariat supplemental report, he reviewed the same thousand foot visualizations and found that while the equipment was visible at a thousand feet, in his opinion it was not apparent due to the position of the equipment and the curvature of the track that the AIPC engine was in the foul and that the crew couldn't make that determination until they were much closer, at which point it would have been impossible to avoid a collision. Do you disagree with that statement?

A I think the best I can answer that is to say that obviously I disagree with his opinion as far as

the foreseeability of the hazard at a thousand feet, which has outlined in my report. In terms of where Mr. Peterson believed that they could first perceive that the AIPC locomotive within in the foul and whether or not a collision was avoidable at that point, I would defer to the experts who are qualified to offer those opinions.

Q Did your analysis account for the curvature of the Norfolk Southern mainline track at the accident location?

A To the extent that any curvature is appreciable in the video and the visualizations by Allen Powers, yes. Is that something that I explicitly am addressing, I guess, no.

Q In your report you state that the lack of pre-impact response was inconsistent with the visual information available to the crew and that breaking over nine seconds after apparent recognition is inconsistent with the reaction time data. Where did that nine seconds number come from?

A That came from the Secretariat report as well as Mr. Power's analysis of looking at paragraph 2 on page 5 of my report.

Q Well, yeah, I guess the quote I'm specifically referring to would be in the

fourth paragraph.

A No, I understand. But you asked where the nine seconds came from and that's what that's referring to. So the Secretariat report says that approximately nine seconds before impact that Rightmier and Small exhibited "visible signs of recognition and an increased focus ahead" and then Mr. Powers opined that Small reaches for the brakes approximately 9.4 seconds before impact. Yet the evidence if I understand it, is that breaking did not occur until after impact. So that's where the nine seconds comes from in the fourth paragraph that you are referring to.

Q Okay. Thank you. If Small, I guess perceived and reached for the brakes at that 9.4 second mark, doesn't that show that he did perceive the AIPC engine and did prepare to respond?

A So the distinction there being that if at you know, minus approximately nine seconds Small reaches for the brakes and that is the initiation of a response to an identifiable hazard, then what would normally follow from a human factors perspective and the perception response time universe would be the physical response.

And the fact that he sort of initiates the

response by reaching for the break but then there's no measurable or discernible response until over nine seconds later is what I would say is inconsistent with the literature.

Q And as we discussed earlier, there's a difference between perceiving an object and making a determination about whether it's a hazard; right?

MR. RADECK: Objection to form.

Go ahead.

THE WITNESS: Yes.

BY MR. WHITNEY:

Q Since Paul or since Small reached for the brakes at 9.4 seconds, in your opinion, does that show that he perceived the object meaning the AIPC engine but had not yet made that hazardous determination?

A I have no way of knowing that for certain.

Q Do you believe he was reacting to something ahead on the track?

A I think the best I can do in this situation is assume that that's why he was reaching for the break unless that's some sort of normal practice for him.

Q Did you calculate an expected perception response time for this crew and compare it to an actual measured response?

A No. I think that the data provided by Cogan et al. kind of gives us a framework for perception response time in this context, which is why that's discussed here. But in terms of knowing exactly what the operator's perception response time was, there's in my opinion no way of doing that.

Q So the Cogan study is your, I guess, authority for the expected response time in this context?

A I wouldn't say that it's necessarily an expected response time, but it gives us a framework for understanding the -- the way that visual information affects perception response time in this context and gives us a benchmark of how quickly operators can respond to, you know, relatively large and high contrast, potential hazards or stimuli in the environment.

Q Later in your report you opine that Rightmier's secondary task of doing paperwork drew on the same perceptual resources as monitoring the track and may have contributed to a reduction in his ability to appreciate the hazard and potentially slowed his response; is that correct?

A Generally speaking, yes.

Q Since you say the task may have contributed

and likely reduced, you are not saying to a reasonable degree of scientific certainty that doing paperwork caused this collision; correct?

A No, I didn't offer that opinion. I would defer to the opinion as it's articulated in my report just describing how engaging in a secondary task that draws on the same resources as a primary task can cause performance sacraments to one or both of those tasks and that in turn how that affects perceiving and responding to a potential hazard.

Q The inward facing RailView video shows that Rightmier had put his paperwork away roughly 34 seconds before the collision. Do you agree with that?

A I don't have the exact time at which he puts it away in front of me, but I agree it's somewhere in that ballpark.

Q Do you agree that after he put the paperwork away, both crew members appeared focused ahead and reacted to the AIPC engine at the same time?

MR. RADECK: Object to form.

You can answer.

THE WITNESS: Based on what we can see in the video, I -- the best that I can answer that is to say that they both appear to have their heads at least oriented towards the forward view what exactly

they're looking at or attending to isn't discernible in the video. And I would agree that at some point as the video unfolds, we do see some discernible changes in behavior, which again, going back to my earlier testimony, we assume is in response to the visual information in front of them.

BY MR. WHITNEY:

Q If he put the paperwork away at, you know, in the ballpark of 34 seconds before the collision I think was the term you used. That is before the 22 or 23 second mark we previously discussed when the AIPC equipment first became visible; correct?

A It's before the 22 to 23 second interval at which in my opinion, the AIPC locomotive being in the foul is perceivable, but as I understand it, the near existence of the AIPC locomotive would have been perceivable even further back.

Q So at the point that you believe the engine was detectable as being in the foul, that 22 to 23 second mark Rightmier was not doing paperwork; correct?

A At the minus 22 to 23 second mark where in my opinion, and I believe Mr. Powers, that the AIPC train being in the foul would have been perceivable. Correct. Mr. Rightmier I believe has put his

paperwork away by then,

Q If that's true on what basis do you opine that the paperwork impaired his perception of a potential hazard?

A Well, as I stated earlier, the minus 22 to minus 23 second interval isn't the first time that the AIPC train is -- its presence is perceivable. And so having that additional time to monitor this piece of visual information and have an understanding of the changes in field of view would contribute to an understanding of the fact that it's stopped and where it appears to be stopped.

So it's just highlighting that at that earlier interval when the AIPC locomotive being in the foul may not have been readily perceivable, it's an opportunity to be gathering visual information and particularly how that information is changing, which informs our overall perception of whether or not that's a hazard.

Q In your opinion, should the crew have recognized the engine as a hazard because it was stationary?

A Not the fact that it was stationary in and of itself doesn't necessarily make it a hazard, no.

Q Do you know how long Rightmier's eyes were

off the track during the relevant window when he was doing his paperwork?
A I don't believe there's any way to tell that from the video.
Q Your report goes on to say that Small, I guess, testified that he could see clearly and was watching and wasn't doing paperwork. If he had an unobstructed view. How does Rightmier's paperwork contribute to what you described as their inability to proceed this hazard?
A Well, it doesn't explain both of them right, like that just gives us insight into Rightmier and his plausible allocation of attentional resources. In terms of Mr. Small's ability to appreciate that they were approaching a hazard, there's no obvious indication in a video of him engaging in a secondary task that would have limited his ability.
Q I'll take a short break until eleven and then I will --
A Okay.
Q -- come back and I'll have, you know, probably one more hour. I don't know how much John will have, but hopefully we'll get you out of here before lunch.
THE REPORTER: Okay.

THE WITNESS: Okay. So you said back at eleven?
MR. WHITNEY: That works for you guys?
THE REPORTER: That works for me.
THE WITNESS: Sure.
THE REPORTER: The time now is 10:52 a.m. and we will be off the record.
(Off the record)
THE REPORTER: We are back on the record. The time is 11:02 a.m.
Mr. Whitney, you may continue.
BY MR. WHITNEY:
Q Are you offering any opinions regarding when the AIPC engine was first perceivable by the Norfolk Southern crew regardless of whether they could determine it was in the foul or not?
A No, I would defer to the other experts who have identified that point.
Q Are you offering any opinions regarding whether the Norfolk Southern train could have stopped if braking was initiated at the 1000 foot mark when you say that the AIPC engine should have been perceivable as being in the foul?
A No. I would defer to any other experts who are offering opinions regarding that.

MR. WHITNEY: And one housekeeping note, I showed you Allen Power's report previously. I don't think I marked it as exhibit. So Derick, we'll mark that as Exhibit 6.

THE REPORTER: Okay. And you said that was the Powers?

MR. WHITNEY: Allen Powers expert report.

THE REPORTER: Thank you.

MR. WHITNEY: I'll send all these.

(Exhibit 6 was marked for identification.)

BY MR. WHITNEY:

Q Earlier we discussed Rico Blanchett's deposition transcript, which you reviewed; correct?

A I did.

Q I'll share my screen. This will be, it's Exhibit 7. This is a excerpt that I took from your file that was produced. Did you highlight this portion of his testimony here?

(Exhibit 7 was marked for identification.)

A Most likely, yes.

