# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

CASE NUMBER
C.A. No. 3:25-cv-06618-SAL

NORFOLK SOUTHERN RAILWAY COMPANY,
Plaintiff,
VS.
AMERICAN ITALIAN PASTA COMPANY,
Defendant.

DEPOSITION TESTIMONY OF: ALLEN POWERS
SEPTEMBER 11, 2026
9:00 a.m.

me about that."

Q. So you don't have any opinion as to what distance the Norfolk Southern locomotive was from the AIPC engine when you believe the crew should have recognized the AIPC engine was in the foul?

A. They should have -- no, I do not have an opinion about that. I mean, you see in my report that you can first see it from about 2,000 feet away. The specifics of that number is in the report. But in terms of where they should have, that's not in my opinions.

Q. You would agree with me that there's a difference in spotting or seeing an object up in front of you and realizing or appreciating that you need to take some type of action in response to that object?

A. Of course, of course.

Q. In this case, you said based on your work, you believe at about 2,000 feet, the train crew could have seen the AIPC engine off in the distance in front of

them. That was your determination, right?
A. Yes.
Q. But as you just told me a minute ago, you're not saying that at that distance or any other, you didn't determine that they should have realized, "Hey, this thing is in the foul, we better do something"?
A. That is correct. In other words, really what you're asking me is what I think of as a jury evaluation; in other words, once they have a rendering or a visualization that shows what it looks like in real life, then they are able to say -- and obviously we see in the video where people are reacting, we're looking at what both Rightmier and Small talked about when they could see it and recognized it as a problem, and I guess the reactions speak for themselves.
Q. And you agree with me that they had no obligation or responsibilities to start trying to do an emergency braking

A. Uh-huh.
Q. Is that "yes"?
A. I would agree there is some, but there's not much.
Q. And there's going to be some glare from the sun and the position of the sun, that's going to come into play, right?
A. I don't recall the sun being an effect on this one.
Q. Well, there's going to be some sunshine, glare, overcast, depending on what the weather conditions were that morning, right?
A. Sure.
Q. How does your animation account for all of those factors, in terms of trying to replicate the view of what these guys inside the cab would see?
A. Well, the first thing I would say is, that wasn't the point of our visualization. As I stated I think early on, the whole point of our visualizations was to allow the jury to see the videos

that you see from the train positions are misleading. They're misleading because of the things we talked about before. They're choppy, it's a wide-angle lens, and so the whole point of the animation was to draw a difference between those. I don't think there's anything in there where I'm saying, "Hey, this is what Small's perspective was."

Q. Or Rightmier?

A. Correct.

Q. Fair enough. And then as we talked about earlier, and you gave me Exhibit 8 which combined with Exhibit 9, you looked at different starting points for the braking, based on some of the testimony in the case, and where that would have left them in relation to the AIPC engine if they began braking at that specific point. Is that fair?

A. Yes.

Q. And you agree with me that based upon Mr. Small's testimony about where he