UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Norfolk Southern Railway Company, | ) | C.A. No. 3:25-cv-6618-SAL |
| Plaintiff, | ) | |
| v. | ) | **PLAINTIFF'S MOTION TO EXCLUDE THE TESTIMONY AND OPINIONS OF RONALD T. BUDRA AND INCORPORATED MEMORANDUM OF LAW** |
| American Italian Pasta Company, | ) | |
| Defendant. | ) | |

PLEASE TAKE NOTICE that Plaintiff Norfolk Southern Railway Company ("Norfolk Southern" or "NS"), by and through its undersigned counsel, and pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), hereby moves this Court for an Order excluding the expert testimony of Ronald T. Budra. The grounds for this Motion are set forth in the incorporated memorandum of law in accordance with Local Civil Rules 7.04 and 7.05 (D.S.C.). For the reasons stated therein, Mr. Budra is not qualified to offer the opinions he proffers and his opinions fail to apply any reliable methodology to the facts of this case. Additionally, his opinions lack a sufficient factual foundation, rest on inadmissible speculation, fail to connect his experience to his conclusions, and impermissibly offer legal conclusions. Norfolk Southern respectfully requests that the Court exclude his report and testimony in their entirety.

## INTRODUCTION

Defendant American Italian Pasta Company ("AIPC") offers Ronald T. Budra to challenge limited aspects of Norfolk Southern's damages claim. Mr. Budra agrees that Norfolk Southern is entitled to recover damages relating to track repair and replacement, clean-up, access agreements with Richland County to gain access to the location where the derailment occurred, and settlement of the personal injury claims brought by Conductor Rightmier and Engineer Small. *See* Ex. 1, Budra Dep. 46:13-47:15; 48:24-49:12; 50:11-22. With the exception of the settlement of the personal injury claims, he admits that the amounts sought by Norfolk Southern for these aspects of its damages claim are reasonable. *Id.* at 86:15-88:6. Regarding the personal injury settlements, he has no criticism of them; he merely stated that he was not asked to evaluate them and therefore had no comment on that specific issue. *Id.* at 88:7-12. However, he admitted that as a claims handler if he had settled two permanent injury claims for the amounts paid by Norfolk Southern, "someone would be buying me lunch," thereby admitting that those amounts are likewise reasonable. *Id.* at 51:17-23.

Similarly, Mr. Budra does not challenge Norfolk Southern's claim for destruction of damaged railcars or the amount claimed. *Id.* at 83:14-84:22. With respect to the three locomotives damaged in the derailment, Mr. Budra agreed that Norfolk Southern is entitled either to the depreciated value ("DV") of the engines if they were a total loss and not subject to repair, or that it is entitled to the repair costs so long as the cost to repair and loss of use damages do not exceed the DV. *See id.* at 56:1-16; 77:11-18; 99:13-21; 107:10-15. Mr. Budra's opinions in this case primarily relate to this limited issue of loss of use. Mr. Budra seeks to persuade the jury that Norfolk Southern's loss of use claim is "speculative," "inflated by more than $4.5 million," "self-serving," and the product of a "failure to mitigate." *See* Ex. 2, Budra Report; Ex. 3, Budra Supp.

Report. Those are serious accusations. But an expert may deliver them to a jury only if the proponent first shows that he is qualified to render the opinions, the opinions rest on a reliable methodology, and that this methodology has been reliably applied to sufficient facts. AIPC cannot make that showing, because Mr. Budra admits that he has not done the work needed to evaluate the claim and has no methodology at all that he is applying to this case.

Mr. Budra's only experience pertaining to locomotive repairs was a one-year stint in Amtrak's mechanical department where he drove a forklift delivering parts and worked a short time in the payroll department. Ex. 1, Budra Dep. 42:12-43:23. He has never been a locomotive mechanic, has never conducted repairs himself, and has no training or qualifications that would allow him to assess what repairs are needed, what parts are required, or the length of time needed to perform repairs. *See id.* at 43:21-44:20. He testified that his only locomotive repair "experience" consisted of watching others perform repairs in the shop and watching a video on YouTube where an engine supposedly was assembled from scratch in fourteen days.[1] *See id.*; 59:4-18.

With respect to his methodology, his reports recite a five-item list labeled "Methodology" – "Industry Experience and Practice," "Comparative Analysis," "Document Review and Internal Consistency," "Economic and Operational Reasonableness," and "Evaluation of AAR-Based Methodologies" – but never explain how any of them were applied, or how any of them produce his loss of use numbers or his criticisms of Norfolk Southern's claim. Ex. 2, Budra Report 2; Ex. 3, Budra Supp. Report 2-3. At his deposition, the gap between label and substance became an admission. Mr. Budra testified that he "do[es]n't calculate these things"; that he chose his one original number – a 70-day repair period – because "you've got to get a number someplace out there" and to "get you all talking"; that he adopted Norfolk Southern's own figures "as is" and

[1] Of course, Mr. Budra could not cite or produce the video.

