# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

NORFOLK SOUTHERN RAILWAY COMPANY,
Plaintiff,
vs. CASE NO. 3:25-cv-06618-SAL
AMERICAN ITALIAN PASTA COMPANY,
Defendant.

DEPOSITION OF: RONALD BUDRA
DATE: September 16, 2026
TIME: 10:06 a.m.
LOCATION: Remote Proceeding
Estero, FL

TAKEN BY: Counsel for the Plaintiff
REPORTED BY: MARIE MCCOLLUM, Court Reporter
___________________________________________________

APPEARANCES OF COUNSEL:

ATTORNEYS FOR PLAINTIFF
NORFOLK SOUTHERN RAILWAY COMPANY:
GALLIVAN, WHITE & BOYD, P.A.
BY: RONALD K. WRAY, II
55 Beattie Place
Ste. 1200
Greenville, SC 29601
(864) 271-9580
Rwray@gwblawfirm.com

ATTORNEYS FOR DEFENDANT
AMERICAN ITALIAN PASTA COMPANY:

HOOD LAW FIRM, LLC
BY: JOHN O. RADECK
172 Meeting St.
Charleston, SC 29401
(843) 577-4435
John.radeck@hoodlaw.com

(INDEX AT REAR OF TRANSCRIPT)

COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.

They further acknowledge that, in lieu of an oath administered in person, I will administer the oath remotely.

The parties further agree that if the witness is testifying from a state where I am not a Notary, that the witness may be sworn in by an out-of-state Notary.

If any party has an objection to this manner of reporting, please state it now.

(No response.)

COURT REPORTER: Hearing none, we can proceed.

RONALD BUDRA

being first duly sworn, testified as follows:

EXAMINATION

BY MR. WRAY:

Q. Good morning. Would you please state your full name for the record?

A. Ronald Budra.

Q. Mr. Budra, good morning again. My name

is Ron Wray, and I just introduced myself to you briefly before we went on the record. I'm one of the attorneys representing Norfolk Southern Railway Company in a claim that we've brought against a company that is known as American Italian Pasta Company. During the deposition today, I'll probably refer to them as AIPC. If I do that, will you understand who I'm referring to?

A. Yes.

Q. Obviously, we're doing this remote. Where are you physically located this morning?

A. In my home in Estero, Florida.

Q. Is anyone present with you?

A. Not in this room. I have the door closed for my little den, but my wife is in the condo in another room.

Q. You understand that during the course of the deposition today that it would be inappropriate for you to consult with or talk with anyone else about any of the questions you're asked or any of the testimony you may give today?

A. I'm sorry. If I'm on a break, I can't talk about it?

Q. No, sir. During the breaks today, you can't talk to anyone substantively about your

testimony unless you want me to be able to ask you about it. I guess you and Mr. Radeck could discuss that. But if you do during a break, then I'm entitled to ask you what you discussed and the content of those discussions. Do you understand that?

A. I understand. I've never heard that before.

Q. Okay. Well, that's the rule in South Carolina. It may not be the rule in every state. But leaving that aside, you understand that it would be inappropriate for you to send a text message or receive a text message about your testimony here today during the course of our deposition?

A. Yes, I understand what you're saying. I didn't know -- I didn't know it was a problem, sorry.

Q. No problem. Have you given deposition testimony before, Mr. Budra?

A. Yes.

Q. How many times?

A. Maybe four or five. It was a while ago. I haven't done one in the last five years. I've been lucky.

Q. Have you ever testified in court?
A. Not yet.
Q. So since you haven't testified in court, is it fair to say you've never been qualified as an expert witness by any court?
A. I don't know that process. I don't know -- I don't understand the question.
Q. Okay. Have you ever -- you've never been in a courtroom where someone said, we offer Mr. Budra as an expert witness on these topics and the court has said I find him qualified? You've never had that happen, right?
A. I have not. You're correct.
Q. The four to five prior depositions you've given, what was the context of those matters?
A. Railroad claims.
Q. What were you asked to do in those cases?
A. Evaluate the property damage claims.
Q. Were those matters similar to this one involving a railroad bringing a claim against some third party saying that the railroad suffered damages as a result of an accident?
A. Yes.

Q. And in each of those cases, were you retained by the party against whom the railroad was trying to recover damages?

A. Yes.

Q. Have you ever been retained by a railroad company to work on their behalf in evaluating a property damage claim?

A. Since I retired from the railroad, no. Prior to retiring from the railroad, I was the man.

Q. About that, you mean you had a job with a railroad company where part of your job was to evaluate claims for your employer?

A. Yes.

Q. But in the context like we are here today where either litigation has been filed or some type of claim has been presented, since the time you left work for the railroads, you've never been retained by a railroad to work on their behalf in pursuing a damage claim against some other party; is that correct?

A. Yes.

Q. When did you retire?

A. 15 years ago.

Q. And what company were you working for at the time of your retirement?

A. Amtrak.
Q. What was your position at Amtrak?
A. I worked in the law department. I was a specialist in the rolling stock damage unit, RSDU. We had a two-man team that covered the whole country, and we handled property damage claims to Amtrak equipment.
Q. And in your role at Amtrak in that position, was it your job to try to recover money for Amtrak when they were involved in an incident and someone had caused them damage?
A. Yes.
Q. And did you also evaluate claims where someone else may have brought a claim against Amtrak saying Amtrak was the one that caused the damage?
A. Well, I worked for Amtrak. I evaluated a claim when someone presented a claim against Amtrak, yes.
Q. Right. That's what I was trying to understand. You worked on both sides of the equation. Sometimes Amtrak might be the one trying to recover some money, and sometimes it might be a third party trying to recover money from Amtrak; is that right?

A. I defended Amtrak on those claims. I also did personal injury claims.
Q. Personal injury claims that you worked on, were those primarily FELA claims?
A. No. All personal injury claims.
Q. Okay. So a crossing accident where someone was injured at a crossing, that would fall under your department?
A. Slip, trip, and fall at a train station. Any claim that a person would present against Amtrak, personal injury.
Q. How many years did you work with Amtrak?
A. 10, roughly.
Q. You said you were in the law department. You're not a lawyer, are you?
A. No.
Q. And I think I saw from your CV, in addition to Amtrak, did you also work for Conrail at one point?
A. Well, I started my career on the railroad in 1967 working for the New York Central Railroad. A year into my job, New York Central and the Pennsylvania Railroad merged, and my check then said Penn Central employee. And then several years

later, Penn Central merged with 13 other railroads and we became Conrail. And then my check said Conrail.

Q. Got you. When you hired out with the New York Central in 1967, what position did you have?

A. I was called a movement coordinator.

Q. What did that mean that you did?

A. Yard office clerk.

Q. What does a yard office clerk do?

A. I handled the bill rack, helped the yard master, keep track of where the rolling freight is in our vicinity. So I was an assistant to the yard master.

Q. Did you remain in that same position when the New York Central became Penn Central?

A. Actually, I moved up from clerk to yard master.

Q. What did a yard master at Penn Central do?

A. In charge of all the train crews and also be aware of incoming and outgoing freight trains, handle productivity for the train crews.

Q. And then when the consolidation occurred and it became Conrail, what position did

you have at Conrail?
A. I moved into the damage prevention department for Conrail.
Q. Tell me about that job. What did that involve?
A. Freight railroads have a certain amount of damaged freight that occurs while they're handling boxcars, tank cars, and sometimes the damaged freight is refused by the customer, and it was my job to go to the customer sighting and convince them to accept the damaged product. But also a part of my job was to identify damage that happened on the railroad, how it happened, and how to prevent it from happening in the future. So that was the damage prevention.
Q. Did your role at Conrail involve in any way evaluating and settling claims that were brought against the railroad or brought by the railroad against someone else?
A. No.
Q. And then how long did you stay at Conrail before you moved over to Amtrak?
A. Maybe 15 years. 10, 15 years maybe.
Q. Did you remain in that same damage prevention role the entire time you were at

Conrail?

A. Actually, I was in -- as a yard master for a while, and then I was in train master training to be promoted to train master, but the -- that didn't develop by the time the company was sold. But I was in train master training.

Q. And by -- when you said the company was sold, you're referring to the point in time when Norfolk Southern and CSX acquired Conrail?

A. Just prior to them acquiring it, yes. Many departments -- we had 200,000 employees and many departments were cut in half, a third and downsized, and we were offered the golden handshake, which I gladly took.

Q. So you took a buyout and you moved from Conrail over to Amtrak?

A. I took a year or two off. Didn't like it.

Q. Didn't like being off work?

A. Well, I had -- I was only 55, and I had a couple more years before I could -- 52, I think, and I had a couple more years before I would qualify for my railroad retirement. So I needed to get back onto the railroad retirement umbrella, which that's why I went back to work for Amtrak.

Q. Did you ever work with a fella named -- and I believe the last name is Ferrone -- Neil Ferrone at Conrail?

A. I worked with Neil. There was a Neil that I worked with in Pennsylvania. I don't remember his last name, but I think we were still Conrail when I worked with Neil. You're saying a Neil on Amtrak?

Q. No, no. Well, if I did, I misspoke. I meant to say Conrail.

A. Conrail?

Q. Yeah.

A. I knew a Neil on -- on -- on Conrail, and he was in the same department with me.

Q. Yeah. The Neil I'm referring to was in the claims department at Conrail, and at the time I knew him, I think he was the head of claims there around 2012 or so. But it's fine. I just was curious if you knew Neil or worked with him.

A. If he was the head of claims, I'd know him, and I don't know any Neil that was the head of claims. There was a Neil in the claims department, yes.

Q. Okay.

A. Very nice man. He stuttered and he

took it kindly.
Q. Yeah. Unfortunately, I believe Neil has passed away now. But in any event, any other work that you have in the railroad area for any other companies?
A. No, that's my life.
Q. At any of the matters -- you mentioned that you've had some other cases where you've given depositions -- did any of those cases involve Norfolk Southern?
A. No. I don't believe so.
Q. Then I think you told me it's been a while since you last gave a deposition. How long do you think it's been?
A. Over five years.
Q. How old are you, Mr. Budra?
A. I just turned 80.
Q. Congratulations. You look like you're doing well. I hope I look as well as you at 80.
A. I'm trying.
Q. What do you currently do?
A. Could you say that again?
Q. Yeah. Are you currently working or do you draw income from any source at present?
A. I'm retired from the railroad. And

when I retired, I started my LLC, railroadclaims.com, LLC, at the request of two, maybe three insurance companies that personally called me and asked me to please help them. They liked me.

Q. Who were the insurance companies?

A. Because I was fair.

Q. Who were the insurance companies that contacted you?

A. I think it was -- Farm Bureau was one of them. The other one was Cherokee. I don't remember if the third one was -- maybe Great West Casualty, maybe.

Q. And were those companies that you had dealt with during your career at Amtrak and that's how they got to know you?

A. Yes. They said I was fair.

Q. Are you the sole owner of Railroad Claims LLC?

A. Yes.

Q. Has that always been the case or has anyone else ever had a ownership in that business?

A. Not yet. I'm trying to get my wife to be my vice president, but she keeps on saying no.

Q. What is the nature of the work that

Railroad Claims LLC does?
A. Well, usually, insurance companies will contact me and say that they -- they have a company that has a policy with them that has been involved in some type of a railroad accident and they would like me to review the claim submitted by the railroad and give my opinion about the -- the claim that they've been -- which they received from the railroad.
Q. When did you form Railroad Claims LLC?
A. I have no idea. About 15 years ago.
Q. So roughly 2011?
A. Perhaps. Yeah. I can look it up for you. But --
Q. If you've got something there that gives you that information, please do.
A. No. I'd have to -- I'd have to go dig in a box someplace.
Q. That's all right.
A. I'm sorry.
Q. And, actually, let's do something. Let me see if I can pull up your CV. Let's see.
MR. WRAY: Marie, my documents are not pulling up here in your app.
(A recess transpired.)

BY MR. WRAY:
Q. Mr. Budra, we're back on the record with my apologies for the technological glitch there.
But I've pulled up what we're going to mark as Exhibit 1.
MR. WRAY: And, Marie, I'll send you the exhibits after the deposition today.
(PLF. EXHIBIT 1, CV of Mr. Budra, was marked for identification.)
BY MR. WRAY:
Q. And I'll tell you, Mr. Budra, this was a copy of a CV that we were provided from Mr. Radeck's office. Looks like it is for Ronald T. Budra. Is that you?
A. Yes, sir.
Q. And I'll just scroll through here fairly slowly, but if you need me to go slower or stop on something, you can let me know. And basically all I want you to do is can you confirm that this is a copy of your most recent CV?
A. It appears to be the most recent one.
Q. And what started me down this road was I was trying to determine when you formed or founded Railroad Claims LLC, but your CV doesn't

list a date for that company starting, does it?
A. 2009.
Q. Okay. So you checked that during the break and you came up with 2009?
A. Uh-huh. I found -- I found something in my folders that had a 2009 date for Railroad Claims LLC. Actually, 2009 is when I retired from Amtrak, so that would stand to be the same date.
Q. And earlier in the deposition I asked you how many times you had been deposed and you said roughly four or five times. How many different matters have you worked on as part of your business for Railroad Claims LLC? Do you have a ballpark estimate?
A. I don't -- I don't really understand how many matters. You mean how many different types of claims?
Q. No. Total number of claims that you've worked on as part of your consulting business?
A. Oh, from 2009 until today. Wow. A couple of hundred maybe.
Q. On the matters that you've been retained through your consulting business, have you always been retained by an insurance company?
A. Sometimes I'll be retained by an

attorney who is working either for or with an insurance company.

Q. Okay. So sometimes you may be retained by the company directly and sometimes it may be through counsel that has employed the attorney -- I'm sorry, through the insurance company that's employed the attorney; is that right?

A. Yes.

Q. In this particular matter, you were initially retained directly by Travelers; is that right?

A. Yes.

Q. And who was it at Travelers that contacted you? Do you remember?

A. Tom Shugre, S-H-U-G-R-E-U [sic], maybe. I can -- I can get his name for you.

Q. I've got it. That's okay.

A. Oh, okay.

Q. And had you worked on matters with Travelers before this particular case?

A. Yes.

Q. How many different matters with Travelers had you handled? And, again, if it's a ballpark estimate, that's fine.

A. I would say four or five.

Q. Were those all with Mr. -- I think it's Shugre. S-H-U-G-R-E is what I have in my e-mails.
A. Okay. I don't know how to say it.
Q. But have all of those prior matters with Travelers been with Mr. Shugre --
A. No.
Q. -- or have you worked with other people there at Travelers?
A. Every one has been with a different person.
Q. The prior matters that you had with Travelers, were they all like this case where you were evaluating a claim brought by a railroad company against some third party?
A. Yes.
Q. Did any of those involve Norfolk Southern Railway Company to your knowledge?
A. I don't believe so, no.
Q. With us today on the deposition is Mr. John Radeck, who is the counsel for AIPC in this case, and he is with the Hood Law Firm down in Charleston. Have you ever had any other matters with Mr. Radeck or any member of the Hood Law Firm?
A. No.
Q. When Mr. Shugre contacted you, what did

he ask you to do in this case?
A. Tom said that he had received my name from a fellow Travelers employee and they recommended that he hire me to help him evaluate the claim from the railroad.
Q. Did Tom give you any instructions as to how you were to go about doing that?
A. No.
Q. Did he provide you with any information to assist you in doing your work?
A. Well, normally, when an insurance company asks me to help them, they send me everything that they've received from the railroad so that I can review the claim.
Q. Well, part of the reason I asked that question, Mr. Budra, is I know in this case there was some material provided directly to you from the railroad; isn't that correct?
A. Quite often that -- that is the case, yes.
Q. And I was just trying to understand, I know you got some materials through the railroad that you asked for to help you do your evaluation. Did you get other materials from Travelers to assist you in your evaluation of the claim that did

not come directly from the railroad?
A. I received material to review from Travelers and also from the railroad.
Q. Do you know what specific materials you got from Travelers?
A. Not specifically, no.
Q. Did anyone else work on this project with you?
A. Tom had an attorney that was helping him -- he sent me an e-mail saying that he had an attorney that was helping him, but he only wanted that attorney to handle the PI section, and he told the attorney that I would be handling the PD section.
Q. Did you do any work at all on the personal injury part of the case?
A. No.
Q. So there was some involvement by counsel at least handling the personal injury part of the case, but you didn't give him any advice or assist him in handling the personal injury claims that were brought by the two railroad employees; is that what you told me?
A. Written advice or verbal?
Q. Either.

A. I don't remember even speaking with the attorney. But I -- no. I didn't speak with the attorney at all. It was only e-mail, and I did not give them any advice about personal injuries that I can remember.

Q. And I had asked you earlier did anyone else work on this matter with you and you referenced the attorney. So, obviously, the attorney had his responsibilities in defending the case. Did anyone outside the lawyers retained by Travelers have any involvement with your evaluation of this claim?

A. The only people I was involved with was Tom and the claim agent for the Norfolk Southern, that I remember.

Q. So in terms of any work that was done in the evaluation of the railroad's claim in this case, that was all done by you or someone at Travelers?

A. I don't know about Travelers, but I did my work.

Q. Okay. The work that was done for your consulting group, was that all done solely by you?

A. I'm a one-man team, yes.

Q. Right. Well, you might be a one-man

team, but you might associate somebody on a particular project is what I'm trying to understand. You didn't associate anybody on this case?

A. No. Not that I remember, no.

Q. Did you do any type of Internet research to provide you with information that you relied upon to evaluate this case?

A. Yes.

Q. What specifically did you look at on the Internet to try to help you in evaluating this claim?

A. Information about the Norfolk Southern railroad.

Q. What specifically were you looking for about Norfolk Southern to help you evaluate this case?

A. Any information about the Norfolk Southern and their locomotive handling or anything to do with locomotives under Norfolk Southern.

Q. When you use the term locomotive handling, what are you talking about?

A. It's interesting to find out if there has been any changes in the number of locomotives on trains or locomotives that are not in the

operational system or storage. Also I like to look and see if they are sending any locomotives to auction. It's all interesting information about the railroads.

Q. Where did you look for that information? Was there a specific website that you went to to gather this type of information?

A. No. I just go to Google.

Q. Did you preserve any of the information that you obtained by those Google searches?

A. Not usually. Sometimes. Maybe not -- I don't remember.

Q. Were you provided with a copy of a subpoena that we issued in advance of this deposition asking for your file materials?

A. Yes.

Q. And one of the items we asked for specifically, Mr. Budra, was whether you had done any Internet searches and copies of any type of searches you had done, but I did not see any of that material in the documents we got. Do you actually have reserved any information you got from any of those searches?

A. I don't usually save Google searches. I just read them.

Q. Okay. So you pull them up on your computer and you read them but you don't save them?
A. Not usually, no.
Q. And you don't print them out?
A. Sometimes.
Q. Did you do that here?
A. I don't remember, to tell you the truth. I might have. Maybe.
Q. Well, if you did, did you provide those to us in response to our subpoena?
A. I -- I gave John and his law firm everything that I had in my file. So if it was in my file, then I sent it to them. I was under the impression that -- something about you wanted all e-mails.
Q. Well, that was part of what we asked for. We certainly did ask for communications, but we also asked for any Internet searches or information you obtained from Internet searches that formed the basis of your opinions in this case. And you're telling me you did some searches but you don't know, sitting here right now, whether you saved those or printed them out. Is that what you're telling me?
A. Yes.

Q. Did you rely upon any of the information you got from any of those Google searches in forming any opinions that you intend to express in this case?
A. No.
Q. Was that because, once you did your searches, the information you got didn't prove helpful to you, or why did you not rely on it in forming your opinions?
A. My opinions were based on the documents I received that were provided by the Norfolk Southern.
Q. Okay. In looking at your CV that we marked as Exhibit 1, under the section for president of Railroad Claims LLC, there is a third bullet point that says: Expert defense litigation for all property damage claims, reducing claim totals on average about 40 percent.
Did I read that correctly?
A. Yes.
Q. And do you see that as kind of the role that your company plays when you're hired by one of these insurance companies or their attorneys to help them reduce the claim total?
A. No. That's only -- that's only

information about what happens sometimes in claims. My role is to provide -- my opinion, I try to be very fair with the railroad and insurance company to give them both my -- my honest opinion as to what I think the value of the claim should be. And hopefully they'll come to an agreement with my recommendation.

Q. All right. And then in those cases where you have successfully accomplished a reduction in the claim total, how do you go about doing that?

A. Well, some -- hello? Somebody is outside my house.

Well, in a claim -- in most claims, there is opportunities to talk to the railroad claim agent and ask for maybe clarification of information and then talk to an insurance company. And by talking to both parties, sometimes we can agree that certain things that are in the claim may be -- could be reduced, modified, or maybe they're a little high, or sometimes they just don't pertain to the claim. And the railroad claim agent may not have realized what he or she was provided by the departments and the railroads. So it's kind of a fact-finding for both parties to try to get to a

common ground so that everybody feels like they understand why I'm saying what I say.

Q. In this particular case, you never went to the location at the AIPC facility where this accident occurred, did you?

A. No.

Q. You never interviewed any of the witnesses that were involved in the matter, did you?

A. No. No.

Q. Other than reviewing invoices and supporting materials provided by Norfolk Southern as the basis for its claim in this case, did you do any other type of work as part of your evaluation of this particular claim?

A. Wow. You mean with other people or just by myself?

Q. I'm asking anything, period. I know you've got some documentation from the railroad that included invoices, repair records, billing records from various people that did work there at the scene; is that fair to say, you got all those type of documents?

A. Well, I received what I received. I don't know if it's all. They -- what they -- if

they gave me all, I don't know. But what they gave me I received is what I can say.
Q. Right. I wasn't asking you that question. I was just --
A. Oh.
Q. -- asking the type of materials you reviewed. Did I accurately describe the categories of documents that you received in this case and that you reviewed as part of your work?
A. I believe so, yes.
Q. And then you told me earlier you did some Internet researches, but you didn't rely on any of those as part of your opinions, correct?
A. Correct.
Q. And my question to you was, outside of reviewing the documents that I listed earlier and that are part of your file and doing the Internet researches that you've already told me about, did you do anything else as part of your work on this case that you haven't already told me?
A. Not -- not that I know of.
Q. Well, if you don't know, who would know?
A. I honestly don't understand what else you're -- what else I -- I don't understand

your question.
Q. It's not a trick question. I'm just trying to understand, did you do anything else that I haven't asked you about to help you evaluate this case and render the opinions that you intend to express in this case? Maybe I haven't hit on something that you did and I want to make sure that I cover everything that you did. Do you understand that?
A. I understand what you're saying. But I don't recall anything that I would be able to explain to you or say to you that would fall into the category you're asking about.
Q. Okay. And what is your rate for your work on this matter, Mr. Budra?
A. Well, in the beginning it was $125 an hour. But I realized that after so many years I hadn't changed my rate, so on this one here the beginning rate was $125, but when we put the claim on hold for so long and waited and waited and waited and then it was brought up again, I had moved on to $200 an hour.
Q. Do you know how much you've billed to date for your work on the case?
A. I don't remember. I can -- I might

have it right here. It's only a couple -- maybe 1,000 or something.

Q. Can you see a document on your screen right now that says, Ronald T. Budra Railroad Claims --

A. Oh, there it is.

Q. -- Interim Invoice?

A. You're asking me; you already had it. You're killing me here.

Q. Well, I didn't know if this is all, but --

A. Yeah.

Q. -- we're going to mark it as Exhibit 2 --

(PLF. EXHIBIT 2, Ronald T. Budra Railroad Claims LLC Interim Invoice Dated June 6, 2025, was marked for identification.)

THE WITNESS: Yeah. What's the total on that? I forgot.

BY MR. WRAY:

Q. Invoice. If we scroll down --

A. Yeah.

Q. -- looks like the total is $1,750, but that's as of June 6th, 2025. Do you see that?

A. I was close. See, I figured it was a

couple of thousand. That's all I've -- that's all I've billed so far.

Q. Okay.

A. I'm not a high-priced person.

Q. I understand. And I'm sure your clients appreciate that.

A. Uh-huh.

Q. But this was the only invoice I got and it's dated from June of 2025?

A. Yeah.

Q. So it's almost a year and three months or maybe a little bit over a year and three months old, and my question is have you sent any other bills since June of 2025?

A. No.

Q. Have you done any work since June of 2025?

A. Yes.

Q. So that's why I asked you how much you've billed is because it appeared to me there is some additional charges that should be out there, but you just haven't sent a formal bill for that yet?

A. I never know what to -- when to send them. Some -- believe me or not, some insurance

companies and some attorneys say, stop billing me, just wait to the end, and then other people say, don't wait till the end, bill now. So I have no idea what the hell to do, so I'm just waiting again.

Q. Obviously, since this bill went out, you've prepared at least two reports that I've seen for your work on this case, correct?

A. Yes.

Q. And I assume if you got additional documents through counsel, you reviewed those documents. Is that fair to say?

A. Yes.

Q. You've met with Mr. Radeck as necessary on the case, correct?

A. Virtually.

Q. Do you have a ballpark of how much additional time -- on this invoice you had billed 14 hours as of June of 2025. Do you know how many additional hours you have since then up through September 16, 2026?

A. I would say probably -- I think the last time I thought about it, it was about 15 or 16 hours, not counting today.

Q. Okay. And that 15 or 16 hours, once

it's billed, will be billed at that $200 an hour rate?

A. Yes. Unless they hold me to the old rate. I don't care. I'm just having fun. I don't -- I'm not in it for the money.

Q. Have you completed all of the work that you felt was necessary to render the opinions that are reflected in your report?

A. Yes.

Q. Is there any additional work that you believe needs to be done in order for you to feel comfortable and confident that your opinions are well supported?

A. Yes.

Q. What other work do you need to do?

A. Well, I'm waiting patiently for you all to decide on which way this claim is going to go. We still haven't -- I need to review the process when you all decide if the claim is going to go forward with DV, depreciated value, or repair. I haven't done my formal review of the DV documents and I haven't even started my review of the repair claim because I don't want to do both if one of them is not going to be involved in the movement forward for the claim. I'm just waiting for you

all to tell me which way it's going to go so I can offer my services to give my opinion about those parts of the claim.

Q. Well, help me understand that, Mr. Budra. Did you understand that it's part of your work in this case that you are required to provide an expert report in federal court?

A. Yes.

Q. And did you understand that your report is required to include a statement of all of the opinions that you intend to express in this case?

A. To date, yes.

Q. And it also requires you to identify all of the materials that you relied upon in forming your opinions; is that right?

A. Yes.

Q. But are you telling me that your report, as we sit here today, is not complete because you have not, as of today, evaluated the DV value or the repair costs for any of the involved equipment?

A. No. I have evaluated the claims presented to date, but that is when the claims are received and I evaluate it, there is additional work that can be done to -- what they call do a

deep dive and ask -- possibly ask for clarification or some more information, but I wouldn't ask for that if it's not relevant to the claim moving forward. So I'm just waiting for you all to say which way you're going to go.

