UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Norfolk Southern Railway Company,<br><br>Plaintiff,<br><br>v.<br><br>American Italian Pasta Company,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 3:25-cv-6618-SAL<br><br>**PLAINTIFF'S MOTION TO EXCLUDE THE TESTIMONY AND OPINIONS OF ALLEN POWERS AND INCORPORATED MEMORANDUM OF LAW** |

PLEASE TAKE NOTICE that Plaintiff Norfolk Southern Railway Company ("Norfolk Southern" or "NS"), by and through its undersigned counsel, and pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), hereby moves this Court for an Order excluding the expert testimony of Allen Powers. The grounds for this Motion are set forth in the incorporated memorandum of law in accordance with Local Civil Rules 7.04 and 7.05 (D.S.C.). For the reasons stated therein, Mr. Powers's opinions are not the product of reliable principles and methods reliably applied to the facts of this case, are not based on sufficient facts or data, and, by his own admission, will not assist the trier of fact. Norfolk Southern respectfully requests that the Court exclude his report and testimony in their entirety.

## INTRODUCTION

This case arises from a July 11, 2022 collision in which a locomotive operated by Defendant American Italian Pasta Company's ("AIPC") employee Rico Blanchett ran over a double switch point derail and came to rest in the foul[1] of Norfolk Southern's mainline track, where it was struck by NS Train 238. Compl. ¶¶ 23-25, ECF No. 1. To deflect responsibility for its employee's conduct, AIPC offers Allen Powers, a mechanical engineer, who seeks to opine that the Norfolk Southern train crew could have stopped short of the collision, or at least reduced its severity, by braking earlier. *See* Ex. 1, Powers Report.

Those opinions cannot survive Rule 702. Mr. Powers:

- Admitted that the central question of whether and when the crew should have recognized that the AIPC engine was fouling Norfolk Southern's mainline track "is what I think of as a jury evaluation" and that he does "not have an opinion about that." Ex. 2, Powers Dep. 110:2-111:20.
- Expressly acknowledged that he did not attempt to determine the point at which the Norfolk Southern crew could have recognized that the AIPC engine was in the foul and that responsive action was required. *Id.*
- Admitted that the Norfolk Southern crew could not have stopped short of the AIPC engine and avoided the collision based on the crew's testimony regarding the actual distance at which they recognized it was in the foul. *See id.* at 152:22-153:13.
- Conceded that his opinion about reduced derailment severity is "just completely common sense" for which he "cannot cite ... to anything" in peer-reviewed studies or literature in

[1] In the foul means something is in close enough proximity to the tracks where it could be struck by a passing train or other type of rail equipment such as a hi-rail or track machine. *See* Compl. ¶ 25, ECF No. 1.

support. *Id.* at 153:14-156:2.

- Calculated the train's stopping distance using a deceleration rate he lifted from the event recorder data of "a previous different train accident," bracketed by figures taken from two general publications and a brake build-up time he borrowed from a figure another expert "put together in prior litigation." Ex. 1, Powers Report 6; Ex. 2, Powers Dep. 50:4-20, 75:17-22.
- Did not account for the weight of the train, the grade of the track, or the type of braking system – all of which are variables he conceded affect stopping distance – because they "did not factor into the calculations." Ex. 2, Powers Dep. 83:10-84:18.

The Fourth Circuit requires that engineering and accident reconstruction opinions rest on "specialized *knowledge* and not on belief or speculation," and that the expert reliably connect his data to his conclusions rather than bridge the gap by his own say-so. *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999); *see O'Connor v. Fairfax Taxi, Inc.*, 188 F.4th 336, 354 (4th Cir. 2026). Measured against that standard, Mr. Powers has failed to meet the requirements of Rule 702 because he cannot identify the distance at which the Norfolk Southern crew should have recognized that the AIPC engine was in the foul, he admits the collision could not have been avoided based on the crew's testimony regarding the actual distance at which they recognized it was in the foul, and cannot say what the consequences of the collision would have been had the crew braked at a particular distance prior to impact. The Court should perform its gatekeeping function and exclude Mr. Powers's opinions.

