# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

CASE NUMBER
C.A. No. 3:25-cv-06618-SAL

NORFOLK SOUTHERN RAILWAY COMPANY,
Plaintiff,
VS.
AMERICAN ITALIAN PASTA COMPANY,
Defendant.

DEPOSITION TESTIMONY OF: ALLEN POWERS
SEPTEMBER 11, 2026
9:00 a.m.

S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of ALLEN POWERS may be taken before Donna Winters, CCR and Notary Public, State of Alabama at Large, at the offices of Veritext, 2205 Fourth Street, Suite 20, Tuscaloosa, Alabama 35401, commencing at approximately 9:00 a.m. on September 11, 2026.

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is reserved, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties

may make objections and assign grounds at the time of the trial or at the time said deposition is offered in evidence, or prior thereto.

APPEARANCES:

FOR THE PLAINTIFF:

GALLIVAN, WHITE & BOYD
Ronald K. Wray, II
55 Beattie Place, Suite 1200
Greenville, South Carolina 29601
Phone: 864.271.5362
E-mail: rwray@gwblawfirm.com

FOR THE DEFENDANT:

HOOD LAW FIRM
John O. Radeck, Jr.
172 Meeting Street
Charleston, South Carolina 29402
Phone: 843.577.1203
E-mail: John.Radeck@hoodlaw.com

EXAMINATION INDEX

| EXAMINATION BY: | PAGE NO. |
| --- | --- |
| Mr. Wray | 7 - 168 |
| | 173 - 174 |
| Mr. Radeck | 168 - 172 |

EXHIBIT INDEX


| Plaintiff's | | Page |
|---|---|---|
| Exhibit 1 | Allen K. Powers, P.E. resume | 25 |
| Exhibit 2 | Allen K. Powers, P.E. Depositions/Trials | 31 |
| Exhibit 3 | 3 Axis invoices | 35 |
| Exhibit 4 | Handwritten calculation | 47 |
| Exhibit 5 | Calculations to determine stopping distance | 54 |
| Exhibit 6 | 8-21-2025 e-mail re: source materials | 95 |
| Exhibit 7 | 2-25-2026 Report on the Norfolk Southern - AIPC Matter | 100 |
| Exhibit 8 | Speed at Impact vs Distance to start P/R | 116 |
| Exhibit 9 | Speed analysis | 118 |
| Exhibit 10 | Accident Reconstruction Analysis | 157 |

I, Donna Winters, a Certified Court Reporter and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, pursuant to the Alabama Rules of Civil Procedure, and the foregoing stipulation of counsel, there came before me at the offices of Veritext, 2205 Fourth Street, Suite 20, Tuscaloosa, Alabama 35401, commencing at approximately 9:00 a.m. on September 11, 2026, ALLEN POWERS, witness in the above cause, for oral examination, whereupon the following proceedings were had:

ALLEN POWERS,

having been first duly sworn, was examined and testified as follows:

EXAMINATION BY MR. WRAY:

Q. State your full name for the record, please.
A. My name is Allen Powers.

Q. Good morning, Mr. Powers. If you don't mind, I may call you Allen today. Is that okay?
A. That's great.
Q. My name is Ron Wray. I introduced myself just prior to the deposition today. I'm one of the attorneys representing Norfolk Southern in a lawsuit that we brought against a company called American Italian Pasta Company. During the day, I'm going to refer to them as "AIPC." If I do that, will you understand who I'm talking about?
A. Yes, I will.
Q. I'm going to be taking your deposition this morning, and I'm sure at some point along the way, I'll ask you a question that is confusing or doesn't make any sense. If I do that, will you ask me to repeat it or rephrase it so that I make sure you understand my question?
A. I'll do my very best.
Q. And if you answer a question I've

asked, am I fair to assume that you understood my question and you're giving me the most honest and truthful answer to that question you can give?
A. Absolutely, it is, as long as I do understand the question. It's easy to misunderstand one, so as long as I understand that I misunderstood it, I'll let you know.
Q. Where do you work, Allen?
A. 3 Axis Engineering.
Q. How long have you been there?
A. That's been, what, I think it was 2012. Is that right? 2013, yes.
Q. What do you do there?
A. I'm an engineer, one of the owners.
Q. How many owners are there?
A. There are four.
Q. Did you found the company?
A. Sort of.
Q. What do you mean by "sort of"?
A. Well, we started, you can see the

CV, started out with a former partner of mine, Julian Doughty, and he and I had a firm for a long time. It was Doughty and Powers Engineering. And then when Julian sort of retired-out, then he and I were the owners of that. So when he retired, then we brought some of the other guys that had been working with us all along into ownership for the new entity.

Q. What does 3 Axis Engineering do?

A. We are mechanical engineers. We are what I think of as forensic engineering. Most of that is accident reconstruction. Also, we do handle some things under the umbrella of mechanical engineering.

Q. And is that the same type work you do, either mechanical engineering/accident reconstruction type work?

A. Yes, it is.

Q. How much of your work is in the context of litigation like we're here today

on?
A. Pretty much all of it. You understand that there are plenty of times when most of what we do is just investigation, but I think that's pretty universally with the understanding there could be litigation.
Q. How long have you been doing legal consulting type work?
A. Well, I've been doing this type of work really since the early '80s, full-time since 1994.
Q. Since 1994, have you been providing testimony as an expert witness in cases where you've done some type of accident reconstruction?
A. Yes.
Q. I understand in this case that you were initially contacted by a friend of mine named Turner Williams?
A. Yes. You're friends with Turner, that's good.
Q. Yes. We've known each other for

years in the railroad business. Kind of like the engineering business, it's a small group, so I've known Turner for a long time, and it looks like, from some of the e-mail traffic I've seen, that you've known Turner for a long time?

A. That's true.

Q. How many cases over the years, you can give me a ballpark, have you had with Turner?

A. I don't have a guess on that. I would say a reasonable amount. If I were to take a wild guess, 30 to 60, maybe.

Q. Have all your cases with Turner been in the context of railroad litigation, or have you done other type of work with him as well?

A. Other type of work.

Q. In this case, of course, with you today is Mr. Radeck, my friend from South Carolina. Is this the first time you've ever had a case with the Hood Law Firm?

A. It's the first time I remember.

I don't recall working with him before. If I have, my apologies.

Q. What was it that Mr. Williams asked you to do when he first got in touch with you?

A. Well, I don't have any specific notes of that. You have our e-mails. I haven't gone back and reviewed the e-mails. But generally speaking, I know that I'm always asked to really do what we can to reconstruct forensically what has happened; in other words, understand what happened in the accident. And I know very early on, this is a particular one to look at the aspect of the video and the train, because one of the things that we know, just from looking at it, it's a pretty poor quality video. It's wide-angle. So it doesn't give you a good perspective of what you might see with the human eye, so we need to address those issues as well.

Q. Since you mentioned your e-mails and said you didn't go back and look at

them, what did you do to get ready for today's deposition?
A. Pretty much just reviewed the work that we've done to go through and assemble all the materials that we have. I apologize if I didn't mention it, but I brought a thumb drive that has all the stuff that you asked me to bring. Pretty much assemble that, go back through and just re-understand the work that we have already done.
Q. When you say "reviewed the work," what specifically did you look at?
A. Well, as I'm sure you've noticed already, I was pulled in for a couple of matters that I believe are suits involving Mr. Small and Mr. Rightmier, so we did a lot of work there, prepared for trial, all that sort of thing, so I think that was the work that we had done already. So since then, it's just been a matter of, since there has been some time passed, going back and just refreshing myself.

Q. Obviously you met with Mr. Radeck briefly this morning before the deposition. Did you have any other meetings with counsel to prepare for today?
A. Well, we had phone conversations, may have even been a zoom in there as well.
Q. Did you meet with anyone else outside of counsel to prepare for today's deposition?
A. No. Of course, I met with some of our younger engineers that did some of the work as well.
Q. And who was that, specifically?
A. That would be Andrew Clark. I don't remember if I met with Eddie on it recently or not. Eddie Lavett is also a guy that does a lot of our graphics work.
Q. How do you spell Eddie's last name?
A. L-A-V-E-T-T.
Q. Anyone else you met with on your team?
A. No.

Q. What role did Mr. Clark play in the work on this project?
A. He's an engineer, so he would have been the guy who did most of the button-pushing and things like that on the animation. Also, he's going to help out with the drawings, analysis, and that sort of thing.
Q. You said he's going to help out with the drawings. What do you mean by that? Are you going to do some drawings that have not yet been prepared?
A. Oh, no. That was probably an ill-stated verb on my part. My apologies. I'm just saying, that's the kind of thing he's going to be doing in the matter.
Q. And then Mr. Lavett, what role did he play?
A. He also would be a graphics fellow. He's sort of our AR-CAD expert, so in terms of putting data together, putting together the scene drawing, he would do that type of thing.

Q. Did any other members of the 3 Axis team work on this case?
A. No, none that I recall, I mean other than office work, you'll see someone sending out things, administrative things, not what I think of as engineering work.
Q. Did you consult with anyone outside of your firm as part of your work on this case?
A. No.
Q. I did actually look at your e-mails, and my recollection of the e-mail Mr. Williams sent you is that he wanted to know if you could look at this case and determine whether the Norfolk Southern train had the capability of stopping short of the point where the AIPC train was positioned on the tracks the morning this accident occurred. Do you have a recollection of that being your assignment?
A. I don't specifically remember when that came into the conversation, but I know that's part of it as well.

Q. We did serve you with a subpoena in this case asking you for certain records relating to your work. Did you receive the subpoena?

A. Yes.

Q. And did you provide us with everything that was responsive to the subpoena?

A. Pretty much, yes. Everything was practical. I would say to answer that specifically, I would want to look at it. Do you want me just to go down through the list?

Q. Do you have it there in front of you?

A. Yes, I do.

Q. I'm going to try to save us a little bit of time without going down all 11 items. You said you provided everything that was practicable, so tell me what you considered to be not practicable to provide to me.

A. Well, number 3 there, back when I

was in the aerospace business, I was involved in a couple publications, article types of things. I couldn't find them if I wanted to, and they have nothing to do with accident reconstruction.

Q. So I take it from that answer, there might have been some articles or books or publications that you weren't able to track down or provide. Is that what you're saying?

A. That is correct. It would be articles, not books.

Q. Okay, that's fine. Anything else on the list that you just looked at and said, "I'm not going to give them that"?

A. That statement has not gone through my mind. 7 gets to a little bit more of what I meant in terms of practicable, you know, when you talk about words in there that I have or expect to consult. Well, I don't know about that. Say, for example, Foster has already made some commentary about our stopping

deceleration rates, so if anything else were to come up on that, you know, I might do more review.

Q. And you're referring to Foster Peterson, our expert?

A. Yes, that's correct. Really what I'm focusing on is that "expect to consult." I don't know what's going to happen between here and trial.

Q. So let's not worry about number 7 for now. Any others that you either didn't produce documents or limited the production?

A. I think you have it, and everything is going to be on those thumb drives. I did bring a couple of extra things that as I was making preparation, a couple printouts of some of the calculations.

Q. You brought that today?

A. Yes.

Q. Do you have it printed-out for me?

A. I do.
Q. We'll look at that during a break, then, and then I'll decide whether I need to add that to the list of exhibits or not. I did receive a quite extensive e-mail production. Did you produce to us all the e-mails that you had related to your work on this case?
A. Yes, so far as I know. In other words, what I did is I asked someone in my office, "Print out all the e-mails and send them." I did not go through and check them to make sure nothing had been missed; but, yes, my understanding is you have everything.
Q. I didn't see any handwritten notes. Do you actually make handwritten notes when you're working on a case like this?
A. Sometimes, but not in this matter. There was nothing to do.
Q. I saw some computer-generated notes and analysis and what I call the math

behind some of your calculations. Did you produce all of the work product that you generated as a result of your work on this case?

A. Yes.

Q. Other than the items that you've already mentioned today, particularly as they pertain to supporting materials, literature supporting materials, is there anything else that you did not produce for any reason?

A. No.

Q. Did you interview any witnesses as part of your work on this case?

A. No.

Q. I know you went to the site, we're going to talk about that in a little bit, but while you were on-site, did you talk to anybody who claimed to have any firsthand knowledge of what happened on the day of this accident?

A. Not that I recall, no.

Q. Did you do any internet or AI

type work related to this project?
A. No. Certainly no AI. Internet, some of the technical references, we may have gotten those from the internet, and there are some things like Google Maps. You'll see in the materials, in terms of just some of the vehicle research, there's a video in there of a person who went and videoed inside one of these locomotives, a very similar locomotive, so there are a few things like that.
Q. In this case, I was provided with some videos and some, I'm going to call them still images that I think came from the videos. How do you describe that work product that your team created, the video and the images that were provided to me?
A. Well, it depends on the specific ones. Like a lot of the images that might be photographs, those would be photographs that I took. Some, like the drone images, that was done later by Andrew and another person, that may have been Eddie. I would

have to go back to the building and see. So in terms of still images, I would say that. I would say in terms of the videos and such, you're asking what was the process?

Q. No. I'm just trying to -- I want to make sure I'm using the same term you are when we describe -- and maybe my question wasn't very clear or precise. I obviously know what a photograph is, I know what a drone image is. I think you used the word "animation" earlier, but maybe I'm wrong about that, the work product that your team created to try to recreate, in your mind, what happened at the time of this accident?

A. Yes.

Q. What do you call that? Do you describe that as an animation?

A. I would describe that as an animation, yes.

Q. We'll use that term as we talk today. Part of the reason I asked is you

said you saw Mr. Peterson's deposition. He referred to it as a visualization, and I didn't know if there was some distinction you might be drawing.

A. Visualization is probably superior, so I'll tip my hat to Foster and will adopt that term, so visualization is certainly representative of what we did.

(Whereupon, Plaintiff's Exhibit Number 1 was marked for identification, a copy of which is attached to the original of the transcript.)

Q. I'm going to show you what I've marked as Exhibit 1. My understanding is, this was the CV provided by your office to me, but I'll give you a chance to look at it. Does that appear that's what it is?

A. Yes, it does.

Q. Is this your most recent CV?

A. I believe the answer to that question is "yes." Let me see. Yes, it appears to be.

Q. Your educational background is in

mechanical engineering?
A. Yes.
Q. You have never worked for a railroad, have you?
A. No, other than this sort of thing. I don't know if you call what I am doing today working for a railroad or not, but I have never been an employee of a railroad entity.
Q. You don't hold yourself out as having expertise in the operations of a locomotive as an engineer or a conductor, do you?
A. Correct.
Q. You have never attended a school or training to be a locomotive engineer, have you?
A. Correct.
Q. You don't have any certifications as a locomotive engineer or conductor?
A. Correct.
Q. We'll talk about your report and your opinions in a minute. I didn't see

any opinions in there. Are you offering any opinions in this case as to the conduct of the Norfolk Southern train crew?

A. No. I mean, other than what I would say the obvious things, like we'll talk about at what point things happened, like Mr. Rightmier when he started reacting, things like that. But that's only really from a reconstruction standpoint, not from a what he should have done, what his responsibilities as a conductor were.

Q. Fair enough. And that's because you don't have any expertise in those areas in terms of what an engineer or conductor is supposed to do when faced with a situation like this, correct?

A. That is correct, yes.

Q. You don't hold yourself out as having expertise in locomotive braking systems, do you?

A. That is correct.

Q. You referenced earlier that you

have been retained in some cases that involved a railroad company. I believe you said Mr. Williams was involved in a lot of those. Have you ever been involved in a case where you were asked to work on behalf of Norfolk Southern Railroad?

A. I would have to go back and look. I think the answer is "yes" to that one, but I'm not certain.

Q. So you don't know for sure, and if you don't know for sure, I assume it's also true you wouldn't know how many cases, if any, you've had that involved Norfolk Southern?

A. That is correct.

Q. I assume it's also fair to say that if you did work on a case, you don't recall the details or specifics of what that case may have involved, as we sit here today?

A. That is correct, with the exception, I would have to go back and look at it. One of the things that we did in

terms of our deceleration rate determinations is a case that we've worked on. For some reason or other, I'm thinking that might have been Norfolk Southern. We can open that up, if you like, because I think it's cited in there.

Q. When you say "open that up," what do you mean?

A. Well, let me see if I can find it.

Q. While you're doing that, let me just go ahead and put on the record, we did ask you to bring with you today your file materials related to your work on this case, correct?

A. Correct.

Q. And my understanding, from what you told me, is you did bring it all today. They're on a thumb drive or you have it there on your computer. Is that accurate?

A. That is correct.

Q. And as we sit here now, you're trying to pull up some aspect of your file

on the computer. Is that correct?
A. Yes. Okay, I found that in the materials that I provided, there's a folder that's called References. One of them is an Excel spreadsheet called Exemplar Train Braking, and there's a couple of matters in there that we worked on that we had EDR data, but neither one of those is Norfolk Southern.
Q. Having looked at that particular file or folder, does that refresh your memory at all that perhaps you have not worked on a Norfolk Southern case, or do you still have some lingering thought in your background that maybe you did?
A. The second part, this didn't refresh whether I had or not.
Q. The exemplar data that you referenced me to a moment ago, what railroad company was involved in that?
A. Well, there's two of them. One is Watco, W-A-T-C-O, and the other is KCS, and I don't remember who that is.

Q. Watco was the name of the railroad company?
A. Yes.
Q. Is that a short line?
A. It is. Now, there's KCS which I think may have been short-term, but I don't recall.
Q. That's probably Kansas City Southern, would be my guess.
A. I think that's right, yes.
Q. Are those cases you had with Mr. Williams?
A. I don't have the cite of who I worked for on that one.
(Whereupon, Plaintiff's Exhibit Number 2 was marked for identification, a copy of which is attached to the original of the transcript.)
Q. I'm going to hand you what I've marked as Exhibit 2, and this was a case list that was provided to me through your attorneys. It looks like it goes back to 2020, but you told me you've been

consulting much longer than that, correct?
A. That is correct.
Q. And under our federal rules, you don't have to give me the list going back for all time, but does this appear to be the list of cases where you've given a deposition or trial testimony, at least since 2020 to present?
A. It does, except I have a newer version. I don't know if you would rather mark that as Number 2 or not. There have been a couple more depositions, a couple more appearances.
Q. Yes, we'll substitute it out. Mr. Powers, I've substituted the updated version of your case list that you gave me, and that will now be our Exhibit 2.
A. Okay.
Q. Just looking through this, I didn't see any references to Norfolk Southern, at least on this list, but it may not always be clear that you're listing all the parties, or that maybe I'm

understanding who the parties were. As you look down this list, do you see any cases that involve Norfolk Southern?

A. I do not.

Q. You and I chatted earlier today. You have had quite a few cases over the years, I believe, with our expert, Foster Peterson?

A. Yes.

Q. Roughly how many cases do you think you've had with Foster?

A. Gosh, I don't have a category there either. It would be a wild guess. Did he make a guess?

Q. I don't think so. I don't think he was asked that question.

A. I was going to agree with him. I don't have a real number for you. You know, maybe between 10 and 30, but I can't say.

Q. Do you agree that Mr. Peterson is well-qualified in his field?

MR. RADECK: Object to the form.

A. That's my understanding, yes.
Q. In the cases that you had with Foster, is the typical division of work that Foster focuses on the railroad operations issues and you perhaps focus on the accident reconstruction issues?
MR. RADECK: Object to form. You can answer.
A. That's fair.
Q. Since there was an objection, how would you describe the roles that you and Foster play in the cases you've had together?
A. Mine certainly is accident reconstruction. Foster, my understanding in terms of the work that he's done, is that he's the guy that very much knows the ins and outs of the railroad business. He's worked as an engineer at the railroad, he's consulted a lot in terms of EDR data, in terms of operational types of things.
Q. How are you compensated for your work on this case?

A. How am I?
Q. Yes.
A. I'm billed out -- I brought you the billing sheets, but I'm billed out by my company at $420 an hour.
(Whereupon, Plaintiff's Exhibit Number 3 was marked for identification, a copy of which is attached to the original of the transcript.)
Q. I'll hand you what has been marked as Exhibit 3, Allen, and I'll tell you, these were the invoices that we were finally able to get after a couple of requests, that I was told relate to your company's work on this matter.
A. That is correct.
Q. And can you flip through there and tell me, are these all of your invoices?
A. Yes. Certainly since the last date which was March 9th of this year. It doesn't include what we've done in the last few weeks, which is preparing for the

deposition.
Q. I didn't go through them and add them all up. Do you know what the total you've billed to date for this file?
A. No.
Q. I assume it's fair to say, if we did some math, we could go through these invoices and add the numbers and that would give us the total, right?
A. Yes.
Q. In looking at the invoices, I see some initials on here. You've already told me about, I assume ALC is Andrew Clark?
A. Yes.
Q. TEL, is that Mr. Eddie Lavett?
A. Yes.
Q. AKP, that's you?
A. Yes.
Q. Then I see some other names. Are those mostly administrative people?
A. No. It kind of depends on what they are. Like SES, that's Sam, Sam Sogol. He's an engineer with us. The ASST, that's

an assistant that I brought with me to the original scene, he's not an actual employee. CTM is administrative. I think that's all I see.

Q. Who actually put together the animation that your company created in this matter?

A. That would be a combination of myself, Andrew, I know Eddie had done some work on that, Sam did some work on that as well.

Q. What role did you play in that process?

A. Generally speaking, more of an overseer of it, say these are the things that we need to do, the overall scope of it, and pretty much the other guys put that together.

Q. So I'm going to try to paraphrase here, but you tell me if I've said this wrong, and certainly correct me. It sounds like you give the instructions of what you want to be depicted, and then your team

puts it together. Is that a fair characterization?

A. That's a fair characterization with another addition, as progress is being made, then I'll review it, look over it, make whatever commentary or assistance that may be necessary there.

Q. In this case, one of the things that you analyzed and did a calculation on was what you determined to be the stopping distance of the train. Is that fair to say that was part of your work?

A. Yes.

Q. Have you ever done that in any other case other than this one?

A. In other words, do any sort of analysis to determine stopping distances?

Q. For a train, not for a car or a truck, tractor-trailer truck or any other line of work you might do, for a locomotive engine like we have in this case.

A. Yes. In other words, the references that I made earlier when I told

you I was pulling up that spreadsheet, there were two matters where we were looking at stopping distances.

Q. The matters might have involved looking at stopping distance. My question is, did you yourself do that analysis and calculation?

A. Well, we did that work that you're describing; in other words, when we do the analysis on it, yes, in the sense of it would be the same type of thing. In other words, whenever we get ready to do analysis, normally what I'll do is I'll talk to the guys and I'll say, "This is what I want to do, put together a spreadsheet." They'll put together a spreadsheet and I'll review that, look it over, make whatever modifications, adjustments that are necessary, until we ultimately get the final product.

Q. You used the term, you said "We would do that work"?

A. Yes.

Q. By "we," are you referring to members of your team?
A. Yes.
Q. That's what I was trying to understand, Allen, because you've told me you've had some cases where you and Foster partner together, I was trying to understand, in the cases where locomotive stopping distance has been an issue, was that work done by Foster or somebody else like Foster, or was that done by you or someone on your team under your supervision?
A. Well, to really answer that question, I would just have to go back through those cases and look at them. I don't have a specific recollection of precisely what you're asking.
Q. So to make sure I understand the answer you just gave me, you can't identify a case for me where you or your team was tasked with calculating the locomotive stopping distance. Is that fair to say?

A. Well, except for the two I've pointed out that we've spoken about earlier.

Q. So those two, the KCS matter and the Watco matter, you or your team did some calculations of locomotive stopping distance for those two matters?

A. That's correct.

Q. What formula did you use to make that calculation, do you know?

A. Well, generically speaking, it really is just an idea that comes straight out of the conservation of energy, and it is just a -- I think Foster described it well. It's simple kinematics and dynamics relating velocity distance and deceleration.

Q. Is that formula -- I assume you plug in some numbers into an equation, that's usually the way a lot of math is done. Is that what you do here to calculate stopping distance?

A. Yes.

Q. Is that equation listed or described in your report?
A. I don't know if the equation itself is. I don't think it is.
Q. Is it listed or described in any of the work product that you generated in this case?
A. I mean, it's there. Often when we do our spreadsheets, we'll print out equations, so we'll just have to look at those and see if that's the case or not. But generically speaking, I can tell you the answer to that question is that when you're looking at a total stopping distance, the way we're handling that here is the portion -- you break it into a couple of portions, and the portions have to do with the time where the vehicle is actively braking. In other words, the general principle here is the same as it is for a tractor-trailer or pretty much any other kind of braking. You have a portion where you have braking, and you determine

that. That's just clear physics relating velocity, distance, deceleration rate, that sort of thing. And then prior to that is the distances that you look at that have to do with, say, perception reaction. So let's just say hypothetically, before you start braking, say you have a speed of 50 miles an hour, not related to this case but responding to your answer, then you use the 1.5 seconds of perception reaction time at 50 miles an hour, so that gives you a distance. In this case, you have not only the perception reaction but the build-up and the propagation times.

Q. You're not testifying in this case that the braking system on a locomotive is the same as a braking system on a tractor-trailer, are you?

A. No, I'm not. What I'm saying is, though, the analysis of braking is similar.

Q. Similar?

A. Yes.

Q. But it involves different

components and different mechanisms of braking, fair to say?

A. Yes.

Q. And my question to you, what I was trying to understand, and you can look through your file if you've got it somewhere there, I'll give you a real simple, because I'm a pretty simple guy, I'm not real good at math and I know you've got some expertise in that area. I've heard the equation E = mc2. You're familiar with that, aren't you?

A. I am.

Q. If I give you E, M, and C, or some variation of that, you can solve for the missing factor, correct?

A. Yes.

Q. That's what I want to understand here. Can you tell me what equation you used to calculate the stopping distance for the Norfolk Southern locomotive engine that you analyzed in this case?

A. Sure. Sure.

Q. Tell me what it was.
A. The analysis, the numbers or the equations are not necessarily specifically put into it, but you do see the results of that, so I can tell you what those equations are.
Q. Tell me what the equation that you used to calculate stopping distance in this case was.
A. I can't believe it, I don't have my engineering pad. Can I borrow a clean sheet of paper?
Q. I'll have to charge you for it, but I'm pretty reasonable.
A. I don't mind. What I would say is, again, like I mentioned before, once you have braking, once you're in the braking phase of the analysis, then your distance is going to be the velocity squared divided by 2 times G times the deceleration rate, and that gives you the distance based on velocity and deceleration rate.

