UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Norfolk Southern Railway Company, | ) | C.A. No. 3:25-cv-6618-SAL |
| Plaintiff, | ) | |
| v. | ) | **PLAINTIFF'S MOTION TO EXCLUDE THE TESTIMONY AND OPINIONS OF KENNETH E. RUSK AND INCORPORATED MEMORANDUM OF LAW** |
| American Italian Pasta Company, | ) | |
| Defendant. | ) | |

PLEASE TAKE NOTICE that Plaintiff Norfolk Southern Railway Company ("Norfolk Southern" or "NS"), by and through its undersigned counsel, and pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), hereby moves this Court for an Order excluding the expert testimony of Kenneth E. Rusk. The grounds for this Motion are set forth in the incorporated memorandum of law in accordance with Local Civil Rules 7.04 and 7.05 (D.S.C.). For the reasons stated therein, Mr. Rusk's opinions are not based on sufficient facts or data and are not the product of reliable principles and methods reliably applied to the facts of this case. Norfolk Southern respectfully requests that the Court exclude his report and testimony in their entirety.

## INTRODUCTION

Defendant American Italian Pasta Company ("AIPC") retained Kenneth Rusk as a railroad track safety consultant. Mr. Rusk purports to offer the causation opinions on which AIPC's comparative negligence defense depends. Specifically, he opines: (1) that the Norfolk Southern derail device "was unable to perform its stated purpose of protecting the main track from unauthorized train movements" and (2) that if the derail had been installed further away from the Norfolk Southern mainline track than where it was positioned, the derailed AIPC locomotive would not have reached the NS mainline track "and the collision would have been avoided." Ex. 1, Rusk Report 18; Ex. 2, Rusk Supp. Report 19, 34. As demonstrated herein, however, Mr. Rusk's opinions cannot survive Rule 702 scrutiny and should be excluded in their entirety.

First, the factual premises that underlie Mr. Rusk's opinions are both unreliable and irrelevant. He did not visit the derailment site until July 10, 2024, nearly two years after the incident, and measured the derail that was installed following the accident and that had been rebuilt and physically extended after the accident. In other words, the derail he measured was not the same length, location or curvature as the one that was in place at the time of the derailment. And even though photographs and other evidence could have been used to determine exactly where the derail was positioned at the time of the accident, Mr. Rusk never tried to do an assessment based on that positioning and instead used measurements from the newly installed derail. This is no insignificant mistake. Mr. Rusk agreed that the inside curved rail on the new derail "had been extended out further" and that his measurements did not measure or show what the track centers were at the time of the accident because he "didn't know exactly where ... it was." Ex. 3, Rusk Dep. 108:14-20, 111:24-112:9.

Second, his opinions that Norfolk Southern failed to design or install the derail in

accordance with its own plans are based on an internal design plan dated 2003 and a construction specifications manual dated July 2020, neither of which applies to a derail installed many years earlier in 1995 or 1996. *See id.* at 80:23-81:3. Norfolk Southern cannot be faulted for failing to comply with policies that were created many years later. Basing opinions on documents, policies, and measurements having no relation to the accident is not proper expert work.

Third, Mr. Rusk's causation opinion was never tested: he ran no simulation, no calculations, and no deceleration analysis, and admitted this repeatedly under oath. *See id.* at 71:19-73:12. His opinions rest on variables he never measured (speed and weight of the AIPC engine and railcars, grade of the track, and ground conditions) and on a circular assumption that the derailed train "would have traveled the same distance regardless of where the derail was placed" and regardless of where the train left the rails. Without testing, such an opinion is not "knowledge"; it is an untested hypothesis connected to the record "only by the *ipse dixit* of the expert," resting on data drawn from the wrong device and the wrong rulebook. *O'Connor v. Fairfax Taxi, Inc.*, 188 F.4th 336, 354 (4th Cir. 2026) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). AIPC cannot carry its burden under amended Rule 702 to show otherwise. Mr. Rusk's causation and ultimate fault opinions should be excluded.

