# EXHIBIT 2

# Supplemental Expert Report

of
Kenneth E. Rusk
August 27, 2026

Norfolk Southern Railway Company
vs.
American Italian Pasta Company, and
Treehouse Foods, Inc.

United States District Court
District of South Carolina
Columbia Division

Case No. 3:25-CV-6618-SAL

Kenneth Rusk & Associates, LLC
10 Valarian Terrace
Crossville, TN 38558

**Supplemental Report Modifications**
I received additional materials after I submitted my original report on February 17, 2026. After reviewing the additional materials, I have included supplemental opinions in this matter. The new material included NS Guidelines for Design and Construction of Privately Owned Industry Tracks manuals dated 1989, 1994, 2000, 2011; Depositions with Exhibits of Justin Brooks (4-22-2026), Foster Peterson (8-4-2026), and Dustin Bell (8-4-2026). I also looked at additional information, including AREMA switch terminology, Alton derail installation booklet, and Western Cullun Hayes derail installation booklet.

My Supplemental Findings and Opinions begin on Page 19

My Supplemental Conclusions begin on Page 32

I have been retained by counsel for the American Italian Pasta Company (AIPC) to review and analyze information in connection to an incident involving a NS train striking a derailed locomotive owned by AIPC at NS Milepost SC 121.8. The accident occurred on July 11, 2022, at the east end of the AIPC industry track in Columbia, Richland County, South Carolina.

I have been asked to review documents provided to me to form opinions, including NS compliance with its own track standards, general industry track standards, and the applicable federal regulations, including Track Safety Standards, and state regulations. As a result of my review of the documents, I have formulated my findings and opinions which are contained in Section 8 of this report.

## 1.0 Background and Experience

I am currently the principal of Kenneth Rusk & Associates, LLC, which is a railroad consulting practice. I have a Bachelor of Science degree from Purdue University in Construction Technology. I have more than 51 years of experience in the railroad industry. I worked for two railroads, Illinois Central Gulf and Gulf & Mississippi, for thirteen years, where I held increasingly responsible railroad positions in the Engineering, Maintenance, and Structures Departments. My duties included the inspection and repair of track in compliance with Federal Railroad Administration Track Safety Standards.

I worked for the Federal Railroad Administration (FRA) in various capacities for over twenty-one (21) years. My positions included Railroad Track Safety Inspector (3 years), Regional Track Safety Specialist (4 years), Deputy Regional Administrator (3 years), and Staff Director, Track Division (11 years). I have attached my curriculum vitae as Exhibit A.

During my FRA career, I conducted and managed numerous accident investigations, special investigations, and studies. I have conducted multiple joint accident

investigations with the National Transportation Safety Board to determine cause of major rail accidents.

As Staff Director, I was responsible for continuously monitoring the federal Track Safety Standards and Railroad Workplace Safety regulations to ensure they appropriately address the current industry safety issues, proposed new regulations to FRA administrator when appropriate, and facilitated track rulemaking through the FRA's Railroad Safety Advisory Committee process.

I was also responsible for the appropriate interpretation and consistent application of the regulations by the agency's field inspectors and industry. As needed, I was responsible for the preparation and distribution of FRA Track Technical Bulletins to provide additional guidance for field inspectors and industry.
I represented FRA as an expert in formal hearings on the application of the agency's track rules and regulations, and in informal public interviews on track issues.

I continually reviewed inspection and accident data to determine issues and trends. Based on the safety issue identified, I was responsible for the preparation of a Safety Advisory to inform the industry of the safety issue and advise it of recommended actions.

I managed and directed the creation and presentation of numerous presentations to government leaders, agency and industry national groups to promote consistent rules understanding and application.

I have been a member of AREMA since 1986. I am currently a member of Committee 5 Track, Committee 24 Education and Professional Development, and Committee 40 Engineering Safety & Training.

## 2.0 History of Depositions and Court Appearances

I have attached my testimony history as Exhibit B

## 3.0 Fee Schedule

I have attached my fee schedule as Exhibit C

## 4.0 Material Reviewed

I have reviewed the following materials provided to me in this case:

- Plaintiff's Complaint

I have also reviewed the following materials provided to me in the Rightmier v American Italian Pasta Company case filed in the County of Richland, South Carolina:

- Original and Supplemental Track Agreements

- NS Documents Produced
  (500-000001 to 501-002038), (501-000001 to 501-001865), (510-000001 to 510-000007), (521-000001 to 521-000023)
- Emails and Texts
- Photographs
- Track Inspection Reports

Additional Documents Reviewed
- Federal Railroad Administration Part 213 Track Safety Standards
- Federal Railroad Administration Track and Rail and Infrastructure Integrity Compliance Manual, January 2021
- Federal Railroad Administration Safety Data
- Google Earth
- AREMA Practical Guide to Railroad Engineering, Chapter 3 – Basic Track 2003
- NS Standards for Industry Track July 2020
- BNSF Industry Standards August 2018
- CSX Standard Specifications for the Design and Construction of Private Sidetracks September 2016
- UP Engineering Standard Drawing 2020, September 2020

## 5.0 Statement of Facts

On July 28, 1995, AIPC and NS executed an agreement which provided for the construction and maintenance of industrial tracks to allow AIPC to receive rail transportation service. The construction and maintenance requirements of AIPC industry Track #1 were included in the agreement. The agreement stated that NS was to construct the railroad track to the point of Division of Ownership and Maintenance. The Division of Ownership was noted in the attached plan as located at station 2+00. Therefore, the NS was to construct the first 200 feet of railroad track, including a main track turnout and a double switch point derail (DSPD). AIPC was to reimburse the NS for the cost of the construction. The agreement also stated that the NS would be the owner and be responsible for the maintenance of the 200 feet of track, the main track turnout and the double switch point derail. The AIPC was responsible for the construction and maintenance of the remainder of the industry track.

AIPC industry Track #1 is located north of, and parallel to, the NS main track. The east end of AIPC industry Track #1 emanates from the NS main track from a switch located at about NS Milepost 121.86.

