# EXHIBIT 3

DEPOSITION OF KENNETH RUSK
September 1, 2026
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

---

NORFOLK SOUTHERN RAILWAY COMPANY,

Plaintiff,

vs. C.A. No. 3:25-cv-06618-SAL

AMERICAN ITALIAN PASTA COMPANY,

Defendant.

---

APPEARANCES:

FOR THE PLAINTIFF:
RONALD K. WRAY, II, ESQ. (Fed Bar # 5763)
Gallivan, White & Boyd, P.A.
55 Beattie Place, Suite 1200 (29601)
P.O. Box 10589
Greenville, South Carolina 29603
(864)271-9580
rwray@gwblawfirm.com

FOR THE DEFENDANT:

JOHN O. RADECK, JR., ESQ.
Hood Law Firm, LLC
172 Meeting Street
P.O. Box 1508
Charleston, South Carolina 29402
john.radeck@hoodlaw.com

I N D E X


| Examinations | Page |
| --- | --- |
| KENNETH RUSK | |
| Examination By Mr. Wray | 3 |
| Examination By Mr. Radeck | 158 |
| Reexamination By Mr. Wray | 167 |


E X H I B I T S


| No. | Description | Page |
| --- | --- | --- |
| Exhibit 1 | Notice of Deposition and Subpoena | 17 |
| Exhibit 2 | Mr. Rusk's CV | 27 |
| Exhibit 3 | History of Depositions and Court Appearances | 31 |
| Exhibit 4 | Time Sheet | 43 |
| Exhibit 5 | Supplemental Report | 46 |
| Exhibit 6 | Notes | 47 |
| Exhibit 7 | Exhibit H of Mr. Rusk's Report | 80 |
| Exhibit 8 | Exhibit F of Mr. Rusk's Report | 90 |
| Exhibit 9 | Exhibit D of Mr. Rusk's report | 100 |
| Exhibit 10 | Photographs | 127 |
| Exhibit 11 | Excerpt From Mr. Fianchino's Deposition | 131 |

(On record at about 9:50 a.m.)

KENNETH RUSK,

having first been duly sworn, was examined and testified on his oath as follows:

EXAMINATION

BY MR. WRAY:

Q. State your full name for the record, please.

A. Kenneth Rusk, R U S K.

Q. Good morning, Mr. Rusk. My name is Ron Wray and we met earlier this morning. I am one of the attorneys representing Norfolk Southern in a lawsuit we filed against a company called American Italian Pasta Company; I may refer to them as AIPC during the course of the day. If I do that, will you understand who I am talking about?

A. I will.

Q. Of course we have been told that you have been retained by AIPC as an expert witness in this case; is that correct?

A. Yes, it is.

Q. Tell me where you reside.

A. Crossville, Tennessee.

Q. We are here in Knoxville today. How far is Crossville from Knoxville?
A. About 75 miles.
Q. Did you grow up in Crossville?
A. No.
Q. Where did you grow up?
A. Indiana.
Q. What brought you from Indiana to Crossville, Tennessee?
A. Golf.
Q. Are you currently employed?
A. Self-employed.
Q. What capacity are you self-employed?
A. I am employed by Kenneth Rusk & Associates.
Q. The associate part implies that there are others besides you who may work for the company; is that true or not true?
A. Well, it is not true. It was -- that was the plan back-when, when I started the company in 2016, but it is not now.
Q. Have you ever had any employees of Kenneth Rusk & Associates?
A. No.
Q. Are you the sole owner?

A. I would say yes but my wife is involved.
Q. What role does she play with your company?
A. Financials.
Q. Tell me what you mean by that.
A. She does the billing and prepares the invoices.
Q. You and your wife basically own it together, then?
A. Yes, but I am the sole proprietor.
Q. Is your wife paid a salary for the work that she does for the business?
A. No.
Q. When did you form Kenneth Rusk & Associates?
A. April 2016.
Q. And what is the nature of that business?
A. It is consulting in railroad safety, track safety.
Q. When you say consulting, tell me what you mean by that.
A. It started out I was doing a lot of training in track safety, federal regulations, AREMA training, but then I also went into expert work and just general consulting with railroads as to safety on

their property with regards to track.
Q. Do you still do training?
A. I did a session of training last year for one week was all.
Q. Who did you do that training for?
A. Merrimack. They are a contractor that the FRA uses to -- for automated track inspections.
Q. Over the course of your career at Ken Rusk & Associates, have you done training for Class I railroads?
A. Class I's, no.
Q. You said you then moved over to the expert witness side. When did you first begin doing work as an expert witness?
A. I would say later in 2016. A co-worker of mine wanted me to do expert work with him, so I decided to sub to him and did some expert work.
Q. Who was the co-worker you are referencing?
A. Fred Dennin.
THE REPORTER: What's his last name?
THE WITNESS: Dennin, D E N N I N, I believe.
BY MR. WRAY:
Q. And how did you know Mr. Dennin?

A. He and I were co-workers. I used to actually work for him.
Q. Were you co-workers at the FRA?
A. Yes.
Q. Do you have an estimation of how many cases you have worked on over your career as an expert witness?
A. Giving testimony or just worked on?
Q. Let's break it down into both components.
So I assume in some cases you may be retained but not actually testifying; is that fair to say?
A. That is correct.
Q. And then in other cases you are retained and perhaps you give a deposition or even come to trial if necessary; is that correct?
A. That is correct.
Q. So let's talk about the second half first.
How many cases have you actually testified either by deposition or at trial?
A. Probably around 30, 35.
Q. And then beyond that -- and I know these are ballpark figures, I am not holding you to an exact number. But how many other cases have you worked on

that it was not necessary for you to give testimony either at deposition or at trial?

A. Probably say another 30, maybe 40.

Q. In what areas do you hold yourself out as having expertise?

A. Track safety.

Q. Looking at your CV, which I am going to mark in a moment, it appears that most of your background and career has been on the track side; is that fair to say?

A. That's correct.

Q. You have always worked in engineering when you were with the railroad?

A. Engineering department which includes track and bridge.

Q. When you say you consider yourself to be a track safety expert, is there any specific subcomponents or subsections of track safety that you focus on?

A. No, I think in general the whole gamut of track safety from the track and to roadway worker protection that would be involved with FRA Regulations 213, 214.

Q. In this case, of course, you know that our case focuses -- or your testimony in particular

focuses on a derail device, correct?
A. Correct.
Q. Do you consider a derail device to be a part of the track or is that a separate structure?
A. No, it is part of a track; it is involved with the track safety.
Q. In the 30 to 35 cases that you estimated for me you have testified previously, have you ever testified in a case involving some allegation that a derail device did not perform as intended?
A. My answer to that would be no, I don't recall any.
Q. And you told me you have also done some cases you evaluated where perhaps you didn't testify. Did any of those cases involve an allegation that a derail device did not perform as intended?
A. I am not sure on that because derails are required under Part 214 and I did consult with some of those, and I can't recall that being in one of them but I hadn't testified to any derails.
Q. Do you recall ever evaluating a case in which there was an allegation that a derail device failed to prevent equipment or a locomotive from reaching a mainline track and fouling the mainline track?

A. No.
Q. Are you aware of whether there have ever been any challenges to your ability to testify as an expert witness at trial?
A. I am. There was -- my first case was a federal case that the judge limited my testimony to publicly available information because in my deposition in that case I think I was alluding to a lot of private FRA rulemakings and -- that and I was not allowed to testify to any backroom FRA dealings that become of the rulemaking, so he limited my testimony on that.
And I think there was another one in -- I think it was in New Hampshire, where I was excluded from testifying because the judge had excluded the plaintiff's expert from testifying, so thereby he didn't allow me to testify as well.
Q. The first case that you told me about where the judge limited your testimony due to relying on some materials that he said were inappropriate, do you remember who the plaintiff or who your client was in that case?
A. It was BNSF.
Q. Approximately what year was that?
A. I would have to go back and look at my testimony history, but that was my first trial that I

was at; it was probably in the neighborhood of 2018 for the trial, maybe '17.

Q. Did I understand you to say that you were allowed to testify, you just were limited in the scope of what you were able to address?

A. Correct.

Q. The second matter you said -- that you described, you said it was a New Hampshire case where the judge actually fully excluded you; is that correct?

A. Yeah, that is correct. It wasn't for myself but he didn't allow the plaintiff expert to testify so he didn't allow any experts on track safety to testify.

Q. Has there ever been a case where a judge entered an order saying that you were not qualified to give the opinions that you had expressed in that case?

A. No.

Q. Has there ever been a case -- other than the New Hampshire case where you say he excluded because he didn't let any expert testify, but has there ever been a case where you were excluded for any reason other than the judge just said I don't want any experts in the courtroom?

A. No.

Q. You have never worked on the

transportation side of a railroad; is that correct?
A. I was never in the operating department, no. I was with the railroad but on the track, so I was interfacing with the operating department, but I was never employed in that department.
Q. You have never worked for a Class I railroad?
A. Yes, I have.
Q. Okay. Which Class I did you work for?
A. The Illinois Central Gulf.
Q. Is Illinois Central Gulf still a Class I or has it been absorbed by one of the other players?
A. Well, it is now a part of the CN Network.
Q. How many years did you work for Illinois Central?
A. Ten years, I believe.
Q. That was all on the engineering side?
A. Yes, including track, bridges, design.
Q. During the course of your consulting career, I did see from your list of cases you have been retained a number of times by Class I railroads as an expert witness for the railroad, correct?
A. That's correct.
Q. You have never been retained by Norfolk Southern, have you?

A. Yes.
Q. You have?
A. Yes.
Q. Okay. When were you last retained by Norfolk Southern?
A. I have some current cases going on with NS.
Q. You don't see that as a conflict?
A. No.
Q. So you have got cases where you are currently consulting with and giving opinions on behalf of Norfolk Southern?
A. My opinions are based on rules and regulations, so, no, that's where my -- I guess I would testify to.
Q. Have you been disclosed as an expert witness in any of those matters where you are currently working that involve Norfolk Southern?
A. Yes.
Q. Tell me how many cases currently do you have.
A. Currently, that's ongoing?
Q. Yes.
A. I think it is only one.
Q. And where is that case pending?

A. No, wait a minute, it is in New York.
Q. Who has retained you?
A. I would have to go back and look at my files as for the attorney but -- yeah, because I can't recall it offhand. It is set for trial, I have given my -- I think I did a deposition so it should be in my deposition file.
Q. Do you know who the plaintiff is?
A. It was -- it is an NS employee.
Q. It's an FELA case?
A. I am thinking so but, yes. I am not sure; I don't follow, you know, those kind of cases. Whether it is that or something else, I am looking at track rules and regulations.
Q. You don't recall the name of the plaintiff?
A. No, not right off.
Q. And you don't recall the Norfolk Southern attorney who retained you?
A. No, this has been ongoing. It keeps being delayed going to trial so I am not sure.
Q. What is the subject matter of your testimony in that case?
A. It is about a culvert that collapsed underneath the railroad and caused a derailment and the

train crew was injured.
Q. So one current case that involved Norfolk Southern. You said you have had others in the past?
A. Yes.
Q. How many cases altogether do you think you have worked on for Norfolk Southern, forget the one in New York, how many additional?
A. Again, these go back ten years. I would have to look and see. I am thinking -- one I know and there may be another one that I have given a deposition in.
Q. So maybe one or two other cases that you were retained on behalf of Norfolk Southern?
A. Correct.
Q. Do you recall who the attorneys were in either of those cases?
A. No, they go back a number of years.
Q. Do you recall the general subject matter of your testimony in either case?
A. Typically it is FRA regulations and railroad rules.
Q. To your knowledge, have any of the cases where you were retained to evaluate a case on behalf of Norfolk Southern involved a derail?
A. No.

Q. In this case I believe you initially were retained by Turner Williams?
A. That's correct.
Q. Have you worked on other cases with Turner in the past?
A. I have.
Q. What did Turner or someone in his firm ask you to do in this particular case?
A. In this case?
Q. Uh-huh.
A. To look at the site and the track that was there at the site and determine, in my opinion, you know, if there was any issues with the track structure.
Q. Were you asked to evaluate any issues involving the actions of the train crew, engineer and conductor?
A. NS train crew?
Q. Yes.
A. No.
Q. Have you done that in this case?
A. No.
Q. Do you have any opinions that you expect to offer at a trial of this case that relate to the engineer and conductor of the NS train?
A. No.

MR. RADECK: There goes an hour of his questions.

(Exhibit 1 - Notice of Deposition and Subpoena.)

BY MR. WRAY:

Q. Mr. Rusk, I am going to hand you what I will mark as Exhibit 1. It is a copy of the Notice and Deposition Subpoena that brings us together today.

Did you review the Deposition Notice and Subpoena prior to your arrival today?

A. I did.

Q. Did you see that the Subpoena asked you to bring with you certain materials that relate to your work in this case?

A. Are you referring to Addendum A?

Q. Yes. I guess it is the fourth page in, the first page of the Subpoena. Do you see in the middle of that page there is a box checked for production? It says: You, or your representatives, must also bring with you to the deposition the following documents that are listed in Addendum A.

A. I did not read that part.

Q. I understand. We had a brief discussion prior to the deposition.

You didn't bring anything with you today other than a copy of your Supplemental Report; is that

correct?
A. That's correct, I submitted my deposition file to you electronically but I didn't bring it.
Q. My understanding is that Mr. Radeck has access to your file and you believe you have access to whatever materials you are going to need to testify here today?
A. No, I didn't -- my deposition file didn't contain the information that was provided to me by counsel, so I referred to that in my Report and, you know -- but my deposition file didn't include all of the information that had been put -- or given to me in the case.
Q. Tell me what you mean by that, I am confused by what you are saying.
A. Like NS documents that were produced, they were produced to the attorneys who then gave them to me. I didn't turn around and send them back to the attorney as part of my deposition file.
Q. Right, and I don't need you to do that. If it is something that I produced to Mr. Radeck, I didn't expect you or him to send it back to me; I don't need my same documents twice.
It does sound like you have got -- I am going to say your file consists of a couple of

components; one is all of the materials that were sent to you for your review, correct?
A. Correct.
Q. As to those materials, you did not bring them -- you personally don't have access to them unless through Mr. Radeck today; is that correct?
A. That's correct.
Q. And then what you described as your file, quote, unquote, I did receive from Mr. Radeck's office, I think on Friday afternoon, a file that consisted of, I think it is, 963 pages of material; is that what you consider to be your file?
A. Yes.
Q. Okay. And as to that again, I know you don't have it here in front of you but you do have access to that today through Mr. Radeck as well, correct?
A. Yes, I believe so.
MR. RADECK: I will just say, Ron, it sounds like you are making a little bit of a deal about that. I will say, for your witnesses in Atlanta, I made the request that they have access; they didn't have access, they had to rely on Will, so it is kind of a similar arrangement. He has got access to everything through me.

MR. WRAY: I am not making an issue; I have zero problem with the way we are proceeding.
MR RADECK: I didn't think so.
BY MR. WRAY:
Q. This is where my question was ultimately getting.
Is there anything that you need access to today that you don't have access to either through Mr. Radeck or through what you brought that you believe is going to be necessary for you to answer my questions today about your work on this case?
A. Yes, I believe I have access to everything I am going to need.
MR. WRAY: That's all that I am getting to, John. As long as he can say yes, we didn't have an issue. What I didn't want to have happen today is us leave and him say, well, if only I had this document, if I only had that, I could probably answer your question.
BY MR. WRAY:
Q. But you don't believe that is going to be the case, right, Mr. Rusk?
A. You are correct.
Q. And then if we look at Addendum A, just to make sure we are on the same page, I did get a set

of materials that, as I said, I think is 963 pages.
To your knowledge, did that include everything that you consider to be in your file on this case other than depositions and discovery materials that might have been exchanged through counsel?
A. That would be my opinion, that I complied with everything on here except for what was provided to me, produced to me.
Q. Were there any items that you did not produce for any reason that relates to your work on this case?
A. No.
Q. One of the reasons I ask that question, Mr. Rusk, is, as I indicated to you earlier, my understanding from your files is that you initially were retained by Turner Williams and his firm. I did not see any communications between you and that firm.
Do you have any e-mail communications where they retained you or you had discussions with them about your work in the case?
A. I did have communications with them; that was a different case. That was the American Italian Pasta Company was being sued by the employees, and so I didn't know if those were actually, you know, privileged communications with them through -- that's a

different -- but it wasn't very detailed on that. I didn't produce any reports and I was more of a consultant on that case because it didn't go anywhere where they asked me to produce anything.

Q. So am I understanding you to say that you consider it to be two separate matters; one was the employee claims against the pasta company and the Railroad; that was step one?

A. That was step one. Now a lot of the documentation that was produced to me in that case are still part of the documentation that I have in my Report that I depend on, the information there. I didn't include those e-mails in my deposition file because I didn't know how that was going to work without them going through e-mails or if they considered e-mails proprietary, I guess, for lack of a better word on my part.

MR. RADECK: They are protected anyway under the federal rules so --

MR. WRAY: Well, they might be; some things certainly are but not everything.

BY MR. WRAY:

Q. And I just want to make sure I understand the scope of what you did and didn't produce.

So you didn't produce anything that you

consider to be part of the first stage of the case where the Railroad employees were suing the AIPC; is that fair to say?

A. I am going to say yes because I may have taken some notes but those same notes I think I put in the next file for this case because I referred back to them. To tell you the truth, I am not a hundred percent sure on that.

Q. And what you did produce in this case was what you considered to be the second part of this case, which is the Railroad's claim against AIPC; is that correct?

A. Everything -- everything for the Railroad's claim, yes, I did. All the material from the Rightmier case, all they produced to me was transferred over to this case.

Like I said, there were very few notes, I mean, the site visits, all of that was -- I moved it over; you have got that as well.

Q. How many cases have you worked with Mr. Williams over the years?

A. Again, I am going to include some that don't have reports, didn't get to that stage, probably three, maybe four.

Q. Do you have any current cases with them?

A. No.
Q. And of course with you today is Mr. Radeck from the Hood Law Firm.
Have you ever had any cases with the Hood Law Firm prior to this one?
A. No.
Q. How much time do you spend per year working on litigation matters?
A. When you say -- percentage of my work time or number of hours or --
Q. Both, just break it down. How many hours a year do you think you spend on litigation consulting?
A. Percentage-wise it would be a hundred percent this year and 90 percent last year but -- or 80 percent last year would be on consulting and expert work.
Number of hours, more this year than last year but I am not sure that I have got a total number of hours that I can give you. I can give you kind of an amount -- a dollar amount or --
Q. Either way you want to do it, just a rough estimate. I am just trying to understand how much time you spend doing consulting.
A. Last year I made $20,000. This year so far it has been 80,000, so I would have to do the math

and divide it out and see how many hours it was.

Q. What is your billable rate?

A. 350.

Q. So if you billed $80,000 this year and you divide that by 350, that would give us a rough estimate of your hours?

A. Yeah, that would be the amount that I have received back so far. The number of hours I have actually worked that has been billed and not reimbursed or hasn't even been invoiced yet, you know, would increase those hours.

Q. Did you receive any factual information from either Mr. Williams or anyone at his firm or from Mr. Radeck or anyone in his firm that you have relied upon in your evaluation of this case?

A. When you say factual information, I mean, information has been produced to me; I am assuming all of that is factual. So all of the information that has been produced to me I have reviewed and have used in my opinions.

Q. All right. To make my question a little clearer, I am distinguishing between that.

I assume if you were provided documents, depositions, you reviewed those and you relied upon whatever information was contained in those materials

that you felt was pertinent, correct?
A. Yes.
Q. I am saying aside from that. Aside from written materials that you reviewed -- and I want to talk about your own scene visit in a little bit. Did you get any facts from the lawyers that they said this doesn't appear in any of these documents but we want to tell you about this that happened, that you have relied upon in your opinions?
A. No.
Q. Were you asked by any of the lawyers to make any assumptions to -- that underlie any of your opinions?
A. No.
Q. Has anyone worked on this file with you?
A. No.
Q. I know you told me that your wife does some billing but I am assuming she doesn't play any role in terms of -- on the Report that was generated in this case or any of the opinions you have reached in this case; is that correct?
A. No, she will read my Report and come back with grammatical errors or proofread and stuff like that, but as far as developing opinions, no.
Q. The Report that was provided to us in

this case, is that entirely your work?
A. Yes.
Q. I just got through reading a very interesting article about an expert who was taken to task for using ChatGPT to write his report.
I am assuming you didn't do that in this case, did you?
A. No.
Q. Did you use any type of AI programs to assist you with your evaluation of this case?
A. No.
(Exhibit 2 - Mr. Rusk's CV.)
BY MR. WRAY:
Q. I am going to show you what was marked as Exhibit 2, which is a copy of the CV that came to us as an exhibit to your Original Report.
Is Exhibit 2 your CV?
A. Yes.
Q. And I'll tell you, this came with your Original Report that we got in this case, and I see a date on it of April 15, 2024. Do you have a more current version than April 15, 2024?
A. Yes.
Q. Do you have that with you or --
A. It was put in my deposition file and you

should have it.
Q. So in the 963 pages of material, I did see a CV in there.
A. Yes.
Q. Let me see if I can find that and see if it has got a date on it.
I did not print it out, Mr. Rusk, but it looks like it is dated April 12, 2026.
A. Correct.
Q. So it is hot off the press?
A. Yes.
Q. Do you know what additions you have made from the CV we have marked as Exhibit 2 and the one that is included in your file?
A. Typically what I -- what I do is I change my number of years that I have been in the railroad industry. So the one that you produced to me, it says 49 years and my current one is 51 years now.
Q. Do you know of anything of substance that you added or changed to your CV?
A. No.
Q. Any additional training or anything like that that gave you more experience than you had when you did the 2024 CV?
A. No.

Q. And you told me earlier about Kenneth Rusk & Associates. Your CV also refers to a company called Longevity Consulting, LLC; who is that?
A. That's a consulting company to the Federal Transit Administration, and they were doing evaluations of transits; FRA does that but they hire consultants to do it. This was -- Longevity had a new contract with them to go in alongside another consultant that has been there for a long time. FR -- FTA wanted to expand, and so Longevity reached out to me to participate on railbound transit, to evaluate their safety.
Q. It looks like you were doing that at the same time you were operating Kenneth Rusk & Associates?
A. Correct.
Q. Were you considered a W-2 or 1099 employee of Longevity Consulting?
A. Yes.
Q. Which one?
A. Well, I was considered -- I wasn't an employee, I was a consultant to them.
Q. So you got a 1099 when you worked for them?
A. Yes, I did.
Q. You mentioned to me earlier Mr. Dennin.

It looks like for a brief period you were affiliated with him and a company called Dennin, Rusk & Associates?

A. That's correct.

Q. Other than you and Mr. Dennin, anyone else work for that group?

A. We did hire some discipline-specific people because we were developing training programs to comply with the FRA 243 Rule. And so we developed a number of them, but to do that, you know, we hired a signal expert, mechanical expert, to work with us to develop training programs for compliance.

Q. Were you and Mr. Dennin the sole owners of that business?

A. Yes.

Q. Before that you worked with the FRA for -- is it 22 years?

A. Just about, yes; 21.

Q. And I don't want to take a lot of time.

It looks like your CV describes in pretty good detail what you did for the FRA; is that accurate?

A. Yes.

Q. Any other job responsibilities that you had with the FRA that aren't included in your CV?

A. No.

Q. What prompted you to get into railroading?
A. My dad actually worked for Conrail and so I went to work with him when I was a kid and enjoyed it. And the ICT offered me a job out of school so -- so I said sure.
Q. What was it that prompted you to make the move from private industry to the FRA?
A. The Gulf of Mississippi joined with another regional railroad and so we had a duplicate project engineer with the two companies when they joined. And the one on the other company was actually my former boss that hired me -- or I originally worked for him, so they chose him instead of me. So I went and kind of turned and went to the regulatory side with the Illinois Commerce Commission after that.
Q. Did you leave the FRA voluntarily?
A. Yes.
Q. Were you ever disciplined for any reason during the time you worked for the FRA?
A. No.
(Exhibit 3 - History of Depositions and Court Appearances.)
BY MR. WRAY:
Q. I am going to hand you what we have

marked as Exhibit 3. And I'll tell you again, this was a copy of a case list that we were given as part of the exhibits to your Original Report in this case.

I don't know if this is up to date since it came to me probably around February/March of this year.

Have you had any other depositions since, I will say, the first quarter of this year?

A. Yes.

Q. How many?

A. Let's see. I had a deposition and a trial in here that came after my Report -- my Original Report.

Q. Who was your client?

A. CSX.

Q. You said a deposition and a trial; was that the same case?

A. Yes.

Q. Where was that case pending?

A. Where was it?

Q. Yes.

A. It was federal court in Nashville.

Q. Who did you work with at CSX, the counsel?

A. Reifers.

Q. Camille?
A. Camille, yeah.
Q. Is that the one that they just tried with the flooding?
A. Yes.
Q. I didn't know you were involved in that.
And then I do see on this list, you told me earlier about a case in New York, it looks like on the last page, Benjamin Garland versus Norfolk Southern Railway. Is that the case you were telling me earlier that you worked for Norfolk Southern up in New York?
A. Yes, and that is still ongoing, they keep postponing the trial for that one.
And another one, if you were interested, NS cases on the front page, Turrentine versus AGS.
Q. Alabama Great Southern?
A. Yes.
Q. Do you remember who retained you in that case in terms of counsel?
A. No, I don't remember.
Q. Alabama makes me think it might be Crawford McGivaren or Steve Tucker or somebody at that firm. Do you recognize those guys?
A. Tucker sounds familiar; they were in Birmingham.

Q. I asked you earlier about cases in which you might have been excluded from testifying. How many cases altogether have you actually testified in a courtroom?

A. In a court? Three jury trials and then I also testified in Colorado in front of an administrative judge.

Q. You have done other Rule 26 reports in federal court other than the one you did in this case, I assume?

A. You'll have to define Rule 26.

Q. Where you have to actually write up a report with opinions and describe the work you have done and whatever opinions you have reached in a particular case.

A. Correct.

Q. In this case did you understand that your obligation under Rule 26 was to provide a report that included all of the opinions that you intend to express in this case?

A. Yes.

Q. Did you do that?

A. Yes.

Q. Do you have any opinions that you intend to offer at the trial of this matter that are not

covered in your Written Report?
A. At this point, no, this would be my opinions that is in the Report unless I receive additional information.
Q. One other requirement of the federal rules is that you tell me all of the facts that form the basis for any of your opinions in this case as well as any materials that support those opinions.
And did you do that in your Report?
A. I believe so.
Q. Are there any materials that you would intend to tell the jury at trial that support your opinions in this case that are not disclosed in your Report?
A. None that I plan on, I think it is all in my Report.
Q. In your Report you do reference a host of materials that were provided to you for your review.
To the extent you received materials from counsel that you relied upon in forming your opinions, are those listed in your Report?
A. Yes, I believe so.
Q. Did you ask for any materials that you were not provided?
A. No.

Q. Let me ask you, and Mr. Radeck can help you if he wants to, I don't care either way; if you can go to page 895 of the file materials that were provided to us prior to your deposition today.
Are you there, Mr. Rusk?
MR. RADECK: One second.
BY MR. WRAY:
Q. Hopefully we are looking at the same thing. I am looking at an e-mail at the top that says: Kenneth Rusk to John Radeck, Monday, November 3rd, 2025; is that what you are looking at?
A. What was the date again?
Q. I am sorry, it is actually Bates numbered 894, I didn't realize the Bates numbers are at the bottom.
A. 894, okay. Okay.
Q. Are you now looking at an e-mail that at the top, the header is dated Monday, November 3rd, 2025?
A. Yes.
Q. And it looks like -- as I was saying to you earlier, it looks like Mr. Williams' firm initially retained you but when Mr. Radeck got involved they kind of did an introduction to you and them to put you guys together; is that fair to say?

A. Yes.
Q. And in the middle of this page is an e-mail from you to Mr. Radeck dated November 3, 2025 at 1:28 p.m., and it says: John, I need additional information that has not been provided to me.
Do you see that?
A. Yes.
Q. Do you know exactly what it was that you were asking for at that point in time?
A. No, I do not.
Q. Do you have any recollection of why you would have been asking for additional information?
A. No.
Q. Would you agree with me that logically it sounds like it was something you thought was important that you didn't yet have?
A. Yeah, I would say that was in the transition period.
Q. And do you know whether you ever got -- I know you said you don't recall exactly what it was you were asking for; do you recall whether you received it?
A. I believe it was the Complaint from that and I asked him for it and I did get a Complaint -- yeah, down below, in the next one down.
Q. Yeah, I see on the one below you say:

Would you be able to send me the Complaint.
But then the next response from Mr. Radeck says: See attached.
So I assume he sent you the Complaint?
A. Yes.
Q. And then you responded to that by saying: I need additional information that has not been provided to me.
So it probably was not the Complaint; would you agree with me there, since Mr. Radeck had sent you that?
A. Yeah, it could be or it could have been something that was in the Complaint that I had a question about.
Q. All right. And where I am headed with this ultimately is, do you believe you were provided with all of the information that you asked for that you needed to form your opinions in this case?
A. Yes.
Q. In addition to the materials you reviewed, you did actually go out to the Norfolk Southern railroad tracks, AIPC facility, at some point in time as part of your work in this case, correct?
A. I did.
Q. Did you just make one visit?

A. I actually made two.
Q. The first time that you went out was with Mr. Williams and a group of other folks?
A. Yes.
Q. And that included a gentleman by the name of -- is it Joe Lydick who was retained by --
THE REPORTER: I am sorry who?
MR. WRAY: Lydick, L Y D I C K.
THE WITNESS: I think -- think that was the second time I went out.
BY MR. WRAY:
Q. First time you went, who did you go with?
A. I mean, I don't remember all of the people that were there; there were a number of people there. But I think there was some Railroad people there, NS people there. But I think the second time was -- Lydick was there, and I went out as requested by Mr. Turner.
Q. In your Report in this case I think it only describes one visit, but you are saying you think you made two?
A. I was there for the second one; he wanted me there for the second one. He wanted me there when Lydick was making an inspection.
Q. Right, but I am trying to understand.

You said you went out there twice?
A. Correct.
Q. In your Report do you mention both visits or do you only talk about one visit?
A. I only talked about the one visit because that was the time that I took my measurements and took my photographs. I didn't make any notes or take -- took any photographs the second time.
Q. The second time you went out, then, you believe it was after the time you went out and did the photographs and measurements?
A. Yes.
Q. Why did you go back the second time?
A. I was asked by Mr. Williams -- Turner Williams to come out and observe the inspection being done by Lydick.
Q. So you went out one time just with your counsel and you think some Railroad folks and you made photographs and measurements?
A. Correct.
Q. And you went out a second time with Mr. Lydick and others and you didn't take any photographs or measurements on that occasion?
A. That's correct.
Q. Did you generate any work product on that

second visit that relates to your opinions in this case?

A. No.

Q. Did you interview any witnesses?

A. No, I didn't interview anybody.

Q. As we sit here today, have you done all of the work that you felt was necessary to reach the opinions that you have expressed in this case?

A. I do.

Q. Is there anything additional that you think needs to be done or should be done to verify or validate any of the opinions you have reached in this case?

A. I am going to answer, no, I don't think there is anymore information because the last drop of information that came to me after my first Report gave, you know, some more current rules that were at the time of construction.

Q. And you generated a Report initially in this case that looks like it is dated February 17, 2026; do you recall that?

A. Yes.

Q. And you didn't bring that one with you today, right?

A. I didn't bring it with me in that form,

it is all included in the Supplemental.
Q. And that's what I was going to ask you. You then did a Supplemental that was provided to us very recently, and it is dated August 27, 2026, correct?
A. Correct.
Q. And it looks like in your Supplemental Report it specifically references some additional information that -- you say, "Supplemental Findings and Opinions begin on Page 19," and "Supplemental Conclusions begin on Page 32."
Correct?
A. That's correct.
Q. Other than the material that is listed as supplemental findings beginning on page 19 and/or supplemental conclusions being on page 32, did you make any other changes to the Report?
A. No, just the "Report Modifications" at the front, the first paragraph on page 2.
Q. I didn't do an AI comparison or anything but if I ran your Original Report and compared it with your Supplemental Report, would the only changes I should see be in the supplemental sections?
A. Yes.
Q. You didn't read through your Original

Report and say, gosh, I didn't mean to say that or I need to correct this and you made any other changes elsewhere in the Report, did you?

