UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Norfolk Southern Railway Company,<br><br>*Plaintiff*,<br><br>Versus<br><br>American Italian Pasta Company,<br><br>*Defendant*. | ) | C/A No. 3:25-cv-06618-SAL<br><br>**DEFENDANT'S MOTION TO EXCLUDE OR LIMIT THE TESTIMONY OF FOSTER J. PETERSON AND DUSTIN S. BELL** |

Defendant American Italian Pasta Company ("AIPC"), pursuant to Rules 702 and 403 of the Federal Rules of Evidence, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Rule 37(c)(1) of the Federal Rules of Civil Procedure, respectfully moves this Court for an Order excluding, or in the alternative, limiting the opinion testimony of Plaintiff's retained experts Foster J. Peterson and Dustin S. Bell. Specifically, AIPC asks the Court to preclude Peterson and Bell from offering opinions:

(1) regarding the perception, reaction time, sight distance, lookout, attention, or decision-making of the Norfolk Southern train crew, including when or to what extent the crew could have seen the AIPC locomotive in the foul of the mainline, and whether braking earlier would have avoided or mitigated the collision; and

(2) that the AIPC locomotive would have reached the foul of the mainline regardless of how the derail was placed, designed, or constructed, or that it reached the foul because of the locomotive's speed, weight, or tractive effort.

## I. INTRODUCTION

Norfolk Southern's two retained experts have offered a set of conclusions about what the Norfolk Southern train crew could see, when they should have recognized a hazard, and whether

anything they did or failed to do could have changed the outcome. Those conclusions are the heart of Norfolk Southern's answer to AIPC's comparative negligence defense. Yet neither expert claims to be qualified in human factors, and neither did the work needed to make those conclusions more than personal belief.

On qualification, both witnesses conceded at deposition that they are not human factors experts, have no formal education in the field, and are not offering perception or reaction-time opinions. On methodology, Peterson conceded that he performed no stopping-distance calculation, no sight-distance measurement, no perception-reaction analysis, and no reconstruction of any kind; that he did not measure track centers or clearance points when he visited the site; that he cannot identify any literature supporting his conclusions; and that his visibility opinion rests on his having "walked down through it just to look in that direction." Bell went further: he disclaimed human factors opinions entirely, disclaimed any opinion about perception, visibility, attention, distraction, reaction time, or decision-making, and testified that he performed no analysis of why the AIPC locomotive ended up in the foul and is "not giving an opinion of why it ended up where it did."

The second category of opinion fails for the same reason. Peterson opines that the AIPC locomotive traveled past the point of derailment and into the foul because it remained under power and because of the weight of the cars behind it. He then conceded that he does not know the locomotive's speed, does not know how much tractive effort was applied, does not know how long it was applied, and performed no calculations. When asked directly whether he was assuming the tractive effort and combined weight were sufficient to reach the point of foul, he answered: "Yes. That's my opinion exactly what happened when you look at the physical evidence." The physical evidence he identified is a photograph of where the equipment came to rest.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On July 11, 2022, an AIPC employee moving a locomotive and six loaded railcars by remote control on AIPC's Storage Track 1 ran the locomotive through a Norfolk Southern double switch point derail. Norfolk Southern contends the derail directed the wheels away from the mainline. The equipment continued to travel roughly thirty to thirty-five feet beyond the point of derailment and came to rest overhanging Norfolk Southern's mainline by approximately eighteen to nineteen inches. Roughly two hours later, Norfolk Southern Train 238 struck the derailed locomotive. Norfolk Southern sues AIPC for the resulting property damage.

AIPC has pleaded comparative negligence, alleging that the damages were proximately caused by the conduct of Norfolk Southern's own employees. AIPC's experts contend that the derail's inside curved lead rail was too short and insufficiently curved, and that the derail was placed closer to the mainline than the governing plans contemplated; that the AIPC equipment was visible to the Norfolk Southern crew from approximately 1,000 feet; and that braking at that distance would have prevented or materially reduced the collision.

Norfolk Southern disclosed two retained experts, both of Secretariat International: Foster J. Peterson and Dustin S. Bell. They submitted a single joint report, with each signing his own portion. Bell drafted the track and derail sections; Peterson drafted the operational sections. Neither reviewed or assessed the other's work. (Ex. A, Bell Dep. 13:15-14:12; 14:21-24.) Both were deposed on August 4, 2026.