Q And the question in the testimony is --

"Q Did you walk down the mainline and look

to see if the locomotive was in fact in foul of the track?
"A I did.
"Q And you know that to be, what does in the foul of the track mean to you?
"A On the track."
Why did you highlight this portion of Blanchett's testimony?
A Just seemed noteworthy given the fact that we're talking about perception of the locomotive and where it was located. So to me also highlights that his definition of in the foul is inconsistent with what is utilized by others.
Q Moving now into the next page, on page 143 of his testimony was just the bottom left here. The question he is asked is --
"Q What did you do to confirm it was not in the foul of the mainline?
"A Like you said, I judged based on the 4 feet that I had on the side. I didn't pull a tape measure out and measure it, but just to walk the -- I stood on the mainline track and to look, it looked like my train, my cars would clear that gap."
Do you recall reading that testimony?
A Yes. Sorry, if you didn't hear me.

Q If Mr. Blanchett could not determine that his engine was in the foul standing right next to it, what is your basis for saying that the Norfolk Southern crew should have been able to make that determination from a thousand feet away?

A Number one, that again, Mr. Blanchett's definition of in the foul was inconsistent with the others that I've seen utilized in this matter. And number two, he's standing on the mainline, glancing at it and making that determination according to him versus Rightmier and Small are operating another locomotive and part of navigating the field of safe travel is perceiving readily appreciable visual information indicating that there are obstacles or objects that are changing the shape of the field of safe travel and require some kind of response.

Q He did testify that "I judged based on the 4 feet that I had on the side"; correct?

A Right. But he also goes on to say I didn't pull a tape measure out and measure it. And from a human factors perspective, the literature has consistently established that people are not good at making absolute judgments of things like distance or speed. Those judgments tend to be inaccurate and unreliable. So to me his estimate of that is to be

taken with a grain of salt, for lack of a better term.
Q Do you believe that based on his testimony, Rico Blanchett determined that the AIPC's engine was not a hazard?
A I don't know that anyone explicitly asked him that. Based on what we're looking at here, it looks like he was asked a couple of times whether or not it appeared to be in the foul. And obviously his assessment is that it was not based on his definition of a locomotive being in the foul.
Q I'm going to share what will be Exhibit 8. This is your fee schedule that was produced. Are your rates as we sit here today, the same rates that are stated in this fee schedule?
(Exhibit 8 was marked for identification.)
A They are.
Q Which is 375 an hour for consulting and 475 an hour for testimony; correct?
A Correct.
Q Does that testimony rate apply to both depositions and trial?
A It does.
Q I see there's a rush rate. Did that apply to this matter at all?

A I don't believe so, but I can double check for you. No.
Q What would you estimate the total amount of dollars you have billed to date in this matter?
A Based on the invoice that was provided to you, I have billed $3,217.50.
Q What would you estimate the total will be through trial?
A Ooh, that's a little trickier to estimate since I don't know exactly what I will need to do to prepare. But I would say generally in my experience, I would spend at least a couple of hours preparing for trial, both by myself as well as with my client. And then if I'm required to travel to testify in person, there would be time and expense associated with that. And then obviously I would bill my client for the time spent on the stand at trial. So I would say potentially this is going to be in Columbia; right?
Q Yes.
A Just a ballpark figure. Maybe eight hours between prep and travel and then you know, whatever time is going to be spent on the stand.
Q Have any other Perceptio Forensics staff besides you billed on this matter?
A I believe Dr. Hartman, yeah, she reviewed

the report and we would have billed for that time, but that's it.
Q Why would she have reviewed the report?
A That's our standard practice. We can think of it as kind of a peer review process.
Q Do you recall any changes that she suggested after her review?
A I don't.
Q What fraction of your income comes from expert or forensic work?
A At this point probably about 99 percent of it.
Q Have you worked for the Hood Law Firm before?
A I have.
Q How many times would you estimate?
A Over my whole career, maybe five.
Q Have you worked with Mr. Radeck specifically?
A Yes. I can think of at least one other case that I had with Mr. Radeck.
Q Would that be the Spangolia vs. Wright case that's listed in your testimony list?
A Yes.
Q What would you estimate the total fees

charged to the Hood Law Firm over the course of your engagements to them would be?

A I have no idea. I honestly don't recall the specifics of some of the other ones in terms of how much work would have gone into it. And it also would have been earlier in my career and my hourly rate was less so I couldn't tell you.

Q How often does your hourly rate change?

A We typically review those rates annually, usually at the beginning of a new year.

Q I noticed Dr. Hartman's rate is slightly lower than yours. What's the reasoning behind that?

A I am a more experienced practitioner.

Q Have you ever been retained by or worked for Norfolk Southern?

A I don't think so.

Q Have you ever been retained by myself or Ron Wray?

A Not to my recollection.

Q I noticed on the fee schedule there's itemized equipment fees including a 3D laser scanner. Under what circumstances would you use a 3D laser scanner?

A Honestly, I have not used one in years. We probably shouldn't even list it on there anymore. But

in the past I've helped conduct, particularly when I was still at Applied Building Sciences, helped conduct scans for like premises liability cases where we want precise measurements of some fall hazard. And I think maybe one time I scanned a collision scene so that personnel at ABS could create sort of a diagram for me.

Q And what about the digital tribometer, when would you use that?

A That -- I'm sorry, I didn't mean to cut you off. That is used in slip and fall cases.

Q Appears related, but the variable incidents tribometer, when is that used?

A Same thing.

Q And you hadn't use any specialized equipment in this matter or to date; correct?

A Correct.

Q Do you anticipate doing an additional work that'll require any of this equipment?

A No.

Q I'm going to pull up your testimony list. We won't go through it in depth, but I think this is a testimony list that was provided contemporaneously with your report. So I'll scroll to the most recent cases here at the bottom. To your knowledge, are

there any additions that should be made to this or any any additional examples of testimony since March 23, 2026?

(Exhibit 9 was marked for identification.)

A Yes. And I did provide you with an updated list in that link that you received.

Q Could you just estimate how many additional examples of testimony you have?

A I could tell you exactly. I've had five depositions since that version.

Q Is the testimony list, I guess, as produced in your expert file, complete and accurate?

A Yes, it represents my testimony for approximately the last five years.

Q So a few things to, for housekeeping and to wrap up, we discussed earlier, but as you sit here today, do you hold any supplemental opinions that you have not yet included in your report or testified about today?

A No.

Q Have we covered every opinion that you intend to offer at trial in this matter?

A I believe so.

Q Is there anything in your report that you

would like to correct or clarify?
A Aside from a couple of typos, no.
Q Other than what we've discussed, is there any fact, document, test or authority that supports any of your opinions?
A I think we've discussed everything that forms the basis for my opinion here today. Obviously if that changes and new information comes to light, I can certainly let Mr. Radeck know.
MR. WHITNEY: Those are all the questions I have. Mr. Radeck, may I have some for you.
THE WITNESS: Thank you.
MR. RADECK: I don't have any follow up. Thanks.
THE REPORTER: And I apologize Mr. Radeck about that.
Read and sign?
THE WITNESS: Yes, please.
THE REPORTER: All right.
MR. RADECK: Do you have Dr. Borzendowski's email address?
THE REPORTER: I do not.
THE WITNESS: I can drop it in the chat if that helps.

THE REPORTER: That would be awesome. All right. And Mr. Whitney, your order?

MR. WHITNEY: We'll just do an E-transcript for now.

THE REPORTER: Standard delivery?

MR. WHITNEY: Yes, please.

THE REPORTER: With exhibits? All right.

MR. WHITNEY: What would the rush delivery look like, actually.

THE REPORTER: I would have to have them call you and y'all would have to discuss exactly. I can do that. I'll -- I'll send them a message.

MR. WHITNEY: What's the general, the standard turnaround time?

THE REPORTER: Five to seven business days.

MR. WHITNEY: Okay. That should be fine.

THE REPORTER: Okay, Mr. Radeck?

MR. RADECK: Yeah, I'll, you know the E-tran package will be good.

THE REPORTER: Yes, sir. All right.

MR. WHITNEY: I'll email you those exhibits here shortly.

THE REPORTER: Thank you, sir. The time now is 11:19 a.m. and we will be off the record.

(Signature reserved.)

(Whereupon, at 11:19 a.m., the proceeding was concluded.)

CERTIFICATE OF DEPOSITION OFFICER

I, F.C. BRAMMER II, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.



F.C. BRAMMER II
Notary Public in and for the
State of South Carolina

[X] Review of the transcript was requested.

CERTIFICATE OF TRANSCRIBER

I, KELLY MULLEN, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.