"didn't argue with them"; that he did not know "what the word reasonable means here"; and that, when asked how one would even calculate a fair loss of use figure, his "honest answer" was "I don't know." Ex. 1, Budra Dep. 39:21-40:5; 59:19-60:6; 62:23-63:8; 64:9-14; 89:21-90:6; 92:7-93:7.

Expert testimony of this kind – conclusions tethered to the witness's say-so rather than to any discernible methodology – is precisely what Rule 702 and *Daubert* forbid. The Court should exclude Mr. Budra's opinions in their entirety.

## FACTUAL BACKGROUND[2]

On the morning of July 11, 2022, AIPC's employee Rico Blanchett was operating and moving a locomotive by remote control on AIPC's Storage Track 1, pulling six loaded grain railcars toward Norfolk Southern's mainline. Compl. ¶¶ 15, 20, ECF No. 1.[3] Blanchett rode the sixth railcar at the rear, which was the car farthest from the locomotive, as he moved the railcars. *Id.* at ¶ 21. Blanchett failed to set up the air brakes on the locomotive and railcars properly, which significantly reduced braking capability, and he lost control of the locomotive. *Id.* at ¶¶ 22, 23; *see also* ECF No. 36-1, AIPC 30(b)(6) Marshall Dep. 22:10-23; ECF No. 36-2, Blanchett Dep. 101:4-103:22. AIPC admits that Blanchett's conduct and methods of operating the locomotive violated his training and instructions. *See* ECF No. 36-1, AIPC 30(b)(6) Marshall Dep. 22:1-28:25, 64:22-25, 149:1-150:23.

At the time of the incident, Norfolk Southern had installed a device known as a double-switch point derail near the location where the AIPC industry track connected with the Norfolk

---

[2] A more detailed statement of facts is included in the Memorandum in Support of Norfolk Southern's Motion for Summary Judgment. This memo only briefly references those facts pertinent to the present motion.

[3] All allegations referenced in this paragraph and the following paragraphs are proven and undisputed based on the depositions of AIPC's corporate representative, Rhen Marshall, and Rico Blanchett. *See* ECF Nos. 36-1 and 36-2.

Southern mainline track. A derail, as the name implies, is a device that is intended to derail moving equipment off the industry track and away from the mainline track in hopes that the equipment does not foul the track and cause an accident. Blanchett and AIPC both knew that AIPC equipment was not allowed to move through the derail. *See id.* at 23:8-24:18; ECF No. 36-2, Blanchett Dep. 157:6-21. Unfortunately, Blanchett allowed the engine and railcars he was operating to move through the derail while still under power, even though the derail forced the equipment to the left away from Norfolk Southern's mainline track as designed. Compl. ¶¶ 23, 24, ECF No. 1. The derailed equipment then traveled off the rails and on the ground until it came to rest "in the foul" of Norfolk Southern's mainline track, which means it was in close enough proximity that a passing train could strike it. *Id.* at ¶ 25.

After the derailment, Blanchett left the scene without warning or notifying Norfolk Southern that AIPC's equipment was fouling the mainline, and without asking anyone at AIPC to do so. *Id.* at ¶ 26. AIPC gave no warning or notice of any kind to Norfolk Southern. *Id.* at ¶ 27. At approximately 8:14 a.m., Norfolk Southern's Train 238, whose crew was unaware of the derailed equipment, collided with the locomotive AIPC left in the foul, derailing Train 238. *Id.* at ¶¶ 30, 31. The Norfolk Southern crew members operating Train 238, Raymond Rightmier and David Small, were injured as a result of the collision. *Id.* at ¶¶ 34, 35. Norfolk Southern filed the present action on July 1, 2025, asserting a cause of action for contractual indemnity alongside claims for equitable indemnification, negligence, trespass, and punitive damages. *See id.*

AIPC's insurer, Travelers, retained Mr. Budra to "evaluate the damages claimed by Norfolk Southern" arising out of the July 11, 2022 derailment. *See* Ex. 3, Budra Supp. Report 1. Mr. Budra is a retired railroad claims and damage prevention specialist with a long career at New York Central, Penn Central, Conrail, and Amtrak. *See* Ex. 4, Budra CV. He is not an engineer, a

railroad mechanic, an accountant, or an appraiser. He has never been qualified as an expert witness by any court and has never testified in court. Ex. 1, Budra Dep. 6:1-13.

Mr. Budra served an initial report dated March 26, 2026, and a supplemental report dated May 4, 2026. The initial report sets out four conclusory "Opinions": (1) that the loss of use claims are "speculative and improperly calculated" and "likely inflated by more than $4.5 million"; (2) that Norfolk Southern's repair decisions "include modernization and upgrades beyond pre-incident condition, constituting non-recoverable betterment"; (3) that Norfolk Southern "assumed ownership but failed to provide notice regarding disposition" of railcars; and (4) that Norfolk Southern's methodology is "self-serving" because of its reliance on Association of American Railroads ("AAR") materials. *See* Ex. 2, Budra Report 2. Neither the "$4.5 million" figure nor any other conclusion is accompanied by a calculation. *See id.*

The supplemental report adds that, if loss of use is recoverable at all, "a reasonable repair duration would be approximately 70 days," derived by stating "[t]otal labor hours: 10,124" and "144 labor hours per day (6 workers, 3 shifts)," and then applying "NSR's daily rate - $1,771 dollars x 70 days = $123,970 for each locomotive." *See* Ex. 3, Budra Supp. Report 7. It also opines that Norfolk Southern's claim "reflects a clear failure to mitigate damages." *See id.* at 6.