Q. What would you do as part of what you called a deep dive?

A. Well, the depreciated value claim that was created by the AAR, it has multiple lines and line items and numbers, and if you look at the -- I think it's a Rule 109 or 107 form, you'll see lines that say this isn't -- this estimate for this particular line item and then it'll say something else, and it'll say that the owner of the railcar or the locomotive states that when they bought it, it was X amount of dollars. So for the time being, those numbers appear to be correct.

But I would like to go further and ask for some additional information if that is going to be part of the claim moving forward. It's just basic fact finding. It's not trying to do anything wrong. It's just to verify that the numbers are not like mistaken or an extra line item that shouldn't be there. I just -- that's part of what I do. That's what I offer as my service.

Q. And that's what I'm trying to understand, Mr. Budra. What additional information are you referring to that you would like to look at? Tell me specifically.

A. Well, if -- if a DV claim is going to be part of the claim moving forward, I think that the defendant should be afforded proof of how much the owner paid for the railcar or locomotive. Seeing it on a line item or an -- sometimes when people provide spreadsheets, they just type in the number. So we'd like -- I would like to know did the owner of the equipment provide proof that they paid a million dollars for it.

And then I think there is a line item in the -- the DV thing where it says about halfway down something about the AAR has built into that equation that at the time of the accident, if the owner was to buy a brand-new piece of equipment, they estimate it would be -- say they bought it for a million, that the estimate down in the form says -- could say something like the estimate at the time of your accident to buy a new one would have been a million seven.

And estimates kind of scare me, so I think that we would ask for proof from the

manufacturer, you know, as to at the time of this accident, which was in 7/11/22. If they contacted the manufacturer and said if we were to buy this again now, what would you bill us? It would be kind of funny if the bill went down, you know, because of some change that the company made or the bill went up, but I think that's better than using an estimate. That's part of the things I would ask for.

Q. Have you asked for that in this case?

A. Not yet.

Q. Have you tried yourself to compute what the DV value would be for any of the equipment that was damaged in this accident?

A. No.

Q. Why not?

A. I don't know if it would be something that's going to be mo- -- for the case moving forward. If the DV values are not going to be usable, why would I spend time checking them?

Q. Is that something that you're capable of doing?

A. No. I don't do it myself, sir. I -- I ask the -- if it's an attorney, I ask the attorney to please ask for this information. If I'm working

with a claim agent for the railroad, I ask them please provide that, or if I'm working with the insurance company, I ask them to ask for it. I don't do it myself. I don't calculate these things.

Q. Yeah, that's what I was asking you. So in this case you were provided with information from the railroad as to the DV value for all of the involved equipment. Isn't that fair to say?

A. All the damaged equipment, yes.

Q. Right. The equipment that Norfolk Southern is seeking to recover damages for in this case, you were given the railroad's computation of the DV value for that equipment, right?

A. I was given a copy of the AAR rule form, yes.

Q. Right. And you didn't try to compute your own DV value as you just told me, correct?

A. Not yet. Not yet.

Q. And you said a moment ago that's not something that you do, right?

A. No, I can't calculate it myself. I have to ask people for information to help me with my claim. As an example for this, if the DV value moves forward, I would suggest to John that he ask

you to ask somebody for the -- contact the manufacturer to ask how much it would cost to buy that at the date of the accident -- and proof that the owner stated that they paid a million for it, it would be nice to have proof of that. That's -- I would go through all of you. I don't do it myself.

Q. What other information, if any, do you believe that you would need to finalize any opinions you tend to express at the trial of this case?

A. Well, if the case goes forward with the calculations for the repair of the locomotives, there is certain information that would be relevant to the bottom line number to ask for -- I think the defendant is entitled to a copy and proof of the parts that -- the parts -- the price of the parts that are claimed in the claim.

And sometimes I have found in the past that when they list parts, they add in 10 to 15 -- I actually had found one that they listed -- they added 30 percent handling fee to the parts listed that they put in the locomotives. And then down the bottom they added another 10 percent for shipping and handling, so the part prices were --

in these cases they were kind of changed from actual to 40 percent more.

So I would ask for that in this claim, if that's going to be part of it in the future -- invoices -- invoices for parts like a million -- I mean, maybe $100 or $200 above, not the $5 parts.

Q. You've never worked in a locomotive repair shop, correct?

A. Yes, I have.

Q. Oh, you did?

A. Oh, yeah. God, yeah.

Q. What did you do in the locomotive repair shop?

A. Oh, God. When I started with Amtrak, they invited me to participate in a -- in a unique experiment where they asked me if I would come on board and work for one year in multiple operations that at the end of the one year -- since I retired as the management person on Conrail, they would assure me that after the one year I would be moved back into management, which was my goal.

So for a year, I worked in many, many parts of -- of Amtrak. And one of them was I worked in Bear, Delaware, for Amtrak mechanical department. I was -- I was technically a

mechanical department employee while I worked there. And I was in the -- what they called material control department where we would -- I was a -- required to join the union and I would operate a forklift and I would go up and down the aisles collecting parts and put them on pallets, and then I would go through the doorway to the five tracks of the repair equipment and deliver it to spot one, spot seven, track two, and I would deliver all the parts.

And then I also worked in the administrative office in Bear, Delaware, as a mechanical department employee and I did payroll. So that -- the different crafts that worked on the locomotives would turn in their time cards daily, and then the next day, myself and two other payroll employees, we would enter the data in so that by the end of the week we could submit the request to get -- to pay the craft employees. That's what I did in Bear, Delaware.

Q. You didn't perform the duties of a locomotive mechanic, correct?

A. Oh, God, no.

Q. You didn't physically do the repairs to the damaged railcars or equipment that might have

come into the shop, right?
A. No, but I hung around with them. I watched them. It was very interesting because of my years of claims experience. So the more you see, the more you learn. And I talked to them and watched them go from -- sometimes I'd work for an hour on this one and they'd yell over to the guys, I need help with this one, and so they would come over and help them with something that was very heavy. So I gained a lot of on-the-job experience in observing them.
Q. I didn't see in your report -- your report does not include any opinions that you intend to express about the quality of the repairs done by Norfolk Southern in this case, do you?
A. I wasn't there. I couldn't -- I couldn't give an opinion about the quality of the repairs. Quality means did the guys -- did the employees do the job right. That's -- I wasn't there.
Q. All right. And you don't intend to offer any opinions about the specific repairs that they determined were needed for any of this equipment, do you?
A. The only thing I possibly could answer

to that question would be as to -- you know, when a locomotive is in the shop and you're working on something that was damaged in a crossing accident, but while it's in the shop and it's a good time to do a PM monthly or six-month or a yearly maintenance -- or God forbid you see something that is like a safety violation, they would certainly take care of that while it was in the shop. And sometimes those other expenses, they are not separated and they end up on the claim document. So I couldn't offer an opinion as to whether or not some of the work done maybe wasn't related to the accident, but I wouldn't know right now.

Q. And you told me earlier that you drove a forklift delivering parts to the guys that were doing the repairs. You didn't form any opinions in this case as to whether the parts that were used in repairing any of the damaged equipment involved in this accident were the right parts or they should have used different parts or anything like that, did you?

A. While I was in Bear or on this claim?

Q. No, on this particular case?

A. I have no knowledge of what they delivered. I only have -- I only would get a list

of the parts that are in the claim. It would be kind of impossible to say if they're -- unless you -- like if you see the parts list says it's -- you know, it's a mini refrigerator for the locomotive, and I had one, $44 -- I mean, $44,000 and that was a line error. So, no. To answer your question, no.

Q. You've told me a couple of times today, Mr. Budra, that you viewed your role when you were working in the claims department as treating folks fairly. Is that an accurate statement?

A. I hope so, yes.

Q. And would you agree that assuming Norfolk Southern can establish liability in this case against AIPC, that it is entitled to recover damages that would make it whole for any losses it sustained as a result of this accident?

MR. RADECK: Object to form.

THE WITNESS: Yes, I call that being fair to any out-of-pocket expenses related to the accident, and I -- I truly believe that for both sides. It's not fair -- not fair.

BY MR. WRAY:

Q. And part of those damages would include damage to the locomotives that were involved in the

accident. Is that fair to say?
A. Seems, yes, logical.
Q. And part of the damages to which compensation would be -- for which compensation would be appropriate was damage to the railcars that were involved in the accident. Is that fair to say?
A. Yes.
Q. Would you also agree that it would include damages resulting from track repair and the clean-up there at the scene where the accident occurred?
A. Oh, God, yes. There is quite a bit on this claim for track repair and derailment, clean-up. Maybe like a million dollars or more.
Q. Right. And I didn't see in your report, you didn't offer opinions that any of those charges were inappropriate or excessive, did you?
A. I did not. Not at this time, but as the claim moves forward, I will offer my services to review some of those to see if they're appropriate.
Q. Okay. Well, you understand or did you not understand that the time to do that was when you did your report in this case back several

months ago?
A. No. I only do what I'm asked to do. I'm not going to bill for things that I would make up on my own.
Q. At least --
A. They haven't mentioned it to me yet, and if they do, I will.
Q. Hold on one second.
(Off-the-record conference.)
BY MR. WRAY:
Q. At least in terms of your written report and as we sit here today, you don't have any opinions that any of the costs being requested for track repair and clean-up were inappropriate or excessive, do you?
A. I -- I can't give you that answer as to a yes or no. I have -- I don't have an opinion yet because I don't have the information that I probably would ask for if they want me to review it. They have to ask me first. I have --
Q. That's all I was asking. You don't have an opinion as of today?
A. No. No.
Q. Okay. And do you also agree that it would be reasonable for Norfolk Southern to include

as part of the damages to make it whole in this case the amounts that it had to pay the county to access the site where the accident occurred and to get equipment out there to do the clean-up?

A. Can you repeat that? Did you say reasonable?

Q. Yeah. Do you think it's reasonable to include that as a part of the damages claim in this case?

A. Yes. I think it's reasonable to include the bills from the county if the bills are reasonable.

Q. All right. And you didn't evaluate that in this case, don't have an opinion that the county overbilled Norfolk Southern or Norfolk Southern overpaid for that particular aspect of the claim, do you?

A. I don't recall seeing any bills from the county in my quick review of that part of the claim. I don't recall seeing any.

Q. Right. That's fine. I mean, my only question is you don't have an opinion on it as we sit here today; you weren't asked to look at that?

A. I haven't seen any. I have no opinion.

Q. Do you also understand -- I know you

mentioned that Travelers told you they had a lawyer working on the personal injury part of the claim. Do you understand that those employees also sued Norfolk Southern?

A. Wouldn't surprise me.

Q. Do you believe it's reasonable and appropriate for Norfolk Southern to include as part of its damages claim in this case the amounts it paid those two employees to resolve their claims?

A. I have no idea. I'm not a lawyer.

Q. I'm just asking you as a claims person evaluating this claim and whether Norfolk Southern's claim is appropriate or not, have you formed any opinion as to whether or not those damages should be included or they should not be included?

A. The personal injury damages to claim by the employees presumably were part -- were caused by the accident, so I wouldn't -- I don't see why they wouldn't be part of the claim to -- to Travelers. Who else are they going to claim it with?

Q. Right. And in this case, I'll just tell you they paid $125,000 to an engineer and a conductor to resolve all aspects of their claim

against the railroad. You would agree with me that's a very -- extremely reasonable settlement for those two claims, isn't it?

A. Are they ever going to work again? I mean, is it for the rest of their life now?

Q. They got an agreement not to return to work, and they're not going back to the railroad. They're claiming permanent disability.

A. I don't know what the damages are and what the medical history is and stuff like that, but it doesn't seem to be excessive. Although, you know -- you know that one of my pet peeves is that the only industry in the world that I know of that doesn't allow the employees to wear seat belts and have airbags is the engineer and the conductor in a locomotive. It's not fair. Sorry.

Q. No, that's fine. But as a man with over 30 years' experience in the claims industry, if you settled a take-out case, as these were, for $75,000 and $50,000, you'd feel like you did a darn good job, wouldn't you, Mr. Budra?

A. I think someone would be buying me lunch.

MR. RADECK: Object to form. We didn't ask him to look at that. He's not qualified to

talk about that.
MR. WRAY: I'm just asking if he has an opinion on it, John.
BY MR. WRAY:
Q. And sounds like your opinion is that would be a very good settlement, wouldn't it, Mr. Budra?
MR. RADECK: Object to form.
THE WITNESS: You know, it's hard to answer, but it sounds like a good number. But, God forbid, you know, I mean, did they lose an arm? Did they lose a limb? Are they incapacitated for life? If they were incapacitated for life, that would be a very low number, you know.
So, again, like John said, I wasn't asked to talk about it. I don't know the injuries. But I know where you're going with that and, you know, it sounds pretty good.
BY MR. WRAY:
Q. You're not here to offer any criticism of those settlements, are you?
A. No, no. I don't want to.
Q. Now --
A. I don't want to get fired.
Q. So from your report, it looks like you

did -- in this case, you did look at the damages to the involved locomotives, and there were three that were involved in this wreck; is that your recollection?

A. Of course.

Q. And in your report, you assess what you thought was a reasonable value for each of those engines? Is that what you did in your report?

A. No.

Q. What did you -- what do you believe you did in your report in this case? What were you looking at?

A. I haven't -- I haven't challenged the numbers claimed -- looking at in my report, pointing out this is a once-in-a-lifetime claim that I have never, ever seen in 60 years in the railroad. Two things happened. The railroad submitted a claim. I call it claim number one because they had DV on all three locomotives and DV on the damaged railcars, and then told us to -- they told John -- I mean, Tom -- to hold the claim. They -- and then later on came back and fixed them.

I've never had a claim where the railroad submitted a claim for DV and then changed their minds and then submitted a claim for repair.

That's never been -- I've never had that happen that I ever remember in my life.

Q. Right. So I'm not sure --

A. I haven't challenged the numbers yet.

Q. Right. And that's what I want to get to. In your report, you accepted the DV number that was presented by the railroad; is that fair to say?

A. Did not accept it. I acknowledged it.

Q. You acknowledged that number, but you didn't offer a competing number that you had calculated, did you?

A. No. Not yet.

Q. And then same on the repair cost, to the extent you were provided information on the repair cost for the engines, I will use your term, you acknowledged that that was the repair cost the railroad said it incurred, and you didn't make any effort to determine what you thought a fair repair cost for any of these engines should be, did you?

A. No.

Q. I noticed that you do say in your report that you did not include loss of use and you think that's not proper in this case. Am I capturing your opinion on that correct?

A. Partly, yes. Partly, no.
Q. Tell me which part was right and which part was wrong.
A. They're not right or wrong. They're different. When you handle a claim, according to the AAR rules, when the piece of equipment is determined to be non-repairable and they -- they -- the railroad issues a DV form for it, that's the end of the life of the claim for that equipment. And even the AAR says that there is no further claim for that piece of equipment for loss of use.
The equipment no longer is available -- loss of use on these is I think when they generate revenue if the equipment is used. So when you do a DV, that's -- that's all -- the railroad wants no more involvement with anybody. The DV, you pay the DV, and the claim is closed.
In this case, this is the first time in my life that I've ever seen a claim go from DV to repaired and then loss of use for a repaired unit that originally we received the -- John received a claim for scrap. So that's -- this is -- this is a ground breaker for those two things. And it's very important to understand that and -- the way I feel about it.

Q. Well, based on your experience, when is it appropriate for the railroad to use DV as the value of a claim that is presented?

A. Well, I think the whole process of that is to evaluate the equipment to see if it's feasible and economically possible to repair it for less than the DV. If you have a DV for a million and they change their mind and then they fix it for 550,000 -- whoa. And you're not going to pay them the DV for a million because the railroad proved to you it only cost 550,000 to fix it. So if you move from the DV to the repair, then the railroad is now asking for a loss of use, which is appropriate to a certain degree for the amount of time it takes to fix it. I'm using the railroad's numbers to support that.

Q. So if I understand what you're saying, Mr. Budra, you're not saying that loss of use is never recoverable, and you would agree that it is recoverable at least for the period of time between the damage event occurs and a reasonable time to repair that engine. Is that fair to say?

A. No.

Q. Tell me what you said then a minute ago.

A. The loss of use should be a factor in the claim for a reasonable amount of time to fix it. In this particular case, it is my opinion that the railroad has done something that's never been done before. It is my opinion that the railroad found that they had three locomotives with damage at a time in the railroad's existence where -- back then, there were a lot of changes going on in the railroad and -- and like the Norfolk Southern in -- back in '22, maybe '21, but I don't -- '22, the railroad pulled maybe a couple of hundred locomotives out of service and stored them. They stored them for well over a year and they just added these three to their storage. And just -- they left them there for a year so the railroad could gather and regroup.

Big changes on the railroad then. You know, there was a change in the length of real -- of freight trains for the -- what do they call it? Progressive -- progressive railroading where they changed -- the trains used to have 100 cars and then they had 200, and all of a sudden, the Class 1 railroads, Norfolk Southern included, they ended up with locomotives that were just sitting idle for months and months because they didn't need as many

locomotives for the freight trains. They were running less freight trains but they were longer. So when they put 200 units in storage and added these to it, that's not fair to add that to the loss of use. They're in storage. Okay. The railroad reported how many man hours that they are claiming to fix that locomotive.

So in my fair evaluation of the claim, then the railroad should be entitled for loss of use for the man hours divided by -- it's usually a six-man crew, and that's what I did in my calculation. I took the six-man crew and how many hours -- the railroad reported how many hours they took to fix it, and I divided that by the $1,700 that the railroad is claiming per day for loss of use.

I'm not challenging that yet. I'm only offering an opinion as to a logical loss of use would be X amount of dollars. Not a million. You can build a locomotive in 14 days from parts. You can't claim a year loss of use. That's like putting an ATM machine in the mechanical department office and plugging it in for a year and having it spit out money for a year. Every day is $1,700 because you're not fixing it. We used to call

those -- we used to call those lottery locomotives when I worked in the mechanical department. Leave it there and make money.

Q. Did I understand you to say -- maybe I misheard you. Did I understand you to say that you believe they can build an entire locomotive from parts in 14 days?

A. Yeah. There is a video on the YouTube from the -- that stuff. It's an amazing -- it shows the beginning to end for assembling a locomotive. And it's -- to me that's -- you know, that's an overkill to the conversation we're having. You can't take a damaged locomotive apart and put the new parts in and fix and straighten it out in 14 days. That's not happening. I think -- what did I -- what did I use in my expert report for average amount -- I think I have like 70 days or something. I don't remember.

Q. I think you said in your report that if they were entitled to loss of use at all, you would limit it to 70 days?

A. Yeah, I think 70 days is too much, but what the hell. You've got to get a number someplace out there. Let them -- let them all discuss the 70 days and -- and at least that's a

reasonable number. If somebody says, no, it's 100, or somebody says, no, it's 50, then it's up to you. You're lawyers. Let you -- let you all straighten that out. But it's not a -- it's not a year. Okay. It's not a year and a half. That -- that was my point. It was to get you all talking.

Q. Right. And that's what I was trying to understand. You're not of the opinion that loss of use is never appropriate in the context of a case like this. You're not offering that opinion, are you?

A. I just explained that.

Q. Yeah. And you're not offering the opinion that Norfolk Southern is not entitled to some loss of use in this case; you just think the amount they're claiming is excessive. Is that fair to say?

MR. RADECK: Object to form. Go ahead.

THE WITNESS: I think --

BY MR. WRAY:

Q. Is that an accurate statement?

A. I'm sorry?

Q. You're not taking the position that Norfolk Southern should get zero for loss of use; you just don't think they should get the full

amount they're claiming; is that right?
A. For the units that you're going to move forward and discuss the repair costs. There is a unit that the DV is much lower than the repair and loss of use. If the -- if the part of the claim moves forward with one locomotive with -- using the DV calculations, then the DV cuts off the loss of use for that one locomotive.
Q. Okay. So that's fair enough.
A. I think I put that in my report.
Q. Yeah. We'll look at that.
A. I really am trying to be fair.
Q. We'll look at that in a second. So in this particular case, you're saying for the two -- if Norfolk Southern repaired them and returned them to service, they would be entitled to loss of use for those two. For the one that was the repair cost exceeded the DV value for that engine, you're saying they should get nothing for loss of use for that one engine, right?
A. Correct.
Q. And for the two that they did repair and return to service, is it your opinion that the appropriate time period to calculate that loss of use is 70 days?

A. Well, I -- I put 70 days in there as a number that would be open to discussion, but it's better than having no number and it's better than having a year. So 70 days was a reasonable calculation from my experience working in the mechanical department and seeing the men work on locomotives every day.

And I did not cut the repair hours I used -- the full repair hours and I didn't reduce the repair hours by an hour every morning for safety meetings, break, and the employees get 30 minutes every day to clean up before they go home. So you've got an hour and a half, almost two hours of claimed repair time that did not help fix the locomotive, and I didn't even address that.

Q. Right. And you came up with that 70 days by taking the total number of hours that Norfolk Southern reported that it spent repairing those engines and dividing it by 24 hours a day? Is that how you came up with 70?

A. Yes. Like I -- my shop that I worked in, we worked three shifts.

Q. And then if we wanted to calculate what the value would be, we have to multiply that by some daily rate for that locomotive being out of

use -- and Norfolk Southern had a number that we provided to you. I forgot what it was, but it's in your report. You just multiply the number of days by that hourly rate and it gives you a total. Is that fair to say?

A. Yeah. I'm using -- I'm using Norfolk Southern numbers. I didn't change the numbers. I didn't argue with them. Yes.

Q. Right. And then that's my other question for you. Do you have any expertise yourself in determining the value per day for loss of use?

A. Do I have any expertise?

Q. Yeah. Do you know how that's calculated? Norfolk Southern came up with a number and a figure that they provided. Do you know how that's done?

A. Oh, the 1,700 that they -- the document they provided for the evaluation of how they determined the loss of use?

Q. Yes.

A. Like a two- or three-page document?

Q. Well, no. I'm not talking about the number of pages. I'm just asking do you have expertise in determining what the value is per day

for loss of use of an engine?
A. Well, I would have to rely on the numbers provided by the individual railroad as to what they determined to be the value of that locomotive in service. So I'd have to see the information they provide and see if it appears to be reasonable to me. And my experience on the railroad is what I would use to form my opinion.
Q. All right. But you didn't do that in this case. You haven't formed an opinion yourself as to whether the number provided by Norfolk Southern was reasonable or unreasonable?
A. I didn't challenge it. I just used it as is.
Q. And you didn't calculate yourself a competing number?
A. No.
Q. Did you review any depositions at all as part of your work in this case?
A. Not yet. I've been trying to. I've just -- I've got a lot of shit going on -- I got a lot of stuff going on.
Q. That's okay. You didn't offend me.
A. I'm sorry.
Q. But in this case, Mr. Radeck took

depositions from two Norfolk Southern employees recently. One was named Jason Scarpa. You didn't review Mr. Scarpa's deposition?
A. Is he the guy that -- he's a repairman?
Q. No.
A. No, I haven't done it yet. I know one is -- one is a written and one's a video. I'm dying to get to the video one. I want to do that. I think -- I want to do the one about the person who was actual doing the repairs or in the repair shop to see what their opinion was. Maybe I could give John some information as a follow-up. I haven't done it.
Q. Right. And I thought --
MR. RADECK: I'll get that to you.
MR. WRAY: I'm sorry, John. What did you say?
MR. RADECK: Oh, nothing. Sorry. You can keep going.
BY MR. WRAY:
Q. And, Mr. Budra, I think the employee you are referencing there was a gentleman named Ryan Stege --
MR. WRAY: S-T-E-G-E, Marie.

BY MR. WRAY:
Q. You've not reviewed Mr. Stege's deposition, right?
A. I'm trying to do it as quickly as I can. No.
Q. Yeah. I don't know if you realized this or not, but this is the only opportunity I get to depose you, so I have to ask you all my questions today and you have to tell me all you know as of today.
A. That's okay.
Q. So you don't have any opinion --
A. I've had a lot of worse attorneys depose me. Let me tell you.
Q. But just to kind of wrap that up, you don't have any opinions about any of the testimony offered by Stege or Mr. Scarpa because you have not reviewed their testimony yet. Is that fair to say?
A. Correct.
Q. Now, would you agree with me, Mr. Budra, that as part of the process for --
A. I'm sorry, I'm listening.
Q. Yeah. Part of the process for repairing a locomotive that's been damaged, one of the things you have to have is the parts needed to

make the repairs. You would agree with that, wouldn't you?
A. Oh, yeah. It was my job to deliver them.
Q. And you could only deliver them when they arrived at the facility where you were working though, correct?
A. Well, when they arrive, we put them in the bins. It's usually -- the rule of thumb was to have three of everything if your warehouse was big enough.
Q. Right. But my point being that you had to get the -- Conrail or the railroad you were working for didn't make the parts; they ordered those parts --
A. Yes.
Q. -- and purchased them from vendors, right?
A. Correct.
Q. Is that right?
A. Well, the parts -- the parts are ordered -- the parts are ordered by the -- the arriving inspection. As soon as you get a piece of equipment that arrives that's going to be coming into the shop, the first thing to do is an arrival

inspection, and then they do a quick sheet, and the quick sheet is given to the material control department. And the quick sheet would be put into the computer and will check the amount of every -- these items if we don't have them. They're usually in within -- well, I've never seen a part that wasn't there within seven days, five days. All parts --

Q. Right. But you didn't do any --

A. All parts are available within five days.

Q. Well, not all parts. But --

A. That was my goal.

Q. Okay. Right.

A. That was my goal.

Q. But sometimes you're at the mercy of the supply chain and there can be supply chain difficulties in getting parts to a facility. Would you agree with that?

A. To a degree, yeah. I mean, if you had a supply and you couldn't get it to you in 14 days, you get another supplier. We never had a problem getting some parts. We've never had anybody question whether or not we have enough parts on hand. That's just not -- the railroad doesn't do

that.

Q. But you have not analyzed in this case whether there were any difficulties obtaining parts or any supply chain problems that might have contributed to the length of time it took to get these locomotives repaired. You haven't looked at that, have you?

A. In a year? No, I haven't --

Q. I said have you looked at it?

(Reporter clarification.)

BY MR. WRAY:

Q. My question only was: You haven't looked at that, have you?

A. No, no.

Q. And would you also agree with me that oftentimes you have to make one part of the repair before you can move on to another part of the repair process?

A. It's possible, yeah. Possible.

Q. And you didn't look at that in this case either, did you, in terms of what stages were necessary to take these locomotives from their damaged state to fully restore them to where they could become operable again? You didn't look at that, did you?

A. No.
Q. And you didn't look at what steps or stages were necessary to move the locomotive along the repair line to get it to fully completed repairs, did you?
A. The only thing I looked at was what I explained to you. The railroad claimed -- like let's say 350 man hours to fix it. Now, the railroad is telling me that from man hour 1 to man hour 350, they completed the repairs, okay. So that's the basis of -- 350 hours -- it took 350 hours to fix it, it doesn't matter in that 350 hours how long they had to wait for parts.
If they waited for parts within the 350 hours, then that's what added to the -- that's what made up the 350 hours. If you're going from beginning to end, you've -- you've covered and encompassed any issue, whether or not it was -- the part was a weak link coming in because you move on to something else while you're waiting. I did not review what you're talking about because I -- I took the railroad's claim for 350 hours and I calculated that by the $1,700. I thought it was a very fair number.
Q. Right. And then the other thing you

did was you assumed that they had six men that were working on this engine 24 hours a day. Is that what you did?