## FACTUAL BACKGROUND[2]

[2] A more detailed statement of facts is included in the Memorandum in Support of Norfolk Southern's Motion for Summary Judgment. This memo only briefly references those facts pertinent to the present motion.

On the morning of July 11, 2022, AIPC's employee Rico Blanchett was operating and moving a locomotive by remote control on AIPC's Storage Track 1, pulling six loaded grain railcars toward Norfolk Southern's mainline. Compl. ¶¶ 15, 20, ECF No. 1.[3] Blanchett rode the sixth railcar at the rear, which was the car farthest from the locomotive, as he moved the railcars. *Id.* at ¶ 21. Blanchett failed to set up the air brakes on the locomotive and railcars properly, which significantly reduced braking capability, and he lost control of the locomotive. *Id.* at ¶¶ 22, 23; *see also* ECF No. 36-1, AIPC 30(b)(6) Marshall Dep. 22:10-23; ECF No. 36-2, Blanchett Dep. 101:4-103:22. AIPC admits that Blanchett's conduct and methods of operating the locomotive violated his training and instructions. *See* ECF No. 36-1, AIPC 30(b)(6) Marshall Dep. 22:1-28:25, 64:22-25, 149:1-150:23.

At the time of the incident, Norfolk Southern had installed a device known as a double switch point derail near the location where the AIPC industry track connected with the Norfolk Southern mainline track. A derail, as the name implies, is a device that is intended to derail moving equipment off the industry track and away from the mainline track in hopes that the equipment does not foul the track and cause an accident. Blanchett and AIPC both knew that AIPC equipment was not allowed to move through the derail. *See id.* at 23:8-24:18; ECF No. 36-2, Blanchett Dep. 157:6-21. Unfortunately, because Blanchett allowed the engine and railcars he was operating to move through the derail while still under power, even though the derail forced the equipment to the left away from Norfolk Southern's mainline track as designed, the derailed equipment still came to rest "in the foul" of Norfolk Southern's mainline track. Compl. at ¶ 25.

After the derailment, Blanchett left the scene without warning or notifying Norfolk

---

[3] All allegations referenced in this paragraph and the following paragraphs are proven and undisputed based on the depositions of AIPC's corporate representative, Rhen Marshall, and Rico Blanchett. *See* ECF Nos. 36-1 and 36-2.

Southern that AIPC's equipment was fouling the mainline, and without asking anyone at AIPC to do so. *Id.* at ¶ 26. AIPC gave no warning or notice of any kind to Norfolk Southern. *Id.* at ¶ 27. At approximately 8:14 a.m., Norfolk Southern's Train 238, whose crew was unaware of the derailed equipment, collided with the locomotive AIPC left in the foul, derailing Train 238. *Id.* at ¶¶ 30, 31. The Norfolk Southern crew members operating Train 238, Raymond Rightmier and David Small, were injured as a result of the collision. *Id.* at ¶¶ 34, 35. Norfolk Southern filed the present action on July 1, 2025, asserting a cause of action for contractual indemnity alongside claims for equitable indemnification, negligence, trespass, and punitive damages. *See id.*

AIPC retained Mr. Powers to investigate and reconstruct the collision. *See* Ex. 1, Powers Report 2. His February 25, 2026 report offers four principal opinions: (1) the locomotive camera footage is "low resolution, only 5 frames per second, and captured with a wide-angle camera lens," such that a "50mm lens provides a better representation of how the scene appears to the human eye" and the AIPC locomotive "would have been more conspicuous" than it appears in the video; (2) AIPC's locomotive was visible to the Norfolk Southern crew "from more than 2000 feet away from impact"; (3) the Norfolk Southern train's total stopping distance from 31 mph (its speed at 1,000 feet from impact) was "between 494 and 667 feet," and a video Mr. Powers created showed the train stopping 419 feet short of impact had braking begun at 1,000 feet using a 1.5 second perception/reaction time and a 0.0825 g deceleration rate; and (4) earlier braking "would have meaningfully decelerated" the train, "which would be expected to result in a smaller numbers [sic] of cars de-railing and overturning." *Id.* at 5, 7-8.