Q. Times G times what?
A. G times the deceleration rate.
Q. And what variable do you plug in to represent deceleration rate?
A. Well, in this one, we have a range that goes from 1.6 to --
Q. I'm sorry, I wasn't talking about the number.
MR. RADECK: Are you trying to mark his thing?
MR. WRAY: I am.
Q. D refers to distance, distance equals V, velocity square, you said divided by 2?
A. Yes.
Q. Times G which is what?
A. Gravitational constant.
Q. Then times, what's the next?
A. Mu is what people use for deceleration rate.
Q. Anything else in the equation?
A. That's it.
Q. Then I'll take Mr. Radeck's very

good suggestion and we'll mark as Exhibit 4, is this the equation that you wrote out for me to represent how you determine stopping distance in this case?
A. Yes.
(Whereupon, Plaintiff's Exhibit Number 4 was marked for identification, a copy of which is attached to the original of the transcript.)
Q. In terms of velocity, did you take that from the event recorder data that we produced in this case?
A. Yes.
Q. And then the gravitational force, is that a constant number, or did you have to determine that in some fashion?
A. It's constant.
Q. And what number did you use for that?
A. 32.2 feet per second square.
Q. Deceleration rate, where did you get that from?
A. I've given you a range, and the

range that I've used is .065 Gs to .1 Gs.
Q. Where did you get that range from?
A. You'll see in the analysis that I've given you, there are three different rates, .065, .1, and .0825. The .0825 comes from an actual locomotive where we had EDR data where they hit the brakes and we were able to determine what the deceleration rate was. And that's in that --
Q. Go ahead and finish.
A. Okay. That is in that document we talked about earlier under the exemplars that we used.
Q. The reason I wanted to pause for a minute, but I wanted you to finish your answer, you referred to EDR rate. What is EDR rate?
A. Oh, that's the electronic data recorder.
Q. I'm usually familiar with that in the context of automobiles and trucks, not

with trains, so I'm just trying to make sure I understand. When you use the EDR rate, are you talking about something you took from a tractor-trailer case or from a train case?

A. No, these are all train cases. This may just be language, but you have -- the most common term is black box data, and you have that in this matter, and you have -- most modern trains have some sort of data recorder.

Q. Just in my parlance, I refer to that as the event recorder.

A. Okay.

Q. I just want to make sure you and I are talking -- so when you say "EDR," you're referring to, in this case, the event recorder that was on the locomotive involved?

A. That is correct. Everyone has their acronyms, right? The most generic acronym is EDR, electronic data recorder. So yes, in terms of acronyms, everybody

calls it something different. Any sort of data recorder that gives us information about time, speed, that sort of thing.

Q. You gave me three different numbers that you took as a range here. One of them, the .0825, came from some event recorder data you had from another case you worked on years ago?

A. Correct.

Q. Where did the other two numbers come from, the .065 and the .1?

A. They come from a couple of references that I put in there, a couple of papers about train deceleration rates. Generally the .065 is one that is sort of indicated as a low range, and the .1 is a little bit higher. As it turns out, the one that we used was almost exactly in the middle of that, so those are the ones we used.

Q. When you refer to a couple of papers, one of the source materials I saw in your production was a section of a book

that actually was provided to you by one of the lawyers in Turner Williams' office, from a gentleman named Mr. Loumiet. Are you familiar with that publication?

A. I am, but we didn't get it in the way that you said.

Q. You didn't get it from the lawyer?

A. No.

Q. Where did you get it?

A. Law library.

Q. We can look at the e-mail, if we need to, but I'll assure you there's an e-mail from somebody in Mr. Williams' office, I think Al Teel, but I'm not positive that was who it was, but sending to you a chapter from Mr. Loumiet.

A. Oh, really? I know in this particular case, that may have just been additive, because I don't remember seeing that. But I know that Andrew went over to the law library and took copies of pages there.

Q. In any event, was the deceleration rate that you used, or the other numbers that you referenced, the .065 and .1, did those come from Mr. Loumiet's publication or some other source?
A. Well, there's a couple of them in there. Loumiet is one of them. Do you need me to look up the other one?
Q. Yes. If you don't mind, tell me what the other source material was.
A. The other, and I'll have to make sure it's not just this one, was proceedings of the 2017 Joint Rail Conference, JRC 2017. The author was David Thurston.
Q. Is that publication in the materials you provided?
A. Yes.
Q. So you said you had a range here. Is the rate that you actually used and plugged into your calculation for determining stopping distance in this case, the .0825 number?

A. I used all three of those. In other words, if you look at the calculation sheets, you'll see those, so it gives you a range.

Q. So you had a range of stopping distance depending on which of those three numbers you used. Is that a good way to describe it?

A. Yes, sir.

Q. And the stopping distance, based on those three numbers, ranged from what to what?

A. It actually is one of the ones that I printed out for you today. Actually, it's in my report as well. Do you want to see this?

Q. If you've got extra copies, so we can look at the same thing.

A. It's not an extra copy, but I brought it for you. If you'll maybe put that so we can both see it.

Q. Oh, I'm sorry. So you've only got one copy? I thought you had another

one in front of you.

A. No. The reason I printed that out is because this is what we used for our report; in other words, when we were looking at some of these positions and times, we started at 31 miles an hour, and that is looking at those different rates. Do you see the .0825, the .1, and the .065? Those are at 31 miles an hour. I just noticed that because those are the numbers that we have in our report. Now, the answer to your question is essentially 494 to 667 feet is the range of speeds.

(Whereupon, Plaintiff's Exhibit Number 5 was marked for identification, a copy of which is attached to the original of the transcript.)

Q. And we've marked as Exhibit 5, the document you handed me today. This is just a printout of the calculations you ran to determine stopping distance?

A. Yes. In other words, if you look at what I've already provided you, you have

a copy of something that looks very much like this. The only difference is, right there, instead of 31, it has 34.

Q. And why did you change the speed?

A. The best I can do is guess, and that is at some point I'm guessing what happens. I'm sure you've used spreadsheets. The nice thing is, once you put them together, you can modify variables and see how they affect different things. If you look at the one that you've been provided, then this is 34, and I'm going to guess at some point somebody asked me, "Well, how do these numbers change if it's 34 miles an hour," and then when we just changed that, we saved it. But this is the underlying spreadsheet that goes into my report materials.

Q. Why did you use the number 31?

A. The 31 was -- let me see, let me make sure I quote it properly. We used 31 because we were looking at these from 1,000 feet away, and at 1,000 feet away, he was

doing 31 miles an hour.

Q. So Exhibit 5 shows me your calculations of stopping distance of the actual Norfolk Southern train involved in this accident, beginning at 1,000 feet and traveling at 31 miles an hour. Is that accurate?

A. That is correct. But in terms of exactly where it started, it doesn't really matter. What this really just tells you is at 31 miles an hour using this deceleration rate, that's how long it takes it to stop, that's the distance. So it doesn't really matter where in space anything is in this exact accident, as much as it just says at 35 miles an hour, looking at the first column, at 31 miles an hour, at .0825 Gs deceleration rate, and 1.5 perception/reaction time, 2.1 seconds transmission time -- Foster talked about this, how long does it take it to get there -- and then the build-up time is 2-1/2 seconds. So using those variables,

it tells you under that particular circumstance, it takes 562 feet to stop.
Q. Other than changing the speed from 34 miles per hour to 31 miles per hour, does this document otherwise match-up with the prior calculations you gave me?
A. Yes. The distances traveled will vary.
Q. Yes. When you change the speed, it changed the distance of travel, right?
A. Correct.
Q. But in terms of the other variables that you put in the equation, is what I meant to ask you a little more precisely. The other variables all remain the same other than speed?
A. That's correct.
Q. The 1.5-second perception/reaction time, where did you get that from?
A. Well, there actually is a reference or two in there that talks about that. 1.5-second perception/reaction time

is one that has really been used in the reconstruction community, for as long as I can remember, as an average perception/reaction time for a non-complex situation.

Q. Did you consider this to be a non-complex situation?

A. I'm going to let others evaluate that portion of it. The usage of 1.5 perception/reaction time is the idea that when you're doing these calculations, then you have to have a sum of value, so what I'm using is essentially a published average.

Q. I understand you have to have some value, but the value should have some relation to the event you're evaluating, right?

A. Well, I think when you step into that, now you're talking about human factors people, and that's not me.

Q. Answer my next question, you don't have expertise in human factors?

A. Other than it relates directly to accident reconstruction. In other words, I know the difference, generally speaking, between a complex and non-complex situation, and I know 1.5, and I know that those things can change depending on certain aspects, like drinking or fog or lighting, things like that. So there are human factors that fall under the rubric of accident reconstruction, but that's different than being able to say in this circumstance this is what the person should have seen at this time.

Q. You know in this case that AIPC retained someone that they presented as an expert in human factors, correct?

A. I do.

Q. And you've had communications with her, because I saw that in the e-mail correspondence?

A. Uh-huh.

Q. Is that "yes"?

A. Yes, that's a "yes."

Q. I asked you about the 1.5, because that is the number she uses in her report. You are aware of that, correct?
A. Is it?
Q. Yes.
A. Does that mean I'm pretty good?
Q. I'm not going to agree on that, in terms of this.
MR. RADECK: Object to the form of the last question. I'm not sure that's accurate.
MR. WRAY: You're not sure she used 1.5?
MR. RADECK: I'll have to doublecheck.
MR. WRAY: Okay. Well, anyway, if I'm wrong about that, I'm wrong, but I don't think I am. I'm pretty sure that their expert used 1.5. We asked about it in her deposition the other day.
Q. What I was really trying to get at is, did you get the 1.5 from the human factors expert that AIPC retained, or based on your own literature review of some sort?

A. It would be just as I described, that is our own literature, the fact that I've been using that for as long as I can remember, but not specifically from her. It wouldn't surprise me that maybe in our conversation she may have said, "Well, that's about right." But I don't have any specific memory of what she indicated would be the appropriate perception/reaction time in this matter.

Q. Did you or anyone on your staff look at any specific literature or studies that were specific to perception/reaction time of locomotive engineers or conductors?

A. No.

Q. Are you aware of any studies that looked at perception/reaction time from the context of a locomotive engineer or conductor?

A. Not as I sit here.

Q. You would agree with me, I assume, that operating a locomotive is a unique skill?

A. Of course I would.
Q. Not everybody can run a train, can they?
A. Just because I have an engineering degree doesn't mean I can run a train.
Q. Well, not you or anybody, just off the street, we can't just pick somebody and say, "Hey, go run this locomotive," can we?
A. That's right. But I will respond to that, and that is the idea that you've got a similar phenomenon in tractor-trailer drivers, they're professional drivers. So typically when you see them under circumstances, you're able to evaluate them, and they usually have better reaction times than just your normal public because they're professional drivers. So I would say, if anything, I would expect -- it's just my expectation -- that, if anything, the railroad personnel would be better than average.

Q. Well, but Mr. Powers, unlike a tractor-trailer driver, a locomotive engineer who is on a railroad track should have the expectation that he's got control of that track, shouldn't he?

A. All of those are fair questions. The only thing I'm pointing out is the fact that they are professionals; that is to say that in terms of what they're doing, then you would expect them to have, if anything, a better. Now, that's not one of my opinions. You were just asking me about that as a general idea.

Q. I'm not debating the fact whether they're professionals and whether they're well-trained and have to be qualified under federal rules. But my point to you is, a tractor-trailer driver has to anticipate that other cars or motorists on the highway may move, swerve, come into his lane of travel, correct?

A. Yes.

Q. A locomotive engineer who is on a

railroad track shouldn't expect another train to swerve out in front of him or jump out in front of him, right?

MR. RADECK: Object to form.

A. Well, they go through a lot of crossings and they go through a lot of railyards. I don't know how they train. I don't know if I agree or disagree with that statement.

Q. Were they going through a crossing at the time of this accident?

A. Well, they were going through a junction with another rail line.

Q. They were going into a spot where an industry track came out onto the mainline track, correct?

A. What was the word you used?

Q. I said an industry track intersected with the main line track.

A. An industry track, yes, that is correct.

Q. And you understand that the industry track is not supposed to come out

onto the mainline track when there's a Norfolk Southern train on the mainline track?
A. That is my understanding.
Q. And the crew has a right to expect that, don't they?
MR. RADECK: Object to form.
A. Well, I'll let others talk to that.
Q. You don't know?
A. I think that's a Foster question.
Q. You also have in your calculation, Exhibit 5, something you refer to as brake cylinder build-up time, and you refer to that as 2.5 seconds?
A. Yes.
Q. Where did you get that from?
A. There's a couple places there I think that's mentioned in the references that I've given you. In the earlier matters, there was a fellow who was a railroad guy, all this is in my report, but I think he mentioned that as well.

Q. Let me ask you, the file that you brought, does it have Bates numbers that Mr. Radeck's office gave me?
A. No.
Q. Well, we'll have to do this a little more complicated way. I was hoping you could pull this up and look at it.
A. If you can tell me the name of it, I probably could.
Q. Well, it's from the Loumiet study that you provided to me, and it's on page 2583 of the production. John, do you have it?
MR. RADECK: Let me pull it up. I think my computer has just been a little slow.
MR. WRAY: I tried to get the file you sent me up on my computer, I couldn't do it from here, but I did have this one item.
MR. RADECK: Y'all keep going. I'll try to pull it up.
A. What page did you say it was?
Q. The Bates numbers, this comes

from what Mr. Radeck gave me. I don't know if yours is Bates numbered, but it's 2583.

A. What you're looking at, does the page have a page number that's on it?

Q. I do not have the specific page from the Loumiet book. I can take it in and show it to you. I don't want to take up too much time. I'm going to represent to you that this is a page that I cut from -- or Mr. Peterson actually cut from the Loumiet publication that was included in the materials you provided to me. Do you recognize this, looking at it?

A. That looks familiar, yes.

Q. And it says in this study, "Full pressure build-up time for a brake cylinder is nominally ten seconds in emergency braking and longer in service braking." Did I read that correctly?

A. You did read that correctly.

Q. Again, I know you're taking my word for it, but I assure you this came from materials you provided to me as your

resource material.
A. Okay.
Q. Am I correct that in that source material that you provided, it says that "Full pressure build-up is nominally ten seconds"?
A. Yes.
Q. Why did you use 2.5 seconds?
A. Well, the 2.5 came from two places. The one that I specifically remember, I'll show you that. In the materials that you have, there's a PDF, and the name of it is Cox Plaintiffs, and it's abbreviated Pltf'sExhibit 3, and it is something from Mr. Cox, who is one of the railroad experts in one of the other matters, he cites that as two to three seconds, so we used the average of that, 2.5.
Q. So other than being aware that Mr. Cox was an expert retained actually by AIPC in the employee litigation, do you know anything about Mr. Cox?

A. No.
Q. Do you know anything about his qualifications?
A. Other than my understanding is he's a railroad guy; but other than that, I don't recall them. I'm sure I saw them at some point, but I don't remember what they were.
Q. If Mr. Cox said two to three seconds, do you know where he got that from?
A. I do not.
Q. Do you have any peer-reviewed or published literature that shows that using a brake cylinder build-up time of 2-1/2 seconds is an appropriate time to use?
A. Let me see if that's in the other paper. There's another paper that we talked about, so if you'll just give me a minute. What I want to describe to you is a reasonably intensive paper, it's the other paper we talked about, the JRC 2017. That refers to a brake build-up time of one

second.
Q. The brake cylinder build-up?
A. Well, he refers to it as brake build-up.
Q. Well, that's something different, isn't it?
A. Is it?
Q. Well, I'm asking you. Do you know?
A. I do not.
Q. Wouldn't that be important to know if you're going to plug that number in?
A. Well, that's the way he describes it in terms of -- you know, you've got that idea, you know, when I talked about it being similar to tractor-trailers or any braking mechanism, you have a period of time from when you initiate braking until you get full braking, and that's the way he describes that in this paper.
Q. Right. But you're holding yourself out as having expertise in doing

this calculation, right?
A. Yes.
Q. So if you're going to have that expertise, wouldn't you need to know what he's referring to when he says "one second for brake build-up," what that means?
MR. RADECK: Object to the form.
Q. If you're going to rely on it. Are you relying on one second?
A. I'm not relying on one second. I'm using 2.5 seconds.
Q. But you referenced that particular paper. Tell me what that is, again, what paper that is.
A. This one I mentioned earlier, that is the one by David Thurston, it's the JRC 2017 proceedings of the 2017 Joint Rail Conference.
Q. But the 1.0 second he references in that paper, you don't know what that pertains to other than he says brake build-up?
A. He describes it as, my

understanding, the same thing. And I haven't completely read through this full paper to see if there's any other place that he's used that to describe it. So if I want to try to fully answer your question, I would want to do that.

Q. Well, where do you get the basis for your statement that he's describing essentially the same thing?

A. Well, when you go through and you read, hold on just a second. He describes it in his language as the build-up of braking; in other words, you know that once you start braking, there's going to be a finite period of time between once you start braking and you have full braking. That's what I'm referring to as his brake build-up time. So that's just the way Dr. Thurston describes it.

Q. Well, when you say "brake build-up time," what do you mean by that term?

A. I think I just said it. I

probably didn't say it very well.
Q. Well, maybe it was me. I might not have understood it. But tell me what you mean by that.
A. It is the idea that when you initiate braking, you start stepping your foot or turning a throttle, whatever you're doing, turning a valve, and you start the process of braking, so the brake shoes are moving and interacting with the rotors, or the drums, whatever you have, then there's a period of time before they get to full braking. You have a very similar thing with tractor-trailers. It's the very same way it's described in the literature that I've seen here, it's that time period. So you had Mr. Cox who said it was two to three seconds, you have this fellow who is using one second, so you're looking at a brake build-up time. And that's what I mean by that.
Q. When you use the term "brake build-up time," are you talking about the

length of time it takes to run the air from the lead of the engine to the rear of the train?

A. No, no, no, that's completely different. That's the air propagation. They use another term for it. I think they use the word -- the term they used is transmission time. It's what Foster described, is what you were just talking about.

Q. That's what I was trying to understand, is whether you're using those terms interchangeably. You recognize those are two different things?

A. Yes.

Q. So there's a difference between the brake cylinder build-up time and the air brake propagation time, right?

A. That is correct. That is correct.

Q. And you do understand, from what I showed you from Mr. Loumiet, he says it's nominally ten seconds for emergency braking

application, right?
A. That's what that thing that you showed me said.
Q. What does the word "nominally" mean?
A. Nominally, what's the definition of "nominally"?
Q. Yes. Do you know?
A. I would have to Google it. I mean, I have an understanding, but --
Q. So at least Mr. Loumiet, in the publication that you include in your materials that I'm going to tell you came from an e-mail that your counsel sent you, he said 10 seconds, you used 2.5?
A. Yes.
Q. And you used 2.5 because you based it on a number that you found in something Mr. Cox put together in prior litigation, right?
A. Correct, and the paper I referred to.
Q. The paper you referred to didn't

say 2.5.
A. It said 1, but if I used 2.5, then that really is kind of conservative.
Q. Well, let's take 1 for brake application, but you don't know what that term meant in the context of that report, do you?
A. Right. Let me go back to exactly the term he used. Brake build-up, that's the term he used.
Q. And you don't know whether brake build-up and brake cylinder build-up is the same thing?
A. They're describing the same thing, I know that.
Q. And you don't know where Mr. Cox got his two to three seconds from, what the source of that was, do you?
A. That is correct.
Q. And you don't know where Mr. Thurston got -- assuming he was describing the same thing and he called it one second, you don't know where he got

that from?
A. That is correct.
Q. You don't know what type of testing or analysis went into coming up with whatever that number represents, do you?
A. That's correct.
Q. You would agree with me that it makes a difference if you use ten seconds instead of 2.5 seconds, it would make a difference in stopping distance, wouldn't it?
A. It does.
Q. It would take the train longer to stop than what you calculated, correct?
A. That is correct.
Q. You also said that the .0825 number you used came from some data you had on a prior case you had worked on?
A. Yes.
Q. Do you know what type of engine was involved in that case?
A. Not as I sit here. I could go

back and find that file and look it up; but as I sit here, I don't know the answer to that question.

Q. Do you know whether it was the same type of engine that the Norfolk Southern train crew was operating on the date of our accident?

A. Again, I would have to go back and look at that.

Q. Was that not important to you at the time you were doing your analysis?

A. I don't know if it was important or not. I understand a lot of this analysis was done quite some time ago, so I just don't have a specific memory.

Q. Do you understand that the braking systems on locomotive engines differ from different type of engines?

A. Yes.

Q. Did that make any difference to you?

A. No. In other words, it did not enter into our calculations.

Q. I know it didn't enter into your calculation. My question is, why didn't you consider that a factor as something that might be important to look at?

A. I don't know how to answer that question. As a matter of fact, ask it again.

Q. Why didn't you feel it was important to determine whether the engine that was involved in the accident where you got this .825 number from was the same type of engine that was being used by the Norfolk Southern crew at the time of this accident?

A. Well, what I would say there is, in terms of looking at exactly the rate that you need for decelerations, I think that's the central question. And I appreciate that it can be a very complicated situation, but generally speaking, when you're looking at just mechanical forces and the way braking systems operate, once you achieve full

braking, now your deceleration is mostly a function of the interaction between the rail and wheel, so those are all going to be very similar. In other words, you're looking at steel on steel. Just in terms of research that we did, those are the numbers that we found and those are the numbers that I used.

Q. Well, sure it's going to be steel on steel, regardless of what engine is involved. But you would agree with me, wouldn't you, that deceleration rate is going to be a factor of the weight of the train involved in the accident, correct?

A. I think that's going to enter into it, yes.

Q. It's going to depend, in part, on the grade of the track, correct?

A. Correct.

Q. For example, deceleration rate on a downhill stop is going to differ from a deceleration rate on an uphill stop, isn't it?

A. That is correct.
Q. It's going to depend, in part, on the type of braking system that's involved on that locomotive, isn't it?
A. It is, but generally speaking, predominant where you're considering all those factors, those do have to do with the build-up time; but once you've gotten to what you consider to be full braking, then most of those other factors go away in the mechanics of looking at braking forces.
Q. And that was the term you used earlier that I forgot to follow-up on. You did your calculation of stopping distance from the point that you considered them to be in full braking, right?
A. Well, that's part of it. Remember, we wrote out formulas. Part of that was the idea of -- one portion had to do with the braking aspect of it, the other had to do with the pre-braking part of it, the transmission time, build-up time, perception/reaction time, so it's a

combination of both those things.

Q. What did you consider to be the point in time at which the crew had initiated full braking, what you described as full braking?

A. In this accident, they never did. My understanding is he didn't -- I think everybody agrees with this, there is no indication that he hit the brakes until after impact.

Q. Right. I guess to state it differently, then, looking outside the context of this accident, what would you consider to be the point of full braking by a train crew, when does that occur?

A. Well, obviously it's going to be after the build-up time, after those other things, in terms of once you have the deceleration rate, then that's where you look at the .0825, .065, and those rates are consistent with the literature I looked at as well.

Q. What was the length of the train

the Norfolk Southern crew was operating at the time of this accident?
A. I would have to go back and look and see what Foster said, but there's a build-up sheet that's like 1,930 feet, or something like that.
Q. Did that factor into your calculations?
A. Sure.
Q. And what was the weight of the train, do you know?
A. Again, I would have to go back and look. The weight did not factor into the calculations.
Q. Why did the weight not factor in?
A. It is my understanding that the places where the weight is going to have its most effect on the analysis has to do when you're looking at the build-up things, not necessarily full deceleration. If there's full deceleration, once you've gotten to whatever full deceleration is, then the weight is less of a factor.

Q. You say "less of a factor," but it is a factor, isn't it?

A. Well, you could say it's a factor -- it's a factor in the sense of braking forces developed at the wheels are going to be a function of how much weight you have on them. So I'm not going to say it's unrelated at all because there are different aspects of a weighted versus an unweighted train, so we know that. But I think of all that as in the build-up area.

Q. Right. But surely you would agree that it's going to take a longer distance to stop a 10,000-ton train than it would a 1,000-ton train. Is that fair to say?

A. I would think that would be true, yes.

Q. One of the things Foster commented on, and I'm sure you saw it in his deposition, is he said that he disagreed because you used a constant deceleration rate. Is that a fair

criticism by him or is he off base on that?
A. I disagree with that assessment because, at least as I understood it, remember we talked about the two parts of the equation?
Q. Yes. Let's break it down, though. Did you use a constant deceleration rate? Is that a true statement or not?
A. "No" is the answer to your question, but it's a qualified answer. In other words, when you say that there's a -- once we have full braking, then we know that that's where I used a constant deceleration point. But also included, and I think this is what he was talking about, it appeared to be what he was talking about, that had to do with within the analysis of a build-up time and the progression of the air time, progression of the air through the system.
Q. So what I think you're saying there, Allen, is you recognize there's a

period of time where the air is propagating through the system and braking is not yet being applied, correct?

A. That's sort of correct. In other words, that's actually something that -- that we disregarded. In other words, we're acting as though in that build-up time that there was no braking. There's going to be braking. In other words, so if anything, that makes the numbers that we have high. So in other words, if it takes you on the average of 2-1/2 seconds to build up, understand that mechanically what happens is that air surge is going through the train, then the early ones start braking early and the last one doesn't start braking until the air gets to the end. So you could argue mechanically that in that period of time, you've got half-braking. So in terms of did we consider it, in that one, we just presumed no braking. So that means that any number that we calculate should be a smaller number than what you

see on the paper.
Q. And the time you used for propagation of the air from the head end to the rear end of this train was what?
A. 2.1 seconds.
Q. And where did you get that from?
A. Well, that's the length of the train divided by the speed, the propagation speed.
Q. And that's what I'm asking, where did you get the propagation speed from?
A. Foster mentioned them both, and I think they were also mentioned by Mr. Cox as well.
Q. In calculating stopping distance, did you give any consideration to the empty weight of the cars that were involved in the Norfolk Southern train?
A. No.
Q. Did you not believe that made any difference in stopping distance?
A. Again, I'm probably doing a terrible job at this, but what I'm going to

say is, the way braking systems operate is once you've worked up to full braking -- and in all these, we're talking about emergency braking situations. So your full braking, in other words you're braking as hard as you can brake. You know, once you've gotten to that point, now your weight is a negligible number. Where your weight is going to come into it has to do with things like the build-up time, light, for example. We were talking about the build-up time itself being two to three seconds. Well, if you've got an empty car, it might be two seconds. If you've got a full car, fully weighted car, that might be three seconds, so we're using 2-1/2. So in that sense, the weight is considered in what we're doing because we're just using an average, so.

Q. You mentioned earlier steel on steel. Did you look at the friction weight that's applied to the steel wheels on the steel track?

A. Not specifically. In other words, when you look at -- if you're looking at the deceleration rate, then that essentially is going to tell you functionally, in terms of being able to determine how fast you can stop, based on those numbers that we've already talked about.

Q. Have you completed all the work that you felt was necessary to reach the opinions that you expressed in the report you just generated in this case?