Finally, his opinion that the derail "was unable to perform its stated purpose of protecting the main track from unauthorized train movements" is not supported by any federal regulation or industry standard, as Mr. Rusk ultimately had to concede. Mr. Rusk admitted that the AIPC engine and railcars were derailed to the left away from the mainline track, that they were not in the foul of the mainline track at the point after the wheels went through the derail, and that derails cannot immediately stop the movement of derailed equipment and are not intended to do so. His opinion is contrary to the applicable regulations and standards and should be excluded.

## FACTUAL BACKGROUND[1]

On the morning of July 11, 2022, AIPC's employee Rico Blanchett was operating and moving a locomotive by remote control on AIPC's Storage Track 1, pulling six loaded grain railcars toward Norfolk Southern's mainline. Compl. ¶¶ 15, 20, ECF No. 1.[2] Blanchett rode the sixth railcar at the rear, which was the car farthest from the locomotive, as he moved the railcars. *Id.* at ¶ 21. Blanchett failed to set up the air brakes on the locomotive and railcars properly, which significantly reduced braking capability, and he lost control of the locomotive. *Id.* at ¶¶ 22, 23; *see also* ECF No. 36-1, AIPC 30(b)(6) Marshall Dep. 22:10-23; ECF No. 36-2, Blanchett Dep. 101:4-103:22. AIPC admits that Blanchett's conduct and methods of operating the locomotive violated his training and instructions. *See* ECF No. 36-1, AIPC 30(b)(6) Marshall Dep. 22:1-28:25, 64:22-25, 149:1-150:23.

At the time of the incident, Norfolk Southern had installed a device known as a double switch point derail near the location where the AIPC industry track connected with the Norfolk Southern mainline track. A derail, as the name implies, is a device that is intended to derail moving equipment off the industry track and away from the mainline track in hopes that the equipment does not foul the track and cause an accident. Blanchett and AIPC both knew that AIPC equipment was not allowed to move through the derail. *See id.* at 23:8-24:18; ECF No. 36-2, Blanchett Dep. 157:6-21. Unfortunately, because Blanchett allowed the engine and railcars he was operating to move through the derail while still under power, even though the derail forced the equipment to the left away from Norfolk Southern's mainline track as designed, the derailed equipment still

---

[1] A more detailed statement of facts is included in the Memorandum in Support of Norfolk Southern's Motion for Summary Judgment. This memo only briefly references those facts pertinent to the present motion.

[2] All allegations referenced in this paragraph and the following paragraphs are proven and undisputed based on the depositions of AIPC's corporate representative, Rhen Marshall, and Rico Blanchett. *See* ECF Nos. 36-1 and 36-2.

came to rest "in the foul" of Norfolk Southern's mainline track. Compl. at ¶ 25.

After the derailment, Blanchett left the scene without warning or notifying Norfolk Southern that AIPC's equipment was fouling the mainline, and without asking anyone at AIPC to do so. *Id.* at ¶ 26. AIPC gave no warning or notice of any kind to Norfolk Southern. *Id.* at ¶ 27. At approximately 8:14 a.m., Norfolk Southern's Train 238, whose crew was unaware of the derailed equipment, collided with the locomotive AIPC left in the foul, derailing Train 238. *Id.* at ¶¶ 30, 31. The Norfolk Southern crew members operating Train 238, Raymond Rightmier and David Small, were injured as a result of the collision. *Id.* at ¶¶ 34, 35. Norfolk Southern filed the present action on July 1, 2025, asserting a cause of action for contractual indemnity alongside claims for equitable indemnification, negligence, trespass, and punitive damages. *See id.*

AIPC retained Mr. Rusk to opine on Norfolk Southern's compliance with its own track standards, industry standards, and applicable federal and state regulations. *See* Ex. 1, Rusk Report 2. He offers two categories of opinions: that Norfolk Southern built the derail inside the 15-foot clearance point[3] and with an inside curved lead rail that was too short and insufficiently curved; and that the collision "would have been avoided" if the derail had been properly constructed. *See id.* at 18-20; Ex. 2, Rusk Supp. Report 32.