On July 11, 2022, at about 8:14 a.m., NS Train 238P310 collided with an industry locomotive, RSSX 2535, at the east end of the AIPC industry Track #1 in Columbia, Richland County, South Carolina. RSSX 2535 had derailed prior to the incident and was in the foul of the NS main track at the time of the incident. The NS train was operating

in easterly direction on the NS Charleston Sub, Coastal Division, main track at about 35 mph when it struck RSSX 2535.

Prior to the incident, the industry locomotive, RSSX 2535, was operated by an AIPC employee in an easterly direction on AIPC industry Track #1. The RSSX 2535 was connected to the east end of six loaded covered hoppers during the movement. The RSSX 2535 easterly movement traversed over the DSPD. The DSPD derailed the RSSX 2535 and the east axle of the car connected to RSSX 2535. After the RSSX 2535 derailed, it continued to move easterly with it wheels on the top of the ties, coming to rest in the foul of the NS main track, where it was subsequently struck by NS train 238P310 resulting in the derailment of the NS train.

## 6.0 Site Inspection

On July 10, 2024, I conducted a site inspection of the derailment area, including the east end of the AIPC industry Track #1. At the time of my inspection, I had been retained by another counsel for the American Italian Pasta Company in another case, Rightmier/Small vs. American Italian Pasta Company, involving the derailment of the NS train striking the RSSX 2535. I was accompanied on the site inspection by the previous counsel for AIPC, Turner Williams. During my inspection of the area of the derailment, I took notes and nine photographs of the area. (Exhibit D)

I observed that the derailment area had been rebuilt, but the DSPD appeared to be in its original location. I took measurements from the main track turnout to the Division of Ownership and Maintenance which was indicated on the Agreement plan to be at station 2+00. I located the DSPD switch points (1+78), end of outside curved lead rail (1+44), and end of inside curved lead rail (1+37). I also located the 15 foot clear point (1+53). These measurements were from the point of switch of the turnout in the NS mainline.

The distance I measured from the DSPD switch points and the 15' Clear point was 25 feet. The total length of the DSPD at the time of my site visit was 41 feet in length. The track centers at the end of the DSPD was 12 feet.

## 7.0 Applicable Norfolk Southern and Industry Standards

The NS provides guidance to its employees and their industrial partners on the proper track construction and maintenance procedures for industrial tracks. This guidance includes the <u>NS MW&S Standard Procedure Manual</u>, and the <u>Specifications for Design and Construction of Privately Owned Industry Tracks</u>.

Other Class 1 railroads also provide guidance to their employees for industrial track construction and maintenance. Those guidance instructions provide information toward the standard procedures the industry uses. I reviewed the practices of the BNSF, CSX, and UP railroads to determine their guidance.

## 8.0 Findings and Opinions Developed

On July 28, 1995, NS and AIPC executed an agreement to cover the construction, maintenance, ownership, and operation of tracks to provide service to the AIPC facility in Columbia, South Carolina. The agreement included a plan, dated February 6, 1995, showing the layout of the proposed tracks.

The February 6, 1995 plan showed that proposed Track #1 was to originate from a turnout to be constructed in the NS main track at Valuation Station 6460+43. Track #1 was to be built in a westerly direction from the turnout on the north side of the NS main track. The plan showed the Division of Ownership and Maintenance to be at Track #1 station 2+00, and the location of the Double Switch Point Derail (DSPD) to also be constructed at station 2+00. The plan showed that the 15' Clear Point to be at station 1+60. The 15' Clear Point is the location where the track centers are 15 feet apart.

On December 19, 1997, NS and AIPC entered into a subsequent agreement concerning the construction, maintenance, ownership and operation of additional tracks to provide service to the AIPC facility in Columbia, South Carolina. This agreement included a plan, dated October 24, 1996, showing the layout of the additional proposed tracks.

The October 24, 1996 plan showed that the proposed additional tracks were to connect to the existing AIPC tracks to further service the AIPC facility. The plan shows that the additional trackage will continue westerly from the previously constructed industry tracks and connect to the NS main track at Valuation Station 6504+64.

The October 24, 1996 plan also showed information about the previously constructed east end of the AIPC trackage. The plan shows that the east end of the AIPC industrial Track #1 turnout was constructed at Valuation Station 6461+89. This point is located 146 feet west of the originally designed location. The October 24, 1996 plan shows that the Division of Ownership and Maintenance is still at station 2+00 of Track #1. However, the plan now shows that the DSPD was constructed at station 1+85 of Track #1, which is 15 feet closer to the NS main track turnout than it was designed and approved in the July 28, 1995 agreement. During my site visit, I measured the DSPD to be at station 1+78.

The July 28, 1995 agreement stated that NS was responsible for the construction of the industry track that was to be owned by the NS. The plans show that the first 200 feet of Track #1 was to be owned by the NS. Therefore, the NS was to construct that 200 feet of track, including the turnout in the NS main track and the DSPD.

The American Railway Engineering and Maintenance of Way Association (AREMA) is a railroad industry organization that publishes reference material and recommended practices for the design, construction, and maintenance of infrastructure for the railroad industry. One of the reference materials that AREMA publishes is the Practical Guide to Railway Engineering. The Practical Guide combines and consolidates useful information from multiple sources, including the AREMA Manuals, Railroad Engineering by WW Hay, the Federal Railroad Administration, and USDOT.
The Practical Guide to Railway Engineering defines the purpose of a derail (Exhibit E). It states:

> **Derails**
> The purpose of the derail is to keep tracks free of unsecured rolling stock. When properly placed and in the derailing position, the derail will guide the wheels off the track. This prevents unintentional movement of rolling stock from fouling the main line.

Even though AREMA publishes recommended practices for track design, the major North American railroads generally have established their own track standards to govern their employees, including the NS.

NS in its Standard Specifications for Materials and Construction defines a derail. (Exhibit F) It states, in part, that:

> Derails are mechanical devices in the track that intentionally derail a car or train. The idea behind a derail is that it is often better to derail a car rather than to have it continue on the track and cause more damage to life or property.

The NS MW&S Standard Procedure manual contains standards for track construction. The Standard Procedure manual contains a section pertaining to derails. This section is titled 100 Derails. (Exhibit G) 100 Derails contained a section titled General. The General section pertains to all derails, including the double switch point derail.
The items of interest to this case are:

1. General

.02 Derails are to be installed such that rolling stock is derailed away from the main track.