A. I didn't make any changes to my original.

(Exhibit 4 - Time Sheet.)

BY MR. WRAY:

Q. I am going to hand you what I have marked as Exhibit 4.

Can you tell me what this is, Mr. Rusk?

A. You asked for my sheets that would show the number of hours I worked, and that would be the first part of this, Exhibit 4. And that is the hours I worked on this particular case.

Q. And the last page of the timesheet says -- it looks like it is Rusk 940; do you see that?

A. Yes.

Q. And it appears that that is current through 8-28-26, right?

A. Correct.

Q. I assume you did some work getting ready for today?

A. That is correct.

Q. What did you do specifically to get ready for today's deposition?

A. Just kind of go back through my

Supplemental Report and more specifically my Original Report, through that and just kind of review it and -- in my head, talking points and whatnot, things to remember.

Q. Did you meet with Mr. Radeck?

A. I had a phone conversation with him and met with him this morning.

Q. Did you meet with anybody else other than counsel to prepare for this deposition?

A. No.

Q. So you have got a little bit of time perhaps in the last couple of days getting ready for this deposition. But other than that, do these timesheets capture all of your work on this file?

A. Correct.

Q. It looks like the back half of Exhibit 4 is your actual billing records; is that right?

A. That is correct.

Q. And it is Rusk 941 through 944; do you see that?

A. Yes.

Q. And the last page, 944, it looks like an invoice dated August 17, 2026; do you see that?

A. Yes.

Q. Do these invoices reflect all of the

billings you have had on this particular case?
A. To date.
Q. Now did you do the same thing with your billings that you did with your earlier work product, and by that I mean did you separate out the work you did for Mr. Williams and his firm on the employee cases?
A. Yes, the hours I worked on that particular one, the Rightmier case, I have not included in these numbers.
Q. So the timesheets and the invoices we are seeing here only relate to the work that you consider to be done on the case Norfolk Southern filed against AIPC; is that correct?
A. That is correct, under the Hood Law Firm.
Q. And I didn't use my calculator to add these up. Just a rough glancing at the numbers on the billing sheets, it looks like you billed somewhere around $27,000 roughly for your work on this aspect of the case?
A. I haven't added them up either but that sounds about right.
Q. Do you know how much additional you billed Mr. Williams and his firm for the work you did on Rightmier?

A. No, I couldn't. I am going to say it wasn't that much, it was more site visits, traveling down there and being onsite was a good bit of it.
Q. You would agree with me that some of the work you did on the case when you were retained by Mr. Williams did assist you with the opinions you reached in this case, correct?
A. Yes, the facts on the ground, on what I saw on my site visits, the documentation that was produced, I mean, those all carried over, so, yes, those were all contained in my opinions.
Q. I also assume that you have those billing records for what you billed Mr. Williams for your work on that part of the case, correct?
A. Yes.
Q. You just didn't provide them today but it is something that you could provide if we asked for it?
A. Correct.
(Exhibit 5 - Supplemental Report.)
BY MR. WRAY:
Q. Mr. Rusk, I am going to mark as Exhibit 5 the Supplemental Report that was provided to us that is dated August 27, 2026.
And it does not make any difference to me, you can look at Exhibit 5 or you can look at the

one you brought, they should be the same; I printed them out. The only difference might be, did you make any notes or annotations on the one you brought today?

A. No, I did not.

Q. So it is up to you, I don't care which one you look at.

A. Yours has color.

Q. Yes, and we are going to go through this in a moment.

Before I get into the Report, I want to ask you about one other thing and then we will take a break and I'll get into your Report in a little more detail.

(Exhibit 6 - Notes.)

BY MR. WRAY:

Q. I am going to hand you Exhibit 6.

And I am going to tell you that within the file materials that I got from Mr. Radeck's office that were represented to me to be part of your file were a number of, what I am going describe as computer-generated notes that look like to me they were summaries of various documents and, in some cases, depositions that were provided in this case.

Do you recognize Exhibit 6?

A. Yes.

Q. How would you describe this?
A. These would be notes that I have taken when I was, like you said, going through depositions I would take notes of various areas in the deposition, what page it was on, what was said. And the same thing with some documents I was going through, some notes that I would take off those documents and so I wouldn't have to go back into the documents to actually find them, it is all in my notes.
Q. The notes that we have marked as Exhibit 6, are these all generated by you?
A. Yes.
Q. Does anybody else assist you in going through materials that you have been provided by counsel to prepare summaries of those items so that you just review the summaries and not the actual original documentation?
A. No, I review the documentation, then make these notes myself.
Q. In some places it does not show up in color, but you see some highlighting here and there on some of the documents?
A. Yes.
Q. To the extent there was highlighting, would that be something that you did?

A. Yes.
Q. Did you highlight particular items because you thought they were of particular significance or importance?
A. Yes.
Q. Do you agree that, when you are preparing your notes related to the materials you are reviewing, it is important to be accurate in terms of your description of what the documents say?
A. Yes.
Q. And when you drafted your Report in this case, did you rely upon these notes to kind of move over from the notes into your Written Report various facts and details that you were describing in the Report?
A. I would say it is more of the fact that I will scan through my notes, find a location that's of interest to me for my Report, and then I go back to the document at that location and look at the original document.
Q. To the extent that you made notes based upon your review of documents and depositions, were they all on computer?
A. Yes.
Q. I did see some handwritten notes you made

from the site inspection, and we are going to look at those separately.

But in terms of going through the materials when you are looking at them, do you make any handwritten notes and then type them up, or do you do it all on the computer as you are reviewing the documents?

A. I do it all on the computer.

Q. Are there, to your knowledge, and you can take a glance through the materials if you want -- let me ask a different way.

To the extent you had computer-generated notes relating to your review of any materials in this case, did you provide all of those to us?

A. No.

Q. Did you withhold any notes for any reason that you said, well, they probably don't need this one or this one doesn't seem important so you didn't send is to us?

A. No.

MR. WRAY: Do you want to take a five-minute break, we have been going a little bit over an hour?

THE WITNESS: Sure.

(Whereupon a break was held.)

BY MR. WRAY:
Q. Mr. Rusk, I am not going to mark this as an exhibit because it is too big, number one.
But I know you did look at the Supplemental Report done by the experts we retained at Secretariat, correct?
A. Yes.
Q. And in your Supplemental Report you actually responded to some of the things they said in their Report about you as well as deposition testimony that Mr. Bell and others gave in the case, correct?
A. Correct.
Q. So I know there are some areas of disagreement between you and my folks.
I want to start by asking you -- there are a couple areas of agreement. And if you would, I want you to flip over -- let me see if I can find a page number -- to page -- it says 4 of 44 in the bottom right-hand corner.
A. Okay.
Q. It has got a diagram and the bottom section says: Derailment definition.
Do you see that?
A. Correct, uh-huh.
Q. Is that a yes?

A. Yes.
Q. I am not picking on you, I want to make sure we get the record correct.
Let me ask you to read through that derailment definition that was included in the Secretariat report, and just let me know when you are done.
A. This report says: According to the U.S. Department of Transportation --
Q. Hold on. You don't have to read it out loud. I just was asking you to read it to yourself and let me know when you are done.
A. Oh, sorry. Okay.
Yes, I have read it.
Q. Do you agree with the definition of "derailment" as set forth on page 4 of the Secretariat report?
A. That part with the quote, yes, I do agree with that.
Q. When you say the part with the quote, tell me what part you are talking about.
A. "A derailment occurs when on-track equipment leaves the rail for a reason other than collision, explosion, highway-rail grade crossing impact," et cetera.

Q. Do you also agree that the point where a train or equipment wheel leaves the rail from its normal running position is called the point of derailment?
A. When the wheel leaves the tread of -- the tread of the wheel leaves the running surface of the rail, yes, that is point of derailment.
Q. If we flip to the next page, page 5 of 44 from the Secretariat Report, there is a picture there of a railcar; do you see that?
A. Yes.
Q. And do you understand that to be one of the railcars that was involved in the event that we are here to talk about today?
A. Correct.
Q. Do you know, is that the car that's coupled to the locomotive that was at the head of this train?
A. Yes, that's my understanding.
Q. And the folks at Secretariat drew a little diagram or annotated the picture and they have got an arrow that says "point of derailment" and it is pointing to the spot just off the end of the derail device; do you see that?
A. I do.

Q. Do you agree with them that in this case this location is our point of derailment?
A. I do not agree.
Q. Where do you think the point of derailment was?
A. It was when the wheel first leaves the rail.
Q. Which in this case would have been where in your view?
A. It would have been -- well, it would have been on the other rail, the inside curved lead rail is where a wheel first left the rail.
Q. So to make sure I understand what you are saying, in this case -- and we will look at some of the photographs -- the derail device itself had two separate, what are called, curved rails, correct?
A. Correct.
Q. One, I think you refer to in your Report as the outer rail, and one is the inside rail, correct?
A. That's the way I termed them, yes.
Q. And what you have termed as the "inside rail" is the portion of the derail that's between the gauge of the track itself, right?
A. Within the gauge of the industry track, yes.

Q. I think what you were telling me a moment ago is that the length of those two rails that compose the derail is different, right?

A. That is correct.

Q. And by your view of the pictures that you saw, the inside rail, the one that is within the gauge of the industry track, was shorter than the outside rail; is that correct?

A. That would be correct.

Q. And what you were telling me earlier is, in your mind, the point of derailment was actually when the first wheel of the AIPC locomotive went off the inside curve rail which was in the gauge, correct?

A. Correct.

Q. And that inside curve rail would have been closer to the switch points for the derail that was there on the ground at that location, correct?

A. That is correct.

Q. So in your view the point of derailment was actually further back from the mainline track than what Secretariat shows in their diagram, correct?

A. That is correct.

Q. About by how many feet further back towards the industry -- or away from the mainline track was it?

A. I am still looking at this figure 4, this picture here. The -- both wheels of this leading truck were on the ground at the time this picture was taken. So it would have been the full length of this truck, probably six feet, then.

I am estimating, I am not a mechanical person; I am just thinking the length of that truck is about six feet.

Q. So when you say six feet, do you agree with me that then what you have determined to be the point of derail would have actually been six feet further away from the mainline track than what Secretariat shows in this picture, correct?

A. That would -- yes, it would be, and that would be the point where the first wheel came off the rail.

Q. And at that location, what you determined to be the point of the derailment, the distance between the track centers, between the industry track and the mainline Norfolk Southern track, would have been wider than what is shown in these pictures; would you agree with that?

A. Well, I lost you there when you were talking about -- the track centers between the mainline and the industry track, from the center line of the

mainline to the center line of the industry track, yes, that would be wider at that point than at the point where he is looking at here.

Q. Okay. If you assume for a moment that the AIPC lead engine and the wheels on that lead engine went off the ground at the location shown in figure 4, page 5 of the Secretariat Report, and the engine stopped there, did not move from that point forward, it just dropped off the derail rail that we see here in this picture and remained at that location, would you agree with me that at that point the AIPC engine would not have been in the foul of the Norfolk Southern mainline track?

A. Yeah, well -- I am getting sidelined here by what statement you made or a word you used in your question there when you said it went on the -- came off the rail and went into the ground. It didn't go into the ground. The wheel came off the rail and landed on top of the track structure, on top of the ties, so it is not the ground, it's -- I am going to be particular about that.

But if the front first wheel set down right there and that locomotive never moved again, would it be in the foul of the track -- the mainline track? The answer to that would be no, it would not

be.

Q. And I understand what you are saying, because you determined the point of the derail to be where it went off the inside curved rail, which isn't shown in this picture, right?

A. Not in this picture.

Q. And what you are saying is when that rail from the AIPC engine went off the inside curve rail, it dropped off of the inside curve rail onto the crosstie?

A. Correct.

Q. But -- so I will -- I'll modify it to use your terminology.

If that wheel had dropped off the inside curved rail onto that crosstie and the engine had stopped at that point where it dropped from the inside rail onto the crosstie and not moved further, you would agree with me that that engine would not have been in the foul of the Norfolk Southern mainline track, correct?

A. It would not be in the foul that is defined by -- well, let me -- I got to go back and look at the FRA definition of it.

It would not be in the foul of Plate C --

THE REPORTER: Plate seat?

THE WITNESS: Plate C.

So it would not be in the foul of Plate C. However, I am trying to remember -- I think NS has defined being in the foul as being anything inside of 15-foot track centers.

BY MR. WRAY:

Q. Where do you see that definition?

A. I would have to go back and -- but I think they use that definition, if the car was inside that it would be in the foul.

So using the term "foul" is -- I am not sure how I would want to. And it might have been in the operating rules that I went through and it said, you know, if a car was inside of 15 foot on a track like this it would be considered in the foul.

Q. Point me to a document that you have reviewed in this case that says a locomotive or rail equipment is in the foul if it is within 15 feet of an adjacent track.

A. I can't remember exactly, I would have to go back and review the operating rules because I think that's where the definition that I am remembering came from. When you said in the foul, it just kind of popped in my head.

Q. Well, I asked you earlier in your deposition if all of the materials that you relied upon

were set forth in your Report, correct?
A. Yes.
Q. So if that definition of what is considered in the foul is somewhere in the documentation you reviewed, it should be in your Report, shouldn't it?
MR. RADECK: Object to form.
THE WITNESS: I am trying to think if I used the word "foul" in my Report.
BY MR. WRAY:
Q. Take a look, you have it in front of you.
A. I know but I don't know if I want to read all of it to come up with a word search to determine if it is the -- the word "foul" is in my Report. It is not something I would typically use, the word "foul."
Q. Well, in this case isn't that a central issue in this matter, that the -- that the AIPC locomotive was in the foul of the Norfolk Southern tracks and that's why the Norfolk Southern train hit it?
A. Well, that's why I said it was -- when I used the term it was inside Plate C, is when I used it. And that's when you got into where it was going to be hit by movement from -- it had to be in the clear of that otherwise it was directly going to be hit, that's

the clearance that NS has. But the term "foul" is something that I don't -- I don't know that I have used. But it encroached on Plate C; I know I used that, you know, that Plate C terminology when it went inside that.

Q. Right. Under the facts of this case, the AIPC engine ultimately went inside what you call Plate C, correct?

A. Correct.

Q. But I was asking you about whether it was or was not in the foul, or your determination, inside Plate C, if it had dropped off that inside curve rail and stopped right there. And we agree, it would not have been either in the foul or inside Plate C at that specific spot, correct?

A. It would not be inside Plate C and, in my opinion, it would not be struck.

Q. Isn't that the definition of being in the foul, is being in a position to be struck by equipment on the mainline track?

A. Again, I think you are going back to -- I would have to go back into the operating rules of what they actually consider.

Being in the track side, we use in foul of the track on the track side for track employees of

being within four feet. So if you are outside four feet, you wouldn't be struck either but you would be in the foul according to FRA Part 214 but you wouldn't be struck standing there as well.

So there is different terminologies of foul that's being used. One, I am using the 214 definition of foul; I am using Plate C, which is you are inside that, you are going to get hit. And then there is -- I think there is an operating definition of in the foul.

Q. What specific part of 214 are you referencing, what subsection?

A. Roadway Worker Protection so it would be in Part C -- actually it would be defined in the definitions of Part 214.

Q. We are not dealing with Roadway Worker Protections in this case, are we?

A. No, we are not.

Q. So why is that relevant in terms of how the Roadway Worker Protection regulations might define foul; how is that relevant to this case?

A. Because we are using the term "foul" and the definition of foul is dependent upon, you know, what part you are looking at and, you know, what you mean by foul, define foul.

And I am asking -- you know, when you used the term "foul," it is -- like I said, if you are inside Plate C, you are definitely in the foul and you are going to get struck. But I think there is more definitions, like the operating department has considered the term "foul" as being inside the clear point.

Q. But what part of Part 214 are you saying applies to this case?

A. I am not saying 214 does apply but the term "foul" is being used in there. So in my world, you have -- there is a term foul. So when you ask me about foul, there is a term foul that is within inside of four feet to the rail, if you are in there, but that's still outside of Plate C; and so that's where I am saying that.

Q. So leave aside, then, any definition of foul that might appear in Part 214 because you just told me it doesn't apply here.

Is there any other FRA regulation that you are aware of that defines foul as anything other than being close enough to be able to be struck by oncoming equipment?

A. You know, I don't know what the operating rules say on this.

Q. I didn't ask you about operating rules, I said FRA regulation because you referred to Part 214; that's an FRA regulation, right?
A. Correct.
Q. I said outside of 214, is there any other FRA regulation that you can cite me to that defines being in the foul of the track as being anything other than being close enough to the track that you could be struck by oncoming equipment?
A. Sitting here today, I can't come up with a regulation on that because I am not -- I wouldn't call myself an expert in the operating rules except that I, you know, have to -- when I am on the track I have to comply with the operating rules. But, you know, what the FRA requires is the railroad to have operating rules, and I am not -- I would have to go back and look at what NS operating rules say about the term "foul."
Q. Perhaps you and I are using different terminology, then, because you keep using the word "operating rules."
The railroads themselves have operating rules that govern how their train crews must operate on their tracks, correct?
A. Correct.

Q. The FRA has regulations that apply and that regulate and governs railroads, correct?
A. Yes.
Q. Do you consider the FRA regulations -- do you call those, quote, operating rules?
A. My understanding, the FRA has regulations that require the railroads to have operating rules, so, i.e., they review the operating rules of the railroad through the FRA operating practices.
Q. As part of your work in this case, did you review the Norfolk Southern operating rules?
A. I reviewed them and that's where I am thinking that I remember the term "foul" but I -- I can't place it exactly. And I didn't use it. I am using in my Report Plate C, which is where a -- if an object is inside Plate C it would get struck.
Q. Did you make any notes -- we looked earlier at your computer notes. Did you make any notes anywhere in your work on this case where you indicated where the Norfolk Southern operating rules define being in the foul as anything other than being close enough to a track to be struck by oncoming equipment?
A. I don't think I made any notations.
Q. Can you cite me to any Norfolk Southern rules that contains the definition of foul that says

anything other than how I have defined it today?
A. As I sit here today, no, I could not.
Q. Given that we agree that if the locomotive had remained at the spot where the wheel fell onto the ties, off the inner curved rail of the derail, it would not have been in the Plate C or -- and it would not have been struck by the oncoming Norfolk Southern train; what is it that caused this train or engine to move from the point where the wheel came off the rail onto the crosstie to get itself into a position where it could be struck by the oncoming Norfolk Southern train?
A. What caused it?
Q. Yeah.
A. The consist was moving. The consist was moving down the track, and it is on a downhill grade coming towards the mainline. So that downhill movement, you know, the gravitational force, and the fact that it has to be moving to get to the end of the rail would be my answer as to why it was -- got to where it was; it had movement, it had inertia and it was going downhill with gravitational force.
Q. Why was the consist moving?
A. My understanding, it was -- it was being propelled by the industry locomotive, that it was

pulling the consist that way.
Q. Did you also understand that at the time that the equipment derailed there was an AIPC employee that was operating the AIPC engine or equipment?
A. I read that.
Q. He was operating it by way of remote control, correct?
A. That's my understanding.
Q. And he was operating from the rear of the train rather than from the front of the train, correct?
A. I don't remember -- I mean, I don't know.
Q. You don't know that one way or the other?
A. No, I don't know.
Q. It wasn't important to you?
A. I was looking at the track structure, I wasn't looking at the operations of how they were operating.
Q. Did you do anything in this case to evaluate the conduct and actions of Mr. Blanchett who was the AIPC employee who was operating the remote control equipment that day?
A. No.
Q. Do you know anything about how fast the equipment was moving at any point in time when Mr. Blanchett was operating it that day?

A. I do not, no.
Q. Do you know what the speed of the engine was at the time that it reached the point of derailment?
A. No, I do not.
Q. Do you know what the speed was at the time -- let's say in the one to two seconds before the locomotive came to a stop?
A. No, I do not know.
Q. Do you know how many cars Mr. Blanchett had attached to the locomotive that day?
A. My understanding, he had six loads attached to his locomotive.
Q. Do you know anything about the weight of the cars that he was -- I guess, he was pushing that day?
A. I would say he was pulling.
Q. That's right, because the locomotive was on the front end and he was on the rear end.
A. I don't know where he was but, yeah, the locomotive was pulling.
MR. RADECK: He is not that strong to be pushing them.
MR. WRAY: That's a railway term.

BY MR. WRAY:
Q. But go ahead.
A. What size cars they were, I do not know, I just assumed they were 100 ton cars, but that didn't read into my -- whether 100 ton or 125 ton, I don't know.
Q. You are talking about -- when you say 100 ton car, you are talking about just the weight of the car itself?
A. No, that -- no, that would be the weight of a loaded car.
Q. Do you know it was 100 ton that was the weight loaded or are you just guessing?
A. I don't know. I assumed it was just a normal size railcar, which I don't know in this case whether it was a 100 ton railcar or a 125 ton railcar.
Q. Do you know what the weight of the locomotive was?
A. No.
Q. What was the grade of the track in the direction that Mr. Blanchett was operating towards the Norfolk Southern mainline?
A. The -- the 1995, '94 plan, AF-0471, I know that number, showed it as -- it was going to be built at 1 percent grade.

Q. One percent descending or ascending as you move from the location Mr. Blanchett was operating toward the Norfolk Southern mainline?

A. It was going to be descending to the mainline -- Norfolk Southern mainline. I didn't measure it when I did my site visit but that's what the plan showed.

Q. Why didn't you measure it while you were out there? Just curiosity.

A. It was a little more technologically advanced than I could do by myself. I mean, you would have to -- to determine that, you would have to have surveying equipment come up and determine what the grade was.

Q. Did it matter to you whether it was ascending or descending grade or what the percentage was?

A. Yes, it mattered whether it was ascending or descending, which you could tell by looking at it that it was descending towards the NS mainline, but what the percentage of grade was, that I don't know.

Q. You said you weren't able to do it because of some technological challenges; what else did you need to be able to measure the grade?

A. Well, you would have to have surveying

equipment to go out there and -- and mark it, you know, determine what the grade was from one end to the other.
Q. I asked you earlier what caused the consist to be moving and you described for me some of the factors.
Would you agree that the speed at which the train was moving would impact how far it would move?
A. That would go into the inertia that's in the consist, so, yes, that would affect the movement.
Q. Would you agree that the weight of the locomotives and railcar that Mr. Blanchett was operating that day would be a factor in how far the train would move?
A. That would be part of the inertia.
Q. And certainly you agree that the degree of the grade would play a factor, right?
A. Right, gravitational pull.
Q. Did you do any type of simulations to determine where the locomotive and equipment would have stopped when operating at various speeds?
A. No.
Q. Did you do anything in this case to evaluate the movements of the locomotive and railcars Mr. Blanchett was operating from the point of

derailment, as you described it earlier to me, to the point it came to rest in the foul of the Norfolk Southern mainline track?
A. I did not do any scenarios.
Q. Did you do any type of simulations, scenario, calculations to show how far the engine would have moved if it had gone off the rails at a point further back away from the mainline track than where it actually did go off of the inner rail?
A. I did do some in my Report as to -- you know, with everything being equal, because the consist stopped on its own, and how far it would have to go back to, with the same conditions, stop at the same -- you know, same distance that it stopped at.
Q. We are going to talk about it.
I saw in your Report that you reached some conclusions that you think if the derail device had been moved further back it would not have reached the mainline track foul; is that one of your opinions in this case?
A. Yeah, it would not reach the Plate C envelope.
Q. My question to you is, did you do any type of simulation, calculation or other evaluation of how far it actually would have moved had the derail

device been moved further back?
A. I just took the same amount of space that it took to stop in reality and used that as the length it would take for it to stop in the same conditions.
Q. And by that what you mean is you took the measurements and information that the FRA inspector reported following this event and you just used those numbers, correct?
A. That's correct.
Q. You didn't do it -- you didn't do any evaluation or simulation yourself?
A. No.
Q. Now it is fair to say that once this engine went off the inside curved rail and it continued forward to the mainline track, you don't know what caused it to stop moving forward, do you?
A. What caused it to stop? It was basically friction and, you know, the running on top of the ties, it would slow it down, and that brought it to a stop.
Q. At some point the AIPC engine encountered the ballast rock that was lining the Norfolk Southern mainline track, correct?
A. Well, it would -- yeah, it was running basically on top of the ties. There is ballast there, and between the ties it may reach down into the

ballast, but, yeah, I am not sure. But whatever -- that would be part of the cause; any of the friction that it would hit would stop its inertia and cause it to stop.

Q. When you say it was running on the ties, you are talking about running on the ties on the track going towards the AIPC industry, correct?

A. Well, when it came off the tread of the rail and the wheels hit the top of the ties, at that point, as it was approaching the NS mainline track, it was running on top of the ties.

Q. Right. As it approached the NS mainline track but the AIPC engine never actually got onto the mainline rails themselves, correct?

A. That is correct, it never reached the NS mainline.

Q. But it did get to a point where it reached where the ballast line that goes along the mainline track, the AIPC engine reached that point, didn't it?

A. I am not sure where you are talking about but this is -- it is going in -- as it is approaching it is on the turnout, so it stayed on the ties; it never -- it never reached a hundred percent ballast. So when you are talking ballast line, what you said,

along the NS mainline, I am looking at away from the turnout you have a ballast line that's off the end of the ties. Well, in this case it never got off the end of the ties, it stayed on the ties all the way until it stopped.

Q. And it stopped short of the mainline track with the front end wheel in the ballast of the mainline track, right?

A. No, no. As it was approaching the mainline track, it -- the industry transitioned from normal ties and it went onto, I believe it was probably the turnout ties. And so it stayed on the ties, it never reached where it rested into the ballast.

Q. Okay. Did the type of ties that were in place, you called it turnout ties, did that have an impact on stopping the movement?

A. All of -- all of it had an impact because it would, you know -- it would impart a little bit of a force as it is traveling down. So that's what eventually stops the movement is, as it hit each individual tie on its way down, it was losing speed but it kept moving. You know, it wasn't -- it hadn't stopped until the point that it did stop. It had used up all of its inertia and the consist stopped at that point.

Q. If we wanted to know how far it would have moved had the derail been placed back fifteen feet from where it actually was on the day of this event, wouldn't you need to know details like speed and weight at the time of the -- it reached the point of derailment?

A. I would say the speed was probably consistent. Wherever he applied the brakes to it, if he applied the brakes, I am not sure what the operation of the locomotive was, but the speed did it when it finally hit the top of the ties. I mean, it was probably going that speed for a bit of difference -- or a bit of time there between the time it entered the derail until the time that the wheels came off.

Q. You didn't do any type of analysis to determine the deceleration rate from the time the wheels of the locomotive dropped off the rail onto the ties, did you?

A. Deceleration, no; it just stopped at that certain amount of distance from that point to the point of rest.

Q. Right. But if we assume, as you said earlier, that it was going a certain speed at the point it reached the point of derail and the wheel dropped off the rail onto the tie, as you said it did, it then

decreased speed from that point until it reached the stopping point, correct?
A. Correct.
Q. And you did no analysis to determine that rate of deceleration, did you?
A. That is correct, I did not.
Q. Let me ask you to go to your document production, to page Rusk 623 -- well, actually, let's back up. Let's start on 620, just so we can see what we are talking about.
Are you there, Mr. Rusk?
A. Okay, 620?
Q. Yes.
A. Yes.
Q. And you see this is a document that is labeled: Norfolk Southern Railway Company Specifications For Design and Construction Of Privately Owned Industry Tracks.
Do you see that?
A. Yes.
Q. And this is a document you relied upon in your work in this case, correct?
A. I did review it during my work on this project.
Q. You cited it extensively in your

Supplemental Report, didn't you?
A. I would have to -- my Supplemental Report?
Q. Yes.
A. Well, I am not sure if it was in my Original Report, if I used this one or the 2010 document, but I did research it and I did have it in my file.
Q. Your Supplemental Report just included your Original Report plus some new information, right?
A. Correct. So I am not sure if I -- I would have to go through here and see what -- and see what -- if I did actually reference this.
Q. Well, we can look at it in a second.
But you don't know off the top of your head whether your Report in multiple places accuses Norfolk Southern of violating this policy?
A. I had it in here that they didn't comply with the Norfolk Southern Specifications For Design and Construction of Privately Owned Industry Tracks, but I don't know if it was the 2020 version or the 2010 version or a different version of this particular manual.
Q. Okay. Well, regardless of what version it is, this is the document that you cite in your

Report and say Norfolk Southern violated repeatedly in your opinions in this case, correct?
A. Again, could you point out a place where that's in my Report?
Q. Are you telling me you don't know?
A. I don't know if it was 2020 or a different year.
Q. Don't worry about the year. The policy --
A. Oh, if you are just asking me about this, about the NS Specification For Design and Construction, this document is in various -- I mean, we have been given this -- the latest NS-produced documents, we have '89 or '88, '94, 2003, 2005, 2010, I think we got a 2011, so there are a lot of them that came up. I had this in my file so I produced it.
Q. You keep focusing yourself on the year of the document; I don't care about the year of it.
Did you rely upon a document that is captioned Norfolk Southern Company Specifications For Design and Construction of Privately Owned Industry Tracks, and do you say in your Report in more than one place that Norfolk Southern violated that policy?
A. And I included in my Report, basically in Exhibit F -- and I don't have Exhibit F here in front

of me --
Q. I have got them.
A. -- but I don't know what the year is on that one.
Q. Is that a yes or no?
You keep going back to the year. I am saying forget about the year.
A. I am going back to the year because it is important because this, you are pointing me out, is July 2020. And I don't know what my exhibit -- right off the top of my head, what year that was of this -- what version of this document because NS changes its documents kind of frequently.
Q. What version did you rely upon in your Report when you cite to it?
A. I would have to look at my Exhibit F.
Nope, wait a minute, that is Standard Specification but that's material. It is Exhibit H.
(Exhibit 7 - Exhibit H of Mr. Rusk's Report.)
BY MR. WRAY:
Q. Mr. Rusk, I have handed you what we have marked as Exhibit 7.
Do you recognize that document?
A. I do.
Q. And what is it?

A. It is Specification For Design and Construction of Privately Owned Industry Track and it is dated July 2020.

Q. And let's look at Rusk page -- or Rusk 620 from your file that you generated; is that not the same document?

A. Yes.

Q. And when I asked you earlier did you cite to this multiple times in your Report, you didn't know that this was the document you were citing in?

A. Like I said, I have -- since February we have had a number of new documents put in, the same manual that I looked at for a lot of different years so, no, I did not remember exactly which one it was.

Q. But you didn't go back and change -- when you did your Supplemental Report, you didn't go back and change it to reference any other date for this policy, did you?