## III. LEGAL STANDARD

Rule 702 permits expert testimony only if the proponent demonstrates, by a preponderance of the evidence, that the witness is qualified, that the testimony rests on sufficient facts or data and reliable principles and methods, and that the expert's opinion reflects a reliable application of those

principles and methods to the facts of the case. Fed. R. Evid. 702. The 2023 amendments to Rule 702 were adopted specifically to "emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule," and to make clear that the reliable-application requirement is a matter of admissibility for the court, not weight for the jury. Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

The trial court's gatekeeping obligation is not discretionary. *Daubert*, 509 U.S. at 589; *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 275, 297 (4th Cir. 2021) (district courts must perform the gatekeeping function and may not "abdicate" it by deferring reliability questions to cross-examination). It applies with full force to experience-based, non-scientific testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–52 (1999).

An expert's say-so is not a methodology. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The Fourth Circuit has repeatedly excluded opinions where the expert performed no testing, measurement, or calculation to support the conclusion offered. *See Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999); *Nease v. Ford Motor Co.*, 848 F.3d 219, 232 (4th Cir. 2017); *Sardis*, 10 F.4th at 293–96.

Qualification is separately assessed and is opinion-specific: an expert qualified in one field may not testify in another. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 198 (4th Cir. 2001); *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391–93 (D. Md. 2001). And an opinion resting on assumptions unsupported by the record is inadmissible. *Tyger Constr. Co. v. Pensacola*

*Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 477 (4th Cir. 2005).

Finally, a retained expert's report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). An opinion omitted from the report is excluded unless the failure was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1); *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003).

## IV. ARGUMENT

### A. Peterson and Bell Should Be Precluded From Opining on the Crew's Perception, Reaction Time, Sight Distance, and Whether Braking Would Have Mattered.

#### 1. Neither witness is qualified to offer human factors opinions, and both said so under oath.

Whether a train crew perceived a hazard, when a reasonable crew would have perceived it, how long perception and reaction take, and what a crew's attention was directed to are human factors questions. Both of Norfolk Southern's experts disclaimed that field.

Peterson testified:

> Q. Okay. You're not offering any human factors opinions, are you?
> A. No, I don't hold myself as a human factors expert per se.
> Q. Have you ever received any formal education in the field of human factors?
> A. Not as I would describe it — what that means to be a human factors expert, no.

(Ex. B, Peterson Dep. 10:06-13.) He has had no "courses, education, [or] training on how to estimate perception or reaction time." (Ex. B, Peterson Dep. 14:15-17.) He identified no literature in the field of perception, reaction, or human factors supporting his opinions. (Ex. B, Peterson Dep. 12:03-06.) And he agreed that he is not qualified to rebut AIPC's human factors

expert on perception or reaction time "because I'm not offering that." (Ex. B, Peterson Dep. 108:20-24.)

Bell was more emphatic:

> Q. You're not — you're not offering any human factors opinions in this case, are you?
> A. No, not trained. No, I'm not trained in human factors.
> . . .
> Q. You're not going to be offering opinions about perception, visibility, attention, distraction, reaction time, decision-making — anything like that about any of the parties in this case; is that fair?
> A. That's fair.

(Ex. A, Bell Dep. 68:16-23, 69:05-10.) Bell also confirmed he is not "talking about the actions of the NS crew." (Ex. A, Bell Dep. 14:21-15:02.)

A witness who disclaims the qualifications to give an opinion should not be allowed to give it. AIPC therefore asks the Court to hold both witnesses to those concessions and enter an order confirming that neither may offer perception, reaction-time, visibility, attention, or decision-making opinions at trial.