KELLY MULLEN

Stephanie Borzendowski
sborzendowski@perceptioforensics.com

September 23, 2026

RE: Norfolk Southern Railway Company v. American Italian Pasta Company

9/9/2026, Stephanie Borzendowski (#8394834)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-carolinas@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Norfolk Southern Railway Company v. American Italian Pasta Company

Stephanie Borzendowski (#8394834)

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

________________________________ _______________

Stephanie Borzendowski Date

Norfolk Southern Railway Company v. American Italian Pasta Company

Stephanie Borzendowski (#8394834)

ACKNOWLEDGEMENT OF DEPONENT

I, Stephanie Borzendowski, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________

Stephanie Borzendowski Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

__________________________

NOTARY PUBLIC

**&**

**&** 2:6

**0**

**06618** 1:9 4:9

**1**

**1** 3:7 10:14 11:3 18:15 22:18
**10** 20:22
**1000** 39:21
**11** 3:7
**11:02** 39:10
**11:19** 51:2,4
**1201** 2:7
**14** 3:8,9 21:10
**143** 41:14
**17** 15:12
**172** 2:15
**18** 3:10
**19** 3:11
**1938** 17:11,13

**2**

**2** 3:8 14:1,4,7 31:22
**20** 56:15
**2025** 12:11
**2026** 1:13 4:11 14:18 15:12 48:3 54:3
**20th** 12:11
**22** 26:5,8 27:1 27:4,25 36:10 36:13,19,22 37:5
**23** 14:18 26:5,8 27:2,4,25 36:11,13,19,22 37:6 48:2 54:3
**27096** 53:14
**29201** 2:8
**29401** 2:16
**29483** 1:16

**3**

**3** 3:9 14:18,21
**3,217.50.** 44:6
**3,500** 14:8
**3.1** 20:6
**3.5** 20:22
**30** 7:2 23:24 54:16
**34** 35:12 36:9
**34672** 52:16
**375** 43:18
**3:25** 1:9 4:9
**3d** 46:21,22

**4**

**4** 3:10 18:13,21 25:19 26:1 41:19 42:17
**40** 3:12,13
**43** 3:14
**475** 43:18
**48** 3:15

**5**

**5** 3:3,11 19:14 19:17 28:11,17 31:23
**51** 25:9
**577-4435** 2:18

**6**

**6** 3:12 40:4,11

**7**

**7** 3:13 40:18,21
**724-1755** 2:10

**8**

**8** 3:14 43:11,15
**803** 2:10
**8394834** 1:18 54:5 55:2 56:2
**843** 2:18

**9**

**9** 1:13 3:15 4:11 48:4
**9.4** 32:9,15 33:13
**9/9/2026** 54:5
**99** 45:11
**9:59** 1:14 4:5

**a**

**a.m.** 1:14 4:5 39:7,10 51:2,4
**ability** 10:18 20:18 34:21 38:14,17 52:10 53:7
**able** 17:18 24:12 27:23 42:4
**above** 54:6 56:7
**abs** 47:6
**absent** 4:17
**absolute** 42:23
**accepted** 24:16 24:20
**access** 10:15,15 28:25 29:4
**accident** 16:11 31:9
**account** 13:18 31:8
**accuracy** 54:9
**accurate** 11:6 22:4 48:13 52:9 53:5
**acknowledge...** 56:3
**acknowledg...** 54:12
**acknowledg...** 4:14
**action** 4:9 10:11 52:12,16 53:8,12
**actual** 29:8,12 29:14 33:25
**actually** 17:20 18:13 50:10

**added** 11:15,17
**addition** 21:3
**additional** 11:16 13:11 15:5 21:21 37:8 47:18 48:2,8
**additionally** 4:17
**additions** 48:1 56:6
**address** 13:10 49:22
**addressing** 31:14
**administer** 4:14
**adult** 22:3
**affects** 9:24 34:13 35:9
**agree** 4:15,19 8:20 18:24,25 19:6,7,9 21:19 21:24 27:7,17 27:19 35:13,15 35:17 36:2
**agreement** 3:8 14:1,2
**ahead** 32:7 33:9,18 35:18
**aipc** 13:13 14:3 22:2,9,19 25:20 26:3,7 27:24 28:18 30:19 31:4 32:17 33:14 35:19 36:11,14 36:16,23 37:7 37:14 39:14,22
**aipc's** 28:5 43:3
**al** 34:2
**alert** 18:18 19:5
**allen** 3:12 28:7 31:13 40:2,7
**allocate** 9:14
**allocation** 38:13
**allotted** 54:19
**allowed** 26:24
**allows** 8:4
**alter** 20:24
**amend** 15:4
**american** 1:9 2:12 4:10 5:9 54:4 55:1 56:1
**amount** 44:3
**analysis** 26:10 26:13,15 31:8 31:22
**analyze** 13:3,5 25:3
**analyzed** 8:12
**animation** 29:8
**animations** 29:12
**annually** 46:9
**answer** 6:12 13:16 19:24 23:11 27:16 30:24 35:21,23
**answers** 13:19
**anticipate** 15:6 47:18
**anymore** 46:25
**apologize** 19:25 49:16
**apparent** 30:17 31:18
**appear** 14:2 35:24
**appeared** 35:18 43:8
**appears** 20:2 37:12 47:12
**appended** 56:7
**applicable** 4:23 54:8
**applications** 11:22
**applied** 6:20 7:19 47:2
**applies** 23:18
**apply** 23:22 43:21,24
**applying** 8:5 26:15
**appreciable** 31:12 42:13
**appreciate** 21:15 34:22 38:14
**approach** 20:14
**approaching** 38:15
**appropriate** 21:22
**approximately** 32:5,9,19 48:15
**article** 3:10 17:11,24 18:10 23:16
**articles** 20:2
**articulated** 35:5
**aside** 49:2
**asked** 8:23 12:12,16 13:2 13:6 21:3 32:2 41:16 43:5,7
**aspect** 29:25
**assessment** 29:20 43:9
**assigned** 4:3
**associated** 44:15
**assume** 33:20 36:5
**assuming** 8:3 15:25
**attached** 54:11
**attempting** 9:15 23:19

**attendance** 5:5
**attended** 24:11
**attending** 36:1
**attention** 9:15
**attentional** 38:13
**attorney** 5:6 52:14 53:10 54:13
**audible** 27:9
**audio** 52:8 53:3
**august** 12:11
**authority** 34:8 49:4
**authorized** 4:13
**automobile** 17:14,15
**available** 15:5 22:8 24:22 26:6,22 31:17 54:6
**avoid** 17:24 18:7 30:22
**avoidable** 31:5
**awesome** 50:1

**b**

**b** 3:5
**ba** 6:18
**back** 36:4,17 38:21 39:1,9
**background** 11:7
**ballpark** 35:16 36:9 44:20
**based** 13:7,23 14:13 19:15 22:8 25:7 26:13 28:21 35:22 41:19 42:17 43:2,6,9 44:5
**basically** 7:11 22:23
**basis** 9:19 21:25 37:2 42:3 49:7
**bate** 21:10
**bates** 20:22 21:12
**bear** 12:9
**beginning** 5:6 46:10
**behalf** 2:2,12
**behavior** 36:4
**believe** 7:9 8:7 8:13 11:11,24 13:1 14:14,15 16:10 17:23 22:9,11 24:21 33:17 36:18,23 36:25 38:3 43:2 44:1,25 48:24
**believed** 28:18 31:3
**benchmark** 34:14
**best** 13:16 30:24 33:19 35:23 52:10 53:6
**better** 29:13 43:1
**beyond** 9:19 10:2 16:22 24:25 30:11
**bill** 44:16
**billed** 44:4,6,24 45:1
**black** 23:5,7,13
**blanchett** 3:13 42:1 43:3
**blanchett's** 13:14 40:14 41:8 42:6
**body** 10:11
**borzendowski** 1:12 3:7,9,14 3:15 4:7 5:13 5:16,25 54:1,5 55:2,24 56:2,4 56:12
**borzendowski's** 49:22
**bottom** 23:4 41:15 47:25
**boyd** 2:6
**brakes** 32:8,15 32:20 33:13
**braking** 39:21
**brammer** 1:17 4:3 52:2,17
**break** 6:10,13 33:1,21 38:18
**breaking** 31:17 32:10
**breaks** 6:9
**briefly** 7:15
**building** 7:19 47:2
**business** 7:22 50:16

**c**

**c** 2:1 4:1 10:9
**c.a.** 1:8
**cab** 8:1,3 22:3 22:15 23:3,4
**cabs** 23:13
**calculate** 33:23
**call** 50:12
**called** 5:17 7:19
**camera** 23:1 28:22
**captured** 12:18 26:11
**car** 8:24 9:1,3 17:18
**cards** 7:2
**career** 9:5 45:17 46:6
**carolina** 1:2 4:8 4:12,15 52:19