Mr. Budra was deposed on September 16, 2026, and his testimony confirmed the absence of any qualifications or methodology behind these opinions. Those admissions are detailed in the Argument below.

## <u>LEGAL STANDARD FOR EXPERT TESTIMONY</u>

Rule 702 permits expert testimony only if the proponent "demonstrates to the court that it is more likely than not" that the witness is "qualified as an expert by knowledge, skill, experience, training, or education" and that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Rule "imposes a special gatekeeping obligation on the trial judge" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Nease v. Ford Motor Co.*, 848 F.3d 219, 229-30 (4th Cir. 2017) (quoting *Daubert*, 509 U.S. at 597). The "importance of [the] gatekeeping function cannot be overstated." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 283 (4th Cir. 2021) (quoting *United States v. Barton*, 909 F.3d 1323, 1331 (11th Cir. 2018)). In *Sardis*, the Fourth Circuit held that "the district court abused its discretion" and "improperly abdicated its critical gatekeeping role to the jury" by "rul[ing] that the issues of relevance and reliability impact only the weight of the experts' testimony, not their admissibility" and could be sufficiently addressed by cross-examination. 10 F.4th at 278-79, 281. As the Fourth Circuit made clear, "credibility is entirely distinct from reliability and relevancy, which are *preconditions* to the admissibility of expert testimony." *Sardis*, 10 F.4th at 282 (emphasis in original) (citing *Nease*, 848 F.3d at 229).

Thus, before a witness may be permitted to provide expert testimony, he must be qualified as an expert by the trial court. *Barnthouse v. Wild Dunes Resort, L.L.C.*, 2010 WL 3169358, at *3 (D.S.C. Aug. 5, 2010). In evaluating the qualifications of a potential expert witness, "[t]he trial court ha[s] to decide whether this particular expert ha[s] sufficient specialized knowledge to assist the jurors in deciding the *particular issues* in the case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) (emphasis added). "'There are many different kinds of experts, and many different kinds of expertise.' The fact that a proposed witness is an expert in one area, does not *ipso facto* qualify him [or her] to testify as an expert in all related areas." *Shreve v. Sears, Roebuck & Co.*,

166 F. Supp. 2d 378, 391 (D. Md. 2001) (quoting *Kumho Tire*, 526 U.S. at 150). "The question of whether a witness is qualified to testify is context-driven and 'can only be determined by the nature of the opinion he offers.'" *RG Steel Sparrows Point, LLC v. Kinder Morgan Bulk Terminals, Inc.*, 609 F. App'x 731, 738 (4th Cir. 2015) (quoting *Gladhill v. Gen. Motors Corp.*, 743 F.2d 1049, 1052 (4th Cir. 1984)). The trial court "should consider the proposed expert's full range of experience and training." *United States v. Bright*, 789 F. App'x 947, 950 (4th Cir. 2019) (citations omitted). An expert witness lacks the necessary qualifications if they "have neither satisfactory knowledge, skill, experience, training nor education *on the issue for which the opinion is proffered*." *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989) (emphasis added) (proposed expert for credit and price discrimination case not qualified because she was not an economist, worked primarily on analyzing companies' financial health, and testified she had no personal experience making credit decisions).

As the proponent, AIPC "must establish [admissibility] by a preponderance of proof." *Funderburk v. S.C. Elec. & Gas Co.*, 395 F. Supp. 3d 695, 706 (D.S.C. 2019) (quoting *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001)). Effective December 1, 2023, Rule 702 was amended to "clarify and emphasize" that preponderance standard and to reject the many decisions that had treated "the sufficiency of an expert's basis, and the application of the expert's methodology," as "questions of weight and not admissibility" – an approach the Advisory Committee called an incorrect application of Rules 702 and 104(a). *See* Fed. R. Evid. 702 Advisory Committee's Notes, 2023 Amends. Amended Rule 702(d) further "emphasize[s] that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Id.* The Fourth Circuit has confirmed that the amended Rule governs and places the burden on the offering party, and that an opinion connected to existing data

"only by the ipse dixit of the expert" does not meet the burden. *O'Connor v. Fairfax Taxi, Inc.*, 188 F.4th 336, 354 (4th Cir. 2026) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). If an expert is "relying solely or primarily on experience, then the [expert] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 Advisory Committee's Notes, 2000 Amends. Rule 702 "does not permit an expert to function as a narrator or advocate under the guise of specialized experience." *United States ex rel. Shepherd v. Fluor Corp.*, No. 6:13-CV-02428-JD, 2026 WL 105841, at *5 fn2 (D.S.C. Jan. 14, 2026).