A. Sometimes it was eight. And sometimes a guy will walk off and somebody in the next locomotive will say, hey, John, I need -- I need somebody. Can you grab a forklift and lift up this drawbar? You know, a six-man crew is two up, two down, and two on the side, so those six guys work together. It's not -- not good to be less than six because then you start stretching their physical abilities. Yeah, I assume it was six. Could be eight.

But sometimes, you know, the six will have their time card for locomotive 761 but they're actually helping John over here with his locomotive, and when I get the time card the next day, still shows this locomotive but they didn't charge it for the other one. So there is give and take. There is give and take.

Q. But you understood, didn't you, Mr. Budra, that these locomotive mechanics were not just exclusively devoted to engines that were damaged in the AIPC incident; they had other equipment, locomotives, other tasks they had to

perform as part of their work duties. Would you agree with that?
A. You mean to other equipment?
Q. To other items that needed to be repaired that might be in the shop.
A. But why would they claim the 350 hours to this locomotive if they're working over there?
Q. Well, you're assuming that they're claiming those hours consecutively. The repair -- the work records you got covered a period of work that covered many, many months to repair these engines, didn't they? Or did you look at that?
A. The employees' names and dates of work?
Q. Yeah, and number of hours that they spent working each day and what they were doing.
A. Well, the railroad is claiming 350 hours. That's all you need. You don't need to know how many hours they worked on this unit this day. The total hours by that number gives you a fair number. I don't know what they did other parts of the day.
Q. Right. You didn't look at any of their work records in forming the opinions to criticize the time they spent doing any particular work they were doing on these repairs, did you?

A. No.
Q. And you don't have any opinion on that, that they spent an excessive amount of hours doing any particular part of the repair process, do you?
A. Well, I think I'd reserve that to when I get a chance to look at the parts they installed to see how difficult some of them are. You know, the big stuff was heavy. You need -- you need -- like other crews come in and help you with that. I haven't done that assessment, and unless I'm asked to -- if I'm asked to.
Q. Right. And because you haven't done that assessment and because you haven't been asked to, you don't have an opinion, as we sit here today, on that issue, do you?
A. What's the issue now? I forgot.
Q. Whether any of the amount of time the repair guys spent doing any particular repair was excessive?
A. I have no opinion on that. No.
Q. And I should have done this earlier, Mr. Budra. You and I have been using the term DV a good bit in this deposition. I assume you're referring to depreciated value?
A. Yeah. That's on the bottom of the

form, depreciated value. AAR -- I think it's Rule 107 or 109.

Q. We've been going almost two hours with that technical delay eating some of our time. Do you want to take a short break for restroom or getting a drink?

A. Yep. Whatever you say. I'm okay.

MR. WRAY: Let's do that. Let's take five.

(A recess transpired.)

BY MR. WRAY:

Q. Mr. Budra, we're back on the record. And despite my struggles earlier, I'm going to try to share again. Can you see on your screen now a spreadsheet of -- it lists three engines, NS7119, 8130, and 9646. Do you see that?

A. Yes.

Q. And I'm going to represent to you that this came to me as part of your file materials in this case.

MR. WRAY: And, John, for the record, this is Budra document -- or Page 443 -- Bates stamped 443. And I'll mark this as Exhibit 3.

(PLF. EXHIBIT 3, Excel Spreadsheet with Claim Summary Dated May 5, 2025, was marked for

identification.)

BY MR. WRAY:

Q. Do you recognize this document, Mr. Budra?

A. Yes.

Q. Tell me what this is.

A. Well, it's a claim summary of -- try to get all the numbers from the first claim, the second claim, and trying to get it all on one piece of paper to help people understand how in-depth this claim is turning out to be.

Q. Okay. And up at the top, it says: Claim Summary 5/5/25 RTB.

I assume RTB is you?

A. Yes, sir.

Q. Did you prepare this document?

A. Yes.

Q. And did you provide this to Travelers to help them understand your evaluation of this case?

A. Yes.

Q. And the Equipment ID here on the left, and I'll stick with the engines first, are these the three engines that you understood to be involved in the accident there at the AIPC

facilities that this lawsuit is about?
A. Yes.
Q. And it looks like, when you say first claim, you're talking about the initial invoice that Norfolk Southern provided?
A. The first claim that they gave to the insurance company that gave to me.
Q. Right. And what you were listing here under this column where it says First Claim DV was the depreciated value that Norfolk Southern included in its initial claim that it presented to Travelers for each of those three engines; is that right?
A. Yes.
Q. And then you did a column -- well, first you noted they didn't deduct anything for salvage, right?
A. Yes.
Q. And it's your view that they should take -- if they're going to use DV, they should take the DV value for those engines and reduce it by whatever the salvage credit is; is that fair to say?
A. According to the AAR rules, yes.
Q. And then a second claim was presented,

and this time it included the cost to repair all three engines instead of using the DV value, right?

A. Yes.

Q. And in two of these instances, for locomotive 7119 and locomotive 8130 -- I'm sorry -- I'll take them one by one. For locomotive 7119, the cost of repair was significantly higher than what had been reported as the DV value for that engine, correct?

A. Yes.

Q. And so is it your testimony that if we were evaluating a fair value for the value of that claim, we should use the DV value instead of the repair value?

A. According to my belief, to mitigate the claim to the lowest possible number, it would stand to reason that, yes, you would use the DV value as presented from the railroad in their claim. Yes.

Q. And if we do that, the DV value is $509,420, correct?

A. Yes.

Q. And then you believe we should deduct from that the salvage value, which we'll look at in a minute -- or here it is -- salvage is over to the right, and the salvage value for that unit was

75,900?
A. According to the paperwork I received, yes.
Q. So is it fair to say that if we wanted to determine a fair value for the loss to that engine, we should -- in your view, we should take the DV value of 509,420 and subtract 75,900 and that gives us a fair value for that particular engine?
A. Unless I'm -- I'm requested to do a in-depth review of the DV numbers to see if the numbers change after we question the estimated value listed in the DV -- as the DV is presented, that's what you would do. You take the 509- and you reduce it by 75-, yes.
Q. Right. And that number comes -- if my math is right, 433,520. You can do the math if you want to check my math. Would that be the number?
A. Well, I haven't -- I haven't looked at it, yeah. It could be.
Q. Okay. And you have not done anything to determine a different number for the fair value for that -- for unit 7119, correct?
A. Not yet.
Q. All right. So as we sit here today,

based on the information you've been provided, would you agree with me that a fair value for that engine would be $433,520?

A. Unless I receive additional information, that's all I have to go on, yes.

Q. And then the second unit, NS8130, the DV value for that one was 2,048,000 and some change. The repair cost was 1,771,000 and some change. And so for that unit, is it your view that if we're trying to be fair in evaluating this case, we should use the repair cost instead of the DV value?

A. Maybe.

Q. What's the maybe?

A. Well, that -- that line item, Number 7, that changes if the railroad adds in their loss of use to the repair costs. If those two have to be together, if the railroad demands that they want the repair value and the loss of use, then they've exceeded the DV. So if you're going to claim for both of those, then I would recommend that the lesser number would be the DV, unless the railroad and the insurance company negotiate a reduced loss of use and it stays under the 2 million.

Q. Okay. Fair enough. So let's break

that down then. So if it turns out that the repair value and loss of use exceed 2,048,747, then it's your view that we should use the DV value in determining a fair value for 8130 less any salvage, which we'll look at in a second; is that right?

A. Yes.

Q. Okay. So if we take that 2,048,747 and we look at the -- well, actually, you didn't have a salvage for that one because you used the repair cost since it was less than the DV, right?

A. Right.

Q. So we don't know what the salvage was, but there would be some salvage --

A. I have it here. I have it here. 8130 -- I may never find it. I'm sorry. Never mind.

Q. Okay. We may --

A. It's on the DV. The DV has a -- has a Page 2 that they don't usually give to the insurance companies. But if you look at the DV, there is a little blip on the bottom for Page 2, and that gives you the salvage value, which is not always the number you're supposed to use because I've had cases where I've told the insurance company to find out what the sale value is.

Sometimes the railroad puts it up for auction and they get more at auction than the DV. So if the railroad gets reimbursed from the insurance company for the DV value and then the railroad sells it to -- at an auction company and they get more than the salvage value, they're making money on the deal.

Q. Right. Well, we can get the salvage value.

A. Yeah.

Q. But your view is that if the repair plus loss of use exceeds that $2 million number, then we should use the DV number in reaching a fair value for engine 8130, fair?

A. I believe that's proper way to mitigate the claim, yes, to a -- yes. Okay.

Q. All right. And if it doesn't, if the loss of use plus the repair costs don't exceed that $2 million number, then you think we should use the repair costs; is that right?

A. I think you should use the lowest possible number to be fair, yes.

Q. But in this case -- and I'm going to leave aside loss of use for a moment -- in this case, if we use just the repair cost, you don't

take issue with the cost of repair for unit 8130 being 1,771,046, do you?

A. At this time I do not. I have not reviewed the repair documents from the railroad listing the parts and the prices. I haven't done that yet. But from what I have to date I have done, that seems to be the number that we would use, yes.

Q. Okay. And then at the third engine, NS9646, I assume we would have the same analysis here. The DV value was 1,011,520, correct?

A. Yeah. That's an estimated number, and that one there was kind of surprising. They did a good job fixing that one.

Q. Right. And then the repair costs were 555,500?

A. Right. But that -- and then you've got to loop in the millions of dollars for loss of use claim and puts it above the DV again. So --

Q. Right. But leaving aside loss of use for a moment.

A. Yeah, yeah.

Q. In evaluating a fair value for locomotive 9646, is it your opinion that we should use the DV value or the repair value?

A. Loss of use involved, you would use the repair value.
Q. Isn't that what you did in your report?
A. Yeah. Yes, I did, I think.
Q. Yeah. We'll look at your report in a moment.
A. Oh, okay. How can I answer these questions if I don't look?
Q. And then likewise, on this one, because it was repaired, we don't have any salvage value to offset if we're going to use the repair cost, right?
A. Right.
Q. You then also listed the three railcars that were damaged, and in your report you don't mention any of these. So do you agree that the value being claimed by the railroad for those damaged railcars, meaning the DV value less any salvage, is a reasonable amount for this claim?
A. No.
Q. You don't agree with that. Why do you not agree with that?
A. I haven't researched it yet.
Q. Well --
A. I'm only using the numbers that were

given to me for the report. If I'm asked -- if I'm asked to go further with the research on that, I would definitely challenge the -- where did you go -- I would -- where is the -- yeah, the BNSF railcar -- but it's -- it's small -- it's small numbers. For the time being, I would say yes. Okay.

Q. For the time being --

A. This is a big claim. This is a small amount of a big claim.

Q. For the time being you would say yes to what?

A. Your question.

Q. My question was is that a fair value for the damage that Norfolk Southern incurred for those three railcars?

A. Yes. With the information I've received to date, yes. If you -- if you add in the salvage value, which they didn't. So...

Q. And then that's what you did over here, right? You took in this bottom right column --

A. Uh-huh.

Q. -- so you then took the equipment value, meaning either the DV or the repair cost, depending on which one you thought was the most

appropriate, and for the three engines and the three railcars, you said a fair value for that was $3,068,650; is that correct?
A. Is that Column I?
Q. It's line -- yeah.
A. Column I?
Q. No, I'm sorry. It's Column K over here.
A. Oh, K, I'm sorry. I thought you said --
Q. Yeah, where you summarized it.
A. Oh, down at the bottom there. Okay.
Q. Yeah.
A. It's the same numbers on -- the -- in I. That's why --
Q. It is. Column I just adds the fair value for the engines and the fair value for the railcars to come out to 3,068,650, right?
A. Yeah.
Q. And then that's what you included over in Column K in your summary, right?
A. Yeah. Equipment -- yeah, minus value -- equipment total, other items -- yeah, okay. Yeah.
Q. And then you said we've got to reduce

that by the salvage value for the equipment that can be salvaged and we've got to knock that down by 152,486, right?

A. Yes.

Q. And that gives us a fair value for the equipment total of 2,916,164, right?

A. Depending on what happens with the loss of use on two of those locomotives, yeah. This is before -- this is before we started adding in the loss of use.

Q. Right. But I said -- we're leaving aside loss of use. We're going to talk about that separately.

A. Okay.

Q. Assuming that we don't account for loss of use here, you came up with the fair value of the damage to equipment, the railcars and the engines, to be to be $2,916,164, right?

A. Yes.

Q. And then you understood that the railroad also had track damage, clean-up costs, etcetera, and that number was 1,083,649, right?

A. Yes.

Q. And we've got to add that if we're going to reach a fair value for this claim,

correct?
A. Yes.
Q. So when you added those two numbers together, you came up with a fair value for this claim at $3,999,813, right?
A. Yes.
Q. And as we sit here today, based on the information you have, you would agree with me that $3,999,813 is a fair value for the damages presented by Norfolk Southern in this case, correct?
A. Based on the information I have today, yes. Are you making -- are you making that offer to -- to Travelers?
Q. Mr. Radeck and I can discuss negotiations at the appropriate time. I'm just trying to -- you've been presented as an expert by them, and I'm just trying to make sure I understand where we agree and disagree. So we've agreed on this number as a fair value for the claim based on information you have at present.
And as we said earlier -- and I'll represent to you, it's a small number. The amount they paid to county was about $65,000, and you've already told me you agree that it would be

reasonable. It was actually 67,934. You've already told me you believe it would be reasonable to include that if they had to pay the county to get access to the site and to do the clean-up, right?

A. Yeah. I've seen a lot more.

Q. So we would add that, and then we've talked about the employee settlements, which I know you didn't evaluate, but you don't take issue with them settling those claims for $125,000, do you?

A. I don't have enough information to make an opinion either way on that.

Q. Okay.

A. Wow. This was a year ago I did that.

Q. So that just leaves us then, Mr. Budra, with the area that we talked about earlier. And I think we kind of went through this, so I don't know that we need to do it again. So since we have agreement on those aspects, it sounds like the area where we have disagreement is on loss of use. And in your view, to be fair to Norfolk Southern on loss of use, you think we should only recover 70 days for loss of use for two of the engines, right?

A. I think that's a generous number, but it's open to negotiation between you and John, yes.

Q. And, actually, I think I said that wrong. I think you said 70 days for one of the engines. I want to be fair to you. One of them, but not the other two.

A. Whatever -- whatever the hours are divided by the 1,700 is the calculation that I'm using.

Q. But the -- but in determining what would be a fair loss of use, do you agree with me that it should be the reasonable period of time it took for the railroad to repair these engines and get them back to fully operational status?

A. I lost you. Can I have that again?

Q. Yeah. I said do you agree with me that in calculating loss of use, that number should reflect a fair value for the reasonable amount of time it took to repair those engines and get them back to fully operational status?

A. Are you asking do I think my numbers are reasonable? Yes, I think they are.

Q. No, that's not what I'm asking you. I was going to get to that point. But do you agree that just as a parameter for deciding loss of use, that's the best we should be using, a reasonable period of time to get the engines repaired and back

to fully operational status?

A. I don't know what the word reasonable means here. But if you want to be reasonable, I think you should look at the numbers, yeah. Yes, I guess. I really don't understand the question, but I'll say yes.

Q. Well, then I'll ask you a different way. How would you define the parameters -- not the number of days. But just if I was to ask you, Mr. Budra, I've got to calculate loss of use in this case, how should I determine that? How do I arrive at a fair method of calculating that? What would you tell me?

A. Well, you know, one of the biggest problems is the -- you don't have the information about the time cards, the people that work there, and how long they -- they put it over in the corner on track one, spot one, and left it there.

The reasonable amount of time to fix the locomotive takes into effect that that repair shop has productivity and they have requirements on the crews. A locomotive to be repaired from an accident does not come under the jurisdiction of productivity reports for the month and for the year. So a locomotive in the corner that's --

that's not part of your productivity and your assessment for your work in the shop, you kind of -- if you take guys from one of those locomotives and you do the -- there is a quota on how long it takes to do an oil change, lube job on a regular locomotive. And if you don't meet your quota, all hell breaks loose.

So if the guys that are supposed to be fixing this unit over here come over and they help you with your productivity units that they -- everybody is watching, it kind of -- it helps the crews to work on productivity and not work on the locomotive over here because no one cares about it, and some people say the longer you leave it there, the more money you make. So a reasonable amount of time -- you'd have to look at the time cards and look at the -- I'd like to see the productivity reports for that period of time to see if they met their quotas and look at the time cards to see if they put down working on oil changes or working on a derailment unit to see if they put the correct numbers in.

Q. Right.

A. I'd have to do a deep dive. It's not -- you can't -- you cannot -- you cannot say a

reasonable amount of time. It's not a -- not a way I would look at it, no.
Q. Right. And I understand you've not done that deep dive in this case to this point, right?
A. Correct.
Q. Right. So that's what I'm trying to ask you. Listen carefully to my question and we'll save some time and maybe get done here. I'm not asking you about these particular engines or this particular claim. I'm asking you in general, if I was trying to determine how I would fairly calculate loss of use, how would I do that?
A. I think that one of the ways to do that would be to look at the photos and look at the damage and try to look at the list of parts and see how many of the parts were complex and how many of them are just bolt on, like railings and steps and stuff like that. But if you get into the inner workings of the diesel engine or the generator or if you're going to swap out the -- if you're going to swap out the six traction motors because the new traction motors supplied by Wabtec give you 50 percent more savings and 50 -- 45 percent more tonnage capability -- so how do you come up with a

reasonable number? You have to -- I think I'd have to look at all those factors and then put them on a chart and see how much of that affects the amount of time -- sometimes there is complex repairs and sometimes there is very easy repairs. So that's a -- that's a tough question. And honest answer, that -- I don't know.

Q. Okay. You have not done that type of analysis in this case?

A. No.

Q. All right. And let me see if I can give you an example. If I go to stay in a hotel and I need to determine how much that hotel stay is going to cost me, they'll say, well, our rate is $200 a night and you're going to be here seven days, so we'll multiply seven days times $200 and it's going to cost you $1,400 to stay in our hotel. Do you understand that?

A. Yes.

Q. Would you agree with me that, similarly, if we're determining a fair value for loss of use, we should take a fair number for the number of days it takes to repair the engine, whatever that number may be -- I'm not asking you in this case, but whatever that number may be -- a

fair number for the number of days to repair and multiply that by a fair number for each day the engine is out of service, and that gives us a total, is that a reasonable way to determine loss of use value?

A. It sounds reasonable. The only question I have is who determines what's fair? What if you and I disagree on what's fair? I don't know.

Q. Mr. Budra, I'm going to show you what we're going to mark as Exhibit 4.

(PLF. EXHIBIT 4, Supplemental Expert Report of Ronald T. Budra, was marked for identification.)

BY MR. WRAY:

Q. And it is captioned at the top, Supplemental Expert Report of Ronald T. Budra. Do you recognize that?

A. Yes, sir.

Q. Did you prepare this document?

A. Yes.

Q. And do you want me to scroll through it so you can confirm this is your report?

A. Looks like it.

Q. Do you have it there in front of you as

well?
A. I don't know if I can find it, but --
Q. That's okay. You can look at the screen. I didn't want you to think I'm tricking you.
A. You don't look like that kind of a guy.
Q. I'm not. But I just wanted you to make sure. It looks like it's nine pages?
A. Yeah.
Q. And the last page includes a signature line. Is that your signature?
A. Yes.
Q. Okay. Did anyone else draft this report other than you?
A. No.
Q. I just wanted to ask you a question on Page 2. You say that you have experienced investigating derailments and other incidents, and you told me a little bit about that earlier. In your time at Amtrak and at Conrail, you did that type of work?
A. Yes. I went to derailments, yes.
Q. You didn't -- or weren't asked in this case to investigate any of the details of the accident itself, were you?

A. Oh, the case we're working on now?
Q. Yes.
A. Did I -- did I go there, no.
Q. No, no. I'm saying you weren't -- part of your role in this case was not to investigate the accident and determine who was at fault -- was it Norfolk Southern, was it AIPC, how does that break down -- that wasn't your task, was it?
A. No. But I have an opinion.
Q. Well, it's not in your report, so I'm not interested in other opinions. And then you also say in this last sentence: I have extensive familiarity with industry practices, including repair-versus-scrap determinations, equipment valuation, loss-of-use consideration, and the application and limitations of Association of American Railroad guidelines.
What does that mean? What's the last part? What are the application and limitations of AAR guidelines?
A. Well, I think the AAR guidelines is what we all use. It's the standard rules used by all the railroads. Those are the guidelines we're using for any discussions, any investigations of the value and the cost of derailments -- or,

actually, even just the cost of damage to rolling stock, whether it be boxcars or locomotives.

The AAR guidelines is what all the railroads have agreed to. Don't forget, the railroads created the AAR. The railroads pay the AAR yearly salaries. The AA- -- the standard -- the railroads, Class 1s and now even the Class 2s, contribute to the AAR funding every year. The AAR works for the railroads, and they've all agreed to use these guidelines, so I'm following their guidelines.

Q. Mr. Budra, I appreciate that. I'm going to tell you though, we'll get done a lot quicker and wrap up -- I didn't ask you any question about how the AAR was organized. I just wanted to understand what you were saying there. But I think I understand where you're coming from.

If we go down -- you also talk about -- on your methodology, you say your opinions are based on industry experience and practice, and by that do you mean your prior work in the claims field?

A. The methodology -- well, the methodology is my -- is actually my step-by-step plan to get involved in this claim. Methodology to

me is step by step. That's my method.
Q. Right. My question was more direct. You say --
A. I don't know what that means, though.
Q. Well, it's in your report: My opinions are based on industry experience and practice.
A. Yeah.
Q. And I'm asking you what did you mean by that?
A. You're asking me what the methodology means. Now you're asking for industry experience and practice? Okay. So industry experience and practice to me is my -- because I've been doing the job for a long time. That's my experience, and during the long time has created the way I -- my practice of how I handle a claim. So it's my -- it's like doing a job for a long time. That's my experience -- industry experience. I have that.
Q. What is Subpart B? What are you talking about when you say comparative analysis? What does that mean?
A. Oh, that would be like comparing two things, you know. Comparing what they're claiming and what they haven't and what my experience has found for previous claims. So I'm comparing two

things, I think. So that's my -- I'm --
Q. What did you compare in this case?
A. -- comparing it.
Well, many of the railroad claims that I've had in the past, you would compare that to this. And first thing I would conclude is that we've never, ever had a case like this and hopefully never have one again. I've never had a case where they changed from scrap to a fixed, and it's just -- it's very unusual. So I -- that's my comparative. I'm comparing to these things. I'm comparing them.
Q. Would you agree that if the cost of repair is less than the cost of scrap that that is appropriate to do that?
A. The cost of repair is less than the cost of the DV, scrap?
Q. Yes.
A. The DV -- the scrap is only one small number. So if the cost of the repair was less than the DV, that makes sense to do the repair. Yes.
Q. In Opinion 1 -- I'm sorry, Opinion 2, you say: Norfolk Southern's repair decisions include modernization and upgrades beyond pre-incident condition, constituting

non-recoverable betterment.
What specifically are you referring to in this case that you believe constituted non-recoverable betterment?
A. Well, in the claim there is an invoice from Wabtec for $550,000. And if you read what the Wabtec people are being -- what Norfolk Southern is being -- is paying them to do -- there is a huge -- a huge betterment process going on now where they're taking locomotives and they're making them 50 percent more productive. They can -- they can pull more weight. They -- they use less fuel. I think they're changing the traction motors. All of that, for that locomotive going forward, for the new life of that locomotive, the betterments for the railroad are astronomical. I don't even know how to figure them out.
Q. What makes you think that Norfolk Southern is claiming any of the work being done by Wabtec is part of its damages in this case?
A. It's in -- it's in the claim. It's a line item, 550,000.
Q. Well, there was a 550,000, the cost of repairing that particular engine you're referring to, but how do you know whether that was work done

by Norfolk Southern or done by Wabtec and which part fell under the modernization program and which part fell under repairing damage caused by this accident?

A. Well, that's the way it reads. It reads that they're going to fix the locomotive and the benefits of -- and they also put into their -- their invoice they won't -- they won't give credit for any scrap, and they're -- if they take off usable traction motors, they're going to keep them and not get them better for them. There is a whole lot of stuff that Wabtec is doing that's in their invoice.

Q. Let me ask you this. Would you agree with me that if Norfolk Southern had to pay Wabtec to repair damage caused by this accident that that would be appropriate for them to claim that as an element of damages in this case?

A. I'd have to see the list of parts. They're refusing to give parts and refusing to give labor, so I can't say if it's an -- it's an appropriate invoice because they're very tight-lipped. They won't even -- they won't even give you the hours or the employees' names or even asking for the employee numbers. I can't say it's

a reasonable bill.
Q. Well, Mr. Budra, I'm going to represent to you that in this case we produced all of that information. The employees that worked on it, the number of hours they worked, the parts that were used to repair these engines, all that's been provided in this case. Have you not been given any of that?
A. From Wabtec?
Q. No. From Norfolk Southern -- for the work Norfolk Southern did.
A. You're talking about the work that Wabtec did; you're asking me --
Q. Okay. So I was perhaps confused by your answer then. So on that you're referring only to the work done by Wabtec?
A. You're asking me if the bill is reasonable. How would I know without knowing what they did?
Q. Well, my question might have not have been very clear, so I apologize.
A. No, I'm sorry if I don't understand you properly.
Q. Let me ask you a different way. Whether Norfolk Southern or Wabtec did the repairs,

you would agree with me that that particular engine sustained damages that required repair following this accident. You would agree with that, wouldn't you?

A. Yes.

Q. You've seen the photographs and you know this engine was damaged and could not have been run in the condition it was in immediately following this accident, could it?

A. Which engine?

Q. The one that you're talking about that you said Wabtec repaired.

A. Oh, only that one engine. Okay. It didn't look that bad. That one didn't roll over, I don't think. It didn't look that bad.

Q. Okay. And you're basing that on your time in the mechanical shop delivering parts on the forklift and doing payroll? That's your qualifications for that?

A. I'm basing that on -- I'm sorry, I'll wait.

Q. No, go ahead. I'm finished.

A. I'm basing that on 60 years of experience on the railroads and umpteen derailments that I have gone to back when we had steam cranes.