Mr. Powers expressly limited his report to "the reconstruction issues of the accident." *Id.* at 8. He testified that he is not offering human factors opinions, that whether and when the Norfolk Southern crew "should have" recognized that the AIPC locomotive was in the foul and responded

is “not in my opinions,” and that this question “is what I think of as a jury evaluation.” *See* Ex. 2, Powers Dep. 58:6-21; 110:2-19; 111:3-20.

## LEGAL STANDARD FOR EXPERT TESTIMONY

Rule 702 permits expert testimony only if the proponent “demonstrates to the court that it is more likely than not” that:

> (a) the expert’s scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Rule “imposes a special gatekeeping obligation on the trial judge” to “ensur[e] that an expert’s testimony both rests on a reliable foundation and is relevant to the task at hand.” *Nease v. Ford Motor Co.*, 848 F.3d 219, 229-30 (4th Cir. 2017) (quoting *Daubert*, 509 U.S. at 597). The “importance of [the] gatekeeping function cannot be overstated.” *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 283 (4th Cir. 2021) (quoting *United States v. Barton*, 909 F.3d 1323, 1331 (11th Cir. 2018)). In *Sardis*, the Fourth Circuit held that “the district court abused its discretion” and “improperly abdicated its critical gatekeeping role to the jury” by “rul[ing] that the issues of relevance and reliability impact only the weight of the experts’ testimony, not their admissibility” and could be sufficiently addressed by cross-examination. 10 F.4th at 278-79, 281. As the Fourth Circuit made clear, “credibility is entirely distinct from reliability and relevancy, which are *preconditions* to the admissibility of expert testimony.” *Sardis*, 10 F.4th at 282 (emphasis in original) (citing *Nease*, 848 F.3d at 229).

As the proponent, AIPC “must establish [admissibility] by a preponderance of proof.” *Funderburk v. S.C. Elec. & Gas Co.*, 395 F. Supp. 3d 695, 706 (D.S.C. 2019) (quoting *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001)). Effective December 1, 2023, Rule 702

was amended to "clarify and emphasize" that preponderance standard and to reject the many decisions that had treated "the sufficiency of an expert's basis, and the application of the expert's methodology," as "questions of weight and not admissibility" – an approach the Advisory Committee called an incorrect application of Rules 702 and 104(a). *See* Fed. R. Evid. 702 Advisory Committee's Notes, 2023 Amends. Amended Rule 702(d) further "emphasize[s] that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Id.* The Fourth Circuit has confirmed that the amended Rule governs and places the burden on the offering party, and that an opinion connected to existing data "only by the ipse dixit of the expert" does not meet the burden. *O'Connor*, 188 F.4th at 354 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). If an expert is "relying solely or primarily on experience, then the [expert] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 Advisory Committee's Notes, 2000 Amends. Rule 702 "does not permit an expert to function as a narrator or advocate under the guise of specialized experience." *United States ex rel. Shepherd v. Fluor Corp.*, No. 6:13-CV-02428-JD, 2026 WL 105841, at *5 fn2 (D.S.C. Jan. 14, 2026).

In assessing reliability, courts consider, among other non-exclusive factors, (1) whether the "expert's theory or technique 'can be (and has been) tested'"; (2) whether it "has been subjected to peer review and publication"; (3) its "known or potential rate of error"; and (4) whether the "expert's methodology is generally accepted" in the relevant field. *Sardis*, 10 F.4th at 281 (quoting *Nease*, 848 F.3d at 229). The reliability inquiry is flexible. *Sardis*, 10 F.4th at 281 (quoting *Daubert*, 509 U.S. at 594-95). At its core, a reliable opinion must rest "on scientific, technical, or other specialized *knowledge* and not on belief or speculation," and any inferences must be "derived

using scientific or other valid methods." *Sardis*, 10 F.4th at 281 (emphasis in original) (quoting *Oglesby*, 190 F.3d at 250).