A. Yes.

Q. Did you get all the information that you requested from counsel to allow you to do your work?

A. Yes.

Q. And I know you did some other work outside of review of written materials. We're going to talk about that in a second. But have you completed all the work that you think is necessary to fully support the opinions you've reached

in this case?
A. Yes.
Q. Is there anything else you expect to do other than review new material, if any is provided to you?
A. Well, I don't know how to answer that question. In other words, you've asked some very pointed questions about build-up and things like that. The question would be if we can go back and find out any more information about that, I would be very interested in what Foster had to say, in terms of any of those numbers, because he didn't do any calculations at all. So I would just leave the door open to doing some more research on that.
Q. Well, you and Foster are in agreement that at the point where the crew said they realized the train was in the foul, if they applied the emergency brake at that location, they could not have stopped short of striking the AIPC engine, correct?

A. That is correct.

Q. Were you asked by counsel to make any assumptions as to the facts of this case as part of your work and analysis?

A. I don't remember -- let me try to answer that, and you'll tell me if I get off-base, and that is that when you're talking about making assumptions, obviously right now there's no way for us to know, with great specificity, a lot of precise numbers you would always like to have. Like for example, Mr. Small said at one point he was about 600 feet away when he realized there was a foul. Another, I think the way he described it, he was about 380 feet, and then there was another point at which they recognized it was in the foul and they were doing things. So even though I agreed with what you said, in any of those situations, they still cannot stop so that there's no impact at all; however, depending on which one of those factors is true, then you can significantly reduce the

kinetic energy associated with it, which is obviously going to affect how much or if there's even a derailment at all. You see in my report that depending on which of those factors come into play, that he could have as little as about ten percent of the kinetic energy than it was at the time to maybe half of what it had. Either of those, you can see that you're still going to have an impact, but now the kinetic energy is something that gives you an idea of the magnitude of that impact.

Q. You referred earlier that you used numbers and data from Mr. Cox. Do you remember when you told me that earlier?

A. I did.

Q. Did you see where Mr. Cox said that -- he described this as a sideswipe-type event. Do you agree with that?

A. I don't recall that. Was he deposed?

Q. Yes, he was deposed.

A. I don't think I saw his deposition.
Q. Let me ask you to assume --
A. Can you tell me if it's in my materials? I don't remember.
Q. I don't believe you referenced the deposition. You did have his report in there. But in any event, let me ask you to assume that he described it as a sideswipe-type event, and he testified further that when you have that type of event, it's unpredictable what's going to happen to the train when it strikes, in this case the AIPC engine. Would you agree or disagree with that assessment by Mr. Cox, assuming that's what he said?
A. Well, I would agree that I think of this real large as a sideswiping-type of thing. Anything else, I wouldn't address it. I would address it in the way that I addressed it, and that is to say when you're looking at the magnitude or the energy involved in the impact, that if in

fact whatever braking you did, you're going to reduce that significantly. And by "significantly," remember that your energy is a function of your velocity squared. I think if you look at my report, if you lose 10 or 12 miles an hour, well, you don't lose a third of your energy, you lose half of it; in other words, it's an exponential phenomenon.

Q. Right, I understand that. Foster said, in terms of the kinetic force, that's just math. I think that's what he said. You saw that, right?

A. Right.

Q. My question to you is, you're not offering an opinion, to a reasonable degree of engineering certainty, that even at the reduced speeds, had they applied braking, that the derailment would not have occurred?

A. That is correct.

Q. What is correct, that you're not offering that opinion?

A. That I'm not offering that even at a lower speed, that the derailment would not have occurred.

(Whereupon, at this time a short break was taken.)

Q. We're back on the record. Just very briefly, I'm going to show you Exhibit 6.

(Whereupon, Plaintiff's Exhibit Number 6 was marked for identification, a copy of which is attached to the original of the transcript.)

Q. The only reason I'm showing this to you, so you'll know I wasn't pulling your leg earlier when I told you I thought it was Mr. Teel, and I actually had the name right. And it looks like he sent you, or Eddie Lavett at your office, with a copy to you, an e-mail. In his e-mail, he said, "I also have a textbook on deceleration rates, train accident reconstruction, and FELA and railroad litigation." Do you see that?

A. I do.
Q. And I'll represent to you that's the Loumiet book that I was telling you about earlier.
A. All right. If I may, if that's the end of the question, because you really just made a statement, not a question. If there's any place that I feel like I should have added to, or something, or completely answered a question, then you want me to do it?
Q. If you need to clarify something you said earlier, yes; otherwise, Mr. Radeck can certainly ask you questions if you want to wait for his questions.
A. I think it's a clarification. One of the things we were doing, is we were talking about that phenomenon of the transmission time and the build-up time. You were asking me what were all the bases of that, and I failed to mention that in that exemplar that we used, the numbers that we used are consistent with that

emergency braking on the exemplar braking that we talked about before in a previous accident. I mentioned that the name of it was KSC, and you've got all that data in there. That period of time for the build-up and the transmission time, those are all consistent with the numbers that we've used. So when I look at something that says that number is 2-1/2 seconds, and then I look at this data, then I see consistency there. I just thought I would add that as well. I did not mention that before, when you were asking about the things that were used. How do we determine what numbers that we use to be fair in this assessment, and that's one of them.

Q. I'm not sure I fully understood what you were telling me there, but I'll read back the transcript and maybe it will make more sense to me later.

A. Okay.

Q. But regardless of all that, you acknowledge, and your calculations reflect

this, that assuming hypothetically something can be seen up ahead that requires some type of action, the braking and the deceleration of the train is not going to start immediately upon them observing that object, fair?

A. That is correct.

Q. Because, A, we know there's got to be perception/reaction time to, "Hey, there's something up there" and the brain saying "You need to do something about it," right?

A. Correct.

Q. In this case, you assumed 1.5 seconds?

A. Correct, perception/reaction.

Q. And then we also know, in the context of a locomotive, there's a period of time where he's got to build up air brake pressure, brake cylinder. We talked about that earlier, correct?

A. Uh-huh.

Q. Is that "yes"?

A. Yes.
Q. And there's a period of time that the air has to propagate from the head of the train to the end of the train before there's full braking applied, correct?
A. That's correct.
Q. And all that affects deceleration rate, correct, and stopping distance? I'm sorry, affects stopping distance?
A. Correct, from the beginning of perception. And the real key to what I was trying to say, I'm certain Foster is not going to have a disagreement with the 2.1 seconds because, as he says, that's simple math.
Q. The 2.1 seconds of what, propagation?
A. The propagation time, that's simple math. In terms of the build-up, that's the real question and you asked a lot of different questions about that, in terms of this example that we have, this real life example of a vehicle braking and

coming to a stop, where you see that phenomenon in the data, those times that we've used are consistent with what we've used in this accident.

Q. Right, but the data that you looked at which you're calling the exemplar event, you don't have any data that shows the brake cylinder pipe build-up time for that event, do you?

A. I would have to go back and research that particular case, presuming we still have it.

(Whereupon, Plaintiff's Exhibit Number 7 was marked for identification, a copy of which is attached to the original of the transcript.)

Q. I'm going to show you Exhibit 7, and I'll represent to you that this is the report we were provided reflecting your work in this case. Did you bring your report with you today?

A. Yes, I did.

Q. So it doesn't matter to me, you

can look at Exhibit 7 that I handed you, it should be the same thing, or if you've made notes on your version and you prefer to use your version, that's fine, too.

A. Okay.

Q. First, just housekeeping questions, is this a copy of the report that you prepared?

A. Well, I'm certain you're not one of those tricky fellows that would, you know, change it up. It certainly appears to be one. The front page is certainly mine.

Q. Did you author this report?

A. Yes.

Q. Did anybody else have any input into the text that we see here in the report besides yourself?

A. Oh, sure. I know that Andrew, at a minimum, would have had some input to it.

Q. Anyone else?

A. I wouldn't rule out Eddie, but I think Andrew is probably the main guy.

Q. Do you know by paging through the report any specific sections that you would say, "Yes, this was drafted by Eddie or Andrew, this was drafted by me," or is it all a collaborative effort?

A. It's mostly a collaborative effort. I would say probably the first two pages, the accident statistics, the first two pages after -- the ones that are labeled as 2 and 3, I would say that's mostly Andrew, and I would say the rest of it was collaborative.

Q. You've done reports in federal cases in the past, I assume?

A. Yes.

Q. And you understand the federal rules require you, as part of your report, to disclose all of the opinions that you have in the case?

A. Yes.

Q. You also understand that the federal rules require you to include in your report the basis and materials you

rely upon to reach any opinions you intend to express?
A. Yes.
Q. Did you do that in this case, meaning, A, does your report reflect all of your opinions and all the bases and supporting materials behind those opinions?
A. I'm pretty sure that's true, in answer to that question. So I think the answer is "yes."
Q. Well, that's a dangerous response. When you say you're pretty sure it's true, that leads me to believe that maybe it's not true, or at least not true in part. Is it true or not?
A. I'm going to say it's true, and sorry to cause you suspicions.
Q. That's fine, but you understand barring some court ruling, I don't get to come back and depose you again, so I don't want to leave here and find out you've got three other opinions that you didn't tell me about, which is not fair to me. You

would agree that wouldn't be fair to me, would it?

A. That is correct.

Q. Let's start there. Tell me what the opinions are that you intend to express at the trial of this case.

A. Well, they're pretty much as they're laid out in the report. In other words, the idea is that if you see the camera that you're looking at on the cameras that you see, they're wide-angled, they appear to be poor quality, it's hard to tell if they were dirty, but they distort what a person would see, with normal vision, you know, would see because of those factors. In other words, a wide-angle lens makes things look farther away than they are. So the question is, what would one reasonably be able to expect to see with their eyes from this camera, at these camera positions. So we addressed that, so I would say we've done our visualizations.

Q. So let's pause there, then. You said, "We looked at that." What is your opinion in that regard?
A. Well, the opinion is that the cameras that are on the engine are misleading in the sense of the information they may give a viewer of how this scenario played out visually. In other words, the wide angle is going to make it look like the engines that are fouling the track is going to make them look like they're farther away.
Q. So you've got an opinion about the camera, the accuracy of the video evidence, is that --
A. Not necessarily the accuracy, just the way that it was -- the focus length that you're using there, that it's a wide-angle lens, and that's the sort of thing that is going to make the engines, or the engine and the cars that are sitting on the track, look farther away than they are in reality. So I would say that would be

the opinion.
Q. What other opinions do you have?
A. That I would say a 50-millimeter focal length gives you a much better rendition, and that's shown in the visualizations that we've done. And then generally I would say that in terms of the opinions in each of the descriptors by Mr. Small and Mr. Rightmier, that they are correct in that once they've perceived in the time frames where they talked about perceiving, that it was too late to avoid the collision. What that leaves out -- and Foster says that as well. What that leaves out is the idea that had they braked, then they could have lessened the severity of the impact. In other words, as you see in the video, Mr. Rightmier is right there in front of him with an emergency stop. Well, when he reacts, he's moved, he doesn't stop, he doesn't hit the brakes. And I think Mr. Small said he perceived and reacted but he just froze. So I think the

very end of that would be that pretty much any braking that you're going to do, regardless if we want to argue about some of the factors, is going to reduce the kinetic energy at impact.

Q. What other opinions, if any?

A. I would say that my opinions, of course, are what are stated in the report and what are in my file materials. For example, I don't know if anybody is going to ask me about this, but, you know, it is a slight uphill grade. In terms of looking at distances, I think those are all shown in my drawing. So in terms of just the geometry of the engines, the size of them, the location of the engine from AIPC, you know, we determined all that. That's in the file materials as well.

Q. That just tells me a little bit about the work you did. I'm asking now -- we're going to talk about the work that goes in it, I'm just trying to capture your opinions.

A. Okay. Then I probably misunderstood your question from a legal standpoint, which I would say it's my opinion that the engine for the AIPC vehicle was sitting, as I've shown in my drawings, at impact, so that locates, shows how close it was or how much it was in the foul. It was about a foot-and-a-half off the rail, so if Foster said the foul was four feet, that means he's, what, three feet, two-and-a-half feet into the foul. But the point is, the position is as it is. I would say that our drawings are true and accurate. We used three different technologies to measure the scene; drone, scanner, and total station, so we have an accurate drawing, so the drawing that we have is accurate in terms of distances and measurements and things like that. I think of that as an opinion, you may not.

Q. I consider that, again, to be more of your work, but that's fine.

A. Okay. Then I think I've answered

your question.
Q. I mean, obviously, if you're allowed to testify at trial, you'll be asked how you generated the work that you did, but that's not an opinion, that's just a description of what you and your team did. What I'm trying to identify is, what opinions do you intend to express at trial?
A. First, the thing that I would say, in terms of the opinions, I've already stated them specifically. And you have me at a disadvantage because I've been sitting here and having an attorney just say to me, "You say it's this distance from here to there, that's your opinion." So I'm not always certain exactly what someone sitting in your chair is going to consider an opinion or not.
Q. So have we covered all the opinions you have, then?
A. I think we have. In other words, I'm not holding back anything. There's nothing I'm thinking, "Gosh, Ron didn't ask

me about that."

Q. So you don't have any opinion as to what distance the Norfolk Southern locomotive was from the AIPC engine when you believe the crew should have recognized the AIPC engine was in the foul?

A. They should have -- no, I do not have an opinion about that. I mean, you see in my report that you can first see it from about 2,000 feet away. The specifics of that number is in the report. But in terms of where they should have, that's not in my opinions.

Q. You would agree with me that there's a difference in spotting or seeing an object up in front of you and realizing or appreciating that you need to take some type of action in response to that object?

A. Of course, of course.

Q. In this case, you said based on your work, you believe at about 2,000 feet, the train crew could have seen the AIPC engine off in the distance in front of

them. That was your determination, right?
A. Yes.
Q. But as you just told me a minute ago, you're not saying that at that distance or any other, you didn't determine that they should have realized, "Hey, this thing is in the foul, we better do something"?
A. That is correct. In other words, really what you're asking me is what I think of as a jury evaluation; in other words, once they have a rendering or a visualization that shows what it looks like in real life, then they are able to say -- and obviously we see in the video where people are reacting, we're looking at what both Rightmier and Small talked about when they could see it and recognized it as a problem, and I guess the reactions speak for themselves.
Q. And you agree with me that they had no obligation or responsibilities to start trying to do an emergency braking

application until they appreciated that something was in the foul and they might strike it?

MR. RADECK: Object to form.

Q. Would you agree with that?

A. Well, I would say that sounds like a fair statement, but that's really not in my area. And if I may, you were asking me about other opinions. This is one place where Foster and I may or may not agree, and I don't know, because he talks about this being in a one-degree curve, this area of the accident being in a one-degree curve. Well, if you look at my drawings, the data that was taken, this is about as straight a shot as you've got, and I think the visualizations show that. I think the original video shows that as well. But, again, if I understand what you said before, that's just some of my work, that's not necessarily an opinion.

Q. And to be fair to you, because it is in your report, you do hold an opinion

that if they had started braking at 1,000 feet, you believe they would have been able to stop this engine short of striking the AIPC engine. That's one of your opinions, isn't it?

A. Yes, it is.

Q. You didn't share that with me earlier, but it is in your report.

A. Okay.

Q. But as to that, as you just told me, you're not offering an opinion that they should have seen and recognized it was in the foul 1,000 feet? You're just saying that if they stopped braking at 1,000 feet, they could have stopped short. Is that accurate?

A. That is correct.

Q. And to the extent that you reviewed documents, depositions, written materials that were provided to you, the video of the accident, those are all listed in your report?

A. I believe they are. As a matter

of fact, that exactly is the point of hesitation I had earlier. As I was looking through here, I would have to go back and see if all of these things are included. They should be. I know that since this report, I've gotten other materials that we've had that are not listed here.

Q. In particular, I was interested in item 7, list of depositions, those four, Small, Ogden, Rightmier, and Blanchett. Do you see that?

A. Yes.

Q. Have you reviewed any other depositions besides those four?

A. I have. Since then, of course, Foster, I saw his.

Q. Yes, I'm sorry, you did tell me about Foster earlier.

A. And there's another fellow, Daniel -- what's his last name -- oh, Dustin, Dustin Bell. And in fairness, I did not look at his deposition. I looked at Andrew's summary on it.

Q. Mr. Bell's focus in this case was primarily on the derail device that was out there at the industry track, and that's not something that is in your area of expertise, correct?

A. Correct.

Q. You didn't review the deposition of Ren Marshall, the AIPC representative?

A. No.

Q. As part of your work in this case, you've already told me you didn't evaluate the Norfolk Southern train crew. You didn't do any evaluation of the actions or conduct of Mr. Rico Blanchett, who was the AIPC employee, did you?

A. That is correct. There is one other thing I wanted to give to you as well. It's similar to that one right there. I'll give that to you and you can decide if you want to mark it or not.

Q. Tell me what it is, first.

A. There is a document that you have, that I'm certain you've looked at,

that is listed as deceleration calculations. Do you remember that one?
Q. In the materials you produced to me?
A. Yes.
Q. Yes, I remember seeing quite a bit of data on calculations that your office ran.
A. So to be clear, remember earlier I told you, when we were looking at this one that you marked as 5 --
Q. Exhibit 5, yes.
A. -- where you've got numbers in here based on the 31 miles an hour, those distances are the ones in my report, and that's how we got to them.
(Whereupon, Plaintiff's Exhibit Number 8 was marked for identification, a copy of which is attached to the original of the transcript.)
Q. And then what's Exhibit 8? It looks like it's the same thing, but you dispute the 34 miles per hour?

A. Yes. No, no, no, that's not correct. And I'll show you my screen. This is that document. So the one we just talked about is this section right here, then there's two other sections over there, and that is in my report where I talk about -- this is the very last bullet that talks about where the engine is 483 feet away, and that is when Small begins to reach for the brake. We made a calculation for that one, and that one is on that page. Then later there's one where he said 600 feet away, that's on that same page. And then there's another one towards the bottom of that, is another place he said that he saw the switcher sticking out of the track was when he reached the rear of the cars behind the switcher. I don't know if you remember that or not, but at that point it was 380 feet from impact. That's what this that you marked as Number 8 shows. In other words, that just didn't get printed when that page that you have listed as

deceleration calculation was printed.

(Whereupon, Plaintiff's Exhibit Number 9 was marked for identification, a copy of which is attached to the original of the transcript.)

Q. I'm going to show you Exhibit 9.

A. There you go. See, you had it already.

Q. So Exhibit 9 is the analysis that you had done previously that looked at speed at impact, depending on various different points that he might have initiated braking. Is that right?

A. That is correct.

Q. You did Exhibit 8 today because Exhibit 9 doesn't include 380 feet?

A. That's correct. The report does, but 9 does not.

Q. I got you. Now we'll talk a little bit about the work you did to create the animation that your team did in this case. I want to start here. First off, your team went out to the location where

this occurred, I think from your report, it looked like on two different occasions. Correct?

A. Yes. One of them was me and an assistant, and the other was Andrew, and I'll have to find out who else was with him.

Q. And from the photographs and videos I was provided, it appears pretty clear to me that you got out onto the Norfolk Southern tracks to do part of your work. Is that accurate?

A. Yes, it is.

Q. And you understood, didn't you, because Mr. Williams' office in the e-mails I saw told you you're not supposed to be on the Norfolk Southern right-of-way?

A. That is correct.

Q. Why did you trespass on Norfolk Southern property after your counsel told you you shouldn't be doing that?

MR. RADECK: Object to form.

A. Well, I'll leave it to others to

decide whether I trespassed or not. The reason that I did the work that I did was to make the measurements and take the photographs that I did.

Q. Well, you knew you didn't have permission to be on Norfolk Southern property, correct?

A. If you tell me that Turner said that, then I'll agree with that. I'm sure that I read it.

Q. Do you want me to show you the e-mails where he said, "You can't be on Norfolk Southern property"?

A. No, I believe it. I believe it.

Q. I thought you would.

A. Yes.

Q. And you knew that we were in litigation at that time, we had sued AIPC, and that's why you were out there, right?

A. I did not know that Norfolk Southern was involved in any litigation, I don't think, until after the Small and Rightmier things were done. I just don't

remember early on. They may have been, I don't know. You may look in the documentation and see it there. But in the early portion of this work when we were doing all the investigation, then at least in my mind, it was the Rightmier and Small matters.

Q. And I think you told me you've been doing this consulting work for a long, long time, many cases. Is it your common practice to trespass on the property of the opposing party, if necessary, to do your work?

MR. RADECK: Ron, this is inappropriate.

MR. WRAY: No, it's not, John. It's directly appropriate. It's not appropriate for you guys to have your expert go on Norfolk Southern property without permission. There's a process, which you well know, to inspect property. Did you send a request to inspect property in this case? The answer is no. So if you wanted

to go on our property, there's a process for doing that, and I think it goes directly to the credibility of the witness, and I'm entitled to ask about it.
Q. My question to you, Mr. Powers, was do you commonly trespass on the property of opposing party in litigation when you're doing your consulting work?
A. I think that's a different question. But as a general answer to your question, it is not unusual at all when I'm measuring a highway. If I'm measuring an interstate highway, there's not supposed to be pedestrian traffic, but there's no way you can measure it without getting out there on it. So in that sense, I do it all the time.
Q. But an interstate highway is a public thoroughfare, isn't it?
A. There's a difference between an interstate highway and a rail system, but my understanding is that pedestrians are not supposed to be on the interstates, and

that's what I am when I'm out there measuring interstates. I'm trying to answer your question, and that is to say, I do it all the time.

Q. But unlike an interstate highway, you understood the railroad property is privately-owned property by the railroad, didn't you?

A. That's my understanding, yes.

Q. And you never checked with the railroad or got authorization from the railroad to be on the property to do any of the work you did in this case, did you?

A. That is correct.

Q. And you understood, when you were out there, you and your team doing your work, that the tracks have been reconstructed from what they were at the time of the accident because there was damage to the tracks caused by the accident itself. Did you understand that?

A. That is my understanding for the Norfolk Southern. My understanding is that

the track that joined it was not damaged.
Q. And what effort did you make, if any, to determine the relative differences, if any, between the position of the track at the time of the accident and at the time that your team was out there doing your drone images and 3D scans?
A. I don't know that we specifically did anything to ferret that out, other than I know part of the work that we did is we had a Google image. What we've done is consistent with the Google image, and I don't recall if the Google image was pre or post accident.
Q. You had a Google image of what, the Norfolk Southern tracks?
A. Yes.
Q. Why didn't you just rely on that, then, instead of going on the Norfolk Southern property?
A. Well, there are a lot of people who do that sort of thing, and I would say I would be very critical if they were to

look at things like slope, curvature, distances, positions, based on a Google Maps image.

Q. You also told me earlier that you had some thoughts on the quality of the video captured from the locomotive on the day of this event. Do you recall telling me about that earlier?

A. Yes.

Q. What do you know, if anything, about the type of camera used on the locomotive that captured those images?

A. Everything that I would mention about that just has to do with the product, not necessarily about the camera itself. I would have to go back and try to look, but I'm sure there may be -- most cameras have some kind of metadata. But when I'm looking at this one, I'm really making a commentary just on the visual aspect of the camera; in other words, once you see it, it's obvious that it's a wide-angle lens.

Q. And what makes that obvious to

you, just the frame of reference that you can see when you look at the video?

A. I guess. You know, I don't want to be facetious, but I'd say you can tell by looking. Once you've been to the scene, once you've looked it over, and looking at what that camera looks like, or what image that the camera shows, it's just clear to me it's a wide-angle lens.

Q. And how do you define that term? What do you define to be or determine to be a wide-angle lens?

A. Well, what I'm describing is something that, remember, we've already talked about the idea that it's generally understood that a 50-millimeter camera focal length is what best replicates the human eye. So I think of wide angle as anything that deviates to the lower end of that. It can go from 50 to 40 to 30; fisheye, I think those are down in the 10 focal length, but just something where you're getting distortion of the image.

Q. But you don't know what the focal length was on the video camera on the locomotive, do you?
A. We have ascertained that to be 30 millimeters.
Q. So you've determined the actual camera focal length on the Norfolk Southern camera, from the actual data of the event, to be a 30-millimeter?
A. Yes.
Q. And your view, and I think you gave me an article, your view is that the human eye sees at 50-millimeter?
A. Correct.
Q. Anything else you know about the specifics of the camera used on the locomotive?
A. I mean, I know we were provided data on that camera. I would have to go back and just try to look through that to see any other specific things that are listed on there. But by and large, the commentary that I have really has to do

with the camera's product.

Q. I noticed in your report, you referred to it as capturing five frames per second, and I think in some other materials that we're going to look at in a second, you described it as six frames per second?

A. Yes.

Q. Do you know what it actually is?

A. Well, it's one of those -- there's -- I can tell you, in a general sense, what you're looking at with video cameras and the way they keep data, and there's a lot of variations on specifically how they do it. But by and large, you understand that a video camera is just something that rapidly takes pictures, and we talked about 30 frames per second, it takes 30 pictures in a second, and you can render those down to frames and input them in there. This one, by looking at the data, essentially shows it's being played at 30 frames per second. So the question is, how many actual frames do you have per

second. In other words, does it only shoot at five frames per second or it's shooting at 30 frames per second but it's only writing every sixth one, or does it write them all and then remove some? In other words, if you look at the way that we time that, even when we talk about frame rates, we talk about 30 frames per second, it's actually 29.97 frames per second, which is just another thing that enters itself in there. So what you do is, you go to each frame and you look at its particular duration, and you'll see in some of these that it's looking like it's five, some is looking like it's six; but on average, it's five frames per second. When I say it's five frames per second, all I'm really saying is, it's not 30 frames per second. In other words, that's why it looks jumpy, and that really goes into the other commentary that I had about the fact that it's kind of jumpy, it's wide-angled.

Q. In terms of the accuracy of what

you're seeing, not the quality, because you commented earlier about the quality. But the accuracy of what you're seeing, does it make any difference in your view whether it's four frames per second, five frames per second, or six frames per second?

A. In terms of accuracy, I think that also comes into the fidelity of the camera itself, and I don't remember what this one was. In other words, if you're looking at HDR or you're looking at others where you're looking at, you know, 1080 by, what is it, 960, you know, it's a matter of how many pixels it captures. And this one just looks to be a lower fidelity. Exactly what it is, I don't know.

Q. Now, in this case, you did have access to the AIPC engine that was involved in the accident, correct?

A. Yes.

Q. And your team photographed it, did some 3D imaging of it?

A. Yes.

Q. And you used that as part of your animation that you created, right?
A. Yes.
Q. What did you use for the Norfolk Southern engine, since you did not come out and look at that engine?
A. We pulled another Norfolk Southern engine. It's probably that one that I referred to before. And I know that we've measured Norfolk Southern engines before, which is why I'm telling you that I think I've done work for Norfolk Southern.
Q. You said you used the one that you told me about before. I don't remember you telling me about another Norfolk Southern engine.
A. Well, when I looked at them, I didn't say definitively either one of those were Norfolk Southern, but I know I've measured Norfolk Southern engines. And in this particular one, we looked at what very much appeared to be an exemplar sister engine. You'll see a video on there that's

a cab tour. It kind of shows you where all the knobs are, what the vehicle looks like, and all that. In addition, that's also something you can find on the internet.