Two undisputed facts frame this Motion. First, the derail was altered after the accident: the inside curved lead rail "had an additional rail added to it and it had been curved more," a modification documented in a July 20, 2022 photograph. Ex. 1, Rusk Report 17. Mr. Rusk nonetheless did not inspect the site until July 10, 2024, approximately two years later, and found the derailment area "had been rebuilt." *Id.* at 5. The total length of the derail he measured, 41 feet, "included the additional rail added to the inside curve lead rail." *Id.* at 20. Second, the derail was

[3] A "clearance point" is the specific location near a turnout (switch) beyond which it is unsafe to pass on an adjacent track, because the space between the tracks is too narrow for safe passage.

installed in 1995 or 1996, yet Mr. Rusk's opinions rely on Plan 7-9 (dated June 2003) and the Norfolk Southern Specifications for Design and Construction of Privately Owned Industry Tracks dated July 2020. *See id.* at 12; Ex. 3, Rusk Dep. 80:23-81:3. Both documents post-date the installation of the derail at the AIPC facility. And if that wasn't bad enough, the Construction of Privately Owned Industry Tracks document expressly states that it does not apply to track owned by Norfolk Southern, which Mr. Rusk agreed the track at issue was. *See* Ex. 3, Rusk Dep. 86:4-25.

**LEGAL STANDARD FOR EXPERT TESTIMONY**

Rule 702 permits expert testimony only if the proponent "demonstrates to the court that it is more likely than not" that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Rule "imposes a special gatekeeping obligation on the trial judge" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Nease v. Ford Motor Co.*, 848 F.3d 219, 229-30 (4th Cir. 2017) (quoting *Daubert*, 509 U.S. at 597). The "importance of [the] gatekeeping function cannot be overstated." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 283 (4th Cir. 2021) (quoting *United States v. Barton*, 909 F.3d 1323, 1331 (11th Cir. 2018)). In *Sardis*, the Fourth Circuit held that "the district court abused its discretion" and "improperly abdicated its critical gatekeeping role to the jury" by "rul[ing] that the issues of relevance and reliability impact only the weight of the experts' testimony, not their admissibility" and could be sufficiently addressed by cross-examination. 10 F.4th at 278-79, 281. As the Fourth Circuit made clear, "credibility is entirely distinct from reliability and relevancy,

which are *preconditions* to the admissibility of expert testimony." *Sardis*, 10 F.4th at 282 (emphasis in original) (citing *Nease*, 848 F.3d at 229).

As the proponent, AIPC "must establish [admissibility] by a preponderance of proof." *Funderburk v. S.C. Elec. & Gas Co.*, 395 F. Supp. 3d 695, 706 (D.S.C. 2019) (quoting *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001)). Effective December 1, 2023, Rule 702 was amended to "clarify and emphasize" that preponderance standard and to reject the many decisions that had treated "the sufficiency of an expert's basis, and the application of the expert's methodology," as "questions of weight and not admissibility" – an approach the Advisory Committee called an incorrect application of Rules 702 and 104(a). *See* Fed. R. Evid. 702 Advisory Committee's Notes, 2023 Amends. Amended Rule 702(d) further "emphasize[s] that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Id.* The Fourth Circuit has confirmed that the amended Rule governs and places the burden on the offering party, and that an opinion connected to existing data "only by the ipse dixit of the expert" does not meet the burden. *O'Connor*, 188 F.4th at 354 (quoting *Joiner*, 522 U.S. at 146). If an expert is "relying solely or primarily on experience, then the [expert] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 Advisory Committee's Notes, 2000 Amends.