.03 A double switch point derail is to be installed on any industry or storage track that has a descending grade to the mainline.

.05 Derails should be installed with a minimum 15 foot track centers where conditions permit. On sections of the railroad where tracks exist with closer

clearances, derails are installed at the normal clearance point (location where the adjacent track becomes parallel) but in no event less than on 12 foot track centers.

The NS provided a small portion of section 100 Derail in its production (501-000991) which is titled Switch Point Derails. Section 4 Switch Point Derails states, in part:

.01 See appropriate standard plans for construction details.

.06 Switch point derails must have curved lead rails of sufficient length to derail cars without fouling the track they protect.

The NS did not provide the standard plans for double switch point derail construction details in their production for review.

NS has published additional specifications for design and construction for industry tracks. The publication, titled Norfolk Southern Railway Company Specifications for Design and Construction of Privately Owned Industry Tracks, provides requirements for the design and construction of industry tracks, including requirements on the placement and construction of derails, as well as double switch point derails, on industry tracks. (Exhibit H)

The guidance for privately owned industry tracks includes:

II. Definitions

2.01.4 Clear Point

That point on a spur, lead, or siding track located adjacent to main line track where the distance between tracks is 15 feet, or where the distance between adjacent tracks other than main line track is 14 feet. The clear point is established by horizontal measurement between the centerlines of each track and provides the minimum clear distance that will allow for the safe passage of freight cars and/or locomotives.

VI. Industry Track Design

6.01 General

The following sections describe the criteria to be used in the design of industry track(s) served, or to be served, by the Company. Any exception to these requirements must be approved by the Company's Chief Engineer or designated representative.

6.02 Horizontal Curvature

Curve Placement Horizontal curves shall not begin on the long ties of a turnout. Horizontal curves should not be located within a double switch point derail.

6.06 Track Centers and Clear Points

Clear Points The following apply to clear points and car storage limits.

Clear points shall be shown on the plans and indicated in the field by the presence of a derail, clearance post or crosstie painted green.

6.08 Derails
Derails are installed on industry track(s) at the clear point to derail away from the main line anything moving on the industry track that does not have authority to use Company tracks.....
A double switch point (DSP) derail shall be installed by the Company, with the non-switch end of the derail at the clear point of the industry track, on industry track with descending grade towards the Company track. The entire DSP derail (43' long) shall be located in vertical tangent track outside of any vertical curves. The long timber (end) of the derail shall be placed at the clear point, NOT the point of switch (beginning). See attachment for derail details.

IX. Track Materials & Construction
9.14 Derails
Derails should be new or approved relay and must be the type indicated on the approved plans at the designated location. Where double switch point derails are required they shall be installed in accordance with the Company's Standard Plan for Derails. The standard double switch point derail is 43 feet long.....

XV. Attachments
Agreement and Sidetrack Design Plan Check List
Plan No. 7-1 Clearances for Tracks Located on Industry Property
Plan No. 7-9 Switch Point Derail
Sample Agreement Plan

I will note that both the NS MW&S Standard Procedure manual and the Norfolk Southern Railway Company Specifications for Design and Construction of Privately Owned Industry Tracks require that double switch point derails are to be installed on any industry or storage track that has a descending grade to the mainline. I observed during my site visit and by viewing photographs that Track #1 had a descending grade as it approached the NS main track.

Railcars on a descending grade will continue to be propelled by the weight of the cars, and more so if the cars are loaded as in this case, until there is a force applied to stop them. A regular derail will drop the railcars' wheels from the top of rail and onto the top of the ties. A regular derail does not typically change the direction of the railcar wheels. Railcars wheels can ride on top of the ties, especially on good ties, for a significant distance based on its speed, weight and grade.

A DSPD operates as a switch directing the railcar wheels onto another set of rails, called curved lead rails. The curve lead rails turn the railcar trucks to direct the wheels off the ties and onto the ground. The weight of the wheels will bury into the ground, quickly bringing the railcar(s) to a stop, short of the track being protected.

The July 28, 1995, Siding Agreement stated that NS was responsible for constructing Track #1 to the Division of Ownership and Maintenance, located at station 2+00, including the main track turnout and the double switch point derail (DSPD). The location and track information was shown on the plan, dated February 6, 1995, attached to the Siding Agreement. The plan showed the DSPD switch point was to be located at station 2+00. The plan showed that the 15' Clear Point was located at station 1+60.

The Norfolk Southern Railway Company Specifications for Design and Construction of Privately Owned Industry Tracks, states in 6.08 Derails that:

> A double switch point (DSP) derail shall be installed by the Company, with the non-switch end of the derail at the clear point of the industry track, on industry track with descending grade towards the Company track. The entire DSP derail (43' long) shall be located in vertical tangent track outside of any vertical curves. The long timber (end) of the derail shall be placed at the clear point, NOT the point of switch (beginning). See attachment for derail details.

During my July 2024 site visit I located the points of the DSPD and the 15' Clear Point. I measured the DSPD to be at station 1+78, and the 15' Clear Point to be at 1+53. I measured 25 feet from the points of the DSPD to the 15' Clear Point. At the end of the inside curve lead rail, I measured the track centers at 12 feet, well below the 15' Clear Point as required in 6.08 Derails.

Therefore, the NS did not comply with its requirements for the location of the double switch point derail as stated in 6.08 Derails.

The Sample Sidetrack Design Plan included in the Specifications for Design and Construction of Privately Owned Industry Tracks provides an example of the proper location of a DSPD.




The Specifications for Design and Construction of Privately Owned Industry Tracks also states in Section 6.01 General, that:

> 6.01 General
> The following sections describe the criteria to be used in the design of industry track(s) served, or to be served, by the Company. Any exception to these requirements must be approved by the Company's Chief Engineer or designated representative.

No exception was provided to show that NS Chief Engineer or designated representative approved the DSPD relocating to be inside the Clear Point. I did not observe any conditions during my site visit that would have prevented the DSPD from being located outside the Clear Point.

Therefore, the DSPD as built would not be in compliance with Specifications for Design and Construction of Privately Owned Industry Tracks or the NS MW&S Standard Procedure 100 Derails.