A. No, I didn't change it, I left my Original Report intact.

Q. And then let's skip down to page 624 -- or I am sorry, Rusk 623.

A. Okay.

Q. And read for the record section 2.01.8 where it defines fouling a track. What does it say?

Read it for the record.
A. This says: Fouling a track. The placement of an individual, or equipment in such proximity to a track that the individual, or equipment could be struck by a train, engine, or other on-track equipment, or in any case is within four feet of the field side of the near running rail.
Q. And this is the definition of fouling the track in the document that you cite in your Report and that you accuse Norfolk Southern of violating, correct?
A. Of the -- was inside -- pardon, let me back up.
What was that again?
Q. I said this is the definition of fouling a track that appears in the document that you cite in your Report and you contend Norfolk Southern violated; isn't that correct?
A. They violated the items in this guideline.
Q. That's not what I asked you.
A. You are asking about fouling a track.
Q. I am asking you if the definition of fouling a track that you just read appears in the document that you cite in your Report and that you accuse Norfolk Southern of violating; yes or no? Does

that definition appear in that document that you cite?
A. I stated that NS did not comply with items of this document dated July 2020. I am not sure that I had anything about 2.01.8.
Q. That's not what I asked you. We can be here all day, Mr. Rusk.
A. Okay.
Q. I am asking you a very simple question.
Did you cite and provide me as Exhibit H the Specifications For Design and Construction of Privately Owned Industry Tracks dated July 2020?
A. Did -- did I reference this document in my Original Report? Yes, I did do that.
Q. And do you say in both your Original Report and your Supplemental Report that Norfolk Southern violated certain provisions of the manual that you marked as Exhibit H?
A. They did violate certain provisions of this document.
Q. And that's an opinion you hold in this case, that Norfolk Southern violated the provisions set forth in this document, correct?
A. Yes.
Q. And the only question I asked you is, since you relied upon that document and you accuse my

client of violating it, why didn't you use the definition of fouling a track that appears in that document instead of giving me some definition from Part 214 earlier today when I was asking you that question?

A. I didn't really look at that, fouling a track, in here, in this one.

Q. You agree that this is a valid definition of fouling a track, correct?

A. That is in this document, yes.

Q. And it is recognized in the railroad industry that you have been a part of for 30 years?

A. Yeah, the FRA has guidelines and regulations stating that fouling a track for individuals is within four feet from the rail.

Q. And we all agree, don't we Mr. Rusk, that if this AIPC engine had remained in the position where the wheels dropped off the inside curve rail onto the ties and not moved from that spot, it would not have been fouling the Norfolk Southern track as set forth in this definition, would it?

A. If it set still right at the point where the wheel hit the tie and didn't move another inch, it would be outside this -- outside of Plate C and it would be outside of this.

Q. It would be outside the foul as defined in this policy, wouldn't it, Mr. Rusk?
A. It would be outside Plate C and outside this.
Q. Do you want to keep doing this all day? Why do you keep saying Plate C? I didn't ask you a thing about Plate C.
I said would it have been outside the foul as defined in this rule? I don't care about Plate C.
Tell me, would it or would it not have been outside the foul as defined in this rule?
A. If the locomotive hadn't moved an inch, it would be outside of four feet.
Q. And it would not have been in the foul as defined by this rule, right? Why will you not just say that? We all know it is true.
A. It would not be in foul of this statement 2.01.8, fouling a track.
Q. And you can't cite me anywhere in your Report or in any of your notes where there is any other definition of foul beyond this one, can you?
A. I don't think I mentioned foul of track.
Q. Let me ask you one other thing since we are here.

Let's go back up to Rusk 622.
Are you there?
A. Yes.
Q. And do you see on -- in that introduction section, third paragraph down in bold and all caps, a provision that says, and I am going to read it: INFORMATION CONTAINED WITHIN THESE SPECIFICATIONS APPLY TO PRIVATELY OWNED INDUSTRY TRACKS AND DO NOT APPLY TO TRACKS OWNED OR TO BE OWNED BY THE RAILWAY COMPANY.
Did I read that correctly?
A. Yes.
Q. And in your Report you say that the section of track where the Norfolk Southern derail was located was owned and maintained by Norfolk Southern, correct?
A. That's what they -- the siding agreement called for, yes.
Q. That's what you say in your Report, right?
A. Yes, that's what it calls for.
Q. And this particular policy, which you cited and relied upon in your Report, says it does not apply to tracks owned or to be owned or by the railway company, correct?
A. That's what it says in the 2020 version.

Q. Well, did you look to see if that same language appears in the earlier versions that were in place when this track was constructed?

A. No.

Q. Would it surprise you if it had that same language in there?

A. I don't know if it has -- a lot of things are added into this version that weren't in the '94.

Q. Let's assume for purposes of argument that it does appear in the earlier versions of that policy. If it does would you agree that these -- that the standards, provisions, policies, in this particular document that you cite in your Report would not apply to the track and location where the Norfolk Southern derail was located that we are dealing with in this case?

A. If it's in it, I mean, it's -- be what it says.

Q. What does that mean?

A. If it is in the document, it is there.

Q. Well, it is in the document. I just read it to you. Didn't you read it?

A. I mean in the '94 document.

Q. Okay. Well, I am asking you to assume that same language appears.

A. Well, I can assume but --
Q. Let me ask it a different way.
You didn't cite anywhere in your Report the '94 document, did you?
A. In my Original, no.
Q. In your Original or your Supplement?
A. Yes, I did in my Supplement.
Q. You cited to language in the 1994 report?
A. Yes.
Q. Do you have the 1994 -- I am sorry, I said report -- the 1994 policy?
A. It was in the documents provided.
Q. Throughout your Supplemental Report -- what number is that, what exhibit is that? Number 5.
In Exhibit 5 where there are references to the Norfolk Southern policy on industry -- or privately constructed industry tracks, are you citing this 2020 version that appears in Exhibit H?
A. In my Supplemental? I mean, in my supplemental section, I do not.
Q. What do you mean you do not? You don't cite Exhibit H in your -- no, no, I am not talking about the supplemental section of your Report. I am talking about the document that is captioned Supplemental Expert Report.

A. Yeah, it -- it is in there in my Original Report which is included in my Supplemental.

Q. Right. For example, if we look at page 8 of your Report, you say: Norfolk Southern has published additional specifications for design and construction of industry tracks. The publication, titled Norfolk Southern Railway Company Specifications For Design and Construction of Privately Owned Industry Tracks, provides requirements for the design and construction of industry tracks, including requirements on the placement and construction of derails, as well as double switch point derails, on industry tracks. (Exhibit H.)

Did I read that correctly?

A. You did.

Q. And Exhibit H is this 2020 manual that we have been looking at, correct?

A. Correct.

Q. And I take it you wouldn't have cited that in your Report if you didn't think it applied, right?

A. At that point in time that was the only document I had; NS hadn't provided -- or provided any documentation that would have been current at the time of construction.

Q. But since that time you told me that you have gotten the policies that were in place and current at the time of construction, correct?

A. Correct.

Q. Why didn't you go back and change your Report and cite to the policies that were in place at that time if you thought they were pertinent or relevant?

A. I mean, I didn't change it, I just added supplemental information.

Q. You also cited -- let me see if I can find it.

I have another document that we will mark as Exhibit 8.

(Exhibit 8 - Exhibit F of Mr. Rusk's Report.)

BY MR. WRAY:

Q. And that was Exhibit F to your Report, correct?

A. Yes.

Q. And you contended that this policy applies to Norfolk Southern and that Norfolk Southern violated this policy; is that accurate?

A. I think I used the definition of a derail from Exhibit F.

Q. If we go to page 173 in your materials,

Rusk 173; let me know when you are there.
A. Yes.
Q. And the materials -- or the document beginning at Rusk 173, it is the same document that's Exhibit F to your Report that we marked as Exhibit 8, isn't it?
A. Yes.
Q. If you scroll down, then, to Rusk 178, there is a section that is labeled G -- I don't know if that is GI -- yeah, GI-1, Intent of Contract; do you see that?
A. Yes.
Q. And it says: The Work to be performed under this Contract consists of furnishing all materials, unless furnished by the COMPANY, superintendence, labor, equipment, tools, supplies and transportation required to complete the project and the carrying out of all the duties and obligations imposed by the Contract.
Do you see that?
A. Yes.
Q. Would you not agree with me, Mr. Rusk, that this policy is designed to apply to some type of contract between Norfolk Southern and outside contractors who may be doing work on Norfolk Southern

property?
A. It says the intent of contract, I don't know if this is part of the contract.
Q. You don't know if it is part of what contract?
A. A contract.
Q. Okay.
A. I mean, standing alone it is not part of the contract, so I don't know if it is meant to be part of a contract and when it is part of a contract it is there or if it is -- or if it is just a standard specification for design and construction.
Q. If you just scroll down through that first page and the next page, doesn't it repeatedly use the word "contractor" in all caps and talk about various obligations that the contractor is supposed to have?
A. Yes, I see that.
Q. Do you have any evidence in this case that the portion of the railroad track owned and maintained by Norfolk Southern at the AIPC facility was constructed by a contractor as opposed to Norfolk Southern crews?
A. I don't have any information that it was constructed by anything other than NS forces.

Q. And if that is true, wouldn't you agree with me that this particular document that you cite in your Report as Exhibit F does not apply to the AIPC track that we are dealing with in this case?
A. I would say that they're -- NS' definition of derail would be pretty much the same, as their -- NS' definition of derail.
Q. We know in this case that there is an MW&S Policy 100 that specifically does apply to Norfolk Southern constructed track and derails, don't we?
A. Yes.
Q. And that has a definition of derail in it, doesn't it?
A. Yes.
Q. Why would you contend that the definition of derail in the MW&S policy that is specific to derails does not apply to any work done at the AIPC facility?
Are you going to answer my question?
A. You stated that the MW&S standard procedure for derails has a definition of a derail, and I was just looking in here to see if there was a definition of a derail included in here.
And I am not seeing a definition of derails in here, unless it is somewhere else in the

MW&S standards. I am looking in MW&S Standard 100, Derails.

Q. Okay. Well, that's fine; if it doesn't have one, it doesn't have one.

But you would agree with me, the MW&S Standard Procedure 100 on derails does apply to this location where this track was installed, right?

A. Yes.

Q. On page 5 of your Report, section 7.0, you captioned that: Applicable Norfolk Southern and Industry Standards.

Do you see that?

A. Yes.

Q. And you say: The NS provides guidance to its employees and their industrial partners on the proper track construction and maintenance procedures for industrial tracks. This guidance includes the NS MW&S Standard Procedure Manual and the Specifications For Design and Construction of Privately Owned Industry Tracks.

Do you see that?

A. Yes.

Q. Those are the two policies we looked at earlier, correct?

A. Yes.

Q. And you don't mention a reference in this section at all, MW&S 100, do you?
A. No.
Q. Why not?
A. MW&S Standard Procedure Manual includes the 100.
Q. Which one includes MW&S 100?
A. Well, MW&S Standard Procedure 100, Derails is included inside NS MW&S Standard Procedures Manual; it is a part of that.
Q. Show me where that is.
A. I don't have the full manual.
Q. You do, it is in your materials.
A. No, it is not.
Q. We just looked at it, Mr. Rusk. Do you want to look at it again?
A. Are you talking about --
Q. Well, that's the snippet you attached to your Report.
A. Yes.
Q. I am saying if you go to page 620 in your document production, which you told me was your file for this case --
A. Yes.
Q. -- scroll down through there. Don't you

have the whole manual?
A. 620 is not part of the Standard Procedures Manual. 620 is the Specification For Design and Construction of Privately Owned Industry Track.
Q. I am sorry. So let's go back to page 173.
A. Okay, I am back there.
Q. Okay. Is that the manual you are talking about, 173?
A. No.
Q. Where is that, then, referenced in your Report?
A. Well, that's -- Standard Specifications For Materials and Construction is in my Report on page 7.
Q. You also included in your file some design drawings from BNSF and I think UP as well, didn't you?
A. Yes.
Q. And you would agree that Norfolk Southern is not bound by any policies or drawings from BN or UP?
A. No, I didn't -- I didn't say they were bound by these other drawings.
Q. And the regulatory agency which governs the railroads is the Federal Railroad Administration?

A. Correct.
Q. You also cite to AREMA; that's an industry trade group?
A. Yes.
Q. They have no regulatory authority over the railroads, do they?
A. No, they provide information.
Q. Now as part of your work over the years as an FRA inspector, did you inspect railroad track for compliance with FRA regulations?
A. Yes, I did.
Q. Did you ever issue a citation to a railroad for not having a derail device located at a proper spot?
A. FRA doesn't have any regulations as to a proper spot.
Q. Right, and that's what I was ultimately getting to, Mr. Rusk.
There is no FRA regulation that tells a railroad that a derail must be located a specific number of feet from a mainline track, does it?
A. That's correct.
Q. That's solely up to the railroad to determine where it should place that derail device consistent with its own internal policies, correct?

A. That would be correct.
Q. In this case you did see evidence which was provided to you that the FRA had been out to this AIPC industry track and had done, I think it was, four or five inspections in the year or two before this event occurred, correct?
A. I am going to disagree with that statement. I didn't see any information that said that the FRA inspectors went up into that industry track.
Q. You didn't see any evidence that they had ever been on that AIPC property?
A. No, they went through on the mainline and inspected the mainline and inspected the mainline turnout for NS that went to the property, but I didn't see any information that stated that they went up. Typically FRA inspectors don't go up there; typically if they are on the mainline, they are going to stay on the mainline. Unless they happen to look over and see something interesting, then they might walk up, but typically they are not going up there.
Q. So you don't know if they did or didn't in this case, though, do you?
A. No.
Q. You do know that there were never any citations issued to Norfolk Southern for the location

of this derail at any time prior to this accident?
A. I am not aware of any.
Q. Are you aware of any violations of the FRA track inspection requirements for this track that were ever cited to Norfolk Southern?
A. No, I am not.
Q. Were the only depositions that you reviewed in this case those of Justin Brooks, Foster Peterson and Dustin Bell?
A. I believe that's correct.
Q. You did not review the deposition of the FRA investigator who went out and whose notes you relied upon as part of your work in this case, correct?
A. If you are talking about the state inspector?
Q. Uh-huh.
A. Not an FRA inspector.
Q. Mr. Fianchino?
A. He is the state inspector.
MR. WRAY: F I A N C H I N O.
BY MR. WRAY:
Q. Whether state or federal, you didn't review his deposition?
A. No.
Q. On page 4 of your Report you describe the

AIPC Industry Track Number 1 as being located north of and parallel to the NS main track; is that correct?

A. Yes.

(Exhibit 9 - Exhibit D to Mr. Rusk's Report.)

BY MR. WRAY:

Q. Hand you what we marked as Exhibit 9. This was provided to us as Exhibit D to your Report.

Do you recognize these notes and the attached photographs?

A. Yes.

Q. Are the notes that appear here on the legal pad, are those your notes?

A. Yes.

Q. It looks like they were made in connection with a site visit that you did on July 10, 2024 in Columbia, South Carolina at the AIPC facility?

A. Yes.

Q. And this was the location where our accident occurred, correct?

A. Correct.

Q. The measurements that are reflected here, are those all measurements made by you?

A. Yes.

Q. And the photographs, were those all taken by you?

A. Yes.
Q. And the log here, is that describing to us what we are seeing in each of the photographs?
A. Correct.
Q. Now I am going to just skip over -- the photographs actually aren't numbered, so I am just going to do them in the order they appear in the packet.
And the first photograph that I am looking at is this one here, the third page in the exhibit.
Do you see that?
A. Yes.
Q. So the photograph that appears at the third page, you took this photograph, this is standing towards the AIPC industry looking out towards the Norfolk Southern mainline, correct?
A. Correct.
Q. And the rails that we see here in the picture, those are the derails that existed as of the date that you were there, correct?
A. Correct.
Q. You understood when you were there that these were not the same derail rails that were in place at the time this accident occurred, correct?

A. I am not sure. I know there was a rail added to the inside curve rail, it was longer than pictures at the accident site but I am not sure. I am assuming that the outside curve rail is the one that was there at the time.

Q. But when you say -- let's do this.

I'll let you use the -- if you would mark on there what you are referring to as the inside curved rail.

A. How do you want me to do this?

Q. Just put "inside" and draw an arrow to it.

And then label the other one. What do you call it, the outside curved rail?

A. I'll call it the outside.

Q. Okay. And let me see if -- let me see your picture so I can --

Okay. And which of the two rails are you saying had some additional rail added to it?

A. The inside.

Q. And do you know how much additional rail was added -- or how much length was added from what you observed on the day you were there versus what was there at the time of this incident?

A. No, I don't know.

Q. Was that important to you?
A. That's a question of how they put it together, and, you know, where they had to make a cut because the inside curved rail was broken at the end. And so I am not sure how much they cut off and what they -- what they added to it, so that's a guess. I mean, from the -- typically what I am looking at is from that joint to the end of it, that was all added.
Q. One of the things you did do was you made some measurements to determine track centers, correct?
A. Yes.
Q. And you say you measured from the end of the inside curved rail; is that right?
A. No.
Q. Where did you measure from?
A. I measured from the center line of the mainline track to the center line of the industry track at the location where the end of the curved derail lead was.
Q. Okay. Where was the end of the curved derail?
A. So I am looking at this right here, because I noted the location of that -- end of that -- end of that rail from the mainline switch point. And so I took a center line measurement -- track center

line measurement from the center line of the mainline to the center line of the industry track at that location, which was, I think, 133 feet from the mainline points. So all of my track center lines were taken from the mainline to the industry track, not to the derail. There is -- the derail is not a track.

Q. Let me ask you to look at page 10 of your Report.

A. Okay.

Q. And you have got a paragraph that begins: During my July 2024 site visit.

Do you see that?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. You say: I located the points of the DSPD and the 15' Clear Point.

Correct?

A. Correct.

Q. And then talks about the measurements you made. And the last sentence there says: At the end of the inside curve rail, I measured the track centers at 12 feet.

A. Correct.

Q. Isn't that what you said?

A. Yes.
Q. So where is the end of the inside curved lead rail from which you made these measurements; that's what I am asking?
A. Here is the inside -- end of the inside rail, so I took the measurement from the mainline to the center line of this track at that point.
Q. All right.
A. I didn't measure from the mainline to the curve lead rail, that had nothing to do. Just because I measured from the point and I located where that end of that rail was, I had a distance from the mainline point, so I wanted to know what the track center line from mainline to AIPC industry track track centers.
Q. Okay. So what I asked you to do was put an X on the spot that you describe in your Report that you said "at the end of the inside curve lead rail, I measured the track centers at 12 feet." Put an X of what you are calling "the end of the inside curve lead rail" where you did that measurement.
A. I am not sure what you want me to do here.
Q. I want you to put an X on the spot that you describe in your Report.
A. Yeah, well, the end of the rail is right

there, too. And I am going to put an X there, from the center here to the center over here.

Q. I am going to get you to do that in a second. All I want you to do right now, you have got a very specific statement in your Report, I want you to put an X at the spot you are describing on page 10 of your Report that I just read.

A. A track center is center line to center line.

Q. I didn't ask you about track centers.

A. I know.

Q. Listen to my question, Mr. Rusk, we will get through a lot quicker.

You say in your Report: At the end of the inside curve lead rail, I measured the track centers at 12 feet.

All I want you to do is put an X at the point that you say in your Report is "the end of the inside curve lead rail" where you did that measurement.

A. Okay.

That is just about -- that's just about at the center. Okay.

You want me to put an X at the center line where I took the measurement from, right?

Q. No. I want you to put an X at "the end

of the inside curve lead rail," which is what you said in the Report is where you did the measurement.
A. I took -- I took a track center line measurement at that point.
Q. Okay. You took a track center line measurement at the point where you marked X, correct?
A. That's the center line of the industry track.
Q. And then if you would draw me an arrow from the point where you made the measurement to where you made the measurement on the mainline NS track.
A. You can't see the mainline very well.
Q. We can see it; just draw it over there.
A. So I don't know if it is the right angle or not. You want me to just draw a straight line?
Q. I want you to draw it as you measured it that day; that's what I am trying to understand, where you measured from and what you measured.
A. Okay.
Q. So draw it the best you can to reflect what you measured that day.
A. The way you take a track center measurement is you measure -- basically with one person, you measure from the rail here, from the gauge line of this rail to the gauge line of this rail. So

that's how I took the measurement, from here to here. And it was at the location -- at this location from the mainline points.

Q. Okay. Draw the line, that's what I have asked you to do. Draw me a line that shows where you made the measurements from and to.

Okay. So the line that you drew through the X represents, on the day you were there doing your site visit or inspection, the measurement you made to determine the track centers --

A. Correct.

Q. -- between those two spots, right?

A. Yes.

Q. And my question to you earlier is, you understood when you were out there that day that the inside curve rail had been extended out further --

A. Yes.

Q. -- toward the mainline track than where it was at the time this accident occurred, didn't you?

A. Yes.

Q. Why did you not measure from the point where the inside curve rail was actually located at the time of this accident which you told me earlier was the point of derailment?

A. I was just tracking track center lines,

distances at various points, and I had three points because I measured it down the track, so I was measuring down the track. So I took one at the end of the inside curve rail, I took one at the end of the outside curve rail, and then I found 15-foot clear point in there. So I took three track center measurements, all done the same way, from the near rail of here to the -- to the corresponding rail of the industry track. And I had -- so I located three track centers just to see what the track centers were at the various locations and how it was -- what was -- you know, how the track centers were increasing.

Q. But the three measurements that you made that you just described to me all only showed the track centers for those locations at the time of your July 2024 site visit, correct?

A. Yes.

Q. They did not measure or show what the track centers were at the time of our accident, did they?

A. No -- well, I was there on the day I was there. So the track doesn't look like it has changed much; it was still the same configuration, it looked like, as when it was. But, I mean, I wasn't there; they didn't take track measurements on the day of the

accident that I know of.

Q. Right, but you had photographs that were taken the day of the accident that showed exactly where the rail ended at the time of the accident, didn't you?

A. Yeah.

Q. Both the inside curve rail and the derail and outside curve rail and the derail, correct; you had those pictures, didn't you?

A. Yep. I could have stated this a little differently if -- because what I would mean to say here is -- let me get back to my site visit -- is that at 1 plus 37, which was the end of the 137 feet from the mainline switch points, I took a track center measurement. I took another track center measurement at 144 feet from the mainline points. And then I also took -- found a 15-foot clear point which is at 153 feet. So I took those three track center points. They just happened to be where the end of the curved rail because I'd measured out and I marked point off. And I just took that as the same measurement so I didn't have to go back and measure another spot and take a track center measurement.

Q. They happened to be at the same spot where the end of the curve rail was on the date that you were there doing your site inspection, correct?

A. Yes.
Q. But in this case, what you were trying to analyze and what you did analyze in your Report and reached an opinion was that the Norfolk Southern derail device was not installed at the proper location at the time this accident occurred; isn't that an opinion you have?
A. Yes, it is an opinion I have because the drawing stated that it was -- should have been put at station 2 plus 00, or 200 feet, away from the mainline points. That's where it said it was supposed to be put and so -- and it wasn't installed at that location.
Q. Well, you don't know where it was installed at the time it was originally built back in the 1990s, do you?
A. I would say it was installed -- they measured -- NS, or somebody, measured it at 185 feet from the mainline points.
Q. And what's the basis for that?
A. The drawing that was prepared in 1996.
Q. The second AIPC construction track drawings is what you are talking about?
A. Yes, it showed it as constructed.
Q. And my question to you was, if you wanted to know where the derail device was constructed and

located in relation to the clear point, which was something you were analyzing in this case, at the time of the event, why did you not measure the track centers from where the derail -- end of the curved rail on the derail was located at the time of the event as opposed to at the time you were there?

A. Because I didn't know exactly where -- if that was important to me I would've -- wouldn't know where exactly it was.

Q. Why couldn't you look at the pictures that were taken by the inspectors, investigators who were on scene that day and determine where it was?

A. Because they added rail and, again, I don't know where -- how they added the rail and where they added the rail.

Q. So since you didn't measure that, is it accurate to say that you don't know where that derail was located in relation to the clear point on the day this accident occurred, do you?

MR. RADECK: Object to form.

THE WITNESS: The derail is the thing from switch points to the end of the curve lead rails, this whole thing is a derail. So it is not at the end of it, it is the whole thing. And so the derail was supposed to be with the switch

points at 200 feet from the mainline, that's where the switch points were supposed to be of the derail. And on that drawing the clear point was 1 plus 60, or 160 feet; it was 40 feet between where the derail was supposed to be placed and the clear point, and -- which would have taken and allowed the entire derail to be outside the clear point.

Now I didn't -- I was more interested in the 15-foot clear point, where it was in relationship to the derail switch points, how close it was, and so that is what I was looking for. But I was also looking at -- well, I had measurements denoted on my plan, you know, like 137 feet to this spot, 144 feet to that spot, I went ahead and took track centers at those locations as well. And then I found -- like, give me an idea of where the 15-foot clear point was located at, and I was able to hone in to where it was and I found it.

MR. WRAY: So I'll move to strike that as nonresponsive.

BY MR. WRAY:

Q. My question to you was do you know what the distance was from the track centers on the date of this derailment from the point where the inside curved

rail ended on the industry track over to the mainline track; do you know what that distance was at the time of this accident; yes or no?
A. From -- let me -- from the track center of AIPC Track 1 to the center line of the mainline at the location where the inside curve rail was located at the time of the accident?
Q. Yes.
A. No, I do not know.
Q. And you didn't try to make that measurement when you were out there that day, did you?
A. No.
Q. And you have never tried to do it any time since, have you?
A. No.
Q. And the idea behind that curved rail is that when the equipment, whether it is a locomotive or a railcar, drops off the rail, you want it to drop off the rail in a spot where it is not in the foul of the mainline track, correct?
A. That's -- the NS says it's -- you know, different points it says -- in the '94 it says it has to be back past the clear point.
Q. The clear point is defined as what?
A. Fifteen-foot clear point.

Q. And you don't know whether this derail device, the end of that curved rail, was at the clear point or not back when this accident occurred, do you, because you didn't measure it?
A. It -- it is not because, when I measured it, even the outside curved rail was inside the clear point.
Q. You measured it at a time when the rails were not in the same location, though, right?
A. The outside curved lead rail was -- is -- was not changed, in my opinion.
Q. So how did you measure the clearance points from the outside curve rail; where did you measure it from?
A. I didn't measure to the derail.
Q. What did you just tell me that you measured from the outside curve rail?
A. At that location where that is, I measured clear point or the track center from here to the mainline.
Q. Right, that's what you showed me with this line that we have drawn on --
A. No, this is from the end of the inside curved rail.
Q. Okay.

A. I measured across there. And then at this point I did the same type of measurement across there.
Q. Okay.
A. And that is 144 feet. It was just -- since I located it, that's what I -- what I measured so I didn't have to locate another point to take a measurement. I wasn't interested in the distance from the mainline to the derail.
Q. Well, show me in your Report where you say you measured from the outside curved rail to the track center.
A. Well, that's how you measure track centers.
Q. Just show me in your Report where you did that measurement and show me what you came up with; where is it?
A. Well, you just pointed it out to me. So this would be the -- on page 10.
Q. Yes?
A. That's what I measured.
Q. That says to the inside curved rail.
A. At the location where the end of the inside was, but the track measurements are defined as between track centers. Derail is not a track, you

cannot measure to a center line of a derail; it is not -- by definition you cannot do that, that's not a track.

So the measurement is -- and I just took it at that particular point because I had already measured it from the mainline switch point to there and I knew how far it was so I could correlate it between there and the other spots.

Q. So are you saying that the length of the inside curved rail and the outside curved rail were the exact same on the day you were there?

A. I don't understand your question.

Q. You drew on the diagram --

A. Exactly the same?

Q. Yeah.

You drew on the diagram and pointed out to what you called the inside curve rail and the outside curve rail, correct?

A. Yes.

Q. On the day you were there, was that inside curve rail and the outside curve rail the same length?

A. No.

Q. So wouldn't it stand to reason, then, if you made a measurement from the outside curve rail, it

would give you a different track center measurement than measuring from the inside curve rail?

A. I took -- the track center measurement is from AIPC Track 1 center line to the center line of the main track.

MR. RADECK: Guys, we are going to be here all day if you don't stop talking past each other.

THE WITNESS: I am not sure how to explain it to you.

BY MR. WRAY:

Q. I am just trying to understand what you have done, and you, in my view, keep giving me different descriptions of what you did and what you didn't do and it doesn't make any sense to me.

MR RADECK: Object to the form.

MR. WRAY: And I don't think it is going to make any sense to a jury.

MR. RADECK: Object to form.

MR. WRAY: That's certainly an appropriate objection, that's why we are struggling here.

BY MR. WRAY:

Q. In this case you did read the deposition of Justin Brooks?

A. Yes.
Q. And you saw where he took track center measurements and concluded that they were well in excess of 15 feet; you saw that, didn't you?
A. He was measuring track centers to the derail; they are trying to include the derail in track centers. That is not how -- there is no definition of track centers to a derail; it is a derail, it is not a track.
The track centers would go from the center line of Track 1 to the center line of the mainline. He was trying to take it to a center line of what he was determining to be the center line of the derail which is not a track center; it is not a point of clear -- a clear point.
Q. So you would say that Mr. Brooks didn't do his measurement correctly and that's why you disagree with his numbers?
A. Yes, I would say that.
Q. Did you understand that the Norfolk Southern mainline track in the locations that are shown in your pictures at pages 3 and 4 was destroyed as part of this derailment?
A. I know there was damage to the NS main track, I am not sure how far up it was damaged coming

back to the west.
Q. Do you know whether it was damaged all the way up to the point of the switch points on the mainline track?
A. Yeah, the turnout was damaged.
Q. And that turnout and the switch points there had to be replaced following this derailment, didn't they?
A. Yes.
Q. The measurements that you made from -- on the day of your visit were all from the switch points as they were located at the time you were there, correct?
A. Yes.
Q. Did you make any effort to determine where those switch points might have been located prior to this accident and the reconstruction of that track?
A. No, the existing -- the original turnout was destroyed.
Q. Was that of any importance to you?
A. No.
Q. Why not?
A. Because it didn't have the points of the -- the importance here was the clear point, where it was located, and the ownership demarcation between

NS and AIPC.
Q. Let me see the photographs for a second, that exhibit.
A. I do want to go back and correct a statement that I made when you asked me about the location of the mainline point, because the point of ownership was supposed to be 2 plus 00, and when I wheeled it off and measured it, I did measure from point of switches of the mainline turnout to the property line between NS and AIPC as being 200 feet, 2 plus 00. So I would say the mainline points are in the position they were at before.
Q. Mr. Rusk, what I did was I -- in the bottom right-hand corner, I just wrote page numbers down on Exhibit 9 so that you and I could look at the same photographs and make sure we are looking at the same thing.
So let me ask you to go to the photograph that I have labeled 10 as part of Exhibit 9, page 10.
A. Okay.
Q. And I want you to take that same marker -- because you said earlier it was hard to see the track centers on the other exhibit I asked you to mark. So how about do this, draw that same line and show me where you measured track centers when you were

out there that day, from the industry track over to the mainline track, the point where you started and the point where you ended.
A. Well, I can't -- it is in the shade up there at the ends of the rail.
So I am going to go from, say, the inside at that point, 137 feet from the mainline points where I took track center measurements, so it is going to be from here to here, across there. So I am going to mark it that way, okay?
Q. Mark it however you want to that shows me where you made your measurement that day; that's what I want you to show me.
A. This -- it's right there, so it is going to be from here.
Q. Okay.
A. And that's at the inside curve lead rail; 137 feet from the mainline, I'll put it that way.
Q. Okay. So if we look at what you did on page 10 of Exhibit 9, it looks like you drew a line from the rail to the near rail of the mainline track?
A. Yes.
Q. When I asked you to do that earlier on page 3, did you draw it from that same rail?
A. Yep.

Q. Okay. So --
A. The north rail on the mainline here and the north rail of the mainline there.
Q. What's the gauge of the industry track in that location?
A. It is supposed to be 56 1/2.
Q. Okay. And then what you are telling us and what your Report reflects is your measurement from this rail as shown on page 10 to the near rail on the mainline track, you said was 12 feet?
A. Yes.
Q. Did you actually make a measurement where you went out into the center -- what I am calling the track center of the industry track and measure to the track center of the --
A. You mean from here to here?
Q. Yes. At any point along the way?
A. No. As a single person you really can't do that.
Q. What do you mean by that? Why can't you do that as --
A. Well, I mean, you hook it onto the gauge side of the rail here and you measure to the gauge side of the rail of the corresponding rail on the adjacent track; that's how you take a track center measurement

by yourself.