Peterson's testimony shows why the order is needed. After disclaiming human factors opinions, he testified that the one-degree curve in the mainline "absolutely" affected the crew's ability to perceive the AIPC locomotive's proximity (Ex. B, Peterson Dep. 57:13-19); that the AIPC equipment "would not . . . necessarily be perceived as unusual" (Ex. B, Peterson Dep. 68:04-08); that the crew "appreciated the emergency situation" only five to six seconds before impact (Ex. B, Peterson Dep. 105:23-106:04); and that no one "in this case can say" where the crew should have perceived the hazard (Ex. B, Peterson Dep. 78:19-22). Peterson nonetheless insists: "To make it clear, I wasn't offering human factors opinions." (Ex. B, Peterson Dep. 61:19-21.) Each of the opinions above is a human factors opinion, and he confirmed he would give them at trial if asked on direct. (Ex. B, Peterson Dep. 61:19-25; 62:01-22.) An order is necessary.

**2. The opinions are unreliable because neither witness performed any of the analysis the opinions require.**

Even if Peterson were qualified, these opinions would be inadmissible because they rest only on his own impressions of a video and a site walk. Three separate gaps each require exclusion or limitation.

**a. No sight-distance or visibility analysis.**

Peterson opines that although the AIPC locomotive and cars were visible from approximately 1,000 feet, it was "not apparent, due to the position of the equipment and the curvature of the NS main track, that the AIPC engine is in the foul of the track." (Ex. B, Peterson Dep. 104:02-07.) He performed no analysis supporting that conclusion.

He did not calculate the curvature; he read the figure off a track profile. (Ex. B, Peterson Dep. 58:14-17.) He did not measure where the curve begins relative to the point of impact. (Ex. B, Peterson Dep. 59:09-11.) He did not quantify visibility at any distance beyond 1,000 feet, and has "no specific opinions beyond the thousand feet." (Ex. B, Peterson Dep. 104:12-105:10.) He visited the site but took no measurements at all, not track centers, not clearance points, "nothing like that." He "just looked at it visually." (Ex. B, Peterson Dep. 107:24-108:06.) Asked to "cite me any . . . literature, research, any analysis that you've done that support the opinion that the one degree curve in this affected how they could perceive the AIPC train," he answered: "No." (Ex. B, Peterson Dep. 61:07-12.)

What remains is the witness's own visual impression: "having seen the video is consistent with, you know, when I went to the scene I walked down through it just to look in that direction." (Ex. B, Peterson Dep. 66:21-24.) That is exactly the "connected to existing data only by the ipse dixit of the expert" testimony *Joiner* forecloses. 522 U.S. at 146.

**b. No perception-reaction analysis.**

Peterson opines that the crew reacted to the AIPC movement approximately nine seconds before impact, that a "possible fouling" was recognized at that point, and that the crew "appreciated the emergency situation" between five and six seconds before impact. (Ex. B, Peterson Dep. 63:03-25; 64:01-03; 105:20-25; 106:01-04.) He derived these figures by watching the inward-facing video and observing body movement. He performed no perception-reaction calculation, has no training in estimating perception or reaction time, has no training in body language interpretation, and relies on no literature. (Ex. B, Peterson Dep. 14:15-17; 12:03-06.) He explained that he cites no reaction-time literature "because [I] wasn't offering those opinions." (Ex. B, Peterson Dep. 10:14-20.)

Peterson further opines that a crew is not required to reduce speed until it is "certain" or has made a "determination" that equipment is in the foul. (Ex. B, Peterson Dep. 64:21-25; 65:01-21; 74:11-17.) AIPC does not ask the Court to bar Peterson from describing train-handling practice. He spent a career in railroad operations, and he may testify to how crews are trained and what the rules require of them once a hazard is recognized. The objection is narrower. The "certainty" formulation carries a second conclusion: when this crew should have recognized that the AIPC equipment was fouling the main track. That is a perception question, not a train-handling question. It belongs to the field Peterson expressly disclaimed (Ex. B, Peterson Dep. 10:06-13), and he performed no sight-distance work and relies on no literature to support it. (Ex. B, Peterson Dep. 12:03-06; 107:24-108:06.) Peterson should be permitted to testify to what is required of a crew once a hazard is recognized, and precluded from opining on when recognition should have occurred. *Sardis*, 10 F.4th at 293.

**c. No stopping-distance analysis.**

Peterson's ultimate opinion, that the crew reacted "at a location from impact that did not allow the mechanics of the collision to be appreciably changed" (Ex. B, Peterson Dep. 105:11-16), is a stopping-distance opinion. He did no stopping-distance calculation.