**carolinas** 54:15
**cars** 41:23
**case** 8:5 9:2 12:1,17 14:20 16:25 17:5 19:8 24:13 26:22 27:22 45:20,22
**cases** 9:10 10:6 11:23 18:16 25:3 47:3,11 47:25
**categories** 8:18
**cause** 35:8
**caused** 35:3
**cell** 9:23
**censured** 10:11
**certain** 33:16
**certainly** 15:21 18:25 49:9
**certainty** 24:18 25:5 35:2
**certificate** 52:1 53:1
**certification** 7:8,9
**certifications** 6:24 7:12
**certified** 4:20 6:25 7:1,6
**certify** 52:4 53:2
**change** 15:14 17:18 46:8 55:4,7,10,13,16 55:19
**changed** 12:23
**changes** 36:3 37:10 45:6 49:8 54:10 56:6
**changing** 17:20 37:17 42:15
**chapter** 18:11
**charged** 46:1
**charleston** 2:16
**chat** 49:24
**check** 44:1
**circumstances** 19:8 27:21 46:22
**cited** 17:10
**civil** 4:9
**clarify** 6:7 29:19 49:1
**clarity** 30:4
**clear** 41:23
**clearer** 30:7
**clearly** 6:5 29:25 38:6
**clemson** 6:21 6:23
**client** 44:13,16
**close** 23:7,13
**closer** 30:21
**closest** 22:3,16 22:20,23,23 23:2
**cogan** 3:11 19:13 34:1,7
**cognitive** 20:15
**college** 6:19
**collision** 8:12 8:24 9:1,12 11:22 13:19 20:24 21:6,9 30:22 31:5 35:3,13 36:9 47:5
**collisions** 8:24 17:25 18:7
**color** 22:18
**columbia** 1:3 2:8 4:9 44:18
**column** 21:17
**combination** 26:9
**come** 6:5 26:8 31:20 38:21
**comes** 32:12 45:9 49:8
**comfortable** 25:17
**company** 1:6,9 2:3,12 4:10,11 5:10 7:18 54:4 54:4 55:1,1 56:1,1
**compare** 33:24
**compared** 26:21
**comparison** 28:21
**compensation** 14:10
**complete** 11:6 14:19 15:17 48:13 56:8
**completed** 54:16
**completing** 21:7
**concentration** 6:20
**concept** 17:17
**concepts** 12:2
**concluded** 51:5
**conclusion** 26:25
**conclusions** 26:20
**conditions** 18:18
**conduct** 13:14 16:14 47:1,2
**conducted** 19:15
**confirm** 8:18 41:17
**consider** 16:21
**considerably** 22:2
**considering** 20:15

**consistent** 17:6 25:1 30:1
**consistently** 42:22
**constitute** 5:2
**construction** 7:3
**consultant** 7:21
**consulting** 3:8 14:1 24:16 43:18
**contacted** 12:4
**contained** 15:1 16:20
**contemporan...** 47:23
**context** 17:15 26:16 34:3,9 34:14
**continue** 39:11
**continuing** 7:4 7:7,10
**contrast** 34:16
**contribute** 9:16 37:10 38:9
**contributed** 34:21,25
**contributing** 29:23
**control** 8:4
**copies** 54:14
**correct** 7:13,14 14:8,9 15:1,2 16:3 17:5,6,14 17:19 18:1,7 19:22 20:7,9 23:9,20 28:8 29:1 34:23 35:3 36:12,21 36:25 40:15 42:18 43:19,20 47:16,17 49:1 56:8
**corrections** 56:6
**correctly** 18:20 20:16 21:1 25:22
**counsel** 52:11 52:14 53:7,10 54:14
**counselors** 5:4
**couple** 43:7 44:12 49:2
**course** 46:1
**court** 1:1 4:8 9:7
**covered** 48:22
**cowart** 10:9
**create** 28:14 30:10 47:6
**credential** 7:7
**crew** 8:9 27:23 30:20 31:17 33:24 35:18 37:20 39:15 42:4
**crooks** 17:10
**cs** 54:15
**current** 12:24
**currently** 6:24
**curvature** 30:18 31:8,11
**cut** 47:10
**cutting** 17:24
**cv** 1:9 3:7 4:9 8:14 10:14 11:6

**d**

**d** 3:1 4:1
**data** 16:21 25:9 31:19 34:1
**date** 1:13 12:10 44:4 47:16 55:24 56:12
**dated** 15:12
**day** 56:15
**days** 50:17 54:16
**declare** 56:4
**decrements** 24:4
**deemed** 56:6
**defendant** 1:10 2:12
**defer** 31:6 35:5 39:17,24
**define** 25:4
**definitely** 29:21
**definition** 41:12 42:7 43:9
**degree** 7:17 24:18 25:4 35:2
**degrees** 6:16
**delivery** 50:5 50:10
**depend** 24:9
**depending** 27:20
**depicted** 28:17
**deponent** 54:13 56:3
**deposed** 30:12
**deposing** 54:13
**deposition** 1:12 4:6,25 6:4 9:5 13:17,21 16:2 40:15 52:1
**depositions** 6:1 43:22 48:11
**depth** 47:22
**derail** 27:7
**derick** 40:3
**derived** 18:1
**described** 22:5 38:9
**describing** 35:6
**description** 3:6
**design** 20:6
**detect** 18:7,19 19:6 20:19

**detectable** 36:19
**detected** 19:2,5 21:4
**detecting** 19:10
**detection** 18:15
**determination** 19:10 30:20 33:7,15 42:5 42:10
**determine** 20:19 21:4,22 24:19 27:24 28:17 39:16 42:1
**determined** 26:18 43:3
**diagram** 47:6
**difference** 19:9 33:6
**different** 23:23
**digital** 47:8 52:8 53:3
**directly** 8:21
**disagree** 21:25 30:22,25
**discernible** 33:2 36:1,3
**disciplinary** 10:11
**discuss** 50:12
**discussed** 12:2 33:5 34:4 36:11 40:14 48:17 49:3,6
**discussing** 23:25
**discussion** 22:1 27:11
**displayed** 20:25
**distance** 42:23
**distinction** 32:18
**distracting** 9:23 24:5
**distraction** 24:2
**district** 1:1,2 4:8,8
**division** 1:3 4:9
**document** 15:16 17:3 24:22 49:4
**documentation** 7:10
**documents** 16:5,19
**doing** 10:22 34:6,19 35:2 36:20 38:2,7 47:18
**dollars** 44:4
**double** 44:1
**dr** 7:22 44:25 46:11 49:22
**draws** 35:7
**drew** 34:19
**driver** 9:21 18:19 19:3,5
**driver's** 9:24 18:17
**drivers** 9:14
**driving** 8:17 17:14,15
**drop** 49:24
**due** 20:25 21:20 30:17
**duly** 5:17 52:5
**duplicative** 10:5

**e**

**e** 2:1,1,4 3:1,5 4:1,1 10:7 50:4 50:22 55:3,3,3
**earlier** 33:5 36:4 37:5,14 40:14 46:6 48:17
**early** 9:4
**earned** 6:19,22
**easy** 7:18
**ecological** 11:22
**education** 7:4,7 7:10 16:22 17:4
**effectively** 25:9
**eight** 7:19 44:20
**either** 7:7 12:24 16:5
**eleven** 38:18 39:2
**email** 49:22 50:24
**employed** 52:11,14 53:8 53:11
**employee** 13:13 52:13 53:10
**employment** 7:16
**enabled** 20:14
**encompasses** 15:20
**encountering** 25:1
**ended** 9:21
**engaged** 23:22 23:23
**engagement** 8:11
**engagements** 46:2
**engaging** 9:22 24:1 35:6 38:16
**engine** 27:24 28:18 30:19 32:17 33:14 35:19 36:18 37:21 39:14,22 42:2 43:3

**entire** 22:9
**entirely** 17:2
**entities** 26:21
**entitled** 11:20
**environment** 34:17
**equipment** 27:5 30:16,18 36:12 46:21 47:15,19
**ergonomic** 24:23
**errata** 54:11,13 54:16
**es** 52:4
**esquire** 2:4,13
**established** 42:22
**estimate** 42:25 44:3,7,9 45:16 45:25 48:8
**et** 34:2
**evaluate** 13:13 20:13
**events** 13:18
**everett** 10:8
**evidence** 22:8 32:10
**evidentiary** 4:24
**exact** 35:14
**exactly** 24:8 34:4 35:25 44:10 48:10 50:12
**exam** 7:8
**examination** 3:2 5:23
**examined** 5:19
**examples** 48:2 48:9
**excerpt** 3:13 18:11 40:18
**excluded** 9:7,10 9:19
**exhaust** 14:16
**exhausted** 14:11 15:19
**exhibit** 3:7,8,9 3:10,11,12,13 3:14,15 10:14 11:3 14:1,4,18 14:21 18:13,21 19:14,17 40:3 40:4,11,18,21 43:11,15 48:4
**exhibited** 32:6
**exhibits** 50:7 50:25
**existence** 36:16
**expect** 24:9
**expected** 18:19 19:6 33:23 34:8,11
**expense** 44:15
**experience** 16:22 17:3 21:8 25:1 44:11
**experienced** 46:13
**experiment** 16:25
**expert** 13:22 16:1 17:7 40:7 45:10 48:13
**experts** 10:5 17:4 31:6 39:17,24
**explain** 38:11
**explicitly** 24:14 31:14 43:5
**extent** 15:24 31:11
**exterior** 28:22
**eye** 16:24
**eyes** 37:25