In assessing reliability, courts consider, among other non-exclusive factors, (1) whether the "expert's theory or technique 'can be (and has been) tested'"; (2) whether it "has been subjected to peer review and publication"; (3) its "known or potential rate of error"; and (4) whether the "expert's methodology is generally accepted" in the relevant field. *Sardis*, 10 F.4th at 281 (quoting *Nease*, 848 F.3d at 229). The reliability inquiry is flexible. *Sardis*, 10 F.4th at 281 (quoting *Daubert*, 509 U.S. at 594-95). At its core, a reliable opinion must rest "on scientific, technical, or other specialized *knowledge* and not on belief or speculation," and any inferences must be "derived using scientific or other valid methods." *Sardis*, 10 F.4th at 281 (emphasis in original) (quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)).

Finally, "[e]xpert testimony that merely states a legal conclusion is less likely to assist the jury in its determination." *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002). Similarly, an opinion that merely restates a legal standard the jury can apply for itself is not helpful and is excludable. *See Ponder v. City of Asheville*, 589 F. Supp. 3d 500, 504 (W.D.N.C. 2022). "The best way to determine whether opinion testimony contains legal conclusions is to determine whether the terms used by the witness have a separate, distinct, and specialized meaning in the law different

from that present in the vernacular." *Barile*, 286 F.3d at 760. "[C]onclusory opinion testimony using terms having specialized legal meaning such as 'discrimination,' 'negligent,' or 'fraudulent … scheme' are freighted with 'considerable legal baggage' and 'such testimony nearly always invades the province of the jury.'" *Riddick v. Norfolk S. Ry. Co.*, No. 2:21cv297, 2022 WL 1180018, at *5 (E.D. Va. Apr. 20, 2022) (quoting *United States v. Perkins*, 470 F.3d 150, 158 (4th Cir. 2006)).

## ARGUMENT

### I. Mr. Budra Is Not Qualified to Opine on Locomotive Damage, Repairs, Repair Timelines, or the Reasonableness of Norfolk Southern's Loss of Use Claim.

Rule 702's threshold requirement is that the witness be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Qualifications are not assessed in the abstract, as the witness must have expertise "on the issue for which the opinion is proffered." *Kline*, 878 F.2d at 799. "The fact that a proposed witness is an expert in one area, does not *ipso facto* qualify him [or her] to testify as an expert in all related areas." *Shreve*, 166 F. Supp. 2d at 391 (quoting *Kumho Tire*, 526 U.S. at 150). Mr. Budra is unqualified to offer opinions about the extent of damage to the three locomotives, the repairs they required, how long those repairs should have taken, and the resulting loss of use charges.

Mr. Budra's expertise, by his own description, lies "within the fields of railroad operations, accident investigation, and claims/risk management" – not locomotive repairs. Ex. 2, Budra Report 1. His only time inside a locomotive repair shop was a partial-year assignment in Amtrak's material control department, where he "operate[d] a forklift" and "deliver[ed] all the parts" to the repair tracks. Ex. 1, Budra Dep. 42:7-43:23. He never performed the job of a locomotive mechanic. *See id.* at 43:21-44:20.

With respect to the information he had about the damages to the locomotives involved in

this case, Mr. Budra testified that his impression of the damage to the locomotives came from photographs he reviewed. Even as to these, he admitted "I don't know if the photos show it all." *Id.* at 103:1-5. Likewise, he knew little or nothing about what was needed to repair the damage. He formed no opinion on whether the parts used in the repairs were the right parts, and conceded that he had not analyzed "whether there were any difficulties obtaining parts or any supply chain problems that might have contributed to the length of time it took to get these locomotives repaired." *See id.* at 45:16-46:7; 69:2-14. Delivering parts on a forklift is not training or experience in locomotive damage assessment or repair, and spending decades working for railroads does not qualify someone as an expert on all railroad-related issues. *See Kline*, 878 F.2d at 799; *Shreve*, 166 F. Supp. 2d at 391 (quoting *Kumho Tire*, 526 U.S. at 150).

Similarly, Mr. Budra confirmed he cannot perform the depreciated value analysis that he offered as an alternative method of calculating damages for one of the damaged locomotives ("I can't calculate it myself. I have to ask people for information to help me with my claim." Ex. 1, Budra Dep. 40:17-24) or loss of use ("[T]hat's a tough question. And honest answer, that – I don't know." *Id.* at 92:7-93:7). While he might be able to evaluate a claim where others have provided him with needed information and he actually studies it, he acknowledged he did not do that here and did not even review all the depositions, documents, and other materials he had been furnished. Most notably, he did not even read the depositions of the two Norfolk Southern 30(b)(6) witnesses on damages and equipment repairs, the two witnesses whose testimony he ostensibly was retained to rebut. *Id.* at 66:15-19. Instead, he simply concluded without basis that the length of time to repair these locomotives was excessive and outside the realm of anything he had encountered previously and based his opinion on nothing more.