Yeah, I'm basing it on a lot of stuff. It didn't look that bad. I don't know if they could use that locomotive -- I would imagine that there is some damage to some part of it. I don't know if the photos show it all. I can't agree to that.
Q. Let me flip over to Page 7 for a moment.
A. I'll put my glasses back on. Okay.
Q. On Page 7 you say: Industry practice supports repair timelines measured in weeks or months, not multiple years.
And my question to you is where does this industry practice come from? Is there a document that you could refer me to or something I can look at that would suggest that repair timelines should be weeks or months for these particular engines?
A. I would say to that take a look at any claim that's ever been filed by any railroad in the last 60 years, and I would be willing to bet that you'd never find a claim from any railroad for loss of use for a year or longer ever in my lifetime have I ever seen that. It's always measured in weeks and months, not years. Not multiple years.
Q. It's measured in the length of time it

takes to get something repaired; isn't that right?
A. Yes.
Q. And it's not one-size-fits-all. The damage caused by an engine -- or caused to an engine in one accident may not be as severe as the damage caused to a different engine in a different accident. You would agree with that, wouldn't you?
A. Yes.
Q. And you said down here under bullet point B -- 2B: Inclusion of internal deliberation periods in LOU -- which that's loss of use; is that right?
A. Yeah, loss of use.
Q. Inclusion of internal deliberation periods in LOU is contrary to accepted industry standards.
And, again, my question is is there an industry standard document, something that you could refer me to that I could look at that would support this statement?
A. Inclusion of -- the intent of that sentence is to identify that the Norfolk Southern spent considerable amount of time with internal deliberation periods to determine if they were going to fix it or scrap it, which I think

deliberation periods is contrary to accepted industry standards the way that I have seen them for 60 years.

Q. And that's what I'm asking you, Mr. Budra. I understand that's your opinion.

A. Right.

Q. I'm asking you for the basis for that opinion. Is it solely based on your experience or is there a publication, a document that I can go look at that would give me that same statement?

A. Not the statement, but it would prove that, if you looked at all claims from all railroads, you would never find a railroad using internal deliberation time added on to a loss of use. Never. It's just not done, in my opinion.

Q. Now, in terms of what you call the unusual circumstance of this case in changing from DV value to repair cost, you would agree with me that, setting loss of use damages aside, switching from DV to repair cost actually was to AIPC's benefit for two of the three engines, wasn't it?

A. Yes.

Q. Because the repair costs for two of the three were less than the depreciated value for those two engines, right?

A. Yes.
Q. And you're fine with that, correct?
A. I think that's logical, yes.
Q. And you agree that Norfolk Southern's use of repair costs for those two engines is a reasonable way to approach those engines, leaving aside any questions about loss of use, right?
A. I missed the first part of that. I'm sorry.
Q. I said you would agree that Norfolk Southern's claiming the repair costs for those two engines is a reasonable way to value this claim leaving aside any issues that you may have with their loss of use claim, right?
A. Yes.
Q. Have we covered all of the opinions that you've reached as of today's date, Mr. Budra?
A. God, I hope so, yes.
Q. Is there anything else that you plan to do, as we sit here today, other than perhaps review additional information if it's provided to you?
A. Yes.
Q. What else would you plan to do other than review additional information?
A. Yes, I will -- I will review additional

information if it's provided to me. I'm sorry, yes.

Q. Yeah. My question was other than that -- I understand if Mr. Radeck sends you something and says take a look at it, you'll probably do that, but is there anything else that you've come up with on your own -- I need to go do A, B, C, or D to finish up my work in this case -- other than review new information that may be provided?

A. I also need to review the depositions they sent me, yes. There is nothing else that I know of yet.

MR. WRAY: All right. John, I'll turn it over to you.

MR. RADECK: I just have a few quick follow-ups. Let me just share my screen.

EXAMINATION

BY MR. RADECK:

Q. Okay. So, Mr. Budra, what I first want to do is ask you about the timeline that we know about in this case so far. So you were asked some questions about the repair period and how long that may have took. We know that this accident happened on July 11th, 2022. Is that your understanding?

A. Yes.
Q. Okay. And I'll represent to you -- and I'm not sure if it's a document you've seen or not -- but the records reflect through e-mails with a guy named Wayne Freeman that on or about September 28th, 2022, is when all of the three locomotives were taken from the accident site. Were you aware of that or not?
A. I must apologize, John. That's so small. I -- if I was 20 years old, I still couldn't read it. Can you make it a little bit bigger, just the part --
Q. I'm not asking you about --
A. Okay.
Q. -- it yet, but I will once I ask you about it.
A. What's the question?
Q. Let me do this. So the accident was in July 11th, 2022. On or about September 28th, 2022, is when the three locomotives were removed from the accident site. Were you aware of that?
A. I'm aware that they were involved in the accident on that date, yes.
Q. And I'll just -- what I'm saying is I'll represent to you that based on the evidence we

have they were taken -- the locomotives were removed from the accident site on or about September 28th, 2022, okay?
A. Okay.
Q. And the testimony that is in the depositions that you haven't read yet is that they were at that point taken to the repair shop, Juniata, which is in I guess the town of Altoona. Are you familiar with that place?
A. Yes.
Q. Okay. And we don't know the exact date. The testimony is that we don't know the exact date that they arrived at Juniata at this point. We know from the records that the repairs were started in March of 2023 and that the repairs ended in December of 2025. All right?
A. Yes.
MR. WRAY: Are you talking about for a specific engine, John, or generically for the last -- for any of the three?
MR. RADECK: The last -- just the bookends for all three locomotives.
MR. WRAY: Okay. I'll just object to the form because there were different dates for the different locomotives, but you can proceed.

BY MR. RADECK:
Q. Yeah. And so, again, my understanding is that the last locomotive was finished in December. I think there may have been others that were finished earlier on. I'm not trying to get into those weeds right now, Mr. Budra. But the bottom line is from the accident date until -- July 11th, 2022, until December 2025 is the time frame for which Norfolk Southern is claiming loss of use. Are you aware of that?
MR. WRAY: Object to form. Misstates the evidence.
THE WITNESS: Yes.
BY MR. RADECK:
Q. Okay. And would it be important for you in your analysis to know whether there were any delays or gaps in time during the time period the locomotives were at Juniata where repairs were not being made?
A. Yes. My understanding was they were put in storage with 2- or 300 others.
Q. Okay. And where would that be? What do you mean by that?
A. Well, in that time frame of the accident, the publications on the railroad news and

railroad magazines and stuff, they indicated that the railroads were suffering some difficulties. And the Norfolk Southern had put a couple of hundred locomotives -- I remember reading about it in the magazine that they put a couple hundred locomotives in storage. Mainly they put in the ones that they didn't need for the trains because they changed things over to different train runs.

But they also put the locomotives in that were the -- there were some locomotives that are more efficient than others by the years they were built. So they just took a couple of hundred and put them in storage, and these three ended up with them, you know, for the time being. There is no rush to handle anything because they had a lot more important things on their mind, I think. My opinion.

Q. Okay. And does that play a part of your opinions in this case when you're determining whether or not the repair time frame was reasonable or not?

A. Absolutely.

Q. And how so?

A. Well, first of all, there is no incentive to fix them quickly. Actually, there is

an incentive not to fix them quickly because they're charging $1,700 a day for every day they don't look at them. So if you're trying to make revenue and generate revenue for your company, I think that the first thing you would do is to say no rush, let them sit there, and we'll just add that on. So, in my opinion, that's not the right way to do things. And it would affect -- it would affect the number of the claim, yes.

Q. Okay. I want to show you a document that's been produced as Bates labeled by Norfolk Southern as 504-1. Can you see this document?

A. Almost. Not yet. Okay. I got my glasses on. I got it. So it's: Loco out of service.

Q. This is a -- essentially their own created summary document for locomotive 7119, and they're claiming a loss of use period from July 11th, 2022, to April 18th, 2024. So almost two years. In your view, is that a reasonable time frame for loss of use for that locomotive?

A. Never in my lifetime. No, it's not.

Q. Have you ever seen a locomotive be held for a loss of use period such as that?

A. Never. And -- never have.

Q. And then if we go to the next document here, which is Bates Page 504-3, this is for locomotive 8130. They're claiming a loss of use period from July 11th, 2022, to December 28th, 2025. Have you ever seen a loss of use period that long before?

A. No. And nobody has on the railroad, in my opinion.

Q. Would it be important for you to know what was happening at the Juniata shop to determine why it took that long to make the repairs?

MR. WRAY: Object to form.

THE WITNESS: Well, John, that's -- that's a good question because back in that time period the railroads were suffering. There was excessive labor hours for the mechanical departments, and you might want to look into the -- Norfolk Southern's layoff at the time because the Burlington Northern and the UP, they laid off massive numbers of mechanical department employees to the point where if you look at that -- go back to that time frame, you might find that Norfolk Southern, along with the other railroads -- I know of two railroads that did it -- they kept enough mechanical department employees to do the oil

changes and the lube jobs, change the wheels, but when it came to damaged units, some railroads -- and maybe the Norfolk Southern might have done this -- they hired third-party companies, nonunion shops, and the locomotive went there to be fixed.

And the railroad mechanical department employees filed suit against them, and in '24 -- I think in '24 the unions won their lawsuit and the railroads were stopped from hiring outside companies to fix their locomotives. So that might play into why the locomotives were there for a year or two or three. It was just unreasonable, in my opinion.

BY MR. RADECK:

Q. And this document now I'm showing you is Bates labeled 504-5. This is their summary for locomotive 9646. Do you see that?

A. Yes.

Q. And this one, they're claiming loss of use or out of service from July 11th, 2022, the date of the accident, and through September 27th, 2025. Do you see that?

A. Yes.

Q. Okay. Reasonable or not reasonable?

A. Well, I can only say it's the most

unreasonable claim I've ever seen in my life. It is unreasonable.

Q. Okay. And I'm going to try to make -- this is Bates Page 504-37 here, and I'll represent to you that this is a summary. The preceding pages listed a bunch of labor dates in these spreadsheets like this. Do you see what I'm showing you?

A. Yeah.

Q. I mean, I know you can't read it, but do you see the numbers?

A. Yes. Yes.

Q. Okay. Is this -- first of all, let me ask you this. Did you receive a lot of spreadsheets from Norfolk Southern in this case?

A. Yes.

Q. Okay. Were you able -- looking at the spreadsheets themselves, did it give you enough information to understand what they were saying?

A. No.

Q. What information was missing?

A. Well, I'd have to go back and look at them again, but I was told to put everything aside and wait for them to say whether or not they're going to file a second claim. So this was after the second claim was filed, I'm assuming, because

it has the dates of '25 on it. So I haven't been told to go back and look at those yet. We're still trying to determine which part of the claim was going to be important to go forward and review. So I'm waiting on that decision.

Q. So, for example, some of these spreadsheets would like have a column called Reference Document. There would be other documents, and I'll report to you that the witnesses testified that there are some supporting documents for some of these spreadsheet line items.

Have you ever seen any of those kinds of supporting documents in the claims that you've reviewed before?

MR. WRAY: Object to form.

THE WITNESS: No, I have not.

BY MR. RADECK:

Q. Do you know why not?

A. Usually the -- they just won't give it to you. I've asked for years and years. They don't produce things. The more they produce, the better I can understand a claim and perhaps help them have -- negotiate a lower settlement.

Q. All right. So back on Page 504-37, this is a -- if you see my mouse here, this is sort

of a summary of the labor dates that I understand to be the labor dates for the three locomotives that were performed. And as you can see, they're bookend from -- starting in March 15th, 2023, to December 29th, 2025. Do you see that?

A. Yes.

Q. Okay. And do you notice that there are gaps between some of the time periods?

A. Oh, absolutely. That's because they're working on productivities of the stuff in the shop that they are rated on. They're not rated on the repair time for this locomotive. So there is no one watching, so they can help their productivity for the month and the quarter by doing the repairs that are more observed by the upper management.

But you look at 3/15 to 7/27/23, so it looks like they -- they didn't start working on the unit until '23 and the accident happened in '22. So that was one of the ones that went into storage and they decided to bring it in when they wanted to. You know, if the accident happened in '22, the pre-repair team is very important. They go and look at the equipment ASAP. And that's the benefit for the materials control and the parts department. The preinspection gives them the opportunity to get

their handle on what parts they need as quickly as possible.

Q. Well, in your experience, how long do the railroad companies typically take to determine the extent of damage and what parts they may need?

MR. WRAY: Object to form.

THE WITNESS: I have actually seen them come out to a derailment. If it's not -- if it's not too far away, they'll get out right away and look at it. Especially if you're -- if you only have an X amount of number of locomotives and you don't want anything being in the shop too long because of -- you know, the power desk then determines if you have enough locomotives to run the trains for every day. So you've got to -- they've gone out quickly to look at those and get an idea of what parts they need. Yeah, it's done quickly sometimes, but not if they're in storage though.

BY MR. RADECK:

Q. What do you mean by that?

A. If they're put in storage, nobody looks at them because nobody knows why the -- you're not going to order parts on something you may not fix. That'd be kind of crazy to tie up money in parts.

Q. So, again, going back to our timeline. Accident July 11th, 2022; they're taken from the site late September of 2022; and then something is going on between September 2022 and when the labor apparently starts in March of 2023. Would it be important to you to know what was happening at that time?

MR. WRAY: Object to form.

THE WITNESS: Yeah, it'd be interesting and very important to help me with the assessment of the overall claim.

BY MR. RADECK:

Q. And would it be important to know that to determine whatever they were doing during that time period whether that delay in starting the labor was reasonable or not?

MR. WRAY: Object to form.

THE WITNESS: Yes.

BY MR. RADECK:

Q. Do you think it's reasonable for Norfolk Southern to claim loss of use for periods of time -- I mean, based on these labor dates here, we know that there were periods of time where they're not working on the train but they're still claiming loss of use for those gaps in time. Is

that your understanding?
MR. WRAY: Object to form.
THE WITNESS: Absolutely, yes.
BY MR. RADECK:
Q. Is that reasonable?
A. No. I'm against that.
Q. Do you -- just for the gaps that we have in this spreadsheet on Page 504-37, would it be important for you to know why there were gaps in these labor dates?
MR. WRAY: Object to form.
THE WITNESS: Yeah. Yes. Absolutely.
BY MR. RADECK:
Q. Okay. And I'll tell you, based on the depositions that you haven't read, that none of those witnesses could tell me about anything that was happening during any of these gaps of time. Would that be important for you to know?
MR. WRAY: Object to form.
THE WITNESS: Yes.
BY MR. RADECK:
Q. And would that help you to make your -- finalize your opinions of whether or not the loss of use period is reasonable or not?
A. Yes.

Q. And another question I have here that I thought was interesting, but you see the additive rate here in percentages?

A. Yes.

Q. Okay. Do you have any reason to understand why the rate would have doubled and tripled during the time span involved?

MR. WRAY: Object to form.

BY MR. RADECK:

Q. Do you see how the percentages go from 97 percent to 188 percent to 199 percent? Do you see that?

A. Yes.

Q. Do you know -- do you have any reason to -- I mean, does that seem reasonable or not reasonable to you or do you know?

MR. WRAY: Object to form.

THE WITNESS: It's unreasonable and I would definitely want to look into why the additives for the -- for the different crafts were increased. Yes, that would -- that would definitely be part of my review.

John, I would also ask for a list of what constitutes the additives that adds up to that number. Absolutely want to know what the -- what

the list of additives are. In some railroads, they charge you for the employee safety shoes as part of an additive. Health and welfare, vacation, projected injuries -- actually, there is a loss of use -- no, there is a additive for the labor rate for projected injuries that may occur while they're fixing a locomotive, and that's very interesting to find out those -- get that list.

BY MR. RADECK:

Q. Based on how you analyzed this claim, to your knowledge, is that consistent with the experts in your field that are engaged to do sort of a forensic analysis of a claim to determine whether or not a damages claim is proper?

MR. WRAY: Object to form.

THE WITNESS: I really don't know what other people do. I'm not involved with other experts. I would assume that if they're doing a good job, they would -- I don't want to say -- toot my own horn, but seem to be -- they would have to be doing what I'm doing, I guess. I don't know what they do.

BY MR. RADECK:

Q. And are you -- how are you getting -- how are you coming up with the 70-day time period?

Are you comparing that to other claims you've had in the past or are you looking at something else specific? How are you coming up with that time period for the -- as far as the -- the days -- I guess what you call the high end of days that you think could be reasonable for performing repairs for a loss of use period?

A. I have found that through the years giving a reasonable calculation to the insurance company and the railroad helps both sides understand my logic. I don't want to say that a million dollars is just too much, don't pay it, for loss of use. I want to give people an idea of what a reasonable amount of time could be, and I usually go on the high side.

I use their numbers. I'm taking their labor hours and I'm taking their daily rate and dividing it by a six-man crew. And I could use an eight-man crew and make the number lower and they could use a four-man crew and make the number bigger, but I'm giving people an opportunity to kind of understand the middle ground and let's talk about it. It helps in the negotiations and, believe it or not, a lot of people don't understand railroad lingo, so that's why I do what I do.

It's -- I think it's a fair number. It's a middle number, and I'd like to see people start with that. And then they can pose their arguments either way.

Q. Yeah. I mean, you essentially gave Norfolk Southern the benefit of the doubt on a lot of their numbers; is that fair?

MR. WRAY: Object to form.

THE WITNESS: Absolutely. The 70 days is, in my mind, for the one that's 550,000, 70 days would be -- it's like an overkill times two or three. It doesn't -- doesn't take that long.

But you have to understand that the superintendent of that shop has a boss. They have productivity quotas. They're called on the carpet. So if they can find a way of sharing their employees for the units that they're judged on, the productivity numbers, nobody judges them on how long it takes to fix this. Somebody might say to them, leave it alone, we're making money. So I've been there; I've been here; I worked there; I'm doing it now. This is just my opinion of how the real world happens.

If you want to go back and deep dive on a $7 million claim, I'd get every time card. If they're using electronic data now, you can get it

all electronically. So, I mean, there is a lot of work to be done to reduce the possibility of paying a $7 million claim, which I think is highly irregular and unreasonable and we'll probably never see again in our life. I hope -- my life.

BY MR. RADECK:

Q. And if we were even to begin to consider whether March '23 to December '25 when these trains were essentially at the repair shop, whether we were -- whether we were to even consider whether that time period is reasonable, we would need to have a better understanding from what we have now -- what you have now as to what was happening during that time frame, why were there any delays, why there were gaps in the repair time; is that fair?

MR. WRAY: Object to form.

THE WITNESS: Yes.

MR. RADECK: All right. I don't have any other questions. Thank you.

EXAMINATION

BY MR. WRAY:

Q. Mr. Budra, you said that the three engines that were damaged in this wreck were put in storage. What is the basis for your statement in

that regard? Where did you get that from?

A. Oh, that's an assumption that I made after reading the news release about not only the Norfolk Southern but I think the UP put hundreds of units in -- in storage. So I did see photos of these three locomotives at -- outside the repair shop, and I believe that somebody mentioned to Wayne and Wayne told me that they had been moved from outside the repair shop to a -- a storage track or a dead track. I think Wayne said they were being moved to a dead track. Because you really don't want to move heavy equipment like that every day.

Your leads -- you know, you got two or three leads going into the shop. I don't know how many tracks they have in that shop, but you don't want to move that stuff around. And then they certainly wouldn't put those three in the shop and let them stay there for a year. They don't have that kind of room. The overhead cranes would be going nuts.

So, you know, they -- I was told that they were put on a dead track or a storage track until they make up their mind. And he said, Ron, don't do any more work on it. Just I'll let you

know when I know. And that's the last I heard -- from Wayne, which I thought was a real nice guy.

Q. Do you understand there is a difference between taking locomotives out of service and putting them in storage and putting them in a place -- in a repair shop where they are waiting to be put in line for the actual repairs to be made? Do you understand there is a difference between those two things?

A. Yes. Long-term storage they have to do maintenance on the locomotives. There is a lot of things you have to do to make sure that the locomotive is not going to deteriorate while it's in storage. They've even tried to -- they've even tried to wrap them, which didn't work.

Q. And I don't think there is any question that some engines are, in fact, taken out of service and moved to storage, but you don't have any evidence in this case that any of our three involved locomotives were taken from the repair shop and put in a storage warehouse, do you?

A. Not without asking the railroad for -- for track movement on them. Or the -- maybe the power desk would know where they are. You'd have to ask them.

Q. When you said earlier in response to Mr. Radeck's question that these three engines ended up as being one of those in storage, you don't have any proof of that, do you?

A. Well, Wayne told me they were on a storage track.

Q. Well, that's the difference --

A. (Audio distortion) storage track with the other ones -- another storage track outside the shop, I don't know. No, I don't.

Q. We talked about that difference. There is a difference in a storage facility and a place at the repair facility where it's waiting to be put in line for repairs. We already discussed that and you agreed with that, right?

A. Well, I'd like to say that I don't know of any storage facilities. Put in storage is usually an old switching out that they're using for long term. They don't put it inside buildings -- not 200, 300 locomotives. Storage -- storage location, not a storage facility.

Q. Right --

A. Facility is a building.

Q. But the Juniata repair -- locomotive repair shop is not a storage facility where the

railroad stores all these engines they've taken out of service that they're not going to be using anytime soon, is it?
A. I don't know that.
Q. Okay. So you don't know one way or the other then, do you?
A. No, I do not.
Q. All right. You also don't know what was going on at the repair shop at any point in time that might have impacted the ability to get these repairs completed, do you?
A. Not without asking for additional information.
Q. As we sit here today, you don't have any --
A. No.
Q. -- any information about that, do you?
A. No.
Q. What was the mechanical damage to these engines that they sustained in this accident?
A. You mean item by item?
Q. Yeah. What was the mechanical damage that they sustained --
A. That's impossible --
Q. -- that had to be repaired?

A. Impossible question to answer. Do you want me to look at a photograph and tell you what was damaged?

Q. I'm asking you, as you sit here today, you've formed some opinions in this case that you think the repair time period was excessive. Isn't that one of the opinions you just told Mr. Radeck you had in this case?

A. Yes. According to the labor hours the railroad acknowledged that it took to repair it.

Q. Right. And to know whether the time to repair was appropriate or excessive, wouldn't you have to know what type of damage was required to be repaired for this accident?

A. That's only one part of a big equation. There's more to know than just that one question, much more.

Q. I don't disagree with that necessarily. But one part of it would be you have to know what needs to be fixed, don't you?

A. That would help, yes.

Q. And you need to know what parts were available to make those repairs or whatever fix was required, wouldn't you?

A. That seems logical. Yes.

Q. In this case, do you know anything about what mechanical damage was incurred by any of these three engines that had to be fixed as a result of this accident?

A. It's a tough question to answer. I would have to say, no, I don't. No.

Q. Do you know anything about the status and availability of any of the parts that were needed to make any of those mechanical repairs?

A. Well, based on my experience of working in the parts department, I wouldn't -- I would assume that all railroads have a very good supply chain. And in my experience, we've never waited more than a week for any part at any time in the whole year that I worked in the parts department. So I would assume that the Norfolk Southern would be very similar. But I would certainly ask them what's the longest time for getting a part.

Q. Well, I don't want you to make any assumptions. In a court of law, we're based on evidence, not assumptions. Do you have any evidence as to what specific parts were needed to repair these engines and what delays, if any, were encountered in obtaining any of those parts? Do you know one way or the other?

A. No.
Q. Mr. Radeck asked you a question about the additive rate. What is that? What is an additive rate?
A. Well, when you have an employee that works for you, you normally give them an hourly wage. You have to pay things for that person to be employed at -- in your company. You contribute to their health and welfare, hopefully. You contribute to -- you give them vacation time that's accrued after they work. You sometimes have to give them safety gear, safety equipment, you do that.

And so for the amount of time that that person is not doing their normal job, they're doing repairs on equipment that was involved in an accident, then the railroads believe it's reasonable to add in the benefits that they're paying that employee while they're doing work on the locomotive that was involved in the accident.

That's my understanding. There is a lot of things involved in -- in overheads and additives. A lot. So that -- I mean, those numbers are interesting to read. You'd like to get the list.

Did I answer your question properly?

Q. Do you know how the additive rate is calculated?

A. Specifically which one?

Q. Any of them that you looked at. Mr. Radeck showed you a spreadsheet. It had various ones that you said caused you some concerns.

A. Yes.

Q. Do you know how those additive rates were calculated?

A. You're ask -- I've asked the railroad immediately, right away, what's your calculation for -- how much of the $81 for safety gear is -- and where do you get that from? Is that your yearly per employee or is that for that type of craft? So you need more information on that to dig into it.

But it's interesting that the report that he showed had different calculations for different times of the year. I'd be very interested in that.

Q. My question to you, Mr. Budra, you're holding yourself out as having expertise in this field of evaluating claims and damages, and Mr. Radeck asked you about the additive rate.

My question was very simple. Do you know how that is calculated?
A. The only way -- I do not know until I ask the railroad, and I suspect that my experience is telling me that we need to ask more questions.
Q. All right.
A. Yes.
Q. Yes, you need to ask more questions, not, yes, you know how it was calculated in this case, right?
A. Yes. Yes.
Q. Since I asked two questions, let me break it down. You're saying you don't know how the additive rate that you saw on that spreadsheet was calculated by Norfolk Southern, do you?
A. I have not received that data from the Norfolk Southern yet.
Q. Okay. And you don't have any opinion sitting here today about how it was calculated, correct?
A. I'll reserve that answer until I see the list and --
Q. No. My question was sitting here today.
A. Today, no, I do not know.

Q. And there is nothing in your report saying that the additive rate for any of the labor costs was improper or excessive, is there?

A. I didn't mention the additive rate in the report.

Q. You also talked a little bit about quotas and things like that. You don't have any details about -- or evidence in this case that any of that had anything to do with how long it took to get these repairs done, do you?

A. It did where I worked --

Q. I didn't ask you that, about where you work. I said in this case, Mr. Budra, what evidence do you have that some type of quota or some type of working to meet a quota had anything to do with the length of time it took to repair the engines involved in this accident?

A. I do not have that data yet.

Q. Okay. So as we sit here today, you can't point me to any evidence suggesting that that played a role at all, can you?

A. Only my experience on the railroad.

Q. And Mr. Radeck asked you a lot of questions that really were all primarily focussed on loss of use, and the depreciated value of an

engine has nothing to do with loss of use, does it?
A. If the depreciated value is going to be used in the claim, it is my contention that there is no loss of use at all for that locomotive, no.
Q. I understand that. But the DV rates that you used in this case and that we talked about earlier, do those come from those AAR guidelines that you told me are industry specific in this field of work?
A. The DV rates on that form came from the Norfolk Southern railroad, and they use the calculations provided by the AAR.
Q. And that's -- yeah. So you answered my question. And then my question is in coming up with that DV rate, it does not factor in and include any number for loss of use that might be associated with that engine if it becomes damaged, does it?
A. Actually, the AAR says you cannot use loss of use on a DV form. You cannot.
Q. Right.
A. It's not allowed.
Q. I think you're answering my question somewhat, but you're dancing around. I'm just looking for a simple answer. If it says DV equals

$2 million, that does not mean $2 million plus anything for loss of use. That just means the actual value, the DV, is $2 million, period, right?
A. Period, yes.
Q. And loss of use has nothing to do with the cost to repair and clean up the track where this damage occurred, does it?
A. Loss of use claimed for a locomotive --
Q. Yeah.
A. -- or loss of use for them to use their main line track?
Q. No, the loss of use calculations for the damage to the locomotives has nothing to do with the costs that were incurred to repair the track and put it back in storage, does it?
A. Not that I'm aware of.
Q. Thank you, Mr. Budra. Appreciate your time.
A. You're welcome.
(The witness, after having been advised of his right to read and sign this transcript, does not waive that right.)
(This deposition was concluded at 1:28 p.m.)