Helpfulness is the "touchstone" of Rule 702 and expert testimony is presumed helpful "unless it concerns matters within the everyday knowledge and experience of a lay juror." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) (citing *Persinger v. Norfolk & W. Ry. Co.*, 920 F.2d 1185, 1188 (4th Cir. 1990); *Friendship Heights Assocs. v. Koubek*, 785 F.2d 1154, 1159 (4th Cir. 1986)). "Trouble is encountered only when the evaluation of the commonplace by an expert witness might supplant a jury's independent exercise of common sense." *Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1055 (4th Cir. 1986). A common-sense and common-knowledge opinion "is not rendered admissible as an expert opinion merely because it is supported by scientific data or other specialized knowledge." *Koenig v. Johnson*, No. 2:18-CV-3599-DCN, 2020 WL 2308305, at *8 (D.S.C. May 8, 2020).

## ARGUMENT

### I. Powers's Opinions on Crew Perception and on What the Locomotive Video "Really" Shows Will Not Assist the Jury and Invade Its Province.

Several of Mr. Powers's opinions fail the threshold requirement of "fit" because they will not assist the trier of fact and invade the jury's exclusive role in weighing the evidence. Relevance and fit are "a precondition to admissibility." *See Sardis*, 10 F.4th at 282. Expert testimony is no longer presumed to be helpful if it "concerns matters within the everyday knowledge and experience of a lay juror," and must be excluded where "the evaluation of the commonplace by an expert witness might supplant a jury's independent exercise of common sense." *See Kopf*, 993 F.2d at 377 (citing *Persinger*, 920 F.2d at 1188; *Koubek*, 785 F.2d at 1159); *Scott*, 789 F.2d at 1055.

Mr. Powers opines that the Norfolk Southern engine's cameras "are misleading in the sense

of the information they may give a viewer of how this scenario played out visually," and that the wide-angle lens makes engines that are fouling the track "look like they're farther away." Ex. 2, Powers Dep. 105:2-12. These opinions do not meet the requirements of Rule 702. The video of the accident will be presented at trial. Thus, the jury will watch the same video footage that Mr. Powers saw, making his thoughts and opinions about the video's quality unnecessary and irrelevant. The Fourth Circuit has affirmed the exclusion of experts offered to interpret surveillance images precisely because the "comparison of photographs is something that can sufficiently be done by the jury without help from an expert." *United States v. Dorsey*, 45 F.3d 809, 815 (4th Cir. 1995). Mr. Powers's description of his observations of the video quality would "supplant a jury's independent exercise of common sense," as the jury can watch the same video and make its own observations. *See Scott*, 789 F.2d at 1055.

Mr. Powers's opinion that a "50-millimeter lens is better" than what the train video shows compounds the problem. *See* Ex. 1, Powers Report 5. His assertion that a 50 mm camera focal length "best replicates the human eye" rests on a photography textbook and a camera perception article, not on his engineering or accident reconstruction expertise, and the Norfolk Southern engine's actual camera focal length was 30 mm. *See id.* at 5; Ex. 2, Powers Dep. 126:10-127:10. Mr. Powers is not a human vision or human factors expert, and this opinion exceeds the bounds of his expertise. *See* Ex. 2, Powers Dep. 58:6-21. Additionally, when asked how his animation accounted for factors such as the windshield and glare from the sun "in trying to replicate the view of what these guys inside the cab would see," Mr. Powers admitted "that wasn't the point of our visualization" and clarified that "the whole point of our visualizations was to allow the jury to see the videos that you see from train positions are misleading," not to say "this is what [the crew]'s perspective was." *Id.* at 151:15-152:11. If his animation is not intended to replicate what Norfolk

Southern's crew would have seen with their own eyes, then his testimony and opinions relying on it should be excluded. For this same reason, Mr. Powers's opinion that a 50 mm camera focal length "best replicates the human eye" is also irrelevant and would only serve to confuse the jury. *See id.* at 126:10-18.