Q. Did you use an engine that was the same make and model of the engine the crew was actually operating at the time of this accident?

A. I would just have to go back and look into that to see what it was. I think the answer is "yes."

Q. But you don't know?

A. Well, I may know the answer, I'm just not able to recall it as we're sitting here speaking.

Q. Does it make any difference?

A. Well, what we used on the other one that certainly was an exemplar engine, then it shows where the video cameras are. So that's primarily what we used for that, is where is the video camera; and that is the video camera that's outside, the video camera that's here. We measured both of

those before, I know, on another Norfolk Southern engine. So it would have just been a combination of those, I think, with how we located the camera.

Q. I'm not sure you answered my question, though. Did it make any difference if you used the exact same make and model as the engine the Norfolk Southern crew was operating that day?

A. Well, I think what I would say, does it make a difference? I would have to kind of think about that to try to give an answer. What I would say to that is, from what we've done, I am satisfied that the camera positions -- which is really the only thing that we've used other than in the visualization, this is just something it looks like -- would be the camera positions, and I'm confident of those.

Q. Well, you understand that different locomotives have different dimensions, correct?

A. Oh, sure.

Q. They have different heights?
A. Yes.
Q. They have different widths?
A. That's correct.
Q. So where the camera is going to be positioned may be dependent, in part, on the height and width of that particular engine, correct?
A. Yes.
Q. And part of what you tried to do in some of your images was give the view that you want to tell this jury Mr. Rightmier and Mr. Small had at the time they were approaching the accident location, right?
A. Uh-huh.
Q. Is that "yes"?
A. Yes. Yes.
Q. And to do that, you would need to place the camera in the exact same spot as it was -- or place your images in the exact same spot that they were at the time of the event, right?

A. I disagree with that. When you say "the exact same spot," it's not going to alter the point of what it shows if you move that camera one or two feet. Either one of them, it's not going to alter that. But the thing that gives me confidence is that with our visualization and where we placed the cameras is not only from the others -- and I remember this, too -- when you look at a photograph, there's a process that you can go through to determine the position of that camera. In other words, it's just a standard technique. If I take a picture here, then I know where these things are, now I can locate the position of that camera. So what we did is, we had the other cameras that we had seen before, we knew where they were, then we look at the scene; and when you look at the scene, then you're able to say -- in a still frame from the Norfolk Southern camera, when you see that, then you can determine the location of that. So we did all of that to

determine those camera locations. You know, you bring in the term "exact," that's a pretty precise definition. I would say I'm confident we're within, at best, a few inches of where those exact cameras were, without measuring that.

Q. In terms of building the physical animation itself that was provided to us, that work was actually done by the other members of your team and not you, right?

A. That is correct.

Q. And I noticed one of the things you used to do some of this was you also flew a drone out there?

A. Yes.

Q. Are you required to get FAA approval to do a drone flight?

A. As a general rule, the answer is yes; in other words, as a drone pilot, there's a process that you go through to see are you able to fly here or not. In most places, the answer is absolutely, understanding that drones are under

400 feet, so you're not getting up into the airspace of aircraft. But if there are restrictions, then you can ask for an exception to that restriction for a period of time, and you can get that. So all I really know is that whichever one of those that we needed to do, we did.

Q. You're confident that your team either got FAA approval or got an exception?

A. Yes. When you say "got FAA approval," to me, that's a whole different thing. That is where you do some interaction with FAA and say, "We want to specifically ask about this location. What do we do?" No. There are apps that you use that essentially do that. In other words, when I'm at a scene, I can pull up my phone and I go through the FAA-approved app and see am I okay to fly here.

Q. Right, and that's what I was asking.

A. And that's what we do.

Q. In this particular case, did you either get whatever permissions or approvals were needed or get an exception?

A. Yes. In other words, when I say that, I wasn't with Andrew when he droned the scene. In other words, there's a thing called a LAANCE authorization. If you get to a spot and it says "You can't fly here," but you can get a LAANCE authorization, then there's a process of getting that. I did that two days ago. It is our procedure that we never fly unless we have authorization that we're supposed to. In other words, we do our due diligence to make sure that we don't infiltrate an airspace we're not supposed to.

Q. I didn't see that in the file that I got, but you believe you have that somewhere?

A. That's something that would never enter into the file.

Q. And that's because you may have done it on an app, or something like that,

that's not printed out?
A. Correct.
Q. In terms of positioning of the AIPC engine and where it was located on the industry track, how did you determine where to place that engine in your animation?
A. When you look at the tracks that it's on, it's my understanding that the tracks themselves, nothing had really significantly altered any of those, you actually saw the markings where the wheels of the AIPC vehicle went onto the crossties, so we measured all of those. So at the end of that damage to the ties that we measured, when we placed the engine there, then now knowing the complete workup of the physical state of the vehicle, and we placed the tracks at that point, as it turns out, if you measure that off the tracks, it's right at 19 inches, which is what somebody did a measurement there at the time said. We didn't necessarily rely on that measurement, but that was certainly

congruent with where we placed the AIPC engine.
Q. So you didn't rely on the measurement that was made by the investigating team on the date of the accident. Is that what you're telling me?
A. Essentially. It depends on what you mean by "rely." In other words, we made our assessment of where it is, then we compared it to that, and they were compatible.
Q. Right. But the measurements that you made and that you determined on the date your team was there, in relation to the markings you saw, were with respect to the track as it currently exists, correct?
A. For the AIPC, yes.
Q. Well, you were measuring in relation to the Norfolk Southern mainline track, right?
A. That is correct.
Q. Because you were trying to place the AIPC engine a certain distance back

from the Norfolk Southern mainline track to replicate, as best you could, where it was positioned at the time this accident occurred, right?

A. That is correct, only I would say it a little bit differently. I would say that we placed the AIPC engine where all the forensic data intended it needed to be placed, then we measured that to the tracks as they currently exist. And if they were different, then it would just be different. I have not seen any information that says they were different.

Q. Would that make a difference to you, though, if it was different, if it was moved a foot or two in the other direction away from the industry track?

A. Would it make a difference to me? I don't think it would. In other words, we know it fouled the track.

Q. Right.

A. We know it was within a certain distance, and then you had somebody there

that measured it at 19 inches which matched what we had, so that implies that the Norfolk Southern tracks didn't change in position after they were repaired.

Q. And you've referred a couple times to this measurement. You didn't have it in your materials reviewed, so I assume you did not review the deposition of Mr. Fianchino, who was the state investigator who came out to the scene the day of this accident. You didn't look at that, did you?

A. I don't remember. Is that one of the documents that's in there?

Q. I'll tell you, it wasn't in the materials I got from you, and it's not listed in your list of depositions reviewed, but if you think you've got it somewhere else, I'm happy to let you look, but I'm trying to save us some time.

A. And I appreciate that. Maybe, then, to save us some time, I'll say if it's in my materials, then we can look it

up. The best that I have is that I know that at some point someone said that.

Q. And I'm just going to read to you what Mr. Fianchino said. We marked this as Exhibit 11 to Mr. Rusk's deposition that I took last week. On page 82, line 20, he was asked, "You could tell that by a measurement you made, or by your observation, or both," and his answer on line 22, "It was a measurement with a guess on where the rail would have been because there was no rail." You weren't aware of that, were you?

A. No. No, that is true. And I think the answer in what I have, and you have all of this, are documents that -- the incident report. One is the NS incident report, there's another one that's labeled 5210001-something, and then there's NS production, South Carolina ORS and FRA inspection, and then there's some articles in there or some documents in there that I would expect if I had anything that

addressed that, it would be there.
Q. Now, since you were out there on scene and you had access to the AIPC engine, why did you not have somebody at the AIPC facility place that engine in the location where you depicted in the animation 19 inches from the rail and take some pictures to show us exactly what it would look like, using the 50-millimeter lens, which you say best replicates the human eye?
A. The best thing I can do there is give you my recollection, because that would have been a swell idea, and that is that my recollection is that it's no longer in service. They just had it there on the yard somewhere, but it was no longer in service.
Q. You're talking about the engine itself?
A. Yes.
Q. Did you ask them if maybe they could restore it to service for just one

day for purposes of you doing your work?
A. I did not.
Q. You didn't think about that as maybe the best representation of what could have been seen at certain distances using a 50-millimeter lens, as opposed to creating an animation?
MR. RADECK: Object to form.
A. Well, I would say creating an animation, creating a visualization with what we did, is the equivalent of that. In other words, did I consider that? That's really the great advent of visualizations as we have in our world now because, you know, we're able to -- we scanned that engine, so we know exactly its size. We scanned and we measured the tracks, so we know with precision where it was when impact occurred, so we have that.
Q. But part of what you were trying to do, and what you want to show the jury, if permitted, is you're trying to tell the jury what you believe would have been

available for the train crew to see on the date and time of this accident as they were approaching the accident location. Isn't that part of what you're trying to do --

A. That is correct.

Q. -- with you animation?

A. Yes.

Q. And couldn't you have done that equally well or better by actually placing the engine in the spot where it was and taking photographs using the 50-millimeter lens?

A. Well, I think we've done it equally as well, in terms of doing exactly that. Although I don't specifically remember asking this, I'm pretty certain if we had said to Norfolk Southern, "We want to hitch a ride on your engine so I can take a video from your positions," to do that, I don't think they would have let us. So that's really the point of what you have, but we go through what we need to do to measure as accurately as we can all

those things. Then in terms of the engine itself, the only real important thing to us is the location of those cameras, and we did what we should do to get those positions. So now we have that, we have the accurate location of the evidence on the track, we have a precise measurement and representation of the AIPC engine, then we have everything that we can get to, to be able to show the jury "This is what it would have looked like had you been sitting there in the position of this camera."

Q. Well, let's talk about that for a minute because -- well, let me ask you this first. Have you ever, yourself, ridden inside the cab of a locomotive engine as it's moving down a mainline track?

A. I'll have to go back and think. You know, I've done a lot of railroad cases, and I'm trying to remember if I have or not. I know I've been in and out of them a lot, but I just don't recall if I've ever been in one -- I mean, I took an

Amtrak to New Orleans. That doesn't count.
Q. No. I asked you from inside of a locomotive cab where the crew would be sitting, not sitting back in the comfortable chair of an Amtrak passenger car. But you know if you've been inside an engine at all and even looked inside it, they're looking through a windshield, correct?
A. Yes.
Q. And that windshield has dirt and grime and bugs and all the things you would expect to see on a windshield of an engine going down a railroad track, right?
A. Well, the first question I would ask you when you asked me if I know that, I would wonder if they're under the same regulations that truck drivers are to have a clean windshield.
Q. Regardless of whether it's clean and it meets the regulations, it's not going to be pristine, is it, similar to you and I standing on the tracks looking down

the tracks with our naked eye?
A. Are you asking me if a piece of glass makes a difference?
Q. I'm asking you if looking through a piece of glass would affect the perception of the train crew, as opposed to somebody just standing on the tracks, not in a locomotive cab?
A. I would say that in terms of looking through the window, and that sort of thing, I think one of these is an exterior camera.
Q. But I'm not talking about the camera. I'm talking about what you were trying to replicate in your work and how you did that. How did you account for the fact that they were looking through a windshield, with whatever imperfections that windshield may bring, if any?
A. Well, with an exterior camera, we don't do that.
Q. Well, you're not depicting it from an exterior if you're trying to show

what the crew was looking at. They're not on the exterior of the engine, are they, riding down the track?
A. That's true, but what we're showing is what the exterior view sees as well.
Q. I get that. But in terms of what the crew is going to do, they can only go based on their position in the cab, right, not based on what the exterior camera sees?
A. That is correct.
Q. And you understand that as a locomotive engine is going down the track, there's some bounce in the movement. Do you understand that?
MR. RADECK: Object to form.
A. I understand that, yes.
Q. Do you understand there's lateral and horizontal movement of the engine as it's moving down the track?
A. In a very limited sense, because it is in fact on rails.
Q. But there's some?

A. Uh-huh.
Q. Is that "yes"?
A. I would agree there is some, but there's not much.
Q. And there's going to be some glare from the sun and the position of the sun, that's going to come into play, right?
A. I don't recall the sun being an effect on this one.
Q. Well, there's going to be some sunshine, glare, overcast, depending on what the weather conditions were that morning, right?
A. Sure.
Q. How does your animation account for all of those factors, in terms of trying to replicate the view of what these guys inside the cab would see?
A. Well, the first thing I would say is, that wasn't the point of our visualization. As I stated I think early on, the whole point of our visualizations was to allow the jury to see the videos

that you see from the train positions are misleading. They're misleading because of the things we talked about before. They're choppy, it's a wide-angle lens, and so the whole point of the animation was to draw a difference between those. I don't think there's anything in there where I'm saying, "Hey, this is what Small's perspective was."

Q. Or Rightmier?

A. Correct.

Q. Fair enough. And then as we talked about earlier, and you gave me Exhibit 8 which combined with Exhibit 9, you looked at different starting points for the braking, based on some of the testimony in the case, and where that would have left them in relation to the AIPC engine if they began braking at that specific point. Is that fair?

A. Yes.

Q. And you agree with me that based upon Mr. Small's testimony about where he

said, "I realize this thing was in the foul," whether you take the 600 feet or whether you take the end of the railcar, which you did, which is the 383 feet I think you gave me today, under neither one of those distances could this train have stopped short of striking the AIPC engine, could it?

A. That is correct. And although you said I gave you that today, I gave you the spreadsheet that shows that, but that was in my report earlier, so that has been there all along.

Q. And in terms of what would have happened had they struck it at one of these lower speeds, as you told me earlier, you're not offering any opinion on that?

A. That is correct.

Q. You agree that would be pure speculation as to whether a derailment would have occurred and what that might have looked like?

A. Certainly I would stick to the

point that I made, and that is that the reduction in speed is going to dramatically reduce the kinetic energy that that Norfolk Southern vehicle has at impact, and then that is going to influence in some way the extent of the derailment.

Q. Right. It may impact the kinetic force, but in terms of the consequences of that impact, you're not offering any opinion on that?

A. Not necessarily, in the sense of then if the train is going slower, then I think it's just completely common sense that says you're going to have less trains or less cars that are going to derail; in other words, the extent of the derail. You can say certainly that's going to be less, because if you're going a slower speed, then you know that you don't have as many cars spill off the railway.

Q. Can you cite me to any peer-reviewed study that supports that opinion?

A. No. I'm making a simple observation of physics and momentum; that is to say that if you start falling off at 36 miles an hour, then you're going to have a lot less fall-off if you're doing 10 miles an hour.

Q. Well, you described it earlier as common sense, so you're basically saying based on your view of it, you're using your common sense, that's what you would expect, right?

A. Well, I did use that term "common sense," but what I used in my report was the idea of the amount of kinetic energy.

Q. Well, I get the kinetic energy part, Allen. What I'm trying to understand is, can you cite me any study, literature, anything peer-reviewed that suggests that if you strike something at 15 miles per hour versus 30 miles per hour, the consequences of the derailment are going to be different?

A. As it specifically applies to

trains and derailments, then, no, I cannot cite you to anything.

Q. Do you hold any type of particular degree or certification in the preparation of these 3D animations?

A. A degree or certification?

Q. Yes. Is there anything that you hold a special citation that says "I went through these courses and I developed this specialized skill to create these documents"?

A. No, I do not. I can't recall if any of my crew has been through any training of those specifically or not.

Q. Do you know what type of software application was used to create it, or would that be a question I need to ask somebody else on your team?

A. No, I know the answer to that.

Q. What is it?

A. Blender is the software we used.

Q. Do you know how that software models a 15-millimeter lens, which I think

is what you told us you used?
A. I do, yes.
Q. How does it do that?
A. In other words, there's two things you have. One is the idea of what you see out of a picture. In other words, the point of me taking all those photographs approaching the scene is that I shoot all those in 50-millimeters. So they can take any picture that I take and use that and use that focal length, then compare that with what you're seeing from the visualization, in addition to the fact that we've done that plenty of times before where you can compare and you look to see what the effect of a focal length does for you.
(Whereupon, Plaintiff's Exhibit Number 10 was marked for identification, a copy of which is attached to the original of the transcript.)
Q. I'll show you what I'm going to mark as Exhibit 10. I think I have a lot

less questions about this than I otherwise would have, based on some of the things you've told me earlier today. This was a presentation you put together that you were expecting to potentially use, had you testified at the Small trial. Is that fair to say?

A. That is correct.

Q. The case resolved before you actually took the stand, right?

A. Right.

Q. So you didn't testify before the jury, did you?

A. No. That is correct.

Q. The question I wanted to ask you, if we look at page 12 -- and I'm saying 12, that's the last two numbers, 2612 -- the purpose of this image, and I think what you were planning to do with the jury and may try to do in this case, if allowed, is you were trying to draw a distinction between what the animation you created shows, clarity, as compared to what you say on the

slide here is the cloudiness of the actual rail video, right?

A. Right.

Q. But you would agree with me, your 3D animation is not designed or intended to show precisely what is shown or what would have been shown at the scene that day, for somebody who was present. Is that accurate?

MR. RADECK: Object to form.

A. Ask me that question again.

Q. Yes, it wasn't very-well phrased. You're not claiming that your 3D image is identical to what someone would have seen with their naked eye, had they been there on the date and time of this accident, are you?

A. Well, "no" is the general answer to the question for a number of reasons, and one is, the eye is not -- this is using the train camera focal length which is essentially 30-millimeters.

Q. But in this image, is your

animation image also using 30-millimeter?
A. Yes.
Q. So that's what I was getting at. You're showing a 30-millimeter image as rendered by the animation and what you described as a 30-millimeter image as rendered by the actual train video, right?
A. Correct.
Q. And you're comparing those two?
A. Yes.
Q. But you're not claiming that your 30-millimeter image created with your animation would show the exact -- or depicts the exact same thing the naked eye would have seen if somebody had been present looking out of the locomotive cab at that exact point in time, are you?
A. Well, if they were in the position of this camera, if you're looking at what would have happened if you're looking at this camera if you're looking in that position, then yes. You're using terms in there like "exact." You never

ever ever get exact, but it is representative of -- the real main point of this right here is to say, "Okay, we recognize that it's wide-angle and we're showing you within our visualization that we can recreate that wide-angle view."

Q. And I'm not trying to trick you, but if we look at the picture on the left, for example, the treeline comes basically right up to the edge of the track. Do you see that in your animation on the left?

A. Yes.

Q. If we look on the right, regardless of the cloudiness, you would agree with me that the treeline is actually, I don't know how many feet, but it's not as close to the track as it shows in your animation, does it?

A. That is correct, but what I will say is that the tracks that you see in there are correct.

Q. Yes. Well, I'm not asking you about the tracks yet. But the treeline is

not in the same position it's shown in the video picture, right?
A. That is correct.
Q. And if we look at the actual video picture from the train, you see vegetation along the edge of the track between the train rail and where the treeline begins, correct?
A. Ask me again. I'm not sure I understood it.
Q. If you look at this picture, there's vegetation between the treeline and where the train rail is?
A. Oh, yes, I agree.
Q. And if we look at your animation, that vegetation is not there, correct?
A. That is correct.
Q. That's my point, the animation is intended to capture a representation, but it's not an identical view of what somebody, if they were standing there that day, would have seen, right?
A. With those constraints, I agree

with what you're saying.
Q. Do you know what distance this image is supposed to represent?
A. Distance away?
Q. Distance from the AIPC engine.
A. I don't have that one. The next one that you have does show what the distance is. When you say do I know it, I don't know it as I sit here, but I could go back and figure that out, if that's important.
Q. You're not rendering any opinions in this case that the train crew wasn't keeping a vigilant lookout?
A. That is correct.
Q. I did want to ask you one other thing. You did note in Exhibit 10 -- no, I'm sorry, it's in your report. In your report on page 4, you say that "The switching locomotive was inspected, photographed, measured, and scanned on July 15, 2025. Scraping was observed along the right side of the locomotive, beginning

approximately 11 feet rearward from the front right corner of the walkway, as shown below." Is that accurate, did I read that correctly?

A. Yes, you did.

Q. Is what you're saying there, that some portion of the Norfolk Southern train actually cleared the AIPC engine before contact was made between the Norfolk Southern train and the AIPC engine?

A. I don't understand your question.

Q. In other words, when the Norfolk Southern engine arrived at the point where the AIPC engine was stopped that day, the front end of the Norfolk Southern engine did not impact the front end of the AIPC engine, did it?

A. I would say that's a -- I think that's correct, yes.

Q. Some portion of the Norfolk Southern train actually got past the AIPC engine, and then it began contact with the sides, and you measured the scraping marks

about 11 feet rearward from the front right corner, right?

A. Correct.

Q. And is that what you determined or concluded was the point where the Norfolk Southern engine came into contact with the AIPC engine?

A. That would be the first point of contact on the AIPC engine, yes.

Q. And if that was the first point of contact, given the length you measured from the AIPC engine, how much of the engine had the Norfolk Southern locomotive cleared before impact was made?

A. In other words, that's not a measurement sitting here, within my head, so let me see. I don't think we ever printed anything out to show that. I know that that is in our data from the visualization to see exactly what portion of the Norfolk Southern would have struck it. I just don't have that to show you. If it's important, I can produce that.

Q. That's fine. I think we can do the math if we knew the measurement. Do you know what the length of the AIPC engine was, do you have that in front of you?
A. I do not have that in front of me.
Q. We'll figure it out. But you agree with me that there was some portion of the Norfolk Southern train that got by before contact was made between those two engines, right?
A. I would want to make that determination before I agree to that statement.
Q. Well, if it made it instantaneously, you would expect the scraping marks to have started before where you measured and documented in the picture, wouldn't you?
A. Say that again.
Q. If the engine had struck the AIPC engine at the point that it reached that spot on the track where the engine was

parked, and contact had been made at that precise point, wouldn't you expect the scraping to be evident there, as opposed to where you measured it, 11 feet from the rear?

A. You mean the contact with Norfolk Southern?

Q. Yes. Between the Norfolk Southern engine and the AIPC engine.

A. Let me do something else to try to answer that question.

Q. It's all right, I'll withdraw the question. I've got the point.

MR. RADECK: I don't think y'all are on the same page.

Q. It's fine. Have I covered all of your opinions in this case?

A. I think you have. There's nothing that I can think of that I've held back, there's nothing that I can think of that, "Gosh, Ron didn't ask me this." But my typical answer to that is always it's in my report, it's in my file materials, it's

what I've said today, so I think you have.
Q. And have you understood my questions today, except for the ones that you asked me to rephrase or repeat?
A. Well, before I answer that question, I'm going to say I want the right to read and sign, I should have said that at the start, my apologies. But so far as I know, I think so. I think when I knew that I didn't understand the question, I asked you to repeat it. But that's why I always read and sign.
MR. WRAY: That's all I've got, John.
MR. RADECK: I've got a few follow-ups.

EXAMINATION BY MR. RADECK:
Q. Allen, the formulas, the math, the physics, things you described during the deposition, calculations you made, the way that you did them in this case, do you believe that that's consistent with how -- do you believe that your methodology is

generally accepted within the field of accident reconstruction?
A. Yes, I do.
Q. The software that you used, I believe you called it Blender, is that technology the kind of software that's relied upon by accident reconstructionists?
A. Yes. When you say "the software," there are a lot of softwares. There's AR-CAD, there's Excel, there's a number of things that are used; but, yes, everything that we use, there's nothing that's an outlier there that no one has ever heard of. It's commonly-accepted technology and technology tools.
Q. In your experience, is it common for accident reconstructionists, experts like yourself, to create animations to be helpful to a jury to provide representations of objects or accident scenes themselves?
A. Yes. We do that quite commonly.
Q. Have you ever been qualified in

state and federal court to give the kinds of reconstruction opinions you're giving in this case, as it relates to the process that you went through in creating the animations?

A. Oh, sure, absolutely.

Q. Have your animations like you've done in this case ever been admissible in court before?

A. I'm not aware of any time that they've not been admissible. My understanding is every time that we've ever done one, it's been accepted.

Q. The data that goes behind the animation comes from real data from the scene? It's not like just a video game sort of AI generation?

MR. WRAY: Object to form, leading.

A. That is correct. Obviously, there's nothing that's AI generation. Some things, in terms of what I think are the critical aspects of what we would show, things like the size of the AIPC engine,

the tracks, the measurements of the tracks, all of that, that's just specific, clear forensic engineering. In terms of what we'll see in the rendering in terms of just the -- of course, come to think of it, I don't think you actually see the Norfolk Southern engine in the animation, but what we used for that one would be the fact that we measured engines that I'm certain are similar to this one, and we also included models for that. So there are some things that have to do with the lead railroad car that we would have used models for. But as I explained earlier, that really doesn't come into the visualization. What comes into visualization comes from determining those camera positions predominantly from all the other measurements that we made.

Q. So any kind of variations like those trees that counsel was asking you about that are on the side, you're not looking to see, "Okay, am I inserting a pine tree into this animation versus an

evergreen?" Those kind of things aren't necessarily things that are done by accident reconstructionists, are they?

MR. WRAY: Object to form.

A. That is correct. That is correct.

Q. Do any of the variations that were discussed in the animation impact the reliability, in your view, of your opinions?

A. No.

Q. Have all the opinions you've offered today been given to a reasonable degree of scientific and engineering certainty?

A. Yes.

Q. Is it your professional opinion that your analysis in this case is the product of reliable industry-accepted principles that apply to the facts of this case?

A. Yes.

MR. RADECK: That's all I have. Thank

you.

MR. WRAY: Allen, just a few follow-ups.

RE-EXAMINATION BY MR. WRAY:

Q. John asked you about your qualification. Have you ever been qualified in court to give an opinion as to train stopping distance?

A. I don't recall if that's the case or not. I don't know that any of those has ever gone to trial.

Q. Has your opinion on any issue ever been excluded in a court of law for any reason, that you know of?

A. Not that I'm aware of.

Q. You did not do any type of visual acuity assessment or analysis in this case, did you?

A. That is correct.

Q. And you don't have expertise in that field, do you?

A. Correct. And by "visual acuity,"

let me make sure I understood your question. I think you're talking about the idea that even though, let's just say we three have 20/20 vision, we go over here and look out the window, we may not see things quite the same. That's what I think you mean by "visual acuity."

Q. Well, that could be one version of it. You didn't do any type of analysis, however we define it, that you would consider to be a visual acuity analysis in this case, did you?

A. Not the way I would define it, that's correct.

MR. WRAY: That's it. You reserve reading and signing, so Donna will take care of that.

(Whereupon, at this time the deposition was concluded at 12:00 p.m.)

FURTHER DEPONENT SAITH NOT.

C E R T I F I C A T E

STATE OF ALABAMA)
JEFFERSON COUNTY)

I hereby certify that the above and foregoing proceedings were taken down by me in stenotype, and the questions and answers thereto were reduced to computer print under my supervision, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said proceedings.