In assessing reliability, courts consider, among other non-exclusive factors, (1) whether the "expert's theory or technique 'can be (and has been) tested'"; (2) whether it "has been subjected to peer review and publication"; (3) its "known or potential rate of error"; and (4) whether the "expert's methodology is generally accepted" in the relevant field." *Sardis*, 10 F.4th at 281 (quoting *Nease*, 848 F.3d at 229). The reliability inquiry is flexible. *Sardis*, 10 F.4th at 281 (quoting

*Daubert*, 509 U.S. at 594-95). At its core, a reliable opinion must rest "on scientific, technical, or other specialized *knowledge* and not on belief or speculation," and any inferences must be "derived using scientific or other valid methods." *Sardis*, 10 F.4th at 281 (emphasis in original) (quoting *Oglesby*, 190 F.3d at 250). A court does not discharge its duty by "taking the expert's word for it," and nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. *Sardis*, 10 F.4th at 289-90 (citing *Joiner*, 522 U.S. at 146).

## ARGUMENT

### I. Rusk's Opinions Rest on Unreliable and Irrelevant Factual Premises Because He Measured an Altered Post-Repair Derail and Judged Norfolk Southern Against Standards That Did Not Govern at the Time of the Derail's Construction or Even Apply to Railroad-Owned Track.

Mr. Rusk's opinions fail at the threshold because their factual premises are untethered from the derail device and the standards actually at issue in the case. Rule 702(b) demands "sufficient facts or data," and the Court must confirm a "reliable application of the principles and methods to the facts of the case"; an opinion that "supplies through assumption the very facts the record omits" is speculative and excludable. Fed. R. Evid. 702(b); *O'Connor*, 188 F.4th at 354 (citing *Joiner*, 522 U.S. at 146). Relevance is independently "a precondition to admissibility" and the opinion must bear "a valid scientific connection to the pertinent inquiry." *Nease*, 848 F.3d at 229 (quoting *Daubert*, 509 U.S. at 592). An opinion that measures an altered post-repair object, or measures conduct against the wrong yardstick, satisfies neither requirement. *See Sardis*, 10 F.4th at 281.

The derail Mr. Rusk inspected in July 2024 was not the same device that derailed the AIPC locomotive and railcars. Mr. Rusk acknowledges the inside lead rail had "an additional rail added to it" and "curved more" after post-accident repairs, and that his measured 41-foot length "included the additional rail added to the inside curve lead rail." Ex. 1, Rusk Report 17, 20. He cannot

quantify the alteration: when asked "how much length was added from what you observed on the day you were there versus what was there at the time of this incident," he answered, "No, I don't know." Ex. 3, Rusk Dep. 102:21-25. He testified that "from that joint to the end of it, that was all added." *Id.* at 103:8.

Mr. Rusk admitted the derail device was materially different on the incident date: when asked if he "understood when you were out there that day that the inside curve rail had been extended out further ... toward the mainline track than where it was at the time this accident occurred," he answered, "Yes." *Id.* at 108:14-20. His key measurements therefore do not reflect the conditions as they were on the incident date: he agreed that the three track center measurements "all only showed the track centers for those locations at the time of your July 2024 site visit" and "did not measure or show what the track centers were at the time of our accident." *See id.* at 109:13-22. He agreed that, "at the very least," the inside curved rail "was further from the mainline than it was on the date that" he was there. *Id.* at 170:5-11.

This defect requires exclusion. Mr. Rusk's central premise is that Norfolk Southern standards required that derails should be installed "with a minimum of 15 foot track centers where conditions permit," and that NS failed to comply with its own standards. Ex. 1, Rusk Report 19-20; Ex. 2, Rusk Supp. Report 31-32. According to Mr. Rusk, however, he measured 12-foot track centers at the end of the inside curved rail of the post-repair derail device. *See* Ex. 1, Rusk Report 19-20. Setting aside that the NS policy specifically says that 15 feet is only required "where conditions permit," Mr. Rusk's measurements and determination of the track centers as they existed at the time of his inspection—with additional rail added and new curvature—are completely irrelevant. Instead, what matters would be (a) compliance with the policy that existed at the time the original derail was installed (a policy Mr. Rusk did not review) and (b) the location