The NS MW&S Standard Procedure section pertaining to Derails contained information pertinent to this location. The General section pertains to all derails, including the double switch point derail.

The items of interest to this case are:

1. General

   .03 A double switch point derail is to be installed on any industry or storage track that has a descending grade to the mainline.

   .05 Derails should be installed with a minimum 15 foot track centers where conditions permit. On sections of the railroad where tracks exist with closer clearances, derails are installed at the normal clearance point (location where the adjacent track becomes parallel) but in no event less than on 12 foot track centers.

I observed during my site visit and by viewing photographs that Track #1 had a descending grade as it approached the NS main track. Therefore, the NS Standard required that a DSPD was to be installed as required by 1.03.

As I have shown above, the DSPD was not installed by NS with the non-switch end of the derail at the clear point. Therefore, the DSPD installed by NS was not in compliance with <u>NS MW&S Standard Procedure</u> 100 Derail:

4. Switch Point Derails

   .05 Derails should be installed with a minimum 15 foot track centers where conditions permit.

The Siding Agreement states that the NS would install the DSPD. The <u>NS MW&S Standard Procedure</u> manual in its section 100 Derail states in part:

4. Switch Point Derails

   .01 See appropriate standard plans for construction details.

   .06 Switch point derails must have curved lead rails of sufficient length to derail cars without fouling the track they protect.

The <u>Norfolk Southern Railway Company Specifications for Design and Construction of Privately Owned Industry Tracks</u> includes an attachment, Plan 7-9 (Exhibit H).




Plan 7-9 shows construction details for a DSPD. The plan shows the curved lead rails. The curved lead rail inside the running track is longer than the curved lead rail outside the running track. That allows the inside curved rail to continue to guide the derailed wheels from the outside curved lead rail off the track structure onto the ground to stop the derailed car(s).

The practice of having the inside curved rail longer than the outside curve rail for double switch point derails is consistent in the railroad industry. Other Class 1 carriers, such as BNSF (Exhibit I) and UP (Exhibit J) have similar requirements, as shown on their respective standard plans.






Photographs taken at the derailment site following accident show the relative lengths of the curved lead rails. Photograph labeled AIPC 000056 shows the lead wheel of the lead truck on the north side of the first car attached to RSSX is derailed to the outside.




Photograph labeled AIPC 000059 shows both wheels of the lead truck on the south side of the first car are derailed on the inside of the track.



These two photographs show that the inside curved lead rail was shorter than the outside lead rail.

Therefore, the NS did not construct the DSPD in compliance with Plan 7-9 as required.

A photograph provided to me labeled Photo 1 shows the curved rails following the derailment after the cars were removed from Track #1. In the background there was still work equipment and workers still on site. Photo 1 shows the inside curved rail shorter than the outside curved rail. Photo 1 also shows that the inside curved rail was not curved as it was lined straight toward the main track. Photo 1 also shows the marks from the derailed wheels. The marks can be seen on the top of the ties. The marks show that the derailed wheels ran in a straight line directly toward the main track.

Photo 1



These three photographs show the DSPS was not in compliance with Plan 7-9 at the time of the accident. They also show that the DSPD was not in compliance with NS MW&S Standard Procedure 100 Derail:

4. Switch Point Derails

.06 Switch point derails must have curved lead rails of sufficient length to derail cars without fouling the track they protect.

Another photograph provided to me was labeled Photo 5. Photo 5 had a note within it showing it was taken on July 20, 2022.

Photo 5




Photo 5 was taken after Photo 1, as there is no work equipment visible in the derailment area, and the DSPD had been modified. The inside curve lead rail had an additional rail added to it and it had been curved more to the opposite rail. The outside curve lead rail was also moved more away from the running track rail. This indicates that the DSPD was modified after the accident and appears to be in compliance with Plan 7-9 on July 20, 2022.

The NS TreeTop Accident Sketch was constructed during the accident investigation. The Sketch has a note that indicates the front end of the industry locomotive RSSX 2535 was located 19 inches from the NS rail. SC Track Inspector Fianchino investigated the accident and created a Track Synopsis. The Synopsis stated:

*Engine No. RSSX 2535 measures 42' from front to rear excluding knuckles. This positioned the right front outer most point of the derailed engine 19" from the outside of the closest Norfolk Southern SC mainline rail. The Norfolk Southern lead engine passed by the rear 28' of RSSX 2535, before colliding or sideswiping into the remaining front 14' at 35 mph.*

The Synopsis continued and stated:

*The RSSX 2535 remained in the same position as determined by the wheel marks on crossties.*

The Association of American Railroads (AAR) has issued AAR Plate "C" Equipment Diagram. Plate "C" shows the maximum dimensions for railcars in general use in the United States railroad system. NS provided Plate "C" to industries for minimum clearance requirements. Plate "C" is included in NS Plan 7-1 *Clearances for Tracks Located on Industry Property*. (Exhibit K) If an object is within the Plate "C" dimensions, the object will be struck by general use rail equipment.

Plate "C" shows the outer dimension of general rail equipment to be 5 feet 4 inches from the center line of the track, or 33 inches from the outside edge of the rail. Mr. Fianchino's measurement of 19 inches from the front edge of the derailed RSSX 2535 to outside of the mainline rail shows that the RSSX 2535 to be 14 inches inside of the Plate "C" clearance dimension. To not to be struck, the RSSX 2535 would have not entered the Plate "C" envelope.

The AIPC east turnout was constructed with a #10 turnout. The term #10 is derived from the fact that for every 10 units of measurements along the main track, the diverging track will move further away by 1 unit of measurement (i.e. 10 inches of travel will yield 1 inch of additional clearance.)




The Track Synopsis mentioned above stated the RSSX 2535 did not move during the contact by the NS locomotives. With the RSSX 2535 being 14 inches inside the Plate "C" envelope, if the RSSX 2535 had traveled 140 inches shorter (10 x 14 = 140 inches, or 12 feet) it would not have been inside the Plate "C" envelope and the collision would have been avoided.