Q. And why did you choose that spot as the location to make your measurement?

A. Because when I started wheeling, I marked that spot because that was the end of one of the curved lead rails, and I did it at the end of the other curved lead rail. And then I measured track centers at those two locations after I marked it and put a distance down. Then I took track center measurements at those two locations. And then I also went and found the 15 point -- or 15-foot clear point and marked that and measured to where that was with my measurement.

Q. And this is where we got confused earlier -- or I got confused earlier. You just said again you made measurements at two locations.

A. Three locations.

Q. Okay. You said from the curve rail on the inside and the curve rail on the outside?

A. Yes, but I did the same measurement from the same rail here to the same rail on the industry track. I did not measure to a curved lead rail.

Q. Show me -- on the diagram show me where you did the second measurement, from what point to what point?

A. So I do the same thing.

Q. You can use page 10 if it is easier, or any of them. You can use any of them, just tell us what page you use.

A. So I gave you -- it is hard to tell in here what distances they are, but the first one was from -- okay. So this is going to go at the location of the outside curve lead rail, which is this spot right here, and I am going to measure to the corresponding mainline rail over here. And so I went from here to here, and that's track center measurements, from mainline to the center line of this track at that location, 140-something feet from the mainline point.

Q. And what was that measurement?

A. The track centers? At the end of the -- at 137 feet from mainline point, I measured 12-foot track centers. At 144 feet from the mainline switch points, I measured 13 -- 13-foot 4-inch track centers. And then 153 feet from the mainline points, I measured 15-foot track centers.

Q. So before we close this out, then, show me the third measurement where you got 15 foot; draw the line on the diagram to show me where that measurement was made, from where to where?

MR. RADECK: Do you want him to do all

three on this one?

MR. WRAY: It is fine with me, whatever he wants to do; it would be helpful to have them all in one spot.

MR. RADECK: Just do the other one from the inside and then do the 15 foot, just so we have it all on one picture.

THE WITNESS: All right. So --

BY MR. WRAY:

Q. And what page is this that you are annotating?

A. Four.

Q. Okay.

A. All right. So from the inside curve lead rail, I measured from here to here, across there. And then the 15-foot -- I am guessing here because I don't really know, is going to be from here to there.

Q. So if you would, then, just write out to the side, the first measurement is how far, starting at the top?

A. Track center measurements?

Q. Yeah. Is that 12?

A. Yep.

Q. So just write 12 next to that one.

And then 13.4 for the second one.

And 15 for the third.
And do you know where the inside curve rail ended -- where the end of the inside curve rail was at the time of the accident; do you know?
A. I am assuming it was right there close to that joint bar.
Q. Circle the joint bar that you are talking about on page 4.
A. I don't know that that's the end but I just would assume that because it's -- they had a small piece from the end of the points to the joint bar, which I have pretty much covered it up, but it is somewhere in there. Do you want me to put it on here?
Q. If you can.
A. I don't know if I did very good with that one.
(Exhibit 10 - Photographs.)
BY MR. WRAY:
Q. Show you what we have marked as Exhibit 10.
And these are a series of photographs that I represent to you were provided to us by the South Carolina Office of Regulatory Staff.
And you saw these as part of your work in this case, correct?

A. Yes.
Q. And you would agree with me, this reflects the rail that was actually in place at the time of the derailment, correct?
A. Correct.
Q. Before any rail had been added to the end of the inside curved rail, right?
A. Correct.
Q. You would agree that this is what is called a left-hand derail?
A. Yes.
Q. And by that it -- I mean it is designed to throw equipment or a locomotive off to the left away from the mainline track, right?
A. Well, yes, it is going to the left but it would be away from -- yes, we'll just do it that way, yes.
Q. And that's what happened here, right? When this train went off, it went to the left, the AIPC engine, it went to the left off the rail, right?
A. It went to the left side of the Track 1 running rails, yes.
Q. And that would be away from the mainline track, correct?
A. Yes.

Q. And then, as you described to me earlier, due to the forces of gravity, inertia, speed, weight, it was propelled from that point where -- from the point of derail until it ultimately came into the foul of the Norfolk Southern mainline track, right?
A. That's what appears it did, yes.
Q. And you note in your Report that Mr. Fianchino said that he measured the front end of the AIPC Locomotive Engine 2535 to be roughly 19 inches from the mainline track; do you recall that?
A. Yes.
Q. Did you see what Mr. Fianchino said about how he came up with that measurement?
A. No.
Q. Did it matter to you?
A. I didn't have his deposition, if that's what you are asking; all I had was the report that he wrote up and had that information.
Q. Did that measurement that Mr. Fianchino mentioned, the 19 inches, did it have any relevance to you in this case?
A. Yes.
Q. What relevance did it have?
A. Because it indicated how far inside of Plate C that the industry locomotive was.

Q. Is it fair to say that you relied upon that measurement, then, as part of your work in your analysis of this case?

A. Yes.

Q. Were you aware that Mr. Fianchino said that at the time he wrote down that 19 inch measurement, the Norfolk Southern mainline track was not there, it had been destroyed in the derailment, so he had to make a guess as to where it might have been?

A. I did not see his deposition.

Q. Is that of any importance to you?

A. I am not sure what was there and what wasn't there at the time so --

Q. I am not asking you what was there and what wasn't there. I am saying would it matter to you if Mr. Fianchino said that the 19 inches was really just a guess on his part?

MR. RADECK: Object to the form.

But you can answer.

THE WITNESS: So, I mean, I am not sure what the -- what he said. And also I am not sure how to answer or respond to you.

BY MR. WRAY:

Q. I am not asking you what he said. I am asking you would it matter to you whether it was really

19 inches or maybe it was further than that or less than that?

A. I used his measurements of 19 inches to do -- to come to a conclusion as to how close it was.

Q. Right. And if that measurement is not right, it was either further or shorter than 19 inches, then your reliance on that would be incorrect, wouldn't it?

A. Then that would be a difference, yes.

(Exhibit 11 - Excerpt from Fianchino Deposition.)

BY MR. WRAY:

Q. I am going to show you what I am going to mark as Exhibit 11.

A. Going back to whether you said the mainline was destroyed at that point. I am looking at a figure 23 in Secretariat's Supplemental Report, and it is showing the railcar still on the mainline there, so the track wasn't -- doesn't look like it is destroyed where the track was at this point.

Q. We can look at some other pictures if we need to.

But for now I want you to look at Exhibit 11. And I didn't print the title page which I meant to. But I will tell you, this is portions -- an

excerpt from the deposition of Mr. Fianchino, and this is page 82, line 20.

There was a question: You could tell that by a measurement you made or by your observations or both?

And his answer at line 22 was: It was -- it was a measurement with a guess on where the rail would have been because there was no rail.

Do you see that?

A. I see that.

Q. So at least according to Mr. Fianchino, that rail was gone at the time he was there, correct?

A. By his testimony here that's what he says.

Q. And if you look at the next line, 25, the question: Oh, because the accident took the rail out?

Page 83, line 1, answer: Yes.

That's what Mr. Fianchino said, correct?

A. I see that.

Q. So you don't know whether the engine actually stopped 19 inches short of the Norfolk Southern mainline track or not, do you?

A. I am taking his -- his measurement.

Q. But he just -- you just saw his testimony where he said his measurement was based on an

assumption because the rail wasn't there; isn't that what you just read?

A. I did read that and I just saw a picture that showed that the rail was there.

Q. I am going to ask you to look at page 7 of your Report. And there is a section there where you talk about AREMA; do you see that at the beginning of the second paragraph?

A. Yes.

Q. And you quote from a section from the AREMA manual on derails; do you see that?

A. It is from the Practical Guide to Railway Engineering that is published by AREMA but, yeah, it did have a definition of derail in it.

Q. And it says: Derails, the purpose of the derail is to keep tracks free of unsecured rolling stock.

Do you see that?

A. Yes.

Q. Was the rolling stock that was being operated by Mr. Blanchett at the time he went through the Norfolk Southern derail, was it secured or unsecured?

A. I am not sure how to answer that one because I am not sure about the -- if he had control of

it or not control of it, so -- I didn't see his deposition or do any research into how he was handling his car, so I don't really have a comment or an opinion on that.

Q. How would you define unsecured?

A. Well, if he didn't have control of it or if -- or had control of it and just ran through the derail; I don't know which one it was.

Q. Let me ask you to assume that Mr. Blanchett testified that he had the railcars coupled to the locomotive and he was controlling the movement using a remote control device; would that be secured or unsecured?

MR. RADECK: Object to the form.

THE WITNESS: I am not sure how the operating practices would look at that definition, so I would not be the correct person to ask if he has got control of his consist or not.

BY MR. WRAY:

Q. So you are the expert on derails; that's what you told me earlier, right?

A. On tracks. You are asking me about the operation --

Q. No. I am asking you about a definition of derail that you included in your Report.

A. Yes.
Q. And the definition of derail that you included in your Report says the purpose is to keep the track free of unsecured rolling stock. And you are telling me you don't know what the definition of unsecured rolling stock is?
A. It's rolling stock that is headed toward the mainline, it -- it doesn't have authority to be in that position. So with that it is -- you know, whether he had control of -- and I am looking at control, if he had control of his consist or not. So I am not sure if he had lost control and it was freewheeling, or he had control and he powered through it; I don't know. I look at secured as being he has got control of it and he just went through it.
Q. Where in this definition that you included in your Report does it talk about control or lack of control?
A. Well, that's -- in my mind that's when you asked me about control or non-control, so, I mean, that's what I would be looking at on that.
Q. I am just asking you on the definition that you included as a quote in your Report, you use a definition that says "free of unsecured rolling stock"; do you not know what that means?

A. Unsecured is rolling stock that is not supposed to be where it is. And this was not supposed to be in that spot, so he didn't have authority to be there.
Q. So in your mind it is unsecured whether it is coupled to an engine or not?
A. If it is not supposed to be there.
Q. Is that a yes?
So it is unsecured even if it is coupled to a locomotive in your view?
A. It can be coupled to a locomotive and be unsecured.
Q. And then it says: The derail will guide the wheels off the track.
And that occurred here, didn't it?
A. Yes.
Q. And then the last sentence says: This prevents unintentional movement of rolling stock from fouling the mainline.
In this case you don't know what Mr. Blanchett was doing at the time of the event because you said you didn't look at anything related to his activities, right?
A. No, I did not.
Q. So you don't know whether he was

intending to move cars or not intending to move cars?
A. Well, he didn't have authority to move the cars to that point.
MR. RADECK: Object to form.
BY MR. WRAY:
Q. Well, he didn't have authority to get through the derail but that's different from whether he had authority to move the cars, right?
A. Yes.
Q. You don't have any evidence, do you, that he didn't have permission or authority to move railcars as part of his job, do you?
A. To move railcars, no; I am saying he didn't have authority to move railcars past a derail.
Q. I understand that; that's a different question, Mr. Rusk.
Did he have permission or did he not have permission to move railcars as part of his job?
A. That, I didn't look into that. I don't have information on that.
Q. So you don't know whether his movement was intentional or unintentional because you didn't look at it, right?
A. No, I did not have that information.
Q. You also refer on page 7 at the bottom to

MW&S Standard Procedure 100, which we looked at earlier today; do you remember that?

A. Uh-huh, correct.

Q. And this says: Derails should be installed with a minimum 15 foot track centers where conditions permit.

Correct?

A. Yes.

Q. That means it is not absolutely required to be at 15 feet, doesn't it?

MR. RADECK: Object to form.

THE WITNESS: That's correct.

BY MR. WRAY:

Q. And if the Railroad determines that conditions don't permit it to be at 15 feet, under this policy they can locate it somewhere else as long as it is in no event less than 12-foot track centers, right?

A. Incorrect.

Q. Tell me what's incorrect about that.

A. There are two sentences here, so there are two scenarios here. The first sentence is, like in the situation we just looked at or in this case, where you have a track coming in, it is coming in, so the derail should be placed at 15 foot unless conditions are otherwise. Now so -- the minimum, 15 feet; that's

the closest you can get.
Now if conditions don't permit, then you have to push the derail back away from the mainline to where you can put a derail.
Q. So you read that as saying it has to be a minimum of 15 feet where conditions permit --
A. Yes.
Q. -- to mean that if conditions don't permit it, you can't put it there at all?
A. You got to put it back -- you may have to put it back to 16-, 18-feet track centers.
Q. And where do you get the basis for that statement?
A. Because the next sentence where you said, "where tracks exist with closer," it continues on to say, "location where the adjacent track becomes parallel, but in no event less than 12 foot track centers."
So these are parallel tracks to the mainline, so you come out the turnout and then you go out a little ways and then you turn and you come parallel. And that would be similar to the west end of the AIPC track, that's a parallel track. So that -- this second sentence goes to those kind of tracks that are actually parallel to the mainline.

Q. Right. And in those tracks it can be as low as 12 feet, right?
A. They can be if they are parallel, but this -- this one is not parallel.
Q. Didn't I read that from your Report earlier, where you said in your Report that this is a track located north of and parallel to the NS main track?
A. It is parallel about -- probably more than 50 feet between the two tracks, so it is parallel at 50 feet. And then you have -- it comes into the main track and it is not parallel anymore. And so it comes in, and so at that point you have to leave it at 15-foot clear point, at a minimum, if you can.
Q. Let's assume for purposes of this question that you are wrong and I am right and it can be a minimum of 12 feet. You measured these track centers to be at the lowest point at 12 feet, right?
A. I measured a track center to be at 12 feet, but that's not in compliance with the rule.
Q. I am not quibbling with you, I know that's your opinion, but I said assume that opinion is wrong and it can be at 12 feet. Your measurement showed -- the lowest measurement you got was 12 feet, right?

A. And I am not going to assume I am wrong because I am not.

Q. You don't have to agree with me but you do have to assume for purposes of my question that it can be at 12 feet. And my only question to you is if that is true, if I am right, it can be at 12 feet, you measured these track centers to be at 12 feet at the closest point you measured, right?

A. It doesn't meet the qualifications in the -- where it talks about 12 foot, it is where the tracks become parallel.

Q. Mr. Rusk, I have got all day. We can sit here --

MR. RADECK: No, we don't, I have got a flight.

MR. WRAY: Then you need to talk to your witness then.

MR RADECK: I am not allowed to.

MR. WRAY: You can tell him to answer my questions.

BY MR. WRAY:

Q. It is a very simple question, just answer the question and we will move on and we will get out of here.

If, in fact, it is proper and appropriate

for track centers to be 12 feet where the derail is located, you measured these track centers to be 12 feet, didn't you?

A. I did not measure a parallel track at 12 feet. I am going to stick with this, I am not changing.

Q. All right. Then we will just stay here then.

Go back to -- where are your notes from your measurement? Get out the notes again.

A. I measured track centers at -- between the industry track and the mainline track, and that track is not parallel at that location.

MR. WRAY: Move to strike all that, there was no question pending and it wasn't responsive to anything that I asked you.

BY MR. WRAY:

Q. But we will go back and look at Exhibit 9. Those are your notes, right, we looked at them earlier?

A. Yes.

Q. And on item 1, 1 plus 37 end inside derail, you wrote 12-foot track center, right?

A. Right.

Q. And the reason you wrote that is because

you measured a 12-foot track center at that location, correct?

A. At 1 plus 37 I measured track centers to be 12 feet between the mainline and AIPC Track 1.

Q. I understand that. You measured it to be 12 feet, right?

A. Correct.

Q. That's what you wrote in your notes, right?

A. Yes.

Q. You wouldn't have written it if you didn't believe that to be an accurate measurement of what you did that day, would you?

A. That's a correct measurement.

Q. Then you go on on page 7, the next section refers to NS Standard Specifications for Materials and Construction; do you see that?

A. Materials and construction, yes.

Q. You have got a definition there of derails, right?

A. Yes.

Q. You say: Derails are mechanical devices in the track that intentionally derail a car or train.

Is that accurate?

A. Yes.

Q. And this derail did that, didn't it?
A. Yes.
Q. It says: The idea behind a derail is that it is often better to derail a car than to have it continue on the track and cause more damage to life or property.
This AIPC engine and railcars never made it onto the Norfolk Southern mainline track, did it?
A. No.
Q. The reason it didn't is because this derail took it off the rails and put the wheels on the ground; isn't that correct?
MR. RADECK: Object to form.
THE WITNESS: It did derail the locomotive -- industry locomotive.
BY MR. WRAY:
Q. Then did you go on to -- the bottom part of that, you are quoting from MW&S Standard 100. And section 1.02 says: Derails are to be installed such that rolling stock is derailed away from the main track.
Correct?
A. Yes.
Q. And that happened here, correct?
A. Yes.

Q. And then on page 8 you say, section 4.06, says: Switch point derails must have curved lead rails of sufficient length to derail cars without fouling the track they protect.
Do you see that?
A. Which page was that again?
Q. Page 8.
A. All right. Which part of the page?
Q. The section in the second paragraph where you are quoting from NS Policy 100.06 -- 4.06.
A. Oh, yes, uh-huh, I see it.
Q. And it says: Switch point derails must have curved lead rails in sufficient length to derail cars without fouling the track they protect.
Correct?
A. That's correct.
Q. And as we talked about earlier, at the point of derail where the curved rail ended at the time of this accident -- where it was located at the time of this accident, the front wheel when it hit the ground, it was not in the foul of the track that was being protected, was it?
A. It wouldn't -- if it stopped right there it would not have been struck.
Q. You then go on to quote from the

Specification For Design and Construction of Privately Owned Industry, Exhibit H, which we looked at earlier. And you say: The guidance for privately owned industry tracks.

Do you see that?

A. Yes.

Q. And the location where this accident occurred was not a privately owned industry track, was it?

MR. RADECK: Object to form.

THE WITNESS: It is part of an industry track but it was owned by NS.

BY MR. WRAY:

Q. You say it in your Report, that section of the track was owned and maintained by Norfolk Southern, right?

A. Yes.

Q. On page 10, again you are still quoting from NS 100, you say: A DSPD operates as a switch directing the railcar wheels onto another set of rails called curved lead rails.

And that happened here, right?

A. Yes.

Q. "The curve lead rails turn the railcar trucks to direct the wheels off the ties and onto the

ground."
And that occurred here, didn't it?
A. No, it didn't.
Q. Well, the outside rails -- wheels were outside the crossties, weren't they?
MR. RADECK: Object to form.
THE WITNESS: No.
BY MR. WRAY:
Q. So both sets of wheels, in your view, were on crossties the entire time?
A. Correct.
Q. You don't take issue, I assume, with the fact that Norfolk Southern had a double switch point derail at this location?
A. No.
Q. That's the most protective type of derail that could have been installed, right?
A. Yes, and they required it to be installed there.
Q. On page 20 of your Report you say: The cars will continue until the railcars roll to a stop. The speed of the railcar and the grade of the track will affect the distance the derail car will roll on top of the ties.
Did you say that in your Report?

A. Yeah, I didn't see it while I was getting here but I would agree with that, yes.
Q. That's a true statement, right?
A. Yes.
Q. And you say: On a descending grade, the gravitational force will cause the car to roll further.
Correct?
A. Correct.
Q. In this case -- strike that.
In your Supplemental Report you talk about wedge derails, I think it was, or flop derails; am I remembering that correctly?
A. I did talk about wedge-shaped derails, yes.
Q. What was the purpose of that discussion, what were you trying to communicate there?
A. They are typically what some people would call standard derails versus split switch derails. So I was showing two different kinds of derails.
Q. You weren't suggesting that that -- Norfolk Southern should have had a wedge derail at this location, were you?
A. No, just a difference in how the two work.
Q. And then on page 30 you reference part of

Mr. Bell's report, and you say: Mr. Bell states that the DSPD was in compliance with federal requirements contained in Part 213.205 Derails. He states that I do not contend otherwise in my report, which is correct.

Did I read that accurately?

A. Yes.

Q. You agree that this double switch point derail that was in place at the time of this accident complied with all federal requirements, didn't it?

A. I didn't -- there was no reason for me to believe that it didn't. I mean, there was no photographs of it at the time, so I was okay with it from what I saw.

Q. And then you go on to say: Part 213 Derails does not require what type of derail needs to be installed.

That's accurate, right?

A. Correct.

Q. And it does not prescribe where it needs to be installed, and that's true, right?

A. The federal regulations do not prescribe that.

Q. And it doesn't even require you to have a derail at all, right?

A. That is correct, the federal regulations

don't state that.
I should say -- let me back that up.
Part 213 doesn't require that.
Q. Is there some other provision that would require it?
A. I think there may be some operating rules that require installation of derails at some point.
Q. What operating rule is that? Point me to it.
A. That I don't know, I am not an expert in those.
Q. So you don't know if there is one or not, you are just guessing?
A. I am thinking that that is a means to protect them and there are some mechanical rules that come into play where they have to use blue flag rules for mechanical people when they are in there.
Q. But you don't know that to be the case?
A. Part 214 requires derails to be used to protect people and machines.
Q. But you don't know that to be the case or can't cite me to a specific --
A. Part 214 I can.
Q. Cite it to me, then.
A. It is in Part C.

Q. And it says that you have to have a derail when there are on-track workers?
A. Yes, there are locations where you have to have that.
Q. We didn't have that at the time of this event, did we?
A. This was not a case of protecting workers. So when I say Part 213 does not require it, I mean Part 213.
Q. This particular derail, as you understand it, was installed in 1995, 1996, somewhere in that range?
A. That's my understanding.
Q. It had been in place for over 30 years at the time this accident occurred?
A. Yes.
Q. Did you -- are you aware of any evidence suggesting that this derail had ever failed to perform its intended function on any prior occasion?
A. I only saw the one set of marks on the ties, so that was -- I assumed that there hadn't been another derail where the derail caused it to happen.
Q. So you just made an assumption; you don't know what happened on that occasion, do you?
A. On -- the occasion that -- this incident,

you can see the marks on -- on the rail wheels, on the top of the ties, so you saw where the ties -- or the wheel was running on top of the ties. I didn't see any other marks that were on there that would indicate that there was a previous derailment.
Q. Maybe I misunderstood you, then. I thought you did see evidence of a prior derailment.
You did not?
A. I am sorry. No, I did not.
Q. You didn't do any type of analysis of Mr. Blanchett or AIPC's conduct in relation to how this event occurred, did you?
A. No.
Q. I noticed that you did have in your materials the deposition of Mr. Lydick; is that correct?
A. Yes, in the previous case.
Q. Let me ask you to go to page 55 of his deposition, which is Rusk page 776.
Are you there?
A. 776, yes.
Q. I am on page 55 beginning at line 11.
Before I read it, you know Mr. Lydick, don't you?
A. Yes.

Q. Is he a qualified railroad expert in your opinion?

A. I would say yes, he used to work for the FRA as well.

Q. He had duties very similar to what you did while you were with the FRA, didn't he?

A. Yes.

Q. He said on page 55, line 11: Based on the location of the derail, you know, it's unpredictable when these cars hit the ground what's going to happen, so I can't tell you if that would not be the case or not.

Do you agree with Mr. Lydick's comment that it is unpredictable what is going to happen when the wheels of the railcar hit the ground?

A. I was looking at the question that was asked.

So when the cars hit the ground, no, you don't know exactly what is going to happen. You can predict what is going to happen but you can't be absolutely sure.

Q. And then the follow-up question at line 16 was: When you say it's unpredictable what would happen with the cars when they hit the ground, why do you say that?

And his answer at line 19 was: Because when the cars are on the rail, you know they're going to stay on the rail and they're going to follow the path of the rail. When those cars hit the ground, hit the ties, hit the ballasts, you know, and for whatever, you know, conditions they have to deal with, you don't know what's going to happen. You know, it could shoot one car off the end of the track and foul a main, as far as that goes.

Do you agree with that testimony from Mr. Lydick?

A. Like I said, you can have an idea where it is going to go. Typically the car will go in the direction it is pointed, so if you turn it it will go in the direction that you turn it towards. So how far it goes is a question. And there may be some obstacles in the way that it might change direction, but typically not. It typically heads in the same direction that it was originally going in when it first hits the ground.

Q. A derail is not designed or intended to prevent somebody from driving a piece of equipment under power through a derail and perhaps ending up in the foul of the mainline track, is it?

MR. RADECK: Object to form.

Page 155

THE WITNESS: I think the purpose of a derail is to protect a mainline track, so it is not intended to allow anything to go that way, it is not what it is designed to do.

BY MR. WRAY:

Q. So if in this case hypothetically Mr. Blanchett had purposely driven this locomotive through the derail and continued to power it forward towards the mainline track for whatever reason he wanted to do that, maybe he was mad at Norfolk Southern, maybe he just wanted to get on the news, are you saying that the derail should have prevented that from happening no matter what Mr. Blanchett did or the manner in which he operated his equipment?

A. So you are asking my opinion?

Q. Yeah.

A. I would say in this case, the way it was constructed, it would do it, but it was not constructed properly with the curve rails not being curved to the outside turning the railcar to the left further and out into the dirt where it would bog down. And no matter what he was trying to do, he would -- the locomotive would just bog down and bury itself, and the mainline would be protected.

Q. Would you agree that the derail is not

able to instantaneously stop moving equipment when it goes off the end of the curved rail?

A. I would agree that it is not stopping the material -- the railcar or consist coming off and derailing, and it is not intended to stop it. I mean, it is intended to derail it and put it in a position where it would stop clear.

Q. And where it ends up and how far it goes depends on the factors you told me earlier, the speed, gravity, the grade of the track, the weight of the movement; all of those factors come into play, right?

A. That comes into play, yes.

Q. Have we covered all of your opinions in this case, Mr. Rusk, either through my questioning today or as expressed in your Report?

A. Yes, I think so, what is included in my Report.

Q. Do you have any other opinions about this matter that you have not expressed either to me today or reflected in your Report?

A. And I am going to answer no, there is no other opinions unless I am given additional information.

Q. I always get that answer, which is fine, and my experts say the same thing.

Obviously if you get additional information, you may change or modify something that you have told me here today; is that right?

A. Right.

Q. And you are reserving that right to change your mind based on new material, right?

A. That's what happened with the Supplemental Reports, both of us, we had additional documents produced that changed our Reports.

Q. You didn't quite answer my question.

You are just reserving the right if something new comes along, you may modify your opinions, right?

A. Yes.

Q. And if you do that, you will tell Mr. Radeck and he will tell me; is that fair?

A. That's fair, yes.

Q. As we sit here today, do you have any other opinions based on anything you reviewed, any work you have done, anything you have analyzed that you have not yet shared with me?

A. No, I think it is included in my Report.

MR. WRAY: I'll let Mr. Radeck have a turn if he wants one.

MR. RADECK: I have a few questions.

EXAMINATION

BY MR RADECK:

Q. You were asked questions first about Exhibit E which included the definition of derails from AREMA that talked about unsecured rolling stock; do you remember that line of questioning?

A. Yes.

Q. So assume for the purposes of my question that in this case Mr. Blanchett did not properly set the air brakes and his testimony is that he tried braking, he was unable to get full braking power which lead to him going through the derail.

Would you consider that secured or unsecured rolling stock?

MR. WRAY: Object to form.

Go ahead.

THE WITNESS: I would say that's unsecured.

BY MR RADECK:

Q. Do you consider that being controlled movement through the derail or uncontrolled movement through the derail?

A. I would say if he didn't have control of the consist that -- you know, and it got away from him, he didn't have control of it, then it would be

uncontrolled.

Q. One of your opinions is that had the -- had the lead curve rails been of sufficient length and of sufficient curve that this derail AIPC locomotive would have been derailed into the -- into the dirt and would have stopped short of the mainline; that is one of your opinions?

A. Yes, it is.

MR. WRAY: Object to leading.

BY MR RADECK:

Q. What is the basis of your opinion for why you believe it would have stopped if that had happened?

A. That is a case where, you know, you have a lot of weight on these wheels and, of course, when it is on top of the rail, I mean, it supports it very well; it is steel on steel, it supports it very well. When it gets off of the tread of the -- the tread of the wheel gets off the top of the rail, gets down either on the ballast or on the ties, it is -- the ties will still support it. But once you get into the dirt, the dirt cannot support that weight at all, even on an empty car, and the wheels will just start burying into the dirt. And the more it moves, the deeper it buries in, and so now you are creating an earth dam that is going to stop the movement. And that can -- I have

seen derailments -- I have investigated a lot of derails, even with locomotives coming off the rail, and when they hit the dirt they bury up in the front end and the whole train coming in behind, it just accordions around it, it stops the train from moving very much past it. So that's why my opinion is once that wheel gets into the dirt, it -- the wheel -- it starts hitting that and digging down into the dirt and then that mass is going to suck the inertia out of those cars real quick.

Q. And assume -- and I know one of your opinions is, you talk about the curve of the rail, and you don't -- generally speaking do you believe they should have been more curved toward the outside curve rail; is that right, to the left?

A. In this case, to the left, yes.

Q. Even if -- assume for the purposes of this question, even if, you know, Mr. Blanchett was going whatever -- whatever speed and he was still under power and he was doing it intentionally, whatever the hypothetical you want to produce, assuming that the dirt didn't stop it, what effect, if any, would the angle of the curve rail have on whether or not the mainline is protected?

A. Well, the curve is double purpose. One

is to get those wheels off the track structure into the dirt. The other is, just like in a turnout, it is turning the trucks under the car and redirecting the car and turning it more to the left so the whole entire car, the direction it is traveling, is more to the left, just like a turnout. If you have a frog there -- I mean, it is turning through there and would be heading a different direction than it originally was. So that's the two parts of why the curved lead rails are so important, is to get that car turned away and also get it off the track structure into the dirt.

Q. So regardless of the speed, the weight or the grade, is it your opinion that based on the fact that the curve of the lead rail was not sufficient enough, that's why this foul occurred?

MR. WRAY: Object to leading.

Go ahead.

THE WITNESS: Well, I would say there are two points here. One was, you can see it in the picture, I think, that there was no curve in the inside curved rail. And, number two, the inside curve rail was too short. Basically what is in play here is you are turning that truck but, once the wheel comes off the outside curved rail, the inside curved rail is needed to keep directing

that car to be turned and to force that derail wheel that's on the outside of the track into the dirt. And that's what the importance of a curve -- inside curve lead rail is, is to keep driving that car to the left, keep turning it as much as possible to the left. And that's also, like I said, changing the direction of which way that car is going so its inertia is not going in its original direction down the industry track but it is turning it to the left so its inertia is turning further to the left.

BY MR RADECK:

Q. So regardless, again, of the weight or the speed or the grade, is what you are saying that if the angle or the curve had been proper, no matter how far the locomotive continued to travel, it would not have -- it would have been pointing away from the mainline and would have not actually ever ended up in the foul; is that your opinion?

A. Well, it never -- it wouldn't be pointed away because there is only so much curve that you can do before you get to the other rail. So it is trying to turn that railcar further to the left. So if you look at the new direction it is going, it has a distance to where it would get to the main track which

would be further than the distance that it would have to go if it was still going straight down the industry track. So that's, you know, one of the purpose of that curve. It is, like I said, turning that car, turning the direction of that car, in this case to the left.

Q. I guess I am trying to have you explain, I am trying to understand why in your analysis the speed or the weight or the grade does not necessarily matter?

MR. WRAY: Object to form.

BY MR RADECK:

Q. Does it matter?

A. Well, everything matters when the car is coming downhill because you have more inertia and more force for the car coming down. And if you had a standard derail there, which would just derail the car wheels next to the base of the rail on top of the ties, you would still be heading the same direction and you would have a firmer surface for the wheels to ride on.

Once you turn it and you keep turning that in the double split switch derail and you curve that car to the left further away and the wheels get into the dirt and bury down, so that's why you -- you know, it will take some of that -- a lot of that inertia away. It would still be -- if you are going

faster, the derail car will still go further in the dirt, but it would also bury further in the dirt the further it goes.

Q. Does the work that's done by a double switch point derail, does it stop performing its job at the point of derailment?

MR. WRAY: Object to form.

THE WITNESS: And I am going to say, what it is doing during the process of where it is going, the car is going through the curve lead rails, it is changing its direction, so that's affecting the car even after it leaves. It is headed in a different direction than what it initially was, which was going straight down the industry track. So it has turned it and turned it, in this case, to the left further. So even after it leaves and falls off the end of the rail, the curved lead rails, the car is actually in a different direction than it originally was when it entered the derail.