> Q. Did you perform any calculations on stopping distance in this case?
> A. I did not, no.
> Q. You've done that in other cases; right?
> A. I have.

(Ex. B, Peterson Dep. 14:18-22.) Asked why not, he answered that he "knew without even calculating" that the train would not stop. (Ex. B, Peterson Dep. 15:04-07.) He is prepared to criticize AIPC's expert's constant-deceleration methodology as inappropriate (Ex. B, Peterson Dep. 17:08-23), and he described in detail the more complex analysis he says is required, citing trailing tonnage, tare weights, grade, brake pipe propagation rate, brake cylinder buildup time, brake shoe friction tables, braking ratio (Ex. B, Peterson Dep. 17:25-21:06), while confirming he performed none of it. He conceded the consequence:

> Q. . . . I know you disagree, but let's just say a jury believes they should have seen this a thousand feet away or more. You can't — you can't say based on those numbers, as we sit here today, whether or not the train would have stopped, can you?
> . . .
> THE WITNESS: That's correct only because I didn't make a specific calculation so I don't have the final stopping distance number as an opinion.

(Ex. B, Peterson Dep. 21:20-22:06.) Peterson thus concedes he has no calculated stopping distance for any scenario. He should not be permitted to testify that braking earlier "is, in my opinion, not going to make any substantive difference" (Ex. B, Peterson Dep. 76:15-18) when, by his own account, he lacks the calculation that would support it. An expert who names the correct

method, declines to use it, and offers the conclusion anyway has given the Court its own reason for exclusion. *Nease*, 848 F.3d at 232.

**3. Peterson's curvature-and-visibility opinion was never disclosed in his report and should be excluded or limited on that independent ground.**

Peterson was asked whether his opinion that the one-degree curve affects the crew's perception appears in his report. He answered: "No, I don't — I didn't offer a specific opinion on it. I was just saying in response to your questioning now." (Ex. B, Peterson Dep. 58:18-59:01.) Asked whether he intended to tell the jury that opinion, he confirmed that he would if asked on direct examination. (Ex. B, Peterson Dep. 62:04-22.)

Rule 26(a)(2)(B)(i) required a "complete statement of all opinions the witness will express." An opinion first articulated in a deposition answer, and expressly confirmed not to be in the report, was not disclosed. Exclusion under Rule 37(c)(1) is appropriate: the opinion is not harmless, because it goes directly to the disputed question of what the crew could perceive; AIPC had no opportunity to have its experts address it in their reports; and Norfolk Southern has offered no justification. *S. States Rack & Fixture*, 318 F.3d at 597.

**B. Peterson and Bell Should Be Precluded From Opining That the AIPC Locomotive Would Have Reached the Foul Regardless of the Derail's Placement or Design.**

**1. Peterson's counterfactual opinion lies outside the expertise he claims and rests on forces he concedes he does not know.**

Peterson disclaimed this subject at the outset. He confirmed that he is "not offering opinions as to the track components" (Ex. B, Peterson Dep. 25:22-24), and when asked whether he examined whether the construction or location of the derail had anything to do with how the equipment ended up in the foul, he answered: "Just from a high level perspective. That's back to the engineering side of things is more Mr. Bell." (Ex. B, Peterson Dep. 39:19-40:01.) Whether a derail built to plan

would have brought the AIPC equipment to rest short of the point of impact is a track-engineering question, and Peterson does not hold himself out to answer it.

He nonetheless opines that the AIPC equipment traveled beyond the point of derailment and into the foul because the locomotive remained under power and generated tractive effort, combined with the weight of six loaded cars whose brakes were not properly conditioned. (Ex. B, Peterson Dep. 37:09-16; 39:09-18.) His explanation depends on those forces, and he conceded he does not know any of them:

• He does not know the speed at which the AIPC locomotive traveled through the derail. (Ex. B, Peterson Dep. 36:06-10.)

• He does not know how much tractive effort was applied, "no way to say that objectively." (Ex. B, Peterson Dep. 36:11-14.)

• He does not know how long tractive effort was applied. (Ex. B, Peterson Dep. 36:15-18.)