**f**

**f.c.** 1:17 4:3 52:2,17
**facing** 29:5,5 35:11
**fact** 22:8 32:25 37:11,23 41:1 41:9 49:4
**factors** 6:21,22 7:20 12:20 13:10,14 17:7 24:16,23,24 25:2,3 32:22 42:21
**facts** 16:21
**fails** 54:18
**failure** 9:16
**fair** 6:7,13 16:6 16:7 30:5
**fall** 47:4,11
**falls** 8:17
**familiar** 6:1,2 13:18
**far** 14:13 25:9 30:25
**fast** 20:19
**fee** 3:14 43:12 43:14 46:20
**fees** 45:25 46:21
**feet** 28:6 30:17 31:1 41:20 42:5,18
**felt** 12:19
**field** 7:11 11:21 17:17 18:17 19:1 24:20 37:10 42:12,15
**fields** 6:16
**figure** 22:18 23:3 26:8 27:5 28:11,17 44:20
**file** 10:16 16:1 16:6,20 40:19 48:13
**final** 3:12 20:10 25:19,22,25

**financially** 52:15 53:11
**fine** 25:17 50:19
**firm** 2:14 45:13 46:1
**first** 5:17 9:12 10:7 12:4,17 20:1 31:3 36:12 37:6 39:14
**five** 45:17 48:10,15 50:16
**focus** 32:7
**focused** 35:18
**follow** 32:22 49:14
**follows** 5:19 24:15
**foot** 30:15 39:21
**foregoing** 52:3 52:4 53:4 56:5
**forensic** 11:21 45:10
**forensics** 7:21 44:23
**foreseeability** 31:1
**form** 23:10 33:8 35:20
**forms** 49:7
**forward** 35:25
**foster** 15:11 27:3 30:13
**foul** 28:5,19,21 30:19 31:4 36:15,19,24 37:15 39:16,23 41:1,5,12,18 42:2,7 43:8,10
**fouling** 27:24
**found** 30:16
**founding** 7:21
**fourth** 32:1,12
**fraction** 45:9
**frames** 29:22
**framework** 34:2,11
**frequent** 18:16
**front** 35:15 36:6
**further** 20:15 36:17 52:13 53:9

**g**

**g** 4:1 10:7
**gallivan** 2:6
**gap** 41:23
**gather** 30:8
**gathering** 37:16
**general** 7:2 50:14
**generally** 13:18 15:20 23:25 24:15,19,24 34:24 44:11
**germany** 19:15
**gibson** 17:10
**give** 11:19 12:10
**given** 6:3 13:4 41:9 56:9
**gives** 34:2,11 34:14 38:12
**glancing** 42:9
**glare** 8:16
**go** 22:14 25:16 33:9 47:22
**goes** 38:5 42:19
**going** 10:14 13:25 14:17 18:14 28:10 36:4 43:11 44:18,22 47:21
**good** 4:2 5:25 42:22 50:22
**graduated** 7:17
**grain** 43:1
**guess** 7:16 8:15 11:13 17:2 18:2,10 22:19 23:16 25:11 26:15,17 27:4 27:12 29:7,12 29:19 30:4 31:14,24 32:14 34:7 38:6 48:12
**guys** 39:3
**gwblawfirm....** 2:9

**h**

**h** 3:5 55:3
**half** 7:20
**hand** 5:14 9:15
**happens** 6:6
**happy** 22:13
**hartman** 7:22 44:25
**hartman's** 46:11
**hartwick** 6:19
**hazard** 18:16 19:1,11 20:13 20:20 27:8,18 27:20 31:1 32:21 33:7 34:22 35:10 37:4,19,21,24 38:10,15 43:4 47:4
**hazardous** 21:4 33:15
**hazards** 9:25 34:16
**head** 11:14
**heading** 17:21
**headlight** 8:16
**heads** 35:24
**hear** 19:24 27:10 41:25

**heard** 25:22 27:13
**hearing** 5:11
**held** 25:8 27:11
**helped** 13:9 47:1,2
**helpful** 10:17 25:14
**helps** 49:25
**hereto** 52:15 53:11 56:7
**high** 34:16
**highlight** 29:25 40:19 41:7
**highlighted** 20:5
**highlighting** 20:2 37:13
**highlights** 41:11
**history** 7:16
**hold** 6:24 48:18
**honestly** 46:3 46:24
**hood** 2:14 45:13 46:1
**hoodlaw.com** 2:17
**hopefully** 38:23
**horn** 20:8 21:5
**hour** 6:10 7:2 38:22 43:18,19
**hourly** 46:6,8
**hours** 44:12,20
**housekeeping** 40:1 48:16
**human** 6:20,22 7:20 12:19 13:10,14 17:7 22:3 24:16,23 24:24 25:2,3 32:22 42:21

**i**

**idea** 46:3
**identifiable** 32:21
**identification** 11:4 14:5,22 18:22 19:18 24:8 40:12,22 43:16 48:5
**identified** 10:4 30:11 39:18
**identify** 5:5 13:9
**identifying** 27:20
**ii** 1:17 4:3 52:2 52:17
**iii** 2:4
**image** 28:21 30:7
**imagery** 29:22
**images** 29:12
**imagine** 11:10 12:3
**impact** 26:5 31:16 32:5,9 32:11
**impaired** 37:3
**impossible** 30:22
**improved** 30:4
**inability** 38:9
**inaccurate** 42:24
**incident** 12:19
**incidents** 47:12
**included** 15:23 15:24,25 48:19
**including** 46:21
**income** 45:9
**inconsistent** 31:16,19 33:3 41:12 42:7
**increased** 32:7
**indicated** 26:6
**indicating** 42:14
**indication** 38:16
**individuals** 24:1
**industry** 7:2
**information** 15:5 21:21 24:10 26:6,22 26:24 31:17 34:13 36:6 37:9,16,17 42:14 49:8
**informed** 20:23
**informs** 37:18
**initially** 13:8
**initiated** 39:21
**initiates** 32:25
**initiation** 32:20
**injury** 12:8
**insight** 38:12
**inspector** 7:1,6
**instance** 9:23 17:23
**instances** 19:1
**instructed** 19:20 20:11
**instruction** 13:4
**intend** 14:20 48:23
**intended** 4:22
**interested** 52:15 53:12
**internet** 6:4
**interval** 36:13 37:6,14
**introduce** 10:14
**investigation** 13:15
**invoice** 44:5
**invoiced** 14:13 14:14
**involved** 8:25 9:3,21

**involvement** 7:11
**involving** 8:25 9:12
**inward** 29:5 35:11
**issues** 13:2
**issuing** 15:7
**italian** 1:9 2:12 4:10 5:10 54:4 55:1 56:1
**itemized** 46:21

**j**

**job** 1:18
**john** 2:13 5:9 38:22
**john.radeck** 2:17
**johnson** 10:8
**judge** 10:1
**judged** 41:19 42:17
**judgments** 42:23,24
**july** 15:12
**jury** 9:20 10:3

**k**

**k** 10:7
**kelly** 53:2,15
**kind** 9:13 24:22 24:23 29:23 34:2 42:16 45:5
**knew** 21:6
**know** 5:25 6:11 13:17 14:11 17:7 24:7 25:8 25:9,15 26:25 27:12 30:9,13 32:19 34:15 36:8 37:25 38:21,22 41:4 43:5 44:10,21 49:9 50:21
**knowing** 33:16 34:4
**knowledge** 9:9 10:13 47:25 52:10 53:6
**koenig** 10:7

**l**

**l** 3:10
**labeled** 21:12
**lack** 29:13 31:15 43:1
**lag** 24:3,9,12
**large** 34:15
**larger** 22:2
**laser** 46:21,22
**law** 2:14 45:13 46:1
**laws** 4:24
**leading** 13:19 22:15
**leads** 28:24
**leah** 7:22
**left** 8:17 21:17 41:15
**legal** 54:23
**liability** 47:3
**licensing** 10:11
**light** 49:8
**likely** 21:20 35:1 40:23
**limited** 9:7 38:17
**line** 16:17 55:4 55:7,10,13,16 55:19
**link** 48:7
**list** 3:15 8:14 15:17,23,25 16:5 45:23 46:25 47:21,23 48:7,12
**listed** 16:19 17:9 26:16 45:23
**literature** 17:4 17:9 25:8 33:4 42:21
**litigation** 12:24 12:25
**little** 44:9
**llc** 2:14
**located** 8:6 41:11
**location** 1:15 26:3 31:10
**locomotive** 7:24 8:1,4,4,19 8:22 12:21 17:22 22:2,9 22:19 26:7,12 28:23 29:4,9 29:14 31:4 36:14,16 37:14 41:1,10 42:12 43:10
**locomotive's** 26:25
**long** 24:8 37:25
**longer** 21:20
**look** 12:18 13:6 13:8 22:17 28:16 40:25 41:22 50:10
**looked** 41:22
**looking** 15:16 21:16 22:17 31:22 36:1 43:6
**looks** 12:11 43:7
**lower** 46:12
**lunch** 38:24