Mr. Budra's general claims adjustment experience in the railroad context cannot supply the

specific expertise he lacks. In *Thomas J. Kline, Inc. v. Lorillard, Inc.*, the Fourth Circuit excluded a damages expert whose "work experience was limited largely to analyses of companies' financial health" but who had no training or experience in the specialized subject on which she opined; she "totally lacked the 'knowledge, skill, experience, training, [and] education' that Rule 702 requires," and admitting her testimony was "a clear abuse of discretion." 878 F.2d at 800. This Court, applying *Kline*, has confirmed that the exclusion test turns on whether the witness "clearly has no relevant qualifications" on the specific issue, excluding even a credentialed engineer's opinions that strayed into a sub-field she admitted was "outside [her] area of expertise." *Mears Grp., Inc. v. Kiawah Island Util., Inc.*, No. 2:17-CV-2418-DCN, 2020 WL 13070447, at *8 (D.S.C. Jan. 27, 2020).

Mr. Budra's decades of experience adjusting railroad claims may qualify him to describe, in general terms, how railroads process property damage claims. They do not, however, qualify him to opine on how badly these locomotives were damaged, what repairs they needed, how long those repairs should have taken, or what a reasonable loss of use figure would be. Those opinions should be excluded.

### II. As an Experience-Only Witness, Mr. Budra Fails the Fourth Circuit's Requirement to Connect Experience to Conclusion.

Even setting aside that Mr. Budra is not qualified to offer these opinions at all, his supposedly experience-based opinions independently fail because that experience was never connected to his conclusions as the Fourth Circuit requires. Mr. Budra's opinions are explicitly experience-dependent. His "methodology" leads with "Industry Experience and Practice" and his "materials considered" expressly lists "My professional experience." Ex. 2, Budra Report 2; Ex. 3, Budra Supp. Report 2. He justified his 70-day repair period figure as drawn "from my experience working in the mechanical department." *See* Ex. 1, Budra Dep. 62:4-7. *Kumho Tire* confirms that

an experience-based opinion is subject to the same gatekeeping requirements as any other. *Kumho Tire*, 526 U.S. at 151-52.

The governing standard in this District and Circuit requires more than simply declaring that a witness has sufficient experience in a particular field. The court "must nonetheless require an experiential witness to explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007). Mr. Budra supplied the label but none of that connective reasoning: he conceded he does not calculate depreciated values himself, cannot define "reasonable" in the context of a reasonable time to repair, and could not articulate any method linking his experience to his numbers. *See* Ex. 1, Budra Dep. 39:21-40:5; 89:21-90:6. Nor is the experience the kind his opinions would require. Mr. Budra's six decades were spent in railroad claims and damage prevention, not in locomotive repair, engineering or asset valuation; his only hands-on time in a repair shop was a one-year assignment driving a forklift and moving parts in a "material control department." *Id.* at 43:2-10. Rule 702 "does not permit an expert to function as a narrator or advocate under the guise of specialized experience." *Fluor Corp.*, 2026 WL 105841, at *5 fn2. Because AIPC cannot make the required showing under *Wilson* of how Mr. Budra's experience led to his conclusions, why his experience is a sufficient basis for his opinions, and how his experience was reliably applied to the facts, his experience-based opinions should be excluded. *See* 484 F.3d at 274.

### III. Mr. Budra Employed No Reliable Methodology for Calculating Loss of Use Damages and His Opinions Are Inadmissible *Ipse Dixit*.

Mr. Budra's reports disclose no methodology, only a list of labels. The "Methodology" section names "Industry Experience and Practice," "Comparative Analysis," "Document Review and Internal Consistency," "Economic and Operational Reasonableness," and "Evaluation of

AAR-Based Methodologies," then asserts, without more, that "[t]his methodology is consistent with accepted practices in railroad claims evaluation." Ex. 2, Budra Report 2; Ex. 3, Budra Supp. Report 2-3. Neither report explains what any of these labels mean in practice, how they were applied to the three locomotives at issue here, or how they yield the specific conclusions offered, including the headline opinion that Norfolk Southern's loss of use claim is "likely inflated by more than $4.5 million." *See* Ex. 2, Budra Report 3; Ex. 3, Budra Supp. Report 3.

Mr. Budra's deposition confirmed that there is nothing behind the labels. He testified that he does not perform the depreciated value calculations his opinions require, stating that he "do[es]n't do it myself" and "do[es]n't calculate these things." *See* Ex. 1, Budra Dep. 39:21-40:5. And asked to describe, in general terms, how one would arrive at a fair method for calculating loss of use, he conceded: "that's a tough question. And honest answer, that – I don't know." *Id.* at 92:7-93:7. He confirmed he "ha[d] not done that type of analysis in this case." *Id.* at 93:8-10.