CERTIFICATE OF REPORTER

I, Marie McCollum, Court Reporter and Notary Public for the State of South Carolina at Large, do hereby certify that the foregoing transcript is a true, accurate, and complete record.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal this 18th day of September, 2026, in Greenville County, South Carolina.




________________________________

Marie McCollum,
Court Reporter
My Commission expires
May 18, 2036

I N D E X


| WITNESS/EXAMINATION | Page | Line |
|---|---|---|
| RONALD BUDRA | 3 | 18 |
| EXAMINATION BY MR. WRAY | 3 | 20 |
| EXAMINATION BY MR. RADECK | 108 | 18 |
| EXAMINATION BY MR. WRAY | 126 | 21 |
| CERTIFICATE OF REPORTER | 139 | 1 |


REQUESTED INFORMATION INDEX

(No Information Requested)

E X H I B I T S

| | Page | Line |
|---|---|---|
| PLAINTIFF'S EXHIBITS | | |
| EXHIBIT 1, CV of Mr. Budra | 17 | 9 |
| EXHIBIT 2, Ronald T. Budra Railroad Claims LLC Interim Invoice Dated June 6, 2025 | 32 | 15 |
| EXHIBIT 3, Excel Spreadsheet with Claim Summary Dated May 5, 2025 | 74 | 24 |
| EXHIBIT 4, Supplemental Expert Report of Ronald T. Budra | 94 | 12 |

Ron Budra

September 18, 2026

Norfolk Southern Railway Company v. American Italian Pasta Company

9/16/2026, Ron Budra (#8394859)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at litsup-ga@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Norfolk Southern Railway Company v. American Italian Pasta
Ron Budra (#8394859)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________

________________________________ _______________
Ron Budra Date

Norfolk Southern Railway Company v. American Italian Pasta
Ron Budra (#8394859)

ACKNOWLEDGEMENT OF DEPONENT

I, Ron Budra, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________
Ron Budra Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
______ DAY OF ________________, 20___.

__________________________
NOTARY PUBLIC

**&**

**&** 2:3

**0**

**06618** 1:5

**1**

**1** 17:6,9 27:14 57:22 70:9 99:22 140:11 141:4
**1,000** 32:2
**1,011,520** 82:11
**1,083,649** 86:22
**1,400** 93:17
**1,700** 58:14,24 63:18 70:23 89:6 113:2
**1,750** 32:23
**1,771,000** 79:8
**1,771,046** 82:2
**10** 9:14 11:23 41:20,24
**100** 42:6 57:21 60:1
**107** 37:11 74:2
**108** 140:7
**109** 37:11 74:2
**10:06** 1:11
**11th** 108:25 109:19 111:8 113:19 114:4 115:20 120:2
**12** 141:11
**1200** 2:4
**125** 31:16,19
**125,000** 50:24 88:10
**126** 140:9
**13** 10:1
**139** 140:11
**14** 34:19 58:20 59:7,15 68:21
**15** 7:23 11:23 11:23 16:11 34:23,25 41:20 141:5
**152,486** 86:3
**15th** 118:4
**16** 1:10 34:21 34:23,25
**17** 141:4
**172** 2:9
**18** 139:25 140:4,7 142:3
**188** 122:11
**18th** 113:19 139:12
**1967** 9:22 10:5
**199** 122:11
**1:28** 138:24
**1s** 97:7

**2**

**2** 32:14,15 79:24 80:19,21 81:12,19 95:17 99:22 111:21 138:1,1,3 141:5
**2,048,000** 79:7
**2,048,747** 80:2 80:7
**2,916,164** 86:6 86:18
**20** 109:10 140:5 144:15
**200** 31:22 35:1 42:6 57:22 58:3 93:15,16 129:20
**200,000** 12:11
**2009** 18:2,4,6,7 18:20
**2011** 16:12
**2012** 13:18
**2022** 108:25 109:6,19,19 110:3 111:8 113:19 114:4 115:20 120:2,3 120:4
**2023** 110:15 118:4 120:5
**2024** 113:19
**2025** 32:17,24 33:9,14,17 34:19 74:25 110:16 111:8 114:5 115:22 118:5 141:7,10
**2026** 1:10 34:21 139:13 142:3
**2036** 139:25
**21** 57:10 140:9
**21866** 139:22
**22** 57:10,10 118:18,21
**23** 118:18 126:8
**24** 62:19 71:2 115:7,8 141:8
**25** 117:1 126:8
**271-9580** 2:5
**27th** 115:21
**28th** 109:6,19 110:3 114:4
**29401** 2:10
**29601** 2:5
**29th** 118:5
**2b** 105:10
**2s** 97:7

**3**

**3** 74:23,24 140:4,5 141:8
**3,068,650** 85:3 85:18
**3,999,813** 87:5 87:9
**3/15** 118:16
**30** 41:22 51:18 62:11 142:16

**300** 111:21 129:20
**32** 141:5
**350** 70:8,10,11 70:11,12,14,16 70:22 72:6,16
**3:25** 1:5

**4**

**4** 94:11,12 141:11
**40** 27:18 42:2
**433,520** 78:17 79:3
**44** 46:5
**44,000** 46:5
**443** 74:22,23
**45** 92:24

**5**

**5** 42:6 74:25 141:10
**5/5/25** 75:13
**50** 60:2 92:23 92:24 100:11
**50,000** 51:20
**504-1** 113:12
**504-3** 114:2
**504-37** 116:4 117:24 121:8
**504-5** 115:16
**509** 78:14
**509,420** 77:20 78:7
**52** 12:21
**55** 2:4 12:20
**550,000** 56:9,11 100:6,22,23 125:9
**555,500** 82:16
**577-4435** 2:10

**6**

**6** 32:16 141:7
**60** 53:16 103:23 104:20 106:3
**65,000** 87:24
**67,934** 88:1
**6th** 32:24

**7**

**7** 79:15 104:6,9 125:24 126:3
**7/11/22** 39:2
**7/27/23** 118:16
**70** 59:17,21,22 59:25 61:25 62:1,4,16,20 88:22 89:2 123:25 125:8,9
**7119** 77:5,6 78:23 113:17
**74** 141:8
**75** 78:15
**75,000** 51:20
**75,900** 78:1,7
**761** 71:15

**8**

**80** 14:17,19
**81** 134:13
**8130** 74:16 77:5 80:4,15 81:14 82:1 114:3
**8394859** 142:5 143:2 144:2
**843** 2:10
**864** 2:5

**9**

**9** 141:4
**9/16/2026** 142:5
**94** 141:11
**9646** 74:16 82:24 115:17
**97** 122:11

**a**

**a.m.** 1:11
**aa** 97:6
**aar** 37:9 38:16 40:15 55:6,10 74:1 76:24 96:20,21 97:3 97:5,6,8,8,15 137:7,12,19
**abilities** 71:12
**ability** 130:10
**able** 5:1 31:11 116:16
**above** 42:6 82:19 142:6 144:7
**absolutely** 112:22 118:9 121:3,12 122:25 125:8
**accept** 11:11 54:9
**accepted** 54:6 105:15 106:1
**access** 49:3 88:4
**accident** 6:24 9:6 16:5 29:5 38:17,22 39:2 39:14 41:3 45:3,13,19 46:17,21 47:1 47:6,11 49:3 50:19 75:25 90:23 95:25 96:6 101:4,16 103:3,9 105:5 105:7 108:24 109:7,18,21,23 110:2 111:7,25 115:21 118:18 118:21 120:2 130:20 131:14 132:4 133:17 133:20 136:17
**accomplished** 28:9

**account** 86:15
**accrued** 133:11
**accuracy** 142:9
**accurate** 46:11 60:21 139:6
**accurately** 30:7
**acknowledge** 3:2,6
**acknowledged** 54:9,10,17 131:10
**acknowledge...** 144:3
**acknowledg...** 142:12
**acquired** 12:9
**acquiring** 12:10
**actual** 42:2 65:10 128:7 138:3
**actually** 10:17 12:2 16:21 18:7 25:22 41:21 71:16 80:8 88:1 89:1 97:1,24 106:20 112:25 119:7 123:4 137:19
**add** 41:20 58:4 84:18 86:24 88:7 113:6 133:18
**added** 41:22,24 57:14 58:3 70:15 87:3 106:14
**adding** 86:9
**addition** 9:19
**additional** 33:21 34:10,18 34:20 35:10 36:24 37:19 38:2 79:4 107:21,24,25 130:12
**additions** 144:6
**additive** 122:2 123:3,5 133:3 133:4 134:2,9 134:25 135:14 136:2,4
**additives** 122:20,24 123:1 133:23
**address** 62:15
**adds** 79:16 85:16 122:24
**administer** 3:8
**administered** 3:7
**administrative** 43:12
**advance** 25:14
**advice** 22:20,24 23:4
**advised** 138:20
**affect** 113:8,9
**affects** 93:3
**affixed** 139:12
**afforded** 38:7
**agent** 23:14 28:16,22 40:1
**ago** 5:24 7:23 16:11 40:20 48:1 56:25 88:14
**agree** 3:9 28:19 46:13 47:9 48:24 51:1 56:19 66:20 67:1 68:19 69:15 72:2 79:2 83:16,21 83:22 87:8,19 87:25 89:9,14 89:22 93:20 99:13 101:14 103:1,3 104:5 105:7 106:18 107:4,10
**agreed** 87:19 97:4,9 129:15
**agreement** 28:6 51:6 88:19
**ahead** 60:18 103:22
**aipc** 4:7 20:20 29:4 46:15 71:24 75:25 96:7
**aipc's** 106:20
**airbags** 51:15
**aisles** 43:5
**allotted** 142:19
**allow** 51:14
**allowed** 137:22
**altoona** 110:8
**amazing** 59:9
**american** 1:6 2:7 4:5 96:17 142:4 143:1 144:1
**amount** 11:6 37:16 56:14 57:2 58:19 59:17 60:16 61:1 68:4 73:3 73:17 83:19 84:10 87:23 89:16 90:19 91:15 92:1 93:3 105:23 119:11 124:14 133:14
**amounts** 49:2 50:8
**amtrak** 8:1,2,7 8:8,10,15,15,17 8:19,22,24 9:1 9:11,13,19 11:22 12:16,25 13:8 15:15 18:8 42:14,23

42:24 95:20
**analysis** 82:10 93:9 98:20 111:16 123:13
**analyzed** 69:2 123:10
**answer** 44:25 46:6 48:16 52:10 83:7 93:6 102:15 131:1 132:5 134:1 135:21 137:25
**answered** 137:13
**answering** 137:23
**anybody** 24:3 55:16 68:23
**anytime** 130:3
**apart** 59:13
**apologies** 17:3
**apologize** 102:21 109:9
**app** 16:24
**apparently** 120:5
**appear** 37:17
**appearances** 2:1
**appeared** 33:20
**appears** 17:22 64:6
**appended** 144:7
**applicable** 142:8
**application** 96:16,19
**appreciate** 33:6 97:12 138:17
**approach** 107:6
**appropriate** 47:5,22 50:7 50:13 56:2,13 60:9 61:24 85:1 87:16 99:15 101:17 101:22 131:12
**april** 113:19
**area** 14:4 88:16 88:19
**argue** 63:8
**arguments** 125:3
**arm** 52:11
**arrival** 67:25
**arrive** 67:8 90:12
**arrived** 67:6 110:13
**arrives** 67:24
**arriving** 67:23
**asap** 118:23
**aside** 5:11 81:24 82:20
86:12 106:19 107:7,13 116:22
**asked** 4:20 6:18 15:4 18:9 21:15,23 23:6 25:17 26:16,18 31:4 33:19 39:10 42:16 48:2 49:23 52:16 73:10,11 73:13 84:1,2 95:23 108:22 117:20 133:2 134:11,25 135:12 136:23
**asking** 25:15 29:18 30:3,6 31:13 32:8 40:6 48:21 50:11 52:2 56:13 63:24 89:19,21 92:10 92:11 93:24 98:8,10,11 101:25 102:13 102:17 106:4,7 109:13 128:22 130:12 131:4
**asks** 21:12
**aspect** 49:16
**aspects** 50:25 88:19
**assembling** 59:10
**assess** 53:6
**assessment** 73:10,13 91:2 120:10
**assist** 21:10,25 22:21
**assistant** 10:13
**associate** 24:1,3
**associated** 137:17
**association** 96:16
**assume** 34:10 71:12 73:23 75:14 82:10 123:18 132:12 132:16
**assumed** 71:1
**assuming** 46:13 72:8 86:15 116:25
**assumption** 127:2
**assumptions** 132:20,21
**assure** 42:20
**astronomical** 100:16
**atm** 58:22
**attached** 142:11

**attorney** 19:1,5 19:7 22:9,11 22:12,13 23:2 23:3,8,9 39:24 39:24 142:13
**attorneys** 2:1,7 3:1 4:3 27:23 34:1 66:13
**auction** 25:3 81:1,2,5
**audio** 129:8
**availability** 132:8
**available** 55:12 68:10 131:23 142:6
**average** 27:18 59:17
**aware** 10:22 109:8,21,22 111:10 138:16

**b**

**b** 98:19 105:10 108:8 141:1
**back** 12:24,25 17:2 42:21 47:25 51:7 53:22 57:7,10 74:12 89:12,18 89:25 103:25 104:8 114:14 114:21 116:21 117:2,24 120:1 125:23 138:15
**bad** 103:14,15 104:2
**ballpark** 18:14 19:24 34:17
**based** 27:10 56:1 79:1 87:7 87:12,20 97:20 98:6 106:8 109:25 120:22 121:14 123:10 132:10,20
**basic** 37:21
**basically** 17:20
**basing** 103:16 103:20,23 104:1
**basis** 26:20 29:13 70:11 106:7 126:25
**bates** 74:22 113:11 114:2 115:16 116:4
**bear** 42:24 43:12,20 45:22
**beattie** 2:4
**beginning** 31:16,19 59:10 70:17
**behalf** 7:6,18
**belief** 77:15
**believe** 13:2 14:2,11 20:18 30:10 33:25 35:11 41:9 46:21 50:6 53:10 59:6 77:22 81:15 88:2 100:3 124:24 127:7 133:17
**belts** 51:14
**benefit** 106:21 118:23 125:5
**benefits** 101:7 133:18
**best** 89:24
**bet** 104:20
**better** 39:7 62:3,3 101:11 117:22 126:12
**betterment** 100:1,4,9
**betterments** 100:15
**beyond** 99:24
**big** 57:17 67:10 73:8 84:9,10 131:15
**bigger** 109:12 124:21
**biggest** 90:14
**bill** 10:11 33:22 34:3,6 39:4,5,7 48:3 102:1,17
**billed** 31:23 33:2,20 34:18 35:1,1
**billing** 29:20 34:1
**bills** 33:14 49:11,11,18
**bins** 67:9
**bit** 33:12 47:13 73:23 95:19 109:11 136:6
**blip** 80:21
**bnsf** 84:4
**board** 42:17
**bolt** 92:18
**bookend** 118:4
**bookends** 110:22
**boss** 125:13
**bottom** 41:15 41:24 73:25 80:21 84:21 85:12 111:7
**bought** 37:15 38:19
**box** 16:18
**boxcars** 11:8 97:2
**boyd** 2:3
**brand** 38:18
**break** 4:22 5:3 18:4 62:11 74:5 79:25 96:8 135:13
**breaker** 55:23
**breaks** 4:24 91:7

**briefly** 4:2
**bring** 118:20
**bringing** 6:22
**brought** 4:4 8:14 11:18,18 20:13 22:22 31:21
**budra** 1:9 3:18 3:24,25 5:20 6:10 14:16 17:2,9,12,15 21:16 25:18 31:15 32:4,15 36:5 38:2 46:9 51:21 52:7 56:18 65:21 66:21 71:22 73:22 74:12,22 75:4 88:15 90:10 94:10,13 94:17 97:12 102:2 106:5 107:17 108:20 111:6 126:23 134:22 136:13 138:17 140:4 141:4,5,12 142:1,5 143:2 143:24 144:2,4 144:12
**build** 58:20 59:6
**building** 129:23
**buildings** 129:19
**built** 38:16 112:12
**bullet** 27:16 105:9
**bunch** 116:6
**bureau** 15:10
**burlington** 114:19
**business** 15:22 18:13,19,23
**buy** 38:18,22 39:3 41:2
**buying** 51:22
**buyout** 12:15

**c**

**c** 108:8
**calculate** 40:4 40:22 61:24 62:23 64:15 90:10 92:13
**calculated** 54:12 63:15 70:23 134:3,10 135:2,9,15,19
**calculating** 89:15 90:12
**calculation** 58:12 62:5 89:6 124:9 134:12
**calculations** 41:13 61:7 134:19 137:12 138:12
**call** 36:25 46:19 53:18 57:19 58:25 59:1 106:16 124:5
**called** 10:7 15:4 37:7 43:2 117:7 125:14
**capability** 92:25
**capable** 39:21
**captioned** 94:16
**capturing** 54:25
**card** 71:15,17 125:24
**cards** 43:15 90:16 91:16,19
**care** 35:4 45:8
**career** 9:21 15:15
**carefully** 92:8
**cares** 91:13
**carolina** 1:1 5:10 139:4,14
**carpet** 125:14
**cars** 11:8 57:21
**case** 1:5 15:21 19:20 20:12,21 21:1,16,19 22:16,20 23:10 23:18 24:4,8 24:17 26:21 27:4 29:3,13 30:8,20 31:5,6 31:24 34:8,15 36:6,11 39:10 39:18 40:7,13 41:11,12 44:15 45:17,23 46:15 47:25 49:2,9 49:14 50:8,23 51:19 53:1,11 54:24 55:18 57:3 60:9,15 61:14 64:10,19 64:25 69:2,21 74:20 75:20 79:10 81:23,25 87:10 90:11 92:4 93:9,25 95:24 96:1,5 99:2,7,9 100:3 100:20 101:18 102:3,7 106:17 108:8,22 112:19 116:14 128:19 131:5,8 132:1 135:10 136:8,13 137:6
**cases** 6:19 7:1 14:8,9 28:8 42:1 80:24

**casualty** 15:13
**categories** 30:7
**category** 31:13
**cause** 139:9
**caused** 8:11,15 50:18 101:3,16 105:4,4,6 134:7
**central** 9:22,23 9:25 10:1,5,16 10:16,19
**certain** 11:6 28:19 41:14 56:14
**certainly** 26:17 45:7 127:18 132:17
**certificate** 139:1 140:11
**certify** 139:5,8
**chain** 68:17,17 69:4 132:13
**challenge** 64:13 84:3
**challenged** 53:13 54:4
**challenging** 58:17
**chance** 73:6
**change** 39:6 56:8 57:18 63:7 78:12 79:8,9 91:5 115:1 143:4,7 143:10,13,16 143:19
**changed** 31:18 42:1 53:24 57:21 99:9 112:8
**changes** 24:24 57:8,17 79:16 91:20 115:1 142:10 144:6
**changing** 100:13 106:17
**charge** 10:21 71:19 123:2
**charges** 33:21 47:18
**charging** 113:2
**charleston** 2:10 20:22
**chart** 93:3
**check** 9:24 10:2 68:4 78:18
**checked** 18:3
**checking** 39:20
**cherokee** 15:11
**circumstance** 106:17
**claim** 4:4 6:22 7:7,16,19 8:14 8:18,18 9:10 16:6,7 20:13 21:5,14,25 23:12,14,17 24:12 27:17,24 28:5,10,14,16 28:19,22,22 29:13,15 31:19 35:17,19,23,25 36:3 37:3,8,20 38:5,6 40:1,24 41:18 42:3 45:10,22 46:1 47:14,20 49:8 49:17,20 50:2 50:8,12,13,17 50:20,21,25 53:15,18,18,21 53:23,24,25 55:5,9,11,17,19 55:22 56:3 57:2 58:8,21 61:5 70:22 72:6 74:25 75:7,8,9,11,13 76:4,6,9,11,25 77:13,16,18 79:20 81:16 82:19 83:19 84:9,10 86:25 87:5,20 92:11 97:25 98:16 100:5,21 101:17 104:19 104:21 107:12 107:14 113:9 116:1,24,25 117:3,22 120:11,21 123:10,13,14 125:24 126:3 137:3 141:9
**claimed** 41:18 53:14 62:14 70:7 83:17 138:8
**claiming** 51:8 58:7,15 60:16 61:1 72:9,16 98:23 100:19 107:11 111:9 113:18 114:3 115:19 120:25
**claims** 6:17,20 7:12 8:6,13 9:1 9:2,3,4,5 11:17 13:16,17,20,22 13:22 15:19 16:1,10 17:25 18:7,13,17,18 22:21 27:15,17 28:1,14 32:5 32:16 36:22,23 44:4 46:10 50:9,11 51:3 51:18 88:10 97:21 98:25 99:4 106:12 117:13 124:1 134:24 141:6
**clarification** 28:16 37:1 69:10

**class** 57:22 97:7,7
**clean** 47:11,15 48:14 49:4 62:12 86:21 88:4 138:6
**clear** 102:21
**clerk** 10:9,10 10:17
**clients** 33:6
**close** 32:25
**closed** 4:15 55:17
**collecting** 43:6
**columbia** 1:2
**column** 76:9,15 84:21 85:4,6,7 85:16,21 117:7
**come** 22:1 28:6 42:16 44:1,8 73:9 85:18 90:23 91:9 92:25 104:13 108:7 119:8 137:7
**comes** 78:16
**comfortable** 35:12
**coming** 67:24 70:19 97:17 123:25 124:3 137:14
**commission** 139:24
**common** 29:1
**communicati...** 26:17
**companies** 14:5 15:3,6,8,14 16:2 27:23 34:1 80:20 115:4,10 119:4
**company** 1:3,6 2:2,7 4:4,5,6 7:6,11,24 12:5 12:7 16:3 18:1 18:24 19:2,4,6 20:14,17 21:12 27:22 28:3,17 39:6 40:3 76:7 79:23 80:25 81:3,5 113:4 124:10 133:8 142:4,4 143:1 144:1
**comparative** 98:20 99:11
**compare** 99:2,5
**comparing** 98:22,23,25 99:3,11,12 124:1
**compensation** 47:4,4
**competing** 54:11 64:16
**complete** 36:18 139:6 144:8
**completed** 35:6 70:4,10 130:11 142:16
**complex** 92:17 93:4
**computation** 40:13
**compute** 39:12 40:17
**computer** 26:2 68:4
**concerns** 134:7
**conclude** 99:6
**concluded** 138:23
**condition** 99:25 103:8
**condo** 4:16
**conductor** 50:25 51:15
**conference** 48:9
**confident** 35:12
**confirm** 17:20 94:23
**confused** 102:14
**congratulations** 14:18
**conrail** 9:19 10:2,3,25 11:1 11:3,16,22 12:1,9,16 13:3 13:7,10,11,13 13:16 42:19 67:13 95:20
**consecutively** 72:9
**consider** 126:8 126:10
**considerable** 105:23
**consideration** 96:15
**consistent** 123:11
**consolidation** 10:24
**constituted** 100:3
**constitutes** 122:24
**constituting** 99:25
**consult** 4:19
**consulting** 18:19,23 23:23
**contact** 16:3 41:1
**contacted** 15:9 19:14 20:25 39:2
**content** 5:5
**contention** 137:3
**context** 6:15 7:14 60:9

**contrary** 105:15 106:1
**contribute** 97:8 133:8,10
**contributed** 69:5
**control** 43:3 68:2 118:24
**conversation** 59:12
**convince** 11:11
**coordinator** 10:7
**copies** 25:19 142:14
**copy** 17:13,21 25:13 40:15 41:16
**corner** 90:17 90:25
**correct** 6:13 7:20 21:18 30:13,14 34:8 34:15 37:17 40:18 42:8 43:22 54:25 61:21 66:19 67:7,19 77:9 77:20 78:23 82:11 85:3 87:1,11 91:21 92:6 107:2 135:20 144:8
**corrections** 144:6
**correctly** 27:19
**cost** 41:2 54:14 54:16,17,20 56:11 61:18 77:1,7 79:8,11 80:10 81:25 82:1 83:11 84:24 93:14,17 96:25 97:1 99:13,14,16,17 99:20 100:23 106:18,20 138:6
**costs** 36:20 48:13 61:3 79:17 81:18,20 82:15 86:21 106:23 107:5 107:11 136:3 138:14
**counsel** 1:14 2:1 19:5 20:20 22:19 34:11 139:9 142:14
**counting** 34:24
**country** 8:6
**county** 49:2,11 49:15,19 87:24 88:3 139:13
**couple** 12:21,22 18:21 32:1 33:1 46:8 57:11 112:3,5 112:12
**course** 4:17 5:14 53:5
**court** 1:1,15 3:1,16 6:1,4,5 6:11 36:7 132:20 139:3 139:24
**courtroom** 6:9
**cover** 31:8
**covered** 8:5 70:17 72:10,11 107:16
**craft** 43:19 134:16
**crafts** 43:14 122:20
**cranes** 103:25 127:20
**crazy** 119:25
**created** 37:9 97:5 98:15 113:17
**credit** 76:22 101:8
**crew** 58:11,12 71:8 124:18,19 124:20
**crews** 10:21,23 73:9 90:22 91:12
**criticism** 52:20
**criticize** 72:23
**crossing** 9:6,7 45:3
**csx** 12:9
**curious** 13:19
**currently** 14:21 14:23
**customer** 11:9 11:10
**cut** 12:12 62:8
**cuts** 61:7
**cv** 1:5 9:18 16:22 17:9,13 17:21,25 27:13 141:4

**d**

**d** 108:8 140:1
**daily** 43:15 62:25 124:17
**damage** 6:20 7:7,19 8:4,6,11 8:16 11:2,12 11:15,24 27:17 46:25 47:5 56:21 57:6 84:15 86:17,21 92:16 97:1 101:3,16 104:4 105:4,6 119:5 130:19,22 131:13 132:2 138:7,13