### II. Powers's Opinions That the NS Engine Would Have Stopped Short of the Collision Point, and That the Damage Would Have Been "Reduced in Severity" and Resulted in Fewer Cars Derailing Had the NS Train Crew Begun Braking Earlier Are Inadmissible Speculation.

Mr. Powers's own disclaimers reveal that his opinions relating to whether the Norfolk Southern crew could have stopped or slowed the train prior to impact are inadmissible speculation. Mr. Powers created an animation "demonstrating that the [NS] train could have come to a stop using a 1.5 sec P/R time of the [AIPC] locomotive in the foul began when the [NS] train was 1000 feet from impact and ... achieved a 0.0825g deceleration rate. This shows the [NS] train stopping 419 away from impact." Ex. 1, Powers Report 7. However, he testified that the question of whether and when the crew should have recognized that the AIPC locomotive was fouling the mainline track is "what I think of as a jury evaluation." Ex. 2, Powers Dep. 111:3-20. He also stated that "where they should have [recognized the AIPC engine was in the foul], that's not in my opinions." *Id.* at 110:2-13; *see also* 113:10-17. Finally, he admitted that the question of at what point the crew had an obligation or responsibility to initiate emergency braking is "really not in my area" because he lacks experience with train handling. *See id.* at 112:5-8; *see also* 26:3-27:18.

Yet his opinion that the Norfolk Southern train could have stopped short and avoided the collision depends on an assumption that the NS crew should have recognized the AIPC engine as fouling the mainline track at a distance of 1,000 feet away, a fact Mr. Powers expressly stated he did not determine or evaluate. Ex. 1, Powers Report 7; Ex. 2, Powers Dep. 110:2-13; *see also* 113:10-17. Likewise, he conceded that his 1.5 second perception/reaction time assumption is a

"human factors" matter that is not within his area of expertise. *See* Ex. 2, Powers Dep. 58:6-21. Mr. Powers also made it clear that he is not relying on AIPC's human factors expert, Dr. Stephanie Borzendowski, for the 1.5-second perception/reaction time used in his report. *Id.* at 60:20-61:10 ("[T]hat is our own literature, the fact that I've been using that for as long as I can remember, but not specifically from her."). In other words, he had no basis for either of the assumptions underlying his opinion that the Norfolk Southern crew could have avoided the collision. A reliable opinion must rest on "*knowledge* and not on belief or speculation," and an opinion that depends on assumed facts the expert admits are not present and that he lacks the expertise to provide is speculative, not based on sufficient facts or data, and is properly excluded. *Oglesby*, 190 F.3d at 250 (emphasis in original); *see O'Connor*, 188 F.4th at 354 (citing *Joiner*, 522 U.S. at 146). Where an expert lacks "the necessary data," he can "only speculate as to a possibility which was no more likely than other available possibilities." *Oglesby*, 190 F.3d at 251. Mr. Powers's opinion that the Norfolk Southern crew could have avoided the collision should be excluded as speculative and not based on sufficient facts or data.

Additionally, Mr. Powers conceded at deposition that the Norfolk Southern crew could not have stopped short of the AIPC engine and avoided the collision based on the crew's testimony regarding the actual distance at which they recognized it was in the foul. *See* Ex. 2, Powers Dep. 152:22-153:13. Indeed, he admitted that he was not offering the opinion that the derailment would have been avoided had the crew applied braking earlier and had the train been going at a lower speed at the moment of impact. *See id.* at 94:15-95:3. Instead, Mr. Powers offers the alternative opinion that earlier braking at the crew's recognition point "would have meaningfully decelerated" the Norfolk Southern train and "would be expected to result in a smaller numbers [sic] of cars de-railing and overturning." Ex. 1, Powers Report 8. However, at deposition, Mr. Powers backed

away from this reduced severity opinion and, to the extent he tried to stand by it, admitted it is based solely on speculation and not upon any testing he did or any peer-reviewed studies he relied upon. Specifically, when asked at deposition to confirm that he was "not offering any opinion" about "what would have happened had [the NS train] struck [the AIPC engine] at one of these lower speeds," Mr. Powers answered "[t]hat is correct." Ex. 2, Powers Dep. 153:14-18. He described the idea that fewer cars and trains would derail at a lower speed impact as "just completely common sense." *Id.* at 154:7-20. When asked directly whether he could cite "any study, literature, anything peer-reviewed" supporting a difference in derailment consequences at different speeds, he answered: "As it specifically applies to trains and derailments, then, no, I cannot cite you to anything." *Id.* at 155:15-156:2.