I further certify that I am neither of counsel nor of kin to the parties to the action, nor am I anywise interested in the result of said cause.

Donna L. Winters, ACCR #373
Expires 9-30-2027
Donna L. Winters, Commissioner
My Commission Expires 08-16-2029

Allen Powers
allen@3axisllc.com

September 23, 2026

RE: Norfolk Southern Railway Company v. American Italian Pasta Company

9/11/2026, Allen Powers (#8394846)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-carolinas@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Norfolk Southern Railway Company v. American Italian Pasta Company

Allen Powers (#8394846)

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

________________________________ _______________

Allen Powers Date

Norfolk Southern Railway Company v. American Italian Pasta Company

Allen Powers (#8394846)

ACKNOWLEDGEMENT OF DEPONENT

I, Allen Powers, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

________________________________ _________________

Allen Powers Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

____________________________

NOTARY PUBLIC

**&**

**&** 4:3

**0**

**065** 48:1,6 50:11,15 52:3 54:9 82:20
**06618** 1:6
**08-16-2029** 175:23
**0825** 48:6,6 50:6 52:23 54:8 56:17 77:17 82:20

**1**

**1** 6:3 25:10,14 48:1,6 50:11 50:16 52:4 54:8 76:2,4
**1,000** 55:22,23 56:5 84:15 113:1,13,14
**1,930** 83:5
**1.0** 71:19
**1.5** 43:10 56:18 57:18,23 58:9 59:5 60:1,13 60:21 98:14
**1.5.** 60:18
**1.6** 46:6
**10** 6:13 33:19 75:15 94:6 126:21 155:6 157:19,23 163:17
**10,000** 84:14
**100** 6:10
**1080** 130:12
**11** 1:22 2:10 7:11 18:19 143:5 164:1 165:1 167:4
**116** 6:11
**118** 6:12
**12** 94:6 158:16 158:16
**1200** 4:5
**12:00** 174:19
**15** 155:19 156:23 163:22
**157** 6:13
**168** 5:3,5
**172** 4:13 5:5
**173** 5:4
**174** 5:4
**19** 139:20 142:1 144:7
**1994** 11:12,13

**2**

**2** 6:4 31:16,20 32:11,17 45:20 46:14 102:10
**2,000** 110:10,21
**2-1/2** 56:23 69:15 86:12 88:16 97:9
**2-25-2026** 6:9
**2.1** 56:19 87:5 99:13,16
**2.5** 65:15 68:8 68:9 71:11 75:15,17 76:2 77:10
**2.5.** 68:19 76:1
**20** 2:8 7:9 143:6 178:15
**20/20** 174:4
**2012** 9:14
**2013** 9:14
**2017** 52:13,14 69:22 71:17,17
**2020** 31:23 32:8
**2025** 163:22
**2026** 1:22 2:11 7:11 176:3
**2192** 175:19
**22** 143:10
**2205** 2:8 7:8
**23** 176:3
**25** 6:3
**2583** 66:12 67:2
**2612** 158:17
**29.97** 129:9
**29402** 4:14
**29601** 4:6

**3**

**3** 6:5,5 9:11 10:10 17:1 18:23 35:7,11 68:14 102:10
**30** 12:13 33:19 126:20 127:5,9 128:17,18,22 129:3,8,18 155:20 159:22 160:1,4,6,12 176:16
**31** 6:4 54:6,9 55:3,19,20,21 56:1,6,11,17 57:4 116:14
**32.2** 47:20
**34** 55:3,12,15 57:4 116:23
**35** 6:5 56:16
**35401** 2:9 7:9
**36** 155:4
**373** 175:20
**380** 91:16 117:20 118:16
**383** 153:4
**3:25** 1:6
**3axisllc.com** 176:2
**3d** 124:7 130:22 156:5 159:5,13

**4**

**4** 6:6 47:2,7 163:19
**40** 126:20
**400** 137:1
**420** 35:5
**47** 6:6
**483** 117:8
**494** 54:13

**5**

**5** 6:7 54:15,18 56:2 65:13 116:11,12
**50** 43:8,11 106:3 126:16 126:20 127:13 144:9 145:6 146:11 157:9
**5210001** 143:19
**54** 6:7
**55** 4:5
**562** 57:2

**6**

**6** 6:8 95:8,10
**60** 12:13
**600** 91:13 117:12 153:2
**667** 54:13

**7**

**7** 5:3 6:9 19:17 20:10 100:14 100:17 101:1 114:9

**8**

**8** 6:11 116:18 116:21 117:21 118:15 152:14
**8-21-2025** 6:8
**80s** 11:11
**82** 143:6
**825** 79:11
**8394846** 176:5 177:2 178:2
**843.577.1203** 4:15
**864.271.5362** 4:7

**9**

**9** 6:12 118:3,6 118:9,16,18 152:14
**9-30-2027** 175:21
**9/11/2026** 176:5
**95** 6:8
**960** 130:13
**9:00** 1:23 2:10 7:10
**9th** 35:21

**a**

**a.m.** 1:23 2:10 7:10
**abbreviated** 68:14
**able** 19:8 35:13 48:9 59:11 62:16 89:5 104:19 111:14 113:2 132:14 135:20 136:21 145:15 147:10
**above** 7:12 175:6 176:6 178:7
**absolutely** 9:5 136:22 170:6
**accepted** 169:1 169:14 170:13 172:19
**access** 130:18 144:3
**accident** 6:13 10:13,19 11:16 13:13 17:19 19:5 22:21 24:16 34:6,14 56:5,15 59:2 59:10 64:11 78:7 79:10,14 80:14 82:6,13 83:2 95:21 97:3 100:4 102:8 112:13 113:21 123:19 123:20 124:5 124:14 130:19 132:8 134:14 140:6 141:3 142:11 146:2,3 159:16 169:2,7 169:17,20 172:3
**account** 149:16 151:15
**accr** 175:20
**accuracy** 105:14,16 129:23 130:3,7 176:9
**accurate** 29:20 56:7 60:11 108:14,17,18 113:16 119:12 147:6 159:9 164:3
**accurately** 146:23
**achieve** 79:23
**acknowledge** 97:23
**acknowledge...** 178:3
**acknowledg...** 176:12
**acronym** 49:22
**acronyms** 49:21,23
**acting** 7:3 86:7
**action** 98:3 110:18 175:16

**actions** 115:13
**actively** 42:19
**actual** 37:2 48:7 56:4 127:6,8 128:23 159:1 160:7 162:4
**actually** 17:11 21:17 37:5 51:1 52:20 53:13,15 57:21 67:10 68:21 86:5 95:16 128:8 129:9 132:7 136:9 139:11 146:9 158:10 161:16 164:8,21 171:6
**acuity** 173:18 173:23 174:7 174:11
**add** 21:4 36:2,8 97:12
**added** 96:9
**addition** 38:4 132:3 157:13
**additions** 178:6
**additive** 51:20
**address** 13:21 93:19,20
**addressed** 93:21 104:21 144:1
**adjustments** 39:19
**administrative** 17:5 36:20 37:3
**admissible** 170:8,11
**adopt** 25:7
**advent** 145:13
**aerospace** 19:1
**affect** 55:10 92:2 149:5
**affects** 99:7,9
**ago** 30:19 50:8 78:14 111:4 138:11
**agree** 33:17,21 60:7 61:21 64:8 77:8 80:11 84:13 92:19 93:14,17 104:1 110:14 111:21 112:5 112:11 120:9 151:3 152:22 153:19 159:4 161:15 162:14 162:23 166:8 166:13
**agreed** 2:2,12 2:19 91:19
**agreement** 90:18
**agrees** 82:8
**ahead** 29:12 48:12 98:2
**ai** 22:23 23:2 170:17,20
**aipc** 6:10 8:11 17:17 59:14 60:22 68:22 90:22 93:14 107:16 108:4 110:4,6,22 113:4 115:8,15 120:18 130:18 139:4,12 140:1 140:17,23 141:7 144:3,5 147:8 152:18 153:7 163:5 164:8,10,14,16 164:21 165:7,9 165:12 166:3 166:21 167:9 170:23
**air** 74:1,5,18 85:20,21 86:1 86:14,17 87:3 98:19 99:3
**aircraft** 137:2
**airspace** 137:2 138:16
**akp** 36:17
**al** 51:15
**alabama** 2:7,9 7:3,5,9 175:3
**alc** 36:13
**allen** 1:21 2:5 6:3,4 7:11,16 7:23 8:2 9:10 35:11 40:5 85:23 155:16 168:18 173:2 176:1,2,5 177:2,24 178:2 178:4,12
**allotted** 176:19
**allow** 89:15 151:23
**allowed** 109:3 158:20
**alter** 135:3,5
**altered** 139:10
**american** 1:11 8:10 176:4 177:1 178:1
**amount** 12:12 155:14
**amtrak** 148:1,5
**analysis** 6:12 6:13 16:7 21:23 38:17 39:6,10,13 43:20 45:2,18 48:4 77:4 78:11,14 83:18 85:19 91:4 118:9 172:18 173:18 174:9 174:11

**analyzed** 38:9 44:22
**andrew** 15:14 23:22 36:13 37:9 51:21 101:19,23 102:4,11 119:5 138:5
**andrew's** 114:23
**angle** 13:18 104:17 105:9 105:19 125:22 126:9,12,18 152:4 161:4,6
**angled** 104:11 129:22
**animation** 16:6 24:12,19,21 37:6 118:21 131:2 136:8 139:6 144:7 145:7,10 146:6 151:15 152:5 158:22 159:5 160:1,5,13 161:11,18 162:15,18 170:15 171:7 171:23 172:8
**animations** 156:5 169:18 170:5,7
**answer** 8:23 9:3 18:10 19:6 25:20 28:8 34:8 40:14,20 42:13 43:9 48:18 54:12 58:22 72:5 78:2 79:5 85:10,11 90:6 91:6 103:9,10 121:23 122:10 123:3 132:11 132:13 133:13 136:18,22 143:9,15 156:19 159:18 167:11,22 168:5
**answered** 96:10 108:23 133:5
**answers** 175:8
**anticipate** 63:18
**anybody** 22:19 62:7 101:16 107:10
**anyway** 60:15
**anywise** 175:16
**apologies** 13:2 16:14 168:8
**apologize** 14:6
**app** 137:20 138:23
**appear** 25:17 32:5 104:12
**appearances** 4:1 32:13
**appeared** 85:17 131:22
**appears** 25:22 101:11 119:9
**appended** 178:7
**applicable** 176:8
**application** 75:1 76:5 112:1 156:16
**applied** 86:3 88:22 90:20 94:18 99:5
**applies** 155:23
**apply** 172:20
**appreciate** 79:19 142:21
**appreciated** 112:1
**appreciating** 110:17
**approaching** 134:14 146:3 157:8
**appropriate** 61:9 69:16 121:17,17
**approval** 136:17 137:9 137:12
**approvals** 138:3
**approved** 137:19
**approximately** 2:10 7:10 164:1
**apps** 137:16
**ar** 16:20 169:10
**area** 44:10 84:11 112:8,13 115:4
**areas** 27:14
**argue** 86:18 107:3
**arrived** 164:13
**article** 19:2 127:12
**articles** 19:7,12 143:21
**ascertained** 127:4
**asked** 9:1 13:4 13:10 14:8 21:10 24:23 28:5 33:16 55:13 60:1,18 90:8 91:2 99:20 109:4 143:7 148:2,16 168:4,11 173:6
**asking** 18:2 24:4 40:18

63:12 70:8 87:10 96:20 97:13 107:20 111:10 112:9 137:22 146:16 149:2,4 161:22 171:20
**aspect** 13:15 29:23 81:20 125:20
**aspects** 59:7 84:9 170:22
**assemble** 14:5 14:9
**assessment** 85:2 93:15 97:16 140:9 173:18
**assign** 3:1
**assignment** 17:20
**assistance** 38:6
**assistant** 37:1 119:5
**associated** 92:1
**asst** 36:23
**assume** 9:1 28:11,16 36:6 36:13 41:18 61:22 93:3,9 102:14 142:7
**assumed** 98:14
**assuming** 76:21 93:16 98:1
**assumptions** 91:3,8
**assure** 51:13 67:22
**attached** 25:11 31:17 35:8 47:8 54:16 95:11 100:15 116:19 118:4 157:20 176:11
**attended** 26:15
**attorney** 109:13 176:13
**attorneys** 8:7 31:22
**author** 52:14 101:14
**authorization** 123:11 138:7,9 138:13
**automobiles** 48:23
**available** 146:1 176:6
**average** 58:3 58:14 62:23 68:18 86:12 88:19 129:15
**avoid** 106:12
**aware** 60:3 61:16 68:20 143:12 170:10 173:16
**axis** 6:5 9:11 10:10 17:2

**b**

**back** 13:8,23 14:9,22 18:23 24:1 28:7,22 31:22 32:4 40:15 76:8 78:1,8 83:3,12 90:10 95:6 97:19 100:10 103:20 109:22 114:3 125:16 127:20 132:9 140:23 147:18 148:4 163:10 167:20
**background** 25:23 30:15
**ballpark** 12:9
**barring** 103:19
**base** 85:1 91:7
**based** 45:22 53:10 60:22 75:18 89:6 110:20 116:14 125:2 150:9,10 152:16,22 155:9 158:2
**bases** 96:20 103:6
**basically** 155:8 161:9
**basis** 72:7 102:23
**bates** 66:2,23 67:2
**beattie** 4:5
**began** 152:19 164:22
**beginning** 56:5 99:10 163:23
**begins** 117:9 162:8
**behalf** 28:5
**believe** 14:16 25:20 28:2 33:7 45:10 87:20 93:6 103:13 110:5 110:21 113:2 113:23 120:14 120:14 138:18 145:23 168:22 168:23 169:5
**bell** 114:21
**bell's** 115:1
**best** 8:22 55:5 126:17 136:4 141:2 143:1 144:10,12 145:4
**better** 62:17,22 63:11 106:4 111:7 146:9
**billed** 35:3,4 36:4

**billing** 35:4
**bit** 18:18 19:17 22:18 50:17 107:19 116:7 118:20 141:6
**black** 49:8
**blanchett** 114:10 115:14
**blender** 156:21 169:5
**book** 50:23 67:6 96:3
**books** 19:8,12
**borrow** 45:11
**bottom** 117:14
**bounce** 150:14
**box** 49:8
**boyd** 4:3
**brain** 98:10
**brake** 65:14 67:16 69:15,23 70:2,3 71:6,21 72:17,20 73:9 73:20,22 74:17 74:18 76:4,9 76:11,12 88:6 90:20 98:20,20 100:8 117:10
**braked** 106:15
**brakes** 48:8 82:9 106:21
**braking** 27:20 30:6 42:19,22 42:23 43:7,16 43:17,20 44:2 45:17,18 67:18 67:18 70:18,19 70:20 72:13,14 72:16,16 73:6 73:9,13 74:23 78:17 79:22 80:1 81:3,9,11 81:16,20,21 82:4,5,14 84:5 85:13 86:2,8,9 86:15,17,19,21 88:1,2,4,5,5 94:1,18 97:1,1 98:3 99:5,23 107:2 111:23 113:1,14 118:13 152:16 152:19
**break** 21:3 42:16 85:6 95:5
**briefly** 15:2 95:7
**bring** 14:8 20:16 29:13,18 100:20 136:2 149:19
**brought** 8:9 10:7 14:7 20:20 35:3 37:1 53:20 66:2
**bugs** 148:12
**build** 43:13 56:22 65:14 67:16 68:5 69:15,23 70:2 70:4 71:6,22 72:12,18,21 73:20,23 74:17 76:9,12,12 81:8,22 82:17 83:5,19 84:11 85:19 86:7,12 88:10,12 90:9 96:19 97:6 98:19 99:19 100:8
**building** 24:1 136:7
**bullet** 117:7
**business** 12:1,2 19:1 34:18
**button** 16:5

**c**

**c** 30:22 44:14 175:1,1
**c.a.** 1:6
**cab** 132:1 147:16 148:3 149:8 150:9 151:18 160:16
**cad** 16:20 169:10
**calculate** 41:22 44:20 45:8 86:22
**calculated** 77:15
**calculating** 40:22 87:15
**calculation** 6:6 38:9 39:7 41:10 52:21 53:2 65:13 71:1 79:2 81:14 117:10 118:1
**calculations** 6:7 20:19 22:1 41:6 54:20 56:3 57:6 58:11 78:23 83:8,14 90:14 97:23 116:2,7 168:20
**call** 8:2 21:23 23:13 24:18 26:6
**called** 8:9 30:4 30:5 76:22 138:7 169:5
**calling** 100:6
**calls** 50:1
**camera** 104:10 104:20,21 105:14 125:11 125:15,21

126:7,8,16 127:2,7,8,16,19 128:15 130:9 132:21,22,23 133:4,15,18 134:5,20 135:4 135:12,16,21 136:1 147:12 149:12,14,20 150:10 159:21 160:19,21 171:17
**camera's** 128:1
**cameras** 104:11 105:5 125:17 128:12 132:19 135:8,17 136:5 147:3
**capability** 17:16
**capture** 107:22 162:19
**captured** 125:6 125:12
**captures** 130:14
**capturing** 128:3
**car** 38:18 88:13 88:15,15 148:6 171:12
**care** 174:17
**carolina** 1:2 4:6 4:14 12:21 143:20
**carolinas** 176:15
**cars** 63:19 87:17 105:21 117:17 154:15 154:20
**case** 1:5 11:18 12:19,22 17:2 17:9,14 18:2 21:8,18 22:4 22:14 23:12 27:2 28:5,17 28:19 29:2,15 30:13 31:20 32:16 34:23 38:8,15,21 40:21 42:7,11 43:8,12,16 44:22 45:9 47:4,12 49:4,5 49:17 50:7 51:19 52:22 59:14 77:19,22 89:12 90:1 91:4 93:14 98:14 100:11 100:20 102:19 103:4 104:6 110:20 115:1 115:11 118:22 121:23 123:13 130:17 138:1 152:17 158:9 158:20 163:13 167:17 168:21 170:3,8 172:18 172:21 173:10 173:18 174:12
**cases** 11:15 12:8,14 28:1 28:12 31:11 32:6 33:2,6,10 34:2,12 40:6,8 40:16 49:6 102:14 121:10 147:20
**category** 33:12
**cause** 7:12 103:17 175:17
**caused** 123:20
**ccr** 2:6
**central** 79:18
**certain** 18:2 28:9 59:7 99:12 101:9 109:16 115:23 140:23 141:22 145:5 146:16 171:9
**certainly** 23:2 25:8 34:14 35:20 37:21 96:14 101:11 101:12 132:18 139:23 153:23 154:17
**certainty** 94:17 172:15
**certification** 156:4,6
**certifications** 26:19
**certified** 7:1
**certify** 7:4 175:6,14
**chair** 109:17 148:5
**chance** 25:16
**change** 55:4,14 57:9 59:6 101:11 142:3 177:4,7,10,13 177:16,19
**changed** 55:16 57:10
**changes** 176:10 178:6
**changing** 57:3
**chapter** 51:17
**characterizati...** 38:2,3
**charge** 45:13
**charleston** 4:14
**chatted** 33:5
**check** 21:12
**checked** 123:10
**choppy** 152:4
**circumstance** 57:2 59:12

**circumstances** 62:16
**citation** 156:8
**cite** 31:13 154:21 155:17 156:2
**cited** 29:6
**cites** 68:17
**city** 31:8
**civil** 7:5
**claimed** 22:19
**claiming** 159:13 160:11
**clarification** 96:16
**clarify** 96:12
**clarity** 158:23
**clark** 15:14 16:1 36:13
**clean** 45:11 148:19,20
**clear** 24:9 32:22 43:1 116:9 119:10 126:8 171:2
**cleared** 164:8 165:14
**close** 108:7 161:17
**cloudiness** 159:1 161:14
**collaborative** 102:5,6,12
**collision** 106:13
**columbia** 1:3
**column** 56:17
**combination** 37:8 82:1 133:3
**combined** 152:14
**come** 20:2 50:11,12 52:4 63:20 64:23 88:9 92:5 103:20 131:5 151:7 171:5,15
**comes** 41:12 48:7 66:23 130:8 161:9 170:15 171:15 171:16
**comfortable** 148:5
**coming** 77:4 100:1
**commencing** 2:9 7:10
**commentary** 19:23 38:6 125:20 127:23 129:21
**commented** 84:20 130:2
**commission** 175:23
**commissioner** 7:4 175:22
**common** 49:8 121:10 154:13 155:8,10,12 169:16
**commonly** 122:6 169:14 169:22
**communicati...** 59:18
**community** 58:2
**company** 1:8 1:11 8:9,10 9:20 28:2 30:20 31:2 35:5 37:6 176:4,4 177:1 177:1 178:1,1
**company's** 35:15
**compare** 157:12,15
**compared** 140:10 158:23
**comparing** 160:9
**compatible** 140:11
**compensated** 34:22
**complete** 139:16 178:8
**completed** 89:9 89:21 176:16
**completely** 72:2 74:4 96:9 154:13
**complex** 58:4,7 59:4,4
**compliance** 2:16
**complicated** 66:6 79:20
**components** 44:1
**computer** 21:22 29:20 30:1 66:15,18 175:9
**concluded** 165:5 174:19
**conditions** 151:12
**conduct** 27:2 115:14
**conductor** 26:12,20 27:12 27:15 61:19
**conductors** 61:14
**conference** 52:14 71:18
**confidence** 135:6
**confident** 133:19 136:4

137:8
**confusing** 8:18
**congruent** 140:1
**consequences** 154:8 155:21
**conservation** 41:13
**conservative** 76:3
**consider** 58:6 79:3 81:9 82:2 82:14 86:20 108:21 109:17 145:12 174:11
**consideration** 87:16
**considered** 18:21 81:15 88:17
**considering** 81:6
**consistency** 97:11
**consistent** 82:21 96:23 97:7 100:3 124:12 168:22
**constant** 46:17 47:15,17 84:22 85:7,14
**constraints** 162:23
**consult** 17:7 19:21 20:8
**consulted** 34:20
**consulting** 11:9 32:1 121:9 122:8
**contact** 164:9 164:22 165:6,9 165:11 166:10 167:1,6
**contacted** 11:19
**context** 10:23 12:15 48:23 61:18 76:6 82:13 98:18
**control** 63:4
**conversation** 17:22 61:6
**conversations** 15:5
**copies** 51:22 53:17 176:14
**copy** 25:11 31:17 35:8 47:8 53:19,23 54:16 55:1 95:11,18 100:15 101:7 116:19 118:4 157:20
**corner** 164:2 165:2
**correct** 19:11 20:6 26:14,18 26:21 27:17,18 27:22 28:15,21 29:15,16,21 30:1 32:1,2 35:16 37:21 41:8 44:16 49:20 50:9 56:8 57:11,17 59:16 60:3 63:21 64:16,21 68:3 74:19,20 75:21 76:19 77:2,7,15,16 80:14,18,19 81:1 86:3,4 90:23 91:1 94:21,22 98:7 98:13,16,21 99:5,6,8,10 104:3 106:10 111:9 113:17 115:5,6,16 117:2 118:14 118:17 119:3 119:18 120:7 123:14 127:14 130:19 133:22 134:4,8 136:11 139:2 140:16 140:21 141:5 146:5 148:9 150:11 152:11 153:9,18 158:8 158:14 160:8 161:19,21 162:3,8,16,17 163:15 164:19 165:3 170:19 172:5,6 173:20 173:23 174:14 175:11 178:8
**corrections** 178:6
**correctly** 67:19 67:20 164:4
**corresponden...** 59:20
**counsel** 2:4,21 2:23 7:7 15:4,8 75:14 89:15 91:2 119:20 171:20 175:15 176:14
**count** 148:1
**county** 175:4
**couple** 14:15 19:2 20:16,18 30:6 32:12,12 35:13 42:17 50:12,13,21 52:6 65:18 142:5
**course** 12:19 15:10 62:1 107:8 110:19 110:19 114:15

171:5
**courses** 156:9
**court** 1:1 2:17 7:2 103:19 170:1,9 173:8 173:14
**covered** 109:19 167:16
**cox** 68:13,15,21 68:23 69:9 73:17 75:19 76:16 87:13 92:14,17 93:16
**create** 118:20 156:10,16 169:18
**created** 23:16 24:14 37:6 131:2 158:22 160:12
**creating** 145:6 145:9,10 170:4
**credibility** 122:3
**crew** 27:3 65:5 78:6 79:13 82:3,15 83:1 90:18 110:5,22 115:12 132:7 133:9 146:1 148:3 149:6 150:1,8 156:13 163:13
**critical** 124:23 170:22
**criticism** 85:1
**crossing** 64:11
**crossings** 64:6
**crossties** 139:13
**cs** 176:15
**ctm** 37:3
**currently** 140:16 141:10
**curvature** 125:1
**curve** 112:12 112:14
**cut** 67:10,10
**cv** 1:6 10:1 25:15,19
**cylinder** 65:14 67:16 69:15 70:2 74:17 76:12 98:20 100:8

**d**

**d** 46:12
**damage** 123:20 139:14
**damaged** 124:1
**dangerous** 103:11
**daniel** 114:20
**data** 16:21 30:8 30:18 34:20 47:11 48:8,20 49:8,11,22 50:2,7 77:18 92:14 97:4,10 100:2,5,7 112:15 116:7 127:8,19 128:12,21 141:8 165:19 170:14,15
**date** 7:4 35:21 36:4 78:7 140:5,14 146:2 159:16 177:24 178:12
**david** 52:14 71:16
**day** 8:11 22:21 60:19 125:7 133:9 142:11 145:1 159:7 162:22 164:14 178:15
**days** 138:11 176:16
**debating** 63:14
**deceleration** 20:1 29:1 41:17 43:2 45:21,22 46:2 46:4,20 47:21 48:10 50:14 52:2 56:11,18 80:1,12,20,22 82:19 83:20,21 83:22 84:23 85:8,15 89:3 95:20 98:4 99:7 116:1 118:1
**decelerations** 79:17
**decide** 21:3 115:20 120:1
**declare** 178:4
**deemed** 178:6
**defendant** 1:12 4:10
**define** 126:10 126:11 174:10 174:13
**definition** 75:6 136:3
**definitively** 131:18
**degree** 62:5 94:16 112:12 112:14 156:4,6 172:14
**depend** 80:17 81:2
**dependent** 134:6
**depending** 53:6 59:6 91:22 92:4 118:11 151:11