of the track centers at that time in light of whatever conditions existed when the original derail was installed (a detail Mr. Rusk did not evaluate). Mr. Rusk considered neither. *See* Ex. 3, Rusk Dep. 80:23-81:20, 109:13-22. Indeed, the only evidence in the record of compliance with the applicable policies and specifications comes from the testimony of Norfolk Southern's Division Engineer, Justin Brooks, and Norfolk Southern's expert, Dustin Bell. Mr. Brooks testified his measurements from the end of the original derail's inside curved rail were 16 feet, and 15 feet 2.5 inches at the end of the post-repair derail, both of which comply with the 15-foot standard Mr. Rusk invokes. Ex. 4, Norfolk Southern 30(b)(6) Brooks Dep. 19:2-23. Likewise, Mr. Bell testified that the track center measurements "far exceeded what the NS policies" require. *See* Ex. 5, Bell Dep. 42:4-43:17. Because Mr. Rusk measured the altered post-repair derail device at a point that did not exist on the incident date, his 12-foot figure is not a measurement of anything relevant to the issues in the case. An opinion dependent on measurements of a reconstructed and extended derail is not "based on sufficient facts or data" about the device that actually derailed the equipment on the date of the incident and does not reliably apply any methodology to these facts. *O'Connor*, 188 F.4th at 354 (citing *Joiner*, 522 U.S. at 146).

Additionally, Mr. Rusk's opinions that Norfolk Southern failed to comply with its own standards are built on a version of Plan 7-9 dated June 2003 that is contained within a version of the Norfolk Southern "Specifications for Design and Construction of Privately Owned Industry Tracks" dated July 2020. *See* Ex. 1, Rusk Report 12; Ex. 3, Rusk Dep. 80:23-81:3. The derail, however, was installed in 1995 or 1996, years before either document existed. And, as importantly, the 2020 manual Mr. Rusk cites expressly states it does not apply to railroad-owned track, which the derail at issue here was—a fact Mr. Rusk does not dispute. *See* Ex. 3, Rusk Dep. 86:4-25.

Setting aside that the manual Mr. Rusk relied on did not even apply to the railroad-owned

track and derail he was evaluating, it is even more concerning that he used a 2020 manual that was not created until nearly 25 years after the derail was installed and thus was plainly inapplicable. He acknowledged the Specifications manuals exist in many versions ("89 or '88, '94, 2003, 2005, 2010, I think we got a 2011"), that "NS changes its documents kind of frequently," and that he did not recall which version he cited. *See* Ex. 3, Rusk Dep. 78:24-79:16, 80:8-13. He confirmed he relied on the July 2020 version in his original expert report and "didn't change it" in his supplemental report even though by then he had the applicable policy for the date at issue. *Id.* at 81:1-20. His supplemental report acknowledges the issue – that Plan 7-9 did not exist when the derail device was installed and that the applicable Plan 5-3 included in the 1994 Guidelines for Design and Construction of Privately Owned Industry Tracks is a document "not produced until after my initial report was submitted" – and then asserts that the "drawings are essentially the same" in the two plans so his "opinions based on the drawings do not change." Ex. 2, Rusk Supp. Report 26-28. His "drawings are essentially the same" assertion ignores that the applicable Plan 5-3 includes a text box stating that "Other switch Material may be used where advantageous," which is not present in the Plan 7-9 cited by Mr. Rusk and indicates that Norfolk Southern employees were permitted a certain level of flexibility and discretion when constructing double switch point derails.

Measuring Norfolk Southern's 1995 or 1996 construction of the derail device against a 2003 plan contained within a 2020 manual is a relevance failure as well as a reliability failure: the opinion lacks a "valid scientific connection to the pertinent inquiry," whether Norfolk Southern complied with the standards that actually governed when it built the derail device, and so it cannot assist the trier of fact. *Nease*, 848 F.3d at 232-33 (quoting *Daubert*, 509 U.S. at 592). Mr. Rusk's "drawings are essentially the same" rationale ignores Plan 5-3's text box granting discretionary

decision-making to Norfolk Southern employees and is an unsupported *ipse dixit* assertion substituted for identifying and applying the standard in force at the time of the derail's construction. *See Sardis*, 10 F.4th at 289-90 (citing *Joiner*, 522 U.S. at 146).