I measured the switch points of the DSPD to be 25 feet from the 15' Clear Point. If the DSPD had been constructed in accordance with Rule 6.08 Derails with 43 feet from the

DSPD switch points to the 15' Clear Point instead of the 25 feet as constructed, the RSSX would have been moved back 18 feet. That would have resulted in the RSSX 2535 stopping short of the Plate "C" envelope and the collision would have been avoided.

The original agreement plan had the DSPD constructed at the Division of Ownership, located at 2+00. If the DSPD had been constructed according to the approved plan, the DSPD would have been moved back 22 feet. That would have resulted in the RSSX 2535 stopping short of the Plate "C" envelope and the collision would have been avoided.

Additionally, the double switch point derail as constructed by NS did not have a sufficient length of inside curved lead rail as required by Plan 7-9, as shown above. The curved lead rail directs the derailed wheels off the track structure and into the ground. Photo 1 above shows that the inside lead rail was not only shorter than the outside lead rail, but that it did not curve and direct the derailed wheels off the track structure and into the ground. Photo 5 above shows that after the accident, NS added additional rail to the inside lead rail and had it curved more toward the opposite rail. That allows the inside curved rail to turn the railcar trucks and to continue to guide the derailed wheels off the track structure onto the ground to stop the derailed cars. My experience is that when the derailed railcar wheels go off the ties and into the ground, the railcars will stop significantly shorter.

It is my opinion that had the NS constructed the DSPD in compliance with Plan 7-9, the RSSX 2535 derailed wheels would had gone into the ground and stopped sooner, and the RSSX 2535 would not have entered the Plate "C" envelope and the collision would have been avoided.

## Supplemental Section

### Purpose of Derail

The purpose of a derail is to direct the rail car wheel off the top of the rail it is running on so that the rail car no longer follows that track. Rail car wheels are designed with tread that runs on the top of the rail and a flange on the inside of the wheel that extend below the wheel tread. The wheels are connected to an axle with a wheel on both sides which the tread runs on top of the rails. The flange on the inside of the wheel contacts on the inside of its rail which keeps the wheel aligned with its rail, and the axle with the track. This allows the wheels to follow the rails, the axle following the track, which allows a rail car to go through curves.

There are different designs of derails that are in use today, including a wedge shape and a split rail. The standard derail is the wedge shape, which is the most common design. It is a wedge shape of steel which fits on top of the rail. When a rail car or locomotive attempts to roll over the wedge derail, the wheel flange is lifted and forced to the outside of the rail where it drops off the rail causing it to derail. In the photos of the standard wedge derails, the wheels are dropped next to the rail and the car continues in its original direction on top of the ties alongside the track's running rails. The cars will continue until the rail cars roll to a stop. The speed of the rail car and the grade of the track will affect the distance the derail car will roll on top of the ties. On a descending grade, the gravitational force will cause the car to roll further.





Theses are examples of wedge shape derails.

Another type of derail is a split rail derail. These derails are basically a complete or partial railroad switch which directs the errant rolling stock away from the main track. The railroad track switch is typically a section of a turnout. A turnout is designed to reroute a train from one track to another. The American Railway Engineering and Maintenance-of-Way Association (AREMA) produced a drawing that shows the location of a switch within a turnout. The switch is comprised of switch points which can be moved laterally into one of two positions to direct train wheels toward the straight path or the diverging path. The switch consists of moveable switch points controlled by a switch stand connected by connecting rods.




Split rail derails can be several types, including a single switch point derail or a double switch point derail. I show both types below. A Double Switch Point Derail (DSPD) is a specialized railroad safety device that uses two switch points to intentionally guide a rail car off the running track onto a short derail section. The derail section consists of two curved lead rails similar to the curved closure rails in the turnout scenario. The curved lead rails divert the rail car from its original route and continues to guide the rail car away from the protected track. The rail car wheels continue on the curved lead rails until they reach the end of the rails and fall off the top of rail onto the track structure. The wheels fall off the curved lead rail that is outside of the running track first close to the edge of the ties. The curved lead rail inside the running track continues to force the wheels to the outside through the wheel flange. This ensures the outside derailed wheels are forced off the ties in the track structure into the dirt outside the track structure.

Forcing the rail car wheels off the ties in the dirt is important. The ties can support the weight of the car through the wheel, even with some tie damage. This damage will slow the derailed wheel, but it will not stop the wheel from continuing to turn as long as the wheel is on the ties if there is a force, including the car's inertia or gravity, to keep it moving. However, the ground, or dirt as I would call it, is unable to support the weight of the rail car through its wheels. Therefore, the wheels will bury into the dirt, with the dirt exerting a greater force on the car causing the car to slow and stop. The further the wheel continues in the dirt, the more the wheel digs in, increasing the force generated to slow and stop the car.

The double switch point derail, on the right, would turn the car away from its protected track.




Both derail types I have shown here will derail the car. The major difference between Double Switch Point Derail (DSPD) and the standard wedge shaped derail is where the rail car is derailed, and direction of the car once it has derailed. The standard wedge shaped derail places the rail car derailed wheel immediately adjacent to the running track rail with the rail car continuing on its original direction. The DSPD is designed to divert the direction of the car from its original direction, places the first derailed wheel at the end of the ties, then forces the derailed wheel(s) off the ties into the ground, ie the dirt.

The railroads require a double switch point derail when the rail cars will approach the main track on descending grade. The descending grade will allow free rolling rail cars to increase its speed. The DSPD is designed to divert the direction of the rail car away from the main track and off the track structure into the dirt, and not allow it to continue to roll on top of the ties.

<u>Location of the Double Switch Point Derail</u>

Mr. Bell stated, Supplement Opinions Regarding Derail Installation, page 28, that the NS Guideline for Design and Construction of Privately Owned Industry Tracks, dated May 1994 would have been applicable. This document, 507-000120, was not produced prior to my original report.

Mr. Bell stated, p28, referenced a section from the 1994 Guideline. The section was part 6.14 Derails (507-000133). He said Part 6.14 Derail references the derail design requirement of derails generally. Part 6.14 Derail states, in part:

*Derails should be new or approved relay and must be the type indicated on the approved plans at the designated location. Where double switch point derails are required, they must be installed in accordance with the Plan 5-3 (see attachment).*

Mr. Bell included in his supplemental report, p29, a highlighted copy of Plan 5-3.