BY MR RADECK:

Q. My question was at the point of derailment, that is when the wheels come off the top of the rail, correct?

A. Correct.

Q. And at that point, though, is the car still -- is the derail still doing something or is the derail's job done at that point?

A. When the wheels are off both of the curved lead rails, not just the outside but also the inside one, then there would not be anymore force applied to the wheels of the car, and the car would -- at that point, the direction it is heading, that's the direction that it will continue to go.

Q. Okay. But the point of derailment is measured at the -- what you said earlier, it is measured at the shorter lead curve rail, whether it is the inside or the outside, correct?

A. Correct.

Q. My point though is, in this case, had it been constructed properly, which is what you are telling us in your Report, is that the inside curve rail -- curve lead rail should have been longer than the outside curve lead rail; is that right?

A. That's correct.

Q. Had it been constructed properly, the point of derailment would have occurred at the outside curve lead rail, right?

MR. WRAY: Object to form.

THE WITNESS: That is right.

BY MR RADECK:
Q. And then does the derail stop doing anything at that point or does the inside curve lead rail still have a function?
A. No, the inside curve lead rail would keep forcing the car, in this case, to the left until the wheels on the inside curve lead rail fall off the end of that rail. You know, it would keep having a force on the car until the wheels fall off the inside as well.
Q. The wheels are off the rail but the lead curve rails are still -- the inside lead curve rail is still driving the train to the left, right?
A. Yes, it would still keep driving the train to the left until the wheels reach the end of the inside curve lead rails.
Q. And that didn't happen here, right?
A. No.
Q. And is what happened here essentially what a normal standard derail would have done?
MR. WRAY: Object to form.
THE WITNESS: Pretty much it just dropped the wheels on top of the ties in the direction the car was already going, and it was, I would say, comparable to a standard derail. It would just

derail the car and the car was headed in the same direction that it was.

MR. RADECK: That's all of the questions that I have. Thank you.

RE-EXAMINATION

BY MR. WRAY:

Q. Mr. Rusk, in follow-up to Mr. Radeck's questions, he asked if you assume the air was not properly set on the locomotive by Mr. Blanchett, the AIPC employee, would you consider that to be an unsecured car and you said you would.

Can you cite me to any FRA rule, regulation, guidance that reflects that definition of unsecured?

A. My definition, if he didn't have control of it, and I was inferring that if he didn't have the air on it, he didn't have control of it, so that would -- in my mind, would have said unsecured. But can I point you to an FRA regulation, no, I cannot.

Q. Or any industry publication, AREMA document, or anything else that gives that definition of unsecured?

A. That would be more of an operating practices issue than -- than mine, whether it is secure

or unsecured.
Q. And you can't cite me anything that says that, can you?
A. No, I personally can't.
Q. And you were asked some questions about what would have happened had this equipment, once it left the derail surface, if it had hit the dirt.
You didn't do any measurements to determine how far it would have traveled in the dirt had it gone into the dirt, did you?
A. No.
Q. You didn't do any type of calculations or simulations that would show how far it would have traveled had it fallen in the dirt as opposed to falling on the ties, did you?
A. No.
Q. And the distance it would travel in the dirt would depend in part on the ground, the consistency of the ground itself, the geography and the topography of the location, correct?
A. I would say yes.
Q. For example, if it was in a desert and it dropped off the rail into desert sand, it would probably go less distance than it would if it dropped onto a hard compact soil; you would agree with that,

wouldn't you?

A. I am not sure what hard compact soil is but -- but, yeah, it -- there can be differences in consistency that might affect it, yes.

Q. You didn't do any type of analysis in this case as to the geography or topography of the dirt, ground, in the location where this incident occurred, did you?

A. No.

Q. You didn't take any soil samples or anything like that to determine what type of materials was in the, quote, unquote, dirt at that location, did you?

A. No.

Q. The location of the inside curved rail from the derail on the date of this incident, you told us earlier you didn't do anything to try to determine exactly where that was, right?

A. Exactly where it was?

Q. Yes.

A. No, I just know they had a short piece, from the photographs, that was attached to the right hand switch point, and that was the end of where it was. And it was, like I said, approximately six feet back, according to the trucks, because both wheels on

that side, on the inside curve lead rail, were both derailed on that first car and it was attached to the locomotive and there was only one wheel on the outside that had actually derailed.

Q. And regardless of where it was -- where the inside curve rail ended on the date that this incident occurred, which you said you don't know exactly where that was, you would agree with me that at the very least it was further from the mainline than it was on the date that you were there?

A. Yes.

Q. You also were asked a question about whether the derail continues to influence the cars after they drop off the derail, and you said something like once it leaves the rail it will continue in the same direction it was headed; do you recall that testimony in response to Mr. Radeck's questions?

A. Yes.

Q. And in this situation, the locomotive and the cars that Mr. Blanchett had been moving, they were headed in the direction of the Norfolk Southern mainline track, correct?

A. That's correct.

Q. And once they left the derail, they were going to continue in that direction until some force

required them to stop, right?
A. The way that it was constructed and installed, yes, that was the end result of this incident.
Q. I am not sure I quite understand that.
The end result was that it would continue from dropping off the end of the rail in the direction toward the mainline track because that's the way it was headed at the time it went through the derail, right?
A. In this incident, yes, that is the direction it was.
MR. WRAY: I am good.
MR RADECK: We are done.
MR. RADECK: You can send the read and sign to --
Do you want to give her your e-mail address?
THE WITNESS: Kenneth.rusk.consulting@gmail.com.
THE REPORTER: You want this obviously?
MR. WRAY: Yes.
MR. RADECK: Read and sign, e-tran package.
(Off the Record at 1:50 p.m.)

C E R T I F I C A T E

STATE OF TENNESSEE

COUNTY OF KNOX

I, Kelly Forfar, LCR #865, Licensed Court Reporter in and for the State of Tennessee, do hereby certify that the above deposition was reported by me and that the foregoing 171 pages of the transcript are a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not related to nor an employee of counsel or any of the parties to the action, nor am I in any way financially interested in the outcome of this case.

I further certify that I am duly licensed by the Tennessee Board of Court Reporting as a Licensed Court Reporter as evidenced by the LCR number and expiration date following my name below.




Kelly Forfar, LCR# 865
Expiration Date: 6/30/28

Kenneth Rusk
kenneth.rusk.consulting@gmail.com

September 16, 2026

RE: Norfolk Southern Railway Company v. American Italian Pasta Company

9/1/2026, Kenneth Rusk (#8394820)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-carolinas@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Norfolk Southern Railway Company v. American Italian Pasta Company

Kenneth Rusk (#8394820)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

________________________________ _______________

Kenneth Rusk Date

Norfolk Southern Railway Company v. American Italian Pasta Company
Kenneth Rusk (#8394820)

ACKNOWLEDGEMENT OF DEPONENT

I, Kenneth Rusk, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________
Kenneth Rusk Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
______ DAY OF ________________, 20___.

__________________________
NOTARY PUBLIC

**&**

**&** 1:17 4:14,23 5:14 6:9 29:2 29:14 30:2

**0**

**00** 111:10 121:7,11
**0471** 69:23
**06618** 1:9

**1**

**1** 1:2 2:13 17:3 17:6 69:25 91:10 100:1 110:11 113:3 114:5 118:4 119:11 128:21 132:17 142:22 142:22 143:3,4
**1.02** 144:19
**1/2** 123:6
**10** 2:23 100:15 104:7 106:6 116:19 121:19 121:19 122:20 123:9 125:1 127:17,20 146:18
**100** 2:22 69:4,5 69:7,12,16 93:9 94:1,6 95:2,6,7,8 138:1 144:18 146:19
**100.06** 145:10
**10589** 1:18
**1099** 29:16,22
**11** 2:24 131:10 131:14,24 152:22 153:8
**12** 28:8 104:23 105:18 106:16 123:10 125:16 126:22,24 138:17 139:17 140:2,17,18,19 140:23,24 141:5,6,7,10 142:1,2,4,23 143:1,4,6
**1200** 1:18
**125** 69:5,16
**127** 2:23
**13** 125:18,18
**13.4** 126:25
**131** 2:25
**133** 104:3
**137** 110:12 113:14 122:7 122:18 125:16
**140** 125:12
**144** 110:15 113:14 116:5 125:17
**15** 27:21,22 59:4,13,17 104:17 109:5 110:16 113:9 113:17 119:4 124:10,11 125:20,22 126:6,16 127:1 138:5,10,15,24 138:25 139:6 140:14
**1508** 1:24
**153** 110:16 125:19
**158** 2:6
**16** 139:11 153:23 173:3
**160** 113:4
**167** 2:7
**17** 2:13 11:2 41:20 44:23
**171** 172:8
**172** 1:23
**173** 90:25 91:1 91:4 96:6,9
**17751** 172:21
**178** 91:8
**18** 139:11
**185** 111:17
**19** 42:10,15 129:9,20 130:6 130:16 131:1,3 131:6 132:21 154:1
**1990s** 111:15
**1994** 88:8,10,11
**1995** 69:23 151:11
**1996** 111:20 151:11
**1:28** 37:4
**1:50** 171:24

**2**

**2** 2:14 27:12,15 27:17 28:13 29:16 42:19 111:10 121:7 121:10
**2.01.8** 81:24 85:19
**2.01.8.** 83:4
**20** 132:2 147:20 175:15
**20,000** 24:24
**200** 111:10 113:1 121:10
**2003** 79:14
**2005** 79:14
**2010** 78:6,21 79:14
**2011** 79:15
**2016** 4:20 5:16 6:15
**2018** 11:1
**2020** 78:21 79:6 80:10 81:3 83:3,11 86:25 88:18 89:16

**2024** 27:21,22 28:24 100:16 104:11 109:16
**2025** 36:11,19 37:3
**2026** 1:2 28:8 41:21 42:4 44:23 46:23 173:3
**21** 30:18
**213** 8:23 149:14 150:3 151:8,9
**213.205** 149:3
**214** 8:23 9:18 62:3,6,11,15 63:8,10,18 64:2,5 84:4 150:19,23
**22** 30:17 132:6
**23** 131:17
**243** 30:9
**25** 132:15
**2535** 129:9
**26** 34:8,11,18
**27** 2:14 42:4 46:23
**27,000** 45:19
**271-9580** 1:19
**29402** 1:24
**29601** 1:18
**29603** 1:19

**3**

**3** 2:5,15 31:22 32:1 37:3 119:22 122:24
**30** 7:22 8:3 9:7 84:12 148:25 151:14 173:16
**31** 2:16
**32** 42:11,16
**35** 7:22 9:7
**350** 25:3,5
**37** 110:12 142:22 143:3
**3:25** 1:9
**3rd** 36:10,18

**4**

**4** 2:17 43:5,8 43:12 44:16 51:18 52:16 56:1 57:6 99:25 119:22 125:18 127:8
**4.06** 145:1
**4.06.** 145:10
**40** 8:3 113:4
**43** 2:17
**44** 51:18 53:8
**46** 2:18
**47** 2:19
**49** 28:18

**5**

**5** 2:18 46:19,21 46:25 53:8 57:7 88:14,15 94:9
**50** 140:10,11
**51** 28:18
**55** 1:18 152:18 152:22 153:8
**56** 123:6
**5763** 1:17

**6**

**6** 2:19 47:14,16 47:24 48:11
**6/30/28** 172:22
**60** 113:4
**620** 77:9,12 81:5 95:21 96:2,3
**622** 86:1
**623** 77:8 81:22
**624** 81:21

**7**

**7** 2:20 80:19,22 96:15 133:5 137:25 143:15
**7.0** 94:9
**75** 4:3
**776** 152:19,21

**8**

**8** 2:21 89:3 90:14,15 91:5 145:1,7
**8-28-26** 43:18
**80** 2:20 24:14
**80,000** 24:25 25:4
**82** 132:2
**83** 132:17
**8394820** 173:5 174:2 175:2
**864** 1:19
**865** 172:5,21
**88** 79:14
**89** 79:14
**894** 36:14,16
**895** 36:3

**9**

**9** 2:22 100:4,6 121:15,19 122:20 142:19
**9/1/2026** 173:5
**90** 2:21 24:14
**94** 69:23 79:14 87:8,23 88:4 114:22
**940** 43:15
**941** 44:19
**944** 44:19,22
**963** 19:11 21:1 28:2

**9:50** 3:1

**a**

**a.m.** 3:1
**ability** 10:3 172:10
**able** 11:5 38:1 63:22 70:22,24 113:18 156:1
**above** 172:7 173:6 175:7
**absolutely** 138:9 153:21
**absorbed** 12:12
**access** 18:5,5 19:5,16,22,23 19:25 20:7,8 20:12
**accident** 99:1 100:19 101:25 102:3 108:19 108:23 109:19 110:1,3,4 111:6 112:19 114:3,7 115:3 120:17 127:4 132:16 145:19 145:20 146:7 149:8 151:15
**accordions** 160:5
**accuracy** 173:9
**accurate** 30:21 49:8 90:22 112:17 143:12 143:24 149:17 172:9
**accurately** 149:5
**accuse** 82:10,25 83:25
**accuses** 78:16
**acknowledge...** 175:3
**acknowledg...** 173:12
**action** 172:13
**actions** 16:15 67:19
**activities** 136:23
**actual** 44:17 48:16
**actually** 7:2,11 7:20 11:9 21:24 25:9 31:3,12 34:3 34:12 36:13 38:21 39:1 48:8 51:9 55:11,20 56:11 61:23 62:14 72:9,25 74:13 76:3 77:8 78:13 101:6 108:22 123:12 128:3 132:21 139:25 162:18 164:18 170:4
**add** 45:16
**added** 28:20 45:21 87:8 90:9 102:2,19 102:22,22 103:6,8 112:13 112:14,15 128:6
**addendum** 17:14,20 20:24
**addition** 38:20
**additional** 15:7 28:22 35:4 37:4,12 38:7 41:10 42:8 45:23 89:5 102:19,21 156:22 157:1,8
**additions** 28:12 175:6
**address** 11:5 171:17
**adjacent** 59:18 123:24 139:16
**administration** 29:5 96:25
**administrative** 34:7
**advanced** 70:11
**af** 69:23
**affect** 71:10 147:23 169:4
**affecting** 164:12
**affiliated** 30:1
**afternoon** 19:10
**agency** 96:24
**ago** 55:2
**agree** 37:14 38:10 46:4 49:6 52:15,18 53:1 54:1,3 56:9,21 57:11 58:17 61:13 66:3 71:6,11 71:16 84:8,16 87:11 91:22 93:1 94:5 96:20 128:2,9 141:3 148:2 149:7 153:13 154:10 155:25 156:3 168:25 170:8
**agreement** 51:16 86:16
**ags** 33:15
**ahead** 69:2 113:15 158:16 161:17
**ai** 27:9 42:20
**aipc** 3:16,21 23:2,11 38:22 45:14 55:12 57:5,11 58:8

60:17 61:7 67:3,4,20 73:20 74:7,13 74:19 84:17 92:21 93:3,17 98:4,11 100:1 100:16 101:16 105:14 111:21 114:5 118:4 121:1,10 128:19 129:9 139:23 143:4 144:7 159:4 167:11
**aipc's** 152:11
**air** 158:10 167:9,18
**alabama** 33:16 33:21
**allegation** 9:9 9:15,22
**allotted** 173:19
**allow** 10:16 11:11,12 155:3
**allowed** 10:9 11:4 113:6 141:18
**alluding** 10:8
**alongside** 29:8
**altogether** 15:5 34:3
**american** 1:10 3:15 21:22 173:4 174:1
175:1
**amount** 24:20 24:20 25:7 73:2 76:20
**analysis** 76:15 77:4 130:3 152:10 163:7 169:5
**analyze** 111:3,3
**analyzed** 157:20
**analyzing** 112:2
**angle** 107:14 160:23 162:15
**annotated** 53:21
**annotating** 126:11
**annotations** 47:3
**answer** 9:11 20:10,19 41:14 57:25 66:20 93:19 130:19 130:22 132:6 132:17 133:24 141:19,22 154:1 156:21 156:24 157:10
**anybody** 41:5 44:8 48:13
**anymore** 41:15 140:12 165:6
**anyway** 22:18
**appear** 26:7 63:18 83:1 87:10 100:11 101:7
**appearances** 1:15 2:16 31:23
**appears** 8:8 43:17 82:15,23 84:2 87:2,25 88:18 101:14 129:6
**appended** 175:7
**applicable** 94:10 173:8
**applied** 76:8,9 89:20 165:7
**applies** 63:9 90:21
**apply** 63:10,19 65:1 86:7,8,23 87:13 91:23 93:3,9,17 94:6
**approached** 74:12
**approaching** 74:10,22 75:9
**appropriate** 118:21 141:25
**approximately** 10:23 169:24
**april** 5:16 27:21,22 28:8
**areas** 8:4 48:4 51:13,16
**arema** 5:23 97:2 133:7,11 133:13 158:5 167:21
**argument** 87:9
**arrangement** 19:24
**arrival** 17:9
**arrow** 53:22 102:11 107:9
**article** 27:4
**ascending** 70:1 70:16,18
**aside** 26:3,3 63:17
**asked** 16:14 17:11 22:4 26:11 34:1 37:23 38:17 40:14 43:10 46:17 59:24 71:3 81:8 82:20 83:5,24 105:15 108:5 121:5,23 122:23 135:20 142:16 153:17 158:3 167:9 168:5 170:12

**asking** 37:9,12 37:21 51:15 52:11 61:10 63:1 79:10 82:21,22 83:8 84:4 87:24 105:4 129:17 130:14,24,25 134:22,24 135:22 155:15
**aspect** 45:19
**assist** 27:10 46:6 48:13
**associate** 4:16
**associates** 4:15 4:23 5:15 6:9 29:2,14 30:3
**assume** 7:10 25:23 34:10 38:4 43:20 46:12 57:4 76:22 87:9,24 88:1 127:10 134:9 140:15 140:22 141:1,4 147:12 158:8 160:11,17 167:9
**assumed** 69:4 69:14 151:21
**assuming** 25:17 26:18 27:6 102:4 127:5 160:21
**assumption** 133:1 151:23
**assumptions** 26:12
**atlanta** 19:22
**attached** 38:3 68:11,13 95:18 100:9 169:22 170:2 173:11
**attorney** 14:4 14:19 18:19 173:13
**attorneys** 3:14 15:15 18:17
**august** 42:4 44:23 46:23
**authority** 97:5 135:8 136:3 137:2,6,8,11,14
**automated** 6:7
**available** 10:7 173:6
**aware** 10:2 63:21 99:2,3 130:5 151:17

**b**

**b** 2:10
**back** 4:20 10:24 14:3 15:8,17 18:18 18:22 23:6 25:8 26:22 40:13 43:25 44:16 48:8 49:18 55:20,23 58:21 59:7,20 61:21,22 64:17 72:8,13,18 73:1 76:2 77:9 80:6,8 81:15 81:16 82:12 86:1 90:5 96:5 96:7 110:11,21 111:14 114:23 115:3 120:1 121:4 131:15 139:3,10,11 142:9,18 150:2 169:25
**background** 8:9
**backroom** 10:10
**ballast** 73:21 73:24 74:1,18 74:24,25 75:2 75:7,13 159:19
**ballasts** 154:5
**ballpark** 7:24
**bar** 1:17 127:6 127:7,11
**base** 163:17
**based** 13:13 49:21 132:25 153:8 157:6,19 161:13
**basically** 5:8 73:17,24 79:24 107:23 161:22
**basis** 35:7 111:19 139:12 159:11
**bates** 36:13,14
**beattie** 1:18
**beginning** 42:15 91:4 133:7 152:22
**begins** 104:10
**behalf** 13:11 15:13,23
**believe** 6:23 12:16 16:1 18:5 19:18 20:9,12,21 35:10,22 37:22 38:16 40:10 75:11 99:10 143:12 149:11 159:12 160:13
**bell** 51:11 99:9 149:1
**bell's** 149:1
**benjamin** 33:9
**best** 107:20 172:9
**better** 22:17 144:4
**beyond** 7:23 85:22

**big** 51:3
**billable** 25:2
**billed** 25:4,9 45:18,24 46:13
**billing** 5:6 26:18 44:17 45:18 46:12
**billings** 45:1,4
**birmingham** 33:25
**bit** 19:20 26:5 44:11 46:3 50:22 75:18 76:12,13
**blanchett** 67:19 67:25 68:10 69:21 70:2 71:12,25 133:21 134:10 136:21 152:11 155:7,13 158:9 160:18 167:10 170:20
**blue** 150:16
**bn** 96:21
**bnsf** 10:22 96:17
**board** 172:16
**bog** 155:21,23
**bold** 86:5
**boss** 31:13
**bottom** 36:15 51:18,21 121:14 137:25 144:17
**bound** 96:21,23
**box** 1:18,24 17:17
**boyd** 1:17
**brakes** 76:8,9 158:10
**braking** 158:11 158:11
**break** 7:9 24:11 47:12 50:22,25
**bridge** 8:15
**bridges** 12:18
**brief** 17:22 30:1
**bring** 17:12,19 17:24 18:3 19:4 41:23,25
**brings** 17:7
**broken** 103:4
**brooks** 99:8 118:25 119:16
**brought** 4:8 20:9 47:1,3 73:19
**built** 69:25 111:14
**buries** 159:23
**bury** 155:23 160:3 163:23 164:2
**burying** 159:22
**business** 5:12 5:17 30:14

**c**

**c** 39:8 58:23,25 59:2 60:22 61:3,4,8,12,14 61:16 62:7,14 63:3,15 65:15 65:16 66:6 72:21 84:24 85:3,6,7,10 99:20 129:25 150:25 172:1,1
**c.a.** 1:9
**calculation** 72:24
**calculations** 72:6 168:12
**calculator** 45:16
**call** 61:7 64:12 65:5 102:14,15 148:18
**called** 3:15 29:3 30:2 53:3 54:16 75:15 86:17 117:17 128:10 146:21
**calling** 105:19 123:13
**calls** 86:20
**camille** 33:1,2
**capacity** 4:13
**caps** 86:5 92:15
**captioned** 79:20 88:24 94:10
**capture** 44:14
**car** 53:16 59:8 59:13 69:8,9 69:11 134:3 143:23 144:4 147:23 148:6 154:8,13 159:22 161:3,4 161:5,10 162:1 162:5,8 163:4 163:5,13,15,16 163:22 164:1 164:10,12,18 165:1,7,7 166:6,9,24 167:1,1,12 170:2
**care** 36:2 47:5 79:18 85:9
**career** 6:8 7:6 8:9 12:20
**carolina** 1:4,19 1:24 100:16 127:23
**carolinas** 173:15
**carried** 46:10
**carrying** 91:18
**cars** 68:10,15 69:3,4 137:1,1 137:3,8 145:3

145:14 147:21 153:10,18,24 154:2,4 160:10 170:13,20
**case** 3:22 8:24 8:25 9:9,21 10:5,6,8,17,21 11:8,14,16,18 11:19,21 13:25 14:10,23 15:2 15:19,23 16:1 16:8,9,20,23 17:13 18:13 20:11,22 21:4 21:11,20,22 22:3,10 23:1,6 23:9,10,15,16 25:15 26:20,21 27:1,7,10,20 32:2,3,17,19 33:8,10,19 34:9,15,17,20 35:7,13 38:18 38:23 39:19 41:2,8,13,20 43:13 45:1,9 45:13,20 46:5 46:7,14 47:23 49:12 50:14 51:11 54:1,8 54:14 59:16 60:16 61:6 62:17,21 63:9 65:10,19 67:18 69:15 71:23 72:20 75:3 77:22 79:2 82:6 83:21 87:16 92:19 93:4,8 95:23 98:2,22 99:8 99:13 111:2 112:2 118:24 127:25 129:21 130:3 136:20 138:22 148:9 150:18,21 151:7 152:17 153:12 155:6 155:17 156:14 158:9 159:13 160:16 163:5 164:16 165:15 166:6 169:6 172:14
**cases** 7:6,10,14 7:20,25 9:7,14 9:15 12:20 13:6,10,20 14:12 15:5,12 15:16,22 16:4 23:20,25 24:4 33:15 34:1,3 45:7 47:22
**cause** 74:2,3 144:5 148:6
**caused** 14:25 66:8,13 71:3 73:16,17 151:22
**center** 56:25 57:1 103:16,17 103:25,25 104:1,2,4 105:7,13 106:2 106:2,8,8,8,22 106:23 107:3,5 107:7,22 108:25 109:6 110:13,14,17 110:22 114:4,5 115:19 116:12 117:1 118:1,3 118:4,4 119:2 119:11,11,12 119:13,14 122:8 123:13 123:14,15,25 124:9 125:10 125:11 126:21 140:19 142:23 143:1
**centers** 56:19 56:24 59:4 103:10 104:22 105:14,18 106:10,16 108:10 109:10 109:10,12,15 109:19 112:3 113:15,24 116:14,25 119:5,7,8,10 121:23,25 124:7 125:15 125:17,18,20 138:5,17 139:11,18 140:18 141:7 142:1,2,11 143:3
**central** 12:10 12:11,15 60:16
**certain** 17:12 76:20,23 83:16 83:18
**certainly** 22:21 71:16 118:20
**certify** 172:7,11 172:15
**cetera** 52:25
**challenges** 10:3 70:23
**change** 28:15 81:15,17,19 90:5,9 154:17 157:2,6 174:4 174:7,10,13,16 174:19
**changed** 28:20 109:22 115:11 157:9
**changes** 42:17 42:22 43:2,4 80:12 173:10 175:6

**changing** 142:6 162:7 164:11
**charleston** 1:24
**chatgpt** 27:5
**checked** 17:17
**choose** 124:2
**chose** 31:14
**circle** 127:7
**citation** 97:12
**citations** 98:25
**cite** 64:6 65:24 78:25 80:15 81:8 82:9,15 82:24 83:1,9 85:20 87:13 88:3,22 90:6 93:2 97:2 150:22,24 167:13 168:2
**cited** 77:25 86:22 88:8 89:19 90:11 99:5
**citing** 81:10 88:17
**claim** 23:11,14
**claims** 22:7
**class** 6:9,11 12:6,9,11,21
**clear** 60:24 63:6 104:17 109:5 110:16 112:1,18 113:3 113:5,7,9,17 114:23,24,25 115:2,6,19 119:15,15 120:24 124:11 140:14 156:7
**clearance** 61:1 115:12
**clearer** 25:22
**client** 10:20 32:14 84:1
**close** 63:22 64:8 65:21 113:11 125:21 127:5 131:4
**closer** 55:16 139:15
**closest** 139:1 141:8
**cn** 12:13
**collapsed** 14:24
**collision** 52:24
**color** 47:7 48:21
**colorado** 34:6
**columbia** 1:5 100:16
**come** 7:15 26:22 40:15 60:13 64:10 70:13 131:4 139:20,21 150:16 156:11 164:23
**comes** 140:11 140:13 156:12 157:12 161:24
**coming** 66:17 119:25 138:23 138:23 156:4 160:2,4 163:14 163:15
**comment** 134:3 153:13
**commerce** 31:16
**commission** 31:16
**communicate** 148:16
**communicati...** 21:17,18,21,25
**compact** 168:25 169:2
**companies** 31:11
**company** 1:7 1:11 3:15,16 4:17,20 5:3 21:23 22:7 29:2,4 30:2 31:12 77:16 79:20 86:9,24 89:7 91:15 173:4,4 174:1 174:1 175:1,1
**comparable** 166:25
**compared** 42:21
**comparison** 42:20
**complaint** 37:22,23 38:1 38:4,9,13
**complete** 91:17 175:8
**completed** 173:16
**compliance** 30:12 97:10 140:20 149:2
**complied** 21:6 149:9
**comply** 30:9 64:14 78:18 83:2
**components** 7:9 19:1
**compose** 55:2
**computer** 47:21 49:23 50:6,8,12 65:18
**concluded** 119:3
**conclusion** 131:4
**conclusions** 42:11,16 72:17
**conditions** 72:13 73:4

138:6,15,24 139:2,6,8 154:6
**conduct** 67:19 152:11
**conductor** 16:16,24
**configuration** 109:23
**conflict** 13:8
**confused** 18:15 124:13,14
**connection** 100:15
**conrail** 31:3
**consider** 8:16 9:3 19:12 21:3 22:6 23:1 45:12 61:23 65:4 158:13,20 167:11
**considered** 22:16 23:10 29:16,20 59:14 60:4 63:6
**consist** 66:15 66:15,23 67:1 71:4,10 72:11 75:24 134:18 135:11 156:4 158:24
**consisted** 19:10
**consistency** 168:19 169:4
**consistent** 76:8 97:25
**consists** 18:25 91:14
**constructed** 87:3 88:17 92:22,25 93:10 111:23,25 155:18,18 165:16,21 171:2
**construction** 41:18 77:17 78:20 79:11,21 81:2 83:10 89:6,8,10,11,25 90:3 92:12 94:16,19 96:4 96:14 111:21 143:17,18 146:1
**consult** 9:18
**consultant** 22:3 29:9,21
**consultants** 29:7
**consulting** 5:18 5:20,25 12:19 13:11 24:12,15 24:23 29:3,4 29:17
**contain** 18:9
**contained** 25:25 46:11 86:7 149:3
**contains** 65:25
**contend** 82:16 93:15 149:4
**contended** 90:20
**continue** 144:5 147:21 165:9 170:15,25 171:6
**continued** 73:14 155:8 162:16
**continues** 139:15 170:13
**contract** 29:8 91:10,14,19,24 92:2,3,5,6,9,10 92:10
**contractor** 6:6 92:15,16,22
**contractors** 91:25
**control** 67:7,21 133:25 134:1,6 134:7,12,18 135:10,10,11 135:12,13,14 135:17,18,20 135:20 158:23 158:25 167:16 167:18
**controlled** 158:20
**controlling** 134:11
**conversation** 44:6
**copies** 173:14
**copy** 17:6,25 27:15 32:2
**corner** 51:19 121:14
**correct** 3:22 7:13,16,17 8:11 9:1,2 11:6 11:9,10 12:1 12:22,23 15:14 16:3 18:1,2 19:2,3,6,7,17 20:23 23:12 26:1,21 28:9 29:15 30:4 34:16 38:23 40:2,20,24 42:5,6,12,13 43:2,19,22 44:15,18 45:14 45:15 46:7,14 46:18 51:6,11 51:12,24 52:3 53:15 54:16,17 54:19 55:4,8,9 55:13,14,17,18 55:21,22 56:13 58:10,19 60:1 61:8,9,15 64:4 64:24,25 65:2

67:7,10 73:8,9 73:22 74:7,14 74:15 77:2,3,6 77:22 78:11 79:2 82:10,17 83:22 84:9 86:15,24 89:17 89:18 90:3,4 90:18 94:24 97:1,22,25 98:1,6 99:10 99:13 100:2,19 100:20 101:4 101:17,18,21 101:22,25 103:10 104:18 104:19,24 107:6 108:11 109:16 110:7 110:25 114:20 117:18 120:13 121:4 127:25 128:4,5,8,24 132:12,18 134:17 138:3,7 138:12 143:2,7 143:14 144:12 144:22,24 145:15,16 147:11 148:7,8 149:4,18,25 152:16 164:24 164:25 165:13 165:14,20 168:20 170:22 170:23 175:8