The colloquy that follows is dispositive:

> Q. Okay. But you're assuming — you're assuming that the tractive effort that was being applied, which you don't know, and you're assuming that the weight of the AIPC consist was combined was enough to get to the point of foul?
> A. Yes. That's my opinion exactly what happened when you look at the physical evidence.

(Ex. B, Peterson Dep. 37:17-23.) The "physical evidence" he identified is a photograph of the equipment's final resting position. (Ex. B, Peterson Dep. 37:24-38:15.) That photograph records the equipment at rest. It does not show the path the derailed wheels took across the ties, the geometry or condition of the curved lead rails that directed them, or anything else bearing on why the equipment traveled as far as it did before stopping. Nor does it answer the central question in this case: whether a derail built at the location and to the dimensions the governing plans required would have brought the equipment to rest short of the point of impact. Peterson performed

no analysis of that question. He took no measurements at the site, identified no plan or standard governing the derail's location or construction, and made no comparison between the derail as built and the derail as designed.

An expert may reason from physical evidence and from experience. What he may not do is posit a specific causal mechanism – tractive effort acting on a particular mass – and then concede that he does not know, and is assuming, every quantity that mechanism requires. Peterson identified the forces he says carried the equipment into the foul and then disclaimed knowledge of each of them. That is not a reliable application of any method to the facts of the case. *Tyger Constr.*, 29 F.3d at 142; *Joiner*, 522 U.S. at 146.

**2. Bell disclaimed this opinion, and Norfolk Southern should be held to that disclaimer.**

Peterson deferred the engineering question to Bell. Bell declined it:

> Q. And as far as the — any kind of calculations about once — this AIPC locomotive came off the top of its rails to the point of derailment, as you said, you have — you've done no formal analysis, calculation, assessment — anything to determine why at that point the locomotive ended up in the foul of the main line, did you?
> A. I've not determined — no, I didn't do any calculations on their speed or weights, different things like that as it relates to why it ended up where it did. No, I did not.
> Q. You're not giving an opinion of why it ended up where it did, are you?
> A. No.

(Ex. A, Bell Dep. 69:11-24.) Bell similarly testified that he "did not take into consideration or account for actions after a derailment occurred" (Ex. A, Bell Dep. 81:07-11), performed no assessment of any distance past the point of clearance (Ex. A, Bell Dep. 82:12-83:21), and took no field measurement bearing on clearance other than the switch-to-derail distance on which the parties' experts agree. (Ex. A, Bell Dep. 37:09-22; 71:18-22.) In short, Bell did not do the track-component assessment that Peterson left to him.

Bell's opinion that "the derail was installed to derail away from the main track" and "worked as intended" therefore speaks only to the moment the wheel left the rail. (Ex. A, Bell Dep. 83:22-84:14.) Bell conceded he performed no assessment of anything past the point of derailment, and he expressly declined to opine why the equipment reached the foul. AIPC therefore asks for an order confirming that Bell may not expand at trial into the causal question he expressly disclaimed: why the equipment reached the foul, and whether a differently placed or differently curved derail would have prevented it.

## V. CONCLUSION

For the foregoing reasons, AIPC respectfully requests that the Court enter an Order precluding Foster J. Peterson and Dustin S. Bell from offering, at trial or in support of any dispositive motion, (1) any opinion regarding the perception, reaction time, sight distance, lookout, attention, or decision-making of the Norfolk Southern train crew, including when or whether the crew could have seen the AIPC locomotive in the foul and whether earlier braking would have avoided or mitigated the collision; and (2) any opinion that the AIPC locomotive would have reached the foul of the mainline regardless of the derail's placement, length, or curvature, or that it did so because of its speed, weight, tractive effort, or the grade of the surrounding ground. AIPC further requests such other and further relief as the Court deems just and proper.

HOOD LAW FIRM, LLC
172 Meeting Street
Post Office Box 1508
Charleston, SC 29402
Phone: (843) 577-4435
Facsimile: (843) 722-1630

*s/ John O. Radeck, Jr.*
James B. Hood (9130)
james.hood@hoodlaw.com
John O. Radeck, Jr. (12021)
john.radeck@hoodlaw.com

*Attorneys for the Defendant*
*American Italian Pasta Company.*

November 16, 2026
Charleston, South Carolina