**m**

**ma'am** 5:20
**made** 33:15 48:1 56:5
**main** 2:7 26:4

**mainline** 22:4 22:16,20,23 23:2,8,14 27:25 31:9 40:25 41:18,22 42:9
**maintain** 7:5
**make** 25:22,24 30:20 37:24 42:4
**making** 19:10 33:6 42:10,23
**manner** 4:25 25:2
**march** 11:13 14:18 48:2
**mark** 14:1 18:13 19:14 27:25 32:16 36:11,20,22 39:21 40:4
**marked** 11:3 14:4,21 18:21 19:17 40:3,11 40:21 43:15 48:4
**master's** 6:19
**materials** 10:16 13:11 15:17 16:21 26:16
**matter** 4:7 8:25 9:6 12:4,9,13 16:15 17:22 42:8 43:25 44:4,24 47:16 48:23
**mean** 8:3 15:21 41:5 47:10
**meaning** 33:14
**means** 5:1 25:6
**measurable** 33:2
**measure** 20:14 41:21,21 42:20 42:20
**measured** 20:7 20:18 33:25
**measurement** 16:25
**measurements** 47:4
**meeting** 2:15
**members** 35:18
**memory** 9:2
**mentioned** 25:20
**message** 50:13
**methodology** 30:9
**middle** 29:2
**minus** 27:1,1 32:19 36:22 37:5,6
**misrepresented** 10:4
**missed** 29:2
**moment** 27:5
**monitor** 37:8
**monitoring** 34:20
**morning** 4:2 5:25
**mouse** 20:6
**moving** 17:25 18:10 20:22 21:10 28:2 41:14
**mullen** 53:2,15
**multiple** 23:17 23:19

**n**

**n** 2:1 3:1 4:1 10:7
**name** 4:2
**names** 10:6
**navigating** 11:21 42:12
**near** 36:15
**necessarily** 22:7 34:10 37:24
**necessary** 56:6
**need** 6:10 18:5 20:24 44:10
**needed** 6:7 21:21 24:10
**needing** 20:13
**neither** 52:11 53:7
**new** 46:10 49:8
**nine** 31:18,20 32:3,5,11,19 33:2
**norfolk** 1:5 2:2 4:10 5:8 22:20 26:11 27:23 28:22 31:9 39:14,20 42:3 46:15 54:4 55:1 56:1
**normal** 17:7 33:21
**normally** 32:22
**notary** 4:13 52:18 56:13,19
**note** 11:8 40:2 54:10
**noted** 12:7 15:3 56:7
**noteworthy** 41:9
**noticed** 46:11 46:20
**noticing** 5:6
**number** 31:20 42:6,9
**numbered** 18:15
**numbers** 21:14

**o**

**o** 4:1 10:7,9

**oaths** 4:14
**object** 19:10 20:19 21:4 23:10 27:20 33:6,14 35:20
**objection** 4:17 5:12 33:8
**objects** 19:21 20:25 42:15
**observed** 30:1
**obstacle** 20:12
**obstacles** 17:25 42:14
**obvious** 27:6 38:15
**obviously** 13:11 14:14 21:12 30:25 43:8 44:16 49:7
**occur** 32:11
**occurred** 16:12
**offer** 9:5 12:20 14:20,25 31:7 35:4 48:23
**offering** 39:13 39:19,25
**offhand** 24:7
**officer** 52:1,2
**oftentimes** 24:3
**okay** 6:15 10:20 14:17 17:12 18:12 20:1,5 21:13 21:18 26:2 28:3 32:14 38:20,25 39:1 40:5 50:18,20
**olson** 3:10 18:10
**ones** 46:4
**ooh** 44:9
**operated** 7:24
**operating** 42:11
**operation** 8:22 20:25
**operations** 8:9 8:19
**operator** 19:3 27:19
**operator's** 34:5
**operators** 34:15
**opine** 34:18 37:2
**opined** 32:8
**opinion** 10:4 22:5,7 26:23 27:22 28:1,6 28:16,20 30:1 30:17,25 33:13 34:6 35:4,5 36:14,23 37:20 48:22 49:7
**opinions** 9:9,13 9:18,22 10:2 11:25 12:20 13:7,22 14:19 14:24 15:4,7 15:14 17:2 24:17 25:7,11 31:7 39:13,19 39:25 48:18 49:5
**opportunity** 37:16
**order** 50:2
**oriented** 35:25
**original** 12:13
**originally** 12:8
**osha** 7:2
**outcome** 52:16 53:12
**outlined** 31:2
**outlines** 24:24
**outset** 12:17 19:22
**outward** 29:5
**overall** 37:18
**overhanging** 23:8
**own** 16:22 26:13

**p**

**p** 2:1,1 4:1
**pa** 2:6
**package** 50:22
**page** 3:2,6 20:22 21:10,14 25:19 26:1 28:2 31:23 41:14,14 55:4 55:7,10,13,16 55:19
**pages** 18:6 25:15
**paper** 17:13 24:22
**paperwork** 34:19 35:2,12 35:17 36:8,20 37:1,3 38:2,7,8
**paragraph** 15:3 18:15 20:10 21:16 25:19,23,25 28:4 31:22 32:1,12
**paragraphs** 25:16
**part** 8:3 9:8 10:3 13:14 28:13 42:12
**participants** 18:3 19:20 20:11,23 21:5
**particular** 29:25
**particularly** 37:17 47:1
**parties** 4:15,18 52:12,14 53:8 53:11

**partner** 7:22
**pass** 7:8
**past** 47:1
**pasta** 1:9 2:12 4:11 5:10 54:4 55:1 56:1
**path** 17:18
**paul** 3:10 33:12
**pedestrian** 18:1 18:4
**pedestrians** 8:15 9:13,17 18:7
**peer** 17:8 45:5
**pending** 6:11
**people** 42:22
**perceivable** 26:5 27:1,7,17 28:5,18,20 36:15,17,24 37:7,15 39:14 39:23
**perceive** 9:16 27:19 31:3 32:16
**perceived** 32:15 33:14
**perceiving** 33:6 35:9 42:13
**percent** 25:9 45:11
**perceptio** 7:21 44:23
**perceptiofore...** 54:2
**perception** 9:24 12:21 20:14 32:23 33:23 34:2,5 34:13 37:3,18 41:10
**perceptual** 34:20
**perform** 16:24 23:19
**performance** 24:4 35:8
**period** 18:17
**permitted** 4:22
**person** 44:14
**personal** 12:8
**personnel** 47:6
**perspective** 13:10 18:4 22:22 24:2 32:22 42:21
**peterson** 27:3 31:3
**peterson's** 15:11 30:14
**phd** 6:22
**phone** 9:24
**physical** 32:24
**physically** 23:2
**piece** 37:8
**pieces** 26:24
**places** 18:9
**plaintiff** 1:7 2:2
**plan** 6:9 14:25
**plausible** 38:13
**playground** 6:25 7:6
**please** 5:5,13 6:6,16 7:15 9:11 25:4 49:19 50:6
**plus** 17:3
**point** 12:23 14:12 23:1 30:21 31:6 36:2,18 39:18 45:11
**points** 6:5
**portion** 15:12 20:5 22:19 23:7 40:20 41:7
**portions** 22:12 23:13
**poses** 19:11
**position** 27:1 28:5 30:18
**positive** 11:8
**possible** 20:12
**potential** 20:13 34:16 35:10 37:4
**potentially** 34:22 44:18
**power's** 26:10 28:12 29:8,17 29:24 30:3,9 31:22 40:2
**powers** 3:12 26:18 28:8 29:11 31:13 32:8 36:23 40:6,7
**practical** 21:20
**practice** 17:7 33:21 45:4
**practices** 24:16
**practitioner** 46:13
**practitioners** 24:25
**pre** 31:16
**precise** 12:10 47:4
**prefer** 30:3
**preferred** 30:6
**premises** 47:3
**prep** 44:21
**prepare** 32:17 44:11
**prepared** 53:3
**preparing** 14:15 44:12
**presence** 37:7
**presentation** 11:16,24
**presented** 8:21