This is the textbook definition of inadmissible *ipse dixit*. The Fourth Circuit's authorities, and courts within it, routinely exclude damages and valuation opinions that name an approach but perform no analysis. In *In re Blackjewel, L.L.C.*, a valuation expert "indicate[d]" an intention to use a recognized "Operating Income Analysis" but "did not follow any methodology in applying this approach," resting instead "solely on his experience and expertise." *In re Blackjewel L.L.C.*, 643 B.R. 128, 139-40 (Bankr. S.D.W. Va. 2022). The court held that this was "precisely the type of *ipse dixit* prohibited by the [Supreme] Court in *Kumho Tire*," that the "failure to connect his opinions to any methodology is not something that can be rehabilitated by cross examination at trial," and that what remained was "pure conjecture and belief, which is insufficient to support the opinion even if such opinion is purportedly based on years of experience and expertise." *Id.* This District reached the same conclusion in *In re Lipitor*, holding that an expert who "acknowledges

he has no methodology" offers nothing but "unacceptable *ipse dixit*." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 185 F. Supp. 3d 786, 801 (D.S.C. 2016) (citing *Joiner*, 522 U.S. at 146). The Supreme Court's rule is controlling: a court need not admit opinion testimony tied to data "only by the *ipse dixit* of the expert" where "too great an analytical gap" separates the two. *Joiner*, 522 U.S. at 146.

Mr. Budra has labeled a methodology he never performed. Under *Blackjewel* and *Lipitor*, the Court should exclude his opinions as unreliable *ipse dixit*. 643 B.R. at 139-40; 185 F. Supp. 3d at 801 (citing *Joiner*, 522 U.S. at 146).

## IV. Mr. Budra's "Reasonable Repair Period" and Related Loss of Use Opinions Are Inadmissible Speculation.

Mr. Budra's one original opinion, that a reasonable repair period is 70 days, illustrates the methodological vacuum, because his own testimony establishes that the figure is a guess offered as a negotiating device, not a calculation he used any accepted methodology to determine. He testified that "70 days is too much, but what the hell. You've got to get a number someplace out there. Let them ... all discuss the 70 days." Ex. 1, Budra Dep. 59:19-60:6. He explained that he "put 70 days in there as a number that would be open to discussion, but it's better than having no number and it's better than having a year," and that the purpose "was to get you all talking." *Id.* at 60:6; 61:22-62:7. He described the entire exercise as negotiation framing: "It helps in the negotiations ... a lot of people don't understand railroad lingo, so that's why I do what I do." *Id.* at 124:23-25.

The way Mr. Budra generated the 70-day reasonable repair period figure confirms that it is a calculation untethered from reality rather than a reasoned estimate. He derived it by dividing Norfolk Southern's reported total labor hours (10,124) by a notional 144 hours per day – six workers across three shifts, around the clock. *See* Ex. 3, Budra Supp. Report 7; Ex. 1, Budra Dep.

62:16-63:8. Mr. Budra assumes continuous, 24-hour, three-shift work on each locomotive, with no parts lead time and no downtime; he admitted he did not even account for the time spent in daily safety meetings, breaks, and cleaning up that he acknowledged occur. *See* Ex. 1, Budra Dep. 62:8-22.

He could not even define the governing principle. Asked whether a fair loss of use figure should reflect "a reasonable period of time" to repair the locomotive engines back to full operational status, Mr. Budra answered: "I don't know what the word reasonable means here." *Id.* at 89:21-90:6. Pressed for any method to reach a "reasonable number," he admitted he had neither done nor could he describe that analysis. *Id.* at 92:7-93:10. His rhetoric during his deposition confirms the point: he characterizes the out of service locomotives as "lottery locomotives ... [l]eave it there and make money," likening a year-long loss of use claim to "an ATM machine" that "spit[s] out money." *Id.* at 58:20-59:3.

As further demonstration of the absence of methodology, Mr. Budra stated that he arrived at his opinions based on his belief that no claim for loss of use has ever been submitted for the length of time or numbers sought by Norfolk Southern here. *See id.* at 56:1-58:21. He did not base it on the damage done to these locomotives, the actual repairs needed, the type of parts required, or any issues that might have been encountered in the repair process. *See id.* at 69:2-70:24. He does not explain in his report, nor did he testify at deposition, that the other hypothetical claims he believes demonstrate the unreasonable nature of Norfolk Southern's claim bear any similarity or resemblance to the damages caused to the locomotives here. In short, he applied no methodology at all and simply expresses an unsupported opinion that in his view the length of time to get these engines back in service was excessive.

Rule 702 aims to prevent speculation by experts, and opinions that rely on belief or

speculation instead of specialized knowledge must be excluded. *See Sardis*, 10 F.4th at 281 (quoting *Oglesby*, 190 F.3d at 250). An opinion that amounts to "pure conjecture and belief" is "insufficient ... even if such opinion is purportedly based on years of experience and expertise." *Blackjewel*, 643 B.R. at 140. A number the witness selected to "get [the lawyers] talking," offered by a witness who cannot define "reasonable" and performed no analysis to support it, is speculation, not expert opinion. *See* Ex. 1, Budra Dep. 60:6; 89:21-90:6. The 70-day opinion, and the related loss of use opinion built on it, should be excluded. *See Joiner*, 522 U.S. at 146.