**damaged** 11:7 11:9,11 39:14 40:10 43:25 45:3,18 53:20 59:13 66:24 69:23 71:24 83:15,18 103:7 115:2 126:24 131:3 137:17
**damages** 6:24 7:3 40:12 46:16,24 47:3 47:10 49:1,8 50:8,15,17 51:9 53:1 87:9 100:20 101:18 103:2 106:19 123:14 134:24
**dancing** 137:24
**darn** 51:20
**data** 43:17 125:25 135:16 136:18
**date** 1:10 18:1 18:6,8 31:24 36:12,23 41:3 82:6 84:18 107:17 109:23 110:12,13 111:7 115:21 143:24 144:12
**dated** 32:16 33:9 74:25 141:7,9
**dates** 72:13 110:24 116:6 117:1 118:1,2 120:22 121:10
**day** 43:16 58:15,24 62:7 62:12,19 63:11 63:25 71:2,18 72:15,19,21 94:2 113:2,2 119:15 123:25 127:13 139:12 144:15
**days** 58:20 59:7 59:15,17,21,22 59:25 61:25 62:1,4,17 63:3 68:7,7,11,21 88:23 89:2 90:9 93:16,16 93:23 94:1 124:4,5 125:8 125:9 142:16
**dead** 127:10,11 127:23
**deal** 81:7
**dealt** 15:15
**december** 110:16 111:4,8 114:4 118:5 126:8
**decide** 35:17,19
**decided** 118:20
**deciding** 89:23
**decision** 117:5
**decisions** 99:23
**declare** 144:4
**deduct** 76:16 77:22
**deemed** 144:6
**deep** 37:1,7 91:24 92:4 125:23
**defendant** 1:7 2:7 38:7 41:16
**defended** 9:1
**defending** 23:9
**defense** 27:16
**define** 90:8
**definitely** 84:3 122:19,22
**degree** 56:14 68:20
**delaware** 42:24 43:12,20
**delay** 74:4 120:15
**delays** 111:17 126:15 132:23
**deliberation** 105:10,14,24 106:1,14
**deliver** 43:8,9 67:3,5
**delivered** 45:25
**delivering** 45:15 103:17
**demands** 79:18
**den** 4:15
**department** 8:3 9:8,16 11:3 13:14,16,22 42:25 43:1,3 43:13 46:10 58:22 59:2 62:6 68:3 114:20,25 115:6 118:24 132:11,15
**departments** 12:11,12 28:24 114:17
**depending** 84:25 86:7
**deponent** 142:13 144:3
**depose** 66:8,14
**deposed** 18:10
**deposing** 142:13
**deposition** 1:9 3:2,3,4 4:6,18 5:15,19 14:13 17:8 18:9 20:19 25:15 65:3 66:3 73:23 138:23
**depositions** 6:14 14:9 64:18 65:1 108:11 110:6

121:15
**depreciated** 35:20 37:8 73:24 74:1 76:10 106:24 136:25 137:2
**depth** 75:10 78:11
**derailment** 47:14 91:21 119:8
**derailments** 95:18,22 96:25 103:24
**describe** 30:7
**desk** 119:13 128:24
**despite** 74:13
**details** 95:24 136:8
**deteriorate** 128:13
**determinations** 96:14
**determine** 17:24 54:19 78:5,22 90:11 92:12 93:13 94:4 96:6 105:24 114:10 117:3 119:4 120:14 123:13
**determined** 44:23 55:7 63:20 64:4
**determines** 94:7 119:14
**determining** 63:11,25 80:4 89:8 93:21 112:19
**develop** 12:5
**devoted** 71:23
**diesel** 92:20
**difference** 128:3,8 129:7 129:11,12
**different** 18:12 18:16 19:22 20:9 43:14 45:20 55:5 78:22 90:7 102:24 105:6,6 110:24,25 112:8 122:20 134:19,20
**difficult** 73:7
**difficulties** 68:18 69:3 112:2
**dig** 16:17 134:16
**direct** 98:2
**directly** 19:4,10 21:17 22:1
**disability** 51:8
**disagree** 87:19 94:8 131:18
**disagreement** 88:20
**discuss** 5:2 59:25 61:3 87:15
**discussed** 5:4 129:14
**discussion** 62:2
**discussions** 5:5 96:24
**distortion** 129:8
**district** 1:1,1
**dive** 37:1,7 91:24 92:4 125:23
**divided** 58:10 58:14 89:6
**dividing** 62:19 124:18
**division** 1:2
**document** 32:3 45:10 63:18,22 74:22 75:3,16 94:20 104:14 105:18 106:9 109:3 113:10 113:12,17 114:1 115:15 117:8
**documentation** 29:19
**documents** 16:23 25:21 27:10 29:23 30:8,16 34:11 34:12 35:21 82:4 117:9,11 117:13
**doing** 4:10 14:19 21:7,10 28:11 30:17 39:22 45:16 65:10 72:15,24 72:25 73:3,18 98:13,17 101:12 103:18 118:14 120:14 123:18,21,21 125:21 133:15 133:15,19
**dollars** 37:16 38:13 47:15 58:19 82:18 124:12
**door** 4:14
**doorway** 43:7
**doubled** 122:6
**doubt** 125:5
**downsized** 12:13
**draft** 95:13
**draw** 14:24
**drawbar** 71:8
**drink** 74:6
**drove** 45:14
**duly** 3:19

**duties** 43:21 72:1
**dv** 35:20,21 36:19 38:5,15 39:13,19 40:8 40:14,18,24 53:19,19,24 54:6 55:8,15 55:16,17,19 56:2,7,7,10,12 61:4,7,7,18 73:22 76:9,20 76:21 77:2,8 77:13,17,19 78:7,11,13,13 79:7,11,20,22 80:3,10,18,18 80:20 81:2,4 81:13 82:11,19 82:25 83:18 84:24 99:17,19 99:21 106:18 106:20 137:5 137:10,15,20 137:25 138:3
**dying** 65:8

**e**

**e** 19:15 20:2,2 22:10 23:3 26:15 65:24,24 109:4 140:1 141:1 143:3,3 143:3
**earlier** 18:9 23:6 30:11,16 45:14 73:21 74:13 87:22 88:16 95:19 111:5 129:1 137:7
**easy** 93:5
**eating** 74:4
**economically** 56:6
**effect** 90:20
**efficient** 112:11
**effort** 54:19
**eight** 71:4,13 124:19
**either** 7:15 19:1 22:25 69:21 84:24 88:12 125:3
**electronic** 125:25
**electronically** 126:1
**element** 101:18
**employed** 19:5 19:7 133:8
**employee** 9:25 21:3 43:1,13 65:21 88:8 101:25 123:2 133:5,19 134:15
**employees** 12:11 22:22 43:17,19 44:19 50:3,9,18 51:14 62:11 65:1 72:13 101:24 102:4 114:20,25 115:7 125:16
**employer** 7:12
**encompassed** 70:18
**encountered** 132:24
**ended** 57:23 110:16 112:13 129:3
**engaged** 123:12
**engine** 56:22 61:18,20 64:1 71:2 77:9 78:6 78:9 79:3 81:14 82:9 92:20 93:23 94:3 100:24 103:1,7,10,13 105:4,5,6 110:19 137:1 137:17
**engineer** 50:24 51:15
**engines** 53:8 54:16,20 62:19 71:23 72:12 74:15 75:23,24 76:12,21 77:2 85:1,17 86:17 88:23 89:3,11 89:17,25 92:10 102:6 104:17 106:21,25 107:5,6,12 126:24 128:17 129:2 130:1,20 132:3,23 136:17
**enter** 43:17
**entire** 11:25 59:6
**entitled** 5:4 41:16 46:15 58:9 59:20 60:14 61:16
**equals** 137:25
**equation** 8:22 38:17 131:15
**equipment** 8:7 36:21 38:12,18 39:13 40:9,10 40:11,14 43:8 43:25 44:24 45:18 49:4 55:6,9,11,12,14 56:5 67:24 71:25 72:3 75:22 84:23 85:22,23 86:1 86:6,17 96:14

118:23 127:12 133:12,16
**errata** 142:11 142:13,16
**error** 46:6
**especially** 119:10
**essentially** 113:16 125:4 126:9
**establish** 46:14
**estero** 1:12 4:12
**estimate** 18:14 19:24 37:12 38:19,20,21 39:8
**estimated** 78:12 82:12
**estimates** 38:24
**etcetera** 86:22
**evaluate** 6:20 7:12 8:13 21:4 24:8,16 31:4 36:24 49:13 56:5 88:9
**evaluated** 8:17 36:19,22
**evaluating** 7:7 11:17 20:13 24:11 50:12 77:12 79:10 82:23 134:24
**evaluation** 21:23,25 23:11 23:17 29:14 58:8 63:19 75:19
**event** 14:3 56:21
**events** 139:10
**everybody** 29:1 91:11
**evidence** 109:25 111:12 128:19 132:21 132:22 136:8 136:14,20
**exact** 110:11,13
**examination** 3:20 108:18 126:21 140:2,5 140:7,9
**example** 40:24 93:12 117:6
**exceed** 80:2 81:18
**exceeded** 61:18 79:20
**exceeds** 81:12
**excel** 74:24 141:8
**excessive** 47:18 48:15 51:11 60:16 73:3,19 114:16 131:6 131:12 136:3
**exclusively** 71:23
**exhibit** 17:6,9 27:14 32:13,15 74:23,24 94:11 94:12 141:4,5 141:8,11
**exhibits** 17:8 141:3
**existence** 57:7
**expenses** 45:9 46:20
**experience** 44:4 44:10 51:18 56:1 62:5 64:7 97:20 98:6,11 98:12,14,18,18 98:24 103:24 106:8 119:3 132:10,13 135:4 136:22
**experienced** 95:17
**experiment** 42:16
**expert** 6:5,10 27:16 36:7 59:16 87:17 94:12,17 141:11
**expertise** 63:10 63:13,25 134:23
**experts** 123:12 123:18
**expires** 139:24
**explain** 31:12
**explained** 60:12 70:7
**express** 27:4 31:6 36:11 41:10 44:14
**extensive** 96:12
**extent** 54:15 119:5
**extra** 37:23
**extremely** 51:2

**f**

**facilities** 76:1 129:17
**facility** 29:4 67:6 68:18 129:12,13,21 129:23,25
**fact** 28:25 37:21 128:17
**factor** 57:1 137:15
**factors** 93:2
**fails** 142:18
**fair** 6:4 15:7,17 28:3 29:22 34:12 40:9 46:20,22,22 47:1,6 51:16 54:7,19 56:22

58:4,8 60:16 61:9,12 63:5 66:18 70:24 72:20 76:22 77:12 78:4,5,8 78:22 79:2,10 79:25 80:4 81:13,14,22 82:23 84:14 85:2,16,17 86:5,16,25 87:4,9,20 88:21 89:3,9 89:16 90:12 93:21,22 94:1 94:2,7,8 125:1 125:6 126:16
**fairly** 17:18 46:11 92:12
**fall** 9:7,9 31:12
**familiar** 110:9
**familiarity** 96:13
**far** 33:2 108:22 119:9 124:4
**farm** 15:10
**fault** 96:6
**feasible** 56:6
**federal** 36:7
**fee** 41:22
**feel** 35:11 51:20 55:24
**feels** 29:1
**fela** 9:4
**fell** 101:2,3
**fella** 13:1
**fellow** 21:3
**felt** 35:7
**ferrone** 13:2,3
**field** 97:22 123:12 134:24 137:9
**figure** 63:16 100:17
**figured** 32:25
**file** 25:15 26:12 26:13 30:17 74:19 116:24
**filed** 7:15 104:19 115:7 116:25
**finalize** 41:9 121:23
**find** 6:11 24:23 80:15,25 95:2 104:21 106:13 114:22 123:8 125:15
**finding** 28:25 37:21
**fine** 13:18 19:24 49:21 51:17 107:2
**finish** 108:8
**finished** 103:22 111:3,5
**fired** 52:24
**firm** 2:8 20:21 20:23 26:11
**first** 3:19 48:20 55:18 67:25 75:8,23 76:3,6 76:9,16 99:6 107:8 108:20 112:24 113:5 116:12
**fits** 105:3
**five** 5:23,24 6:14 14:15 18:11 19:25 43:7 68:7,10 74:9
**fix** 56:8,11,15 57:2 58:7,14 59:14 62:14 70:8,12 90:19 101:6 105:25 112:25 113:1 115:10 119:24 125:18 131:23
**fixed** 53:22 99:9 115:5 131:20 132:3
**fixing** 58:25 82:14 91:9 123:7
**fl** 1:12
**flip** 104:6
**florida** 4:12
**focussed** 136:24
**folders** 18:6
**folks** 46:10
**follow** 65:12 108:17
**following** 97:10 103:2,9
**follows** 3:19
**forbid** 45:6 52:11
**foregoing** 139:5 144:5
**forensic** 123:13
**forget** 97:4
**forgot** 32:19 63:2 73:16
**forklift** 43:5 45:15 71:7 103:18
**form** 16:10 37:11 38:20 40:16 45:16 46:18 51:24 52:8 55:8 60:18 64:8 74:1 110:24 111:11 114:12 117:15 119:6 120:8,17 121:2 121:11,19 122:8,17 123:15 125:7 126:17 137:10

137:20
**formal** 33:22 35:21
**formed** 17:24 26:20 50:14 64:10 131:5
**forming** 27:3,9 36:15 72:23
**forward** 35:20 35:25 37:4,20 38:6 39:19 40:25 41:12 47:20 61:3,6 100:14 117:4
**found** 18:5,5 41:19,21 57:6 98:25 124:8
**founded** 17:25
**four** 5:23 6:14 18:11 19:25 124:20
**frame** 111:8,24 112:20 113:21 114:22 126:14
**freeman** 109:5
**freight** 10:13 10:22 11:6,7,9 57:19 58:1,2
**front** 94:25
**fuel** 100:12
**full** 3:23 60:25 62:9
**fully** 69:23 70:4 89:12,18 90:1
**fun** 35:4
**funding** 97:8
**funny** 39:5
**further** 3:6,9 37:18 55:10 84:2 139:8
**future** 11:14 42:4

**g**

**g** 19:15 20:2 65:24
**ga** 142:15
**gained** 44:10
**gallivan** 2:3
**gaps** 111:17 118:8 120:25 121:7,9,17 126:15
**gather** 25:7 57:16
**gear** 133:12 134:13
**general** 92:11
**generate** 55:13 113:4
**generator** 92:20
**generically** 110:19
**generous** 88:24
**gentleman** 65:22
**getting** 68:18 68:23 74:6 123:24 132:18
**give** 4:21 16:7 21:6 22:20 23:4 28:4 36:2 44:17 48:16 65:12 71:19,20 80:19 92:23 93:12 101:8,20 101:20,24 106:10 116:17 117:19 124:13 133:6,10,12
**given** 5:19 6:15 14:8 40:13,15 68:2 84:1 102:7 144:9
**gives** 16:16 63:4 72:19 78:8 80:22 86:5 94:3 118:25
**giving** 124:9,21
**gladly** 12:14
**glasses** 104:8 113:14
**glitch** 17:3
**go** 11:10 16:17 17:18 21:7 25:8 28:10 35:17,19 36:1 37:5,18 41:6 43:5,7 44:6 55:19 60:18 62:12 79:5 84:2,4 93:12 96:3 97:18 103:22 106:9 108:7 114:1,21 116:21 117:2,4 118:22 122:10 124:15 125:23
**goal** 42:21 68:13,15
**god** 42:11,14 43:23 45:6 47:13 52:10 107:18
**goes** 41:12
**going** 17:5 32:13 35:17,19 35:24 36:1 37:5,19 38:5 39:18,19 42:4 48:3 50:21 51:4,7 52:17 56:9 57:8 61:2 64:21,22 65:19 67:24 70:16 74:3,13,18 76:20 79:20 81:23 83:11 86:12,25 89:22 92:21,21 93:14 93:15,17 94:10 94:11 97:13 100:9,14 101:6

101:10 102:2 105:25 116:3 116:24 117:4 119:24 120:1,4 127:15,21 128:13 130:2,9 137:2
**golden** 12:13
**good** 3:22,25 45:4 51:21 52:6,10,18 71:10 73:23 82:14 114:14 123:19 132:12
**google** 25:8,10 25:24 27:2
**grab** 71:7
**great** 15:12
**greenville** 2:5 139:13
**ground** 29:1 55:23 124:22
**group** 23:23
**guess** 5:2 90:5 110:8 123:21 124:5
**guidelines** 96:17,20,21,23 97:3,10,11 137:7
**guy** 65:4 71:5 95:6 109:5 128:2
**guys** 44:7,18 45:15 71:9 73:18 91:3,8
**gwblawfirm....** 2:6

**h**

**h** 19:15 20:2 141:1 143:3
**half** 12:12 60:5 62:13
**halfway** 38:15
**hand** 68:25 139:11
**handle** 10:23 22:12 55:5 98:16 112:15 119:1
**handled** 8:6 10:11 19:23
**handling** 11:8 22:13,19,21 24:19,22 41:22 41:25
**handshake** 12:14
**happen** 6:12 54:1
**happened** 11:13,13 53:17 108:24 118:18 118:21
**happening** 11:14 59:15 114:10 120:6 121:17 126:14
**happens** 28:1 86:7 125:22
**hard** 52:9
**head** 13:17,20 13:21
**health** 123:3 133:9
**heard** 5:7 128:1
**hearing** 3:16
**heavy** 44:10 73:8 127:12
**held** 113:23
**hell** 34:4 59:23 91:7
**hello** 28:12
**help** 15:4 21:4 21:12,23 24:11 24:16 27:24 31:4 36:4 40:23 44:8,9 62:14 73:9 75:10,19 91:9 117:22 118:13 120:10 121:22 131:21
**helped** 10:11
**helpful** 27:8
**helping** 22:9,11 71:16
**helps** 91:11 124:10,23
**hereto** 144:7
**hereunto** 139:11
**hey** 71:6
**high** 28:21 33:4 124:5,15
**higher** 77:7
**highly** 126:3
**hire** 21:4
**hired** 10:4 27:22 115:4
**hiring** 115:9
**history** 51:10
**hit** 31:6
**hold** 31:20 35:3 48:8 53:21
**holding** 134:23
**home** 4:12 62:12
**honest** 28:4 93:6
**honestly** 30:24
**hood** 2:8 20:21 20:23
**hoodlaw.com** 2:11
**hope** 14:19 46:12 107:18 126:5
**hopefully** 28:6 99:8 133:9
**horn** 123:20
**hotel** 93:12,13 93:17

**hour** 31:17,22 35:1 44:7 62:10,13 70:9 70:10
**hourly** 63:4 133:6
**hours** 34:19,20 34:24,25 58:6 58:10,13,13 62:8,9,10,13,17 62:19 70:8,11 70:12,13,15,16 70:22 71:2 72:6,9,14,17,18 72:19 73:3 74:3 89:5 101:24 102:5 114:16 124:17 131:9
**house** 28:13
**huge** 100:8,9
**huh** 18:5 33:7 84:22
**hundred** 18:21 57:11 112:4,5 112:12
**hundreds** 127:4
**hung** 44:2

**i**

**idea** 16:11 34:4 50:10 119:17 124:13
**identification** 17:10 32:17 75:1 94:14
**identify** 11:12 36:13 105:22
**idle** 57:24
**ii** 2:3
**imagine** 104:3
**immediately** 103:8 134:12
**impacted** 130:10
**important** 55:24 111:15 112:16 114:9 117:4 118:22 120:6,10,13 121:9,18
**impossible** 46:2 130:24 131:1
**impression** 26:14
**improper** 136:3
**inappropriate** 4:19 5:12 47:18 48:14
**incapacitated** 52:12,13
**incentive** 112:25 113:1
**incident** 8:10 71:24 99:25
**incidents** 95:18
**include** 36:10 44:13 46:24 47:10 48:25 49:8,11 50:7 54:23 88:3 99:24 137:16
**included** 29:20 50:15,16 57:23 76:11 77:1 85:20
**includes** 95:10
**including** 96:13
**inclusion** 105:10,14,21
**income** 14:24
**incoming** 10:22
**increased** 122:21
**incurred** 54:18 84:15 132:2 138:14
**index** 2:15 140:16
**indicated** 112:1
**individual** 64:3
**industry** 51:13 51:18 96:13 97:20 98:6,11 98:12,18 104:9 104:13 105:15 105:18 106:2 137:8
**information** 16:16 21:9 24:7,13,18 25:3,6,7,9,22 26:19 27:2,7 28:1,17 37:2 37:19 38:2 39:25 40:7,23 41:8,14 48:18 54:15 64:6 65:12 79:1,5 84:17 87:8,12 87:21 88:11 90:15 102:4 107:21,24 108:1,9 116:18 116:20 130:13 130:17 134:16 140:16,18
**initial** 76:4,11
**initially** 19:10
**injured** 9:7
**injuries** 23:4 52:16 123:4,6
**injury** 9:2,3,5 9:11 22:16,19 22:21 50:2,17
**inner** 92:19
**inside** 129:19
**inspection** 67:23 68:1
**installed** 73:6
**instances** 77:4
**instructions** 21:6

**insurance** 15:3 15:6,8 16:2 18:24 19:2,6 21:11 27:23 28:3,17 33:25 40:3 76:7 79:23 80:20,24 81:3 124:9
**intend** 27:3 31:5 36:11 44:14,21
**intent** 105:21
**interested** 96:11 134:21 139:10
**interesting** 24:23 25:3 44:3 120:9 122:2 123:7 133:24 134:18
**interim** 32:7,16 141:6
**internal** 105:10 105:14,23 106:14
**internet** 24:6 24:11 25:19 26:18,19 30:12 30:17
**interviewed** 29:7
**introduced** 4:1
**investigate** 95:24 96:5
**investigating** 95:18
**investigations** 96:24
**invited** 42:15
**invoice** 32:7,16 32:21 33:8 34:18 76:4 100:5 101:8,13 101:22 141:7
**invoices** 29:11 29:20 42:5,5
**involve** 11:5,16 14:9 20:16
**involved** 8:10 16:4 23:13 29:8 35:24 36:20 40:9 45:18 46:25 47:6 53:2,3 75:25 83:1 97:25 109:22 122:7 123:17 128:20 133:16 133:20,22 136:17
**involvement** 22:18 23:11 55:16
**involving** 6:22
**irregular** 126:4
**issue** 70:18 73:15,16 82:1 88:9
**issued** 25:14
**issues** 55:8 107:13
**it'd** 120:9
**it'll** 37:13,14
**italian** 1:6 2:7 4:5 142:4 143:1 144:1
**item** 37:13,23 38:9,14 79:15 100:22 130:21 130:21
**items** 25:17 37:10 68:5 72:4 85:23 117:11

**j**

**jason** 65:2
**job** 7:10,11 8:9 9:23 11:4,10 11:12 44:10,19 51:21 67:3 82:14 91:5 98:14,17 123:19 133:15
**jobs** 115:1
**john** 2:9 20:20 26:11 40:25 52:3,15 53:21 55:21 65:12,16 71:6,16 74:21 88:25 108:14 109:9 110:19 114:13 122:23
**john.radeck** 2:11
**join** 43:4
**judged** 125:16
**judges** 125:17
**july** 108:25 109:19 111:7 113:18 114:4 115:20 120:2
**june** 32:16,24 33:9,14,16 34:19 141:7
**juniata** 110:8 110:13 111:18 114:10 129:24
**jurisdiction** 90:23

**k**

**k** 2:3 85:7,9,21
**keep** 10:12 65:19 101:10
**keeps** 15:24
**kept** 114:24
**killing** 32:9
**kind** 27:21 28:24 38:24 39:5 42:1 46:2 66:15 82:13 88:17 91:2,11 95:6 119:25 124:22 127:20

**kindly** 14:1
**kinds** 117:12
**knew** 13:13,17 13:19
**knock** 86:2
**know** 5:17,17 6:6,7 13:20,21 15:16 17:19 20:3 21:16,22 22:4 23:20 26:22 29:18,25 30:1,21,22,23 31:23 32:10 33:24 34:19 38:11 39:1,5 39:17 45:1,13 46:4 49:25 51:9,12,12,13 52:9,11,14,16 52:17,18 57:18 59:11 63:14,16 65:6 66:6,10 71:8,14 72:18 72:20 73:7 80:12 88:8,17 90:2,14 93:7 94:9 95:2 98:4 98:23 100:16 100:25 102:18 103:7 104:2,4 108:13,21,24 110:11,12,14 111:16 112:14 114:9,23 116:9 117:18 118:21 119:13 120:6 120:13,23 121:9,18 122:14,16,25 123:16,21 127:14,15,22 128:1,1,24 129:10,16 130:4,5,8 131:11,13,16 131:19,22 132:1,7,25 134:2,9 135:2 135:3,9,13,25
**knowing** 102:18
**knowledge** 20:17 45:24 123:11
**known** 4:5
**knows** 119:23

**l**

**labeled** 113:11 115:16
**labor** 101:21 114:16 116:6 118:1,2 120:4 120:16,22 121:10 123:5 124:17 131:9 136:2
**laid** 114:19
**large** 139:5
**late** 120:3
**law** 2:8 8:3 9:15 20:21,23 26:11 132:20
**lawsuit** 76:1 115:8
**lawyer** 9:16 50:1,10
**lawyers** 23:10 60:3
**layoff** 114:18
**leads** 127:14,15
**learn** 44:5
**leave** 59:2 81:24 91:14 125:19
**leaves** 88:15
**leaving** 5:11 82:20 86:11 107:6,13
**left** 7:17 57:15 75:22 90:18
**legal** 142:23
**length** 57:18 69:5 104:25 136:16
**lesser** 79:22
**liability** 46:14
**lieu** 3:6
**life** 14:6 51:5 52:13,13 54:2 55:9,19 100:15 116:1 126:5,5
**lifetime** 53:15 104:22 113:22
**lift** 71:7
**liked** 15:5
**likewise** 83:9
**limb** 52:12
**limit** 59:21
**limitations** 96:16,19
**line** 37:10,13 37:23 38:9,14 41:15 46:6 70:4 79:15 85:5 95:11 100:22 111:7 117:11 128:7 129:14 138:11 140:2 141:2 143:4,7,10,13 143:16,19
**lines** 37:9,11
**lingo** 124:25
**link** 70:19
**lipped** 101:23
**list** 18:1 41:20 45:25 46:3 92:16 101:19 122:23 123:1,8 133:25 135:22
**listed** 30:16 41:21,22 78:13 83:14 116:6

**listen** 92:8
**listening** 66:22
**listing** 76:8 82:5
**lists** 74:15
**litigation** 7:15 27:16
**litsup** 142:15
**little** 4:15 28:21 33:12 80:21 95:19 109:11 136:6
**llc** 2:8 15:1,2,19 16:1,10 17:25 18:7,13 27:15 32:16 141:6
**located** 4:11
**location** 1:12 29:4 129:21
**loco** 113:14
**locomotive** 24:19,21 37:15 38:8 42:7,12 43:22 45:2 46:5 51:16 58:7,20 59:6 59:11,13 61:6 61:8 62:15,25 64:5 66:24 70:3 71:6,15 71:17,18,22 72:7 77:5,5,6 82:24 90:20,22 90:25 91:6,13 100:14,15 101:6 104:3 111:3 113:17 113:21,23 114:3 115:5,17 118:12 123:7 128:13 129:24 133:20 137:4 138:8
**locomotives** 24:20,24,25 25:2 41:13,23 43:15 46:25 53:2,19 57:6 57:12,24 58:1 59:1 62:7 69:6 69:22 71:25 86:8 91:4 97:2 100:10 109:7 109:20 110:1 110:22,25 111:18 112:4,6 112:9,10 115:10,11 118:2 119:11 119:14 127:6 128:4,11,20 129:20 138:13
**logic** 124:11
**logical** 47:2 58:18 107:3 131:25
**long** 11:21 14:13 31:20 70:13 90:17 91:5 98:14,15 98:17 108:23 114:6,11 119:3 119:12 125:11 125:18 128:10 129:19 136:9
**longer** 55:12 58:2 91:14 104:22
**longest** 132:18
**look** 14:18,19 16:13 24:10 25:1,5 37:10 38:3 49:23 51:25 53:1 61:11,13 69:20 69:24 70:2 72:12,22 73:6 77:23 80:5,8 80:20 83:5,8 90:4 91:16,17 91:19 92:2,15 92:15,16 93:2 95:3,6 103:14 103:15 104:2 104:15,18 105:19 106:10 108:5 113:3 114:17,21 116:21 117:2 118:16,23 119:10,16 122:19 131:2
**looked** 69:6,9 69:13 70:6 78:19 106:12 134:5
**looking** 24:15 27:13 53:12,14 116:16 124:2 137:25
**looks** 17:14 32:23 52:25 76:3 94:24 95:8 118:17 119:22
**loop** 82:18
**loose** 91:7
**lose** 52:11,12
**loss** 54:23 55:11,13,20 56:13,18 57:1 58:5,9,15,18,21 59:20 60:8,15 60:24 61:5,7 61:16,19,24 63:11,20 64:1 78:5 79:16,19 79:23 80:2 81:12,18,24 82:18,20 83:1 86:7,10,12,15 88:20,22,23 89:9,15,23 90:10 92:13 93:22 94:4 96:15 104:21