Where an expert lacks "the necessary data," he can "only speculate as to a possibility which was no more likely than other available possibilities." *Oglesby*, 190 F.3d at 251. As importantly, "common sense" is the province of the jury, not a subject for paid expert testimony dressed up as accident reconstruction expertise. *See Kopf*, 993 F.2d at 377 (citing *Persinger*, 920 F.2d at 1188; *Koubek*, 785 F.2d at 1159); *Scott*, 789 F.2d at 1055. An opinion Mr. Powers himself labels "just completely common sense," and not based upon any scientific testing or study, cannot meet AIPC's burden to show reliable, knowledge-based accident reconstructionist testimony. Mr. Powers's opinion that the Norfolk Southern crew could have reduced the severity of the derailment had they braked at a particular point should be excluded.

## III. Powers Did Not Reliably Apply His Principles to the Facts of This Case and His Opinions Are *Ipse Dixit* Across Too Great an Analytical Gap.

Even considering the general physics concepts Mr. Powers invokes, such as conservation of energy and basic kinematics, he did not reliably apply those principles to his accident reconstruction opinions in this case. *See generally* Ex. 2, Powers Dep. 41:9-17. Rule 702(d)

requires "a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(d). A court need not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," and must exclude an opinion where "there is simply too great an analytical gap between the data and the opinion proffered." *O'Connor*, 188 F.4th at 354 (quoting *Joiner*, 522 U.S. at 146). An expert's "vague *ipse dixit* ... cannot satisfy Rule 702." *Sardis*, 10 F.4th at 289-90 (citing *Joiner*, 522 U.S. at 146; *Daubert*, 509 U.S. at 590; Fed. R. Evid. 702 advisory committee's note to 2000 amendments). This Court has held that where an expert relies on "subjective beliefs and visual observations" alone, "it is impossible for th[e] court to determine whether [he] reliably applied his methodology," leaving "too great an analytical gap." *Walker v. DDR Corp.*, No. 3:17-CV-01586-JMC, 2019 WL 3409724, at *9 (D.S.C. Jan. 4, 2019) (quoting *Joiner*, 522 U.S. at 146).

The analytical gap here is demonstrated by Mr. Powers's own testimony. He agreed that a train's deceleration rate is "a factor of the weight of the train," that it "depend[s], in part, on the grade of the track" (an uphill stop differing from a downhill stop), and that it depends on "the type of braking system." Ex. 2, Powers Dep. 80:11-81:5. He agreed it takes "a longer distance to stop a 10,000-ton train than it would a 1,000-ton train." *Id.* at 84:12-18. Yet he confirmed that "[t]he weight did not factor into the calculations," and that braking-system differences "did not enter into our calculations." *Id.* at 78:16-23; 83:10-14.

A reliable accident reconstructionist applying reliable kinematics principles to reconstruct a train collision would account for the train's weight, its length and consist, its actual braking system, and the grade of the track. Mr. Powers's decision to disregard the very variables that govern the outcome of the collision is the "analytical gap" that Rule 702(d) forbids. His opinion is connected to his generic inputs by nothing more than his own assurance that the omitted variables did not matter, which is textbook *ipse dixit*. *O'Connor*, 188 F.4th at 354 (quoting *Joiner*, 522 U.S.

at 146); *see also Walker*, 2019 WL 3409724, at *9 (quoting *Joiner*, 522 U.S. at 146).