**depends** 23:18 36:21 140:7
**depicted** 37:23 144:6
**depicting** 149:22
**depicts** 160:14
**deponent** 174:20 176:13 178:3
**depose** 103:20
**deposed** 92:22 92:23
**deposing** 176:13
**deposition** 1:21 2:4,14,15 3:3 8:7,16 14:2 15:2,9 25:1 32:7 36:1 60:19 84:21 93:2,7 114:22 115:7 142:8 143:5 168:20 174:19
**depositions** 2:18 6:4 32:12 113:19 114:9 114:14 142:17
**derail** 115:2 154:15,16
**derailment** 92:3 94:19 95:2 153:20 154:6 155:21
**derailments** 156:1
**describe** 23:15 24:8,19,20 34:11 53:8 69:20 72:4
**described** 41:14 42:2,5 61:1 73:15 74:9 82:4 91:15 92:18 93:9 128:6 155:7 160:6 168:19
**describes** 70:14 70:21 71:23 72:11,19
**describing** 39:9 72:8 76:14,22 126:13
**description** 109:6
**descriptors** 106:8
**designed** 159:5
**details** 28:18
**determination** 111:1 166:13
**determinations** 29:2
**determine** 6:7 17:15 38:17 42:23 47:3,16 48:9 54:21 79:9 89:6 97:14 111:5 124:3 126:11 135:11,22 136:1 139:5
**determined** 38:10 107:17 127:6 140:13 165:4
**determining** 52:22 171:16
**developed** 84:5 156:9
**deviates** 126:19
**device** 115:2
**differ** 78:18 80:21
**difference** 55:2 59:3 74:16 77:9,11 78:20 87:21 110:15 122:20 130:4 132:16 133:7 133:11 141:14 141:18 149:3 152:6
**differences** 124:3
**different** 43:23 44:1 48:5 50:1 50:4 54:7 55:10 59:11 70:5 74:5,14 78:18 84:9 99:21 108:14 118:12 119:2 122:9 133:21 133:21 134:1,3 137:12 141:11 141:11,13,15 152:15 155:22
**differently** 82:12 141:6
**diligence** 138:14
**dimensions** 133:22
**direction** 141:16
**directly** 59:1 121:17 122:3
**dirt** 148:11
**dirty** 104:13
**disadvantage** 109:12
**disagree** 64:8 85:2 93:15 135:1
**disagreed** 84:22
**disagreement** 99:13
**disclose** 102:18
**discussed** 172:8
**dispute** 116:23
**disregarded** 86:6

**distance** 6:7,11 38:11 39:5 40:9,23 41:7 41:16,22 42:15 43:2,12 44:20 45:8,19,22 46:12,12 47:4 52:22 53:6,10 54:21 56:3,13 57:10 77:11 81:14 84:14 87:15,21 99:8 99:9 109:14 110:3,23 111:5 140:23 141:23 163:2,4,5,8 173:9
**distances** 38:17 39:3 43:4 57:7 107:13 108:18 116:15 125:2 145:5 153:6
**distinction** 25:3 158:21
**distort** 104:14
**distortion** 126:23
**district** 1:1,2
**divided** 45:20 46:13 87:8
**division** 1:3 34:3
**document** 48:13 54:19 57:5 115:22 117:3
**documentation** 121:3
**documented** 166:18
**documents** 20:12 113:19 142:14 143:16 143:22 156:11
**doing** 11:8,10 16:16 26:7 29:11 56:1 58:11 63:9 70:23 73:8 78:11 87:22 88:18 90:16 91:18 96:17 119:21 121:5,9 122:2,8 123:16 124:6 145:1 146:14 155:5
**donna** 2:5 7:1 174:16 175:20 175:22
**door** 90:15
**doublecheck** 60:14
**doughty** 10:2,3
**downhill** 80:21
**dr** 72:19
**drafted** 102:3,4
**dramatically** 154:2
**draw** 152:5 158:21
**drawing** 16:22 25:4 107:14 108:17,17
**drawings** 16:7 16:10,11 108:6 108:13 112:15
**drinking** 59:7
**drive** 14:7 29:19
**driver** 63:2,18
**drivers** 62:14 62:14,19 148:18
**drives** 20:16
**drone** 23:21 24:11 108:15 124:7 136:14 136:17,19
**droned** 138:5
**drones** 136:23
**drums** 73:11
**due** 138:14
**duly** 7:17
**duration** 129:13
**dustin** 114:21 114:21
**dynamics** 41:15

**e**

**e** 4:8,16 6:8 12:5 13:7,8,22 15:20 17:12,12 21:6,7,11 44:11,14 51:12 51:14 59:19 75:14 95:19,19 119:15 120:12 175:1,1 177:3 177:3,3
**earlier** 24:12 27:23 33:5 38:23 41:3 48:14 65:20 71:15 81:13 88:20 92:13,15 95:15 96:4,13 98:21 113:8 114:2,18 116:9 125:4,8 130:2 152:13 153:12 153:16 155:7 158:3 171:14
**early** 11:11 13:13 86:15,16 121:1,4 151:21
**easy** 9:6
**eddie** 15:15,16 23:23 36:15 37:9 95:18 101:22 102:3

**eddie's** 15:18
**edge** 161:10 162:6
**edr** 30:7 34:20 48:8,18,19 49:2,16,22
**educational** 25:23
**effect** 2:16 83:18 151:9 157:16
**effort** 102:5,7 124:2
**either** 10:18 20:11 33:13 92:8 131:18 135:4 137:9 138:2
**electronic** 48:20 49:22
**emergency** 67:17 74:23 88:4 90:20 97:1 106:19 111:23
**employee** 26:8 37:3 68:22 115:15
**empty** 87:16 88:13
**energy** 41:13 92:1,7,11 93:23 94:3,7 107:5 154:3 155:14,15
**engine** 38:21 44:21 74:2 77:21 78:5 79:9,12 80:10 90:22 93:14 105:5,21 107:16 108:4 110:4,6,23 113:3,4 117:8 130:18 131:5,6 131:8,16,23 132:5,6,18 133:2,8 134:8 139:4,6,15 140:2,23 141:7 144:4,5,19 145:16 146:10 146:18 147:1,8 147:16 148:7 148:13 150:2 150:13,19 152:18 153:7 163:5 164:8,10 164:13,14,15 164:17,22 165:6,7,9,12,13 166:3,21,22,23 167:9,9 170:23 171:7
**engineer** 9:16 16:3 26:12,16 26:20 27:15 34:19 36:23 61:18 63:3,23
**engineering** 9:11 10:4,10 10:13,16,19 12:2 17:6 26:1 45:11 62:5 94:17 171:3 172:14
**engineers** 10:11 15:11 61:14
**engines** 78:17 78:18 105:10 105:20 107:15 131:10,20 166:11 171:9
**enter** 78:23 79:1 80:15 138:21
**enters** 129:10
**entitled** 122:4
**entity** 10:9 26:9
**equally** 146:9 146:14
**equals** 46:13
**equation** 41:19 42:1,3 44:11 44:19 45:7 46:21 47:2 57:13 85:5
**equations** 42:10 45:3,6
**equivalent** 145:11
**errata** 176:11 176:13,16
**essentially** 54:12 58:13 72:9 89:4 128:21 137:17 140:7 159:22
**evaluate** 58:8 62:16 115:12
**evaluating** 58:17
**evaluation** 111:11 115:13
**event** 47:11 49:13,18 50:6 52:1 58:17 92:19 93:8,10 93:12 100:7,9 125:7 127:8 134:23
**evergreen** 172:1
**everybody** 49:23 62:2 82:8
**evidence** 3:3 105:15 147:6
**evident** 167:3
**exact** 56:15 133:7 134:20 134:21 135:2 136:2,5 160:13 160:14,17,23 161:1

**exactly** 50:18 56:9 76:8 79:16 109:16 114:1 130:15 144:8 145:16 146:14 165:20
**examination** 5:1,2 7:12,20 168:17 173:5
**examined** 7:17
**example** 19:22 80:20 88:11 91:12 99:22,23 107:10 161:9
**excel** 30:5 169:10
**except** 2:22 32:9 41:1 168:3
**exception** 28:22 137:4,10 138:3
**excluded** 173:14
**exemplar** 30:5 30:18 96:22 97:1 100:6 131:22 132:18
**exemplars** 48:14
**exhibit** 6:1,3,4 6:5,6,7,8,9,11 6:12,13 25:9 25:14 31:15,20 32:17 35:6,11 47:1,6 54:14 54:18 56:2 65:13 95:7,9 100:13,17 101:1 116:12 116:17,21 118:2,6,9,15,16 143:5 152:14 152:14 157:18 157:23 163:17
**exhibits** 21:4
**exist** 141:10
**exists** 140:16
**expect** 19:20 20:7 62:20 63:10 64:1 65:6 90:3 104:19 143:23 148:13 155:10 166:16 167:2
**expectation** 62:21 63:4
**expecting** 158:5
**experience** 169:16
**expert** 11:14 16:20 20:5 33:7 59:16 60:18,22 68:21 121:18
**expertise** 26:11 27:14,20 44:10 58:23 70:23 71:4 115:5 173:21
**experts** 68:16 169:17
**expires** 175:21 175:23
**explained** 171:14
**exponential** 94:8
**express** 103:2 104:5 109:8
**expressed** 89:11
**extensive** 21:5
**extent** 113:18 154:6,16
**exterior** 149:12 149:20,23 150:2,5,10
**extra** 20:16 53:17,19
**eye** 13:20 126:18 127:13 144:11 149:1 159:15,20 160:14
**eyes** 104:20

**f**

**f** 175:1
**faa** 136:16 137:9,11,14,19
**faced** 27:16
**facetious** 126:4
**facility** 144:5
**fact** 61:2 63:7 63:14 79:6 94:1 114:1 129:21 149:17 150:22 157:13 171:8
**factor** 44:16 79:3 80:13 83:7,13,15,23 84:1,2,4,4
**factors** 58:21 58:23 59:9,16 60:22 81:7,10 91:22 92:5 104:16 107:4 151:16
**facts** 91:3 172:20
**failed** 96:21
**fails** 176:18
**fair** 9:1 27:13 28:16 34:9 36:6 38:1,3,11 40:23 44:2 63:6 84:15,23 97:15 98:6 103:23 104:1 112:7,22 152:12,20 158:6

**fairness** 114:21
**fall** 59:9 155:5
**falling** 155:3
**familiar** 44:12 48:22 51:4 67:14
**far** 21:9 168:8
**farther** 104:17 105:12,22
**fashion** 47:16
**fast** 89:6
**federal** 32:3 63:17 102:13 102:16,22 170:1
**feel** 79:8 96:8
**feet** 47:20 54:13 55:23,23 56:5 57:2 83:5 91:13,16 108:10,11,11 110:10,21 113:2,13,14 117:8,13,20 118:16 135:4 137:1 153:2,4 161:16 164:1 165:1 167:4
**fela** 95:22
**fellow** 16:20 65:21 73:18 114:19
**fellows** 101:10
**felt** 89:10
**ferret** 124:9
**fianchino** 142:9 143:4
**fidelity** 130:8 130:15
**field** 33:22 169:1 173:22
**figure** 163:10 166:7
**file** 29:13,23 30:11 36:4 44:6 66:1,17 78:1 107:9,18 138:17,21 167:23
**final** 39:20
**finally** 35:13
**find** 19:3 29:9 78:1 90:11 103:21 119:6 132:4
**fine** 19:13 101:4 103:18 108:22 166:1 167:16
**finish** 48:12,17
**finite** 72:15
**firm** 4:11 10:3 12:22 17:8
**first** 7:17 12:21 12:23 13:4 56:16 101:6 102:7,8 109:9 110:9 115:21 118:22 147:15 148:15 151:19 165:8,10
**firsthand** 22:20
**fisheye** 126:21
**five** 128:3 129:2,14,16,17 130:5
**flew** 136:14
**flight** 136:17
**flip** 35:17
**fly** 136:21 137:20 138:8 138:12
**focal** 106:4 126:17,22 127:1,7 157:11 157:16 159:21
**focus** 34:5 105:17 115:1
**focuses** 34:4
**focusing** 20:7
**fog** 59:7
**folder** 30:3,11
**follow** 81:13 168:15 173:3
**following** 7:13
**follows** 7:18
**foot** 73:7 108:8 141:16
**force** 2:15 47:14 94:11 154:8
**forces** 79:22 81:11 84:5
**foregoing** 7:6 175:7,11 178:5
**forensic** 10:12 141:8 171:3
**forensically** 13:11
**forgot** 81:13
**form** 2:22 33:23 34:7 60:9 64:4 65:7 71:7 112:4 119:22 145:8 150:16 159:10 170:18 172:4
**former** 10:1
**formula** 41:9 41:18
**formulas** 81:18 168:18
**foster** 19:22 20:4 25:6 33:7 33:11 34:3,4 34:12,15 40:6 40:10,11 41:14 56:20 65:11 74:8 83:4 84:19 87:12 90:12,17 94:10 99:12 106:14 108:9 112:10 114:16,18

**foul** 90:20 91:14,17 108:8 108:9,11 110:6 111:7 112:2 113:13 153:2
**fouled** 141:20
**fouling** 105:10
**found** 9:20 30:2 75:18 80:7
**four** 9:19 108:10 114:9 114:14 130:5
**fourth** 2:8 7:8
**fra** 143:20
**frame** 126:1 129:7,12 135:20
**frames** 106:11 128:3,6,17,19 128:22,23 129:2,3,8,9,16 129:17,18 130:5,5,6
**friction** 88:21
**friend** 11:19 12:20
**friends** 11:21
**front** 18:14 54:1 64:2,3 101:12 106:19 110:16,23 164:2,15,16 165:1 166:4,5
**froze** 106:23
**full** 2:16 7:21 11:12 67:15 68:5 70:20 72:2,16 73:12 79:23 81:9,16 82:4,5,14 83:20,21,22 85:13 88:2,4 88:15 99:5
**fully** 72:5 88:15 89:23 97:17
**function** 80:2 84:6 94:4
**functionally** 89:5
**further** 2:12,19 93:11 174:20 175:14

**g**

**g** 45:20 46:1,2 46:16
**gallivan** 4:3
**game** 170:16
**general** 42:20 63:13 122:10 128:10 136:18 159:18
**generally** 13:9 37:14 50:15 59:3 79:20 81:5 106:7 126:15 169:1
**generated** 21:22 22:3 42:6 89:12 109:4
**generation** 170:17,20
**generic** 49:21
**generically** 41:11 42:12
**gentleman** 51:3
**geometry** 107:15
**getting** 122:15 126:23 137:1 138:10 160:3
**give** 9:4 12:9 13:19 19:15 25:16 32:4 36:9 37:22 44:7,14 69:19 87:16 105:7 115:17,19 133:12 134:11 144:13 170:1 173:8
**given** 32:6 47:23 48:5 65:20 165:11 172:13 175:12 178:9
**gives** 43:11 45:21 50:2 53:3 92:11 106:4 135:6
**giving** 9:2 170:2
**glare** 151:6,11
**glass** 149:3,5
**go** 13:23 14:4,9 18:12 21:12 24:1 28:7,22 29:12 36:2,7 40:15 48:12 62:9 64:5,6 72:10 76:8 77:23 78:8 81:10 83:3,12 90:10 100:10 114:3 118:7 121:18 122:1 125:16 126:20 127:19 129:11 132:9 135:11 136:20 137:19 146:22 147:18 150:8 163:9 174:4
**goes** 31:22 46:6 55:17 107:22 122:2 129:20 170:14
**going** 8:11,15 14:22 16:6,9 16:11,16 18:17 18:18 19:15 20:8,15 22:17 23:13 25:13 31:19 32:4

33:17 37:19 45:19 55:12 58:8 60:7 64:10,12,14 66:20 67:8 70:12 71:3,8 72:14 75:13 80:3,9,13,15,17 80:21 81:2 82:16 83:17 84:6,7,13 86:8 86:14 87:23 88:9 89:4,20 92:2,9 93:12 94:1 95:7 98:5 99:13 100:17 103:16 105:9 105:11,20 107:2,4,10,21 109:17 118:6 124:19 128:5 134:5 135:2,5 143:3 148:14 148:22 150:8 150:13 151:5,7 151:10 154:2,5 154:12,14,15 154:17,18 155:4,21 157:22 168:6
**good** 8:1 11:22 13:19 44:9 47:1 53:7 60:6
**google** 23:5 75:9 124:11,12 124:13,15 125:2
**gosh** 33:12 109:23 167:21
**gotten** 23:4 81:8 83:22 88:7 114:6
**grade** 80:18 107:12
**graphics** 15:17 16:19
**gravitational** 46:17 47:14
**great** 8:4 91:10 145:13
**greenville** 4:6
**grime** 148:12
**grounds** 3:1
**group** 12:3
**gs** 48:1,1 56:17
**guess** 12:11,13 31:9 33:13,14 55:5,13 82:11 111:19 126:3 143:10
**guessing** 55:6
**guy** 15:17 16:4 34:17 44:8 65:22 69:5 101:23
**guys** 10:7 37:17 39:14 121:18
151:18
**gwblawfirm....** 4:8

**h**

**h** 177:3
**half** 86:19 92:8 94:7 108:8,11
**hand** 31:19 35:10
**handed** 54:19 101:1
**handle** 10:14
**handling** 42:15
**handwritten** 6:6 21:16,17
**happen** 20:9 93:13
**happened** 13:11,12 22:20 24:15 27:6 153:15 160:20
**happens** 55:7 86:13
**happy** 142:19
**hard** 88:6 104:12
**hat** 25:6
**hdr** 130:11
**head** 87:3 99:3 165:16
**heard** 44:11 169:14
**height** 134:7
**heights** 134:1
**held** 167:19
**help** 16:6,9
**helpful** 169:19
**hereto** 178:7
**hesitation** 114:2
**hey** 62:9 98:9 111:6 152:8
**high** 86:10
**higher** 50:17
**highway** 63:19 122:12,13,18 122:21 123:5
**hit** 48:8 82:9 106:21
**hitch** 146:18
**hold** 26:10 27:19 72:11 112:23 156:3,8
**holding** 70:22 109:22
**honest** 9:3
**hood** 4:11 12:22
**hoodlaw.com** 4:16
**hoping** 66:6
**horizontal** 150:19
**hour** 35:5 43:8 43:11 54:6,9 55:15 56:1,6

56:11,16,17 57:4,5 94:6 116:14,23 155:4,6,20,20
**housekeeping** 101:6
**huh** 59:21 98:22 134:16 151:1
**human** 13:20 58:20,23 59:9 59:16 60:21 126:18 127:13 144:11
**hypothetically** 43:6 98:1

**i**

**idea** 41:12 58:10 62:12 63:13 70:16 73:5 81:19 92:11 104:9 106:15 126:15 144:14 155:14 157:5 174:3
**identical** 159:14 162:20
**identification** 25:10 31:16 35:7 47:7 54:15 95:10 100:14 116:18 118:3 157:19
**identify** 40:20 109:7
**ii** 4:4
**image** 24:11 124:11,12,13 124:15 125:3 126:7,23 158:18 159:13 159:23 160:1,4 160:6,12 163:3
**images** 23:14 23:17,19,21 24:2 124:7 125:12 134:11 134:21
**imaging** 130:22
**immediately** 98:5
**impact** 6:11 82:10 91:21 92:10,12 93:23 106:17 107:5 108:6 117:20 118:11 145:19 154:4,7,9 164:16 165:14 172:8
**imperfections** 149:18
**implies** 142:2
**important** 70:11 78:10,12 79:4,9 147:2 163:11 165:23
**inappropriate** 121:15
**inches** 136:5 139:20 142:1 144:7
**incident** 143:17 143:17
**include** 35:22 75:12 102:22 118:16
**included** 67:12 85:15 114:4 171:10
**index** 5:1 6:1
**indicated** 50:16 61:8
**indication** 82:9
**industry** 64:15 64:18,20,23 115:3 139:5 141:17 172:19
**infiltrate** 138:15
**influence** 154:5
**information** 50:2 89:14 90:11 105:6 141:12
**initially** 11:19
**initials** 36:12
**initiate** 70:19 73:6
**initiated** 82:4 118:13
**input** 101:16 101:20 128:19
**ins** 34:18
**inserting** 171:22
**inside** 23:9 147:16 148:2,6 148:7 151:18
**inspect** 121:21 121:22
**inspected** 163:20
**inspection** 143:21
**instantaneous...** 166:16
**instructions** 37:22
**intend** 103:1 104:5 109:8
**intended** 141:8 159:5 162:19
**intensive** 69:21
**interacting** 73:10
**interaction** 80:2 137:14
**interchangea...** 74:13
**interested** 90:12 114:8 175:16
**internet** 22:23 23:2,4 132:4

**intersected** 64:19
**interstate** 122:13,18,21 123:5
**interstates** 122:23 123:2
**interview** 22:13
**introduced** 8:6
**investigating** 140:5
**investigation** 11:5 121:5
**investigator** 142:10
**invoices** 6:5 35:12,19 36:8 36:11
**involve** 33:3
**involved** 19:2 28:2,3,4,13,19 30:20 39:4 49:19 56:4 77:22 79:10 80:11,14 81:3 87:17 93:23 120:21 130:18
**involves** 43:23
**involving** 14:16
**issue** 40:9 173:13
**issues** 13:21 34:5,6
**italian** 1:11 8:10 176:4 177:1 178:1
**item** 66:19 114:9
**items** 18:19 22:6

**j**

**jefferson** 175:4
**job** 87:23
**john** 4:12 66:12 121:16 168:13 173:6
**john.radeck** 4:16
**joined** 124:1
**joint** 52:13 71:17
**jr** 4:12
**jrc** 52:14 69:22 71:17
**julian** 10:2,4
**july** 163:21
**jump** 64:2
**jumpy** 129:19 129:22
**junction** 64:13
**jury** 111:11 134:12 145:21 145:23 147:10 151:23 158:13 158:19 169:19

**k**

**k** 4:4 6:3,4
**kansas** 31:8
**kcs** 30:22 31:5 41:4
**keep** 66:20 128:12
**keeping** 163:14
**key** 99:11
**kin** 175:15
**kind** 12:1 16:15 36:21 42:22 76:3 125:18 129:22 132:1 133:12 169:6 171:19 172:1
**kinds** 170:1
**kinematics** 41:15
**kinetic** 92:1,7 92:10 94:11 107:5 154:3,7 155:14,15
**knew** 120:5,17 135:18 166:2 168:9
**knobs** 132:2
**know** 9:9 13:9 13:13,16 17:14 17:23 19:19,21 20:2,8 21:9 22:16 24:10,10 25:3 26:6 28:10,11,12 32:10 33:19 36:3 37:9 41:10 42:3 44:9 51:18,21 59:3,5,5,14 64:7,8 65:10 67:1,21 68:23 69:2,10 70:9 70:12,15,16 71:4,20 72:13 75:8 76:5,11 76:15,16,20,23 77:3,21 78:2,4 78:12 79:1,5 83:11 84:10 85:13 88:6 89:18 90:6 91:9 95:14 98:8,17 101:11 101:19 102:1 104:15 107:10 107:11,17 112:11 114:5 117:18 120:20 121:2,21 124:8 124:10 125:10 126:3 127:1,15 127:18 128:8 130:12,13,16 131:9,19 132:12,13 133:1 135:14 136:2 137:6

141:20,22 143:1 145:15 145:16,18 147:19,21 148:6,16 154:19 156:15 156:19,22 161:16 163:2,8 163:9 165:18 166:3 168:9 173:11,15
**knowing** 139:16
**knowledge** 22:20
**known** 11:23 12:3,5
**knows** 34:17
**ksc** 97:4

**l**

**l** 2:1 15:20 175:20,22
**laance** 138:7,9
**labeled** 102:10 143:18
**laid** 104:8
**lane** 63:20
**language** 49:7 72:12
**large** 2:7 7:3 93:18 127:22 128:14
**late** 106:12
**lateral** 150:18
**lavett** 15:16 16:17 36:15 95:18
**law** 4:11 12:22 51:11,22 173:14
**laws** 2:17
**lawsuit** 8:8
**lawyer** 51:8
**lawyers** 51:2
**lead** 74:2 171:12
**leading** 2:22 170:18
**leads** 103:13
**leave** 90:15 103:21 119:23
**leaves** 106:13 106:14
**left** 152:17 161:8,11
**leg** 95:15
**legal** 11:9 108:2 176:23
**length** 74:1 82:23 87:7 105:18 106:4 126:17,22 127:2,7 157:11 157:16 159:21 165:11 166:3
**lens** 104:17 105:19 125:22 126:9,12 144:10 145:6 146:12 152:4 156:23
**lessened** 106:16
**library** 51:11 51:22
**life** 99:23 111:14
**light** 88:10
**lighting** 59:8
**limited** 20:12 150:21
**line** 31:4 38:20 64:13,19 143:6 143:10 177:4,7 177:10,13,16 177:19
**lingering** 30:14
**list** 18:13 19:14 21:4 31:21 32:4,6,16,21 33:2 114:9 142:17
**listed** 42:1,5 113:21 114:7 116:1 117:23 127:22 142:17
**listing** 32:22
**literature** 22:9 60:23 61:2,12 69:14 73:15 82:21 155:17
**litigation** 10:23 11:7 12:15 68:22 75:20 95:22 120:18 120:21 122:7
**little** 18:18 19:17 22:17 50:17 57:14 66:6,15 92:6 107:19 118:20 141:6
**locate** 135:15
**located** 133:4 139:4
**locates** 108:6
**location** 90:21 107:16 118:23 134:15 135:23 137:15 144:6 146:3 147:3,6
**locations** 136:1
**locomotive** 23:10 26:12,16 26:20 27:20 38:20 40:8,22 41:6 43:17 44:21 48:7 49:18 61:14,18 61:22 62:9 63:2,23 78:17 81:4 98:18 110:4 125:6,12 127:3,17

147:16 148:3 149:8 150:13 160:16 163:20 163:23 165:13
**locomotives** 23:9 133:21
**long** 9:5,7,12 10:3 11:8 12:3 12:6 56:12,21 58:2 61:3 121:9,10
**longer** 32:1 67:18 77:14 84:13 144:15 144:17
**look** 13:14,23 14:13 17:11,14 18:11 21:2 25:16 28:7,22 33:2 38:5 39:17 40:16 42:10 43:4 44:5 51:12 52:8 53:2,18 54:22 55:11 61:12 66:7 78:1,9 79:4 82:20 83:3,13 88:21 89:2 94:5 97:8,10 101:1 104:17 105:9,11,22 112:14 114:22 121:2 125:1,16 126:2 127:20 128:5 129:6,12 131:6 132:10 135:10,18,19 139:7 142:11 142:19,23 144:9 157:15 158:16 161:8 161:13 162:4 162:11,15 174:5
**looked** 19:14 30:10 61:17 82:21 100:6 105:2 114:22 115:23 118:10 119:2 126:6 131:17,21 147:11 148:7 152:15 153:22
**looking** 13:17 32:19 36:11 39:3,5 42:14 54:5,7 55:22 56:16 67:3,13 73:19 79:16,21 80:5 81:11 82:12 83:19 89:3 93:22 104:10 107:12 111:16 114:2 116:10 125:19 126:5,6 128:11 128:20 129:14 129:15 130:11 130:11,12 148:8,23 149:4 149:10,17 150:1 160:16 160:19,21,21 171:22
**lookout** 163:14
**looks** 12:4 31:22 55:1 67:14 95:17 111:13 116:22 126:7 129:19 130:15 132:2 133:18
**lose** 94:5,7,7
**lot** 14:18 15:17 23:19 28:3 34:20 41:20 64:5,6 78:13 91:10 99:21 124:21 128:13 147:19,22 155:5 157:23 169:9
**loumiet** 51:3,17 52:7 66:10 67:6,11 74:22 75:11 96:3
**loumiet's** 52:4
**low** 50:16
**lower** 95:2 126:19 130:15 153:16