The Court should exclude Mr. Rusk's opinions to the extent they rest on his 2024 measurements of the altered post-repair derail device or measure Norfolk Southern's conduct against Plan 7-9 or the July 2020 Guidelines for Design and Construction of Privately Owned Industry Tracks rather than the standards in effect at the time of construction.

## II. Rusk's Causation Opinion Is Independently Unreliable Because It Was Never Tested, Modeled, or Validated.

The threshold reliability question for a testable expert opinion is whether the theory "has been, or can be, tested or otherwise proved objectively." *Sardis*, 10 F.4th at 290-91 (citing *Daubert*, 509 U.S. at 593). An untested theory, however "plausible," and even one that "may even be right," "is no more than a hypothesis, and it thus is not knowledge, nor is it based upon sufficient facts or data or the product of reliable principles and methods applied reliably to the facts of the case." *Nease*, 848 F.3d at 232 (quoting *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010)). In *Nease*, the Fourth Circuit held an engineering causation opinion unreliable where the expert "conducted no testing whatsoever to arrive at his opinion." 848 F.3d at 232. In *Sardis*, it reversed admission of an engineering opinion where the expert performed no testing, built no model, and declined to construct an exemplar, explaining that testing was critically important "to ensure that [the expert]'s opinion was based on scientific *knowledge*." *Sardis*, 10 F.4th at 290-92 (quoting *Nease*, 848 F.3d at 231).

Mr. Rusk's causation opinion that the AIPC engine would not have reached the NS mainline track if the derail had been properly installed suffers precisely this defect, by his own admission. He performed no simulations to determine where the equipment would have stopped

at various speeds ("Q. Did you do any type of simulations to determine where the locomotive and equipment would have stopped when operating at various speeds? A. No." Ex. 3, Rusk Dep. 71:19-22); performed no independent calculation or simulation of the movement of the AIPC locomotive and equipment (*Id.* at 72:23-73:12); conducted no deceleration analysis ("Q. And you did no analysis to determine that rate of deceleration, did you? A. That is correct, I did not." *Id.* at 77:4-6); and, as to his premise that the AIPC locomotive and equipment would have "stopped sooner" in the dirt, took no measurements, ran no calculations or simulations, took no soil samples, and performed no topography analysis, even though he agreed all were factors that could affect the distance traveled. *See id.* at 168:5-169:14.

The sole support he offers is his personal say-so: "My experience is that when the derailed railcar wheels go off the ties and into the ground, the railcars will stop significantly shorter." Ex. 1, Rusk Report 18. That is the embodiment of the *ipse dixit* the Court's gatekeeping function exists to screen out. *See Sardis*, 10 F.4th at 289-90. How far a locomotive pulling loaded railcars travels after passing through a derail device is a quintessentially testable question of physics and engineering, exactly the kind *Sardis* and *Nease* required to be tested rather than asserted in conclusory fashion. *Sardis*, 10 F.4th at 290-92 (quoting *Nease*, 848 F.3d at 231); *Nease*, 848 F.3d at 232. Mr. Rusk's opinion that the AIPC locomotive and loaded railcars would have stopped short of the mainline had Norfolk Southern constructed the derail device differently should be excluded.

## III. Rusk's Causation Opinion Lacks a Sufficient Factual Foundation.

Rule 702(b) requires that an opinion be "based on sufficient facts or data," and an opinion that "supplies through assumption the very facts the record omits" is speculative and excludable. Fed. R. Evid. 702(b); *O'Connor*, 188 F.4th at 354 (citing *Joiner*, 522 U.S. at 146). Mr. Rusk acknowledged that how far a derailed car travels is governed by factors like speed, weight, and

grade: his report states railcar wheels "can ride on top of the ties ... for a significant distance based on its speed, weight and grade," and his supplemental report adds that "[t]he speed of the rail car and the grade of the track will affect the distance the derail [sic] car will roll on top of the ties." Ex. 1, Rusk Report 9; Ex. 2, Rusk Supp. Report 20; *see also* Ex. 3, Rusk Dep. 147:20-148:4. At his deposition he agreed that speed, weight, and grade each affect how far the equipment would move. Ex. 3, Rusk Dep. 71:6-18.