Mr. Bell states that Plan 5-3 allows the "ability to use other switch materials where advantageous or best fit for the location where it is being installed." Plan 5-3 just references that the switch material can be changed. Plan 5-3 does not state or allow the location of the DSPD to be changed.

Mr. Bell also stated, p28, that

*… the proposed track drawings it shows the proposed location NS would install their double switch point derail going into the storage track on the NS maintenance side. When NS is installing the derail, NS can make the decision to move or adjust the placement of the double switch point derail on the ownership portion of the track if needed if they are protecting their main track in compliance with MW&S Standard 100 Derails.*

Mr. Bell identifies the storage track. The AIPC storage track extends from the west end at the NS main track and connects to the AIPC Track #1. The storage track does not extend to the east end of the AIPC facility where the incident occurred.

Part 6.14 Derails states, in part:

*Derails….. must be the type indicated on the approved plans at the designated location.*

The NS Guideline for Design and Construction of Privately Owned Industry Tracks, dated May 1994, also provided definitions. Several pertinent definitions (507-000123) include:

> *2.01.06 "MUST"; "SHALL"; "WILL"*
> *Where the term, "must," "shall," "and/or "will" appears in these guidelines, it is to mean that the information following is a requirement for the proposed track.*
> *2.01.08 CLEAR POINT*
> *That point where there is 15-foot spread between main track and an adjacent track and 14-foot for other tracks as measured between centers, allowing the passing of freight cars and/or locomotives safely.*

Part 6.14 requires that the derail must be the type that is on the approved plan for the east end of the AIPC industry track. The Siding Agreement, dated the 28th day of July, 1995, was signed by Norfolk Southern Railway Company and American Italian Pasta Company The parties agreed a number of items, including Description of Track, and Construction. (501-000090).

The section titled Description of Track stated the industrial track or tracks hereinafter referred to as "track", as shown on print of Plan No. AF-0471, dated February 6, 1995, was attached and made a part hereof.

The section titled Construction stated:

> *The Track will be constructed in accordance with the terms and conditions set forth in Exhibit A, attached hereto and made a part hereof.*

Exhibit A, Item 1 (501-000100) stated:

1. *Railway will construct that portion of the Track to be owned by Railway, and Industry will, at its own cost and expense, construct to the satisfaction of Railway the portion of the Track to be owned by it, which ownership is indicated on the Plan attached to the Agreement.*

Track Plan AF-0471, dated February 6, 1995, (501-000102) is attached to the Siding Agreement dated the 28th day of July, 1995. Track Plan AF-0471 was approved by the Agreement parties and became the approved plan for the AIPC track #1 and track #2, and the NS owned section of the east end of the AIPC industry track.

Approved Plan AF-0471 showed the Division of Ownership of Track #1 was to be located 200 feet from the mainline point of switch. The mainline point of switch is shown on the plan as Station 0+00. The Division of Ownership is shown as Station 2+00. The Agreement states that the NS will construct that portion of the Track to be owned by the Railway.

Approved Track Plan AF-0471 placed the Double Switch Point Derail (DSPD) on Track #1 at Station 2+00, the same as the Division of Ownership. The DSPD location shown as Station 2+00 on the approved plan is the location of the points of the derail switch.

Approved Track Plan AF-0471 showed the Clear Point to be located 160 feet from the mainline point of switch, at Station 1+60. The Clear Point, as I have stated above, is the point where the distance between the main track and Track #1 centerlines is measured at 15 feet.

Approved Track Plan AF-0471 shows that Track #1 is to be constructed with a DSPD. The approved track plan shows that the DSPD will be constructed so that its switch points are located at Station 2+00. The approved track plan shows that as constructed there will be 40 feet of clearance from the Clear Point to the DSPD switch points.

The Agreement details that the parties had agreed that AIPC would pay NS for the cost of engineering toward and construction of the portion of the Track to be constructed by the Railway, including the DSPD. AIPC accepted in the Agreement, which included Approved Track Plan AF-0471, the NS design engineering expertise to place the DSPD in the appropriate location and that the NS would construct the DSPD in the location NS track design engineering determined to be correct.

Mr. Bell stated, p34, that during his site inspection he measured the distance from the mainline switch points to the DSPD switch points to be about 178 feet. The location of the DSPD was not in the location as required by Approved Track Plan AF-0471.

NS was not in compliance with Part 6.14 Derails because it did not locate the derail at the required location as set forth in Approved Track Plan AF-0471.

Mr. Bell opined, p28, that the NS local track forces could relocate the DSPD if needed. Mr. Bell did not opine as to what design criteria caused NS track forces to relocate the DSPD from its required location. There was no material produced by NS that gave the reason why the DSPD was not constructed in the required location as shown on Approved Track Plan AF-0471.

As I stated above, 6.14 Derails requires that derails are to be the type indicated on the approved plans at the designated location on the approved plans. The Siding Agreement dated the 28th day of July, 1995, between NS and AIPC required the Track to be constructed in accordance with the terms and conditions in Exhibit A, which included the Approved

Track Plan AF-0471. Mr. Bell's track measurements shows that the DSPD was not constructed in the location that was required by the Agreement.

Track Drawings AF-0471, dated February 6, 1995 and Track Drawing AF-0680 R1, dated October 24, 1996, Revised May 28, 1997

Mr. Bell in his Supplemental Report, p26, included Track Drawing AF-0680 R1. He stated it is an example of a proposed track design. Track Drawing AF-0680 R1 was made a part of the Supplement Agreement between NS and AIPC, dated December 19, 1997. The parties approved of Track Drawing AF-0680 R1 for the construction of additional track at the AIPC facility. In fact, Track Drawing AF-0680 R1 shows that AIPC Track #1 from the original Siding Agreement, dated July 28, 1995, had already been constructed.

Mr. Bell opined, p25, that

> *For example, in Figure 22, the1995 agreement states that the NS is responsible for constructing the track and the 1996 supplemental agreement states the railroad will construct and maintain a portion of an additional storage track #1 including the double switch point derail.*

Mr. Bell writes that the Supplement Agreement states the NS will construct and maintain a portion of Storage Track #1, including the double switch point derail. The track portion that Mr. Bell is mentioning here that is included in the Supplemental Agreement is in reality on the west end of the AIPC facility, as shown on Track Drawing AF-0680 R1.