**corrections** 175:6

**correctly** 86:10 89:14 119:17 148:12

**correlate** 117:7

**corresponding** 109:8 123:24 125:9

**counsel** 18:10 21:5 32:24 33:19 35:20 40:18 44:9 48:15 172:12 173:14

**county** 172:4

**couple** 18:25 44:12 51:16

**coupled** 53:17 134:11 136:6,9 136:11

**course** 3:16,20 6:8 8:24 12:19 24:2 159:14

**court** 1:3 2:16 31:23 32:22 34:5,9 172:5 172:16,17

**courtroom** 11:23 34:4

**covered** 35:1 127:12 156:13

**crawford** 33:22

**creating** 159:24

**crew** 15:1 16:15,17

**crews** 64:23 92:23

**crossing** 52:24

**crosstie** 58:9,14 58:16 66:10

**crossties** 147:5 147:10

**crossville** 3:25 4:2,4,9

**cs** 173:15

**csx** 32:15,23

**culvert** 14:24

**curiosity** 70:9

**current** 13:6 15:2 23:25 27:22 28:18 41:17 43:17 89:24 90:2

**currently** 4:11 13:11,17,20,22

**curve** 55:13,15 58:8,9 61:12 84:18 102:2,4 104:22 105:10 105:17,19 106:15,19 107:1 108:16 108:22 109:4,5 110:6,7,24 112:22 114:6 115:13,17 117:17,18,21 117:21,25 118:2 122:17 124:17,18 125:7 126:14 127:2,3 146:24 155:19 159:3,4 160:12,14,23 160:25 161:14 161:20,22 162:4,4,15,21 163:4,21 164:10 165:12 165:17,18,19 165:23 166:3,5 166:7,12,12,16 170:1,6

**curved** 54:11 54:16 58:4,14 66:5 73:14 102:8,14 103:4 103:13,18,20 105:2 110:18 112:4 113:25 114:16 115:2,6 115:10,24 116:11,22 117:10,10 124:5,6,21 128:7 145:2,13 145:18 146:21 155:19 156:2 160:14 161:9

161:21,24,25 164:18 165:5 169:15
**cut** 103:3,5
**cv** 1:9 2:14 8:7 27:12,15,17 28:3,13,20,24 29:2 30:20,24

**d**

**d** 2:1,22 6:22 39:8 100:4,7
**dad** 31:3
**dam** 159:24
**damage** 119:24 144:5
**damaged** 119:25 120:2,5
**date** 27:21 28:6 32:4 36:12 45:2 81:17 101:21 110:24 113:24 169:16 170:6,10 172:18,22 174:24 175:12
**dated** 28:8 36:18 37:3 41:20 42:4 44:23 46:23 81:3 83:3,11
**day** 3:17 67:21 67:25 68:11,16 71:13 76:3
83:6 85:5 102:23 107:17 107:21 108:8 108:15 109:21 109:25 110:3 112:12,18 114:11 117:11 117:20 118:7 120:11 122:1 122:12 141:12 143:13 175:15
**days** 44:12 173:16
**deal** 19:20 154:6
**dealing** 62:16 87:15 93:4
**dealings** 10:10
**deceleration** 76:16,19 77:5
**decided** 6:17
**declare** 175:4
**decreased** 77:1
**deemed** 175:6
**deeper** 159:23
**defendant** 1:12 1:21
**define** 34:11 62:20,25 65:20 134:5
**defined** 58:21 59:3 62:14 66:1 85:1,9,12 85:16 114:24
116:24
**defines** 63:21 64:6 81:25
**definitely** 63:3
**definition** 51:22 52:5,15 58:22 59:6,8 59:21 60:3 61:18 62:7,9 62:23 63:17 65:25 82:8,14 82:22 83:1 84:2,3,8,21 85:22 90:23 93:6,7,12,15,21 93:23,24 117:2 119:7 133:14 134:16,24 135:2,5,16,22 135:24 143:19 158:4 167:14 167:16,22
**definitions** 62:15 63:5
**degree** 71:16
**delayed** 14:21
**demarcation** 120:25
**dennin** 6:20,22 6:25 29:25 30:2,5,13
**denoted** 113:13
**department** 8:14 12:2,4,5
52:9 63:5
**depend** 22:12 168:18
**dependent** 62:23
**depends** 156:9
**deponent** 173:13 175:3
**deposing** 173:13
**deposition** 1:1 2:13,25 7:15 7:21 8:2 10:7 14:6,7 15:10 17:3,7,8,19,23 18:2,8,11,19 22:13 27:25 32:11,16 36:4 43:24 44:9,13 48:4 51:10 59:25 99:11,23 118:24 129:16 130:10 131:11 132:1 134:2 152:15,19 172:7
**depositions** 2:15 21:4 25:24 31:22 32:7 47:23 48:3 49:22 99:7
**derail** 9:1,3,10 9:16,22 15:24

53:23 54:15,22 55:3,16 56:11 57:9 58:3 66:6 72:17,25 76:2 76:14,24 86:13 87:15 90:23 93:6,7,12,16,21 93:23 97:13,20 97:24 99:1 101:24 103:18 103:21 104:6,6 110:6,7 111:4 111:25 112:4,5 112:17,21,23 112:25 113:3,5 113:7,10 115:1 115:15 116:9 116:25 117:1 119:6,6,8,8,14 128:10 129:4 133:14,16,22 134:8,25 135:2 136:13 137:7 137:14 138:24 139:3,4 142:1 142:23 143:23 144:1,3,4,11,14 145:3,13,18 147:14,16,23 148:21 149:8 149:15,24 151:2,10,18,22 151:22 153:9 154:21,23 155:2,8,12,25 156:6 158:12 158:21,22 159:4 162:1 163:16,16,21 164:1,5,20 165:2 166:2,20 166:25 167:1 168:7 169:16 170:13,14,24 171:9

**derail's** 165:3

**derailed** 67:3 144:20 159:5 170:2,4

**derailing** 156:5

**derailment** 14:25 51:22 52:5,16,22 53:4,7,22 54:2 54:5 55:11,19 56:18 68:4 72:1 76:6 108:24 113:25 119:23 120:7 128:4 130:8 152:5,7 164:6 164:23 165:10 165:22

**derailments** 160:1

**derails** 9:17,20 89:11,12 93:10 93:17,21,25 94:2,6 95:9 101:20 133:11 133:15 134:20 138:4 143:20 143:22 144:19 145:2,12 148:11,11,13 148:18,18,19 149:3,15 150:7 150:19 158:4 160:2

**descending** 70:1,4,16,19,20 148:5

**describe** 34:13 47:20 48:1 99:25 105:16 105:24

**described** 11:8 19:8 71:4 72:1 109:14 129:1

**describes** 30:20 39:20

**describing** 49:14 101:2 106:6

**description** 2:11 49:9

**descriptions** 118:14

**desert** 168:22 168:23

**design** 12:18 77:17 78:19 79:11,21 81:1 83:10 89:5,8,9 92:12 94:19 96:3,17 146:1

**designed** 91:23 128:12 154:21 155:4

**destroyed** 119:22 120:19 130:8 131:16 131:20

**detail** 30:21 47:13

**detailed** 22:1

**details** 49:14 76:4

**determination** 61:11

**determine** 16:12 60:13 70:12,13 71:2 71:20 76:16 77:4 97:24 103:10 108:10 112:12 120:15 168:9 169:11 169:17

**determined** 56:10,17 58:3

**determines** 138:14

**determining** 119:13

**develop** 30:12
**developed** 30:9
**developing** 26:24 30:8
**device** 9:1,3,10 9:16,22 53:24 54:15 72:17 73:1 97:13,24 111:5,25 115:2 134:12
**devices** 143:22
**diagram** 51:21 53:21 55:21 117:13,16 124:22 125:23
**difference** 46:24 47:2 76:12 131:9 148:23
**differences** 169:3
**different** 21:22 22:1 50:11 55:3 62:5 64:19 78:22 79:7 81:13 88:2 114:22 118:1,14 137:7 137:15 148:19 161:8 164:13 164:19
**differently** 110:10
**digging** 160:8
**direct** 146:25
**directing** 146:20 161:25
**direction** 69:21 154:14,15,17 154:19 161:5,8 162:7,9,24 163:5,18 164:11,13,19 165:8,9 166:23 167:2 170:16 170:21,25 171:7,11
**directly** 60:25
**dirt** 155:21 159:5,20,21,23 160:3,7,8,22 161:2,11 162:3 163:23 164:2,2 168:7,9,10,14 168:18 169:7 169:12
**disagree** 98:7 119:18
**disagreement** 51:14
**discipline** 30:7
**disciplined** 31:19
**disclosed** 13:16 35:13
**discovery** 21:4
**discussion** 17:22 148:15
**discussions** 21:19
**distance** 56:18 72:14 76:20 105:12 113:24 114:2 116:8 124:8 147:23 162:25 163:1 168:17,24
**distances** 109:1 125:5
**distinguishing** 25:22
**district** 1:3,4
**divide** 25:1,5
**division** 1:5
**document** 20:18 49:19,20 59:15 77:7,15 77:21 78:7,25 79:12,18,19 80:12,23 81:6 81:10 82:9,15 82:24 83:1,3 83:12,19,22,25 84:3,10 87:13 87:20,21,23 88:4,24 89:23 90:13 91:3,4 93:2 95:22 167:22
**documentation** 22:10,11 46:9 48:17,18 60:5 89:24
**documents** 17:20 18:16,23 25:23 26:7 47:22 48:6,7,8 48:22 49:9,22 50:7 79:13 80:13 81:12 88:12 157:9
**doing** 5:22 6:13 24:23 29:5,13 85:5 91:25 108:8 110:25 136:21 160:20 164:9 165:2 166:2
**dollar** 24:20
**double** 89:12 147:13 149:7 160:25 163:21 164:4
**downhill** 66:16 66:17,22 163:14
**drafted** 49:11
**draw** 102:11 107:9,13,15,16 107:20 108:4,5 121:24 122:24 125:22

**drawing** 111:9 111:20 113:3
**drawings** 96:17 96:21,23 111:22
**drawn** 115:22
**drew** 53:20 108:7 117:13 117:16 122:20
**driven** 155:7
**driving** 154:22 162:5 166:13 166:14
**drop** 41:15 114:18 170:14
**dropped** 57:9 58:9,13,15 61:12 76:17,24 84:18 166:22 168:23,24
**dropping** 171:7
**drops** 114:18
**dspd** 104:17 146:19 149:2
**due** 10:18 129:2
**duly** 3:4 172:15
**duplicate** 31:10
**dustin** 99:9
**duties** 91:18 153:5

**e**

**e** 2:1,10 6:22 21:18 22:13,15 22:16 36:9,17 37:3 158:4 171:16,22 172:1,1 174:3 174:3,3
**earlier** 3:13 21:14 29:1,25 33:8,10 34:1 36:22 45:4 55:10 59:24 65:18 71:3 72:1 76:23 81:8 84:4 87:2 87:10 94:24 108:14,23 121:22 122:23 124:14,14 129:1 134:21 138:1 140:6 142:20 145:17 146:2 156:9 165:11 169:17
**earth** 159:24
**easier** 125:1
**effect** 160:22
**effort** 120:15
**either** 7:21 8:2 15:16,19 20:8 24:21 25:13 36:2 45:21 61:14 62:2 131:6 156:14 156:19 159:19
**electronically** 18:3
**employed** 4:11 4:12,13,14 12:5
**employee** 14:9 22:7 29:17,21 45:6 67:3,20 167:11 172:12
**employees** 4:22 21:23 23:2 61:25 94:15
**empty** 159:22
**encountered** 73:20
**encroached** 61:3
**ended** 110:4 114:1 122:3 127:3 145:18 162:18 170:6
**ends** 122:5 156:8
**engine** 57:5,5,7 57:11 58:8,14 58:17 61:7 66:9 67:4 68:2 72:6 73:14,20 74:13,19 82:5 84:17 128:20 129:9 132:20 136:6 144:7
**engineer** 16:15 16:24 31:11
**engineering** 8:12,14 12:17 133:13
**enjoyed** 31:4
**entered** 11:15 76:13 164:20
**entire** 113:7 147:10 161:4
**entirely** 27:1
**envelope** 72:22
**equal** 72:11
**equipment** 9:23 52:23 53:2 59:17 61:19 63:23 64:9 65:22 67:3,4,21,24 70:13 71:1,20 82:3,4,6 91:16 114:17 128:13 154:22 155:14 156:1 168:6
**errata** 173:11 173:13,16
**errors** 26:23
**esq** 1:17,22
**essentially** 166:19
**estimate** 24:22 25:6

**estimated** 9:7
**estimating** 56:6
**estimation** 7:5
**et** 52:25
**evaluate** 15:23 16:14 29:11 67:19 71:24
**evaluated** 9:14
**evaluating** 9:21
**evaluation** 25:15 27:10 72:24 73:11
**evaluations** 29:6
**event** 53:13 73:7 76:3 98:6 112:3,5 136:21 138:17 139:17 151:6 152:12
**eventually** 75:20
**evidence** 92:19 98:2,10 137:10 151:17 152:7
**evidenced** 172:17
**exact** 7:24 117:11
**exactly** 37:8,20 59:19 65:14 81:14 110:3 112:7,9 117:14 153:19 169:18 169:19 170:8
**examination** 2:5,6 3:7 158:1 167:6
**examinations** 2:2
**examined** 3:4
**example** 89:3 168:22
**except** 21:7 64:12
**excerpt** 2:24 131:10 132:1
**excess** 119:4
**exchanged** 21:5
**excluded** 10:13 10:14 11:9,19 11:21 34:2
**exhibit** 2:13,14 2:15,17,18,19 2:20,20,21,21 2:22,22,23,24 17:3,6 27:12 27:15,16,17 28:13 31:22 32:1 43:5,8,12 44:16 46:19,21 46:25 47:14,16 47:24 48:11 51:3 79:25,25 80:10,16,18,19 80:19,22 83:9 83:17 88:14,15 88:18,22 89:13 89:16 90:14,15 90:15,17,24 91:5,5 93:3 100:4,4,6,7 101:11 121:3 121:15,19,23 122:20 127:17 127:20 131:10 131:14,24 142:19 146:2 158:4
**exhibits** 32:3
**exist** 139:15
**existed** 101:20
**existing** 120:18
**expand** 29:10
**expect** 16:22 18:22
**experience** 28:23
**expert** 3:21 5:24 6:13,14 6:16,17 7:6 8:17 10:4,15 11:11,20 12:22 13:16 24:15 27:4 30:11,11 64:12 88:25 134:20 150:10 153:1
**expertise** 8:5
**experts** 11:12 11:22 51:5 156:25
**expiration** 172:18,22
**explain** 118:10 163:6
**explosion** 52:24
**express** 34:19
**expressed** 11:16 41:8 156:15,19
**extended** 108:16
**extensively** 77:25
**extent** 35:19 48:24 49:21 50:12

**f**

**f** 2:21 79:25,25 80:16 90:15,17 90:24 91:5 93:3 99:20 172:1
**facility** 38:22 92:21 93:18 100:16
**fact** 49:16 66:19 141:25 147:13 161:13
**factor** 71:13,17
**factors** 71:5 156:9,11
**facts** 26:6 35:6 46:8 49:14

61:6
**factual** 25:12 25:16,18
**failed** 9:23 151:18
**fails** 173:18
**fair** 7:11 8:10 23:3 36:25 73:13 130:1 157:16,17
**fall** 166:7,9
**fallen** 168:14
**falling** 168:15
**falls** 164:17
**familiar** 33:24
**far** 4:1 24:25 25:8 26:24 71:7,13 72:6 72:12,25 76:1 117:7 119:25 126:19 129:24 154:9,15 156:8 162:16 168:9 168:13
**fast** 67:23
**faster** 164:1
**february** 32:5 41:20 81:11
**fed** 1:17
**federal** 5:23 10:6 22:19 29:5 32:22 34:9 35:5 96:25 99:22 149:2,9,21,25
**feet** 55:23 56:5 56:8,9,11 59:17 62:1,2 63:14 76:2 82:6 84:15 85:14 97:21 104:3,23 105:18 106:16 110:12,15,17 111:10,17 113:1,4,4,14,14 116:5 119:4 121:10 122:7 122:18 123:10 125:12,16,17 125:19 138:10 138:15,25 139:6,11 140:2 140:10,11,17 140:18,20,23 140:24 141:5,6 141:7 142:1,3 142:5 143:4,6 169:24
**fela** 14:10
**fell** 66:5
**felt** 26:1 41:7
**fianchino** 99:18 129:8,12,19 130:5,16 131:11 132:1 132:11,18
**fianchino's** 2:24
**field** 82:7
**fifteen** 76:2 114:25
**figure** 56:1 57:6 131:17
**figures** 7:24
**file** 14:7 18:3,5 18:8,11,19,25 19:8,10,12 21:3 22:13 23:6 26:15 27:25 28:14 36:3 44:14 47:18,19 78:8 79:16 81:5 95:22 96:16
**filed** 3:15 45:13
**files** 14:4 21:15
**finally** 76:11
**financially** 172:13
**financials** 5:4
**find** 28:5 48:8 49:17 51:17 90:12
**findings** 42:9 42:15
**fine** 94:3 126:2 156:24
**firm** 1:23 16:7 21:16,17 24:3 24:5 25:13,14 33:23 36:22 45:6,15,24
**firmer** 163:19
**first** 3:4 6:13 7:19 10:5,17 10:25 17:16 23:1 32:8 39:2 39:12 41:16 42:19 43:12 54:6,12 55:12 56:15 57:22 92:14 101:9 125:5 126:19 138:21 154:19 158:3 170:2
**five** 50:22 98:5
**flag** 150:16
**flight** 141:15
**flip** 51:17 53:8
**flooding** 33:4
**flop** 148:11
**focus** 8:19
**focuses** 8:25 9:1
**focusing** 79:17
**folks** 39:3 40:18 51:14 53:20
**follow** 14:12 153:22 154:3 167:8
**following** 17:20 73:7 120:7 172:18

**follows** 3:5
**foot** 59:4,13 109:5 110:16 113:9,17 114:25 124:11 125:16,18,20 125:22 126:6 126:16 138:5 138:17,24 139:17 140:14 141:10 142:23 143:1
**force** 66:18,22 75:19 148:6 162:1 163:15 165:6 166:8 170:25
**forces** 92:25 129:2
**forcing** 166:6
**foregoing** 172:8 175:5
**forfar** 172:5,21
**forget** 15:6 80:7
**form** 5:14 35:6 38:18 41:25 60:7 112:20 118:16,19 130:18 134:14 137:4 138:11 144:13 146:10 147:6 154:25 158:15 163:10 164:7 165:24 166:21
**former** 31:13
**forming** 35:20
**forth** 52:16 60:1 83:22 84:20
**forward** 57:8 73:15,16 155:8
**foster** 99:8
**foul** 57:12,24 58:18,20,23 59:1,3,9,10,14 59:17,22 60:4 60:9,14,15,18 61:1,11,14,19 61:24 62:3,6,7 62:10,21,22,23 62:25,25 63:2 63:3,6,11,12,13 63:13,18,21 64:7,18 65:13 65:21,25 72:2 72:19 85:1,9 85:12,15,18,22 85:23 114:19 129:4 145:21 154:8,24 161:15 162:19
**fouling** 9:24 81:25 82:2,8 82:14,21,23 84:2,6,9,14,20 85:19 136:19 145:3,14
**found** 109:5 110:16 113:16 113:19 124:10
**four** 23:24 62:1 62:1 63:14 82:6 84:15 85:14 98:4 126:12
**fourth** 17:15
**fr** 29:9
**fra** 6:7 7:3 8:22 10:9,10 15:20 29:6 30:9,16 30:21,24 31:8 31:17,20 58:22 62:3 63:20 64:2,3,6,15 65:1,4,6,9 73:6 84:13 97:9,10 97:15,19 98:3 98:9,16 99:4 99:12,17 153:4 153:6 167:13 167:20
**fred** 6:20
**free** 133:16 135:4,24
**freewheeling** 135:12
**frequently** 80:13
**friction** 73:18 74:2
**friday** 19:10
**frog** 161:6
**front** 19:15 33:15 34:6 42:19 57:22 60:11 67:10 68:19 75:7 79:25 129:8 145:20 160:3
**fta** 29:10
**full** 3:9 56:4 95:12 158:11
**fully** 11:9
**function** 151:19 166:4
**furnished** 91:15
**furnishing** 91:14
**further** 55:20 55:23 56:12 58:16 72:8,18 73:1 108:16 131:1,6 148:6 155:20 162:11 162:23 163:1 163:22 164:1,2 164:3,16 170:9 172:11,15

**g**

**g** 91:9
**gallivan** 1:17

**gamut** 8:20
**garland** 33:9
**gauge** 54:23,24 55:6,13 107:24 107:25 123:4 123:22,23
**general** 5:25 8:20 15:18
**generally** 160:13
**generate** 40:25
**generated** 26:19 41:19 47:21 48:11 50:12 81:5
**gentleman** 39:5
**geography** 168:19 169:6
**getting** 20:6,14 43:20 44:12 57:14 97:18 148:1
**gi** 91:10,10
**give** 7:15 8:1 11:16 24:19,19 25:5 113:16 118:1 171:16
**given** 14:5 15:10 18:12 32:2 66:3 79:13 156:22 175:9
**gives** 167:22
**giving** 7:8 13:11 84:3 118:13
**glance** 50:10
**glancing** 45:17
**gmail.com** 173:2
**gmail.com.** 171:19
**go** 10:24 14:3 15:8,17 22:3 29:8 36:3 38:21 39:12 40:13 43:25 47:8 48:8 49:18 57:17 58:21 59:7,20 61:22 64:16 69:2 71:1,9 72:9,12 77:7 78:12 81:15,16 86:1 90:5,25 95:21 96:5 98:16 110:21 119:10 121:4 121:18 122:6 125:6 139:20 142:9,18 143:15 144:17 145:25 149:14 152:18 154:13 154:13,14 155:3 158:16 161:17 163:2 164:1 165:9 168:24
**goes** 17:1 74:18 139:24 154:9 154:16 156:2,8 164:3
**going** 8:7 13:6 14:21 17:5 18:6,25 20:10 20:13,21 22:14 22:15 23:4,22 27:14 31:25 41:14 42:2 43:7 46:1,21 47:8,16,17,20 48:3,6,13 50:1 50:3,22 51:2 57:20 60:23,25 61:21 62:8 63:4 66:22 69:24 70:4 72:15 74:7,22 76:12,23 80:6 80:8 86:6 93:19 98:7,17 98:20 101:5,7 106:1,3 118:6 118:17 122:6,8 122:9,14 125:6 125:8 126:17 128:15 131:13 131:13,15 133:5 141:1 142:5 153:11 153:14,19,20 154:2,3,7,13,19 156:21 158:12 159:25 160:9 160:19 162:8,8 162:24 163:2 163:25 164:8 164:10,10,14 166:24 170:25
**golf** 4:10
**good** 3:12 30:21 46:3 127:15 171:12
**gosh** 43:1
**gotten** 90:2
**govern** 64:23
**governs** 65:2 96:24
**grade** 52:24 66:16 69:20,25 70:14,16,21,24 71:2,17 147:22 148:5 156:10 161:13 162:14 163:8
**grammatical** 26:23
**gravitational** 66:18,22 71:18 148:6
**gravity** 129:2 156:10
**great** 33:16

**greenville** 1:19
**ground** 46:8 55:17 56:3 57:6,17,18,20 144:12 145:20 147:1 153:10 153:15,18,24 154:4,20 168:18,19 169:7
**group** 30:6 39:3 97:3
**grow** 4:4,6
**guess** 13:14 17:15 22:16 68:15 103:6 130:9,17 132:7 163:6
**guessing** 69:13 126:16 150:13
**guidance** 94:14 94:17 146:3 167:14
**guide** 133:12 136:13
**guideline** 82:19
**guidelines** 84:13
**gulf** 12:10,11 31:9
**guys** 33:23 36:24 118:6
**gwblawfirm....** 1:20

**h**

**h** 2:10,20 80:18 80:19 83:9,17 88:18,22 89:13 89:16 99:20 146:2 174:3
**half** 7:18 44:16
**hampshire** 10:13 11:8,19
**hand** 17:5 31:25 43:7 47:16 51:19 100:6 121:14 128:10 169:23
**handed** 80:21
**handling** 134:2
**handwritten** 49:25 50:5
**happen** 20:16 98:18 151:22 153:11,14,19 153:20,24 154:7 166:17
**happened** 26:8 110:18,23 128:18 144:24 146:22 151:24 157:7 159:12 166:19 168:6
**happening** 155:13
**hard** 121:22 125:4 168:25
169:2
**head** 44:3 53:17 59:23 78:16 80:11
**headed** 38:15 135:7 164:13 167:1 170:16 170:21 171:9
**header** 36:18
**heading** 161:8 163:18 165:8
**heads** 154:18
**held** 50:25
**help** 36:1
**helpful** 126:3
**hereto** 175:7
**highlight** 49:2
**highlighting** 48:21,24
**highway** 52:24
**hire** 29:6 30:7
**hired** 30:10 31:13
**history** 2:15 10:25 31:22
**hit** 60:19,24,25 62:8 74:3,9 75:20 76:11 84:23 145:20 153:10,15,18 153:24 154:4,4 154:5 160:3 168:7
**hits** 154:20
**hitting** 160:8
**hold** 8:4 52:10 83:20
**holding** 7:24
**hone** 113:18
**hood** 1:23 24:3 24:4 45:15
**hoodlaw.com** 1:25
**hook** 123:22
**hopefully** 36:8
**host** 35:17
**hot** 28:10
**hour** 17:1 50:23
**hours** 24:10,11 24:17,19 25:1 25:6,8,11 43:11,12 45:8
**huh** 16:10 51:24 99:16 104:13 138:3 145:11
**hundred** 23:7 24:13 74:24
**hypothetical** 160:21
**hypothetically** 155:6

**i**

**i.e.** 65:8

**ict** 31:5
**idea** 113:17 114:16 144:3 154:12
**ii** 1:17
**illinois** 12:10 12:11,14 31:16
**impact** 52:25 71:7 75:16,17
**impart** 75:18
**implies** 4:16
**importance** 49:4 120:20,24 130:11 162:3
**important** 37:15 49:8 50:18 67:14 80:9 103:1 112:8 161:10
**imposed** 91:18
**inappropriate** 10:19
**inch** 84:23 85:13 125:18 130:6
**inches** 129:9,20 130:16 131:1,3 131:6 132:21
**incident** 102:24 151:25 169:7 169:16 170:7 171:4,10
**include** 18:11 21:2 22:13 23:22 119:6
**included** 28:14 30:24 34:19 39:5 42:1 45:9 52:5 78:9 79:24 89:2 93:23 95:9 96:16 134:25 135:3,17,23 156:16 157:22 158:4
**includes** 8:14 94:17 95:5,7
**including** 12:18 89:10
**incorrect** 131:7 138:18,19
**increase** 25:11
**increasing** 109:12
**indiana** 4:7,8
**indicate** 152:4
**indicated** 21:14 65:19 129:24
**individual** 75:21 82:3,4
**individuals** 84:15
**industrial** 94:15,17
**industry** 28:17 31:8 54:24 55:7,24 56:19 56:25 57:1 66:25 74:7 75:10 77:18 78:20 79:21 81:2 83:11 84:12 86:8 88:16,17 89:6 89:8,10,12 94:11,19 96:4 97:3 98:4,9 100:1 101:16 103:17 104:2,5 105:14 107:7 109:9 114:1 122:1 123:4,14 124:20 129:25 142:12 144:15 146:2,3,8,11 162:9 163:2 164:15 167:21
**inertia** 66:21 71:9,15 74:3 75:24 129:2 160:9 162:8,10 163:14,25
**inferring** 167:17
**influence** 170:13
**information** 10:7 18:9,12 22:12 25:12,16 25:17,18,25 35:4 37:5,12 38:7,17 41:15 41:16 42:9 73:6 78:10 86:7 90:10 92:24 97:7 98:8,15 129:18 137:20,24 156:23 157:2
**initially** 16:1 21:15 36:22 41:19 164:14
**injured** 15:1
**inner** 66:5 72:9
**inside** 54:11,19 54:21 55:6,13 55:15 58:4,8,9 58:13,15 59:4 59:8,13 60:22 61:5,7,11,12,14 61:16 62:8 63:3,6,13 65:16 73:14 82:11 84:18 95:9 102:2,8 102:11,20 103:4,13 104:22 105:2,5 105:5,17,19 106:15,19 107:1 108:16 108:22 109:4 110:6 113:25 114:6 115:6,23 116:22,24 117:10,17,21

118:2 122:6,17 124:18 126:6 126:14 127:2,3 128:7 129:24 142:22 161:21 161:21,25 162:4 165:6,13 165:17 166:3,5 166:7,9,12,16 169:15 170:1,6
**inspect** 97:9
**inspected** 98:13 98:13
**inspection** 39:24 40:15 50:1 99:4 108:9 110:25
**inspections** 6:7 98:5
**inspector** 73:6 97:9 99:15,17 99:19
**inspectors** 98:9 98:16 112:11
**installation** 150:7
**installed** 94:7 111:5,12,14,16 138:5 144:19 147:17,18 149:16,20 151:11 171:3
**instantaneous...** 156:1
**intact** 81:20
**intend** 34:19,24 35:12
**intended** 9:10 9:16 151:19 154:21 155:3 156:5,6
**intending** 137:1,1
**intent** 91:10 92:2
**intentional** 137:22
**intentionally** 143:23 160:20
**interest** 49:18
**interested** 33:14 113:8 116:8 172:13
**interesting** 27:4 98:19
**interfacing** 12:4
**internal** 97:25
**interview** 41:4 41:5
**introduction** 36:24 86:4
**investigated** 160:1
**investigator** 99:12
**investigators** 112:11
**invoice** 44:23
**invoiced** 25:10
**invoices** 5:7 44:25 45:11
**involve** 9:15 13:18
**involved** 5:1 8:22 9:5 15:2 15:24 33:6 36:23 53:13
**involving** 9:9 16:15
**issue** 20:1,16 60:17 97:12 147:12 167:25
**issued** 98:25
**issues** 16:13,14
**italian** 1:10 3:15 21:22 173:4 174:1 175:1
**item** 142:22
**items** 21:9 48:15 49:2 82:18 83:3

**j**

**job** 30:23 31:5 137:12,18 164:5 165:3
**joe** 39:6
**john** 1:22 20:15 36:10 37:4
**john.radeck** 1:25
**joined** 31:9,12
**joint** 103:8 127:6,7,11
**jr** 1:22
**judge** 10:6,14 10:18 11:9,14 11:22 34:7
**july** 80:10 81:3 83:3,11 100:15 104:11 109:15
**jury** 34:5 35:12 118:18
**justin** 99:8 118:25

**k**

**k** 1:17 3:11 39:8
**keep** 33:12 64:20 79:17 80:6 85:5,6 118:13 133:16 135:3 161:25 162:4,5 163:20 166:5,8,14
**keeps** 14:20
**kelly** 172:5,21
**ken** 6:8
**kenneth** 1:1 2:4 3:3,11 4:14,23 5:14 29:1,14 36:10 173:1,5

174:2,24 175:2 175:4,12
**kenneth.rusk....** 171:19 173:2
**kept** 75:22
**kid** 31:4
**kind** 14:12 19:24 24:19 31:15 36:23 43:25 44:2 49:12 59:22 80:13 139:24
**kinds** 148:19
**knew** 117:7
**know** 6:25 7:23 8:24 14:8,12 15:9 16:13 18:11 19:14 21:24,24 22:14 25:10 26:17 28:12,19 30:10 32:4 33:6 37:8 37:19,20 41:17 45:23 51:4,13 52:6,12 53:16 59:13 60:12,12 61:2,3,4 62:23 62:24 63:1,24 63:24 64:13,15 66:18 67:11,12 67:13,23 68:2 68:6,9,10,14,20 69:3,6,12,14,15 69:17,24 70:21 71:1 72:11,14 73:15,18 75:18 75:22 76:1,4 78:15,21 79:5 79:6 80:3,10 81:9 85:17 87:7 91:1,9 92:3,4,9 93:8 98:21,24 102:1 102:21,25 103:3 105:13 106:11 107:14 109:12 110:1 111:13,25 112:7,8,14,17 113:13,23 114:2,9,21 115:1 119:24 120:2 126:17 127:2,4,9,15 132:20 134:8 135:5,9,13,25 136:20,25 137:21 140:21 150:10,12,18 150:21 151:24 152:23 153:9 153:19 154:2,5 154:6,7,7 158:24 159:13 160:11,18 163:3,24 166:8 169:21 170:7
**knowledge** 15:22 21:2 50:9 172:9
**knox** 172:4
**knoxville** 4:1,2