**presenting** 11:25
**pressed** 20:8
**pressing** 21:5
**previous** 11:12
**previously** 36:11 40:2
**primary** 24:5 35:7
**principles** 25:7
**prior** 12:24 16:1 52:5
**probably** 38:22 45:11 46:25
**problem** 10:24
**problems** 6:4
**procedural** 4:23
**procedure** 20:23
**procedures** 8:9
**proceed** 5:21 38:10
**proceeding** 1:15 4:4,21 11:20 51:5 53:4
**proceedings** 52:3,5,6,9 53:6
**process** 21:21 45:5
**processing** 20:15
**produced** 4:20 40:19 43:12 48:12
**production** 16:1
**professionals** 25:2
**provide** 48:6
**provided** 15:20 15:22 34:1 44:5 47:23
**proximity** 22:20 23:8
**psychology** 6:18,20,22 11:22
**public** 52:18 56:19
**publications** 8:14 11:7 17:8
**published** 8:15 8:20 17:4,9,13
**pull** 10:18 13:25 14:17 18:5 22:13,17 28:10 41:20 42:20 47:21
**pulled** 11:11
**put** 35:12,17 36:8,25
**puts** 35:14

**q**

**qualifications** 11:7
**qualified** 31:6 52:7
**quality** 29:20
**quantify** 24:12
**question** 6:5,11 6:12 13:20 27:15,16 28:24 29:3,15 40:24 41:16
**questions** 49:11
**quicker** 22:18
**quickly** 20:8,12 25:25 34:14
**quote** 31:24

**r**

**r** 2:1 4:1 10:9 55:3,3
**radeck** 2:13 5:9 5:9 12:5,16 14:3,6 23:10 33:8 35:20 45:18,21 49:9 49:11,14,17,21 50:20,21
**rail** 7:12 12:22 29:20 30:2
**railroad** 8:9,19
**railview** 28:25 29:18 35:11
**railway** 1:5 2:2 4:10 54:4 55:1 56:1
**raise** 5:13
**rate** 43:21,24 46:6,8,11
**rates** 43:13,13 46:9
**reach** 13:22 26:24 28:16
**reached** 14:25 26:21 32:15 33:12
**reaches** 32:8,20
**reaching** 15:6 33:1,20
**react** 19:21 20:11
**reacted** 35:19
**reacting** 33:17
**reaction** 20:7 21:19 31:19
**read** 11:19 18:19 20:16 21:1 49:18 54:9 56:5
**readily** 26:4 27:1 37:15 42:13
**reading** 41:24
**reads** 18:6,16 20:10,23
**really** 9:3

**rear** 9:21
**reason** 19:2 29:15 54:11 55:6,9,12,15,18 55:21
**reasonable** 24:17 25:4 26:19 35:1
**reasonably** 18:18 19:5
**reasoning** 46:12
**recall** 10:6 11:14 41:24 45:6 46:3
**receipt** 54:17
**receive** 16:9
**received** 8:8 13:23 16:1 48:7
**recent** 11:9 47:24
**recognition** 31:18 32:7
**recognizable** 27:8,18
**recognized** 20:12 37:21
**recollection** 46:19
**record** 4:4,5,18 5:5 6:2 27:11 39:7,8,10 51:2 52:9 53:5
**recorded** 4:25 52:6
**recording** 4:20 52:8 53:4
**reduced** 35:1 52:7
**reduction** 34:21
**reenactment** 16:14
**refer** 21:13 25:15
**referenced** 54:6
**referring** 22:15 31:25 32:4,13
**refers** 29:16
**regarding** 11:18 17:17 23:16 39:13,19 39:25
**regardless** 39:15
**reiterate** 6:3
**relate** 8:19
**related** 7:13 8:21 9:14 12:20 47:12 52:11 53:7
**relative** 26:4 52:13 53:10
**relatively** 34:15
**relevant** 11:25 38:1
**relied** 29:18
**rely** 16:20 29:7
**relying** 25:10 28:7,11
**remote** 1:15
**remotely** 4:16
**render** 13:7
**report** 3:9,12 11:12 12:7 14:17,19 15:8 15:11,17,22 16:20 17:10 22:17 23:17,18 24:15 25:5,12 26:10,10 28:7 28:10,11,12 29:16,17 30:12 30:14 31:2,15 31:21,23 32:4 34:18 35:5 38:5 40:2,8 45:1,3 47:24 48:19,25
**reported** 1:17
**reporter** 4:2,3 5:11,20 10:22 10:25 38:25 39:4,6,9 40:5,9 49:16,20,23 50:1,5,7,11,16 50:20,23 51:1
**reports** 22:1
**representation** 22:5
**represents** 48:14
**request** 10:21 16:8
**requested** 52:21
**require** 7:4 42:16 47:19
**required** 44:14 56:13
**requires** 7:7,10
**researchers** 19:15
**reserve** 15:3
**reserved** 51:3
**resource** 23:17
**resources** 24:19 34:20 35:7 38:13
**respond** 32:17 34:15
**responding** 35:10
**response** 9:24 12:21 21:22 27:9 31:16 32:21,23,24 33:1,2,24,25 34:3,5,8,11,13 34:23 36:5 42:16
**restate** 6:6 27:15

**rests** 17:2
**retained** 12:8 46:14,17
**retainer** 14:7 14:11
**return** 54:13,16
**review** 15:16 17:3 24:19 45:5,7 46:9 52:21 54:7
**reviewed** 13:11 13:17,21 15:10 15:18 16:5 17:9 26:17,20 30:13,15 40:15 44:25 45:3
**reviewing** 9:2 29:11
**rico** 3:13 13:13 40:14 43:3
**ridden** 8:1
**right** 5:13 6:15 9:15 10:22,25 15:4 19:16 20:20 21:6,7 21:10 29:19 33:7 38:11 42:2,19 44:18 49:20 50:2,8 50:23
**rightmier** 8:6 32:6 35:12 36:20,25 38:12 42:11
**rightmier's** 34:19 37:25 38:8
**risk** 20:24 21:6
**ron** 46:17
**roughly** 6:9 35:12
**rules** 4:24 6:2
**run** 27:7
**rush** 43:24 50:9

**s**

**s** 2:1 3:5 4:1 55:3
**sacraments** 35:8
**safe** 11:21 15:25 17:18 42:12,16
**safety** 6:25 7:6
**sal** 1:9 4:9
**salt** 43:1
**saying** 30:6,7 35:1 42:3
**says** 19:4 20:21 24:15 32:4
**sborzendowski** 54:2
**sc** 1:16 2:8,16
**scanned** 47:5
**scanner** 46:21 46:23
**scans** 47:3
**scene** 47:5
**schedule** 3:14 43:12,14 46:20
**sciences** 7:19 47:2
**scientific** 24:18 25:5,7 35:2
**screen** 10:17 18:14 25:14 40:17
**scroll** 47:24
**second** 9:20 10:8 11:19 15:3 21:16 27:5,25 28:4 29:22 32:16 36:11,13,20,22 37:6
**secondary** 9:22 24:4 34:19 35:6 38:16
**seconds** 23:24 26:5,8 27:2 31:18,20 32:3 32:5,9,12,19 33:3,13 35:13 36:9
**secretariat** 15:10 26:9,17 27:3 30:14 31:21 32:4
**section** 14:7 15:16
**see** 10:17 11:2 12:19 13:9 23:4 35:22 36:3 38:6 41:1 43:24
**seemed** 8:15 26:18 41:9
**seen** 24:8 42:8
**send** 10:20 40:10 50:13
**sensory** 20:14
**sent** 54:14
**september** 1:13 4:11 54:3
**service** 8:2
**serving** 7:20
**settings** 21:20
**seven** 50:16
**shape** 42:15
**share** 10:16 18:14 25:14 40:17 43:11
**sharing** 10:21
**sheet** 54:11
**short** 38:18
**shortly** 50:25
**shot** 29:7
**show** 32:16 33:13
**showed** 40:2
**shown** 18:3
**shows** 35:11
**side** 41:20 42:18