### V. Mr. Budra's Opinions Lack a Sufficient Factual Foundation and Rest on Unsupported Assumptions.

Mr. Budra's opinions independently fail Rule 702(b) because they are not "based on sufficient facts or data." Fed. R. Evid. 702(b). First, the centerpiece "likely inflated by more than $4.5 million" figure appears in his reports as a bare conclusion, with no computation shown or explained. *See* Ex. 2, Budra Report 3; Ex. 3, Budra Supp. Report 3. Second, Mr. Budra did not compute a depreciated value for any unit and testified that doing so is not something he does. *See* Ex. 1, Budra Dep. 39:21-40:5. His supplemental report, dated May 4, 2026, states for each locomotive that "[t]he alleged NSR repair costs for this locomotive are unverified and unsupported by invoices or any supporting documentation other than NSR's own internal numbers." *See* Ex. 3, Budra Supp. Report 4-6. But as to this, he admitted he did not review the repair records and supporting documents produced in the case. Instead, he testified that a "deep dive" and additional information were still required before his opinions could be finalized, reserved opinions he had not yet formed, and had not yet reviewed any deposition testimony in the case. *See id.* at 64:18-22 ("Q. Did you review any depositions at all as part of your work in this case? A. Not yet. I've been trying to... I got a lot of stuff going on."); 73:2-11 ("Q. And you don't have any opinion on that, that they spent an excessive amount of hours doing any particular part of the repair process, do

you? A. Well, I think I'd reserve that to when I get a chance to look at the parts they installed to see how difficult some of them are... I haven't done that assessment"); 90:8-92:6; 135:18-25 ("Q. [Y]ou don't have any opinion sitting here today about how [Norfolk Southern's additive rate] was calculated, correct? A. I'll reserve that answer until I see the list ... [t]oday, no, I do not know.").

Of course, Mr. Budra could have done this if he had chosen to do so or been directed to do so. Norfolk Southern produced detailed locomotive repair spreadsheets on February 19, 2026, prior to Mr. Budra's initial report, and supplemented with updated spreadsheets on June 12, 2026, well in advance of Mr. Budra's deposition on September 16, 2026. But Mr. Budra never looked at these because he was not asked to do so. *Id.* at 73:2-20 (admitting he had no opinion on whether Norfolk Southern spent an excessive amount of time on the repair process because he wouldn't evaluate those issues "unless I'm asked to" and he had not been asked to do so by AIPC). Mr. Budra should not be permitted to tell the jury that Norfolk Southern's repair costs are "unverified and unsupported" when he admitted he had not done an assessment of the repair records that were produced. *See id.* at 73:2-11.

To the extent Mr. Budra seeks to avoid exclusion by claiming he did not have certain information or did not do evaluations he was not yet asked to do, such an effort is unavailing. Rule 26(a)(2)(B) requires that an expert report must contain "a *complete* statement of *all* opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B) (emphasis added). Further supplementation of his report would also be inappropriate because discovery has closed and Rule 26(e) "does not cover failures of omission because the expert did an inadequate or incomplete preparation." *Akeva L.L.C. v. Mizuno Corp.*, 212 F.R.D. 306, 310 (M.D.N.C. 2002) (citations omitted). Mr. Budra's report, by his own admission, is unfinished and his attempt to reserve the right to express additional unidentified opinions at a later date fails to comply with

Rule 26's requirements.

Third, Mr. Budra's opinions assume facts the record does not supply and disregard the facts that actually determine repair duration. He opined that repairs should have taken roughly 70 days without analyzing or accounting for parts availability or supply chain delays, conceding he had "not analyzed in this case whether there were any difficulties obtaining parts or any supply chain problems that might have contributed to the length of time it took to get these locomotives repaired." *Id.* at 69:2-14. His assertion that "[y]ou can build a locomotive in 14 days from parts" rested not on the record but on "a video on the YouTube." *See id.* at 58:19-59:11. And he did not even preserve the internet research he did perform: "I don't usually save Google searches. I just read them." *Id.* at 25:24-25.

Similarly, Mr. Budra's opinions that "NSR's repair decisions include modernization and upgrades beyond pre-incident condition, constituting non-recoverable betterment," from his initial report, and "Wabtec's inclusion of modernization constitutes non-recoverable betterment, the details of which cannot be known at this time without further details from Wabtec and/or NSR," from his supplemental report, disregard facts in the record. *See* Ex. 2, Budra Report 3; Ex. 3, Budra Supp. Report 6. Despite Mr. Budra's claim that "NSR has not provided any documentation from Wabtec to enable me to differentiate between modernization and repairs" for NS 9646, Norfolk Southern produced the Addendum 2 to Locomotive Modernization Agreement with Wabtec on February 19, 2026, which included a bulleted list detailing the "Wreck Repair Scope" to be performed in addition to the Modernization Services and listed the price for the Wreck Repair Scope as $555,000. Ex. 5, Addendum 2 to Locomotive Modernization Agreement. Although irrelevant to the wreck repairs in this case, Norfolk Southern also produced the underlying Locomotive Modernization Agreement and Amendments on May 8, 2026. If the documents alone

were not enough, Norfolk Southern's corporate designee Ryan Stege testified about the work included in the modernization scope for NS 9646 and said there was no overlap with the wreck repair scope detailed in Addendum 2. *See* Ex. 6, Norfolk Southern 30(b)(6) Stege Dep. 36:2-37:14; 66:22-67:16. Mr. Budra's opinions about "modernization" and "non-recoverable betterment" are unsupported assumptions that are not based on sufficient facts or data because he failed to review the Wabtec documents and Mr. Stege's deposition, much less rebut them.