105:11,13 106:14,19 107:7,14 111:9 113:18,21,24 114:3,5 115:19 120:21,25 121:23 123:4 124:7,13 136:25 137:1,4 137:16,20 138:2,5,8,10,12
**losses** 46:16
**lost** 89:13
**lot** 44:10 57:8 64:21,22 66:13 88:6 97:13 101:12 104:1 112:15 116:13 124:24 125:5 126:1 128:11 133:22,23 136:23
**lottery** 59:1
**lou** 105:11,15
**low** 52:14
**lower** 61:4 117:23 124:19
**lowest** 77:16 81:21
**lube** 91:5 115:1
**lucky** 5:25
**lunch** 51:23

**m**

**machine** 58:22
**made** 39:6 70:16 111:19 127:2 128:7 144:5
**magazine** 112:5
**magazines** 112:1
**mail** 22:10 23:3
**mails** 20:2 26:15 109:4
**main** 138:11
**maintenance** 45:6 128:11
**make** 31:7 46:16 48:3 49:1 54:18 59:3 67:1,14 69:16 87:18 88:11 91:15 95:7 109:11 113:3 114:11 116:3 121:22 124:19,20 127:24 128:12 131:23 132:9 132:19
**makes** 99:21 100:18
**making** 81:6 87:13,13 100:10 125:19
**man** 7:9 8:5 13:25 23:24,25 51:17 58:6,10 58:11,12 70:8 70:9,9 71:8 124:18,19,20
**management** 42:19,21 118:15
**manner** 3:14
**manufacturer** 39:1,3 41:2
**march** 110:15 118:4 120:5 126:8
**marie** 1:15 16:23 17:7 65:24 139:3,23
**mark** 17:6 32:13 74:23 94:11
**marked** 17:10 27:14 32:17 74:25 94:13
**massive** 114:20
**master** 10:12 10:14,18,19 12:2,3,4,6
**material** 21:17 22:2 25:21 43:3 68:2
**materials** 21:22 21:24 22:4 25:15 29:12 30:6 36:14 74:19 118:24
**math** 78:17,17 78:18
**matter** 19:9 23:7 29:8 31:15 70:12
**matters** 6:16,21 14:7 18:12,16 18:22 19:19,22 20:4,11,22
**mccollum** 1:15 139:3,23
**mean** 7:10 10:8 18:16 29:16 42:6 46:5 49:21 51:5 52:11 53:21 68:20 72:3 96:18 97:21 98:8,21 111:23 116:9 119:21 120:22 122:15 125:4 126:1 130:21 133:23 138:1
**meaning** 83:18 84:24
**means** 44:18 90:3 98:4,11 138:2
**meant** 13:10

**measured** 104:10,23,25
**mechanic** 43:22
**mechanical** 42:24 43:1,13 58:22 59:2 62:6 103:17 114:16,20,25 115:6 130:19 130:22 132:2,9
**mechanics** 71:22
**medical** 51:10
**meet** 91:6 136:15
**meeting** 2:9
**meetings** 62:11
**member** 20:23
**men** 62:6 71:1
**mention** 83:16 136:4
**mentioned** 14:7 48:6 50:1 127:7
**mercy** 68:16
**merged** 9:24 10:1
**message** 5:13 5:13
**met** 34:14 91:18
**method** 90:12 98:1
**methodology** 97:19,23,24,25 98:10
**middle** 124:22 125:1
**million** 38:13 38:20,23 41:4 42:5 47:15 56:7,10 58:19 79:24 81:12,19 124:12 125:24 126:3 138:1,1 138:3
**millions** 82:18
**mind** 56:8 80:16 112:16 125:9 127:24
**minds** 53:25
**mini** 46:4
**minus** 85:22
**minute** 56:24 77:24
**minutes** 62:12
**misheard** 59:5
**missed** 107:8
**missing** 116:20
**misspoke** 13:9
**misstates** 111:11
**mistaken** 37:23
**mitigate** 77:15 81:15
**mo** 39:18
**modernization** 99:24 101:2
**modified** 28:20
**moment** 40:20 81:24 82:21 83:6 104:7
**money** 8:9,23 8:24 35:5 58:24 59:3 81:6 91:15 119:25 125:19
**month** 45:5 90:24 118:14
**monthly** 45:5
**months** 33:11 33:12 48:1 57:25,25 72:11 104:11,16,24
**morning** 3:22 3:25 4:11 62:10
**motors** 92:22 92:23 100:13 101:10
**mouse** 117:25
**move** 56:11 61:2 69:17 70:3,19 127:12 127:17
**moved** 10:17 11:2,22 12:15 31:22 42:20 127:8,11 128:18
**movement** 10:7 35:24 128:23
**moves** 40:25 47:20 61:6
**moving** 37:3,20 38:6 39:18
**multiple** 37:9 42:17 104:11 104:24
**multiply** 62:24 63:3 93:16 94:2

**n**

**n** 140:1
**name** 3:23,25 13:2,6 19:16 21:2
**named** 13:1 65:2,22 109:5
**names** 72:13 101:24
**nature** 15:25
**necessarily** 131:18
**necessary** 34:14 35:7 69:22 70:3 144:6
**need** 17:18 35:15,18 41:9 44:8 57:25 71:6,6 72:17 72:17 73:8,8

88:18 93:13 108:7,11 112:7 119:1,5,17 126:12 131:22 134:16 135:5,8
**needed** 12:23 44:23 66:25 72:4 132:9,22
**needs** 35:11 131:20
**negotiate** 79:23 117:23
**negotiation** 88:25
**negotiations** 87:16 124:23
**neil** 13:2,4,4,7 13:8,13,15,19 13:21,22 14:2
**neither** 139:8
**never** 5:7 6:4,8 6:12 7:17 29:3 29:7 33:24 42:7 53:16,23 54:1,1 56:19 57:4 60:9 68:6 68:22,23 80:15 80:15 99:7,8,8 104:21 106:13 106:15 113:22 113:25,25 126:4 132:13
**new** 9:22,23 10:5,16 38:18 38:22 59:14 92:22 100:15 108:9
**news** 111:25 127:3
**nice** 13:25 41:5 128:2
**night** 93:15
**nine** 95:8
**non** 55:7 100:1 100:4
**nonunion** 115:4
**norfolk** 1:3 2:2 4:3 12:9 14:10 20:16 23:14 24:13,16,18,20 27:11 29:12 40:11 44:15 46:14 48:25 49:15,15 50:4 50:7,12 57:9 57:23 60:14,24 61:15 62:18 63:1,6,15 64:11 65:1 76:5,10 84:15 87:10 88:21 96:7 99:23 100:7,18 101:1 101:15 102:10 102:11,25 105:22 107:4 107:10 111:9 112:3 113:11 114:18,22 115:3 116:14 120:21 125:5 127:4 132:16 135:15,17 137:11 142:4 143:1 144:1
**normal** 133:15
**normally** 21:11 133:6
**northern** 114:19
**notary** 3:11,12 139:4 144:13 144:19
**note** 142:10
**noted** 76:16 144:7
**notice** 118:7
**noticed** 54:22
**ns7119** 74:15
**ns8130** 79:6
**ns9646** 82:10
**number** 18:18 24:24 38:11 41:15 52:10,14 53:18 54:6,10 54:11 59:23 60:1 62:2,3,17 63:1,3,15,24 64:11,16 70:24 72:14,19,20 77:16 78:16,18 78:22 79:15,22 80:23 81:12,13 81:19,22 82:7 82:12 86:22 87:20,23 88:24 89:15 90:9 93:1,22,23,24 93:25 94:1,1,2 99:20 102:5 113:9 119:11 122:25 124:19 124:20 125:1,2 137:16
**numbers** 37:10 37:17,22 53:14 54:4 56:15 63:7,7 64:3 75:8 78:11,12 83:25 84:6 85:14 87:3 89:19 90:4 91:22 101:25 114:20 116:10 124:16 125:6 125:17 133:24
**nuts** 127:21

**o**

**o** 2:9
**oath** 3:7,8
**object** 46:18 51:24 52:8 60:18 110:23 111:11 114:12

117:15 119:6 120:8,17 121:2 121:11,19 122:8,17 123:15 125:7 126:17
**objection** 3:13
**observed** 118:15
**observing** 44:11
**obtained** 25:10 26:19
**obtaining** 69:3 132:24
**obviously** 4:10 23:8 34:6
**occur** 123:6
**occurred** 10:25 29:5 47:12 49:3 138:7
**occurs** 11:7 56:21
**offend** 64:23
**offer** 6:9 36:2 37:25 44:22 45:11 47:17,20 52:20 54:11 87:13
**offered** 12:13 66:17
**offering** 58:18 60:10,13
**office** 10:9,10 17:14 43:12 58:23
**official** 139:12
**offset** 83:11
**oftentimes** 69:16
**oh** 18:20 19:18 30:5 32:6 42:10,11,14 43:23 47:13 63:18 65:18 67:3 83:7 85:9 85:12 96:1 98:22 103:13 118:9 127:2
**oil** 91:5,20 114:25
**okay** 5:9 6:8 9:6 13:24 18:3 19:3,17,18 20:3 23:22 26:1 27:13 31:14 33:3 34:25 47:23 48:24 58:5 60:5 61:9 64:23 66:11 68:14 70:10 74:7 75:12 78:21 79:25 80:7,17 81:16 82:9 83:7 84:7 85:12,24 86:14 88:13 93:8 95:3,13 98:12 102:14 103:13 103:16 104:8 108:20 109:2 109:14 110:3,4 110:11,23 111:15,22 112:18 113:10 113:13 115:24 116:3,12,16 118:7 121:14 122:5 130:5 135:18 136:19
**old** 14:16 33:13 35:3 109:10 129:18
**once** 27:6 34:25 53:15 109:15
**one's** 65:7
**ones** 112:7 118:19 129:9 134:7
**open** 62:2 88:25
**operable** 69:24
**operate** 43:4
**operational** 25:1 89:12,18 90:1
**operations** 42:17
**opinion** 16:7 28:2,4 36:2 44:17 45:11 48:17,22 49:14 49:22,24 50:14 52:3,5 54:25 57:3,5 58:18 60:8,10,14 61:23 64:8,10 65:11 66:12 73:2,14,20 82:24 88:12 96:9 99:22,22 106:5,8,15 112:17 113:7 114:8 115:13 125:21 135:18
**opinions** 26:20 27:3,9,10 30:13 31:5 35:7,12 36:11 36:15 41:10 44:13,22 45:16 47:17 48:13 66:16 72:23 96:11 97:19 98:5 107:16 112:19 121:23 131:5,7
**opportunities** 28:15
**opportunity** 66:7 118:25 124:21
**order** 35:11 119:24

**ordered** 67:14 67:22,22
**organized** 97:15
**originally** 55:21
**outgoing** 10:22
**outside** 23:10 28:13 30:15 115:9 127:6,9 129:9
**overall** 120:11
**overbilled** 49:15
**overhead** 127:20
**overheads** 133:22
**overkill** 59:12 125:10
**overpaid** 49:16
**own** 40:18 48:4 108:7 113:16 123:20
**owner** 15:18 37:14 38:8,12 38:18 41:4
**ownership** 15:22

**p**

**p.a.** 2:3
**p.m.** 138:24
**page** 63:22 74:22 80:19,21 95:10,17 104:6 104:9 114:2 116:4 117:24 121:8 140:2 141:2 143:4,7 143:10,13,16 143:19
**pages** 63:24 95:8 116:5
**paid** 38:8,13 41:4 50:9,24 87:24
**pallets** 43:6
**paper** 75:10
**paperwork** 78:2
**parameter** 89:23
**parameters** 90:8
**part** 7:11 11:12 18:12,19 21:15 22:16,19 26:16 29:14 30:9,13 30:17,19 36:5 37:6,20,24 38:6 39:8 41:25 42:4 46:24 47:3 49:1,8,19 50:2 50:7,18,20 55:2,3 61:5 64:19 66:21,23 68:6 69:16,17 70:19 72:1 73:4 74:19 91:1 96:4,19 100:20 101:2,3 104:4 107:8 109:12 112:18 117:3 122:22 123:2 131:15 131:19 132:14 132:18
**participate** 42:15
**participating** 3:2
**particular** 19:9 19:20 24:2 29:3,15 37:13 45:23 49:16 57:3 61:14 72:24 73:4,18 78:8 92:10,11 100:24 103:1 104:17
**parties** 3:9 28:18,25
**partly** 55:1,1
**parts** 36:3 41:17,17,17,20 41:22 42:5,6 42:23 43:6,10 45:15,17,19,20 46:1,3 58:20 59:7,14 66:25 67:14,15,21,21 67:22 68:8,10 68:12,18,23,24 69:3 70:13,14 72:21 73:6 82:5 92:16,17 101:19,20 102:5 103:17 118:24 119:1,5 119:17,24,25 131:22 132:8 132:11,15,22 132:24
**party** 3:13 6:23 7:2,20 8:24 20:14 115:4 139:9
**passed** 14:3
**past** 41:19 99:5 124:2
**pasta** 1:6 2:7 4:5 142:4 143:1 144:1
**patiently** 35:16
**pay** 43:19 49:2 55:16 56:9 88:3 97:5 101:15 124:12 133:7
**paying** 100:8 126:2 133:19
**payroll** 43:13 43:16 103:18

**pd** 22:13
**peeves** 51:12
**pending** 139:10
**penn** 9:25 10:1 10:16,19
**pennsylvania** 9:24 13:5
**people** 20:7 23:13 29:16,21 34:2 38:10 40:23 75:10 90:16 91:14 100:7 123:17 124:13,21,24 125:2
**percent** 27:18 41:22,24 42:2 92:24,24 100:11 122:11 122:11,11
**percentages** 122:3,10
**perform** 43:21 72:1
**performed** 118:3
**performing** 124:6
**period** 29:18 56:20 61:24 72:10 89:10,25 91:18 108:23 111:17 113:18 113:24 114:4,5 114:15 120:15 121:24 123:25 124:4,7 126:11 131:6 138:3,4
**periods** 105:11 105:15,24 106:1 118:8 120:21,23
**permanent** 51:8
**person** 3:7 9:10 20:10 33:4 42:19 50:11 65:9 133:7,15
**personal** 9:2,3 9:5,11 22:16 22:19,21 23:4 50:2,17
**personally** 15:3
**pertain** 28:21
**pet** 51:12
**photograph** 131:2
**photographs** 103:6
**photos** 92:15 104:5 127:5
**physical** 71:11
**physically** 3:3 4:11 43:24
**pi** 22:12
**piece** 38:18 55:6,11 67:23 75:9
**place** 2:4 110:9 128:6 129:12
**plaintiff** 1:4,14 2:1
**plaintiff's** 141:3
**plan** 97:25 107:19,23
**play** 112:18 115:11
**played** 136:21
**plays** 27:22
**please** 3:14,22 15:4 16:16 39:25 40:2
**plf** 17:9 32:15 74:24 94:12
**plugging** 58:23
**plus** 81:12,18 138:1
**pm** 45:5
**pocket** 46:20
**point** 9:20 12:8 27:16 60:6 67:12 89:22 92:4 105:10 110:7,14 114:21 130:9 136:20
**pointing** 53:15
**policy** 16:4
**pose** 125:3
**position** 8:2,9 10:5,15,25 60:23
**possibility** 126:2
**possible** 56:6 69:19,19 77:16 81:22 119:2
**possibly** 37:1 44:25
**power** 119:13 128:24
**practice** 97:20 98:6,12,13,16 104:9,13
**practices** 96:13
**pre** 99:25 118:22
**preceding** 116:5
**preinspection** 118:25
**prepare** 75:16 94:20
**prepared** 34:7
**present** 3:3 4:13 9:10 14:24 87:21
**presented** 7:16 8:18 36:23 54:7 56:3 76:11,25 77:18 78:13 87:10,17
**preserve** 25:9
**president** 15:24 27:15

**presumably** 50:18
**pretty** 52:18
**prevent** 11:14
**prevention** 11:2,15,25
**previous** 98:25
**price** 41:17
**priced** 33:4
**prices** 41:25 82:5
**primarily** 9:4 136:24
**print** 26:4
**printed** 26:23
**prior** 6:14 7:9 12:10 20:4,11 97:21
**probably** 4:7 34:22 48:19 108:6 126:4
**problem** 5:17 5:19 68:22
**problems** 69:4 90:15
**proceed** 3:17 110:25
**proceeding** 1:12
**process** 6:6 35:18 56:4 66:21,23 69:18 73:4 100:9
**produce** 117:21 117:21
**produced** 102:3 113:11
**product** 11:11
**productive** 100:11
**productivities** 118:10
**productivity** 10:23 90:21,24 91:1,10,12,17 118:13 125:14 125:17
**program** 101:2
**progressive** 57:20,20
**project** 22:7 24:2
**projected** 123:4,6
**promoted** 12:4
**proof** 38:7,12 38:25 41:3,5 41:16 129:4
**proper** 54:24 81:15 123:14
**properly** 102:23 134:1
**property** 6:20 7:7 8:6 27:17
**prove** 27:7 106:11
**proved** 56:10
**provide** 21:9 24:7 26:9 28:2 36:6 38:10,12 40:2 64:6 75:18
**provided** 17:13 21:17 25:13 27:11 28:23 29:12 40:7 54:15 63:2,16 63:19 64:3,11 76:5 79:1 102:7 107:21 108:1,10 137:12
**public** 139:4 144:19
**publication** 106:9
**publications** 111:25
**pull** 16:22 26:1 100:12
**pulled** 17:5 57:11
**pulling** 16:24
**purchased** 67:17
**pursuing** 7:19
**put** 31:19 41:23 43:6 58:3 59:14 61:10 62:1 67:8 68:3 90:17 91:20,21 93:2 101:7 104:8 111:21 112:3,5,6,9,13 116:22 119:22 126:24 127:4 127:18,23 128:7,21 129:13,17,19 138:15
**puts** 81:1 82:19
**putting** 58:22 128:5,5

**q**

**qualifications** 103:19
**qualified** 6:5 6:11 51:25
**qualify** 12:23
**quality** 44:14 44:17,18
**quarter** 118:14
**question** 6:7 21:16 30:4,15 31:1,2 33:13 45:1 46:7 49:22 63:10 68:24 69:12 78:12 84:13,14 90:5 92:8 93:6 94:7 95:16 97:15 98:2 102:20 104:12

105:17 108:3 109:17 114:14 122:1 128:16 129:2 131:1,16 132:5 133:2 134:1,22 135:1 135:23 137:14 137:14,23
**questions** 4:20 66:9 83:8 107:7 108:23 126:20 135:5,8 135:12 136:24
**quick** 49:19 68:1,2,3 108:16
**quicker** 97:14
**quickly** 66:4 112:25 113:1 119:1,16,18
**quite** 21:19 47:13
**quota** 91:4,7 136:14,15
**quotas** 91:19 125:14 136:7

**r**

**r** 19:15 20:2 143:3,3
**rack** 10:11
**radeck** 2:9 5:2 20:20,23 34:14 46:18 51:24 52:8 60:18 64:25 65:15,18 87:15 108:4,16 108:19 110:21 111:1,14 115:14 117:17 119:20 120:12 120:19 121:4 121:13,21 122:9 123:9,23 126:6,19 131:7 133:2 134:6,25 136:23 140:8
**radeck's** 17:14 129:2
**railcar** 37:14 38:8 84:5
**railcars** 43:25 47:5 53:20 83:14,18 84:16 85:2,18 86:17
**railings** 92:18
**railroad** 6:17 6:22,23 7:2,6,8 7:9,11,18 9:22 9:23,24 11:13 11:18,19 12:23 12:24 14:4,25 15:18 16:1,5,7 16:9,10 17:25 18:6,13 20:13 21:5,13,18,22 22:1,3,22 24:14 27:15 28:3,15,22 29:19 32:4,16 40:1,8 51:1,7 53:17,17,24 54:7,18 55:8 55:15 56:2,10 56:12 57:4,5,9 57:11,15,17 58:6,9,13,15 64:3,8 67:13 68:25 70:7,9 72:16 77:18 79:16,18,22 81:1,3,4 82:4 83:17 86:21 89:11 96:17 99:4 100:16 104:19,21 106:13 111:25 112:1 114:7 115:6 119:4 124:10,25 128:22 130:1 131:10 134:11 135:4 136:22 137:11 141:6
**railroad's** 23:17 40:13 56:15 57:7 70:22
**railroadclaim...** 15:2
**railroading** 57:20
**railroads** 7:17 10:1 11:6 25:4 28:24 57:23 96:23 97:4,5,5 97:7,9 103:24 106:13 112:2 114:15,23,24 115:2,9 123:1 132:12 133:17
**railway** 1:3 2:2 4:3 20:17 142:4 143:1 144:1
**rate** 31:14,18 31:19 35:2,4 62:25 63:4 93:14 122:3,6 123:5 124:17 133:3,4 134:2 134:25 135:14 136:2,4 137:15
**rated** 118:11,11
**rates** 134:9 137:5,10
**reach** 86:25
**reached** 107:17
**reaching** 81:13
**read** 25:25 26:2 27:19 100:6 109:11 110:6 116:9 121:15 133:24 138:21 142:9 144:5

**reading** 112:4 127:3
**reads** 101:5,6
**real** 57:18 125:22 128:2
**realized** 28:23 31:17 66:6
**really** 18:15 61:12 90:5 123:16 127:12 136:24
**rear** 2:15
**reason** 21:15 77:17 122:5,14 142:11 143:6,9 143:12,15,18 143:21
**reasonable** 48:25 49:6,7 49:10,12 50:6 51:2 53:7 56:21 57:2 60:1 62:4 64:7 64:12 83:19 88:1,2 89:10 89:16,20,24 90:2,3,19 91:15 92:1 93:1 94:4,6 102:1,18 107:6 107:12 112:20 113:20 115:24 115:24 120:16 120:20 121:5 121:24 122:15 122:16 124:6,9 124:14 126:11 133:18
**recall** 31:11 49:18,20
**receipt** 142:17
**receive** 5:13 79:4 116:13
**received** 16:8 21:2,13 22:2 27:11 29:24,24 30:2,8 36:24 55:21,21 78:2 84:18 135:16
**recent** 17:21,22
**recently** 65:2
**recess** 16:25 74:10
**recognize** 75:3 94:18
**recollection** 53:4
**recommend** 79:21
**recommendat...** 28:7
**recommended** 21:4
**record** 3:23 4:2 17:2 48:9 74:12,21 139:7
**records** 29:20 29:21 72:10,23 109:4 110:14
**recover** 7:3 8:9 8:23,24 40:12 46:15 88:22
**recoverable** 56:19,20 100:1 100:4
**reduce** 27:24 62:9 76:21 78:15 85:25 126:2
**reduced** 28:20 79:23
**reducing** 27:17
**reduction** 28:10
**refer** 4:7 104:14 105:19
**reference** 117:8
**referenced** 23:8 142:6
**referencing** 65:22
**referring** 4:8 12:8 13:15 38:3 73:24 100:2,24 102:15
**reflect** 89:16 109:4
**reflected** 35:8
**refrigerator** 46:4
**refused** 11:9
**refusing** 101:20 101:20
**regard** 127:1
**regroup** 57:16
**regular** 91:6
**reimbursed** 81:3
**related** 45:12 46:20 139:9
**release** 127:3
**relevant** 37:3 41:14
**relied** 24:8 36:14
**rely** 27:1,8 30:12 64:2
**remain** 10:15 11:24
**remember** 13:6 15:12 19:14 23:1,5,15 24:5 25:12 26:7 31:25 54:2 59:18 112:4
**remote** 1:12 4:10
**remotely** 3:5,8
**removed** 109:20 110:2
**render** 31:5 35:7
**repair** 29:20 35:20,22 36:20

41:13 42:8,13 43:8 47:10,14 48:14 53:25 54:14,16,17,19 56:6,12,22 61:3,4,17,22 62:8,9,10,14 65:10 69:16,18 70:4 72:9,11 73:4,18,18 77:1,7,14 79:8 79:11,17,19 80:1,9 81:11 81:18,20,25 82:1,4,15,25 83:2,11 84:24 89:11,17 90:20 93:23 94:1 96:14 99:14,16 99:20,21,23 101:16 102:6 103:2 104:10 104:15 106:18 106:20,23 107:5,11 108:23 110:7 112:20 118:12 118:22 126:9 126:15 127:6,9 128:6,20 129:13,24,25 130:9 131:6,10 131:12 132:23 136:16 138:6 138:14
**repairable** 55:7
**repaired** 55:20 55:20 61:15 69:6 72:5 83:10 89:25 90:22 103:12 105:1 130:25 131:14
**repairing** 45:18 62:18 66:24 100:24 101:3
**repairman** 65:4
**repairs** 43:24 44:14,18,22 45:16 65:10 67:1 70:5,10 72:25 93:4,5 102:25 110:14 110:15 111:18 114:11 118:14 124:6 128:7 129:14 130:11 131:23 132:9 133:16 136:10
**repeat** 49:5
**report** 35:8 36:7,9,18 44:12,13 47:17 47:25 48:12 52:25 53:6,8 53:11,14 54:6 54:23 59:16,19 61:10 63:3 83:3,5,15 84:1 94:13,17,23 95:14 96:10 98:5 117:9 134:18 136:1,5 141:12
**reported** 1:15 58:6,13 62:18 77:8
**reporter** 1:15 3:1,16 69:10 139:1,3,24 140:11
**reporting** 3:4 3:14
**reports** 34:7 90:24 91:18
**represent** 74:18 87:23 102:2 109:2,25 116:4
**representing** 4:3
**request** 15:2 43:18
**requested** 48:13 78:10 140:16,18
**required** 36:6 36:10 43:4 103:2 131:13 131:24 144:13
**requirements** 90:21
**requires** 36:13
**research** 24:7 84:2
**researched** 83:23
**researches** 30:12,18
**reserve** 73:5 135:21
**reserved** 25:22
**resolve** 50:9,25
**response** 3:15 26:10 129:1
**responsibilities** 23:9
**rest** 51:5
**restore** 69:23
**restroom** 74:5
**result** 6:24 46:17 132:4
**resulting** 47:10
**retained** 7:2,5 7:18 18:23,24 18:25 19:3,10 23:10
**retire** 7:22
**retired** 7:8 14:25 15:1 18:7 42:18
**retirement** 7:25 12:23,24
**retiring** 7:9
**return** 51:6 61:23 142:13