## IV. Powers's Opinions on Stopping Distance Are Not Based on Sufficient Facts or Data Because His Inputs Were Taken from Unrelated Equipment and Generic Literature.

Mr. Powers's opinions about stopping distance also fail Rule 702(b) because they are not "based on sufficient facts or data." Fed. R. Evid. 702(b). Input data that lacks "a valid scientific connection to the pertinent inquiry" and is not "relevant to the task at hand" cannot support an expert opinion. *Nease*, 848 F.3d at 232-33 (quoting *Daubert*, 509 U.S. at 592, 597).

A recent Fourth Circuit decision is squarely controlling. In *O'Connor v. Fairfax Taxi, Inc.*, the court affirmed the exclusion of an accident reconstruction expert whose opinion "depended on facts that the record did not supply." 188 F.4th at 354. The Fourth Circuit held that "[a]n opinion that supplies through assumption the very facts the record omits is not 'based on sufficient facts or data,' Fed. R. Evid. 702(b), and a district court does not abuse its discretion by excluding it." *Id.* The Fourth Circuit's decision in *Nease* has the same effect: there, an expert relied on a failure mode analysis for different designs of vehicles than the one at issue in the case, which was deemed to be data "lack[ing] a 'valid scientific connection to the pertinent inquiry'" and could not substitute for case-specific data. *Nease*, 848 F.3d at 232-33 (quoting *Daubert*, 509 U.S. at 592, 597). Similarly, in *Smithers v. C & G Custom Module Hauling*, the district court excluded a reconstruction opinion even though the underlying momentum science was "well-tested, commented upon, verified, and accepted" because the expert used "the same and among the lowest drag and friction coefficients" across different surfaces and lifted a critical distance figure from a source neither "based on any scientifically accepted variable" nor reflective of the actual facts. 172 F. Supp. 2d 765, 771-72 (E.D. Va. 2000). "[T]he extent of [the expert's] assumptions, combined with his discounting of ... important factors for the proper application of the scientific principles

involved," rendered the testimony inadmissible. *Id.* at 773.

Mr. Powers's opinions fail for the same reasons. In performing his calculations on stopping distance, he used data from a different engine and a different train accident instead of using the data from the engine and accident at issue here. *See* Ex. 1, Powers Report 6-7. He says nothing in his report indicating that the prior accident was even comparable to this accident. *See id.* Mr. Powers admitted that his operative deceleration figure came from an exemplar locomotive in a different matter, that he did not know whether that exemplar engine was the same type of engine the Norfolk Southern crew operated, and, when asked whether that mattered, answered, "I don't know if it was important or not." Ex. 2, Powers Dep. 78:4-15. He confirmed that braking system differences between locomotive engine types "did not enter into our calculations." *Id.* at 78:16-23.

Because Mr. Powers's opinions on stopping distance rest on data drawn from unrelated equipment in an unrelated accident rather than the train at issue, they are not based on sufficient facts or data and must be excluded. The Court should not permit Mr. Powers to offer opinions when he does not know how the data he used compares to the accident he was asked to evaluate, especially after conceding that he did not know whether having information about the actual engine involved "was important or not." *Id.* at 78:4-15.

## <u>CONCLUSION</u>

For the foregoing reasons, Norfolk Southern respectfully requests that the Court exclude the opinions and testimony of Allen Powers in their entirety and grant such further relief as the Court deems just and proper.

***Signature Page to Follow***

Respectfully submitted,

**GALLIVAN, WHITE & BOYD, P.A.**

*s/ Ronald K. Wray, II*
Ronald K. Wray, II (Fed Bar # 5763)
William E. Whitney, III (Fed Bar # 14024)
GALLIVAN, WHITE & BOYD, P.A.
55 Beattie Place, Suite 1200
P.O. Box 10589
Greenville, SC 29603
Telephone: (864) 271-5362
Facsimile: (864) 271-7502
rwray@gwblawfirm.com
wwhitney@gwblawfirm.com

*Attorneys for Plaintiff*
*Norfolk Southern Railway Company*

November 16, 2026
Columbia, South Carolina