**m**

**m** 44:14
**made** 2:21 19:22 38:5,23 87:20 96:7 101:2 117:10 140:4,9,13 143:8 154:1 164:9 165:14 166:10,15 167:1 168:20 171:18 178:5
**magnitude** 92:12 93:22
**mail** 4:8,16 6:8 12:5 17:12 21:6 51:12,14 59:19 75:14 95:19,19
**mails** 13:7,8,22 17:12 21:7,11 119:15 120:12
**main** 64:19 101:23 161:2
**mainline** 64:16 65:1,2 140:19 141:1 147:17
**make** 3:1 8:18 8:20 21:13,17 24:7 33:14 38:6 39:18 40:19 41:9 49:1,15 52:11

55:21 77:10 78:20 91:2 97:20 105:9,11 105:20 120:3 124:2 130:4 132:6,16 133:6 133:7,11 138:15 141:14 141:18 166:12 174:1
**makes** 77:9 86:10 104:17 125:23 149:3
**making** 20:17 91:8 125:19 155:1
**maps** 23:5 125:3
**march** 35:21
**mark** 32:11 46:9 47:1 115:20 157:23
**marked** 25:10 25:14 31:16,20 35:7,11 47:7 54:15,18 95:10 100:14 116:11 116:18 117:21 118:3 143:4 157:19
**markings** 139:11 140:15
**marks** 164:23 166:17
**marshall** 115:8
**match** 57:5
**matched** 142:1
**material** 52:10 68:1,4 90:4
**materials** 6:8 14:5 22:8,9 23:6 29:14 30:3 50:22 52:17 55:18 67:12,23 68:12 75:13 89:20 93:5 102:23 103:7 107:9,18 113:20 114:6 116:3 128:4 142:7,16,23 167:23
**math** 21:23 36:7 41:20 44:9 94:12 99:15,19 166:2 168:18
**matter** 6:10 14:21 16:16 21:21 35:15 37:7 41:4,5 49:9 56:10,14 61:10 79:6 100:23 113:23 130:13
**matters** 14:16 30:6 39:2,4 41:7 65:21 68:17 121:7
**mc2** 44:11
**mean** 9:22 16:10 17:3 27:4 29:8 42:8 60:6 62:5 72:21 73:4,21 75:5,10 109:2 110:8 127:18 140:8 147:23 167:6 174:7
**meaning** 103:5
**means** 71:6 86:22 108:10
**meant** 19:18 57:14 76:6
**measure** 108:15 122:15 139:19 146:23
**measured** 131:10,20 132:23 139:13 139:15 141:9 142:1 145:17 163:21 164:23 165:11 166:18 167:4 171:9
**measurement** 139:21,23 140:4 142:6 143:8,10 147:7 165:16 166:2
**measurements** 108:19 120:3 140:12 171:1 171:18
**measuring** 122:12,12 123:2 136:6 140:18
**mechanical** 10:11,15,18 26:1 79:22
**mechanically** 86:13,18
**mechanics** 81:11
**mechanism** 70:18
**mechanisms** 44:1
**meet** 15:7
**meeting** 4:13
**meetings** 15:3
**meets** 148:21
**members** 17:1 40:2 136:10
**memory** 30:12 61:8 78:15
**mention** 14:6 96:21 97:12 125:13
**mentioned** 13:22 22:7 45:16 65:19,23 71:15 87:12,13 88:20 97:3

**met** 15:1,10,15 15:21
**metadata** 125:18
**methodology** 168:23
**middle** 50:19
**miles** 43:8,11 54:6,9 55:15 56:1,6,11,16,17 57:4,4 94:6 116:14,23 155:4,6,19,20
**millimeter** 106:3 126:16 127:9,13 144:9 145:6 146:11 156:23 160:1,4 160:6,12
**millimeters** 127:5 157:9 159:22
**mind** 8:2 19:17 24:15 45:15 52:9 121:6
**mine** 10:2 11:20 34:14 101:13
**minimum** 101:20
**minute** 26:23 48:17 69:20 111:3 147:14
**misleading** 105:6 152:2,2
**missed** 21:13
**missing** 44:16
**misunderstand** 9:7
**misunderstood** 9:8 108:2
**model** 132:6 133:8
**models** 156:23 171:11,13
**modern** 49:10
**modifications** 39:18
**modify** 55:9
**moment** 30:19
**momentum** 155:2
**morning** 8:1,16 15:2 17:18 151:13
**motorists** 63:19
**move** 63:20 135:4
**moved** 106:20 141:16
**movement** 150:14,19
**moving** 73:10 147:17 150:20
**mu** 46:19

**n**

**n** 2:1
**naked** 149:1 159:15 160:14
**name** 7:21,23 8:5 15:19 31:1 66:8 68:13 95:17 97:3 114:20
**named** 11:20 51:3
**names** 36:19
**necessarily** 45:3 83:20 105:16 112:21 125:15 139:22 154:11 172:2
**necessary** 2:20 38:7 39:19 89:10,22 121:12 178:6
**need** 13:20 21:4 37:16 51:13 52:8 71:4 79:17 96:12 98:11 110:17 134:19 146:22 156:17
**needed** 137:7 138:3 141:8
**negligible** 88:8
**neither** 30:8 153:5 175:14
**never** 26:3,8,15 82:6 123:10 138:12,20 160:23
**new** 10:9 90:4 148:1
**newer** 32:9
**nice** 55:8
**nominally** 67:17 68:5 74:23 75:4,6,7
**non** 58:4,7 59:4
**norfolk** 1:8 6:9 8:8 17:15 27:3 28:6,13 29:4 30:8,13 32:20 33:3 44:21 56:4 65:2 78:5 79:13 83:1 87:18 110:3 115:12 119:11 119:17,19 120:6,13,20 121:19 123:23 124:16,19 127:7 131:4,7 131:10,12,15 131:19,20 133:1,8 135:21 140:19 141:1 142:3 146:17 154:3 164:7,9 164:12,15,20 165:6,13,21

166:9 167:6,8 171:6 176:4 177:1 178:1
**normal** 62:18 104:15
**normally** 39:13
**notary** 2:6 7:2 178:13,19
**note** 163:17 176:10
**noted** 178:7
**notes** 13:7 21:17,18,23 101:3
**noticed** 14:14 54:10 128:2 136:12
**ns** 143:17,19
**number** 1:5 18:23 20:10 25:10 31:16 32:11 33:18 35:7 46:8 47:7 47:15,18 52:23 54:15 55:19 60:2 67:4 70:12 75:18 77:5,18 79:11 86:22,23 88:8 95:10 97:9 100:14 110:11 116:18 117:21 118:3 157:19 159:19 169:11
**numbered** 67:2
**numbers** 36:8 41:19 45:2 50:5,10 52:3 53:7,11 54:11 55:14 66:2,23 80:7,8 86:10 89:7 90:13 91:11 92:14 96:22 97:7,15 116:13 158:17

**o**

**o** 2:1 4:12 30:22
**object** 33:23 34:7 60:9 64:4 65:7 71:7 98:6 110:16,18 112:4 119:22 145:8 150:16 159:10 170:18 172:4
**objection** 34:10
**objections** 2:21 3:1
**objects** 169:20
**obligation** 111:22
**observation** 143:9 155:2
**observed** 163:22
**observing** 98:6
**obvious** 27:5 125:22,23
**obviously** 15:1 24:10 82:16 91:8 92:2 109:2 111:15 170:19
**occasions** 119:2
**occur** 82:15
**occurred** 17:19 94:20 95:3 119:1 141:4 145:19 153:21
**offered** 3:3 172:13
**offering** 27:1 94:16,23 95:1 113:11 153:17 154:9
**office** 17:4 21:11 25:15 51:2,15 66:3 95:18 116:8 119:15
**offices** 2:7 7:8
**ogden** 114:10
**oh** 16:13 48:20 51:18 53:22 101:19 114:20 133:23 162:14 170:6
**okay** 8:3 19:13 30:2 32:18 48:13 49:14 60:15 68:2 97:21 101:5 108:1,23 113:9 137:20 161:3 171:22
**once** 45:16,17 55:8 72:13,15 79:23 81:8 82:18 83:21 85:13 88:2,6 106:10 111:12 125:21 126:5,6
**ones** 23:19 50:19 53:13 86:15 102:9 116:15 168:3
**open** 29:5,7 90:15
**operate** 79:23 88:1
**operating** 61:22 78:6 83:1 132:7 133:9
**operational** 34:21
**operations** 26:11 34:5
**opinion** 94:16 94:23 105:3,4 105:13 106:1 108:4,20 109:5 109:15,18

110:2,8 112:21 112:23 113:11 153:17 154:10 154:23 172:17 173:8,13
**opinions** 26:23 27:1,2 63:12 89:11,23 102:18 103:1,6 103:7,22 104:5 106:2,8 107:6 107:7,23 109:8 109:10,20 110:13 112:9 113:4 163:12 167:17 170:2 172:10,12
**opposed** 145:6 149:6 167:3
**opposing** 121:12 122:7
**oral** 7:12
**original** 25:11 31:17 35:8 37:2 47:8 54:16 95:11 100:15 112:18 116:19 118:4 157:20
**orleans** 148:1
**ors** 143:20
**outlier** 169:13
**outs** 34:18
**outside** 15:8 17:8 82:12 89:19 132:22
**overall** 37:16
**overcast** 151:11
**overseer** 37:15
**own** 60:23 61:2
**owned** 123:7
**owners** 9:17,18 10:6
**ownership** 10:9

**p**

**p** 2:1 6:11
**p.e.** 6:3,4
**p.m.** 174:19
**pad** 45:11
**page** 5:2 6:2 66:11,22 67:4 67:4,5,9 101:12 117:11 117:13,23 143:6 158:16 163:19 167:15 177:4,7,10,13 177:16,19
**pages** 51:22 102:8,9
**paging** 102:1
**paper** 45:12 69:18,18,21,22 70:21 71:13,14 71:20 72:3 75:21,23 87:1
**papers** 50:14 50:22
**paraphrase** 37:19
**parked** 167:1
**parlance** 49:12
**part** 16:14 17:8 17:23 22:14 24:23 30:16 38:12 80:17 81:2,17,18,21 91:4 102:17 103:15 115:10 119:11 124:10 131:1 134:6,10 145:20 146:4 155:16
**particular** 13:14 30:10 51:19 57:1 71:13 100:11 114:8 129:12 131:21 134:7 138:1 156:4
**particularly** 22:7
**parties** 2:3,23 32:23 33:1 175:15
**partner** 10:1 40:7
**parts** 85:4
**party** 121:12 122:7
**passed** 14:22
**passenger** 148:5
**past** 102:14 164:21
**pasta** 1:11 8:10 176:4 177:1 178:1
**pause** 48:16 105:1
**pdf** 68:12
**pedestrian** 122:14
**pedestrians** 122:22
**peer** 69:13 154:22 155:18
**people** 36:20 46:19 58:21 111:16 124:21
**perceived** 106:10,22
**perceiving** 106:12
**percent** 92:6
**perception** 43:5,10,13 56:19 57:19,23 58:4,10 61:9 61:13,17 81:23 98:9,16 99:11 149:6

**period** 70:18 72:15 73:12,16 86:1,19 97:5 98:18 99:2 137:4
**permission** 120:6 121:20
**permissions** 138:2
**permitted** 145:22
**person** 23:8,23 59:12 104:14
**personnel** 62:22
**perspective** 13:19 152:8
**pertain** 22:8
**pertains** 71:21
**peterson** 20:5 33:8,21 67:10
**peterson's** 25:1
**phase** 45:18
**phenomenon** 62:13 94:9 96:18 100:2
**phone** 4:7,15 15:5 137:19
**photograph** 24:10 135:10
**photographed** 130:21 163:21
**photographs** 23:20,20 119:8 120:4 146:11 157:8
**phrased** 159:12
**physical** 136:7 139:17
**physics** 43:1 155:2 168:19
**pick** 62:8
**picture** 135:14 157:6,10 161:8 162:2,5,11 166:18
**pictures** 128:16 128:18 144:8
**piece** 149:2,5
**pilot** 136:19
**pine** 171:23
**pipe** 100:8
**pixels** 130:14
**place** 4:5 72:3 96:8 112:10 117:15 134:20 134:21 139:6 140:22 144:5
**placed** 135:8 139:15,18 140:1 141:7,9
**places** 65:18 68:10 83:17 136:22
**placing** 146:9
**plaintiff** 1:9 4:2
**plaintiff's** 6:2 25:9 31:15 35:6 47:6 54:14 95:9 100:13 116:17 118:2 157:18
**plaintiffs** 68:13
**planning** 158:19
**play** 16:1,18 34:12 37:12 92:5 151:7
**played** 105:8 128:21
**please** 7:22
**plenty** 11:3 157:14
**pltf'sexhibit** 68:14
**plug** 41:19 46:3 70:12
**plugged** 52:21
**point** 8:17 17:17 27:6 55:6,13 63:17 69:7 81:15 82:3,14 85:15 88:7 90:18 91:13,16 108:12 114:1 117:19 135:3 139:18 143:2 146:21 151:20 151:22 152:5 152:19 154:1 157:7 160:17 161:2 162:18 164:13 165:5,8 165:10 166:22 167:2,13
**pointed** 41:2 90:8
**pointing** 63:7
**points** 118:12 152:15
**poor** 13:17 104:12
**portion** 42:16 42:22 58:9 81:19 121:4 164:7,20 165:20 166:8
**portions** 42:17 42:17
**position** 108:12 124:4 135:12 135:15 142:4 147:12 150:9 151:6 160:19 160:22 162:1
**positioned** 17:18 134:6 141:3
**positioning** 139:3
**positions** 54:5 104:21 125:2 133:15,19 146:19 147:5 152:1 171:17

**positive** 51:16
**post** 124:14
**potentially** 158:5
**powers** 1:21 2:5 6:3,4 7:11 7:16,23 8:1 10:4 32:15 63:1 122:5 176:1,5 177:2 177:24 178:2,4 178:12
**practicable** 18:20,21 19:19
**practical** 18:10
**practice** 121:11
**pre** 81:21 124:13
**precise** 24:9 91:10 136:3 147:7 167:2
**precisely** 40:18 57:15 159:6
**precision** 145:18
**predominant** 81:6
**predominantly** 171:17
**prefer** 101:3
**preparation** 20:17 156:5
**prepare** 15:4,8
**prepared** 14:18 16:12 101:8
**preparing** 35:23
**present** 32:8 159:8 160:16
**presentation** 158:4
**presented** 59:15
**pressure** 67:16 68:5 98:20
**presumed** 86:21
**presuming** 100:11
**pretty** 11:2,5 13:17 14:3,8 18:9 37:17 42:21 44:8 45:14 60:6,17 103:8,12 104:7 107:1 119:9 136:3 146:16
**previous** 97:2
**previously** 118:10
**primarily** 115:2 132:20
**principle** 42:20
**principles** 172:20
**print** 21:11 42:9 175:9
**printed** 20:22 53:14 54:2 117:22 118:1 139:1 165:18
**printout** 54:20
**printouts** 20:18
**prior** 3:3 8:6 43:3 57:6 75:19 77:19
**pristine** 148:22
**privately** 123:7
**probably** 16:13 25:5 31:8 66:9 73:1 87:22 101:23 102:7 108:1 131:8
**problem** 111:19
**procedure** 7:6 138:11
**proceedings** 7:13 52:13 71:17 175:7,13
**process** 24:5 37:13 73:9 121:20 122:1 135:10 136:20 138:10 170:3
**produce** 20:12 21:6 22:2,10 165:23
**produced** 47:12 116:3
**product** 22:2 23:16 24:13 39:20 42:6 125:14 128:1 172:19
**production** 20:13 21:6 50:23 66:12 143:20
**professional** 62:14,19 172:17
**professionals** 63:8,15
**progress** 38:4
**progression** 85:20,20
**project** 16:2 23:1
**propagate** 99:3
**propagating** 86:1
**propagation** 43:14 74:5,18 87:3,8,11 99:17,18
**properly** 55:21
**property** 119:20 120:7 120:13 121:11 121:19,21,22 122:1,7 123:6 123:7,12 124:20

**provide** 18:6,21 19:9 169:19
**provided** 18:19 23:12,17 25:15 30:3 31:21 51:1 52:17 54:23 55:12 66:11 67:12,23 68:4 90:5 100:19 113:20 119:9 127:18 136:8
**providing** 11:14
**public** 2:6 7:2 62:18 122:19 178:19
**publication** 51:4 52:5,16 67:11 75:12
**publications** 19:2,8
**published** 58:13 69:14
**pull** 29:23 66:7 66:14,21 137:18
**pulled** 14:15 131:7
**pulling** 39:1 95:14
**pure** 153:19
**purpose** 158:18
**purposes** 145:1
**pursuant** 7:5
**pushing** 16:5
**put** 29:12 37:5 37:17 39:15,16 45:4 50:13 53:20 55:9 57:13 75:19 158:4
**puts** 38:1
**putting** 16:21 16:21

**q**

**qualification** 173:7
**qualifications** 69:3
**qualified** 33:22 63:16 85:11 169:23 173:8
**quality** 13:17 104:12 125:5 130:1,2
**question** 8:18 8:21,23 9:2,4,6 24:9 25:21 33:16 39:5 40:15 42:13 44:4 54:12 58:22 60:10 65:11 72:6 78:3 79:2,6,18 85:11 90:7,10 94:15 96:6,7 96:10 99:20 103:9 104:18 108:2 109:1 122:5,10,11 123:3 128:22 133:6 148:15 156:17 158:15 159:11,19 164:11 167:11 167:13 168:6 168:10 174:2
**questions** 2:22 2:23 63:6 90:8 96:14,15 99:21 101:7 158:1 168:3 175:8
**quite** 21:5 33:6 78:14 116:6 169:22 174:6
**quote** 55:21

**r**

**r** 6:11 175:1 177:3,3
**radeck** 4:12 5:5 12:20 15:1 33:23 34:7 46:9 60:9,14 64:4 65:7 66:14,20 67:1 71:7 96:14 112:4 119:22 121:14 145:8 150:16 159:10 167:14 168:14 168:17 172:23
**radeck's** 46:23 66:3
**rail** 52:13 64:13 71:17 80:3 108:9 122:21 143:11 143:12 144:7 159:2 162:7,13
**railcar** 153:3
**railroad** 12:1 12:15 26:4,7,9 28:2,6 30:20 31:2 34:4,18 34:19 62:22 63:3 64:1 65:22 68:16 69:5 95:22 123:6,7,11,12 147:19 148:14 171:12
**rails** 150:22
**railway** 1:8 154:20 176:4 177:1 178:1
**railyards** 64:7
**ran** 54:20 116:8
**range** 46:6 47:23 48:1,2 50:5,16 52:19 53:4,5 54:13

**ranged** 53:11
**rapidly** 128:16
**rate** 29:1 43:2 45:21,23 46:2 46:4,20 47:21 48:10,18,19 49:3 52:2,20 56:12,18 79:16 80:12,20,22 82:19 84:23 85:8 89:3 99:8
**rates** 20:1 48:6 50:14 54:7 82:20 95:21 129:7
**rather** 32:10
**reach** 89:10 103:1 117:10
**reached** 89:23 117:17 166:22
**reacted** 106:23
**reacting** 27:8 111:16
**reaction** 43:5 43:10,13 56:19 57:19,23 58:4 58:10 61:9,13 61:17 62:17 81:23 98:9,16
**reactions** 111:19
**reacts** 106:20
**read** 67:19,20 72:2,11 97:19 120:10 143:3 164:3 168:7,12 176:9 178:5
**reading** 2:13 174:16
**ready** 14:1 39:12
**real** 33:18 44:7 44:9 93:18 99:11,20,23 111:14 147:2 161:2 170:15
**reality** 105:23
**realize** 153:1
**realized** 90:19 91:14 111:6
**realizing** 110:16
**really** 11:11 13:10 20:6 27:9 40:14 41:12 51:18 56:9,10,13 58:1 60:20 76:3 96:6 111:10 112:7 125:19 127:23 129:17,20 133:15 137:6 139:9 145:13 146:21 171:14
**rear** 74:2 87:4 117:17 167:5
**rearward** 164:1 165:1
**reason** 22:11 24:23 29:3 48:16 54:2 95:13 120:2 173:15 176:11 177:6,9,12,15 177:18,21
**reasonable** 12:12 45:14 94:16 172:13
**reasonably** 69:21 104:19
**reasons** 159:19
**recall** 13:1 17:3 22:22 28:18 31:7 69:6 92:21 124:13 125:7 132:14 147:22 151:8 156:12 173:10
**receipt** 176:17
**receive** 18:3 21:5
**recent** 25:19
**recently** 15:16
**recognize** 67:13 74:13 85:23 161:4
**recognized** 91:17 110:5 111:18 113:12
**recollection** 17:12,20 40:17 144:13,15
**reconstruct** 13:11
**reconstructed** 123:18
**reconstruction** 6:13 10:14,19 11:16 19:5 27:9 34:6,15 58:2 59:2,10 95:21 169:2 170:2
**reconstructio...** 169:7,17 172:3
**record** 7:22 29:12 95:6
**recorder** 47:11 48:21 49:11,13 49:18,22 50:2 50:7
**records** 18:2
**recreate** 24:14 161:6
**reduce** 91:23 94:2 107:4 154:3
**reduced** 94:18 175:9
**reduction** 154:2
**refer** 8:11 49:12 50:21

65:13,15
**reference** 57:22 126:1
**referenced** 27:23 30:19 52:3 71:12 93:6 176:6
**references** 23:3 30:4 32:20 38:23 50:13 65:19 71:19
**referred** 25:2 48:18 75:21,23 92:13 128:3 131:9 142:5
**referring** 20:4 40:1 49:17 71:5 72:17
**refers** 46:12 69:23 70:3
**reflect** 97:23 103:5
**reflecting** 100:19
**refresh** 30:11 30:17
**refreshing** 14:23
**regard** 105:3
**regardless** 80:10 97:22 107:3 148:20 161:14
**regulations** 148:18,21
**relate** 35:14
**related** 21:7 23:1 29:14 43:8
**relates** 59:1 170:3
**relating** 2:17 18:3 41:16 43:1
**relation** 58:17 140:14,19 152:18
**relative** 124:3
**reliability** 172:9
**reliable** 172:19
**relied** 169:7
**rely** 71:8 103:1 124:18 139:22 140:3,8
**relying** 71:9,10
**remain** 57:15
**remember** 12:23 15:15 17:21 30:23 51:20 58:3 61:4 68:11 69:7 81:18 85:4 91:5 92:15 93:5 94:3 116:2,6,9 117:19 121:1 126:14 130:9 131:14 135:9 142:13 146:16 147:20
**remove** 129:5
**ren** 115:8
**render** 128:19
**rendered** 160:5 160:7
**rendering** 111:12 163:12 171:4
**rendition** 106:5
**repaired** 142:4
**repeat** 8:20 168:4,11
**rephrase** 8:20 168:4
**replicate** 141:2 149:15 151:17
**replicates** 126:17 144:10
**report** 6:9 26:22 42:2 53:15 54:4,11 55:18 60:3 65:22 76:6 89:11 92:4 93:7 94:5 100:19,21 101:7,14,18 102:2,17,23 103:5 104:8 107:8 110:9,11 112:23 113:8 113:22 114:6 116:15 117:6 118:17 119:1 128:2 143:17 143:18 153:12 155:13 163:18 163:19 167:23
**reporter** 7:2
**reports** 102:13
**represent** 46:4 47:3 67:8 96:2 100:18 163:3
**representation** 145:4 147:8 162:19
**representations** 169:20
**representative** 25:8 115:8 161:2
**representing** 8:8
**represents** 77:5 175:11
**request** 121:22
**requested** 89:15
**requests** 35:14
**require** 102:17 102:22
**required** 136:16 178:13

**requires** 98:3
**research** 23:7 80:6 90:16 100:11
**reserve** 174:15
**reserved** 2:14
**resolved** 158:9
**resource** 68:1
**respect** 140:15
**respective** 2:4
**respond** 62:11
**responding** 43:9
**response** 103:12 110:18
**responsibilities** 27:11 111:22
**responsive** 18:7
**rest** 102:11
**restore** 144:23
**restriction** 137:4
**restrictions** 137:3
**result** 22:3 175:17
**results** 45:4
**resume** 6:3
**retained** 28:1 59:15 60:22 68:21
**retired** 10:5,6
**return** 176:13 176:16
**review** 20:3 38:5 39:17 60:23 89:19 90:4 115:7 142:8 176:7
**reviewed** 13:8 14:3,12 69:13 113:19 114:13 142:7,18 154:22 155:18
**rico** 115:14
**ridden** 147:15
**ride** 146:18
**riding** 150:3
**right** 9:14 31:10 36:9 49:21 55:2 57:10 58:18 61:7 62:11 64:3 65:5 70:22 71:1 74:18 75:1,20 76:8 81:16 82:11 84:12 91:9 94:10,13 94:14 95:17 96:5 98:12 100:5 106:18 111:1 115:18 117:4 118:13 119:17 120:19 131:2 134:15 134:23 136:10 137:21 139:20 140:12,20 141:4,21 148:14 150:9 151:7,13 154:7 155:11 158:10 158:11 159:2,3 160:7 161:3,10 161:13 162:2 162:22 163:23 164:2 165:1,2 166:11 167:12 168:6
**rightmier** 14:17 27:7 106:9,18 111:17 114:10 120:23 121:6 134:13 152:10
**role** 16:1,17 37:12
**roles** 34:11
**ron** 8:5 109:23 121:14 167:21
**ronald** 4:4
**rotors** 73:10
**roughly** 33:10
**rubric** 59:9
**rule** 101:22 136:18
**rules** 2:17 7:5 32:3 63:17 102:17,22
**ruling** 103:19
**run** 62:2,5,9 74:1
**rusk's** 143:5
**rwray** 4:8

**s**

**s** 2:1 177:3
**saith** 174:20
**sal** 1:6
**sam** 36:22,22 37:10
**satisfied** 133:14
**save** 18:17 142:20,22
**saved** 55:16
**saw** 21:22 25:1 50:22 59:19 69:6 84:20 93:1 94:13 114:16 117:16 119:16 139:11 140:15
**saying** 16:15 19:10 43:19 85:22 98:11 111:4 113:13 129:18 152:7 155:8 158:16 163:1 164:6
**says** 56:15 67:15 68:4 71:5,21 74:22 97:9 99:14 106:14 138:8