Yet he knew or measured none of these variables. He did not know the speed of the AIPC engine at the time it reached the point of derailment (Ex. 3, Rusk Dep. 68:2-5), did not know the weight of the cars or the locomotive (he "assumed" a figure and conceded "I don't know"; *see id.* at 69:3-19); did not measure the grade (*See id.* at 70:5-14); and agreed the distance the equipment would have traveled in the dirt depends on ground consistency and topography he never analyzed (*See id.* at 168:8-169:14). An expert who testifies that the outcome is governed by a set of variables, but measures none of them, has no factual foundation for an opinion about that outcome. *See O'Connor*, 188 F.4th at 354. The opinion should be excluded under Rule 702(b).

## IV. Rusk Failed to Apply Reliable Principles to the Facts Because His "Calculation" of Where the AIPC Engine Would Have Stopped if the Derail Had Been Placed Further Back Assumes Its Own Conclusion.

Next, Mr. Rusk's opinion that the AIPC engine would have stopped short of the NS mainline track if the NS derail had been installed further back, as he contends the construction plans show, also must be excluded because it is not supported by the proper application of any scientific principles. Rule 702(d) requires a "reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(d). Mr. Rusk claims that the construction plans required that the derail be installed 22 feet further back from where it was actually installed, and that if this had been done the collision would have been avoided because the AIPC engine would not have

traveled far enough to foul the NS track. *See* Ex. 1, Rusk Report 18. However, he confirmed he performed no engineering calculation to verify this. He simply took the distance the AIPC equipment actually traveled and assumed it would travel that identical distance regardless of where the derail device was placed: "I just took the same amount of space that it took to stop in reality and used that as the length it would take for it to stop in the same conditions." Ex. 3, Rusk Dep. 72:23-73:4. He confirmed he did not do any evaluation or simulation of the stopping distance himself. *Id.* at 73:10-12.

The reasoning is circular: to prove that relocating the derail would change where the AIPC equipment stopped, Mr. Rusk assumed it would stop after the same travel distance "in the same conditions," which is the very point in dispute. Had the derail been moved further back, by definition it would not have been traveling over the "same conditions." The rail would have been different, the ties would have been different, and the grade would have been different. Mr. Rusk also agreed that after going through the derail, "when the cars hit the ground, no, you don't know exactly what is going to happen." *Id.* at 153:8-21. Thus, without any type of scientific or engineering analysis, it would be impossible to say what would have happened if the derail location had moved. Assuming the same result under different circumstances without doing any analysis is not a reliable application of reliable principles to the facts of the case. *See O'Connor*, 188 F.4th at 354. And it cannot be reconciled with his concession that where the AIPC equipment ends up and how far it goes depends on factors like speed, gravity, the grade of the track, and the weight of the movement. *See* Ex. 3, Rusk Dep. 156:8-12. Mr. Rusk's opinions that the AIPC equipment would have stopped short of the Norfolk Southern mainline and the collision would have been avoided if the derail device had been constructed in alternative locations should be excluded under Rule 702(d).

## V. Rusk's Opinion that "the Derail Was Unable to Perform Its Stated Purpose" Is Not Based on Sufficient Facts or Data Because It Ignores the Applicable Standards.