The July 11, 2022 incident occurred on the track constructed under the original Siding Agreement, which included the Approved Track Drawing AF-0471. The Supplemental Agreement, dated December 19, 1997, is not applicable to the location of the July 11, 2022 incident.

Double Switch Point Derail Plan 5-3, dated 1981, and Plan 7-9, dated 2003

Mr. Bell, p35, states that the plan I was referencing, Plan 7-9, was not in effect at the time the DSPD was installed at the east end of the AIPC track #1. He states that the 1994 Plan 5-3 is the applicable plan. The 1994 Guidelines for Design and Construction of Privately Owned Industry Tracks includes Plan 5-3 (507-000165). This document was not produced until after my initial report was submitted.

Mr. Bell included in his supplemental report, p29, a highlighted copy of Plan 5-3.







I have added Plan 7-9 (Exhibit H in my original report) for comparison. A comparison of the illustration of the DSPD in both plans shows that the designs are very close. The material used is different, ie weight of rail, switch point lengths, but the design is the same. The inside curved lead rail is longer than the outside curved lead rail. The curved lead rails both curve away from the initial running rails. There are still 19 ties between the head block ties and the end of the outside curved lead rail. The outside curved lead rail is still the 39-foot bent stock rail. There is a rail section added to the heel of the switch point to comprise the inside curved lead rail that extends it past the outside curved lead rail.

The drawings are essentially the same, except that NS updated and specified the material to use in the DSPD.

My opinions based on the drawings do not change.

Clear Point and Track Centers

Mr. Bell in his Supplement Report, p29, references the 1988 MW&S Standard Procedure 100 Derail. He referenced Document 506-000004. He said the said the Policy said:

> *1988 Policy – Derails should be installed with a minimum 15-foot track centers where conditions permit. On sections of the railroad where tracks exist with closer clearances, derails are installed at the normal clearance point (location where the adjacent track becomes parallel) but in no event less than on 12-foot track centers.*

Mr. Bell stated that the language did not change in reference to the installation with a minimum 15-foot track center where conditions permit or no less than 12-foot track centers.

The 1988 Policy Mr. Bell references has two sentences that apply to different applications. The first sentence is:

> *Derails should be installed with a minimum of 15-foot track centers where conditions permit.*

This sentence is generic and applies to all derails. A 15-foot track center meets the definition of the Clear Point. As I stated above, NS defines Clear Point in its Guidelines for Design and Construction of Privately Owned Industry Tracks, dated May 1994. It states:

> *2.01.08 CLEAR POINT*
> *That point where there is 15-foot spread between main track and an adjacent track and 14-foot for other tracks as measured between centers, allowing the passing of freight cars and/or locomotives safely.*

The policy is clear, the minimum distance a derail can be placed is at the 15-foot Clear Point from the main track, as long as the conditions permit it to being installed there.

There are conditions that exist that would not allow a derail to be installed at that location. For instance, a track was emanating from the main track turnout and began a curve to divert away from the main track. If that curve continued to a point past the 15-foot Clear Point, a standard derail could not be placed there.

A standard wedge shape derail would have to be installed on the industry track rail furthest from the main track to allow it to derail the car away from the main track. However, that

would place the derail on the inside rail of the curve in this scenario. Rail car wheels entering a curve will push toward the outside of the curve and tend to draw away from the inner curved rail. The inside wheel will try and go to the outside of the curve, reducing the likelihood that a derail installed on the inner rail will carry the wheel over the rail to derail on the inside of the curve. This would be an improper placement of a standard derail. Therefore, to properly place that standard derail, the installer would have to push back the installation location to a point past the curve to be in tangent track.

I took a screenshot of a proposed track (507-000293) showing this track configuration of a curve diverting away from the main track.




The second sentence of the 1988 Policy Mr. Bell references is:

> *On sections of the railroad where tracks exist with closer clearances, derails are installed at the normal clearance point (location where the adjacent track becomes parallel) but in no event less than on 12 foot track centers.*

This is entirely different from from the first sentence. This is for locations where the adjacent track is parallel to the main track. NS has prepared a document, Data on Turnouts, (507-000162) in the 1994 Guidelines for Design and Construction of Privately Owned Industry Tracks that provides information of the location of the clearance point for parallel tracks. The 1994 document contains a schematic showing the location of the

clearance point for 14-foot track center. This policy does not allow derails to be placed on parallel track that has less than 12-foot track centers.

Mr. Bell is incorrectly applying the policy when he opines that one could use a 12-foot track center to comply with the first sentence in the policy. The "in no event less than on 12-foot track centers" is only applicable on parallel track situations. The track configuation at the east end of the AIPC industry track is not a parallel track as it approaches the NS main track. Therefore, the first sentence would apply to the east end of AIPC industry track.

<u>Federal Railroad Administration Track Safety Standards Part 213.205 Derails</u>

Mr. Bell states that the DSPD was in compliance with federal requirements contained in Part 213.205 Derails. He states that I do not contend otherwise in my report, which is correct. Part 213.205 states:

> *(a) Each derail shall be clearly visible.*
> *(b) When in a locked position, a derail shall be free of lost motion which would prevent it from performing its intended function.*
> *(c) Each derail shall be maintained to function as intended.*
> *(d) Each derail shall be properly installed for the rail to which it is applied. (This paragraph is applicable September 21, 1999.)*

Part 213 Derails does not require what type of derail needs to be install or where it needs to be installed, or even if a derail is required to be installed. Part 213.205 states the requirements the derail must meet if it is installed, which are minimum requirements.

The issue in this incident is the NS requirements for derails to be installed on NS owned tracks. These requirements include the type of derail to be used, the location of the derail to be placed, and the construction of the derail to applicable NS requirements and plans. The FRA Part 213.205 requirments do not address any of these isssues, and are not applicable to the incident.

**9.0 Conclusions**

It is my opinion, based on my review of the material provided and as shown above, the Norfork Southern Railway failed to comply with its own standards. Specifically, they are as follows.