**l**

**l** 39:8
**label** 102:13
**labeled** 77:16 91:9 121:19
**labor** 91:16
**lack** 22:16 135:18
**landed** 57:18
**language** 87:2 87:6,25 88:8
**latest** 79:13
**law** 1:23 24:3,5 45:15
**lawsuit** 3:14
**lawyers** 26:6 26:11
**lcr** 172:5,17,21
**lead** 54:11 57:5 57:5 103:18 105:3,10,17,19 106:15,19 107:1 112:22 115:10 122:17 124:6,7,21 125:7 126:14 145:2,13 146:21,24 158:12 159:3 161:9,14 162:4 164:10,18 165:5,12,18,19 165:23 166:3,5 166:7,11,12,16 170:1
**leading** 56:2 159:9 161:16
**leave** 20:17 31:17 63:17 140:13
**leaves** 52:23 53:2,5,6 54:6 164:12,17 170:15
**left** 54:12 81:19 128:10,13,15 128:19,20,21 155:20 160:15 160:16 161:4,6 162:5,6,10,11 162:23 163:5 163:22 164:16 166:6,13,15 168:7 170:24
**legal** 100:12 173:23
**length** 55:2 56:4,7 73:3 102:22 117:9 117:22 145:3 145:13 159:3

**licensed** 172:5 172:15,16
**life** 144:5
**limited** 10:6,11 10:18 11:4
**line** 56:25 57:1 74:18,25 75:2 103:16,17,25 104:1,1,2 105:7,13 106:8 106:9,24 107:3 107:5,7,15,25 107:25 108:4,5 108:7 114:5 115:22 117:1 118:4,4 119:11 119:11,12,13 121:10,24 122:20 125:11 125:23 132:2,6 132:15,17 152:22 153:8 153:23 154:1 158:6 174:4,7 174:10,13,16 174:19
**lines** 104:4 108:25
**lining** 73:21
**list** 12:20 32:2 33:7
**listed** 17:20 35:21 42:14
**listen** 106:12
**litigation** 24:8 24:12
**little** 19:20 25:21 26:5 44:11 47:12 50:22 53:21 70:10 75:18 110:9 139:21
**llc** 1:23 29:3
**loaded** 69:11 69:13
**loads** 68:12
**locate** 116:7 138:16
**located** 86:14 87:15 97:13,20 100:1 104:16 105:11 108:22 109:9 112:1,5 112:18 113:18 114:6 116:6 120:12,16,25 140:7 142:2 145:19
**location** 49:17 49:19 54:2 55:17 56:17 57:6,10 70:2 87:14 94:7 98:25 100:18 103:18,23 104:3 108:2,2 111:5,12 114:6 115:9,18 116:23 121:6 123:5 124:3 125:6,12 139:16 142:13 143:1 146:7 147:14 148:22 153:9 168:20 169:7,12,15
**locations** 109:11,15 113:16 119:21 124:8,10,15,16 151:3
**locomotive** 9:23 53:17 55:12 57:23 59:16 60:18 66:4,25 68:8 68:11,13,18,21 69:18 71:20,24 76:10,17 85:13 114:17 128:13 129:9,25 134:11 136:10 136:11 144:15 144:15 155:7 155:22 159:4 162:16 167:10 170:3,19
**locomotives** 71:12 160:2
**log** 101:2
**logically** 37:14
**long** 20:15 29:9 138:16
**longer** 102:2 165:18
**longevity** 29:3 29:7,10,17
**look** 10:24 14:3 15:9 16:11 20:24 46:25,25 47:6,21 49:19 50:1 51:4 54:14 58:21 60:11 64:17 78:14 80:16 81:4 84:6 87:1 89:3 95:16 98:18 104:7 109:22 112:10 121:15 122:19 131:19,21,23 132:15 133:5 134:16 135:14 136:22 137:19 137:23 142:18 162:24
**looked** 65:17 81:13 94:23 95:15 109:23 138:1,22 142:19 146:2
**looking** 8:7 14:13 36:8,9 36:11,17 50:4

56:1 57:3 62:24 67:15,16 70:19 75:1 89:17 93:22 94:1 101:10,16 103:7,22 113:11,12 121:16 131:16 135:10,21 153:16
**looks** 28:8 29:13 30:1,20 33:8 36:21,22 41:20 42:7 43:15 44:16,22 45:18 100:14 122:20
**losing** 75:21
**lost** 56:23 135:12
**lot** 5:22 10:8 22:9 30:19 79:15 81:13 87:7 106:13 159:14 160:1 163:24
**loud** 52:11
**low** 140:2
**lowest** 140:18 140:24
**lydick** 39:6,8 39:17,24 40:16 40:22 152:15 152:23 154:11
**lydick's** 153:13

**m**

**machines** 150:20
**mad** 155:10
**made** 19:22 24:24 28:12 39:1,21 40:18 43:2 49:21,25 57:15 65:23 100:14,22 103:9 104:21 105:3 107:10 107:11 108:6,9 109:13 117:25 120:10 121:5 122:12 124:15 125:24 132:4 144:7 151:23 175:5
**mail** 21:18 36:9 36:17 37:3 171:16
**mails** 22:13,15 22:16
**main** 100:2 118:5 119:24 140:7,12 144:20 154:8 162:25
**mainline** 9:24 9:24 55:20,24 56:12,20,24 57:1,13,24 58:18 61:20 66:17 69:22 70:3,5,5,20 72:3,8,19 73:15,22 74:10 74:12,14,16,19 75:1,6,8,10 97:21 98:12,13 98:13,17,18 101:17 103:17 103:24 104:1,4 104:5 105:6,9 105:12,14 107:11,12 108:3,18 110:13,15 111:10,18 113:1 114:1,5 114:20 115:20 116:9 117:6 119:12,21 120:4 121:6,9 121:11 122:2,7 122:18,21 123:2,3,10 125:9,11,13,16 125:17,19 128:14,23 129:5,10 130:7 131:16,18 132:22 135:8 136:19 139:3 139:20,25 142:12 143:4 144:8 154:24 155:2,9,23 159:6 160:24 162:18 170:9 170:22 171:8
**maintained** 86:14 92:21 146:15
**maintenance** 94:16
**make** 20:25 22:23 25:21 26:12 31:7 38:25 40:7 42:16 43:4 46:24 47:2 48:18 50:4 52:2 54:13 65:17,18 103:3 114:10 118:15 118:18 120:15 121:16 123:12 124:3 130:9
**makes** 33:21
**making** 19:20 20:1 39:24
**manner** 155:14
**manual** 78:23 81:13 83:16 89:16 94:18 95:5,10,12 96:1,3,8 133:11

**march** 32:5
**mark** 8:8 17:6 46:21 51:2 71:1 90:13 102:7 121:24 122:9,11 131:14
**marked** 27:14 28:13 32:1 43:7 48:10 80:22 83:17 91:5 100:6 107:6 110:19 124:4,8,11 127:19
**marker** 121:22
**marks** 151:20 152:1,4
**mass** 160:9
**material** 19:11 23:14 28:2 42:14 80:18 156:4 157:6
**materials** 10:19 17:12 18:6 19:1,4 21:1,4 25:25 26:4 35:8,11,18,19 35:23 36:3 38:20 47:18 48:14 49:7 50:4,10,13 59:25 90:25 91:3,15 95:13 96:14 143:17 143:18 152:15 169:11
**math** 24:25
**matter** 11:7 14:22 15:18 34:25 60:17 70:15 129:15 130:15,25 155:13,21 156:19 162:15 163:9,12
**mattered** 70:18
**matters** 13:17 22:6 24:8 163:13
**mcgivaren** 33:22
**mean** 5:5,21 18:14 23:18 25:16 39:13 43:1 45:5 46:10 62:25 67:11 70:11 73:5 76:11 79:12 87:17,19 87:23 88:19,21 90:9 92:8 103:7 109:24 110:10 123:16 123:20,22 128:12 130:20 135:20 139:8 149:11 151:9 156:5 159:15 161:7
**means** 135:25 138:9 150:14
**meant** 92:9 131:25
**measure** 70:6,8 70:24 103:15 105:9 107:23 107:24 108:21 109:18 110:21 112:3,16 115:4 115:12,14,15 116:13 117:1 121:8 123:14 123:23 124:21 125:8 142:4
**measured** 103:12,16 104:22 105:11 105:18 106:15 107:16,18,18 107:21 109:2 110:19 111:17 111:17 115:5,8 115:17,19 116:1,6,11,21 117:6 121:8,25 124:7,12 125:16,18,19 126:15 129:8 140:17,19 141:7,8 142:2 142:11 143:1,3 143:5 165:11 165:12
**measurement** 103:25 104:1 105:6,20 106:19,24 107:2,4,6,10,11 107:23 108:1,9 110:14,14,20 110:22 114:11 116:2,8,16 117:4,25 118:1 118:3 119:17 122:12 123:8 123:12,25 124:3,12,19,23 125:14,22,24 126:19 129:13 129:19 130:2,7 131:5 132:4,7 132:23,25 140:23,24 142:10 143:12 143:14
**measurements** 40:6,11,19,23 73:6 100:21,22 103:10 104:20 105:3 108:6 109:7,13,25 113:13 116:24 119:3 120:10 122:8 124:9,15 125:11 126:21

131:3 168:8
**measuring** 109:3 118:2 119:5
**mechanical** 30:11 56:6 143:22 150:15 150:17
**meet** 44:5,8 141:9
**meeting** 1:23
**mention** 40:3 95:1
**mentioned** 29:25 85:23 129:20
**merrimack** 6:6
**met** 3:13 44:7
**middle** 17:17 37:2
**miles** 4:3
**mind** 55:11 135:19 136:5 157:6 167:19
**mine** 6:16 167:25
**minimum** 138:5,25 139:6 140:14,17
**minute** 14:1 50:22 80:17
**mississippi** 31:9
**misunderstood** 152:6
**modifications** 42:18
**modify** 58:11 157:2,12
**moment** 8:8 47:9 55:1 57:4
**monday** 36:10 36:18
**morning** 3:12 3:13 44:7
**move** 31:8 49:12 57:8 66:9 70:2 71:8 71:14 84:23 113:20 137:1,1 137:2,8,11,13 137:14,18 141:23 142:14
**moved** 6:12 23:18 57:23 58:16 72:7,18 72:25 73:1 76:2 84:19 85:13
**movement** 60:24 66:18,21 71:10 75:16,20 134:12 136:18 137:21 156:11 158:21,21 159:25
**movements** 71:24
**moves** 159:23
**moving** 66:15 66:16,19,23 67:24 71:4,7 73:16 75:22 156:1 160:5 170:20
**multiple** 78:16 81:9
**mw&s** 93:9,16 93:20 94:1,1,5 94:18 95:2,5,7 95:8,9 138:1 144:18

**n**

**n** 2:1 6:22,22 6:22 99:20,20
**name** 3:9,12 6:21 14:15 39:5 172:18
**nashville** 32:22
**nature** 5:17
**near** 82:7 109:7 122:21 123:9
**necessarily** 163:8
**necessary** 7:16 8:1 20:10 41:7 175:6
**need** 18:6,20,23 20:7,13 37:4 38:7 43:2 50:17 70:24 76:4 131:22 141:16
**needed** 38:18 161:25
**needs** 41:11 149:15,19
**neighborhood** 11:1
**network** 12:13
**never** 11:25 12:2,5,6,24 57:23 74:13,15 74:24,24 75:3 75:13 98:24 114:13 144:7 162:20
**new** 10:13 11:8 11:19 14:1 15:7 29:7 33:8 33:11 78:10 81:12 157:6,12 162:24
**news** 155:11
**non** 135:20
**nonresponsive** 113:21
**nope** 80:17
**norfolk** 1:7 3:14 12:24 13:5,12,18 14:18 15:2,6 15:13,24 33:9

33:11 38:21 45:13 56:20 57:12 58:18 60:18,19 65:11 65:20,24 66:7 66:12 69:22 70:3,5 72:2 73:21 77:16 78:17,19 79:1 79:20,23 82:10 82:16,25 83:15 83:21 84:20 86:13,14 87:14 88:16 89:4,7 90:21,21 91:24 91:25 92:21,22 93:9 94:10 96:20 98:25 99:5 101:17 111:4 119:20 129:5 130:7 132:21 133:22 144:8 146:15 147:13 148:21 155:10 170:21 173:4 174:1 175:1
**normal** 53:3 69:15 75:11 166:20
**north** 100:1 123:2,3 140:7
**notary** 175:13 175:19
**notations** 65:23
**note** 129:7 173:10
**noted** 103:23 175:7
**notes** 2:19 23:5 23:5,17 40:7 47:3,14,21 48:2,4,6,9,10 48:19 49:7,12 49:13,17,21,25 50:5,13,16 65:17,18,18 85:21 99:12 100:8,11,12 142:9,10,19 143:8
**notice** 2:13 17:3,6,8
**noticed** 152:14
**november** 36:10,18 37:3
**ns** 13:7 14:9 16:17,24 18:16 33:15 39:16 59:3 61:1 64:17 70:20 74:10,12,15 75:1 79:11,13 80:12 83:2 89:23 92:25 93:5,7 94:14 94:17 95:9 98:14 100:2 107:11 111:17 114:21 119:24 121:1,10 140:7 143:16 145:10 146:12,19
**number** 7:25 12:21 15:17 24:10,17,18 25:8 28:16 30:10 39:14 43:11 47:20 51:3,18 69:24 81:12 88:14,14 97:21 100:1 161:21 172:17
**numbered** 36:14 101:6
**numbers** 36:14 45:10,17 73:8 119:18 121:14

**o**

**o** 1:22 99:20
**oath** 3:5
**object** 60:7 65:16 112:20 118:16,19 130:18 134:14 137:4 138:11 144:13 146:10 147:6 154:25 158:15 159:9 161:16 163:10 164:7 165:24 166:21
**objection** 118:21
**obligation** 34:18
**obligations** 91:18 92:16
**observations** 132:4
**observe** 40:15
**observed** 102:23
**obstacles** 154:16
**obviously** 157:1 171:20
**occasion** 40:23 151:19,24,25
**occurred** 98:6 100:19 101:25 108:19 111:6 112:19 115:3 136:15 146:8 147:2 151:15 152:12 161:15 165:22 169:8 170:7
**occurs** 52:22
**offer** 16:23 34:25
**offered** 31:5
**offhand** 14:5
**office** 19:9 47:18 127:23

**oh** 52:13 79:10 132:16 145:11
**okay** 12:9 13:4 19:14 36:16,16 51:20 52:13 57:4 75:14 77:12 78:24 81:23 83:7 87:24 92:7 94:3 96:7,8 102:16,18 103:20 104:9 105:15 106:20 106:22 107:5 107:19 108:4,7 115:25 116:4 121:20 122:10 122:16,19 123:1,7 124:17 125:6 126:13 149:12 165:10
**once** 73:13 159:20 160:6 161:23 163:20 168:6 170:15 170:24
**oncoming** 63:23 64:9 65:22 66:7,11
**ongoing** 13:22 14:20 33:12
**onsite** 46:3
**operate** 64:23
**operated** 133:21 155:14
**operates** 146:19
**operating** 12:2 12:4 29:14 59:12,20 61:22 62:9 63:5,24 64:1,12,14,16 64:17,21,22 65:5,7,8,9,11 65:20 67:4,6,9 67:17,20,25 69:21 70:2 71:13,21,25 134:16 150:6,8 167:24
**operation** 76:9 134:23
**operations** 67:16
**opinion** 16:12 21:6 61:17 83:20 111:4,6 111:8 115:11 134:3 140:22 140:22 153:2 155:15 159:11 160:6 161:13 162:19
**opinions** 11:16 13:11,13 16:22 25:20 26:9,13 26:20,24 34:13 34:14,19,24 35:3,7,8,13,20 38:18 41:1,8 41:12 42:10 46:6,11 72:19 79:2 156:13,18 156:22 157:13 157:19 159:2,7 160:12
**opposed** 92:22 112:5 168:14
**order** 11:15 101:7
**original** 27:16 27:20 32:3,12 42:21,25 43:4 44:1 48:16 49:19 78:6,10 81:20 83:13,14 88:5,6 89:1 120:18 162:9
**originally** 31:13 111:14 154:19 161:8 164:19
**outcome** 172:14
**outer** 54:19
**outside** 55:7 62:1 63:15 64:5 84:24,24 84:25 85:1,3,3 85:8,12,14 91:24 102:4,14 102:15 109:5 110:7 113:7 115:6,10,13,17 116:11 117:10 117:18,21,25 124:18 125:7 147:4,5 155:20 160:14 161:24 162:2 165:5,13 165:19,22 170:3
**own** 5:8 26:5 72:12 97:25
**owned** 77:18 78:20 79:21 81:2 83:11 86:8,9,9,14,23 86:23 89:8 92:20 94:19 96:4 146:2,3,8 146:12,15
**owner** 4:25
**owners** 30:13
**ownership** 120:25 121:7

**p**

**p.a.** 1:17
**p.m.** 37:4 171:24
**p.o.** 1:18,24
**package** 171:23
**packet** 101:8

**pad** 100:12
**page** 2:2,11 17:15,16,17 20:25 33:9,15 36:3 37:2 42:10,11,15,16 42:19 43:14 44:22 48:5 51:18,18 52:16 53:8,8 57:7 77:8 81:4,21 89:3 90:25 92:14,14 94:9 95:21 96:6,15 99:25 101:10 101:15 104:7 106:6 116:19 121:14,19 122:20,24 123:9 125:1,3 126:10 127:8 131:24 132:2 132:17 133:5 137:25 143:15 145:1,6,7,8 146:18 147:20 148:25 152:18 152:19,22 153:8 174:4,7 174:10,13,16 174:19
**pages** 19:11 21:1 28:2 119:22 172:8
**paid** 5:11
**paragraph** 42:19 86:5 104:10 133:8 145:9
**parallel** 100:2 139:17,19,22 139:23,25 140:3,4,7,9,10 140:12 141:11 142:4,13
**pardon** 82:11
**part** 4:16 9:4,5 9:18 12:13 17:21 18:19 22:11,17 23:1 23:10 32:2 38:23 43:12 46:14 47:19 52:18,20,21 62:3,11,14,15 62:24 63:8,8 63:18 64:2 65:10 71:15 74:2 84:4,12 92:3,4,8,9,10 95:10 96:2 97:8 99:13 119:22 121:19 127:24 130:2 130:17 137:12 137:18 144:17 145:8 146:11 148:25 149:3 149:14 150:3 150:19,23,25 151:8,9 168:18
**participate** 29:11
**particular** 8:25 16:8 34:15 43:13 45:1,9 49:2,3 57:20 78:22 86:21 87:12 93:2 117:5 151:10
**parties** 172:12
**partners** 94:15
**parts** 161:9
**past** 15:3 16:5 114:23 118:7 137:14 160:6
**pasta** 1:10 3:15 21:23 22:7 173:4 174:1 175:1
**path** 154:4
**pending** 13:25 32:19 142:15
**people** 30:8 39:14,14,15,16 148:17 150:17 150:20
**percent** 23:8 24:14,14,15 69:25 70:1 74:24
**percentage** 24:9,13 70:16 70:21
**perform** 9:10 9:16 151:18
**performed** 91:13
**performing** 164:5
**period** 30:1 37:18
**permission** 137:11,17,18
**permit** 138:6 138:15 139:2,6 139:9
**person** 56:7 107:24 123:18 134:17
**personally** 19:5 168:4
**pertinent** 26:1 90:7
**peterson** 99:9
**phone** 44:6
**photograph** 101:9,14,15 121:18
**photographs** 2:23 40:7,8,11 40:19,23 54:15 100:9,24 101:3 101:6 110:2 121:2,16

127:17,21 149:12 169:22
**picking** 52:2
**picture** 53:9,21 56:2,3,13 57:10 58:5,6 101:20 102:17 126:7 133:3 161:20
**pictures** 55:5 56:21 102:3 110:8 112:10 119:22 131:21
**piece** 127:11 154:22 169:21
**place** 1:18 65:14 75:15 79:3,23 87:3 90:2,6 97:24 101:24 128:3 149:8 151:14
**placed** 76:2 113:5 138:24
**placement** 82:3 89:11
**places** 48:20 78:16
**plaintiff** 1:8,16 10:20 11:11 14:8,16
**plaintiff's** 10:15
**plan** 4:20 35:15 69:23 70:7 113:13
**plate** 58:23,24 58:25 59:2 60:22 61:3,4,8 61:12,14,16 62:7 63:3,15 65:15,16 66:6 72:21 84:24 85:3,6,7,10 129:25
**play** 5:2 26:18 71:17 150:16 156:11,12 161:23
**players** 12:12
**please** 3:10
**plus** 78:10 110:12 111:10 113:4 121:7,11 142:22 143:3
**point** 35:2 37:9 38:22 53:1,3,7 53:22 54:2,4 55:11,19 56:11 56:15,18 57:2 57:2,8,11 58:3 58:15 59:15 63:7 66:9 67:24 68:3 71:25 72:2,7 73:20 74:10,17 74:19 75:23,25 76:5,20,20,23 76:24 77:1,2 79:3 84:22 89:12,22 103:24 104:17 105:7,11,13 106:18 107:4,6 107:10 108:21 108:24 109:6 110:16,19 112:1,18 113:3 113:6,7,9,17,25 114:23,24,25 115:3,7,19 116:2,7 117:5 117:6 119:14 119:15 120:3 120:24 121:6,6 121:9 122:2,3 122:7 123:17 124:11,11,23 124:24 125:13 125:16 129:3,4 131:16,20 137:3 140:13 140:14,18 141:8 145:2,12 145:18 147:13 149:7 150:7,8 164:5,6,22 165:1,3,8,10,15 165:22 166:3 167:20 169:23
**pointed** 116:18 117:16 154:14 162:20
**pointing** 53:23 80:9 162:17
**points** 44:3 55:16 104:4,16 108:3 109:1,1 110:13,15,17 111:11,18 112:22 113:1,2 113:10 114:22 115:13 120:3,6 120:11,16,23 121:11 122:7 125:18,19 127:11 161:19
**policies** 87:12 90:2,6 94:23 96:21 97:25
**policy** 78:17 79:9,23 81:18 85:2 86:21 87:11 88:11,16 90:20,22 91:23 93:9,16 138:16 145:10
**popped** 59:23
**portion** 54:22 92:20
**portions** 131:25
**position** 53:3 61:19 66:11 84:17 121:12 135:9 156:6

**possible** 162:6
**postponing** 33:13
**power** 154:23 155:8 158:11 160:20
**powered** 135:13
**practical** 133:12
**practices** 65:9 134:16 167:25
**predict** 153:20
**prepare** 44:9 48:15
**prepared** 111:20
**prepares** 5:6
**preparing** 49:6
**prescribe** 149:19,21
**press** 28:10
**pretty** 30:20 93:6 127:12 166:22
**prevent** 9:23 154:22
**prevented** 155:12
**prevents** 136:18
**previous** 152:5 152:17
**previously** 9:8
**print** 28:7 131:24
**printed** 47:1
**prior** 17:9,23 24:5 36:4 99:1 120:16 151:19 152:7
**private** 10:8 31:8
**privately** 77:17 78:20 79:21 81:2 83:11 86:8 88:17 89:8 94:19 96:4 146:1,3,8
**privileged** 21:25
**probably** 7:22 8:3 11:1 20:19 23:23 32:5 38:9 50:17 56:5 75:11 76:7,12 140:9 168:24
**problem** 20:2
**procedure** 93:21 94:6,18 95:5,8 138:1
**procedures** 94:16 95:9 96:3
**proceeding** 20:2
**process** 164:9
**produce** 21:10 22:2,4,24,25 23:9 160:21
**produced** 18:16,17,21 21:8 22:10 23:15 25:17,19 28:17 46:10 79:13,16 157:9
**product** 40:25 45:4
**production** 17:18 77:8 95:22
**programs** 27:9 30:8,12
**project** 31:11 77:24 91:17
**prompted** 31:1 31:7
**proofread** 26:23
**propelled** 66:25 129:3
**proper** 94:16 97:14,16 111:5 141:25 162:15
**properly** 155:19 158:9 165:16,21 167:10
**property** 6:1 92:1 98:11,14 121:10 144:6
**proprietary** 22:16
**proprietor** 5:10
**protect** 145:4 145:14 150:15 150:20 155:2
**protected** 22:18 145:22 155:24 160:24
**protecting** 151:7
**protection** 8:22 62:13,20
**protections** 62:17
**protective** 147:16
**provide** 34:18 46:16,17 50:14 83:9 97:7
**provided** 18:9 21:7 25:23 26:25 35:18,24 36:3 37:5 38:8 38:16 42:3 46:22 47:23 48:14 88:12 89:23,23 98:3 100:7 127:22
**provides** 89:9 94:14
**provision** 86:6 150:4

**provisions** 83:16,18,21 87:12
**proximity** 82:4
**public** 175:19
**publication** 89:6 167:21
**publicly** 10:7
**published** 89:5 133:13
**pull** 71:18
**pulling** 67:1 68:17,21
**purpose** 133:15 135:3 148:15 155:1 160:25 163:3
**purposely** 155:7
**purposes** 87:9 140:15 141:4 158:8 160:17
**push** 139:3
**pushing** 68:15 68:23
**put** 18:12 23:5 27:25 36:24 81:12 102:11 103:2 105:15 105:18,23 106:1,6,17,23 106:25 111:9 111:11 122:18 124:8 127:13 139:4,9,10,11 144:11 156:6

**q**

**qualifications** 141:9
**qualified** 11:15 153:1
**quarter** 32:8
**question** 20:5 20:19 21:13 25:21 38:14 57:16 72:23 83:8,24 84:5 93:19 103:2 106:12 108:14 111:24 113:23 117:12 132:3 132:16 137:16 140:16 141:4,5 141:22,23 142:15 153:16 153:22 154:16 157:10 158:8 160:18 164:22 170:12
**questioning** 156:14 158:6
**questions** 17:2 20:10 141:20 157:25 158:3 167:3,9 168:5 170:17
**quibbling** 140:21
**quick** 160:10
**quicker** 106:13
**quite** 157:10 171:5
**quote** 19:9 52:18,20 65:5 133:10 135:23 145:25 169:12
**quoting** 144:18 145:10 146:18

**r**

**r** 3:11 172:1 174:3,3
**radeck** 1:22 2:6 17:1 18:4,21 19:6,16,19 20:3,9 22:18 24:3 25:14 36:1,6,10,23 37:3 38:3,10 44:5 60:7 68:22 112:20 118:6,16,19 125:25 126:5 130:18 134:14 137:4 138:11 141:14,18 144:13 146:10 147:6 154:25 157:16,23,25 158:2,19 159:10 162:12 163:11 164:21 166:1 167:3 171:13,14,22
**radeck's** 19:9 47:18 167:8 170:17
**rail** 52:23,24 53:2,7 54:7,11 54:11,12,19,19 54:22 55:6,8 55:13,15 56:16 57:9,17,18 58:4,7,8,9,14 58:16 59:16 61:12 63:14 66:5,10,20 72:9 73:14 74:9 76:17,25 82:7 84:15,18 102:1,2,4,9,14 102:19,21 103:4,13,24 104:22 105:3,6 105:10,12,17 105:20,25 106:15,19 107:1,24,25,25 108:16,22 109:4,5,7,8 110:4,6,7,18,24 112:4,13,14,15 114:1,6,16,18 114:19 115:2,6

115:10,13,17 115:24 116:11 116:22 117:10 117:10,17,18 117:21,21,25 118:2 122:5,17 122:21,21,24 123:2,3,9,9,23 123:24,24 124:7,17,18,20 124:20,21 125:7,9 126:15 127:3,3 128:3 128:6,7,20 132:7,8,12,16 133:1,4 145:18 152:1 154:2,3 154:4 156:2 159:15,18 160:2,12,15,23 161:14,21,22 161:24,25 162:4,22 163:17 164:17 164:24 165:12 165:18,18,19 165:23 166:4,5 166:7,8,11,12 168:23 169:15 170:1,6,15 171:7

**railbound** 29:11

**railcar** 53:10 69:15,16,16 71:12 114:18 131:18 146:20 146:24 147:22 153:15 155:20 156:4 162:23

**railcars** 53:13 71:24 134:10 137:11,13,14 137:18 144:7 147:21

**railroad** 5:18 8:13 12:1,3,7 12:22 14:25 15:21 22:8 23:2 28:16 31:10 38:22 39:15 40:18 64:15 65:8 84:11 92:20 96:25 97:9,13 97:20,23 138:14 153:1

**railroad's** 23:11,14

**railroading** 31:2

**railroads** 5:25 6:10 12:21 64:22 65:2,7 96:25 97:6

**rails** 54:16 55:2 72:7 74:14 101:19,24 102:18 112:23 115:8 124:6 128:22 144:11 145:2,13 146:20,21,24 147:4 155:19 159:3 161:9 164:11,18 165:5 166:12 166:16

**railway** 1:7 33:10 68:24 77:16 86:9,23 89:7 133:12 173:4 174:1 175:1

**ran** 42:21 134:7

**range** 151:12

**rate** 25:2 76:16 77:5

**rather** 67:10

**reach** 41:7 72:21 73:25 166:15

**reached** 26:20 29:10 34:14 41:12 46:7 68:3 72:16,18 74:15,18,19,24 75:13 76:5,24 77:1 111:4

**reaching** 9:24

**read** 17:21 26:22 42:25 52:4,10,11,14 60:12 67:5 69:5 81:24 82:1,23 86:6 86:10 87:21,22 89:14 106:7 118:24 133:2,3 139:5 140:5 149:5 152:23 171:14,22 173:9 175:5

**reading** 27:3

**ready** 43:20,23 44:12

**real** 160:10

**reality** 73:3

**realize** 36:14

**really** 84:6 123:18 126:17 130:16,25 134:3

**rear** 67:9 68:19

**reason** 11:21 21:10 31:19 50:16 52:23 117:24 142:25 144:10 149:10 155:9 173:11 174:6,9,12,15 174:18,21

**reasons** 21:13
**recall** 9:12,19 9:21 14:5,15 14:18 15:15,18 37:20,21 41:21 129:10 170:16
**receipt** 173:17
**receive** 19:9 25:12 35:3
**received** 25:8 35:19 37:21
**recently** 42:4
**recognize** 33:23 47:24 80:23 100:8
**recognized** 84:11
**recollection** 37:11
**reconstruction** 120:17
**record** 3:1,9 52:3 81:24 82:1 171:24 172:9
**records** 44:17 46:13
**redirecting** 161:3
**reexamination** 2:7
**refer** 3:16 54:18 137:25
**reference** 35:17 78:13 81:17 83:12 95:1 148:25
**referenced** 96:11 173:6
**references** 42:8 88:15
**referencing** 6:19 62:12
**referred** 18:10 23:6 64:2
**referring** 17:14 102:8
**refers** 29:2 143:16
**reflect** 44:25 107:20
**reflected** 100:21 156:20
**reflects** 123:8 128:3 167:14
**regardless** 78:24 161:12 162:13 170:5
**regards** 6:1
**regional** 31:10
**regulate** 65:2
**regulation** 63:20 64:2,3,6 64:11 97:19 167:14,20
**regulations** 5:23 8:23 13:14 14:14 15:20 62:20 65:1,4,6 84:14 97:10,15 149:21,25
**regulatory** 31:15 96:24 97:5 127:23
**reifers** 32:25
**reimbursed** 25:9
**relate** 16:23 17:12 45:12
**related** 49:7 136:22 172:11
**relates** 21:10 41:1
**relating** 50:13
**relation** 112:1 112:18 152:11
**relationship** 113:10
**relevance** 129:20,23
**relevant** 62:19 62:21 90:8
**reliance** 131:7
**relied** 25:14,24 26:8 35:20 59:25 77:21 83:25 86:22 99:13 130:1
**rely** 19:23 49:12 79:19 80:14
**relying** 10:18
**remained** 57:10 66:4 84:17
**remember** 10:20 33:18,20 39:13 44:4 59:2,19 65:13 67:11 81:14 138:2 158:6
**remembering** 59:21 148:12
**remote** 67:6,20 134:12
**repeatedly** 79:1 92:14
**replaced** 120:7
**report** 2:18,20 2:21,22 17:25 18:10 22:12 26:19,22,25 27:5,16,20 32:3,12,13 34:13,18 35:1 35:3,9,14,16,17 35:21 39:19 40:3 41:16,19 42:8,17,18,21 42:22 43:1,3 44:1,2 46:19 46:22 47:10,12 49:11,13,15,18 51:5,8,10 52:6 52:8,17 53:9