**sight** 16:17
**sign** 49:18 54:12
**signature** 51:3 52:16 53:14
**signed** 3:8 13:25 14:2 54:19
**signs** 32:6
**similar** 12:2 24:22
**similarly** 10:1
**simulated** 21:9
**simulator** 21:8
**simultaneously** 23:19 24:1
**sir** 50:23 51:1
**sit** 43:13 48:17
**site** 16:11
**situation** 33:19
**skills** 52:10 53:6
**slightly** 46:11
**slip** 47:11
**slips** 8:16
**slowed** 34:22
**small** 8:6 32:6 32:8,14,19 33:12 38:5 42:11
**small's** 38:14
**smoothest** 29:23
**society** 24:23
**solutions** 54:23
**somewhat** 13:21
**sooner** 6:10
**sorry** 10:23 12:9,14,15 19:24 21:11 25:21 29:2 41:25 47:10
**sort** 10:4 32:25 33:21 47:6
**sources** 27:4
**south** 1:2 4:8 4:12,14 52:19
**southern** 1:5 2:2 4:10 5:8 26:11 27:23 28:23 31:9 39:15,20 42:4 46:15 54:4 55:1 56:1
**southerns** 22:20
**spangolia** 45:22
**speak** 10:23
**speaking** 34:24
**specialized** 47:15
**specifically** 13:2,24 14:6 15:11 22:15 31:25 45:19
**specifics** 9:4 46:4
**spectacular** 29:21
**speed** 20:7 42:24
**spend** 44:12
**spent** 44:17,22
**split** 12:22
**staff** 44:23
**stand** 44:17,22
**standard** 25:8 45:4 50:5,15
**standards** 24:17,24
**standing** 42:2,9
**starting** 17:10
**state** 22:2 31:15 52:19
**stated** 29:10 37:5 43:14
**statement** 11:6 14:19 18:24 19:4 21:24 22:7 28:11 30:23
**states** 1:1 4:7 23:18
**stationary** 17:25 19:21 26:7 37:22,23
**steer** 17:22
**steering** 17:19
**stenographic** 5:1
**stephanie** 1:12 4:6 5:16 54:1,5 55:2,24 56:2,4 56:12
**stimuli** 18:2 34:16
**stipulation** 5:2
**stood** 41:22
**stopped** 12:21 26:25 37:11,12 39:20
**stopping** 23:23 24:4
**street** 2:7,15
**studies** 18:1
**study** 3:11 6:17 16:17 17:13 19:13,14,20 20:6,18 21:5 21:13 22:1 23:16 34:7
**subject** 10:10
**subscribed** 56:14
**subsequent** 13:11 15:22
**substantial** 18:17
**substantially** 11:9
**suggested** 45:6

**summerville** 1:16 4:12
**super** 7:18
**supplement** 15:4
**supplemental** 15:7,7,11 30:14 48:18
**supports** 49:4
**sure** 6:18 8:17 9:12 18:8 25:13,22 39:5
**swear** 4:15 5:12
**switching** 24:5 24:11
**sworn** 4:18 5:17 52:5 56:14

**t**

**t** 3:5 10:9 55:3 55:3
**take** 4:4,13 6:9 6:12 12:18 13:6,8 38:18
**taken** 4:7 43:1 52:3,12 53:9
**talk** 12:3 14:10 17:8 19:13
**talked** 6:1
**talking** 41:10
**tape** 41:20 42:20
**task** 9:23 12:23 23:22,23 24:5 24:6 34:19,25 35:6,7 38:17
**tasks** 23:19 24:1,10 35:9
**tell** 5:18 6:16 9:3,11 21:11 38:3 46:7 48:10
**tend** 42:24
**term** 29:13 36:10 43:1
**terms** 16:4 17:20 24:3 29:21 31:2 34:4 38:14 46:4
**test** 49:4
**testified** 5:19 38:6 48:19
**testify** 42:17 44:14
**testifying** 52:5
**testimony** 3:15 9:5,8 13:17,22 29:17 36:5 40:20,24 41:8 41:15,24 43:2 43:19,21 45:23 47:21,23 48:2 48:9,12,14 54:9,17 56:8
**thank** 5:11,20 5:22 21:11,15 32:14 40:9 49:13 51:1
**thanks** 49:15
**theory** 23:17
**thing** 27:13 47:14
**things** 15:21 42:23 48:16
**think** 9:4 10:3 11:13 12:7,17 13:16 15:19 24:9 27:16 29:24 30:24 33:19 34:1 36:10 40:3 45:4,20 46:16 47:4,22 49:6
**thousand** 28:6 30:15,17 31:1 42:5
**three** 7:8 26:24
**time** 1:14 5:4 11:12 14:15 15:9 18:18 20:14,16 21:21 24:3 31:19 32:23 33:24 34:3,5,8,11,13 35:14,19 37:6 37:8 39:6,10 44:15,16,22 45:1 47:5 50:15 51:2 54:18
**timeframe** 54:8
**times** 21:19 43:7 45:16
**timing** 26:13
**title** 11:20 18:6
**today** 12:3 14:15 15:6 43:13 48:18,20 49:7
**took** 40:18
**top** 11:14 18:6
**total** 16:4 44:3 44:7 45:25
**towards** 35:25
**track** 22:21 26:4 27:25 30:19 31:9 33:18 34:20 38:1 41:2,5,6 41:22
**tracking** 16:24
**tracks** 19:21
**tractor** 9:21
**trailer** 9:21
**train** 8:12,12 8:23,23,24 9:1 9:3 20:8 21:5 36:24 37:7 39:20 41:23
**train's** 20:25
**training** 7:5 8:8 16:23 17:3

**trains** 26:3 28:5
**tran** 50:22
**transcriber** 53:1
**transcript** 4:20 40:15 50:4 52:21 53:3,5 54:6,19 56:5,8
**transcriptionist** 52:8
**travel** 11:21 17:18 42:13,16 44:14,21
**trial** 14:25 43:22 44:8,13 44:17 48:23
**tribometer** 47:8,13
**tribometrist** 7:1,9
**trickier** 44:9
**true** 37:2 52:9 53:5 56:8
**truth** 5:18,18 5:19
**trying** 12:10
**turn** 9:15 25:11 35:9
**turnaround** 50:15
**two** 9:10 42:9
**type** 7:23 10:12 16:24
**types** 24:18 25:3
**typewriting** 52:7
**typically** 46:9
**typos** 49:2

**u**

**ultimately** 6:21
**under** 4:23 18:18 20:6,22 46:22
**underlying** 12:8
**understand** 4:19 9:18 10:3 32:2,10 36:15
**understanding** 9:20 10:2 34:12 37:9,11
**unfolds** 36:3
**united** 1:1 4:7
**universe** 16:4 32:23
**university** 6:21 6:23
**unobstructed** 38:8
**unreliable** 42:25
**updated** 48:6
**usage** 9:24
**use** 25:5 46:22 47:9,15
**used** 30:9,11 36:10 46:24 47:11,13 54:19
**uses** 4:22
**usually** 46:10
**utilized** 41:13 42:8

**v**

**v** 1:8 4:10 54:4 55:1 56:1
**vague** 9:2
**vantage** 23:1
**variable** 47:12
**vehicle** 9:13
**verify** 54:9
**veritext** 4:4 54:14,23
**veritext.com.** 54:15
**version** 11:9 48:11
**versus** 9:13 42:11
**video** 22:13 26:11,14,23 29:8,13,18,23 30:2,8 31:12 35:11,23 36:2 36:3 38:4,16
**videoconfere...** 2:5,13
**videos** 12:18 13:7,8 29:1,4 29:20
**view** 18:17 19:1 28:22 35:25 37:10 38:8
**virtual** 6:3 10:15
**visible** 8:16 27:6 30:16 32:6 36:12
**visit** 16:11
**visual** 9:14 18:2 26:6 31:16 34:12 36:5 37:9,16 42:13
**visualization** 28:14,17 30:3
**visualizations** 28:7 29:11,16 29:24 30:10,15 31:12
**vs** 10:8,9 45:22

**w**

**w** 10:9
**walk** 7:15 40:25 41:21
**want** 17:8 19:13 25:21 47:3
**wanted** 10:17
**watching** 38:7
**way** 29:16 33:16 34:6,12

38:3
**we've** 49:3,6
**wednesday** 1:13 4:11
**white** 2:6 24:22
**whitney** 2:4 3:3 5:7,7,21,22,24 10:20,24 11:1 23:15 27:14 33:11 36:7 39:3,11,12 40:1,7,10,13 49:10 50:2,3,6 50:9,14,18,24
**wickens** 23:18
**william** 2:4 5:7
**window** 38:1
**winter** 10:9
**witness** 4:16,18 4:19 5:12,17 23:12 27:12 33:10 35:22 39:1,5 49:13 49:19,24 52:4 54:8,10,12,18
**work** 7:23 17:5 45:10 46:5 47:18
**worked** 45:13 45:18 46:14
**works** 39:3,4
**worst** 21:8
**wrap** 48:17
**wray** 46:18
**wright** 45:22
**written** 5:2
**wwhitney** 2:9

**x**

**x** 3:1,5 52:21
**xl** 7:1,9

**y**

**y'all** 50:12
**yeah** 7:18 17:16,20 22:22 25:24 31:24 44:25 50:21
**year** 46:10
**years** 7:8,20 25:1 46:24 48:15
**yellow** 22:4,10 22:12 23:3

South Carolina Rules of Civil Procedure

Part V. Depositions and Discovery

Court Rule 30

(e) Submission to Witness; Changes; Signing. When the testimony is fully transcribed the deposition shall be submitted to the witness for examination and shall be read to or by him unless such examination and reading are waived by the witness and by the parties. Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness, unless the parties by stipulation waive the signing or the witness is ill or cannot be found or refuses to sign. If the deposition is not signed by the witness within 30 days of its submission to him, the officer shall sign it and state on the record the fact of the waiver or of the illness or absence of the witness or the fact of the refusal to sign together with the reason, if any, given therefor; and the deposition may then be used as fully as though signed unless on a motion to suppress under Rule 32(d)(4) the court holds

that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.