One of the Fourth Circuit's most recent decisions is directly on point. In *O'Connor v. Fairfax Taxi, Inc.*, the court affirmed exclusion of an opinion that "depended on facts that the record did not supply," holding that "[a]n opinion that supplies through assumption the very facts the record omits is not 'based on sufficient facts or data,'" and is properly excluded as "speculative." 188 F.4th at 354. So too here: an opinion that a repair "should" have taken 70 days, offered without any analysis of the parts, labor sequencing, or supply constraints that determine repair time, "supplies through assumption the very facts the record omits." *See id.* The Court should exclude it, as well as the other opinions discussed above, under Rule 702(b). *See id.*; *see also Blackjewel*, 643 B.R. at 137-38.

## VI. Mr. Budra's Legal Conclusion and Credibility Opinions Invade the Province of the Jury and Will Not Assist the Trier of Fact.

Finally, and independent of the reliability defects addressed above, several of Mr. Budra's opinions are inadmissible because they usurp the Court's role in instructing on the law and the jury's role in weighing the evidence. Mr. Budra opines that Norfolk Southern's "claim reflects a clear failure to mitigate damages" and that Norfolk Southern had "a duty to take reasonable steps to limit damages." Ex. 3, Budra Supp. Report 6, 8. He further opines that repair work constituted "non-recoverable betterment." *Id.* at 3. "Mitigation," "duty," and "recoverability" are legal concepts for the Court to define and the jury to apply under the Court's instructions. Although

Rule 704(a) provides that an opinion is "not objectionable just because it embraces an ultimate issue," it "does not lower the bars so as to admit all opinions"; testimony that "merely states a legal conclusion," using terms that carry "a separate, distinct and specialized meaning in the law," does not assist the jury and is excludable. Fed. R. Evid. 704; *Barile*, 286 F.3d at 760. This District has applied that rule to exclude expert opinions that a party was "negligent" or that its conduct was the "direct, proximate and efficient cause" of harm, reasoning that such terms carry a specialized legal meaning and render expert testimony inadmissible. *Hermitage Indus. v. Schwerman Trucking Co.*, 814 F. Supp. 484, 484-88 (D.S.C. 1993).

Mr. Budra also brands Norfolk Southern's methodology "self-serving," its claims a "windfall," and its conduct variously "speculative" and "inflated." *See* Ex. 3, Budra Supp. Report 3-5. Rule 702 "does not permit expert testimony that directly, or in practical effect, instructs the jury to conclude that a party acted" improperly; such characterizations "depend on credibility and intent assessments reserved for the jury and are not the product of a reliable expert application of specialized knowledge." *Fluor Corp.*, 2026 WL 105841, at *5 (citing *Joiner*, 522 U.S. at 146; *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006)).

Much of what remains requires no expertise at all. Observing that Norfolk Southern's revised demand is larger than its initial demand, that a claimed loss of use figure exceeds a locomotive's depreciated value, or that a rate increased without a change in duration calls for nothing more than arithmetic and reading. *See* Ex. 3, Budra Supp. Report 3-8. Expert testimony is admissible only where it would "help the trier of fact," and an opinion that restates a conclusion a jury "could readily assess ... for themselves" is not helpful and should be excluded. *See Ponder*, 589 F. Supp. 3d at 504.

## CONCLUSION

AIPC cannot carry its burden of showing, more likely than not, that Mr. Budra is qualified to offer the opinions he proffers, that they rest on a reliable methodology that has been reliably applied to sufficient facts, or that they would help the jury rather than usurp its role. For these reasons, Norfolk Southern respectfully requests that the Court exclude Mr. Budra's report and testimony in their entirety and grant such further relief as the Court deems just and proper.

Respectfully submitted,

**GALLIVAN, WHITE & BOYD, P.A.**

*s/ Ronald K. Wray, II*
Ronald K. Wray, II (Fed Bar # 5763)
William E. Whitney, III (Fed Bar # 14024)
GALLIVAN, WHITE & BOYD, P.A.
55 Beattie Place, Suite 1200
P.O. Box 10589
Greenville, SC 29603
Telephone: (864) 271-5362
Facsimile: (864) 271-7502
rwray@gwblawfirm.com
wwhitney@gwblawfirm.com

*Attorneys for Plaintiff*
*Norfolk Southern Railway Company*

November 16, 2026
Columbia, South Carolina