142:16
**returned** 61:15
**revenue** 55:14 113:4,4
**review** 16:6 21:14 22:2 35:18,21,22 47:21 48:19 49:19 64:18 65:3 70:21 78:11 107:20 107:24,25 108:9,11 117:4 122:22 142:7
**reviewed** 30:7 30:9 34:11 66:2,18 82:4 117:14
**reviewing** 29:11 30:16
**right** 6:12 8:20 8:25 16:19 19:7,11 23:25 26:22 28:8 30:3 32:1,4 36:15 40:11,14 40:17,21 44:1 44:19,21 45:13 45:19 47:16 49:13,21 50:23 54:3,5 55:2,4 60:7 61:1,20 62:16 63:9 64:9 65:14 66:3 67:12,18 67:20 68:9,14 70:25 72:22 73:12 76:8,13 76:17 77:2,25 78:16,17,25 80:5,10,11 81:8,17,20 82:15,17,20 83:12,13 84:21 84:21 85:18,21 86:3,6,11,18,22 87:5 88:5,23 91:23 92:3,5,7 93:11 98:2 105:1,12 106:6 106:25 107:7 107:14 108:14 110:16 111:6 113:7 117:24 119:9 126:19 129:15,22 130:8 131:11 134:12 135:6 135:10 137:21 138:3,21,22
**road** 17:23
**role** 8:8 11:16 11:25 27:21 28:2 46:9 96:5 136:21
**roll** 103:14
**rolling** 8:4 10:12 97:1
**ron** 4:1 127:24 142:1,5 143:2 143:24 144:2,4 144:12
**ronald** 1:9 2:3 3:18,24 17:14 32:4,15 94:13 94:17 140:4 141:5,12
**room** 3:3 4:14 4:16 127:20
**roughly** 9:14 16:12 18:11
**rsdu** 8:5
**rtb** 75:13,14
**rule** 5:9,10 37:11 40:15 67:9 74:1
**rules** 55:6 76:24 96:22
**run** 103:8 119:14
**running** 58:2
**runs** 112:8
**rush** 112:15 113:6
**rwray** 2:6
**ryan** 65:23

**s**

**s** 19:15 20:2 65:24 141:1 143:3
**safety** 45:7 62:11 123:2 133:12,12 134:13
**sal** 1:5
**salaries** 97:6
**sale** 80:25
**salvage** 76:17 76:22 77:23,24 77:25 80:4,9 80:12,13,22 81:6,8 83:10 83:19 84:19 86:1
**salvaged** 86:2
**save** 25:24 26:2 92:9
**saved** 26:23
**savings** 92:24
**saw** 9:18 135:14
**saying** 5:16 6:23 8:15 13:7 15:24 22:10 29:2 31:10 56:17,18 61:14 61:19 96:4 97:16 109:24 116:18 135:13 136:2
**says** 27:16 32:4 38:15,21 46:3 55:10 60:1,2 75:12 76:9

108:5 137:19 137:25
**sc** 2:5,10
**scare** 38:24
**scarpa** 65:2 66:17
**scarpa's** 65:3
**scene** 29:22 47:11
**scrap** 55:22 96:14 99:9,14 99:17,19 101:9 105:25
**screen** 32:3 74:14 95:4 108:17
**scroll** 17:17 32:21 94:22
**seal** 139:12
**searches** 25:10 25:19,20,23,24 26:18,19,21 27:3,7
**seat** 51:14
**second** 48:8 61:13 75:9 76:25 79:6 80:5 116:24,25
**section** 22:12 22:14 27:14
**see** 16:22,22 25:2,20 27:21 32:3,24,25 37:11 44:5,12 45:6 46:3 47:16,21 50:19 56:5 64:5,6 65:11 73:7 74:14,16 78:11 91:17,18,19,21 92:16 93:3,11 101:19 113:12 115:17,22 116:7,10 117:25 118:3,5 122:2,10,12 125:2 126:5 127:5 135:21
**seeing** 38:9 49:18,20 62:6
**seeking** 40:12
**seem** 51:11 122:15 123:20
**seems** 47:2 82:7 131:25
**seen** 34:7 49:24 53:16 55:19 68:6 88:6 103:6 104:23 106:2 109:3 113:23 114:5 116:1 117:12 119:7
**sells** 81:4
**send** 5:12 17:7 21:12 33:24
**sending** 25:2
**sends** 108:4
**sense** 99:21
**sent** 22:10 26:13 33:13,22 108:12 142:14
**sentence** 96:12 105:22
**separated** 45:10
**separately** 86:13
**september** 1:10 34:21 109:6,19 110:3 115:21 120:3,4 139:13 142:3
**service** 37:25 57:12 61:16,23 64:5 94:3 113:15 115:20 128:4,18 130:2
**services** 36:2 47:20
**setting** 106:19
**settled** 51:19
**settlement** 51:2 52:6 117:23
**settlements** 52:21 88:8
**settling** 11:17 88:10
**seven** 38:23 43:9 68:7 93:15,16
**several** 9:25 47:25
**severe** 105:5
**share** 74:14 108:17
**sharing** 125:15
**sheet** 68:1,2,3 142:11
**shifts** 62:22
**shipping** 41:25
**shit** 64:21
**shoes** 123:2
**shop** 42:8,13 44:1 45:2,4,8 62:21 65:11 67:25 72:5 90:21 91:2 103:17 110:7 114:10 118:10 119:12 125:13 126:9 127:7,9 127:15,16,18 128:6,21 129:10,25 130:9
**shops** 115:5
**short** 74:5
**show** 94:10 104:5 113:10
**showed** 134:6 134:19
**showing** 115:15 116:7

**shows** 59:10 71:18
**shugre** 19:15 20:2,5,25
**sic** 19:15
**side** 71:9 124:15
**sides** 8:21 46:22 124:10
**sighting** 11:10
**sign** 138:21 142:12
**signature** 95:10 95:11 139:22
**signed** 142:19
**significantly** 77:7
**similar** 6:21 132:17
**similarly** 93:21
**simple** 135:1 137:25
**sir** 4:24 17:16 39:23 75:15 94:19
**sit** 36:18 48:12 49:23 73:14 78:25 87:7 107:20 113:6 130:14 131:4 136:19
**site** 49:3 88:4 109:7,21 110:2 120:3
**sitting** 26:22 57:24 135:19 135:23
**six** 45:5 58:11 58:12 71:1,8,9 71:10,12,14 92:22 124:18
**size** 105:3
**slip** 9:9
**slower** 17:18
**slowly** 17:18
**small** 84:5,5,9 87:23 99:19 109:10
**sold** 12:6,8
**sole** 15:18
**solely** 23:23 106:8
**solutions** 142:23
**somebody** 24:1 28:12 41:1 60:1,2 71:5,7 125:18 127:7
**someplace** 16:18 59:24
**somewhat** 137:24
**soon** 67:23 130:3
**sorry** 4:22 5:18 16:20 19:6 51:16 60:22 64:24 65:16,18 66:22 77:5 80:15 85:7,9 99:22 102:22 103:20 107:9 108:1
**sort** 117:25 123:12
**sounds** 52:5,10 52:18 88:19 94:6
**source** 14:24
**south** 1:1 5:9 139:4,13
**southern** 1:3 2:2 4:3 12:9 14:10 20:17 23:14 24:13,16 24:19,20 27:12 29:12 40:12 44:15 46:14 48:25 49:15,16 50:4,7 57:9,23 60:14,24 61:15 62:18 63:1,7 63:15 64:12 65:1 76:5,10 84:15 87:10 88:21 96:7 100:7,19 101:1 101:15 102:10 102:11,25 105:22 111:9 112:3 113:12 114:23 115:3 116:14 120:21 125:5 127:4 132:16 135:15 135:17 137:11 142:4 143:1 144:1
**southern's** 50:13 99:23 107:4,11 114:18
**span** 122:7
**speak** 23:2
**speaking** 23:1
**specialist** 8:4
**specific** 22:4 25:6 44:22 110:19 124:3 132:22 137:8
**specifically** 22:6 24:10,15 25:18 38:4 100:2 134:4
**spend** 39:20
**spent** 62:18 72:15,24 73:3 73:18 105:23
**spit** 58:24
**spot** 43:8,9 90:18
**spreadsheet** 74:15,24 117:11 121:8 134:6 135:14 141:8

**spreadsheets** 38:10 116:6,14 116:17 117:7
**st** 2:9
**stages** 69:21 70:3
**stamped** 74:23
**stand** 18:8 77:16
**standard** 96:22 97:6 105:18
**standards** 105:16 106:2
**start** 71:11 118:17 125:2
**started** 9:21 15:1 17:23 35:22 42:14 86:9 110:15
**starting** 18:1 118:4 120:15
**starts** 120:5
**state** 3:10,12,14 3:22 5:10 69:23 139:4
**stated** 41:4
**statement** 36:10 46:11 60:21 105:20 106:10,11 126:25
**states** 1:1 37:15
**station** 9:10
**status** 89:12,18 90:1 132:7
**stay** 11:21 93:12,13,17 127:19
**stays** 79:24
**ste** 2:4
**steam** 103:25
**stege** 65:23 66:17
**stege's** 66:2
**step** 97:24,24 98:1,1
**steps** 70:2 92:18
**stick** 75:23
**stock** 8:4 97:2
**stop** 17:19 34:1
**stopped** 115:9
**storage** 25:1 57:14 58:3,5 111:21 112:6 112:13 118:19 119:18,22 126:25 127:5,9 127:23 128:5 128:10,14,18 128:21 129:3,6 129:8,9,12,17 129:17,20,20 129:21,25 138:15
**stored** 57:12,13
**stores** 130:1
**straighten** 59:14 60:3
**stretching** 71:11
**struggles** 74:13
**stuff** 51:10 59:9 64:22 73:8 92:19 101:12 104:1 112:1 118:10 127:17
**stuttered** 13:25
**submit** 43:18
**submitted** 16:6 53:18,24,25
**subpart** 98:19
**subpoena** 25:14 26:10
**subscribed** 144:14
**substantively** 4:25
**subtract** 78:7
**successfully** 28:9
**sudden** 57:22
**sued** 50:3
**suffered** 6:23
**suffering** 112:2 114:15
**suggest** 40:25 104:15
**suggesting** 136:20
**suit** 115:7
**summarized** 85:11
**summary** 74:25 75:7,13 85:21 113:17 115:16 116:5 118:1 141:9
**superintendent** 125:13
**supplemental** 94:12,17 141:11
**supplied** 92:23
**supplier** 68:22
**supply** 68:17 68:17,21 69:4 132:12
**support** 56:16 105:20
**supported** 35:13
**supporting** 29:12 117:10 117:13
**supports** 104:10
**supposed** 80:23 91:8
**sure** 31:7 33:5 54:3 87:18 95:8 109:3 128:12

**surprise** 50:5
**surprising** 82:13
**suspect** 135:4
**sustained** 46:17 103:2 130:20 130:23
**swap** 92:21,22
**switching** 106:19 129:18
**sworn** 3:11,19 144:14
**system** 25:1

**t**

**t** 17:14 32:4,15 65:24 94:13,17 141:1,5,12 143:3,3
**take** 45:8 51:19 59:13 69:22 71:20,20 74:5 74:8 76:20,21 77:6 78:6,14 80:7 82:1 88:9 91:3 93:22 101:9 104:18 108:5 119:4 125:11
**taken** 1:14 109:7 110:1,7 120:2 128:17 128:20 130:1
**takes** 56:14 90:20 91:5 93:23 105:1 125:18
**talk** 4:19,23,25 28:15,17 52:1 52:16 86:12 97:18 124:22
**talked** 44:5 88:8,16 129:11 136:6 137:6
**talking** 24:22 28:18 60:6 63:23 70:21 76:4 98:20 102:12 103:11 110:18
**tank** 11:8
**task** 96:8
**tasks** 71:25
**team** 8:5 23:24 24:1 118:22
**technical** 74:4
**technically** 42:25
**technological** 17:3
**tell** 11:4 17:12 26:7 36:1 38:4 50:24 55:2 56:24 66:9,14 75:6 90:13 97:13 121:14 121:16 131:2
**telling** 26:21,24 36:17 70:9 135:5
**tend** 41:10
**term** 24:21 54:16 73:22 128:10 129:19
**terms** 23:16 48:11 69:21 106:16
**testified** 3:19 6:1,3 117:10
**testifying** 3:10
**testimony** 4:21 5:1,14,20 66:16,18 77:11 110:5,12 142:9 142:17 144:8
**text** 5:12,13
**thank** 126:20 138:17
**that'd** 119:25
**thereof** 139:10
**thing** 38:15 44:25 67:25 70:6,25 99:6 113:5
**things** 28:19 39:8 40:5 48:3 53:17 55:23 66:25 98:23 99:1,11 112:8 112:16 113:8 117:21 128:9 128:12 133:7 133:22 136:7
**think** 9:18 12:21 13:6,17 14:12,14 15:10 20:1 28:5 34:22 37:11 38:6,14,25 39:7 41:15 49:7,10 51:22 54:24 55:13 56:4 59:15,17 59:19,22 60:15 60:19,25 61:10 65:9,21 73:5 74:1 81:19,21 83:4 88:17,22 88:24 89:1,2 89:19,20 90:4 92:14 93:1 95:4 96:21 97:17 99:1 100:13,18 103:15 105:25 107:3 111:4 112:16 113:5 115:8 120:20 124:6 125:1 126:3 127:4,10 128:16 131:6 137:23
**third** 6:23 8:24 12:12 15:12 20:14 27:15

82:9 115:4
**thought** 34:23 53:7 54:19 65:14 70:23 84:25 85:9 122:2 128:2
**thousand** 33:1
**three** 15:3 33:11,12 53:2 53:19 57:6,14 62:22 63:22 67:10 74:15 75:24 76:12 77:2 83:14 84:16 85:1,2 106:21,24 109:6,20 110:20,22 112:13 115:12 118:2 125:11 126:23 127:6 127:15,18 128:19 129:2 132:3
**thumb** 67:9
**tie** 119:25
**tight** 101:23
**till** 34:3
**time** 1:11 7:17 7:25 11:25 12:5,8 13:16 34:18,23 37:16 38:17,22 39:1 39:20 43:15 45:4 47:19,24 55:18 56:14,20 56:21 57:2,7 61:24 62:14 69:5 71:15,17 72:24 73:17 74:4 77:1 82:3 84:6,8,11 87:16 89:10,17 89:25 90:16,19 91:16,16,18,19 92:1,9 93:4 95:20 98:14,15 98:17 103:17 104:25 105:23 106:14 111:8 111:17,17,24 112:14,20 113:20 114:14 114:18,22 118:8,12 120:7 120:15,22,23 120:25 121:17 122:7 123:25 124:3,14 125:24 126:11 126:14,15 130:10 131:6 131:11 132:14 132:18 133:10 133:14 136:16 138:18 142:18
**timeframe** 142:8
**timeline** 108:21 120:1
**timelines** 104:10,16
**times** 5:22 18:10,11 46:8 93:16 125:10 134:20
**today** 4:6,18,21 4:24 5:14 7:15 17:8 18:20 20:19 34:24 36:18,19 46:8 48:12,22 49:23 66:9,10 73:15 78:25 87:7,12 107:20 130:14 131:4 135:19 135:24,25 136:19
**today's** 107:17
**together** 71:10 79:18 87:4
**told** 14:12 22:12,23 30:11 30:18,20 40:18 45:14 46:8 50:1 53:20,21 80:24 87:25 88:2 95:19 116:22 117:2 127:8,22 129:5 131:7 137:8
**tom** 19:15 21:2 21:6 22:9 23:14 53:21
**tonnage** 92:25
**took** 12:14,15 12:17 14:1 58:12,14 64:25 69:5 70:11,22 84:21,23 89:11 89:17 108:24 112:12 114:11 131:10 136:9 136:16
**toot** 123:19
**top** 75:12 94:16
**topics** 6:10
**total** 18:18 27:24 28:10 32:18,23 62:17 63:4 72:19 85:23 86:6 94:4
**totals** 27:18
**tough** 93:6 132:5
**town** 110:8
**track** 10:12 43:9 47:10,14 48:14 86:21 90:18 127:10 127:10,11,23 127:23 128:23 129:6,8,9 138:6,11,15

**tracks** 43:7 127:16
**traction** 92:22 92:23 100:13 101:10
**train** 9:9 10:21 10:23 12:3,4,6 112:8 120:24
**training** 12:4,6
**trains** 10:23 24:25 57:19,21 58:1,2 112:7 119:15 126:9
**transcript** 2:15 138:21 139:6 142:6,19 144:5 144:8
**transpired** 16:25 74:10
**travelers** 19:10 19:13,20,23 20:5,8,12 21:3 21:24 22:3,5 23:11,19,20 50:1,21 75:18 76:12 87:14
**treating** 46:10
**trial** 41:10
**trick** 31:2
**tricking** 95:4
**tried** 39:12 128:14,15
**trip** 9:9
**tripled** 122:7
**true** 139:6 144:8
**truly** 46:21
**truth** 26:8
**try** 8:9 24:11 28:2,25 40:17 74:13 75:7 92:16 116:3
**trying** 7:3 8:20 8:22,24 14:20 15:23 17:24 21:21 24:2 31:3 37:21 38:1 60:7 61:12 64:20 66:4 75:9 79:10 87:17,18 92:7,12 111:5 113:3 117:3
**turn** 43:15 108:14
**turned** 14:17
**turning** 75:11
**turns** 80:1
**two** 8:5 12:17 15:2 22:22 34:7 43:9,16 50:9 51:3 53:17 55:23 61:14,17,22 62:13 63:22 65:1 71:8,8,9 74:3 77:4 79:17 86:8 87:3 88:23 89:4 98:22,25 106:21,23,25 107:5,11 113:19 114:24 115:12 125:10 127:14 128:9 135:12
**type** 7:16 16:5 24:6 25:7,19 29:14,23 30:6 38:10 93:8 95:21 131:13 134:15 136:14 136:15
**types** 18:17
**typically** 119:4

**u**

**u** 19:15,15 20:2
**uh** 18:5 33:7 84:22
**umbrella** 12:24
**umpteen** 103:24
**under** 9:8 24:20 26:13 27:14 76:9 79:24 90:23 101:2,3 105:9
**understand** 4:8 4:17 5:5,7,11 5:16 6:7 8:21 18:15 21:21 24:3 29:2 30:24,25 31:3 31:8,10 33:5 36:4,5,9 38:2 47:23,24 49:25 50:3 55:24 56:17 59:4,5 60:8 75:10,19 87:18 90:5 92:3 93:18 97:16,17 102:22 106:5 108:4 116:18 117:22 118:1 122:6 124:11 124:22,24 125:12 128:3,8 137:5
**understanding** 108:25 111:2 111:20 121:1 126:12 133:21
**understood** 71:21 75:24 86:20
**unfortunately** 14:2
**union** 43:4
**unions** 115:8
**unique** 42:15
**unit** 8:4 55:20 61:4 72:18 77:25 78:23

79:6,9 82:1 91:9,21 118:18
**united** 1:1
**units** 58:3 61:2 91:10 115:2 125:16 127:5
**unreasonable** 64:12 115:12 116:1,2 122:18 126:4
**unusual** 99:10 106:17
**upgrades** 99:24
**upper** 118:15
**ups** 108:17
**usable** 39:20 101:10
**use** 24:21 54:16 54:23 55:11,13 55:20 56:2,13 56:18 57:1 58:5,10,16,18 58:21 59:16,20 60:9,15,24 61:5,8,16,19,25 63:1,12,20 64:1,8 76:20 77:13,17 79:11 79:17,19,24 80:2,3,23 81:12,13,18,19 81:21,24,25 82:8,18,20,25 83:1,1,11 86:8 86:10,12,16 88:20,22,23 89:9,15,23 90:10 92:13 93:22 94:5 96:15,22 97:10 100:12 104:2 104:22 105:11 105:13 106:15 106:19 107:5,7 107:14 111:9 113:18,21,24 114:3,5 115:20 120:21,25 121:24 123:5 124:7,13,16,18 124:20 136:25 137:1,4,11,16 137:19,20 138:2,5,8,10,10 138:12
**used** 45:17,20 55:14 57:21 58:25 59:1 62:9 64:13 80:9 96:22 102:6 137:3,6 142:19
**using** 39:7 56:15 61:6 63:6,6 73:22 77:2 83:25 89:7,24 96:24 106:13 125:25 129:18 130:2
**usually** 16:2 25:11,24 26:3 58:10 67:9 68:5 80:19 117:19 124:14 129:18

**v**

**v** 142:4 143:1 144:1
**vacation** 123:3 133:10
**valuation** 96:15
**value** 28:5 35:20 36:20 37:8 39:13 40:8,14,18,24 53:7 56:3 61:18 62:24 63:11,25 64:4 73:24 74:1 76:10,21 77:2 77:8,12,12,13 77:14,17,19,23 77:25 78:5,7,8 78:13,22 79:2 79:7,12,19 80:2,3,4,22,25 81:4,6,9,14 82:11,23,25,25 83:2,10,17,18 84:14,19,24 85:2,17,17,23 86:1,5,16,25 87:4,9,20 89:16 93:21 94:5 96:25 106:18,24 107:12 136:25 137:2 138:3
**values** 39:19
**various** 29:21 134:6
**vendors** 67:17
**verbal** 22:24
**verify** 37:22 142:9
**veritext** 142:14 142:23
**veritext.com** 142:15
**versus** 96:14
**vice** 15:24
**vicinity** 10:13
**video** 59:8 65:7 65:8
**view** 76:19 78:6 79:9 80:3 81:11 88:21 113:20
**viewed** 46:9
**violation** 45:7
**virtually** 34:16
**vs** 1:5

**w**

**wabtec** 92:23 100:6,7,20 101:1,12,15 102:9,13,16,25 103:12
**wage** 133:7
**wait** 34:2,3 70:13 103:21 116:23
**waited** 31:20 31:20,21 70:14 132:13
**waiting** 34:4 35:16,25 37:4 70:20 117:5 128:6 129:13
**waive** 138:22
**walk** 71:5
**want** 5:1 17:20 31:7 35:23 48:19 52:22,24 54:5 65:8,9 74:5 78:18 79:18 89:3 90:3 94:22 95:4 108:20 113:10 114:17 119:12 122:19 122:25 123:19 124:11,13 125:23 127:12 127:17 131:2 132:19
**wanted** 22:11 26:14 62:23 78:4 95:7,16 97:16 118:20
**wants** 55:15
**warehouse** 67:10 128:21
**watched** 44:3,6
**watching** 91:11 118:13
**way** 11:17 35:17 36:1 37:5 55:24 81:15 88:12 90:8 92:1 94:4 98:15 101:5 102:24 106:2 107:6,12 113:8 125:3,15 130:5 132:25 135:3
**wayne** 109:5 127:8,8,10 128:2 129:5
**ways** 92:14
**we've** 4:4 68:23 74:3 85:25 86:2,24 87:19 88:7 99:7 132:13
**weak** 70:19
**wear** 51:14
**website** 25:6
**weeds** 111:6
**week** 43:18 132:14
**weeks** 104:10 104:16,24
**weight** 100:12
**welcome** 138:19
**welfare** 123:3 133:9
**went** 4:2 12:25 25:7 29:3 34:6 39:5,7 88:17 95:22 115:5 118:19
**west** 15:12
**wheels** 115:1
**white** 2:3
**whoa** 56:9
**wife** 4:15 15:23
**willing** 104:20
**witness** 3:10,11 6:5,10 32:18 46:19 52:9 60:19 111:13 114:13 117:16 119:7 120:9,18 121:3,12,20 122:18 123:16 125:8 126:18 138:20 139:11 140:2 142:8,10 142:12,18
**witnesses** 29:8 117:10 121:16
**won** 115:8
**word** 90:2
**work** 7:6,17,18 9:12,19 12:19 12:25 13:1 14:4 15:25 21:10 22:7,15 23:7,16,21,22 29:14,21 30:9 30:19 31:15,24 33:16 34:8 35:6,10,15 36:6,25 42:17 44:6 45:12 51:4,7 62:6 64:19 71:9 72:1,10,10,13 72:23,24 90:16 91:2,12,12 95:21 97:21 100:19,25 102:11,12,16 108:8 126:2 127:25 128:15 133:11,19 136:13 137:9
**worked** 8:3,17 8:21 9:3 13:4,5 13:7,19 18:12 18:19 19:19 20:7 42:7,22 42:24 43:1,11

43:14 59:2 62:21,22 72:18 102:4,5 125:20 132:15 136:11
**working** 7:24 9:22 14:23 19:1 39:25 40:2 45:2 46:10 50:2 62:5 67:6,14 71:2 72:7,15 91:20,20 96:1 118:10,17 120:24 132:10 136:15
**workings** 92:20
**works** 97:9 133:6
**world** 51:13 125:22
**worse** 66:13
**wow** 18:20 29:16 88:14
**wrap** 66:15 97:14 128:15
**wray** 2:3 3:21 4:1 16:23 17:1 17:7,11 32:20 46:23 48:10 52:2,4,19 60:20 65:16,20 65:24 66:1 69:11 74:8,11 74:21 75:2 94:15 108:14 110:18,23 111:11 114:12 117:15 119:6 120:8,17 121:2 121:11,19 122:8,17 123:15 125:7 126:17,22 140:6,10
**wreck** 53:3 126:24
**written** 22:24 48:11 65:7
**wrong** 37:22 55:3,4 89:2

**x**

**x** 37:16 58:19 119:11 140:1 141:1

**y**

**yard** 10:9,10,12 10:14,17,19 12:2
**yeah** 13:12,15 14:2,23 16:13 32:12,18,22 33:10 40:6 42:11,11 49:7 59:8,22 60:13 61:11 63:6,14 66:6,23 67:3 68:20 69:19 71:12 72:14 73:25 78:20 81:10 82:12,22 82:22 83:4,5 84:4 85:5,11 85:13,19,22,22 85:23,24 86:8 88:6 89:14 90:4 95:9 98:7 104:1 105:13 108:3 111:2 116:8 119:17 120:9 121:12 125:4 130:22 137:13 138:9
**year** 9:23 12:17 33:11,12 42:17 42:18,20,22 57:13,15 58:21 58:23,24 60:4 60:5 62:4 69:8 88:14 90:25 97:8 104:22 115:11 127:19 132:15 134:20
**yearly** 45:5 97:6 134:15
**years** 5:24 7:23 9:12,25 11:23 11:23 12:21,22 14:15 16:11 31:17 44:4 51:18 53:16 103:23 104:11 104:20,24,24 106:3 109:10 112:11 113:20 117:20,20 124:8
**yell** 44:7
**yep** 74:7
**york** 9:22,23 10:5,16
**youtube** 59:8

**z**

**zero** 60:24

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.