141:12 154:14 156:8
**scanned** 145:15 145:17 163:21
**scanner** 108:16
**scans** 124:7
**scenario** 105:7
**scene** 16:22 37:2 108:15 126:5 135:19 135:19 137:18 138:6 142:10 144:3 157:8 159:7 170:16
**scenes** 169:21
**school** 26:15
**scientific** 172:14
**scope** 37:16
**scraping** 163:22 164:23 166:17 167:3
**screen** 117:2
**second** 30:16 47:20 57:18,23 70:1 71:5,9,10 71:19 72:11 73:19 76:23 89:21 128:4,5 128:6,17,18,22 129:1,2,3,8,9 129:16,17,18 130:5,6,6
**seconds** 43:10 56:19,23 65:15 67:17 68:6,8 68:18 69:10,16 71:11 73:18 74:23 75:15 76:17 77:9,10 86:12 87:5 88:13,14,16 97:9 98:15 99:14,16
**section** 50:23 117:4
**sections** 102:2 117:5
**see** 9:23 13:20 17:4 21:16 23:6 24:1 25:21 26:23 29:9 32:20 33:2 36:11,19 37:4 42:11 45:4 48:4 53:3 53:16,21 54:8 55:10,20 62:15 69:17 72:3 83:4 87:1 92:3 92:9,17 95:22 97:10 100:1 101:17 104:9 104:11,14,15 104:20 106:17 110:9,9 111:15 111:18 114:4 114:11 118:7 121:3 125:21 126:2 127:21 129:13 131:23 132:10 135:22 136:21 137:20 138:17 146:1 148:13 151:18 151:23 152:1 157:6,15 161:11,20 162:5 165:17 165:20 171:4,6 171:22 174:5
**seeing** 51:20 110:15 116:6 130:1,3 157:12
**seen** 12:5 59:13 73:16 98:2 110:22 113:12 135:17 141:12 145:5 159:14 160:15 162:22
**sees** 127:13 150:5,10
**send** 21:11 121:22
**sending** 17:5 51:16
**sense** 8:19 39:10 84:4 88:17 97:20 105:6 122:16 128:11 150:21 154:11,13 155:8,10,13
**sent** 17:13 66:18 75:14 95:17 176:14
**september** 1:22 2:10 7:11 176:3
**serve** 18:1
**service** 67:18 144:16,18,23
**ses** 36:22
**severity** 106:16
**share** 113:7
**sheet** 45:12 83:5 176:11
**sheets** 35:4 53:3
**shoes** 73:9
**shoot** 129:1 157:9
**shooting** 129:2
**short** 17:16 31:4,6 90:22 95:4 113:3,15 153:7
**shot** 112:16
**show** 25:13 67:7 68:11 95:7 100:17 112:17 117:2 118:6 120:11 144:8 145:21 147:10 149:23

157:22 159:6 160:13 163:7 165:18,22 170:22
**showed** 74:22 75:3
**showing** 95:13 150:5 160:4 161:5
**shown** 106:5 107:13 108:5 159:6,7 162:1 164:2
**shows** 56:2 69:14 100:7 108:6 111:13 112:18 117:21 126:8 128:21 132:1,19 135:3 153:11 158:22 161:17
**side** 163:23 171:21
**sides** 164:23
**sideswipe** 92:19 93:10
**sideswiping** 93:18
**sign** 168:7,12 176:12
**signature** 2:13 175:19
**signed** 176:19
**significantly** 91:23 94:2,3 139:10
**signing** 174:16
**similar** 23:10 43:20,21 62:13 70:17 73:13 80:4 115:18 148:22 171:10
**simple** 41:15 44:8,8 99:14 99:19 155:1
**sir** 53:9
**sister** 131:22
**sit** 28:19 29:22 61:20 77:23 78:2 163:9
**site** 22:16,18
**sitting** 105:21 108:5 109:12 109:16 132:14 147:11 148:4,4 165:16
**situation** 27:17 58:5,7 59:5 79:20
**situations** 88:4 91:20
**six** 128:6 129:15 130:6
**sixth** 129:4
**size** 107:15 145:16 170:23
**skill** 61:23 156:10
**slide** 159:1
**slight** 107:12
**slope** 125:1
**slow** 66:16
**slower** 154:12 154:18
**small** 12:2 14:17 91:12 106:9,22 111:17 114:10 117:9 120:22 121:6 134:13 158:6
**small's** 152:8 152:23
**smaller** 86:23
**software** 156:15,21,22 169:4,6,9
**softwares** 169:9
**sogol** 36:22
**solutions** 176:23
**solve** 44:15
**somebody** 40:10 51:14 55:13 62:8 139:21 141:23 144:4 149:7 156:17 159:8 160:15 162:21
**sorry** 46:7 53:22 99:9 103:17 114:17 163:18
**sort** 9:21,22 10:5 14:19 16:7,20 26:5 38:16 43:3 49:10 50:1,3 50:15 60:23 86:4 105:19 124:22 149:10 170:17
**sounds** 37:21 112:6
**source** 6:8 50:22 52:5,10 68:3 76:18
**south** 1:2 4:6 4:14 12:20 143:20
**southern** 1:8 6:9 8:8 17:15 27:3 28:6,14 29:4 30:9,13 31:9 32:21 33:3 44:21 56:4 65:2 78:6 79:13 83:1 87:18 110:3 115:12 119:11 119:17,20 120:6,13,21 121:19 123:23

124:16,20 127:7 131:5,8 131:10,12,16 131:19,20 133:2,9 135:21 140:19 141:1 142:3 146:17 154:4 164:7,10 164:13,15,21 165:6,13,21 166:9 167:7,9 171:7 176:4 177:1 178:1
**space** 56:14
**speak** 111:19
**speaking** 13:9 37:14 41:11 42:12 59:3 79:21 81:5 132:15
**special** 156:8
**specialized** 156:10
**specific** 13:6 23:18 40:17 61:8,12,13 67:5 78:15 102:2 127:21 152:19 171:2
**specifically** 14:13 15:13 17:21 18:11 45:3 61:4 68:10 89:1
109:11 124:8 128:13 137:15 146:15 155:23 156:14
**specificity** 91:10
**specifics** 28:18 110:10 127:16
**speculation** 153:20
**speed** 6:11,12 43:7 50:3 55:4 57:3,9,16 87:8 87:9,11 95:2 118:11 154:2 154:18
**speeds** 54:13 94:18 153:16
**spell** 15:18
**spill** 154:20
**spoken** 41:2
**spot** 64:14 134:20,22 135:2 138:8 146:10 166:23
**spotting** 110:15
**spreadsheet** 30:5 39:1,16 39:17 55:17 153:11
**spreadsheets** 42:9 55:8
**square** 46:13 47:20
**squared** 45:20 94:4
**staff** 61:11
**stand** 158:10
**standard** 135:13
**standing** 148:23 149:7 162:21
**standpoint** 27:10 108:3
**start** 6:11 43:7 72:14,16 73:6 73:8 86:15,16 98:5 104:4 111:23 118:22 155:3 168:8
**started** 9:23 10:1 27:7 54:6 56:9 113:1 166:17
**starting** 152:15
**state** 2:6 7:3,21 82:11 139:17 142:9 170:1 175:3
**stated** 16:14 107:8 109:11 151:21
**statement** 19:16 64:9 72:8 85:9 96:7 112:7 166:14
**states** 1:1
**station** 108:16
**statistics** 102:8
**steel** 80:5,5,9 80:10 88:20,21 88:22,23
**stenotype** 175:8
**step** 58:19
**stepping** 73:6
**stick** 153:23
**sticking** 117:16
**stipulated** 2:2 2:12,19
**stipulation** 7:6
**stop** 56:12 57:2 77:15 80:21,22 84:14 89:6 91:20 100:1 106:19,21 113:3
**stopped** 90:22 113:14,15 153:7 164:14
**stopping** 6:7 17:16 19:23 38:10,17 39:3 39:5 40:9,23 41:6,22 42:14 44:20 45:8 47:4 52:22 53:5,10 54:21 56:3 77:11 81:14 87:15,21

99:8,9 173:9
**straight** 41:12 112:16
**street** 2:8 4:13 7:8 62:8
**strike** 112:3 155:19
**strikes** 93:13
**striking** 90:22 113:3 153:7
**struck** 153:15 165:21 166:21
**studies** 61:12 61:16
**study** 66:10 67:15 154:22 155:17
**stuff** 14:8
**subpoena** 18:1 18:4,8
**subscribed** 178:14
**substitute** 32:14
**substituted** 32:15
**sued** 120:18
**suggestion** 47:1
**suggests** 155:18
**suite** 2:8 4:5 7:9
**suits** 14:16
**sum** 58:12
**summary** 114:23
**sun** 151:6,7,8
**sunshine** 151:11
**superior** 25:6
**supervision** 40:13 175:10
**support** 89:23
**supporting** 22:8,9 103:7
**supports** 154:22
**supposed** 27:16 64:23 119:16 122:13,23 138:13,16 163:3
**sure** 8:16,21 14:14 21:13 24:7 28:10,11 40:19 44:23,23 49:2,15 52:12 55:7,21 60:10 60:12,17 69:6 80:9 83:9 84:20 97:17 101:19 103:8 103:12 120:9 125:17 133:5 133:23 138:15 151:14 162:9 170:6 174:1
**surely** 84:12
**surge** 86:14
**surprise** 61:5
**suspicions** 103:17
**swell** 144:14
**swerve** 63:20 64:2
**switcher** 117:16,18
**switching** 163:20
**sworn** 7:17 178:14
**system** 43:16 43:17 81:3 85:21 86:2 122:21
**systems** 27:21 78:17 79:23 88:1

**t**

**t** 2:1,1 15:20,20 30:22 175:1,1 177:3,3
**take** 12:13 19:6 46:23 47:11 56:21 67:6,7 76:4 77:14 84:13 110:17 120:3 135:13 144:7 146:19 153:2,3 157:10 157:10 174:16
**taken** 2:5 95:5 112:15 175:7
**takes** 56:12 57:2 74:1 86:11 128:16 128:18
**talk** 19:19 22:17,19 24:22 26:22 27:6 39:14 65:8 89:20 107:21 117:6 118:19 129:7,8 147:13
**talked** 48:14 56:20 69:19,22 70:16 85:4 89:7 97:2 98:20 106:11 111:17 117:4 126:15 128:17 152:3,13
**talking** 8:13 46:7 49:3,16 58:20 73:23 74:9 85:16,17 88:3,11 91:8 96:18 144:19 149:13,14 174:2
**talks** 57:22 112:11 117:8
**tasked** 40:22

**team** 15:22 17:2 23:16 24:14 37:23 40:2,12,21 41:5 109:6 118:21,23 123:16 124:6 130:21 136:10 137:8 140:5,14 156:18
**technical** 23:3
**technique** 135:13
**technologies** 108:15
**technology** 169:6,15,15
**teel** 51:15 95:16
**tel** 36:15
**tell** 18:20 35:11 35:18 37:20 42:12 44:19 45:1,5,7 52:9 66:8 71:13 73:3 75:13 89:4 91:6 93:4 103:22 104:4 104:13 114:17 115:21 120:8 126:4 128:10 134:12 142:15 143:7 145:22
**telling** 96:3 97:18 125:7 131:11,15 140:6
**tells** 56:10 57:1 107:19
**ten** 67:17 68:5 74:23 77:9 92:6
**term** 24:7,22 25:7 31:6 39:21 49:8 72:22 73:22 74:6,7 76:6,9 76:10 81:12 126:10 136:2 155:12
**terms** 16:21 19:18 23:6 24:2,3 27:15 29:1 34:16,20 34:21 47:10 49:23 56:8 57:12 60:8 63:9 70:15 74:13 79:16 80:5 82:18 86:20 89:5 90:13 94:11 99:19,22 106:7 107:12,14 108:18 109:10 110:12 129:23 130:7 136:7 139:3 146:14 147:1 149:9 150:7 151:16 153:14 154:8 160:23 170:21 171:3,4
**terrible** 87:23
**testified** 7:18 93:10 158:6
**testify** 109:3 158:12
**testifying** 43:15
**testimony** 1:21 11:14 32:7 152:16,23 175:12 176:9 176:17 178:8
**testing** 77:4
**text** 101:17
**textbook** 95:20
**thank** 172:23
**thereto** 3:4 175:9
**thing** 14:19 16:8,15,23 26:6 39:11 43:3 46:10 50:3 53:18 55:8 63:7 72:1 72:9 73:13 75:2 76:13,15 76:22 93:19 101:2 105:20 109:9 111:7 115:17 116:22 124:22 129:10 133:16 135:6 137:13 138:6 144:12 147:2 149:11 151:19 153:1 160:14 163:17
**things** 10:15 13:16 16:5 17:5,5 19:3 20:17 23:5,11 27:5,6,8 28:23 34:21 37:15 38:8 55:10 59:6,8 74:14 82:1,18 83:19 84:19 88:10 90:9 91:18 96:17 97:14 104:17 108:19 114:4 120:23 125:1 127:21 135:15 136:12 147:1 148:12 152:3 157:5 158:2 168:19 169:11 170:21 170:23 171:11 172:1,2 174:6
**think** 9:13 10:12 11:5 14:19 17:6 20:14 23:14 24:11 28:8 29:6 31:6,10

33:11,15,15 37:3 41:14 42:4 51:15 58:19 60:17 65:11,19,23 66:15 72:23 74:6 79:17 80:15 82:7 84:11,17 85:16 85:22 87:13 89:22 91:15 93:1,17 94:5 94:12 96:16 101:23 103:9 106:22,23 107:13 108:19 108:23 109:21 111:11 112:17 112:18 119:1 120:22 121:8 122:2,9 126:18 126:21 127:11 128:4 130:7 131:12 132:10 133:3,10,12 141:19 142:18 143:15 145:3 146:13,20 147:18 149:11 151:21 152:6 153:5 154:13 156:23 157:23 158:18 164:18 165:17 166:1 167:14,18,19 167:20 168:1,9 168:9 170:21 171:5,6 174:2 174:6

**thinking** 29:3 109:23

**third** 94:7

**thoroughfare** 122:19

**thought** 30:14 53:23 95:15 97:11 120:15

**thoughts** 125:5

**three** 48:5 50:4 53:1,6,11 68:17 69:9 73:18 76:17 88:12,16 103:22 108:10 108:14 174:4

**throttle** 73:7

**thumb** 14:7 20:15 29:19

**thurston** 52:15 71:16 72:19 76:21

**ties** 139:14

**time** 3:2,2 10:3 11:12 12:4,6 12:21,23 14:22 18:18 24:15 32:5 42:18 43:10 50:3 56:19,20,22 57:19,23 58:4 58:10 59:13 61:9,14,17 64:11 65:14 67:8,16 69:15 69:16,23 70:19 72:15,18,21 73:12,16,20,23 74:1,8,17,18 78:11,14 79:13 81:8,22,22,23 82:3,17 83:2 85:19,20 86:1 86:7,19 87:2 88:10,12 92:7 95:4 96:19,19 97:5,6 98:9,19 99:2,18 100:8 106:11 120:18 121:10 122:17 123:4,19 124:5 124:5 129:6 132:7 134:13 134:22 137:5 139:22 141:3 142:20,22 146:2 159:16 160:17 170:10 170:12 174:18 176:18

**timeframe** 176:8

**times** 11:3 43:14 45:20,20 46:1,1,2,16,18 54:6 62:18 100:2 142:6 157:14

**tip** 25:6

**today** 8:2,7 10:23 12:20 15:4 20:20 22:7 24:23 26:7 28:20 29:13,18 33:5 53:14 54:19 100:21 118:15 153:5,10 158:3 168:1,3 172:13

**today's** 14:2 15:8

**together** 16:21 16:22 34:13 37:5,18 38:1 39:15,16 40:7 55:9 75:19 158:4

**told** 29:18 31:23 35:14 36:12 38:23 40:5 92:15 95:15 111:3 113:10 115:11 116:10 119:16 119:20 121:8 125:4 131:14

153:16 157:1 158:3
**ton** 84:14,15
**took** 23:21 49:4 50:5 51:22 143:6 147:23 158:10
**tools** 169:15
**total** 36:3,9 42:14 108:16
**touch** 13:4
**tour** 132:1
**towards** 117:14
**track** 19:9 63:3 63:5 64:1,15 64:16,18,19,20 64:23 65:1,3 80:18 88:23 105:10,22 115:3 117:16 124:1,4 139:5 140:16,20 141:1,17,20 147:7,17 148:14 150:3 150:13,20 161:10,17 162:6 166:23
**tracks** 17:18 119:11 123:17 123:20 124:16 139:7,9,18,20 141:9 142:3 145:17 148:23 149:1,7 161:20 161:23 171:1,1
**tractor** 38:19 42:21 43:18 49:4 62:13 63:2,18 70:17 73:14
**traffic** 12:5 122:14
**trailer** 38:19 42:21 43:18 49:4 62:13 63:2,18
**trailers** 70:17 73:14
**train** 13:15 17:16,17 27:3 30:5 38:11,18 49:5,6 50:14 56:4 62:2,6 64:2,7 65:2 74:3 77:14 78:6 80:14 82:15,23 83:11 84:10,14,15 86:15 87:4,8 87:18 90:19 93:13 95:21 98:4 99:4,4 110:22 115:12 146:1 149:6 152:1 153:6 154:12 159:21 160:7 162:5,7 162:13 163:13 164:7,10,21 166:9 173:9
**trained** 63:16
**training** 26:16 156:14
**trains** 49:1,10 154:14 156:1
**transcript** 25:12 31:18 35:9 47:9 54:17 95:12 97:19 100:16 116:20 118:5 157:21 175:12 176:6,19 178:5 178:8
**transmission** 56:20 74:8 81:22 96:19 97:6
**travel** 57:10 63:21
**traveled** 57:7
**traveling** 56:6
**tree** 171:23
**treeline** 161:9 161:15,23 162:8,12
**trees** 171:20
**trespass** 119:19 121:11 122:6
**trespassed** 120:1
**trial** 3:2 14:18 20:9 32:7 104:6 109:3,8 158:6 173:12
**trials** 6:4
**trick** 161:7
**tricky** 101:10
**tried** 66:17 134:10
**truck** 38:19,19 148:18
**trucks** 48:23
**true** 12:7 28:12 84:17 85:8 91:23 103:8,13 103:14,14,15 103:16 108:13 143:14 150:4 175:11 178:8
**truthful** 9:3
**try** 18:17 24:14 37:19 66:21 72:5 91:5 125:16 127:20 133:12 158:20 167:10
**trying** 24:6 29:23 40:4,7 44:5 46:9 49:1 60:20 74:11 99:12 107:22 109:7 111:23 123:2 140:22 142:20 145:20

145:22 146:4 147:20 149:15 149:23 151:17 155:16 158:21 161:7
**turner** 11:20,21 12:3,6,10,14 51:2 120:8
**turning** 73:7,8
**turns** 50:17 139:19
**tuscaloosa** 2:9 7:9
**two** 30:21 39:2 41:1,4,7 50:10 57:22 68:9,17 69:9 73:17 74:14 76:17 85:4 88:12,14 102:7,9 108:11 117:5 119:2 135:4 138:11 141:16 157:4 158:17 160:9 166:10
**type** 10:17,19 11:9,10,15 12:16,18 16:23 23:1 39:11 77:3,21 78:5 78:18 79:11 81:3 92:19 93:10,11,18 98:3 110:18 125:11 156:3 156:15 173:17 174:9
**types** 19:3 34:21
**typical** 34:3 167:22
**typically** 62:15

**u**

**u** 2:1
**uh** 59:21 98:22 134:16 151:1
**ultimately** 39:20
**umbrella** 10:15
**under** 10:15 32:3 40:12 48:14 57:1 59:9 62:15 63:16 136:23 148:17 153:5 175:10
**underlying** 55:17
**understand** 8:12,21 9:6,8 11:3,18 13:12 14:10 40:5,8 40:19 44:5,18 49:2 58:15 64:22 74:12,21 78:13,16 86:13 94:10 102:16 102:21 103:18 112:19 123:21 128:15 133:20 150:12,15,17 150:18 155:16 164:11 168:10
**understanding** 11:6 21:14 25:14 29:17 33:1 34:1,15 65:4 69:4 72:1 75:10 82:7 83:16 122:22 123:9,22,23 136:23 139:8 170:12
**understood** 9:2 73:3 85:3 97:17 119:14 123:6,15 126:16 162:10 168:2 174:1
**unique** 61:23
**united** 1:1
**universally** 11:6
**unpredictable** 93:12
**unrelated** 84:8
**unusual** 122:11
**unweighted** 84:10
**updated** 32:15
**uphill** 80:22 107:12
**ups** 168:15 173:3
**usage** 58:9
**use** 24:22 41:9 43:9 46:19 47:18 49:2 55:19 68:8 69:16 73:22 74:6,7 77:9 85:7 97:15 101:3 131:4 132:5 137:17 155:12 157:10 157:11 158:5 169:12
**used** 24:11 39:21 44:20 45:8 48:1,15 50:18,20 52:2 52:20 53:1,7 54:3 55:7,21 58:1 60:12,18 64:17 68:18 72:4 74:7 75:15,17 76:2 76:9,10 77:18 79:12 80:8 81:12 84:22 85:14 87:2 92:14 96:22,23 97:8,14 100:3 100:4 108:14

125:11 127:16 131:1,13 132:17,20 133:7,16 136:13 155:13 156:16,21 157:1 169:4,11 171:8,13 176:19
**uses** 60:2
**using** 24:7 56:11,23 58:13 61:3 69:14 71:11 73:19 74:12 88:16,18 105:18 144:9 145:5 146:11 155:9 159:20 160:1,22
**usually** 41:20 48:22 62:17

**v**

**v** 15:20 46:13 176:4 177:1 178:1
**value** 58:12,16 58:16
**valve** 73:8
**variable** 46:3
**variables** 55:9 56:23 57:13,15
**variation** 44:15
**variations** 128:13 171:19 172:7
**various** 118:11
**vary** 57:8
**vegetation** 162:6,12,16
**vehicle** 23:7 42:18 99:23 108:5 132:2 139:12,17 154:4
**velocity** 41:16 43:2 45:19,22 46:13 47:10 94:4
**verb** 16:14
**verify** 176:9
**veritext** 2:8 7:8 176:14,23
**veritext.com.** 176:15
**version** 32:10 32:16 101:3,4 174:8
**versus** 84:9 155:20 171:23
**video** 13:15,18 23:8,16 105:14 106:18 111:15 112:18 113:21 125:6 126:2 127:2 128:11 128:15 131:23 132:19,21,22 132:22 146:19 159:2 160:7 162:2,5 170:16
**videoed** 23:9
**videos** 23:13,15 24:3 119:9 151:23
**view** 127:11,12 130:4 134:11 150:5 151:17 155:9 161:6 162:20 172:9
**viewer** 105:7
**vigilant** 163:14
**vision** 104:15 174:4
**visual** 125:20 173:17,23 174:7,11
**visualization** 25:2,5,7 111:13 133:17 135:7 145:10 151:21 157:13 161:5 165:20 171:15,16
**visualizations** 104:23 106:6 112:17 145:13 151:22
**visually** 105:8
**vs** 1:10 6:11

**w**

**w** 30:22
**wait** 96:15
**walkway** 164:2
**want** 18:11,12 24:6 37:23 39:15 44:18 49:15 53:16 67:7 69:20 72:5,6 96:10 96:15 103:21 107:3 115:20 118:22 120:11 126:3 134:12 137:14 145:21 146:17 163:16 166:12 168:6
**wanted** 17:13 19:4 48:16,17 115:17 121:23 158:15
**watco** 30:22 31:1 41:5
**way** 8:17 41:20 42:15 51:6 53:7 66:6 70:14,20 72:18 73:15 79:22 88:1 91:9,15 93:20 105:17 119:17 122:14 128:12 129:6 154:5 168:21

174:13
**we've** 11:23 14:4 29:2 35:22 41:2 54:18 89:7 97:8 100:3,3 104:22 106:6 114:7 124:11 126:14 131:10 133:14,16 146:13 157:14 170:12
**weather** 151:12
**week** 143:6
**weeks** 35:23
**weight** 80:13 83:10,13,15,17 83:23 84:6 87:17 88:8,9 88:17,21
**weighted** 84:9 88:15
**went** 22:16 23:8 51:21 77:4 118:23 139:12 156:8 170:4
**wheel** 80:3
**wheels** 84:5 88:22 139:11
**whichever** 137:6
**white** 4:3
**wide** 13:18 104:11,17 105:9,19 125:22 126:9 126:12,18 129:22 152:4 161:4,6
**width** 134:7
**widths** 134:3
**wild** 12:13 33:13
**williams** 11:20 13:3 17:13 28:3 31:12 51:2,14 119:15
**window** 149:10 174:5
**windshield** 148:8,11,13,19 149:18,19
**winters** 2:6 7:1 175:20,22
**withdraw** 167:12
**witness** 2:14 7:11 11:14 122:3 175:13 176:8,10,12,18
**witnesses** 22:13
**wonder** 148:17
**word** 24:12 64:17 67:22 74:7 75:4
**words** 13:12 19:20 21:10 38:16,22 39:9 39:12 42:19 53:2 54:4,22 59:2 72:13 78:22 80:4 85:12 86:5,6,9 86:11 88:5 89:2 90:7 94:8 104:9,16 105:8 106:17 109:21 111:9,12 117:22 125:21 129:1,6,19 130:10 135:12 136:19 137:18 138:4,6,14 140:8 141:19 145:12 154:16 157:4,6 164:12 165:15
**work** 9:10 10:17,20,22 11:9,11 12:16 12:18 14:4,10 14:12,18,20 15:12,17 16:2 17:2,4,6,8 18:3 21:8 22:2,3,14 23:1,15 24:13 28:5,17 29:14 34:3,16,23 35:15 37:10,10 38:12,20 39:8 39:22 40:10 42:6 89:9,16 89:19,22 91:4 100:20 107:20 107:21 108:22 109:4 110:21 112:20 115:10 118:20 119:12 120:2 121:4,9 121:13 122:8 123:13,17 124:10 131:12 136:9 145:1 149:15
**worked** 26:3 29:2 30:7,13 31:14 34:19 50:8 77:19 88:2
**working** 10:8 13:1 21:18 26:7
**workup** 139:16
**world** 145:14
**worry** 20:10
**wray** 4:4 5:3 7:20 8:5 46:11 60:12,15 66:17 121:16 168:13 170:18 172:4 173:2,5 174:15
**write** 129:4

**writing** 129:4
**written** 89:19 113:19
**wrong** 24:13 37:21 60:16,16
**wrote** 47:2 81:18

**y**

**y'all** 66:20 167:14
**yard** 144:17
**year** 35:21
**years** 12:1,8 33:7 50:8
**younger** 15:11

**z**

**zoom** 15:6

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.