Finally, Mr. Rusk's opinion that "the derail was unable to perform its stated purpose of protecting the main track from unauthorized train movements" must be excluded because it is not based on sufficient facts or data and disregards the applicable standards and regulations. *See* Fed. R. Evid. 702(b); *O'Connor*, 188 F.4th at 354 (citing *Joiner*, 522 U.S. at 146). The applicable FRA regulation, Part 213.205 Derails, states in part that "(c) Each derail shall be maintained to function as intended" and "(d) Each derail shall be properly installed for the rail to which it is applied." Mr. Rusk agreed that he does not contend that Norfolk Southern violated Part 213.205 Derails and testified that "there was no reason for me to believe [the derail] didn't" comply with the regulation. Ex. 3, Rusk Dep. 149:1-13; *see* Ex. 2, Rusk Supp. Report 30. Recognizing that Norfolk Southern complied with all applicable federal regulations, Mr. Rusk contends instead that the "issue in this incident is the NS requirements for derails to be installed on NS owned tracks." Ex. 2, Rusk Supp. Report 30.

However, the record in the case makes it clear that the derail functioned as intended in accordance with Norfolk Southern's standards and policies. Norfolk Southern's MW&S Standard Procedure 100 Derails states, in part, that "Derails are to be installed such that rolling stock is derailed away from the main track." *See id.* at 7. When asked if "that happened here," Mr. Rusk testified "[y]es." Ex. 3, Rusk Dep. 144:17-25. Mr. Rusk also agreed that the AIPC engine and railcars never made it onto the NS mainline track because the derail device "did derail the locomotive." *Id.* at 144:3-15. He acknowledged that, had the AIPC engine and cars stopped in the exact position where the wheels dropped off the derail's inside curved rail after passing through it, "it would be outside of four feet" and "would not be in [the] foul" as defined by Norfolk

Southern's Guidelines for Design and Construction of Privately Owned Industry Tracks. *Id.* at 85:11-19; *see also* 145:17-24 ("[I]f it stopped right there it would not have been struck."). Mr. Rusk testified that the AIPC engine ended up fouling the mainline track because "it had movement, it had inertia and it was going downhill with gravitational force" while being operated by an AIPC employee. *See id.* at 66:8-67:5. Mr. Rusk acknowledged that the type of double switch point derail installed at this location is designed to derail equipment to the left away from the mainline track, and agreed that the AIPC engine "went to the left side of the Track 1 running rails" which was away from the mainline track. *Id.* at 128:12-25. Mr. Rusk agreed that, "when the cars hit ground" after going through a derail, "you don't know exactly what is going to happen." *Id.* at 153:8-21. He also conceded that the derail "is not stopping ... the railcar or consist coming off and derailing, and it is not intended to stop it." *Id.* at 155:25-156:12.

In sum, Mr. Rusk's opinion that the derail failed to perform its stated purpose cannot stand in the face of his concessions. He admitted that:

- the AIPC engine and cars derailed to the left away from the mainline track and were not fouling the mainline track at that point;
- a derail cannot instantaneously stop the movement of derailed equipment and is not intended to do so;
- you don't know what is going to happen once the wheels have left the rail; and
- the AIPC engine and railcars came to rest in the foul of Norfolk Southern's mainline track because it was being operated by AIPC's employee.

Mr. Rusk's opinion is an unsupported *ipse dixit* assertion contradicted, as he admitted, by the applicable regulations and standards and should be excluded. *See Sardis*, 10 F.4th at 289-90 (citing *Joiner*, 522 U.S. at 146).

## CONCLUSION

For the foregoing reasons, Norfolk Southern respectfully requests that the Court exclude the opinions and testimony of Kenneth E. Rusk in their entirety and grant such further relief as the Court deems just and proper.

Respectfully submitted,

**GALLIVAN, WHITE & BOYD, P.A.**

*s/Ronald K. Wray, II*
Ronald K. Wray, II (Fed Bar # 5763)
William E. Whitney, III (Fed Bar # 14024)
GALLIVAN, WHITE & BOYD, P.A.
55 Beattie Place, Suite 1200
P.O. Box 10589
Greenville, SC 29603
Telephone: (864) 271-5362
Facsimile: (864) 271-7502
rwray@gwblawfirm.com
wwhitney@gwblawfirm.com

*Attorneys for Plaintiff*
*Norfolk Southern Railway Company*

November 16, 2026
Columbia, South Carolina