<u>NS MW&S Standard Procedure</u> 100 Derail

NS did not comply with its Rule(s):

1.02 Derails are to be installed such that rolling stock is derailed away from the main track.
4.01 See appropriate standard plans for construction details.

The double switch point derail as constructed by NS did not conform to the NS Standard Drawing 7-9 Double Switch Point Derail. The inside curved lead rail was shorter than the outside curved lead rail. The inside curved rail was not curved to direct the derailed cars away from the track to be protected. Photo 1 shows that when the cars entered the derail, the cars proceeded to the end of the derail's lead rails and were not directed away from the main track. The derailed wheels were lined directly toward the main track by the lead rails.

NS did not comply with its Rule(s):
4.06 Switch point derails must have curved lead rails of sufficient length to derail cars without fouling the track they protect.

The double switch point derail as constructed by NS did not have a sufficient length of inside curved lead rail to direct the derailed wheels off the track structure to protect the main track. Photo 1 above shows that the inside lead rail was not only shorter than the outside lead rail, but that it did not curve and direct the derailed wheels away from the main track. Photo 5 above shows that after the accident, NS added additional rail to the inside lead rail and had it curved more toward the opposite rail. The outside curve lead rail was also moved more away from the running track rail. The NS subsequent work appears to bring the DSPD into compliance with Rule 4.06 and Plan 7-9 after the accident.

NS did not comply with its Rule(s):
1.05 Derails should be installed with a minimum 15 foot track centers where conditions permit.
4.05 Derails should be installed with a minimum 15 foot track centers where conditions permit.

I observed during my site visit that the DSPD appeared to be in its original location. I confirmed that by comparing my site visit photographs with Photo 1 and Photo 5 provided to me from the accident site. During my site visit, I located the DSPD switch points and took track center measurements at the ends of the DSPD curved lead rails and located the 15' Clear Point.

The distance I measured from the DSPD switch points to the 15' Clear Point was 25 feet. The total length of the DSPD at the time of my visit was 41 feet in length, which included the additional rail added to the inside curve lead rail. The track centers at the end of the current DSPD is 12 feet.

Therefore, the original DSPD was not installed where the entire DSPD was outside the 15' Clear Point as required. NS approved the Track #1 layout plan. NS was required to construct the DSPD per the Agreement. NS constructed the DSPD in a location that was not in compliance with the approved plan or their standards and rules.

Norfolk Southern Railway Company Specifications for Design and Construction of Privately Owned Industry Tracks

NS did not comply with its Rule:

6.08 Derails
A double switch point (DSP) derail shall be installed by the Company, with the non-switch end of the derail at the clear point of the industry track, on industry track with descending grade towards the Company track. The entire DSP derail (43' long) shall be located in vertical tangent track outside of any vertical curves. The long timber (end) of the derail shall be placed at the clear point, NOT the point of switch (beginning). See attachment for derail details.

As I noted above, the NS did not locate or construct its double switch point derail outside the 15' Clear Point. Therefore, NS was not in compliance with its Rule 6.08 Derails.

**Supplemental Conclusions**

NS MW&S Standard Procedure 100 Derail 1988

NS did not comply with its 1988 Policy, which states:

*1988 Policy – Derails should be installed with a minimum 15-foot track centers where conditions permit. On sections of the railroad where tracks exist with closer clearances, derails are installed at the normal clearance point (location where the adjacent track becomes parallel) but in no event less than on 12-foot track centers.*

The derail is to be installed with a minimum of 15-foot track centers where conditions permit. The Approved Track Plan AF-0471 required the Double Switch Point Derail to be located at Station 2+00. The Clear Point on the Approved Plan was at Station 1+60, a distance of 40 feet. The Approved Plan had correctly planned for the DSPD to be outside the Clear Point. However, since the DSPD was not located at 2+00 as required, but was constructed at Station 1+78, the derail extended inside the 15-foot Clear Point. The DSPD as constructed was not in compliance with the 1988 Policy.

Norfolk Southern Railway Company Specifications for Design and Construction of Privately Owned Industry Tracks, 1994

NS was not in compliance with Part 6.14 Derails
NS did not locate the derail at the required location as set forth in Approved Track Plan AF-0471. Part 6.14 Derails states, in part:

> *Derails….. must be the type indicated on the approved plans at the designated location.*

The 1994 Guidelines also provided a definition of "Must". It stated that when the term "Must" is used, it is to mean that the information following is a requirement for the proposed track. The term " Must" is used in Part 6.14, therefore, it is required that the derail be placed at the location on the approved plan.

Approved Track Plan AF-0471 set the location of the derail to be at Station 2+00. The derail was constructed at Station 1+78. NS was not in compliance with Part 6.14

Part 6.14 Derail also states, in part:

> *Where double switch point derails are required, they must be installed in accordance with the Plan 5-3 (see attachment).*

The double switch point derail as constructed by NS did not conform to the NS Standard Drawing 5-3 Derails. The inside curved lead rail was not longer than the outside curved lead rail, as shown on Plan 5-3. The inside curved rail was not curved to direct the derailed cars away from the track to be protected, as shown on Plan 5-3.

The double switch point derail as constructed by NS did not have a sufficient length of inside curved lead rail to direct the derailed wheels off the track structure to protect the main track. Photo 1 above shows that the inside lead rail was not only shorter than the outside lead rail, but that it did not curve and direct the derailed wheels away from the main track. Photo 5 above shows that after the accident, NS added additional rail to the inside lead rail and had it curved more toward the opposite rail. The outside curve lead rail was also moved more away from the running track rail. The NS subsequent work appears to bring the DSPD into compliance with old Part 6.14 (and current Rule 4.06) and Plan 5-3 (and current Plan 7-9) after the accident.

In summary, since the double switch point derail was not constructed by NS at a location required by NS rule, and the double switch point derail was not constructed to the NS standard, the derail was unable to perform its stated purpose of protecting the main track from unauthorized train movements.

These findings and opinions are to a reasonable degree of certainty based on my background, training and experience and a review of the materials provided thus far. I reserve the right to amend or supplement these findings and opinions if additional materials are provided. I may also perform additional analysis if requested.

Submitted by,

Kenneth E. Rusk
Kenneth Rusk & Associates LLC