54:18 57:7 60:1,6,9,14 65:15 72:10,16 78:1,3,6,9,10 78:16 79:1,4 79:22,24 80:15 80:19 81:9,16 81:20 82:9,16 82:24 83:13,15 83:15 85:21 86:12,18,22 87:13 88:3,8 88:11,13,23,25 89:2,4,20 90:6 90:15,17 91:5 93:3 94:9 95:19 96:12,14 99:25 100:4,7 104:8 105:16 105:24 106:5,7 106:14,18 107:2 111:3 116:10,15 123:8 129:7,17 131:17 133:6 134:25 135:3 135:17,23 140:5,6 146:14 147:20,25 148:10 149:1,4 156:15,17,20 157:22 165:17

**reported** 73:7 172:7

**reporter** 6:21 39:7 58:24 171:20 172:6 172:17

**reporting** 172:16

**reports** 22:2 23:23 34:8 157:8,9

**represent** 127:22

**representatives** 17:18

**represented** 47:19

**representing** 3:14

**represents** 108:8

**request** 19:22

**requested** 39:17

**require** 65:7 149:15,23 150:3,5,7 151:8

**required** 9:18 91:17 138:9 147:18 171:1 175:13

**requirement** 35:5

**requirements** 89:9,10 99:4 149:2,9

**requires** 64:15 150:19

**research** 78:7 134:2

**reserving** 157:5 157:11

**reside** 3:24

**respond** 130:22

**responded** 38:6 51:9

**response** 38:2 170:17

**responsibilities** 30:23

**responsive** 142:15

**rest** 72:2 76:21

**rested** 75:13

**result** 171:3,6

**retained** 3:21 7:11,14 12:21 12:24 13:4 14:2,19 15:13 15:23 16:2 21:16,19 33:18 36:23 39:6 46:5 51:5

**return** 173:13 173:16

**review** 17:8 19:2 35:18 44:2 48:16,18 49:22 50:13 59:20 65:8,11 77:23 99:11,23 173:7

**reviewed** 25:19 25:24 26:4 38:21 59:16 60:5 65:12 99:8 157:19

**reviewing** 49:7 50:6

**ride** 163:19

**right** 14:17 18:20 20:22 25:21 38:15 39:25 41:24 43:18 44:17 45:22 51:19 54:23 55:3 57:23 58:5 61:6,13 64:3 68:18 71:17,18 74:12 75:8 76:22 78:10 80:10 84:22 85:16 86:19 89:3,21 94:7 97:17 103:13 103:22 105:8 105:25 106:4 106:24 107:14 108:12 110:2 115:9,21 121:14 122:14 125:8 126:8,14

127:5 128:7,14 128:18,20 129:5 131:5,6 134:21 136:23 137:8,23 138:17 140:1,2 140:16,18,25 141:6,8 142:7 142:19,23,24 143:6,9,20 145:8,23 146:16,22 147:17 148:3 149:17,20,24 156:11 157:3,4 157:5,6,11,13 160:15 165:19 165:23,25 166:13,17 169:18,22 171:1,9
**rightmier** 23:15 45:9,25
**roadway** 8:21 62:13,16,20
**rock** 73:21
**role** 5:2 26:19
**roll** 147:21,23 148:6
**rolling** 133:16 133:20 135:4,6 135:7,24 136:1 136:18 144:20 158:5,14
**ron** 3:12 19:19
**ronald** 1:17
**rough** 24:22 25:5 45:17
**roughly** 45:19 129:9
**rule** 30:9 34:8 34:11,18 85:9 85:12,16 140:20 150:8 167:13
**rulemaking** 10:11
**rulemakings** 10:9
**rules** 13:13 14:14 15:21 22:19 35:6 41:17 59:12,20 61:22 63:25 64:1,12,14,16 64:17,21,23 65:5,7,8,11,20 65:25 150:6,15 150:16
**running** 53:3,6 73:18,23 74:5 74:6,11 82:7 128:22 152:3
**rusk** 1:1 2:4 3:3 3:11,12 4:14 4:23 5:14 6:9 17:5 20:22 21:14 28:7 29:2,14 30:2 36:5,10 43:9 43:15 44:19 46:21 51:2 77:8,11 80:21 81:4,5,22 83:6 84:16 85:2 86:1 91:1,4,8 91:22 95:15 97:18 106:12 121:13 137:16 141:12 152:19 156:14 167:8 173:1,5 174:2 174:24 175:2,4 175:12
**rusk's** 2:14,20 2:21,22 27:12 80:19 90:15 100:4
**rwray** 1:20

**s**

**s** 2:10 3:11 174:3
**safety** 5:18,19 5:23,25 8:6,17 8:18,21 9:6 11:12 29:12
**sal** 1:9
**salary** 5:11
**samples** 169:10
**sand** 168:23
**saw** 46:9 55:6 72:16 119:2,4 127:24 132:24 133:3 149:13 151:20 152:2
**saying** 11:15 18:15 26:3 36:21 38:6 39:20 54:14 58:2,7 63:8,10 63:16 80:7 85:6 95:21 102:19 117:9 130:15 137:13 139:5 155:12 162:14
**says** 17:18 28:18 36:9 37:4 38:3 43:15 51:18,22 52:8 53:22 59:16 65:25 82:2 86:6,22 86:25 87:18 91:13 92:2 104:21 114:21 114:22,22 116:22 132:14 133:15 135:3 135:24 136:13 136:17 138:4 144:3,19 145:2 145:12 151:1 168:2

**scan** 49:17
**scenario** 72:6
**scenarios** 72:4 138:21
**scene** 26:5 112:12
**school** 31:5
**scope** 11:4 22:24
**scroll** 91:8 92:13 95:25
**search** 60:13
**seat** 58:24
**second** 7:18 11:7 23:10 36:6 39:10,16 39:22,23 40:8 40:9,13,21 41:1 78:14 106:4 111:21 121:2 124:23 126:25 133:8 139:24 145:9
**seconds** 68:7
**secretariat** 51:6 52:6,16 53:9,20 55:21 56:13 57:7
**secretariat's** 131:17
**section** 51:22 81:24 86:5,13 88:20,23 91:9 94:9 95:2 133:6,10 143:16 144:19 145:1,9 146:14
**sections** 42:23
**secure** 167:25
**secured** 133:22 134:13 135:14 158:13
**see** 12:20 13:8 15:9 17:11,16 21:17 25:1 27:20 28:3,5,5 32:11 33:7 37:6,25 38:3 42:23 43:15 44:20,23 48:21 49:25 51:17,23 53:10,24 57:9 59:6 77:9,15 77:19 78:12,12 86:4 87:1 90:11 91:11,20 92:18 93:22 94:12,21 98:2 98:8,10,15,18 101:12,19 102:16,16 104:12 107:12 107:13 109:10 121:2,22 129:12 130:10 132:9,10,19 133:7,11,18 134:1 143:17 145:5,11 146:5 148:1 152:1,3 152:7 161:19
**seeing** 45:12 93:24 101:3
**seem** 50:18
**seen** 160:1
**self** 4:12,13
**send** 18:18,22 38:1 50:18 171:14
**sense** 118:15,18
**sent** 19:1 38:4 38:11 173:14
**sentence** 104:21 136:17 138:21 139:14 139:24
**sentences** 138:20
**separate** 9:4 22:6 45:5 54:16
**separately** 50:2
**september** 1:2 173:3
**series** 127:21
**session** 6:3
**set** 14:5 20:25 52:16 57:22 60:1 83:21 84:20,22 146:20 151:20 158:9 167:10
**sets** 147:9
**shade** 122:4
**shaped** 148:13
**shared** 157:21
**sheet** 2:17 43:5 173:11
**sheets** 43:10 45:18
**shoot** 154:7
**short** 75:6 132:21 159:6 161:22 169:21
**shorter** 55:7 131:6 165:12
**show** 27:14 43:10 48:20 72:6 95:11 109:18 116:10 116:15,16 121:25 122:13 124:22,22 125:21,23 127:19 131:13 168:13
**showed** 69:24 70:7 109:14 110:3 111:23 115:21 133:4 140:24
**showing** 131:18 148:19
**shown** 56:21 57:6 58:5 119:21 123:9

**shows** 55:21 56:13 108:5 122:11
**side** 6:13 8:9 12:1,17 31:15 61:24,25 82:7 123:23,23 126:19 128:21 170:1
**sidelined** 57:14
**siding** 86:16
**sign** 171:15,22 173:12
**signal** 30:11
**signature** 172:21
**signed** 173:19
**significance** 49:4
**similar** 19:24 139:22 153:5
**simple** 83:8 141:22
**simulation** 72:24 73:11
**simulations** 71:19 72:5 168:13
**single** 123:18
**sit** 41:6 66:2 141:12 157:18
**site** 16:11,12 23:18 46:2,9 50:1 70:6 100:15 102:3 104:11 108:9 109:16 110:11 110:25
**sitting** 64:10
**situation** 138:22 170:19
**six** 56:5,8,9,11 68:12 169:24
**size** 69:3,15
**skills** 172:10
**skip** 81:21 101:5
**slow** 73:19
**small** 127:10
**snippet** 95:18
**soil** 168:25 169:2,10
**sole** 4:25 5:10 30:13
**solely** 97:23
**solutions** 173:23
**somebody** 33:22 111:17 154:22
**sorry** 36:13 39:7 52:13 81:22 88:10 96:5 152:9
**sound** 18:24
**sounds** 19:20 33:24 37:15 45:22
**south** 1:4,19,24 100:16 127:23
**southern** 1:7 3:14 12:25 13:5,12,18 14:18 15:3,6 15:13,24 33:9 33:11,16 38:22 45:13 56:20 57:12 58:18 60:18,19 65:11 65:20,24 66:8 66:12 69:22 70:3,5 72:3 73:21 77:16 78:17,19 79:1 79:20,23 82:10 82:16,25 83:16 83:21 84:20 86:13,14 87:14 88:16 89:4,7 90:21,21 91:24 91:25 92:21,23 93:10 94:10 96:20 98:25 99:5 101:17 111:4 119:21 129:5 130:7 132:22 133:22 144:8 146:16 147:13 148:21 155:11 170:21 173:4 174:1 175:1
**space** 73:2
**speaking** 160:13
**specific** 8:17 30:7 61:15 62:11 93:16 97:20 106:5 150:22
**specifically** 42:8 43:23 44:1 93:9
**specification** 79:11 80:18 81:1 92:12 96:3 146:1
**specifications** 77:17 78:19 79:20 83:10 86:7 89:5,7 94:18 96:13 143:16
**speed** 68:2,6 71:6 75:21 76:4,7,10,12,23 77:1 129:2 147:22 156:9 160:19 161:12 162:14 163:8
**speeds** 71:21
**spend** 24:7,12 24:23
**split** 148:18 163:21

**spot** 53:23 61:15 66:4 84:19 97:14,16 105:16,23 106:6 110:21 110:23 113:14 113:14 114:19 124:2,5 125:7 126:4 136:3
**spots** 108:12 117:8
**staff** 127:23
**stage** 23:1,23
**stand** 117:24
**standard** 80:17 92:11 93:20 94:1,6,18 95:5 95:8,9 96:2,13 138:1 143:16 144:18 148:18 163:16 166:20 166:25
**standards** 87:12 94:1,11
**standing** 62:4 92:8 101:15
**start** 51:15 77:9 159:22
**started** 4:20 5:22 122:2 124:4
**starting** 126:19
**starts** 160:8
**state** 3:9 99:14 99:19,22 150:1 172:2,6
**stated** 83:2 93:20 98:15 110:9 111:9
**statement** 57:15 85:18 98:8 106:5 121:5 139:13 148:3
**states** 1:3 149:1 149:3
**stating** 84:14
**station** 111:10
**stay** 98:17 142:7 154:3
**stayed** 74:23 75:4,12
**steel** 159:16,16
**step** 22:8,9
**steve** 33:22
**stick** 142:5
**stock** 133:17,20 135:4,6,7,24 136:1,18 144:20 158:5 158:14
**stop** 68:8 72:13 73:3,4,16,17,19 74:3,4 75:23 118:7 147:21 156:1,5,7 159:25 160:22 164:5 166:2 171:1
**stopped** 57:8 58:15 61:13 71:21 72:12,14 75:5,6,23,24 76:19 132:21 145:23 159:6 159:12
**stopping** 75:16 77:2 156:3
**stops** 75:20 160:5
**straight** 107:15 163:2 164:14
**street** 1:23
**strike** 113:20 142:14 148:9
**strong** 68:22
**struck** 61:17,19 62:2,4 63:4,22 64:9 65:16,22 66:7,11 82:5 145:24
**structure** 9:4 16:13 57:19 67:15 161:1,11
**struggling** 118:22
**stuff** 26:23
**sub** 6:17
**subcompone...** 8:18
**subject** 14:22 15:18
**submitted** 18:2
**subpoena** 2:13 17:3,7,9,11,16
**subscribed** 175:14
**subsection** 62:12
**subsections** 8:18
**substance** 28:19
**suck** 160:9
**sued** 21:23
**sufficient** 145:3 145:13 159:3,4 161:14
**suggesting** 148:20 151:18
**suing** 23:2
**suite** 1:18
**summaries** 47:22 48:15,16
**superintende...** 91:16
**supplement** 88:6,7
**supplemental** 2:18 17:25 42:1,3,7,9,10 42:15,16,22,23 44:1 46:19,22 51:5,8 78:1,2,9

81:16 83:15 88:13,19,20,23 88:25 89:2 90:10 131:17 148:10 157:8
**supplies** 91:16
**support** 35:8 35:12 159:20 159:21
**supports** 159:15,16
**supposed** 92:16 111:11 112:25 113:2,5 121:7 123:6 136:2,2 136:7
**sure** 9:17 14:12 14:21 20:25 22:23 23:8 24:18 31:6 50:24 52:3 54:13 59:11 74:1,21 76:9 78:5,11 83:3 102:1,3 103:5 105:21 118:9 119:25 121:16 130:12,20,21 133:24,25 134:15 135:11 153:21 169:2 171:5
**surface** 53:6 163:19 168:7
**surprise** 87:5
**surveying** 70:13,25
**switch** 55:16 89:12 103:24 110:13 112:22 112:25 113:2 113:10 117:6 120:3,6,11,16 125:17 145:2 145:12 146:19 147:13 148:18 149:7 163:21 164:5 169:23
**switches** 121:9
**sworn** 3:4 175:14

**t**

**t** 2:10 172:1,1 174:3,3
**take** 30:19 40:7 40:22 47:11 48:4,7 50:10 50:21 60:11 73:4 89:19 107:22 109:25 110:21 116:7 119:12 121:21 123:25 147:12 163:24 169:10
**taken** 23:5 27:4 48:2 56:3 100:24 104:5 110:3 112:11 113:6
**talk** 7:18 26:5 40:4 53:14 72:15 92:15 133:7 135:17 141:16 148:10 148:13 160:12
**talked** 40:5 145:17 158:5
**talking** 3:18 44:3 52:21 56:24 69:7,8 74:6,21,25 77:10 88:22,24 95:17 96:8 99:14 111:22 118:7 127:7
**talks** 104:20 141:10
**task** 27:5
**technological** 70:23
**technologically** 70:10
**tell** 3:24 5:5,20 13:20 18:14 23:7 26:8 27:19 32:1 35:6,12 43:9 47:17 52:21 70:19 85:11 115:16 125:2,4 131:25 132:3 138:19 141:19 153:11 157:15 157:16
**telling** 33:10 55:1,10 79:5 123:7 135:5 165:17
**tells** 97:19
**ten** 12:16 15:8
**tennessee** 3:25 4:9 172:2,6,16
**term** 59:10 60:22 61:1 62:22 63:2,6 63:11,12,13 64:18 65:13 68:24
**termed** 54:20 54:21
**terminologies** 62:5
**terminology** 58:12 61:4 64:20
**terms** 26:19 33:19 49:8 50:3 62:19
**testified** 3:5 7:21 9:8,9,20 34:3,6 134:10
**testify** 9:14 10:3,10,16 11:4,12,13,20 13:15 18:6

**testifying** 7:11 10:14,15 34:2
**testimony** 7:8 8:1,25 10:6,11 10:18,25 14:23 15:19 51:10 132:13,24 154:10 158:10 170:17 173:9 173:17 175:8
**thank** 167:4
**thing** 36:9 45:3 47:11 48:5 85:7,24 112:21 112:23,24 121:17 124:25 156:25
**things** 22:21 44:3 51:9 87:7 103:9
**think** 8:20 10:8 10:12,13 13:24 14:6 15:5 19:10,11 20:3 21:1 23:5 24:12 33:21 35:15 39:9,9 39:15,16,19,20 40:18 41:11,14 54:4,18 55:1 59:3,8,20 60:8 61:21 62:9 63:4 65:23 72:17 79:14 85:23 89:20 90:23 96:17 98:4 104:3 118:17 148:11 150:6 155:1 156:16 157:22 161:20
**thinking** 14:11 15:9 56:7 65:13 150:14
**third** 86:5 101:10,15 125:22 127:1
**thought** 37:15 49:3 90:7 152:7
**three** 23:24 34:5 109:1,6,9 109:13 110:17 124:16 126:1
**throw** 128:13
**tie** 75:21 76:25 84:23
**ties** 57:19 66:5 73:18,24,25 74:5,6,9,11,23 75:3,4,4,11,12 75:12,14,15 76:11,18 84:19 146:25 147:24 151:21 152:2,2 152:3 154:5 159:19,19 163:17 166:23 168:15
**time** 2:17 24:7 24:10,23 29:9 29:14 30:19 31:20 37:9 38:23 39:2,10 39:12,16 40:6 40:8,9,10,13,17 40:21 41:17 43:5 44:11 56:3 67:2,24 68:3,7 76:5,13 76:13,14,16 89:22,24 90:1 90:3,7 99:1 101:25 102:5 102:24 108:19 108:23 109:15 109:19 110:4 111:6,14 112:2 112:5,6 114:2 114:7,14 115:8 120:12 127:4 128:4 130:6,13 132:12 133:21 136:21 145:18 145:19 147:10 149:8,12 151:5 151:15 171:9 173:18
**timeframe** 173:8
**times** 12:21 81:9
**timesheet** 43:14
**timesheets** 44:14 45:11
**title** 131:24
**titled** 89:7
**today** 4:1 17:7 17:9,24 18:7 19:6,16 20:8 20:11,17 24:2 36:4 41:6,24 43:21 46:16 47:3 53:14 64:10 66:1,2 84:4 138:2 156:15,19 157:3,18
**today's** 43:24
**together** 5:9 17:7 36:25 103:3
**told** 3:20 9:13 10:17 26:17 29:1 33:7 63:19 90:1 95:22 108:23 134:21 156:9 157:3 169:16
**ton** 69:4,5,5,8 69:12,16,16
**took** 40:6,6,8 73:2,3,5 101:15 103:25 105:6 106:24 107:3,3,5

108:1 109:3,4 109:6 110:13 110:14,16,17 110:20 113:15 117:4 118:3 119:2 122:8 124:9 132:16 144:11
**tools** 91:16
**top** 36:9,18 57:19,19 73:18 73:24 74:9,11 76:11 78:15 80:11 126:20 147:24 152:2,3 159:15,18 163:17 164:23 166:23
**topography** 168:20 169:6
**total** 24:18
**toward** 70:3 108:18 135:7 160:14 171:8
**towards** 55:24 66:17 69:21 70:20 74:7 101:16,16 154:15 155:9
**track** 5:19,23 6:1,7 8:6,9,15 8:17,18,21,21 9:4,5,6,24,25 11:12 12:3,18 14:14 16:11,13 52:22 54:23,24 55:7,20,24 56:12,19,19,20 56:24,25 57:1 57:13,19,24,25 58:18 59:4,13 59:18 61:20,24 61:25,25,25 64:7,8,13 65:22 66:16 67:15 69:20 72:3,8,19 73:15,22 74:6 74:10,13,19 75:7,8,10 81:2 81:25 82:2,4,5 82:9,15,21,23 84:2,7,9,14,20 85:19,23 86:13 87:3,14 92:20 93:4,10 94:7 94:16 96:4 97:9,21 98:4,9 99:4,4 100:1,2 103:10,17,17 103:25 104:2,4 104:5,6,22 105:7,13,14,14 105:18 106:8 106:10,15 107:3,5,8,11,22 108:10,18,25 109:2,3,6,9,9 109:10,12,14 109:19,22,25 110:13,14,17 110:21 111:21 112:3 113:15 113:24 114:1,2 114:4,5,20 115:19 116:12 116:13,24,25 116:25 117:3 118:1,3,4,5 119:2,5,6,8,9 119:10,11,14 119:21,25 120:4,17 121:23,25 122:1,2,8,21 123:4,10,14,14 123:15,25,25 124:7,9,21 125:10,12,15 125:17,18,20 126:21 128:14 128:21,24 129:5,10 130:7 131:19,20 132:22 135:4 136:14 138:5 138:17,23 139:11,16,17 139:23,23 140:7,8,12,17 140:19 141:7 142:1,2,4,11,12 142:12,13,23 143:1,3,4,23 144:5,8,21 145:4,14,21 146:8,12,15 147:22 151:2 154:8,24 155:2 155:9 156:10 161:1,11 162:2 162:9,25 163:3 164:15 170:22 171:8
**tracking** 108:25
**tracks** 38:22 60:19 64:24 77:18 78:20 79:22 83:11 86:8,9,23 88:17 89:6,9 89:10,12 94:17 94:20 133:16 134:22 139:15 139:19,24 140:1,10 141:11 146:4
**trade** 97:3
**train** 15:1 16:15,17,24 53:2,18 60:19 64:23 66:8,8 66:12 67:10,10 71:7,14 82:5 128:19 143:23

160:4,5 166:13 166:15
**training** 5:23 5:24 6:2,3,5,9 28:22 30:8,12
**tran** 171:22
**transcript** 172:8 173:6,19 175:5,8
**transferred** 23:16
**transit** 29:5,11
**transition** 37:18
**transitioned** 75:10
**transits** 29:6
**transportation** 12:1 52:9 91:17
**travel** 162:16 168:17
**traveled** 168:9 168:14
**traveling** 46:2 75:19 161:5
**tread** 53:5,6 74:8 159:17,17
**trial** 7:15,21 8:2 10:4,25 11:2 14:5,21 16:23 32:12,16 33:13 34:25 35:12
**trials** 34:5
**tried** 33:3 114:13 158:10
**truck** 56:2,4,7 161:23
**trucks** 146:25 161:3 169:25
**true** 4:18,18,19 85:17 93:1 141:6 148:3 149:20 172:9 175:8
**truth** 23:7
**try** 114:10 169:17
**trying** 24:22 39:25 59:2 60:8 107:17 111:2 118:12 119:6,12 148:16 155:22 162:22 163:6,7
**tucker** 33:22,24
**turn** 18:18 139:21 146:24 154:14,15 157:24 162:23 163:20
**turned** 31:15 161:10 162:1 164:15,15
**turner** 16:2,5,7 21:16 39:18 40:14
**turning** 155:20 161:3,4,7,23 162:5,10,11 163:4,4,20
**turnout** 74:23 75:2,12,15 98:14 120:5,6 120:18 121:9 139:20 161:2,6
**turrentine** 33:15
**twice** 18:23 40:1
**two** 15:12 22:6 31:11 39:1,21 54:15 55:2 68:7 94:23 98:5 102:18 108:12 124:8 124:10,15 138:20,21 140:10 148:19 148:23 161:9 161:19,21
**type** 27:9 50:5 71:19 72:5,24 75:14 76:15 91:23 116:2 147:16 149:15 152:10 168:12 169:5,11
**typically** 15:20 28:15 60:15 98:16,16,20
103:7 148:17 154:13,18,18

**u**

**u** 3:11
**u.s.** 52:8
**uh** 16:10 51:24 99:16 104:13 138:3 145:11
**ultimately** 20:5 38:16 61:7 97:17 129:4
**unable** 158:11
**uncontrolled** 158:21 159:1
**under** 9:18 22:19 34:18 45:15 61:6 91:14 138:15 154:23 160:19 161:3
**underlie** 26:12
**underneath** 14:25
**understand** 3:17 11:3 17:22 22:23 24:22 34:17 39:25 53:12 54:13 58:2 67:2 107:17 117:12 118:12 119:20 137:15 143:5 151:10

163:7 171:5
**understanding** 18:4 21:15 22:5 53:19 65:6 66:24 67:8 68:12 151:13
**understood** 101:23 108:15
**unintentional** 136:18 137:22
**united** 1:3
**unpredictable** 153:10,14,23
**unquote** 19:9 169:12
**unsecured** 133:16,23 134:5,13 135:4 135:6,24 136:1 136:5,9,12 158:5,14,18 167:12,15,19 167:23 168:1
**use** 27:9 45:16 58:11 59:8 60:15 61:24 65:14 84:1 92:14 102:7 125:1,2,3 135:23 150:16
**used** 7:1 25:19 57:15 60:9,22 60:22 61:3,3 62:6 63:2,11 73:3,7 75:23 78:6 90:23 131:3 150:19 153:3 173:19
**uses** 6:7
**using** 27:5 59:10 62:6,7 62:22 64:19,20 65:15 134:12

**v**

**v** 173:4 174:1 175:1
**valid** 84:8
**validate** 41:12
**various** 47:22 48:4 49:13 71:21 79:12 92:16 109:1,11
**verify** 41:11 173:9
**veritext** 173:14 173:23
**veritext.com.** 173:15
**version** 27:22 78:21,22,22,24 80:12,14 86:25 87:8 88:18
**versions** 87:2 87:10
**versus** 33:9,15 102:23 148:18
**view** 54:9 55:5 55:19 118:13 136:10 147:9
**violate** 83:18
**violated** 79:1 79:23 82:16,18 83:16,21 90:22
**violating** 78:17 82:10,25 84:1
**violations** 99:3
**visit** 26:5 38:25 39:20 40:4,5 41:1 70:6 100:15 104:11 108:9 109:16 110:11 120:11
**visits** 23:18 40:3 46:2,9
**voluntarily** 31:17
**vs** 1:9

**w**

**w** 29:16
**wait** 14:1 80:17
**walk** 98:19
**want** 11:22 20:16 22:23 24:21 26:4,7 30:19 47:10 50:10,21 51:15 51:17 52:2 59:11 60:12 85:5 95:16 102:10 105:21 105:23 106:4,5 106:17,23,25 107:15,16 114:18 121:4 121:21 122:11 122:13 125:25 127:13 131:23 160:21 171:16 171:20
**wanted** 6:16 29:10 39:22,23 76:1 105:13 111:24 155:10 155:11
**wants** 36:2 126:3 157:24
**way** 20:2 24:21 36:2 50:11 54:20 67:1,6 67:12 75:4,21 88:2 107:22 109:7 120:3 122:10,18 123:17 128:16 154:17 155:3 155:17 162:7 171:2,8 172:13
**ways** 139:21
**wedge** 148:11 148:13,21
**week** 6:4
**weight** 68:14 69:8,10,13,17

71:11 76:4 129:2 156:10 159:14,21 161:12 162:13 163:8
**went** 5:24 31:4 31:14,15 39:2 39:10,12,17 40:1,9,10,17,21 55:12 57:6,16 57:17 58:4,8 59:12 61:4,7 73:14 75:11 98:9,12,14,15 99:12 113:15 123:13 124:10 125:9 128:19 128:19,20,21 133:21 135:15 171:9
**west** 120:1 139:22
**whatnot** 44:3
**wheel** 53:2,5,6 54:6,12 55:12 56:15 57:18,22 58:13 66:4,9 75:7 76:24 84:23 145:20 152:3 159:18 160:7,7 161:24 162:2 170:3
**wheeled** 121:8
**wheeling** 124:4
**wheels** 56:2 57:5 74:9 76:14,17 84:18 136:14 144:11 146:20,25 147:4,9 152:1 153:15 159:14 159:22 161:1 163:17,19,22 164:23 165:4,7 166:7,9,11,15 166:23 169:25
**white** 1:17
**wider** 56:20 57:2
**wife** 5:1,8,11 26:17
**williams** 16:2 21:16 23:21 25:13 36:22 39:3 40:14,15 45:6,24 46:6 46:13
**wise** 24:13
**withhold** 50:16
**witness** 3:21 6:13,14,22 7:7 10:4 12:22 13:17 39:9 50:24 58:25 60:8 112:21 118:9 126:8 130:20 134:15 138:12 141:17 144:14 146:11 147:7 155:1 158:17 161:18 164:8 165:25 166:22 171:18 173:8,10,12,18
**witnesses** 19:21 41:4
**word** 22:17 57:15 60:9,13 60:14,15 64:20 92:15
**work** 4:17 5:11 5:24 6:14,16 6:17 7:2 12:9 12:14 17:13 20:11 21:10,20 22:14 24:9,16 27:1 30:6,11 31:4 32:23 34:13 38:23 40:25 41:7 43:20 44:14 45:4,5,12,19,24 46:5,13 65:10 65:19 77:22,23 91:13,25 93:17 97:8 99:13 127:24 130:2 148:24 153:3 157:19 164:4
**worked** 7:6,8 7:25 8:12 11:25 12:6 15:6 16:4 23:20 25:9 26:15 29:22 30:16 31:3,13 31:20 33:11 43:11,13 45:8
**worker** 6:15,18 8:21 62:13,16 62:20
**workers** 7:1,3 151:2,8
**working** 13:18 24:8
**world** 63:11
**worry** 79:8
**would've** 112:8
**wray** 1:17 2:5,7 3:8,13 6:24 17:4 20:1,4,14 20:20 22:20,22 27:13 31:24 36:7 39:8,11 43:6 46:20 47:15 50:21 51:1 59:5 60:10 68:24 69:1 80:20 90:16 99:20,21 100:5 113:20 113:22 118:11 118:17,20,23 126:2,9 127:18 130:23 131:12

134:19 137:5 138:13 141:16 141:19,21 142:14,17 144:16 146:13 147:8 155:5 157:23 158:15 159:9 161:16 163:10 164:7 165:24 166:21 167:7 171:12 171:21
**write** 27:5 34:12 126:18 126:24
**written** 26:4 35:1 49:13 143:11
**wrong** 140:16 140:23 141:1
**wrote** 121:14 129:18 130:6 142:23,25 143:8

**x**

**x** 2:1,10 105:16 105:18,23 106:1,6,17,23 106:25 107:6 108:8

**y**

**y** 39:8
**yeah** 11:10 14:4 25:7 33:2 37:17,24,25 38:12 57:14 66:14 68:20 72:21 73:23 74:1 84:13 89:1 91:10 105:25 110:5 117:15 120:5 126:22 133:13 148:1 155:16 169:3
**year** 6:3 10:23 24:7,12,14,14 24:15,17,18,24 24:24 25:4 32:6,8 79:7,8 79:17,18 80:3 80:6,7,8,11 98:5
**years** 12:14,16 15:8,17 23:21 28:16,18,18 30:17 81:13 84:12 97:8 151:14
**yep** 110:9 122:25 126:23
**york** 14:1 15:7 33:8,11

**z**

**zero** 20:2

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.