UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

NORFOLK SOUTHERN RAILWAY COMPANY,
Plaintiff,
vs. CIVIL ACTION NO. 3:25-cv-06618-SAL
AMERICAN ITALIAN PASTA COMPANY,
Defendant.

DEPOSITION OF: DUSTIN BELL
DATE: August 4, 2026
TIME: 8:47 A.M.

LOCATION: Law Offices of
Gallivan, White & Boyd, PA
1201 Main Street, Suite 1200
Columbia, SC
TAKEN BY: Counsel for the Defendant
REPORTED BY: LORI S. MORTGE,
Certified Court
Reporter, CCR

Page 2

APPEARANCES OF COUNSEL:
ATTORNEYS FOR THE PLAINTIFF
NORFOLK SOUTHERN RAILWAY COMPANY:

GALLIVAN, WHITE & BOYD, PA
BY: WILLIAM E. WHITNEY, III
55 Beattie Place
Suite 1200
Greenville, SC 29601
(864) 271-9580
wwhitney@gwblawfirm.com

ATTORNEYS FOR THE DEFENDANT
AMERICAN ITALIAN PASTA COMPANY:

HOOD LAW FIRM, LLC
BY: JOHN O. RADECK, JR.
172 Meeting Street
Charleston, SC 29401
(843) 577-4435
john.radeck@hoodlaw.com

(INDEX AT REAR OF TRANSCRIPT)

Page 3

(EXHIBIT A, Supplemental Report by Foster Peterson and Dustin Bell, was marked for identification.)
* * * * * * * * * * *
DUSTIN BELL
being first duly sworn, testified as follows:
EXAMINATION
BY MR. RADECK:
Q. Can you state your full name for the record?
A. Dustin Bell.
Q. Dustin -- is it all right if I call you Dustin?
A. Yes.
Q. We met just before we started. As you know, I'm John Radeck. I represent American Italian Pasta Company in this lawsuit brought by Norfolk Southern and you're here today because you were retained as a paid consultant on behalf of Norfolk Southern; is that right?
A. Yes, that's correct.
Q. And you were actually retained going all the way back to the prior personal injury cases; is that right?
A. Yes, that's correct.

Page 4

Q. And you gave a deposition in those cases; is that right?
A. Yes.
Q. Did you have a chance to review that deposition in preparation for today's deposition?
A. Yes, I did.
Q. Okay. Did -- is there anything that you testified under oath about in that deposition that's now untrue?
A. The only thing in that deposition there's some distances that are referenced that I later went back and checked that were a little off. So some of the distances that I originally reported in that deposition I verified and I would like to correct those.
Q. Okay. Is it easy for you to just go ahead and tell us those now?
A. Yeah, sure. So one that comes to the top of my head was the seven-foot measurement from the point of switch of the derail. It was 22 feet to the end of the ownership so 178 plus 22 feet which is where the NS versus AIPC ownership point changes -- or maintenance point changes, so I wanted to clarify that reference.
Q. On that point so -- okay. So before you

Page 5

tell me the next one I know in your testimony you said if Norfolk Southern wanted to they could have moved -- at the time you testified they could have moved the derail seven feet further back. So basically now you're saying they had actually 22 feet to do that if they wanted to?
A. There is --
MR. WHITNEY: Object to the form. Go ahead.
THE WITNESS: Yes. There's 22 -- so there's 22 feet based on the original plan or the agreement that was in the original plan there. So the 200-foot mark was the maintenance ownership -- or the maintenance line, so that's what I wanted to verify.
BY MR. RADECK:
Q. And --
A. Or clarify.
Q. Got it. Okay. But the effect of that is on your testimony you said if -- again, if Norfolk Southern, their position is they don't think they need to move it anywhere and they haven't. Even still --
A. Right.
Q. -- if they wanted to back then you said

they could move it back seven feet and now you're actually saying they would have an extra 22 feet if they so choose?
A. If they so choose.
Q. And then the plan you referenced, which plan are we talking about? -3 or 7-1?
A. The 1999 plan that showed the maintenance portion line -- or the maintenance line for Norfolk Southern and AIPC.
Q. And the 9 -- the 1999 plan that's part of the siding agreement? Is that what you referenced?
A. Yeah, the 1995 siding agreement plan.
Q. Okay. What other measurements -- distances did you need to correct?
A. That's -- that's all that came to the top of my head as of right now.
Q. And when you -- what was the process of going back and determining that your original estimate was incorrect? Did you make a site visit, did you just look at the plan closer? How did that come about?
A. Yeah. Reviewed my deposition and was reviewing the original agreement and the proposed plan for the derail and the ownership mark -- or the



maintenance marks on the proposed plan there. So that's what I wanted to clarify -- or where I wanted to clarify.
Q. I mean, consultants aren't perfect, y'all make mistakes, too; right?
A. That's right.
Q. Okay. And just for the sake of clarity let me try to -- do you have -- the plan that you're referencing, I've got the siding agreement in here somewhere. The plan that you're referencing, is it part of your report?
A. It is. Let me see. So I do have it in here under Figure 21. This is the 1996 -- the supplement or the updated agreement. It still shows the 200-foot mark.
Q. And what page of your report is that on?
A. It's Page 26.
Q. And can you point me to the 200-foot mark there?
A. Yeah. So it says -- on the bottom right-hand corner it says: Typical Clearance Section No Scale.
And then right below that it says: Division -- Maintenance -- Ownership and Maintenance, I believe that word is, and it says



Industry to the left and then Railroad to the right. And then the bottom there it says STA200.
Q. And this plan was attached as an exhibit to the agreement; right?
A. This was in the file materials I received, yes.
Q. Right. It was -- it was attached to and was part of the siding agreement, the contract between AIPC and Norfolk Southern; right?
A. Yes.
Q. Now, when you're looking at the -- the question of the location of the derail, which we'll get into more, to determine if the location was appropriate or not did you look at this plan that we're looking at here or something else?
A. So I referenced this plan and then there's a 1995 plan as well. So I referenced those two plans as far as the proposed location of the -- of the derail.
Q. And when you say the 1995 plan is that -- is that the plan -- is that the Plan 5-3 that's on Page 29 of your report?
A. No. I don't have that plan in my report. It's in my materials that I reviewed, but that plan or the agreement -- the proposed drawing.



It's the proposed drawing between NS and AIPC. So this is -- Figure 21 is the 1996 proposed plan and then also referenced the 1995 proposed plan.
Q. Okay. You're calling it proposed plan. Where do you get that term proposed from?
A. It says it on the -- it says it on the agreement here or on the plan itself. It says -- on the bottom right-hand corner it says: Proposed Tracks to Serve American Italian Pasta Company.
And then it says: Typical Clearance Section No Scale.
So that's showing this is a proposed plan with the proposed tracks going in.
Q. Did you find that the location of where this derail was placed deviated from those two plans that you referenced?
A. The proposed plan -- well, it was slightly different from the proposed plan.
Q. Okay. When you say slightly different what do you mean?
A. So Norfolk Southern, as they're installing their derail, they put it in a place that they felt was best fit. And so it was at a location that was a little different from what was originally marked on the -- on the plans.

Page 10

Q. Okay. So I just -- so you will at least agree -- we'll get into the differences and whether or not it's justifiable or not, I get that. But you would at least agree that Norfolk Southern did not construct the derail in the location as it's contained in what you're calling the proposed plans; is that right?
A. So they weren't required to put it in that location. There was -- you know, it was a proposed plan. So it was a location that they were estimating that the whole switch point derail was to go. So based on that proposed plan it was put in a different location when they made that determination in the field.
Q. I understand, but just listen to my straightforward question. Would you at least agree, though, that it was not built according to the plans that you're calling proposed; is that right?
A. It was not set where they proposed it to potentially go.
Q. So, again, at least we can talk about the reasons why. But for the purposes of my question you would at least agree that they did deviate from the two plans that were in the contracts; is that right?

Page 11

MR. WHITNEY: Object to the form. Go ahead.
THE WITNESS: So, again, they -- they made the determination to put the derail in a different place from the proposed plan.
BY MR. RADECK:
Q. And you're calling it a proposed plan, but it's cited in the siding agreement; is that right?
A. The track itself, the construction of the track?
Q. Yeah. The two proposed plans that you're calling them, they were cited in the siding agreements; right?
A. Yes.
Q. They were attached to them; right?
A. Yes.
Q. And are you taking the position of whether or not those were part of the contract or not?
MR. WHITNEY: Object to the form. Go ahead.
THE WITNESS: No, I'm not.
BY MR. RADECK:
Q. Okay. So I know that early on you did,

Page 12

you know, back in 2024 I believe you did a site inspection; is that right?
A. Yes.
Q. Have you been back out to the site since then?
A. No, I have not.
Q. And so other than reviewing -- doing your one site inspection, reviewing the records that you've listed in your report and reviewing the depositions listed in your report and drafting your report, any other work that you've done in this case?
A. No.
Q. Okay. Since your last deposition, other than going back and correcting the seven-foot/22-foot maintenance right-of-way issue, have you done any other additional calculations?
A. No. No other specific calculations, no. Just reviewing policies, standards Norfolk Southern had at the time.
Q. When you say policies and standards, are those Norfolk Southern's?
A. Yes.
Q. All right. And I know we talked about him before we started, but Foster peter -- Peterson

Page 13

is a consultant in this case and he's your colleague; is that right?
A. Yes, that's correct.
Q. Do you know whether or not he was retained in the other cases?
MR. WHITNEY: Object to the form but you can answer.
THE WITNESS: I -- I don't believe so. I'm not -- I'm not sure.
BY MR. RADECK:
Q. So you and Foster -- Foster Peterson have issued what appears to be sort of a joint report; is that right?
A. Yes, that's correct.
Q. Okay. How much are y'all coordinating in formulating your opinions, if at all?
A. So my opinions are directly related to the track and the derail itself. Foster's opinions are outlined as far as, you know, train handling and whatever he was asked to do. So it's broken down and divided in the report and so our names or initials are attached to our specific opinions in areas in the report.
Q. When you're in the process of drafting the report, though, how did that work? Did you

Page 14

draft a portion and did Foster -- who had the final say in reviewing it? You or Foster or both?
A. So I drafted my portion and then Foster drafted his portion of it. So he included his piece, I included my piece of it.
Q. Do you know -- did you review and try to assess any aspect of his opinions?
A. No.
Q. Do you know if he did that to yours?
A. No, not to my knowledge. He didn't -- he did not review any of mine or make any assessments or anything.
Q. Who compiled your opinions together? Is that something that came from your office that was then given to the attorneys or did the attorneys compile them into a report for y'all?
A. Yeah. So we have a report template and I put my portion of the report in. So I would work on my portion and Foster would work on his portion of the report in the same report template.
Q. Okay. So what is your -- your -- the lane you're staying in, as far as your opinions in this case, have to do with the derail?
A. Yes, the track and the derail.
Q. You're not talking about the actions of

Page 15

the NS crew; right?
A. Right.
Q. You're not talking about the actions of the AIPC employee Rico Blanchett; is that right?
A. Not specifically as far as his controlling of the -- of the train and, you know, his controlling -- his locomotive/engineer operations and things like that, no.
Q. And you're not testifying as to any kind of, like, property damage, assessing any of that, are you?
A. No.
Q. All right. Let's try to check off probably quickly some things that we should agree on. The derail at issue is a double switch point derail; is that right?
A. Yes.
Q. Norfolk Southern installed -- installed the industry track in this case and the double switch point derail under its agreement with AIPC; is that right?
A. Yes, it did.
Q. Okay. And Norfolk Southern owned and maintained the derail; is that right?
A. Yes, sir.

Page 16

Q. And a double switch point derail is designed to direct equipment away from the track it's intended to protect; is that right?
A. Say that again.
Q. A double switch point derail is designed to protect equipment away from the track it is intended to protect; is that right?
A. Yes, that's correct.
Q. And the purpose of the derail was to protect the Norfolk Southern main track from unintended movement by industry equipment; is that fair?
A. So the purpose of the derail is to derail equipment away from the main track that it is intended to protect, yes.
Q. And you obviously know that the AIPC locomotive moved through the derail unintentionally. You would agree with that; right?
A. I don't know about the word unintentionally, but it did move through the derail.
Q. Okay. Have you seen any evidence that suggests that Rico Blanchett intentionally tried to run this through the derail?
A. I have -- I have not. I haven't reviewed his actions but, yeah, the fact that it

Page 17

wasn't reported and no one knew about it prior to NS, you know, making contact with the train I don't know if I would use the word unintentional or how that -- you know, it should be classified.
Q. Well, what happened afterwards is irrelevant. My question is, do you have any evidence to suggest that the act of him going through the derail was done intentionally?
A. That -- I can't answer that.
Q. And, obviously, this incident involved both a derailment and a foul of Norfolk Southern's main track; is that right?
A. The NS train derail due to -- yes, the AIPC engine derailing and fouling -- ultimately fouling the NS main track, yes.
Q. And the main track was fouled by the AIPC locomotive by about 18 or 19 inches; is that right?
A. Approximately.
Q. Do you agree that a derail near a main track is a safety device intended to protect the main line?
MR. WHITNEY: Object to the form. Go ahead.
THE WITNESS: It's intended to derail

Page 18

equipment away from the main track but it's intended to protect. What happens after the derailment is -- that can't be determined. There's different factors that go into that.
BY MR. RADECK:
Q. I understand. But there is intent -- I mean, the whole point of a derail, the intent -- it's not a device that's done to, you know, affect the operations -- it's not a device used as part of, like, the operations of the industry. It's not like it's a switch that they're using. It is a device -- safety device used to ultimately, hopefully, protect the main line; is that right?
A. The intent of the derail is, yes, to derail equipment away from the main line and to protect it. So -- but, again, what happens after that wheel-to-rail relationship changes and the wheel drops on the ground, that's -- you know, that's undetermined like such in this -- this case here. That's not something that you can predict, you know, or can predict what is going to happen.
MR. RADECK: And I just move to strike the last part as nonresponsive. You can ignore it if I do that objection.
Q. A double switch point derail is more --

Page 19

is a more effective type of derail than a standard derail; is that true?
A. It -- it is generally more effective than some other types of derails that are used.
Q. And you talk about that in your report. You have pictures of a standard derail and a double switch point; right?
A. I do, yes.
Q. And a standard derail is, as you say, it just drops -- basically just drops one wheel off the top of the rail; is that right?
A. So yes. The standard wheel or standard derail or, like, a hinged derail, single hinged derail, will generally take a wheel and drop it off the outside of a rail, yes. And then when that happens the rails on the right side -- or the wheels on the right side as well will generally drop in the gauge of the track as well.
Q. With a standard -- you called them a few different types and I'm just kind of generally grouping them into a standard derail that's not a double switch point. Is that a fair way to put it? It's one that just, as you said, basically drops the wheels off to the -- whichever side you're trying to get?

Page 20

A. So those are -- yeah, those are standard or fixed hinge -- there's different types. There's hinged derails, there's portable derails but, yeah, they all generally do the same thing. They -- they take a wheel and drop it right off of the outside of the rail away from, you know, the track that they're generally designed to protect. Then the other wheel will drop in the gauge of the track.
Q. And with those standard derails we're calling them there are no what I call curved lead rails or maybe they're called extension rails; is that -- is that right?
A. That's right. There's not.
Q. Okay. Which term do you use? Curve -- is it lead rails -- curved lead rails, extension rails, either?
A. Either, yeah.
Q. There are curved lead rails on a double switch point derail; is that right?
A. There are, yes.
Q. Okay. What is the purpose of those curved lead rails?
A. Those -- those curved rails are intended to move the equipment away from the track that it's intended to protect. So if it's a left-hand switch,

Page 21

left-hand curve, the lead rails will take the train to the left and derail the equipment to the left.
Q. And that's after the wheels are thrown off the top of the rail onto the ground; is that right?
A. Yeah. Derailment occurs when that wheel-to-rail relationship changes. So when the wheel hits the ground, that's the point of the derailment right there.
Q. So those curved lead rails, once the point of derailment happens, they're continuing to do work to essentially try to drive the equipment further away from the main line that it's intended to protect; is that right?
A. No. No. They -- the curved rails are moving the equipment to the left -- or in this situation the curved rails are moving the equipment to the left, again, away from the main track. And then after the derailment occurs it's undetermined what happens after that.
Q. Right. The derailment -- you're saying the point of derailment is when the wheels come off the top of the rail?
A. Yes.
Q. And then at that point the curved lead

rails are doing something; right?
A. They're -- yes. They're moving the train in its intended direction. So in this example the curved lead rails are going to the left, it's moving the train to the left away from the main track that it's intended to protect.
Q. Right, and that was my question. So you have this -- you have the point of derailment and on the double switch point derail you have curved lead rails, and after the point of derailment happens these curved lead rails continue to do work to continue to push in this case to the left, the equipment away from the main line; is that right? That's what you just said?
A. When -- no. When the wheels are off the -- I want to make sure I understand you. So when the wheels are off the rails, the curved lead rails aren't guiding the wheels anymore. So there's nothing guiding the wheels at that point. So whatever happens when the wheels are off that's -- you know, the curved rails are no longer guiding that wheel-to-rail relationship or guiding the wheels at that point.
Q. So is your position that the point of derailment is at the very end of the curved lead



rails?
MR. WHITNEY: Object to the form. Go ahead.
THE WITNESS: Yeah. Again, the point of derailment is the -- the point where the wheel-to-rail relationship changes. So in this situation at the end of that lead rail when the wheel drops off of the rail, right there at that point where the wheel hits the ground, that's -- that's the point of derailment.
BY MR. RADECK:
Q. Are the length of the lead rails important?
A. Are they important? Yeah. So yes, they can be important, yes.
Q. Okay. And why is that?
A. It's -- you know, again, the -- it's how the train and the double switch point derail. So in this situation the lead rails are taking the equipment to the left so you want them to be of sufficient length to drive the train to the left or to the -- you know, to the direction that it's, you know, intended to protect.
Q. And is the curve of them important?
A. Curve is -- yes, you know, it's



important as well.
Q. And why is that?
A. Again, you know, the double switch point design -- you know, it's designed to have, you know, a little bit more of a curve in it and so it is switched -- or it's a derail that's designed to derail equipment, you know, at a little more of an angle.
Q. I mean, yeah. I mean, the stronger the angle the further it's going to be curving away from the track that it's intended to protect; right?
A. Stronger the angle -- yes. More of an angle. You know, it could potentially, you know, move it away from the track more.
Q. I mean, that would be the -- that would be the point. I mean, the point of curving it more would be to try to get it to curve further -- have it going left or whatever direction you're trying to do it, in this case left, it would be an attempt to curve it left more; right?
A. Well, again, so, you know, generally it could. But when the derail happens, you know, the wheel -- again, the wheel is inside the gauge of the track. So once the wheel hits the ground that, you know -- again, you can't predict what happens after



that. So even if there's a little -- you know, a little more of an angle and one of those curves, you know, derails -- or double switch derail, you know, once the derailment occurs that's -- you know, it's undetermined what happens after that, so...
Q. Well, I mean, theoretically if you make the curve derails long enough it would stay on the rail all the way until it got to the tree line if you wanted it to technically; right? I mean, you could curve it all the way around?
A. Well --
MR. WHITNEY: Object to the form. Go ahead.
THE WITNESS: No, not necessarily, because the rail would have to stop right there at the running rail because you have -- so you have the running rails and then you have the derail itself. So the curved rail can't go into the running rail so that wouldn't -- you know, that wouldn't be possible to curve it that much.
BY MR. RADECK:
Q. So in this case the right lead curve rail is actually -- do you call that the inside curve rail?
A. Yeah. Inside rail, gauged -- curved

closure derail.
Q. Okay. Do you agree that the curved lead rails must be of sufficient length to derail cars without fouling the track it's meant to protect?
A. Yes. They -- you know, curved rails, that's what the policy states. I believe that's what it says. (Reading.)
Q. Which policy?
A. Yeah. The MW&S Standard 100 says: Switch point derails must have curved lead rails of sufficient length to derail cars without fouling the track they protect.
Q. That's Norfolk Southern MW&S 100?
A. Yes.
Q. And Norfolk Southern is supposed to comply with that standard; right?
A. This is a standard that they have. There are situations and there are cases where, you know, deviations are -- are made from standard plans. That's something that happens. So yeah, if there's a deviation that needs to be made in the field then that is something that's possible to do.
Q. But they're -- I mean, they're required to comply with their own standard; right?
A. Yes. Yeah. In this situation they did



have curved lead rails of sufficient length to derail cars without fouling the track that they intended to protect. In this situation here specifically the derail did comply with, you know, this MW&S Standard 100.
Q. Do you think they complied with that?
A. Yes, they did.
Q. So why stall -- why install a double switch point rail here instead of a standard derail?
A. So this was a determination that was made by Norfolk Southern in -- in conjunction with AIPC. But in this location here this looked to be due to certain things such as, you know, maybe the grade coming from the industry going towards the main line.
And, you know, outside of that there's, you know -- I don't know, I wasn't part of the conversation when they originally decided to install this derail. But just looking at the grade and some of that, this is the location that, you know, I would have probably put a double switch point derail as well in my experience.
Q. What are -- what are some of the scenarios that happened with why -- why something like a locomotive goes through a double switch point



derail?
A. Why would a double?
Q. Yeah. What are some of the unintended movements? Like how does that happen?
A. Are you talking about cars rolling away from...
Q. Right. What are some of the scenarios in your experience you've seen as to why cars are going through derails?
A. Yeah. So in my experience when equipment has run over derails it's been, you know -- or it's been due to brakes not being set on cars, you know, employees not paying attention to, you know, to derails being set. I'm trying to think what else. That's really about it. You know, brakes not being set, employees not paying attention. I can't think of any others right now at this time.
Q. Have you ever -- I mean, are they supposed to account for things like -- you're saying employees not paying attention. I guess presumably that would mean they're still using -- they're still powering the train forward and they don't realize that they've hit the derail and it goes through the derail under power; is that right?



A. Yes. I've seen that -- I've seen that happen.
Q. And I guess there's -- I would assume they also account for situations like if you had a guy that, I don't know, God forbid has a heart attack or the guy operating becomes incapacitated it's supposed to account for that, too; is that fair?
A. No, we don't -- we don't design our derails to take into account medical conditions or things like that. That's not what they're designed to do. Again, the intent is not to run over a derail or to make contact with a derail. The derail is a last chance option, you know, or a safety measure for that unintended movement such as brakes not being set, but it's not -- you don't ever expect someone to power through a derail, you know, or make that kind of mistake. You're trusting that your employees are operating their trains under control.
And so, yeah, it's not something you design. You don't put a derail in thinking that there's going to be a medical condition.
Q. Yeah. Maybe that was getting a little too specific, but I guess my point was that the point of derail is to prevent unintended movement

Page 30

and that can happen whether it's through someone doing -- not doing what they're supposed to be doing or doing it accidentally or whatever, I mean, whether it's an out of control rail car or whether it's someone powering a rail car through, it's supposed to account for those types of things; right?
A. No. It's -- it's very clear. I mean, a derail is designed to protect the track that it's intended to, you know, protect, you know, unintended movements. I mean, it's that simple.
Q. Well, is there -- is there any detail -- let me ask you this. Is there any derail that's more effective than a double switch point derail?
A. Any derail that's more effective? Not in my opinion, not at this -- no.
Q. And so this -- this derail was on a track that's -- is it Class 1, Class 2?
A. Yes.
Q. Class 1?
A. Class 1.
Q. Okay. Which means it's kind of rated for a certain speed; right?
A. Yes. Ten miles an hour or less.
Q. And what's the highest class track?

Page 31

A. So in freight railroad you have Class 5 and then it goes on up from there, passenger rail. So Class 5 would be the fastest.
Q. And what are the speeds that those trains would be going?
A. I forget -- is it 80? I don't remember exactly what the speed is on Class 5. I know we -- we primarily would go 60 miles an hour so 69, 70. We had Class 5 tracks so 70 -- 69, 70 miles an hour.
Q. When you say we, who are you referring to?
A. CSX.
Q. You used to work there?
A. Yes.
Q. So there are -- I assume there's been situations where a train has been going 60 miles an hour, maybe more, through a double switch point derail. Those are intended to even be effective on trains going that fast; right?
A. No.
Q. They're not?
A. No. There's no derail -- double switch point derail that's going to be installed on a Class 5 track that I -- that I'm aware of. That's not something that happens, no.

Page 32

Q. Okay. What's the highest class track that a double switch point derail is installed on?
A. In my experience I've seen double switch point derails on a 15-mile an hour track. That's the highest that I've ever -- that's the highest ever so, Class 2 track.
Q. You don't know if the AIPC locomotive in this case, you don't know how fast it was going through the derail, do you?
A. I don't. I know it was going fast enough to derail and make it up to the main line, but I don't know how fast.
Q. What does the term clearance point mean or point of clear? Are those interchangeable?
A. Clearance point? Yeah. Clearance point is the location where the two tracks -- two opposing tracks are clear of each other, you know, clear of each other's movements so -- does that answer?
Q. Is the term point of clear, is that the same thing as clearance point just put it another way? I've seen it kind of both ways.
A. Clearance point, yeah. So you have clearance point -- so like, you know, Norfolk Southern, for example, it would be there's a distance between the two tracks and the track center

Page 33

that's, you know, 12 feet apart and beyond that 12 feet. So anything beyond the 12 feet is the clearance point.
That 12 feet would be considered a clearance point and anything beyond that would be clear of that point.
Q. Okay. So anything outside the clearance point is, you know, sort of -- supposed to be the safety part and as you're going closer to the track past the clearance point that's when you're in the danger zone of being in the foul of each other?
MR. WHITNEY: Object to the form. You can answer.
BY MR. RADECK:
Q. You tell me.
A. Yeah. So the clearance point is -- is set. There is a buffer in there, I don't know what the buffer is between the clear point and then, you know, where that contact point could potentially be. But...
Q. Did you calculate -- okay. So then you mentioned -- let me ask. You mentioned track center. Okay. So to find the clearance point are you measuring the track center?
A. Yes.

Page 34

Q. Okay.
A. Well, there's -- you know, you measure the track centers, yes. That's right.
Q. Is the -- is the double switch point derail supposed to be installed outside the clearance point?
A. So the double switch point derail -- I've seen on their instructions that they had the points that can be set at the clear point. The derail portion of the points could be set at the clear points and it also says that the -- I know that they have different policies -- they had some different language on there but it's either set where the wheels derail at the clear point or, you know, behind it.
Q. I mean, is there any -- is there any part of the derail structure supposed to inside the clearance point?
A. No. The derail itself when -- you know, where the derail is set it should be at the clear point or back.
Q. And did Norfolk Southern meet that requirement in this case?
A. Yes. Yeah, the derail on the date of the incident was set well behind the clearance

Page 35

point. And there's a reference of that -- a clear reference of that in my report on Page -- Page 31, Figure 23. You can see the point of the derailment and you can see two wheels on the ground from that first car. But, theoretically, the first wheel would be the point of derailment and then you can see the space between that point of derailment and the main track over to the right. You can't even see the derail or the ties itself, you know, cross from that clear point.
Q. In Figure 23 you've got the point of derailment with an arrow pointed to the -- that's the inside curved lead rail; right?
A. Yes, that's right.
Q. Okay. And then back on Figure 4 you've got a point of derailment with an arrow and that's pointed to the outside lead curved rail; is that right?
A. Yes. So this is referring to -- Figure 4 is referring to the definition of a point of derailment. So this was intended to show what the definition of a -- of a derailment is, where that point of derailment occurs.
And then Figure 23 is showing the point of derailment in reference to the clearance between

Page 36

the point of derailment on the car -- on the NS derailer and the Norfolk Southern main track.
Q. Right, and that's my question. There's not two points of derailment, is there?
A. No. There's generally going to be one -- one point of derailment.
Q. And so -- but you're telling us in your report -- report there's a point of derailment on each curve of the lead rail. So which -- which one is the true point of derailment? Is it on the inside curved lead rail or the outside curved lead rail?
A. So based on -- you know, looking at the -- being at the location the point of -- the actual point of derailment, this inside wheel would have come off first. So this would have been the first point of derailment. (Indicating.) And then the outside wheel you can see...
Q. Inside wheel meaning on the inside derail --
MR. WHITNEY: I think he's still testifying. Answer the question.
THE WITNESS: So on Figure 24, Page 33, you can see the inside rail or the rail in the gauge of the track looks like it would be slightly -- you

Page 37

know, the wheel would drop off on that location prior to or before it would drop off on the field side.
BY MR. RADECK:
Q. That's because the inside curved lead rail was shorter than the outside curved lead rail; right?
A. Yes, that's right.
Q. So looking at Figure 23 do you have -- can you tell me where the track center -- where the track center is that you measured, if you did, where that is on that picture? Can you see it?
A. The track center? No. There's not a -- I didn't measure track center from here. I wasn't out there on the --on the date of the derailment.
Q. Did you measure -- did you ever do a track center measurement?
A. No, I didn't measure the center of track from that point. That point, when I got to my site inspection, this rail was different, this rail was changed. So no, I did not get to measure that clearance point from that location.
Q. When you went out to your inspection there was -- they had already repaired and changed the derail?

Page 38

A. The --
Q. When I say they, Norfolk Southern?
A. Yes, the rail -- this inside rail, the rail inside the gauge of the track was different from this -- from the derailment date.
Q. And they -- Norfolk Southern made the inside lead curve longer; right?
A. They did, yes.
Q. And they made it more curved to the left; is that right?
A. It was generally a little bit more curved to the left, yes.
Q. When you were out on your visit looking at the new derail did you do any track center measurements?
A. So I measured -- no, I didn't measure center of track. It was not something that was on my radar to do. I measured the distance -- no, I didn't measure the center of tracks.
Q. But that's -- but you have to have the track center -- or center of track measurement to determine the clearance point; right?
A. So the clearance point, because it had been changed, so we had some different standards that I went off of as far as measuring track center

Page 39

and the clearance point itself. So I went off of the measurement from the main switch to the point of switch on the derail, and so I measured that distance. And then I measured -- or then I took that and took into consideration the -- the switch point length and then the length of this original rail. So that's what I used to -- that's the track center measurement. But -- or the -- yeah, the clear point. Not the track center measurement, the clear point.
Q. Okay. What's the clearance point that you came up with?
A. So this -- it was about 150 to -- so the clearance point was about 152 feet.
Q. Okay. But we -- knowing that the track center is important to know is part of the basis for your opinions; is that right?
MR. WHITNEY: Object to form. Go ahead.
THE WITNESS: The track center was not something that I took into consideration at the time. There was no -- there's nothing that I saw, there's no materials where track centers were an issue based on the placement of the derail and where the actual derailment occurred.
So I was looking more at the placement

Page 40

of the -- of the switch itself and the determination of whether the switch was, you know, derailing to the left as it was intended to do, all the components were in place. The switch was meeting FRA regulations and NS policies and procedures.
BY MR. RADECK:
Q. But, again, how do you determine the location of the switch, the double switch point derail?
A. So there was the original plans again that were drawn up. So I looked at those plans and took the measurement again from the main track switch down into the industry -- or down into the double switch point derail, stopping at the point of the double switch derail.
Q. But I'm talking about, like, for Norfolk Southern or anyone, how are you deciding where to put the double switch point derail?
A. Are you talking about in the track construction?
Q. Right.
A. So when you install a derail you have -- well, you have your plans that you -- that you go off of. But you determine your clearance -- you basically set the derail to comply with, you know,

Page 41

the clearance point standard or you set it back from that.
So being there on-site, I mean, there was no -- the clearance -- you know, looking at these photos and looking at the materials that I had, reading the reports, there was never a question of, you know, the clearance point being an issue in the -- you know, in the materials that I was reviewing.
So it was more about the placement of the derail or compared to the plan itself and was it in compliance with NS policies and procedures.
Q. Okay. We talked about the plans. Did you -- in your review did you determine that for whatever reason that was made by NS apparently in the field they -- they set the track center at a location that's not in the plans?
MR. WHITNEY: Object to the form, but you can answer.
THE WITNESS: Can you ask that again?
BY MR. RADECK:
Q. Yeah. Based on your review of the plans and everything else you read in the case did you come to the conclusion that where the track center was -- the actual track center, when you're going

Page 42

and measuring it from the location of the derail, that was different from what was noted on the plans; is that right?
A. I -- I'm not sure I understand the question. So the plans that -- the track centers far exceeded what the NS policies are. So the 12-foot track center requirement for NS, the track centers -- where the derailment occurred and where NS set the derailer, the double switch derailer to derail equipment, at that point those track centers far exceeded the 12-foot mark.
I believe Mr. Brooks went back out and took measurements that were around 16 feet or so, you know, so it's somewhere between that 16, you know, maybe 17-foot track center range.
Q. And that's what I'm asking you, did you measure the track center and you said no; right?
A. Yeah. I did not.
Q. Okay. And it sounds like are you relying on Justin Brooks' measurements to be able to talk about the track center that's out there now?
A. As far as the track center that's there now?
Q. Sure.
A. It's different from the original -- the

Page 43

derailment, the date of the derail.
Q. Okay. What was the track center on the date of the derail?
A. That's what I'm saying. It's, like, between 16, 17 feet. So the track center at the point of the derailment was somewhere around 16, 17 feet.
Q. And you know that based on Justin's measurements?
A. So he took measurements, took -- you know, went on Google -- Google Earth, you know, historical view, looked at it myself, you know, did an estimate on that as well. So, you know, there's different ways that -- yes, those are two ways that I looked into that when I -- when I found out that the track clearance or -- you know, that was coming into question.
Q. And Justin, he measured it -- he measured it the day before his deposition this year; is that right?
A. I'm not -- I don't remember exactly when he measured it. I don't remember exactly when he measured it.
Q. And have you seen -- did you see the pictures from his deposition that he took doing his

Page 44

measurements?
A. I have seen them, yes.
Q. Okay. How -- if you were to go out there today and measure track center how would you do it?
A. Well, there's a couple of different ways. You know, one, you have a laser pointer where, you know, you set up a laser and put in the middle of the track and go to the -- you know, the other center so you can do it that way. Tape measure is something that we use quite often. So you use a tape measure to get the track center measurement as well.
Outside of those two things that come in the field, those are pretty much the two ways that I'm getting track center measurement. Either a tape measure or, you know, a laser.
MR. RADECK: I'm going to mark as Exhibit B these three pictures. We'll do them 3 -- I'm sorry --
THE COURT REPORTER: Two.
MR. RADECK: Exhibit 2A, B and C and confusingly they're actually Exhibit 3A, B and C in Justin Brooks' deposition.
(EXHIBIT 2A, Color Photograph of Track

Page 45

Center Measurements Between the Main Line and the Switch Point Derail and Dustin Hall, was marked for identification.)
(EXHIBIT 2B, Color Photograph of Track Center Measurements Between the Main Line and the Switch Point Derail, was marked for identification.)
(EXHIBIT 2C, Color Photograph of Track Center Measurements Between the Main Line and the Switch Point Derail, was marked for identification.)
BY MR. RADECK:
Q. Handing you Exhibit 2, you've said you've seen those pictures before?
A. Yes.
Q. Okay. And is it your understanding does Justin appear to be measuring the track center in those pictures?
A. That's what it looks like.
Q. Based on those pictures do you know whether he was doing it properly?
A. I mean, it looks so, yes.
Q. Okay. Is he measuring -- is he measuring the -- can you tell whether he's measuring

Page 46

from the track to track or measuring it from the main track to the derailment?
A. I'm -- I'm not sure. You would have to -- I'd have to look back and see if he mentioned that in his deposition of which method he was using, but -- yeah. I don't want to speak on behalf of, you know, him and the way he was doing it.
But this is where the tape measures are, where the tape measure is. This is how, you know, we do track center measurements, so...
Q. So in 3A there you would put -- if you were out there you would put the tape measure on, I don't know how you put that, on the far side of the main track?
A. Mm-hmm. Yes.
Q. And then you would pull all the way across to the inside lead curved rail?
A. Yeah. So there's a few different ways that you can do it. One -- the way that I always did it, and Mr. Brooks would have to speak to his training and how -- you know, how he did things, but how I would generally do it, which is a little bit easier, I'd just put -- you know, I would go to the middle of the track itself and do middle to middle. I know you can do rail -- you know, there's

Page 47

rail-to-rail measurements that you can do.
So he would have to be the one to better explain how he did -- he did his measurements, but there are different ways to do it.
Q. So middle-to-middle you would obviously just put your tape measure on each rail, find the middle point and mark it and then go and find the other middle point, mark it and then measure it?
A. Yes.
Q. When you do rail-to-rail how would you do it?
A. Pretty much the same. I mean, it's -- you take the outside rail and then you move it to the inside. It would be the inside rail here on this picture. You can do -- again, just depending on how you -- yeah, that's the main.
Q. You would do the outside rail to the inside rail in the picture; right?
A. Yes, you could do that.
Q. Not could. That is the way you do it if you're doing rail-to-rail?
MR. WHITNEY: Object to the form. You can answer.
THE WITNESS: Yes, I've done it that way.

Page 48

BY MR. RADECK:
Q. Is that how you were trained to do it, go from rail-to-rail?
A. So, my training, again, I mainly went center-to-center. So I know there are guys that did it that way, rail-to-rail, but I did not use that method. I used the center-to-center method.
Q. I understand that. But my question is if you are going to go rail-to-rail, my question is your understanding, and the way you understand it, is you go from -- you go from this outside rail to this rail? (Indicating.)
A. Yes. Should generally give you the same measurement, yes, from outside to the outside.
Q. Do you have any reason why Justin went all the way to the curved lead rail?
A. To take track center measurement?
Q. Right.
MR. WHITNEY: Object to the form. You can answer.
THE WITNESS: Again, I -- you know, I would have to look back to see what he said to see, you know, how he took that measurement or what he was doing at that time. Yeah, I'd have to look back to see what he said. I don't...

Page 49

BY MR. RADECK:
Q. But, again, if this picture -- I mean, I know you have to go back and look at his deposition. But looking at Exhibit 2A, if he's taking the measurement from the lead curved rail, that's not the way to do it if you're trying to measure track center going rail-to-rail; right?
MR. WHITNEY: Object to the form. You can answer.
MR. RADECK: How is that an objectionable question if I'm asking him is that the way to do it?
MR. WHITNEY: I made my objection. He can answer.
MR. RADECK: Well, just -- you know. All right. Let me ask it again.
Q. Based on your training and looking at this picture, if you were going to do a rail-to-rail, it would be improper to take the measurement as it's shown in this picture running all the way to the inside rail --
A. Again --
Q. -- is that right?
A. That tape measure is stretched out all the way to the far rail. So, again, I'll have to

Page 50

look back to see what he's -- what he's doing there in that picture or what -- you know, what type of measurement he's taking or what method he's using. So I can't speak to that particular picture without going back and reading and referencing what he was doing --
Q. You don't need --
A. -- at the time.
Q. Okay. I'm sorry to talk over you there at the end. We don't need to read and reference his deposition, you've got the picture. Again, I get it. You could -- it's laid over a bunch of different things and you can be saying I'm going to take this measurement, I'm going to take this one, I'm going to do this one.
My question is pretty simple. Looking at this picture if you were going to pick two points on this tape measure to get the track center you would take the one on the far outside track and you would take the one on the inside rail of the industry track; right?
A. That is -- yeah, that is one way you can do it.
Q. Okay. You wouldn't take this and this on the rail; correct? (Indicating.)

Page 51

A. No, not -- I've never -- I've never done it that way. So I don't know what -- if that is something that he's doing, I don't know. I would have to look back and see what -- what he's doing there.
Q. We've been going for about an hour. Do you want to take a couple of minutes break? Are you good?
A. I'm good. Do you guys want to take a break?
MR. RADECK: All right to keep going?
MR. WHITNEY: Sure. Are you okay?
THE COURT REPORTER: I'm fine, thank you.
BY MR. RADECK:
Q. Did you measure -- when you were out there did you measure the angle of the curved lead rails?
A. I did not. It was, you know, different than the date of the original incident so I did not measure those.
Q. Do you have any document or record or anything that you reviewed that would show who made the decision in the field to place the derail, where it was actually placed at the time of this incident?

Page 52

A. So at the time of -- when it was originally installed?
Q. Correct.
A. I don't know. I don't know the individual's name that decided that.
Q. And your report talks about how adjustments can be made in the field; is that right?
A. Yes.
Q. But as far as who actually did those adjustments or the decision-making behind that, you haven't seen any evidence of that; is that right?
A. I have not.
Q. Now, I think the report made some reference again to Plan 5-3 and I think y'all took a shot at Ken Rusk's report saying that 7-9 is not applicable, it's Plan 5-3. Why -- why is that?
A. So Plan 5-3 what was -- is what was in effect at the time of the installation. So Plan 5-3, it was from 1994 -- look back and see -- yeah. The 1994 plan, 5-3, is the applicable plan. So that is the plan that would have been in place at the time of installation that Norfolk Southern employees would have been using to -- to reference if needed.
Q. Okay. And we know that the as-built derail at the time of the incident did -- did

Page 53

deviate from the drawing in Plan 5-3 -- first, one, because of the length of the inside curved lead rail in the Plan 5-3 is longer than the outside curved lead rail; is that right?
A. So as far as -- yeah, they did -- they did make adjustments to the derailment when they installed it based on -- from the plan they did make adjustments which they're, you know, entitled to do or they are allowed to do.
Q. My question though, again, is just when you're looking at Plan 5-3 it shows the inside curved lead rail is longer than the outside curved lead rails, but as they built it they did the opposite; is that right?
A. Yes.
Q. And you've referenced in your report, you highlighted some language on the Plan 5-3. Why did you highlight that language?
A. Again, this is a 15-foot switch with the switch plates based, you know, for illustration. The only other switch material may be used where advantageous. So, again, this is showing that if -- you know, if they're out there in the field and they determine that, you know, additional material needs to be used or alterations need to be made to this

Page 54

plan that is something that they can do in the field based on, you know, where they're installing the derail, the location and all that. So it was just showing that they do have the ability and the -- the authorization to make adjustments as advantageous.
Q. But it doesn't say any of that what you just said; right? It doesn't say anything about location, does it?
A. No. It talks about the switch itself.
Q. Okay. And the 15-foot switch, what is that? Is that supposed to be the clearance point or the track center or whichever?
A. Fifteen -- it just says it's a 15-foot switch with switch plates.
Q. What does that mean, 15-foot?
A. So they're talking about the -- the switch itself being 15 feet so that's -- I mean, it's what it says. It shows a 15-foot switch with the switch plates based for Number 8 turnout.
Q. Is that the length of the derail? Is that the measurement that we've been talking about, the track center? What is the 15-foot?
A. The 15-foot is the -- should be the total switch length itself.
Q. Okay.

Page 55

A. Approximate from the switch -- looks like from the switch point. I'm looking to see where the 15-foot -- (reading).
Q. Okay. This -- the blurb that you, you know, put a red box around and highlighted, it's telling us that this plan, 5-3, shows a double switch point derail 15-foot switch with switch plates placed for Number 8 turnout. Other switch material may be used where advantageous.
That's all it -- that's all it says as far as what can be the other, what can be changed at least expressly; right?
A. Yes. Other switch materials may be used where advantageous, yes.
Q. You're interpreting that to mean that an engineering manager/employee in charge of actually installing the derail can make the decision in the field to make adjustments as far as the location of it?
A. The location, yes. So an engineering manager, when they go to install the derail, they can make the determination to install the derail where it is best fit for that location as long as it complies with the NS and MW&S Standard Procedure 100 and FRA regulations.

Page 56

Q. Where are you getting the best fit part and the necessary adjustments part? Because that's not in the document. What's the basis for that language?
A. Where am I getting best fit?
Q. Yeah. You're saying they can make the necessary adjustments and your report says -- or they can put the best fit for the location.
Where -- what's the basis for that language? Is that coming from your head or just --
A. No, that -- that's something that -- again, my experience installing these, maintaining, inspecting these. So when we go out and we install these, you know, you have -- you have your plans and then if you go out there and you determine that there's a location in the field that's a better fit for it whether it be due to, you know, a grade or, you know, terrain or whatever it is, there's different, you know, factors that could go into play of why they would move a derail forward or back in a location like that.
So they're out there in the field, they're looking at the location itself and they're making that determination there in the field that this is going to be where it's best fit whether

Page 57

it's, you know -- there's -- there's other factors that could go into play with that. But they're making a decision based on their training and experience to put a derail in a location that complies with their policies and procedures, complies with that part of the regulations and is a good fit for that derail.
Q. Other than you saying that they can do that based on your experience what -- what NS policy, what industry standard, what else says that they're allowed -- Norfolk Southern is allowed to do that? Is there anything you can point me to?
A. I mean, their training. Their training, their experience.
Q. Whose training?
A. The engineering department, engineering managers that are, you know, building, constructing and inspecting and maintaining these. So their training, their experience goes into play. I don't know about --
Q. So is there -- I'm sorry.
A. As far as a document, I'd have to look back and see if there's a document or some type of language in their policies or their procedures that, you know, specifically says something like that,

Page 58

but...
Q. Okay. Yeah. This is -- this isn't obviously supposed to be me asking you questions and you go do homework. I mean, if you do do homework and give your opinions, let your attorney know because we're entitled to ask you about it.
(This page contains information to be supplied by counsel and/or the deponent.)
BY MR. RADECK:
Q. But my questions are just as to specifically today other than citing to just general training and experience of the people doing the work what other Norfolk Southern policy industry standard, Federal regulation -- anything can you cite me to that says that they're allowed to make adjustments in the field based on location and all those other things you said? Is there anything else that as we sit here today that you can point me to?
A. No. Again, I mean, the proposed -- you know, again, the language in the -- the agreement or the drawing has, you know, a proposed plan, you know, for these -- for these locations for these tracks.
You know, again, you know, these employees -- these railroad employees, these

Page 59

engineering managers, this is what they're trained to do. They go through training, they go through, you know, qualification processes, you know, with FRA and with Norfolk Southern.
So these are experienced people who have been trained to do this. They've been trained to install these derails in locations, you know, that are -- that comply with their internal policies and FRA regulations. So, you know, based on that I know -- you know, I went through the same training myself. I spent a lot of time doing training on, you know, engineering policies, procedures, having to do follow-ups with those types of things. So, you know, that's -- you know, that's what I have for right now on that.
MR. RADECK: All right. I'm going to move to strike.
Q. And again -- I'm going to ask it again. My question is pretty simple. I'm not asking about training experience. Other than what you've told me can you cite to me any industry regulation, Federal FRA regulation, any Norfolk Southern policy that says that they can make necessary adjustments in the field as needed or they can make changes to plans based on the best fit location?

Page 60

MR. WHITNEY: Objection, asked and answered. Go ahead.
THE WITNESS: Again, there's nothing that says they can't do it. I can say that. There's nothing that says that they aren't allowed to make adjustments on their property that, you know, as long as it complies with, again, their policies and procedures. So there's nothing that says they can't do it.
BY MR. RADECK:
Q. There's nothing that says they can expressly? That's all I'm asking.
A. I can't think of anything right off at this time.
Q. Now, on the bottom of Page 29 of your report you talk about -- and you mentioned it earlier in your deposition you talked about how they have -- let me ask it this way.
Is your opinion that Norfolk Southern had the ability to go as close as a 12-foot track center in this location?
A. They could. If they saw that that was the best fit for it they could have set the derail to derail at that 12-foot mark.
Q. Okay. You cite the 1988 MW&S Standard

Page 61

100 policy. Is that the policy that you believe applied at the time of this incident?
A. No. Again, it was the 19 -- it was the 1994 policy. (Reading.)
Q. In your report you cite the '88 policy and the 2005 policy; right?
A. Yes. So showing that the policy has not changed from 1988 to 2005 it's even similar to today.
Q. And that policy says: Derails should be installed with a minimum of 15 foot track centers where conditions permit.
That's -- that's the first sentence; right?
A. Yes, that's correct.
Q. And it goes on to say: On sections of the railroad where tracks exist with closer clearances, derails are installed at the normal clearance point (location where the adjacent track becomes parallel) but in no event less than on 12 foot track centers; right?
A. Yes.
Q. And you don't -- you don't interpret that to mean that you can only go below 15 all the way down to 12 when it's only at a parallel track?

Page 62

A. No. I mean, what it says -- it's very clear right there. It says: In no event less than on 12 foot track centers.
Q. And you recognize that Mr. Rusk's measurement of the track center is different than what Justin Brooks did; right?
A. I understand that, yes.
Q. Did you do anything to verify whether or not Ken's measurement was correct?
A. I -- no, I looked into -- I looked at his measurements as well. But no, I didn't spend any additional time on -- on his measurements.
Q. Do you have any reason to dispute his track center measurement?
A. I'd have to look back to see how he did his process again as well. So I don't remember exactly, you know, what -- what he did or how he took his measurements. I know I did dispute some of his measurements in my report here that I -- that I noted as far as the track centers that he had talked about, stating that NS did not comply with the 1.05 saying derails should be installed with a minimum 15 foot track centers where conditions permit.
So I did dispute what he had to say there because on the day -- again, on the date of

Page 63

the derailment the track centers were well beyond the 12 foot and even beyond the 15 foot track center measurements, so...
Q. And that's based on Justin's measurement of 16 feet and change?
A. Based on that measurement, again, you know, like I have here --
Q. And the Google Earth?
A. Yes.
Q. Well, you were kind of going back into the time machine. You were -- in the other matters you had a draft report which outlined your opinions; right?
A. Yes.
Q. Okay. And in that report at the time there was a different expert, I think maybe his name was Lydick? Do you remember that?
A. Joe Lydick, yes.
Q. And you did a similar thing where he had contrary opinions and you rebutted some of his opinions; is that right?
A. Yes, that's right.
Q. And he measured the track center at 12 feet?
A. 12-feet-nine and some change.

Page 64

Q. And at the time you didn't dispute that measurement, did you?
A. That was on the new track that was installed, so that was not on the original derail. That was in the track. So he took that measurement on the current derail that's in place. So no, I did not dispute that.
Q. Okay. So -- okay. I'm sorry, I'm getting confused; okay?
A. Okay.
Q. I asked you what his track center was and you said it was 12.9 you said?
A. Yeah, I believe that's what -- 12-feet-nine and some change.
Q. And you said that's measured on the current condition of the new derail. That's what you just said; right?
A. Yes.
Q. And you just told me a minute ago that Joe and Justin Brooks did the same measurement and got 16-plus feet; right?
A. Justin Brooks, in his deposition, he said he took the measurement -- the 16-foot measurement came from where the original derail was set -- or where approximately where the original

Page 65

derail was set. So that 16-foot measurement that he took was based on the original spot of -- or the original point of the derailer.
Q. Okay. So after this incident where we have this AIPC locomotive going through the derail and ending up in the foul of the main line, Norfolk Southern went back and reconstructed the derail and moved it four feet closer?
A. Yes. They -- they moved it -- they added some -- they added an extension to the curved closer rail -- or the inside rail, yes.
Q. And so does that -- so that gives them less clearance or more -- more clearance?
A. As far as track centers?
Q. Right.
A. At -- so at the point of the derailment currently, where it's currently installed, it would give them less track centers. But it's within their standards, it's within their policies and procedures, so it still complies with their policies and procedures, still complies with FRA regulations. So it's something that, you know, again, they determined is best fit for that location and it -- it's a move that they determined was good to make there, so...

Page 66

Q. Is having -- is it safer to have more track clearance or less track clearance?
A. Track clearance is -- in relation to -- to what? That's -- I mean, that's a very broad question so...
Q. At the point of -- at the point of derail.
A. So at the point of derail, you know -- again, the derail is intended to derail equipment away from the main line. So they have these clearance -- they have these points set to, you know, derail the equipment and provide, you know, protection for the track that they're intended to protect.
So as far as the clearance goes you install a derail where it's best fit for that location. So if they make adjustments to it, they're making adjustments that they see necessary that are, you know, best fit for that location.
Q. Okay. But the point of derailment is it's got less of a clearance now than it did at the time of the accident?
A. It does have less clearance now than it did at the time of the accident.
MR. RADECK: All right. Let's take five

Page 67

minutes and we'll hopefully -- I do want to go through your report a little bit more but hopefully I don't have too much more. Just make sure you don't talk to anybody about your testimony; all right?
THE WITNESS: Okay.
(A recess transpired.)
BY MR. RADECK:
Q. All right, Dustin. Let's go to -- I want to ask you questions on Page 31 of your report.
A. Okay.
Q. You say that the train was under power when the derailment occurred. You're talking about the AIPC train?
A. Yes.
Q. Okay. How do you know that?
A. The review of the -- review of the information that I received.
Q. Do you know which specific information would indicate that?
A. I have to look back and see exactly what it was. But from what I gathered from the information that I reviewed the train was under power when the train went off the -- or the engine went off the derail.

Page 68

Q. Okay. What does that mean, the train was under power?
A. It was -- it was set to a speed or however, you know, however he was operating he was operating under power. So he was moving the locomotive or moving the train forward.
Q. Does it have -- does that locomotive have, you know, probably not gears but -- or does it have gears in the sense that you were able to determine what gear it was in, how much power?
A. I didn't review that.
Q. Did you determine whether or not any braking was -- was happening at all on the AIPC locomotive?
A. No, I did not look into that.
Q. Let me ask you this. You're not -- you're not offering any human factors opinions in this case, are you?
A. No, not trained. No, I'm not trained in human factors.
Q. Okay. You don't have any formal education in the field of human factors; correct?
A. That's correct.
Q. Also not in the field of biomechanics; is that correct?

Page 69

A. That's correct.
Q. You're not going to be talking about any perception or reaction time; right?
A. That's right. No, I'm not.
Q. Okay. You're not going to be offering opinions about perception, visibility, attention, distraction, reaction time, decision-making -- anything like that about any of the parties in this case; is that fair?
A. That's fair.
Q. And as far as the -- any kind of calculations about once -- this AIPC locomotive came off the top of its rails to the point of derailment, as you said, you have -- you've done no formal analysis, calculation, assessment -- anything to determine why at that point the locomotive ended up in the foul of the main line, did you?
A. I've not determined -- no, I didn't do any calculations on their speed or weights, different things like that as it relates to why it ended up where it did. No, I did not.
Q. You're not giving an opinion of why it ended up where it did, are you?
A. No.
Q. On Page 33 of your report you're

showing -- Page 33. You're showing pictures of the derail as installed at the time of the incident; is that right?
A. Yes, that's correct.
Q. Okay. And you're showing us that there's different parts of the derail that are in place that should be there and those are properly in place? Is that what you're telling us?
A. Yes.
Q. Okay. Are you -- do you recall when you went out there, do you recall seeing heel blocks on both sides of the curved rails?
A. I have to look back at the pictures that I took but, yes, there were heel blocks on -- yes, there were heel blocks on -- on both sides because there were switch points and they transitioned into the -- the curved closure rails.
Q. And the heel blocks are -- is that the block that's in between the curved rails and the track rails?
A. So the heel blocks -- yes. So there's two different types of heel blocks that are installed at this -- in this picture here. There's what's called a rigid heel block, which this is a bent stock rail right here. (Indicating.) So this



bent stock rail has the rigid heel block installed with it. And then the other heel block on this right side is more of a joint bar looking heel block, but it's essentially the same. (Indicating.) It's essentially the same. It's, you know, where the switch point transitions to the curved closure rail.
Q. Well, I mean, is there supposed to be a joint heel block on the right side? Because there doesn't look like there is one, that's all I'm asking.
A. There doesn't have to be on -- on this type of derailer or at this location, no.
Q. Okay. And we talked about your site inspection. That was on December 10, 2024; is that right?
A. Yes.
Q. Okay. You -- you and -- you and Ken Rusk agreed on the distance from the switch points from the main line to the switch points derail and that it was 178 feet; right?
A. Yes. Approximately 178 feet.
Q. And, again, what -- what measurements of Ken's, if any, did you disagree with?
A. I have them noted in here of what I



disagreed with as far as the 15-foot track center measurements that he took. The -- you know, him saying that the AIPC -- or NS did not comply with their 1.05, so I disagreed with him on those.
Q. What page are you?
A. Page 38. The measurements that he took were generally similar to Joe Lydick's measurements that I referenced -- or that he had taken at the time as well. I know they had -- their measurements were a little off but they were somewhat close.
But as far as, you know, him -- his opinion on the 15-foot track center measurement, how he had it stated here, this is where I disagreed as far as his measurements.
Q. Okay. Well, since you kind of jumped up -- based on my question you kind of jumped up to that part of the report, you're on Page 38. Help me understand what you're -- first of all, Page 38 of your report, these are images of measurements you've taken from Google Earth; right?
A. Yes.
Q. And what are you -- what are you trying to show us here with the point of switch and how you're moving it back? What are you trying to show us?



A. Yeah. So, again, Mr. Rusk in his -- in his opinions there, he was stating that NS did not comply with the 1.05 rule. Now that I look back at his report on his measurements he's got specific measurements in his report -- actually, let me reference -- can we pull up his report or -- is there a way I can get to his report?
Q. What measurement are you trying to...
A. Well, he had specific measurements on the 12 -- on the track centers itself and the reference to the point of switch measurements and then 25. So based on his measurements, 25 feet away from the double switch point zero towards the NS main line is where he said the 15-foot track center measurement is.
So 25 feet away from -- so what I'm showing here at the point of switch is approximately 22-foot track center clearances. And then if you take the point of switch and you go approximately 25 feet away to where Mr. Rusk said his -- he measured the 15-foot clearance point reference, that measurement is about 17 -- I got that measurement at about 17 feet.
So the measurements that he took to where he got the 15-foot measurement -- or 15-foot

Page 74

track center is what I was showing as being different there by about two feet.

Q. Okay. And so -- but the 22-foot track center you're showing us on Page 38, that's based on the current location of the double switch point derail?

A. That's the current location and that was at the time of the incident as well.

Q. Okay. How was that different than the 12-foot track center we were talking about earlier that was measured by Lydick and Rusk?

A. Okay. So the point of switch is different from the end of switch. So the end of switch, where it currently sits today, is what they were measuring at that 12-foot -- 12-foot-nine track center point. So this point of switch -- this is the point of switch, the end of derail is where they were measuring.

Q. Okay. But what does the point of switch have to do with this case?

A. It's -- it's the point -- I mean, this case is about a double switch point derail.

Q. Okay.

A. And --

Q. Does -- go ahead.

Page 75

A. Yeah. I mean, it's about a double switch point derailer and the engineer operating through the double switch derailer that was installed. So that point of switch is where the incident started.

Q. Okay. On Page 40 of your report Mr. Rusk's opinion is that the -- that NS did not comply with Rule 6.08 because the entire double switch point derail shall be located in the vertical tangent track outside of any vertical curves. The derail -- long timber (end) of the derail shall be placed at the clear point, not the point of switch. See attachment for derail details.

And your response to that is he's just looking at the wrong -- the wrong rule? What's the response there?

A. So there -- there's a couple of things here. Number 1, the plan he's referring to was not in place at the time of the 1994 Plan 5-3. And, again, as he states in this conclusion: A double switch point derail shall be installed by the Company, with the non-switch end of the derail at the clear point of the industry track, on industry track with descending grade towards the Company track.

Page 76

So, again, this -- here it states that it can be installed at the clear point which, again, is that 12-foot mark that we've been talking about or behind it which, again, this one was installed well beyond that clear point. So we know that it was around 16 to 17 foot of clearance where it was installed.

So, you know, what I'm showing here, this plan that he's referencing, you know, the fact that it doesn't have a 43-foot long is not applicable in this case because that was not the plan that was in place at the time.

Q. Well, was Rule -- was the Rule 6.08 language that he was citing, was that in effect at the time?

A. Not the one that he was referencing. Something similar to it was in place, but from what I gather he was not using the 1994 MW&S Standard 100 procedures, so...

Q. Does -- does 49 CFR 213.205, does that say anything about the location of the derail?

A. Not to my knowledge, but I want to make sure. (Reading.) It does not specifically state about location, no.

Q. Does it even say that you have to have a

Page 77

derail?

A. (Reading.) Does it state that you have to have -- no. This regulation is written, again, for the installation and the compliance with derail. So when a derail is used, if the company chooses to use the derail they have to comply with this regulation.

Q. Right. It doesn't say -- it doesn't outline situations where you have to have one or it doesn't expressly say you to have a derail at all times, here's how to do it. It doesn't say that; right?

A. No, not specifically.

Q. Bear with me one second. I believe you cited in your report the Norfolk Southern guidelines for design and construction of privately owned industry track. Have you seen that before? (Indicating.)

A. Yes, I've seen that.

Q. And the version -- the version that's been produced by Norfolk Southern at Bates Page 507-73 (sic) is the February 1989 version. Is that the version that was applicable at the time of this incident?

A. It would have been applicable, yes. I'd

Page 78

have to look back to see if that was the most up-to-date version, but it would have been applicable at the time.
Q. Do you have -- you don't have a copy -- do you have a copy of that with you -- or, actually, let me just hand it to you.
MR. WHITNEY: What did you say the Bates was on that?
MR. RADECK: 507-133. That's -- that's the part I'm going to direct him to, but the beginning of that policy is...
MR. WHITNEY: I just wanted to know where you were going. That sounds good.
MR. RADECK: Let's mark this as Exhibit...
THE COURT REPORTER: Three.
(EXHIBIT 3, Norfolk Southern February 1989 Guideline for Construction of Privately Owned Industry Track, Bates Stamp Number 507-000133, was marked for identification.)
BY MR. RADECK:
Q. What's been marked as Exhibit 3 is one page of the guidelines for the construction privately owned industry track that we just cited at

Page 79

Bates Page -- the page I gave you is 507-133. And if you look down at the bottom, 6.14, it talks about derails; is that right?
A. Yes.
Q. Okay. And did you review that as part of the materials in forming your opinions?
A. Yes, I did.
Q. Okay. And it says: Where double switch point derails are required, they must be installed in accordance with Plan 5-3.
That's what it says; right?
A. Yes.
Q. Okay. On Page -- let me ask you this. Looking at Page 41 of your report we talked about -- kind of the end of 40, going into 41, you're talking about: The wheels hit the ground in a location that would have had sufficient space for NS trains to pass if the train had not still been under power and the wheels stopped where the derailment occurred.
Do you see that?
A. Yes.
Q. Is that your opinion?
A. Yeah. Again, as shown in the photo there, the wheels -- if the wheels in the derailed state on Figure 23, right there at the point of that

Page 80

derailment when a wheel drops on the ground, at that point they have sufficient space for a Norfolk Southern train to clear. So at that point of derailment the wheel stops right there on the ground, there's plenty -- there's sufficient clearance for Norfolk Southern main -- or train to operate on their main track.
Q. And your opinion assumes that the wheels are going to stop dead in its track at the point of derailment?
A. So I'm not assuming anything. I'm just talking about specifically stating the fact that at the point of derailment, where the derailment occurs, there's sufficient space and clearance from the Norfolk Southern main line for a train to pass -- safely pass at that point.
Q. Right. And your opinion is the derail worked as intended because how do we know that? We know that because when we look at the space between the trains at the point of derailment there's sufficient space. That's what you're saying; right?
A. I'm saying --
MR. WHITNEY: Object to the form. Go ahead and answer.
THE WITNESS: I'm saying that the derail

Page 81

was installed and the points -- the points were installed, the derail away from the main track, and at the end of the rails at that point of derailment there was sufficient space and clearance from the AIPC storage track to the Norfolk Southern main track for a Norfolk Southern train to pass.
I did not take into consideration or account for actions after a derailment occurred in this because, again, that's not something that can be determined, you know, what happens and how far things go and all that.
BY MR. RADECK:
Q. So this derailment is -- Norfolk Southern properly placed this derailment in the proper location because when you look at the point of derailment there was sufficient space; is that what you're saying?
MR. WHITNEY: Object to the form. Go ahead.
THE WITNESS: I'm saying Norfolk Southern installed the derail in a location that derailed equipment away from the Norfolk Southern main line as intended. And, yes, at the point of derailment, at that point the AIPC track and the Norfolk Southern track there was sufficient

Page 82

clearance between those two points.
BY MR. RADECK:
Q. Right. If it -- let's just say hypothetically the train moved just three feet past the point of derailment; okay? There wouldn't have been a foul in that situation; right? Obviously.
A. Three feet? I don't -- more than likely no, I don't believe so, but...
Q. Right. So there is -- there are scenarios that the train could have potentially moved past the point of clearance and still not been in the foul, but you haven't even assessed -- you haven't assessed that at all. You haven't assessed any other distance past the point of clearance to determine whether this is -- this derail was proper; is that right?
A. There's -- no, there was no additional assessments that needed to be made. I mean, I looked at the derail itself when I was there, I reviewed the materials. There was no mention of clearance being an issue by anybody that I reviewed, you know, from the Rightmier case. The FRA went out and investigated the derailment themselves, they did not write any type of violation or condition on clearance. So there was nothing that was -- there

Page 83

was no mention of clearance being an issue. It was what happened after the derailment occurred that was the issue.
MR. RADECK: Okay. I'm just going to have to object to move to strike as nonresponsive.
Q. Again, your -- your whole analysis, your whole point is hinged on the point of clearance -- sorry, the point of derailment. You're not -- you haven't assessed anything past that point?
A. In reference to what?
Q. What happens -- what happens, whether if the train had moved only a couple of feet, whether that would have been proper or not, whether the train went all the way and kept going on down, you know, farther than it did in this case. Anything like that, any kind of movement, what happened. You're not looking at that at all.
You're just assessing, okay, at this point of derailment was there enough clearance. You're saying it worked as intended. That's what you're saying; right?
A. Yes. The derail was installed to derail away from the main track. It derailed the equipment as it was designed and intended to do at the point of derailment, it had sufficient clearance from the

Page 84

Norfolk Southern main which complies with Norfolk Southern's policies and procedures, FRA regulations -- it complied with FRA regulations when it was installed, it had all the components in place. It had, you know, the target, it had the switch stands in place. And so, yeah, there was -- that was what I looked at when I analyzed this.
Q. Shouldn't Norfolk Southern account for some movement after the point of derailment?
A. No. It should not -- a derail is not designed to account for movement after the fact. A derail is designed to derail equipment and provide -- you know, yes, designed to derail equipment.
Q. You mentioned earlier that there's, like, a buffer -- like an extra space past the point of derailment that they take into consideration for movement. What is that?
A. Talking about the clearance point?
Q. Yeah. I think you said -- I think you said that there's a difference between the clearance point and the contact point I think is what you said earlier; right?
A. Yes. So the clearance point, again, is the point where a train can safely pass on one track

Page 85

from equipment sitting at that clearance point on another track. There's obviously -- not obviously, I'm sorry. There's a space or there's a point from that 12-foot back towards where there's additional space there, yeah. But a clearance point -- that is what a clearance point is.
Q. Right. And how far past the point of derailment in this case did we have to go? How much further did we have to go to get to the contact point? Do you know?
A. Around -- I want to say, if I remember, it was 30, 35 feet or so from the end of the -- or from the derailment point to where the train came to a stop, approximately 30 to 35 feet. I have to look back and see exactly what it was, but it was somewhere in that area.
Q. Have you ever -- have you ever, in your experience, seen a train move this far past a derail -- a double switch point derailment or anticipated derail?
A. No, I've not.
Q. How many derails -- double switch point derails, in your experience, have you seen where the inside curved lead rail is shorter than the inside curved lead rail? Have you ever seen that before?

A. I can't remember right off. I -- I can't remember right off.
Q. Now, your report talks a lot about derailing the wheels to the ground. And so what do you mean by ground?
A. Not rail. So the tie -- like in this situation it goes off the rail onto the ties and the ballast.
Q. And you don't consider the ties and the ballast part of the track structure?
A. I never said that. It is part of the structure.
Q. So that's not the ground, is it?
MR. WHITNEY: Object to the form.
THE WITNESS: You can call it ground, you can call it -- it's the ground. It's -- the track structure sits on the ground, so it's the ground.
BY MR. RADECK:
Q. So -- but when the wheels came off the rails they landed on the track structure of the ties and the ballast. My question is, though, they did not -- to get more specific they did not land on bare gravel or dirt; correct?
A. No, they landed on the ties and the



ballast, yes.
Q. And in your view that's appropriate?
A. Is it appropriate for the wheels to derail on the ties?
Q. Correct.
A. It's not appropriate for a train to derail at all and run over a double switch derail. So I would not call it appropriate, but given that it happens it's -- you know, it acted as intended. You know, it derailed the wheels in the appropriate spot.
Q. Did the wheels -- the wheels on the outside lead curved rail landed on ties; correct?
A. Yes, they did ride on top of the rail all the way out but yes, I believe they landed. I'd have to look back to see if they landed on the ties or not but yes, I believe it was.
Q. Okay. And in that situation -- obviously no one wants to derail. But in the event of a derail your position is that that's not -- that's not evidence of an improperly designed derail. You're not -- you're not looking for it to go onto the dirt or the gravel, landing on the ties is okay?
A. Yes. Landing on the ties is -- okay,



that's normally what happens is you land on the ties itself. If we look at this plan also, the Plan 5-3, you can see there when it lands it's going to land, you know, generally land there on the -- on the ties as well so that's what it shows.
Q. Well, that plan shows a longer inside curved lead rail which is going to curve it more off to the side off the rails than what was built in this case; is that fair?
A. So it does have a curve. I wouldn't call that curve more than that was in the track at the time. That curve looks to be close to what was in the track on the date of the -- you know, the date of the incident.
Q. Well, what happens if the -- what happens when the outside -- in this case, if the outside wheel comes off first and the out -- and then the inside wheel is still riding that lead curved rail, what happens next?
A. It stays on the rail a little bit longer.
Q. It will continue to travel in the direction of that lead curved rail; right?
A. It will continue to travel, yes. But the other wheel will be on the ground. So, again,



you can't predict what happens at that point. You know, the wheel's on the ground and causes it to move somehow, some way. Even funny just telling what happened after that point.
Q. But in this case the evidence shows that the inside evidence curved derail was shorter and the wheel came off and it rode -- both wheels rode the ties or the ballast all the way down to the point of foul; is that right?
MR. WHITNEY: Object to the form, but you may answer.
THE WITNESS: The derail -- the wheels derailed to the left away from the main line and then after the derailment occurred the train moved into a position that eventually fouled the NS main line.
BY MR. RADECK:
Q. Did you ask for any materials that you have not received in this case that you need to finalize your opinions?
A. No. Not at this time.
Q. Have you ever testified in any cases where you were critical of railroad employees?
A. Railroad employees. Yes, I have given opinions. I was in the railroad at one time, yes.

Page 90

Q. What kind of cases were those where you were in -- I assume in those cases you were hired by the railroad?
A. Yes. And --
Q. And -- I'm sorry. Go ahead.
A. No.
Q. In defense of -- in defense of claims brought by employees in situations where they were injured?
A. No. This was --
Q. Okay.
A. So this was the railroads -- a case with one railroad and another railroad operating over other territories together and there was an incident at the railroad crossing. So I was hired by the railroad and I had opposing opinions against another railroad.
Q. What were the criticisms of the employees you mentioned you had?
A. It wasn't really -- no, it wasn't really criticisms of employees. It wasn't a injury -- an employee injury case.
Q. How many times have you testified on behalf of Norfolk Southern in the past?
A. Let me look to see.

Page 91

Q. Tell me what page you're on.
A. I'm on the appendix.
Q. D?
A. Appendix D, yes. (Reading.) So one, two, three, four -- looks like five times.
Q. Okay. And this list just goes back to 2023. I just didn't know if there were any others before then.
A. No, sir. I was with CSX at that time.
Q. Okay. And what was the -- you gave a deposition going back to 2023, Julie Williams case. What were you testifying about in that case?
A. Julie Williams was slip, trip and fall case.
Q. You're not, like, a premises liability expert, are you?
A. No.
Q. Why were you -- you're a track guy; right?
A. I'm not sure what -- I'm not even sure what that is. What is premises?
Q. Why were you -- was there some condition of a track that she tripped on?
A. Yes. There was -- yeah, there was complaints about the track conditions, that I was

Page 92

reviewing the track conditions in compliance with NS policies and FRA regulations.
Q. How about the Parks case in 2025, Parks versus Norfolk Southern in West Virginia? What was that about?
A. Employee was near some plates.
Q. What does that have to do with the track?
A. Plates are part of the track structure. So it was in reference to the type of plate, size of plate, things like that.
Q. What's the Digablo case about in Pennsylvania?
A. Digablo is an employee that was injured in claims that he fell into a sinkhole and injured his -- injured himself.
Q. It looks like you've been to trial testimony once before?
A. Once as an expert, yes.
Q. Okay. To your knowledge, have your opinions ever been excluded by any court?
A. Not to my knowledge, no.
Q. Do you know whether or not you've ever been challenged under Daubert, the Federal Court standard?

Page 93

A. I have had some opinions challenged under Daubert, yes.
Q. Do you know whether or not any -- whether a portion of your opinions or even all of your opinions have ever been stricken?
A. So one opinion that I know of was stricken.
Q. What was the reason for that?
A. That was -- so I was brought in -- there was an expert that went out for medical reasons and he gave opinions, and so I provided opinions as well. And in my opinions I included a rules manual that he did not include in his opinions.
So it was -- I was challenged that I used additional rules that the original expert did not cite, so they tossed that -- my use of a rule book.
Q. How many times have you been retained by Gallivan White & Boyd?
A. One.
Q. Have you ever testified on behalf of an industry working alongside like a main track? Like in this case AIPC, have you ever testified for anyone like that before?
A. No, sir.

Page 94

Q. And how much of your work is doing this litigation consulting work?
A. Right now it's about 90 percent.
Q. Okay. What's the other ten percent?
A. Just basically doing training, I do some training for railroads and then do, like, additional audit work, just auditing proxies, procedures, things like that.
(EXHIBIT 4A, ESi Invoices, was marked for identification.)
(EXHIBIT 4B, Secretariat Invoices, was marked for identification.)
BY MR. RADECK:
Q. I've handed you a collection of invoices that we've been provided. 4A is a set that I understand is from your past work when you were at a different firm; is that right?
A. Yes. ESi, yes.
Q. Okay. And then 4B is the set of invoices you've issued since you've been at Secretariat; is that right?
A. Yes, that's correct.
Q. Okay. Just quickly go through. Does that appear to be all the invoices for all the work you've done in this case?

Page 95

A. (Reading.) Yes, it does.
Q. As we sit here today do you anticipate doing any additional work on this case?
A. If I'm called to testify at trial I have prep work, doing that. But outside of that not at this time.
Q. Okay. You don't -- nothing planned as far as, like, any kind of other -- other analysis, trial presentation stuff like animation -- anything like that you -- at this time you don't have plans for that?
A. No, unless new information is brought about I haven't been able to see, no, I don't have any other plans.
MR. RADECK: Let's just take a quick couple of minutes. I'm just going to confirm my notes but I think we're about done.
(A recess transpired.)
(EXHIBIT 5, Section II, Definitions, Bates Stamp Number 507-000123, was marked for identification.)
BY MR. RADECK:
Q. What's been marked as 5 is a portion of the same guidelines for the construction of privately owned industry or track. Can you tell us

Page 96

the Bates Number on that document?
A. 507-000123.
Q. Okay. And in that there's a definition of clear point. Do you see that?
A. Yes.
Q. Okay. Can you tell us what that definition is?
A. The definition on this document says: That point where there is 15-foot spread between main track and an adjacent track and 14-foot for other tracks as measured between centers, allowing the passing of freight cars and/or locomotives safely.
Q. That was part of the NS policy at the time of this action; is that right?
A. I'm not sure where this one -- where this came from or what the date of this is.
Q. It's the same one as the Derail Section 6.14 I believe we talked about earlier. Just a different part of the NS policy.
A. I -- I mean, I do recognize the numbers on the -- on the left over here but...
MR. WHITNEY: If you need to take a moment to review the full document you can do that.
THE WITNESS: Yeah. I'd like to a look

Page 97

at the whole document to make sure.
MR. WHITNEY: Do you want him to pull it up on the laptop?
BY MR. RADECK:
Q. We've got -- it's got Revised May 1994 guidelines for design of construction of privately owned industry tracks at Bates 507-120 and the next -- the next page is the one you have; right, 123, the next couple of pages?
A. Yes.
Q. And it says Definition Clear Point. Is that what you've got?
A. That says clear point, yes.
Q. Okay. And it says: That point where there's a 15-foot spread between main track and an adjacent track and 14-foot for other tracks as measured between centers, allowing the passing of freight cars and/or locomotives safely.
Is that what it says?
A. Yes, that's what it says.
Q. Okay. And, again, this is May of 1994. Do you know whether or not -- do you have any reason to disagree that that applied at the time of this accident?
A. No, I don't.

Page 98

Q. Okay. You mentioned -- I think you referenced some FRA inspections earlier. When they're coming out to do inspections, is that something you're familiar with?
A. Yes.
Q. They come out and check Norfolk Southern derails because it's part of their job; right?
A. Yes, that's part of their job to check.
Q. And when they're checking the derail, I mean, they're checking to see if it's properly maintained?
A. Yes. They check the -- they check it. In this situation they would check it just like a switch, yes.
Q. And what does that mean, just like a switch?
A. So it would be considered a turnout inspection so they're checking the switch stand, the targets, the switch points, the plates, the heel blocks, the bolts, the switch rods -- all the - all the components of it. It's like a switch.
Q. And you called it a turn-on inspection?
A. Turnout inspection.
Q. Turnout inspection. So basically they're just unlocking it, they're kind of manually

Page 99

moving it around and making sure things are bolted down properly and it's where it's supposed to be and kind of functioning properly?
A. Yes. They check to make sure that it complies with their regulations and any applicable NS policies, yes.
Q. Are they walking around with NS policies out there as they're looking at it?
A. They're familiar with NS polities and they're familiar with other railroads' policies generally.
Q. Okay. To the extent of the inspectors in this case you can't speak to their level of knowledge of NS policies?
A. No. I mean, as far as how verse they are in them, no.
Q. And you don't -- you can't -- you don't know their knowledge, if anything, about the siding agreements between AIPC and Norfolk Southern; right?
A. No, I wouldn't know their knowledge of the siding agreements.
Q. When the FRA inspectors go out there, they're not going out there second guessing the location of where NS decided to put it; right?
MR. WHITNEY: Object to the form. You

Page 100

can answer.
THE WITNESS: They're going out there when they -- when they inspect the derail they're going out there to ensure that it complies with their regulations and, I mean, in doing so they're going to look and if they see something out of the ordinary then, yeah, they will absolutely say something or they'll make issue or make note of a derail that's, you know, improperly placed or improperly designed or something like that.
BY MR. RADECK:
Q. In this case there was -- the inspector came out and initially said it was improperly located; right?
A. No. The inspector said that it did not function as intended or did not derail the equipment away from the main line as intended or something along those lines.
BY MR. RADECK:
Q. But to the extent -- again, to the extent that -- you know, to the extent my client disputes that it was built like it should have been according to the plan, there's disagreements between Norfolk Southern and AIPC on that, the location of that, that's not something that the FRA inspectors

Page 101

are getting in the middle of. They're not looking out there and say, okay, did Norfolk Southern put this derail in the location that they were supposed to based on the agreement with AIPC; right? They're not doing that?
A. No, they're not looking at it based on the agreement with AIPC and Norfolk Southern, no.
Q. All right. Have you expressed every opinion you intend to offer in this case?
A. Yes, at this time.
Q. We've covered all your opinions?
A. I believe so, yes.
Q. Okay. Did you understand all my questions?
A. Yes.
Q. Are there any other opinions that you have that are not either in your report or things we've discussed today?
A. No, not at this time.
MR. RADECK: All right. That's all the questions I have. Thank you.
MR. WHITNEY: I just have a few for you, Dustin.
EXAMINATION
BY MR. WHITNEY:

Page 102

Q. You were just asked about the FRA and the inspection process; right?
A. Yeah.
Q. And you were asked about, I guess, the inspection that was done after this incident; is that right?
A. Yes.
Q. Would the FRA also have inspected the this derail before the incident?
A. Yes. I believe it was about five times that they inspected it prior to this incident that Mr. Dion -- Fianchino, I think his name is, being the inspector that actually inspected it a couple of times prior to the incident.
Q. So the same one who inspected it after this incident also inspected it a few times before? Is that what you're saying?
A. Yes.
Q. Did FRA ever, when they were doing these inspections, did they ever issue any citations before the date of the accident about the location of the derail device?
A. No.
Q. And you just explained that -- or you just agreed that they're not looking at the siding

Page 103

agreement preliminary plans for that determination; right?
A. That's right.
MR. RADECK: Object to form.
BY MR. WHITNEY:
Q. Are the FRA inspectors looking to make sure that the derail is located in a place where it can perform as intended?
A. Yes. They -- they're looking to ensure that it complies with the regulations, the 213.205 regulations, and that it can perform -- it can derail equipment away from the track that it is intended to protect.
Q. Were there ever any FRA violations or citations about the angle of the derail?
A. No. I did not see any, no.
Q. Were there ever any FRA citations or violations about the length of the inside rail, extension rail?
A. No, there was not.
Q. Turning to the Regulation 213.205, 205(d) said that: Each derail shall be properly installed for the rail to which it is applied; is that correct?
A. Yes, I believe so. Let me make sure.

Page 104

(Reading.)
MR. RADECK: Just tell me what page you're going to.
MR. WHITNEY: It's Page 21 of his report.
THE WITNESS: Page 21, yes. Yes, that's what it states: Each derail shall be installed for the rail to which it is applied, yes. It says...
BY MR. WHITNEY:
Q. Are you finished?
A. Yeah. It says this paragraph (d) is applicable September 21st, 1999.
Q. Does it say that each derail shall be installed exactly as preliminary plans direct?
MR. RADECK: Object to the form.
THE WITNESS: No, it does not.
BY MR. WHITNEY:
Q. During your experience installing derails like this did you have to make adjustments to plans while you were in the field to ensure that the derail was properly installed?
A. Yes, you have to make adjustments -- yes, I have had to make adjustments to the installation of derails as well as adjustments to other standard plans that we had where we were

Page 105

installing different track materials.
Q. Is it standard practice in the industry to make those type of adjustments once you're on the field and can see the conditions in person?
A. Yes, that's correct.
Q. Turning to the derailment of the AIPC engine, when it went through the derailment point was the engine fouling the Norfolk Southern main line at that point?
A. No. So as the -- as the engine made contact with the switch points it was not fouling its main. And as the wheels derailed on the ground with the inside wheels, you know, being first wheel, it was at that point of derailment was not fouling the NS main line.
Q. And did this derail device derail rolling stock in a direction away from the track or facility to be protected?
A. Yes, it did.
Q. Does that mean it functioned as intended?
A. Yes, it functioned as intended.
Q. Is there anything in guidance or FRA regulations or Norfolk Southern policies, industry policies, that says that a derail must 100 percent

Page 106

guarantee that no matter what happens after the wheel drops off the rail that the equipment must not foul the main line track or it's a violation?
A. No. Again, that's something that's not predictable what happens to derail rolling stock. No, that language is not written anywhere that I know of.
MR. WHITNEY: I don't have any more questions.
MR. RADECK: Just a few quick follow-ups.
EXAMINATION
BY MR. RADECK:
Q. Should Norfolk Southern rely on FRA and their inspections to tell them whether their derails are properly placed and designed?
A. So Norfolk Southern performs their inspections in accordance with the FRA regulations and Norfolk Southern's policies. Norfolk Southern policies are generally more restrictive than FRA regulations, so Norfolk Southern is inspected to their standards. And then the FRA -- they rely on the FRA to, you know, ensure that they're at least meeting FRA regulations.
Q. Right. Norfolk Southern -- to my

Page 107

question, they're not relying on FRA inspections to tell them whether or not it's properly installed; right?
A. No, they're not relying on the FRA. The FRA will generally tell them if it's not installed or maintained properly.
Q. Based on the FRA's standards?
A. Based on if they have -- again, most FRA inspectors have the standards or, you know, operating instructions from the -- from the railroad. Or they know -- they have knowledge of, you know, Norfolk Southern or CSX or other railroads. They have knowledge of their operating practices or policies and procedures. So if there's a more restrictive policy FRA can hold the railroad or they can write a violation to the railroad for their, you know, not adhering to their policies and procedures.
Q. Right. But they're not speaking to the agreements between the parties. We talked about that; right?
A. Agreements as far as...
Q. Construction based on the agreements between the parties.
A. No. They're not involved in the

Page 108

agreements between the parties.
Q. All right. Counsel -- Counsel referred to the plans we discussed today as preliminary plans. They don't -- they're not called preliminary plans anywhere in any documents you've seen; right?
A. Proposed plans -- preliminary proposed, yeah.
Q. You talked about adjustments to the plans and I think you called them minor early on. Do you remember that?
A. Yes.
Q. Okay. What were the minor adjustments that Norfolk Southern made to the plans in this case?
A. So they -- based on the information they had a proposed location for the double switch point derailer to be installed and they made adjustments to that proposed location.
Q. And how many feet -- or what was the difference?
A. So that we have to look back from the 1996 plan. It showed it at 185 feet, which would have been about -- 185, about seven -- seven-foot difference. So approximately seven -- seven feet.
Q. Okay. What's the difference if we look

Page 109

at the 5-3 plan?
A. What's the difference of the 5- ...
Q. 3 plan as far as the location?
A. So the 5-3 plan is the plan that they used to install the derail. That's not a -- that's not a plan talking about location to be installed.
Q. Okay. Other than the difference in location what other adjustments did they make apparently in the field that deviate from the plan?
A. That's all that I really know of. The -- again, the curved closure rail. Yeah, they made adjustments to the curved closure.
Q. What is that?
A. The inside rail.
Q. Okay. What adjustments did they make?
A. It's slightly shorter than the plan calls for, so they just made an adjustment and allowed -- allowed rolling stock to derail at a location close -- or further away from the main track.
Q. Okay. But when you say slightly, what's the measurement? Did you measure the difference in the rails -- curved rails?
A. So this -- this plan here shows it at approximately -- approximately 17 feet and on the

Page 110

day it was approximately ten feet.
Q. Any other adjustments that you've seen that were apparently done in the field?
A. No. Not at this time.
Q. And in your experience is it unusual for Norfolk Southern as -- as regulated and as strict as they are to allow these kind of adjustments in the field without having them documented somewhere?
MR. WHITNEY: Object to the form. You can answer.
THE WITNESS: No, not at all, because the turnouts still complied with the standard plan. The turnout was still built in accordance to the standard plan. So the turnout was constructed according to the standard Plan 5-3, so there was no documentation that needed to be made.
BY MR. RADECK:
Q. I'm going to hand you something that was Defendant 17 in Justin Brooks'. Is that the 1996 plan that you were referencing?
A. (Reading.) Yes.
MR. RADECK: Okay. Let's just go ahead and mark that as an exhibit for sake of -- sake of record since we referenced it so much.
(EXHIBIT 6, Diagram of Proposed Top of

Page 111

Rail Profile Storage Tank 1 & 2, Page 6 of 6, was marked for identification.)
BY MR. RADECK:
Q. And so now that it's marked as Exhibit 6, when I was asking you questions about any adjustments to the plan, what you're telling me about the distance is in feet you're basing that off of the plan from 1996, Exhibit 6?
A. Yes, that's right.
Q. We've already talked about the differences if we're looking at the construction of the derail based on Plan 5-3; right?
A. Can you say that again?
Q. Yeah. We've already talked about the differences in the curved lead rails and everything if we're looking -- if we're comparing it to how it was built in the field based on Plan 5-3; right?
A. Yes. Again, it's very similar to Plan 5-3. Construction of the derail on the date of the incident was constructed in accordance to Plan 5-3.
Q. But other than eyeballing it -- obviously you can tell that the inside curved lead rail is longer now than it was and it's longer in the plan than it was. Did you measure those differences?

Page 112

A. No, that's not something that -- I mean, I know the measurements of the new rail that's in there, I know the measurements of the old rail that's in there. So mathematically, I mean, it's going to be around, you know, 25, 30 -- around 30 feet.
Q. Did you -- I mean, you talked about how you -- ten percent of your work is -- some of it is consulting train companies, like, in a non-litigation type context?
A. Yes.
Q. Were you part of the process that Norfolk Southern undertook when they reconstructed the derail? Were you consulting them in that process at all?
A. No.
MR. RADECK: That's all I have. Thanks.
MR. WHITNEY: I don't have any more.
(The witness, after having been advised of his right to read and sign this transcript, does not waive that right.)
(The deposition was concluded at 11:26 a.m.)

Page 113

William E. Whitney, III.
wwhitney@gwblawfirm.com
August 13, 2026
RE: Norfolk Southern Railway Company v. American Italian Pasta Company
August 4, 2026, Dustin Bell (#8350045)
The above-referenced transcript is available for review.
Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.
The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-carolinas@veritext.com.

Return completed errata within 30 days from receipt of testimony.
If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

Page 114

Norfolk Southern Railway Company vs. American Italian Pasta Company
Dustin Bell (#8350045)

E R R A T A S H E E T

Page_____ Line_____ Change______________________
_____________________________________________
REASON__________________________________________
Page_____ Line_____ Change______________________
_____________________________________________
REASON__________________________________________
Page_____ Line_____ Change______________________
_____________________________________________
REASON__________________________________________
Page_____ Line_____ Change______________________
_____________________________________________
REASON__________________________________________
Page_____ Line_____ Change______________________
_____________________________________________
REASON__________________________________________
Page_____ Line_____ Change______________________
_____________________________________________
REASON__________________________________________

_____________________________ _______________
Dustin Bell Date

Page 115

Norfolk Southern Railway Company vs. American Italian Pasta Company
Dustin Bell (#8350045)

ACKNOWLEDGEMENT OF DEPONENT

I, Dustin Bell, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________ ________________
Dustin Bell Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _________________, 20____.

_____________________________
NOTARY PUBLIC

Page 116

CERTIFICATE OF REPORTER

I, Lori S. Mortge, Certified Court Reporter and Notary Public for the State of South Carolina at Large, do hereby certify that the foregoing transcript is a true, accurate, and complete record.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal this 9th day of August, 2026 at West Columbia, Lexington County, South Carolina.

LORI S. MORTGE NOTARY PUBLIC SOUTH CAROLINA

Lori S. Mortge, CCR

Lori S. Mortge
Certified Court Reporter, CCR
My Commission expires December 13, 2026

Page 117

I N D E X


| | Page | Line |
|---|---|---|
| DUSTIN BELL | 3 | 5 |
| EXAMINATION BY MR. RADECK | 3 | 7 |
| EXAMINATION BY MR. WHITNEY | 101 | 24 |
| EXAMINATION BY MR. RADECK | 106 | 12 |
| CERTIFICATE OF REPORTER | 116 | 1 |


REQUESTED INFORMATION INDEX


| | Page | Line |
|---|---|---|
| Literature for Best Fit/Necessary Adjustments | 58 | 7 |


E X H I B I T S


| DEFENDANT EXHIBITS | Page | Line |
|---|---|---|
| EXHIBIT A, Supplemental Report by Foster Peterson and Dustin Bell | 3 | 1 |

Page 118

| | | |
|---|---|---|
| EXHIBIT 2A, Color Photograph of Track Center Measurements Between the Main Line and the Switch Point Derail and Dustin Hall | 44 | 25 |
| EXHIBIT 2B, Color Photograph of Track Center Measurements Between the Main Line and the Switch Point Derail | 45 | 5 |
| EXHIBIT 3, Norfolk Southern February 1989 Guideline for Construction of Privately Owned Industry Track, Bates Stamp Number 507-000133 | 78 | 17 |
| EXHIBIT 2C, Color Photograph of Track Center Measurements Between the Main Line and the Switch Point Derail | 45 | 9 |
| EXHIBIT 4A, ESi Invoices | 94 | 9 |
| EXHIBIT 4B, Secretariat Invoices | 94 | 11 |
| EXHIBIT 5, Section II, Definitions, Bates Stamp Number 507-000123 | 95 | 19 |

Page 119

| | | |
|---|---|---|
| EXHIBIT 6, Diagram of Proposed Top of Rail Profile Storage Tank 1 & 2, Page 6 of 6 | 110 | 25 |

## &

**&** 1:14 2:3 93:19 111:1 119:3

## 0

**06618** 1:6

## 1

**1** 30:18,20,21 75:18 111:1 117:11,23 119:3
**1.05** 62:21 72:4 73:3
**10** 71:15
**100** 26:9,13 27:5 55:24 61:1 76:18 105:25
**101** 117:7
**106** 117:9
**11** 118:20
**110** 119:1
**116** 117:11
**12** 33:1,1,2,4 42:7,11 60:20 60:24 61:20,25 62:3 63:2,23 63:25 64:14 73:10 74:10,15 74:15 76:3 85:4 117:9
**12.9** 64:12
**1200** 1:14 2:5
**1201** 1:14
**123** 97:9
**13** 113:3 116:23
**14** 96:10 97:16
**15** 32:4 53:19 54:10,13,15,17 54:18,22,23 55:3,7 61:11 61:24 62:22 63:2 72:1,12 73:14,21,25,25 96:9 97:15
**150** 39:13
**152** 39:14
**16** 42:13,14 43:5,6 63:5 64:21,23 65:1 76:6
**17** 42:15 43:5,6 73:22,23 76:6 109:25 110:19 118:10
**172** 2:10
**178** 4:21 71:21 71:22
**18** 17:17
**185** 108:22,23
**19** 17:17 61:3 118:22
**1988** 60:25 61:8
**1989** 77:22 78:18 118:11
**1994** 52:19,20 61:4 75:19 76:18 97:5,21
**1995** 6:13 8:17 8:20 9:3
**1996** 7:13 9:2 108:22 110:19 111:8
**1999** 6:7,10 104:12

## 2

**2** 30:18 32:6 45:14 111:1 119:3
**20** 115:16
**200** 5:13 7:15 7:18
**2005** 61:6,8
**2023** 91:7,11
**2024** 12:1 71:15
**2025** 92:3
**2026** 1:11 113:3,6 116:12 116:23
**205** 103:22
**21** 7:13 9:2 104:4,6
**213.205** 76:20 103:10,21
**21889** 116:21
**21st** 104:12
**22** 4:20,21 5:5 5:10,11 6:2 12:16 73:18 74:3
**23** 35:3,11,24 37:9 79:25
**24** 36:23 117:7
**25** 73:12,12,16 73:19 112:5 118:1 119:1
**26** 7:17
**271-9580** 2:6
**29** 8:22 60:15
**29401** 2:11
**29601** 2:5
**2a** 44:22,25 49:4 118:1
**2b** 45:5 118:6
**2c** 45:9 118:15

## 3

**3** 6:6 44:19 78:17,23 109:3 117:4,5,23 118:10
**30** 85:12,14 112:5,5 113:18
**31** 35:2 67:10
**33** 36:23 69:25 70:1
**35** 85:12,14

**38** 72:6,17,18 74:4
**3:25** 1:6
**3a** 44:23 46:11

**4**

**4** 1:11 35:15,20 113:6
**40** 75:6 79:15
**41** 79:14,15
**43** 76:10
**44** 118:1
**45** 118:6,15
**49** 76:20
**4a** 94:9,15 118:19
**4b** 94:11,19 118:20

**5**

**5** 31:1,3,7,9,24 95:19,23 109:2 117:4 118:6,22
**5-3** 8:21 52:14 52:16,17,19,20 53:1,3,11,17 55:6 75:19 79:10 88:2 109:1,4 110:15 111:12,17,19 111:20
**507-000123** 95:20 96:2 118:24
**507-000133** 78:20 118:14
**507-120** 97:7
**507-133** 78:9 79:1
**507-73** 77:22
**55** 2:4
**577-4435** 2:11
**58** 117:17

**6**

**6** 110:25 111:1 111:2,5,8 119:1,3,3
**6.08** 75:8 76:13
**6.14** 79:2 96:19
**60** 31:8,16
**69** 31:8,9

**7**

**7** 117:5,17
**7-1** 6:6
**7-9** 52:15
**70** 31:8,9,9
**78** 118:10

**8**

**8** 54:19 55:8
**80** 31:6
**8350045** 113:6 114:3 115:3
**843** 2:11
**864** 2:6
**88** 61:5
**8:47** 1:12

**9**

**9** 6:10 118:15 118:19
**90** 94:3
**94** 118:19,20
**95** 118:22
**9th** 116:12

**a**

**a.m.** 1:12 112:23
**ability** 54:4 60:20
**able** 42:20 68:9 95:13
**above** 113:7 115:8
**absolutely** 100:7
**accident** 66:22 66:24 97:24 102:21
**accidentally** 30:3
**accordance** 79:10 106:18 110:13 111:20
**account** 28:20 29:4,7,10 30:6 81:8 84:8,11
**accuracy** 113:10
**accurate** 116:6
**acknowledge...** 115:4
**acknowledg...** 113:13
**act** 17:7
**acted** 87:9
**action** 1:6 96:15
**actions** 14:25 15:3 16:25 81:8
**actual** 36:15 39:24 41:25
**actually** 3:22 5:5 6:2 25:23 44:23 51:25 52:9 55:16 73:5 78:5 102:13
**added** 65:10,10
**additional** 12:17 53:24 62:12 82:17 85:4 93:15 94:6 95:3
**additions** 115:7
**adhering** 107:17
**adjacent** 61:19 96:10 97:16
**adjustment** 109:17

**adjustments** 52:7,10 53:6,8 54:5 55:18 56:2,7 58:16 59:23 60:6 66:17,18 104:19,22,23 104:24 105:3 108:8,12,17 109:8,12,15 110:2,7 111:6 117:18
**advantageous** 53:22 54:5 55:9,14
**advised** 112:19
**affect** 18:8
**affixed** 116:11
**ago** 64:19
**agree** 10:2,4,16 10:23 15:14 16:18 17:20 26:2
**agreed** 71:19 102:25
**agreement** 5:12 6:11,13,24 7:9 7:14 8:4,8,25 9:7 11:8 15:20 58:20 101:4,7 103:1
**agreements** 11:14 99:19,21 107:20,22,23 108:1
**ahead** 4:17 5:9 11:2,22 17:24 23:3 25:13 39:18 60:2 74:25 80:24 81:19 90:5 110:22
**aipc** 4:22 6:9 8:9 9:1 15:4,20 16:16 17:14,17 27:12 32:7 65:5 67:14 68:13 69:12 72:3 81:5,24 93:23 99:19 100:24 101:4,7 105:6
**allotted** 113:21
**allow** 110:7
**allowed** 53:9 57:11,11 58:15 60:5 109:18,18
**allowing** 96:11 97:17
**alongside** 93:22
**alterations** 53:25
**american** 1:7 2:8 3:16 9:9 113:4 114:1 115:1
**analysis** 69:15 83:6 95:8
**analyzed** 84:7
**angle** 24:8,10 24:12,13 25:2 51:17 103:15
**animation** 95:9
**answer** 13:7 17:9 32:18 33:13 36:22 41:19 47:23 48:20 49:9,14 80:24 89:11 100:1 110:10
**answered** 60:2
**anticipate** 95:2
**anticipated** 85:20
**anybody** 67:4 82:21
**anymore** 22:18
**apart** 33:1
**apparently** 41:15 109:9 110:3
**appear** 45:18 94:24
**appearances** 2:1
**appears** 13:12
**appended** 115:8
**appendix** 91:2 91:4
**applicable** 52:16,20 76:11 77:23,25 78:3 99:5 104:12 113:9
**applied** 61:2 97:23 103:23 104:8
**appropriate** 8:14 87:2,3,6,8 87:10
**approximate** 55:1
**approximately** 17:19 64:25 71:22 73:17,19 85:14 108:24 109:25,25 110:1
**area** 85:16
**areas** 13:23
**arrow** 35:12,16
**asked** 13:20 60:1 64:11 102:1,4
**asking** 42:16 49:11 58:3 59:19 60:12 71:11 111:5
**aspect** 14:7
**assess** 14:7
**assessed** 82:12 82:13,13 83:9
**assessing** 15:10 83:18

**assessment** 69:15
**assessments** 14:12 82:18
**assume** 29:3 31:15 90:2
**assumes** 80:8
**assuming** 80:11
**attached** 8:3,7 11:16 13:22 113:12
**attachment** 75:13
**attack** 29:6
**attempt** 24:19
**attention** 28:13 28:17,21 69:6
**attorney** 58:5 113:15
**attorneys** 2:2,8 14:15,15
**audit** 94:7
**auditing** 94:7
**august** 1:11 113:3,6 116:12
**authorization** 54:5
**available** 113:7
**aware** 31:24

**b**

**b** 44:19,22,23 117:20
**back** 3:23 4:12 5:4,25 6:1,19 12:1,4,15 34:21 35:15 41:1 42:12 46:4 48:22,24 49:3 50:1,5 51:4 52:19 56:20 57:23 62:15 63:10 65:7 67:21 70:13 72:24 73:3 78:1 85:4 85:15 87:16 91:6,11 108:21
**ballast** 86:8,10 86:22 87:1 89:8
**bar** 71:3
**bare** 86:24
**based** 5:11 10:12 36:13 39:23 41:22 43:8 45:21 49:17 53:7,20 54:2,19 57:3,9 58:16 59:9,25 63:4,6 65:2 72:16 73:12 74:4 101:4,6 107:7,8,23 108:15 111:12 111:17
**basically** 5:5 19:10,23 40:25 94:5 98:24
**basing** 111:7
**basis** 39:16 56:3,9
**bates** 77:21 78:7,19 79:1 95:20 96:1 97:7 118:13,23
**bear** 77:14
**beattie** 2:4
**beginning** 78:11
**behalf** 3:19 46:6 90:24 93:21
**believe** 7:25 12:1 13:8 26:6 42:12 61:1 64:13 77:14 82:8 87:15,17 96:19 101:12 102:10 103:25
**bell** 1:10 3:2,5 3:11 113:6 114:3,25 115:3 115:5,13 117:4 117:25
**bent** 70:25 71:1
**best** 9:23 55:23 56:1,5,8,25 59:25 60:23 65:23 66:16,19 117:17
**better** 47:2 56:16
**beyond** 33:1,2 33:5 63:1,2 76:5
**biomechanics** 68:24
**bit** 24:5 38:11 46:22 67:2 88:20
**blanchett** 15:4 16:22
**block** 70:19,24 71:1,2,4,9
**blocks** 70:11,14 70:15,18,21,22 98:20
**blurb** 55:4
**bolted** 99:1
**bolts** 98:20
**book** 93:17
**bottom** 7:20 8:2 9:8 60:15 79:2
**box** 55:5
**boyd** 1:14 2:3 93:19
**brakes** 28:12 28:16 29:15
**braking** 68:13
**break** 51:7,10
**broad** 66:4

**broken** 13:20
**brooks** 42:12 42:20 44:24 46:20 62:6 64:20,22 110:19
**brought** 3:17 90:8 93:9 95:12
**buffer** 33:17,18 84:16
**building** 57:17
**built** 10:17 52:24 53:13 88:8 100:22 110:13 111:17
**bunch** 50:12

**c**

**c** 44:22,23
**calculate** 33:21
**calculation** 69:15
**calculations** 12:17,18 69:12 69:19
**call** 3:12 20:10 25:23 86:15,16 87:8 88:11
**called** 19:19 20:11 70:24 95:4 98:22 108:4,9
**calling** 9:4 10:6 10:18 11:7,13 20:10
**calls** 109:17
**car** 30:4,5 35:5 36:1
**carolina** 1:1 116:5,13
**carolinas** 113:16
**cars** 26:3,11 27:2 28:5,8,13 96:12 97:18
**case** 12:12 13:1 14:23 15:19 18:19 22:12 24:19 25:22 32:8 34:23 41:23 68:18 69:9 74:20,22 76:11 82:22 83:15 85:8 88:9,16 89:5 89:19 90:12,22 91:11,12,14 92:3,12 93:23 94:25 95:3 99:13 100:12 101:9 108:14
**cases** 3:23 4:2 13:5 26:18 89:22 90:1,2
**cause** 116:9
**causes** 89:2
**ccr** 1:18 116:22
**center** 32:25 33:23,24 37:10 37:11,13,14,17 37:18 38:14,17 38:19,21,21,25 39:8,9,16,19 41:16,24,25 42:7,15,17,21 42:22 43:2,5 44:4,10,12,16 45:1,6,10,18 46:10 48:5,5,7 48:7,17 49:7 50:18 54:12,22 60:21 62:5,14 63:2,23 64:11 72:1,12 73:14 73:18 74:1,4 74:10,16 118:2 118:7,16
**centers** 34:3 39:22 42:5,8 42:10 61:11,21 62:3,20,23 63:1 65:14,18 73:10 96:11 97:17
**certain** 27:13 30:23
**certificate** 116:1 117:11
**certified** 1:17 116:3,22
**certify** 116:5,8
**cfr** 76:20
**challenged** 92:24 93:1,14
**chance** 4:4 29:14
**change** 63:5,25 64:14 114:5,8 114:11,14,17 114:20
**changed** 37:21 37:24 38:24 55:11 61:8
**changes** 4:23 4:23 18:17 21:7 23:6 59:24 113:11 115:7
**charge** 55:16
**charleston** 2:11
**check** 15:13 98:6,8,12,12,13 99:4
**checked** 4:12
**checking** 98:9 98:10,18
**choose** 6:3,4
**chooses** 77:5
**citations** 102:20 103:15 103:17

**cite** 58:15 59:21 60:25 61:5 93:16
**cited** 11:8,13 77:15 78:25
**citing** 58:11 76:14
**civil** 1:6
**claims** 90:7 92:15
**clarify** 4:24 5:18 7:2,3
**clarity** 7:7
**class** 30:18,18 30:20,21,25 31:1,3,7,9,23 32:1,6
**classified** 17:4
**clear** 30:8 32:14,17,17,19 33:6,18 34:9 34:11,14,20 35:1,10 39:9 39:10 62:2 75:12,23 76:2 76:5 80:3 96:4 97:11,13
**clearance** 7:21 9:10 32:13,15 32:15,20,22,23 33:3,5,7,10,16 33:23 34:6,18 34:25 35:25 37:22 38:22,23 39:1,11,14 40:24 41:1,4,7 43:16 54:11 61:19 65:13,13 66:2,2,3,11,15 66:21,23 73:21 76:6 80:6,14 81:4 82:1,11 82:14,21,25 83:1,7,19,25 84:19,21,24 85:1,5,6
**clearances** 61:18 73:18
**client** 100:21
**close** 60:20 72:10 88:12 109:19
**closer** 6:21 33:9 61:17 65:8,11
**closure** 26:1 70:17 71:6 109:11,12
**colleague** 13:2
**collection** 94:14
**color** 44:25 45:5,9 118:1,6 118:15
**columbia** 1:2 1:15 116:13
**come** 6:22 21:22 36:16 41:24 44:14 98:6
**comes** 4:18 88:17
**coming** 27:14 43:16 56:10 98:3
**commission** 116:23
**companies** 112:9
**company** 1:4,7 2:2,8 3:17 9:9 75:22,24 77:5 113:4,5 114:1 114:2 115:1,2
**compared** 41:11
**comparing** 111:16
**compile** 14:16
**compiled** 14:13
**complaints** 91:25
**complete** 115:9 116:7
**completed** 113:18
**compliance** 41:12 77:4 92:1
**complied** 27:6 84:3 110:12
**complies** 55:24 57:5,6 60:7 65:20,21 84:1 99:5 100:4 103:10
**comply** 26:16 26:24 27:4 40:25 59:8 62:21 72:3 73:3 75:8 77:6
**components** 40:4 84:4 98:21
**concluded** 112:22
**conclusion** 41:24 75:20
**condition** 29:22 64:16 82:24 91:22
**conditions** 29:10 61:12 62:23 91:25 92:1 105:4
**confirm** 95:16
**confused** 64:9
**confusingly** 44:23
**conjunction** 27:11
**consider** 86:9
**consideration** 39:5,20 81:7 84:17
**considered** 33:4 98:17

**construct** 10:5
**constructed** 110:14 111:20
**constructing** 57:17
**construction** 11:10 40:20 77:16 78:18,24 95:24 97:6 107:23 111:11 111:19 118:12
**consultant** 3:19 13:1
**consultants** 7:4
**consulting** 94:2 112:9,14
**contact** 17:2 29:13 33:19 84:22 85:9 105:11
**contained** 10:6
**contains** 58:7
**context** 112:10
**continue** 22:11 22:12 88:22,24
**continuing** 21:11
**contract** 8:8 11:19
**contracts** 10:25
**contrary** 63:20
**control** 29:19 30:4
**controlling** 15:6,7
**conversation** 27:18
**coordinating** 13:15
**copies** 113:15
**copy** 78:4,5
**corner** 7:21 9:8
**correct** 3:21,25 4:15 6:15 13:3 13:14 16:8 50:25 52:3 61:15 62:9 68:22,23,25 69:1 70:4 86:24 87:5,13 94:22 103:24 105:5 115:9
**correcting** 12:15
**corrections** 115:7
**counsel** 1:16 2:1 58:8 108:2 108:2 113:15 116:9
**county** 116:13
**couple** 44:6 51:7 75:17 83:12 95:16 97:9 102:13
**court** 1:1,17 44:21 51:13 78:16 92:21,24 116:3,22
**covered** 101:11
**crew** 15:1
**critical** 89:23
**criticisms** 90:18,21
**cross** 35:9
**crossing** 90:15
**cs** 113:16
**csx** 31:12 91:9 107:12
**current** 64:6,16 74:5,7
**currently** 65:17 65:17 74:14
**curve** 20:14 21:1 23:24,25 24:5,17,20 25:7,10,20,22 25:24 36:9 38:7 88:7,10 88:11,12
**curved** 20:10 20:15,18,22,23 21:10,15,17,25 22:4,9,11,17,21 22:25 25:18,25 26:2,5,10 27:1 35:13,17 36:11 36:11 37:5,6 38:9,12 46:17 48:16 49:5 51:17 53:2,3 53:12,12 65:10 70:12,17,19 71:6 85:24,25 87:13 88:7,19 88:23 89:6 109:11,12,23 111:15,22
**curves** 25:2 75:10
**curving** 24:10 24:16
**cv** 1:6

**d**

**d** 91:3,4 103:22 104:11 117:1
**damage** 15:10
**danger** 33:11
**date** 1:11 34:24 37:15 38:5 43:1,3 51:20 62:25 78:2 88:13,14 96:17 102:21 111:19 114:25 115:13
**daubert** 92:24 93:2
**day** 43:19 62:25 110:1 115:16 116:12
**days** 113:18
**dead** 80:9
**december** 71:15 116:23

**decided** 27:18 52:5 99:24
**deciding** 40:17
**decision** 51:24 52:10 55:17 57:3 69:7
**declare** 115:5
**deemed** 115:7
**defendant** 1:8 1:16 2:8 110:19 117:22
**defense** 90:7,7
**definition** 35:20,22 96:3 96:7,8 97:11
**definitions** 95:19 118:23
**department** 57:16
**depending** 47:15
**deponent** 58:8 113:14 115:4
**deposing** 113:14
**deposition** 1:10 4:1,5,5,8,10,14 6:23 12:14 43:19,25 44:24 46:5 49:3 50:11 60:17 64:22 91:11 112:22
**depositions** 12:10
**derail** 4:20 5:4 6:25 8:12,19 9:15,22 10:5 10:11 11:4 13:18 14:23,24 15:15,16,20,24 16:1,5,9,13,14 16:17,20,23 17:8,13,20,25 18:7,14,15,25 19:1,2,6,9,13 19:13,14,21 20:19 21:2 22:9 23:18 24:6,7,22 25:3 25:17 26:1,3 26:11 27:2,4,9 27:19,21 28:1 28:24,25 29:13 29:13,13,17,21 29:25 30:9,13 30:14,15,17 31:18,22,23 32:2,9,11 34:5 34:7,10,14,17 34:19,20,24 35:9 36:20 37:25 38:14 39:3,23 40:9 40:14,15,18,22 40:25 41:11 42:1,10 43:1,3 45:2,7,11 51:24 52:25 54:3,20 55:7 55:17,21,22 56:20 57:4,7 60:23,24 64:4 64:6,16,24 65:1,5,7 66:7,8 66:9,9,12,16 67:25 70:2,6 71:20 74:6,17 74:22 75:9,11 75:11,13,21,22 76:21 77:1,4,5 77:6,10 80:17 80:25 81:2,21 82:15,19 83:22 83:22 84:10,12 84:12,13 85:19 85:20 87:4,7,7 87:19,20,22 89:6,12 96:18 98:9 100:3,9 100:16 101:3 102:9,22 103:7 103:12,15,22 104:7,13,21 105:16,16,25 106:5 109:5,18 111:12,19 112:14 118:4,9 118:18
**derailed** 79:24 81:22 83:23 87:10 89:13 105:12
**derailer** 36:2 42:9,9 65:3 71:13 75:2,3 108:17
**derailing** 17:14 40:2 86:4
**derailment** 17:11 18:2 21:6,9,11,19,21 21:22 22:8,10 22:25 23:5,10 25:4 35:3,6,7 35:12,16,21,22 35:23,25 36:1 36:4,6,8,10,15 36:17 37:15 38:5 39:24 42:8 43:1,6 46:2 53:6 63:1 65:16 66:20 67:13 69:13 79:19 80:1,4 80:10,13,13,20 81:3,8,13,14,16 81:24 82:5,23 83:2,8,19,25 84:9,17 85:8 85:13,19 89:14 105:6,7,14
**derails** 19:4 20:3,3,9 25:3,7 26:10 28:9,11

28:14 29:10 32:4 59:7 61:10,18 62:22 79:3,9 85:22 85:23 98:7 104:19,24 106:15
**descending** 75:24
**design** 24:4 29:9,21 77:16 97:6
**designed** 16:2,5 20:7 24:4,6 29:11 30:9 83:24 84:11,12 84:13 87:21 100:10 106:16
**detail** 30:12
**details** 75:13
**determination** 10:13 11:4 27:10 40:1 55:22 56:24 103:1
**determine** 8:13 38:22 40:7,24 41:14 53:24 56:15 68:10,12 69:16 82:15
**determined** 18:3 65:23,24 69:18 81:10
**determining** 6:19
**deviate** 10:24 53:1 109:9
**deviated** 9:15
**deviation** 26:21
**deviations** 26:19
**device** 17:21 18:8,9,11,12 102:22 105:16
**diagram** 110:25 119:1
**difference** 84:21 108:20 108:24,25 109:2,7,22
**differences** 10:2 111:11,15 111:25
**different** 9:18 9:19,24 10:13 11:5 18:3 19:20 20:2 34:12,13 37:20 38:4,24 42:2 42:25 43:14 44:6 46:18 47:4 50:13 51:19 56:19 62:5 63:16 69:20 70:6,22 74:2,9,13 94:17 96:20
105:1
**digablo** 92:12 92:14
**dion** 102:12
**direct** 16:2 78:10 104:14
**direction** 22:3 23:22 24:18 88:23 105:17
**directly** 13:17
**dirt** 86:24 87:23
**disagree** 71:24 97:23
**disagreed** 72:1 72:4,13
**disagreements** 100:23
**discussed** 101:18 108:3
**dispute** 62:13 62:18,24 64:1 64:7
**disputes** 100:22
**distance** 32:25 38:18 39:4 71:19 82:14 111:7
**distances** 4:11 4:13 6:15
**distraction** 69:7
**district** 1:1,1
**divided** 13:21
**division** 1:2 7:24
**document** 51:22 56:3 57:22,23 96:1 96:8,24 97:1
**documentation** 110:16
**documented** 110:8
**documents** 108:5
**doing** 12:7 22:1 30:2,2,2,3 43:25 45:22 46:7 47:21 48:24 50:1,6 51:3,4 58:12 59:11 94:1,5 95:3,5 100:5 101:5 102:19
**double** 15:15 15:19 16:1,5 18:25 19:6,22 20:18 22:9 23:18 24:3 25:3 27:8,21 27:25 28:2 30:14 31:17,22 32:2,3 34:4,7 40:8,14,15,18 42:9 55:6 73:13 74:5,22

75:1,3,8,20 79:8 85:19,22 87:7 108:16
**draft** 14:1 63:12
**drafted** 14:3,4
**drafting** 12:10 13:24
**drawing** 8:25 9:1 53:1 58:21
**drawn** 40:11
**drive** 21:12 23:21
**drop** 19:14,17 20:5,8 37:1,2
**drops** 18:18 19:10,10,23 23:8 80:1 106:2
**due** 17:13 27:13 28:12 56:17
**duly** 3:6
**dustin** 1:10 3:2 3:5,11,12,13 45:3 67:9 101:23 113:6 114:3,25 115:3 115:5,13 117:4 117:24 118:4

**e**

**e** 2:4 113:1 114:4,4,4

117:1,20
**earlier** 60:17 74:10 84:15,23 96:19 98:2
**early** 11:25 108:9
**earth** 43:11 63:8 72:20
**easier** 46:23
**easy** 4:16
**education** 68:22
**effect** 5:19 52:18 76:14
**effective** 19:1,3 30:14,15 31:18
**either** 20:16,17 34:13 44:16 101:17
**employee** 15:4 55:16 90:22 92:6,14
**employees** 28:13,16,21 29:19 52:22 58:25,25 89:23 89:24 90:8,19 90:21
**ended** 69:16,21 69:23
**engine** 17:14 67:24 105:7,8 105:10
**engineer** 15:7 75:2
**engineering** 55:16,20 57:16 57:16 59:1,12
**ensure** 100:4 103:9 104:20 106:23
**entire** 75:8
**entitled** 53:8 58:6
**equipment** 16:2,6,11,14 18:1,15 20:24 21:2,12,16,17 22:13 23:20 24:7 28:11 42:10 66:9,12 81:22 83:23 84:12,14 85:1 100:16 103:12 106:2
**errata** 113:12 113:14,18
**esi** 94:9,18 118:19
**essentially** 21:12 71:4,5
**estimate** 6:20 43:13
**estimating** 10:11
**event** 61:20 62:2 87:19
**events** 116:10
**eventually** 89:15
**evidence** 16:21 17:7 52:11 87:21 89:5,6
**exactly** 31:7 43:21,22 62:17 67:21 85:15 104:14
**examination** 3:7 101:24 106:12 117:5,7 117:9
**example** 22:3 32:24
**exceeded** 42:6 42:11
**excluded** 92:21
**exhibit** 3:1 8:3 44:19,22,23,25 45:5,9,14 49:4 78:15,17,23 94:9,11 95:19 110:23,25 111:4,8 117:23 118:1,6,10,15 118:19,20,22 119:1
**exhibits** 117:22
**exist** 61:17
**expect** 29:16
**experience** 27:22 28:8,10

32:3 56:12 57:4,9,14,19 58:12 59:20 85:18,23 104:18 110:5
**experienced** 59:5
**expert** 63:16 91:16 92:19 93:10,15
**expires** 116:23
**explain** 47:3
**explained** 102:24
**expressed** 101:8
**expressly** 55:12 60:12 77:10
**extension** 20:11 20:15 65:10 103:19
**extent** 99:12 100:20,21,21
**extra** 6:2 84:16
**eyeballing** 111:21

**f**

**facility** 105:18
**fact** 16:25 76:9 80:12 84:11
**factors** 18:3 56:19 57:1 68:17,20,22
**fails** 113:20
**fair** 16:12 19:22 29:8 69:9,10 88:9
**fall** 91:13
**familiar** 98:4 99:9,10
**far** 8:18 13:19 14:22 15:5 38:25 42:6,11 42:22 46:13 49:25 50:19 52:9 53:5 55:11,18 57:22 62:20 65:14 66:15 69:11 72:1,11,14 81:10 85:7,18 95:8 99:15 107:22 109:3
**farther** 83:15
**fast** 31:19 32:8 32:10,12
**fastest** 31:3
**february** 77:22 78:17 118:11
**federal** 58:14 59:21 92:24
**feet** 4:20,21 5:4 5:6,11 6:1,2 33:1,2,2,4 39:14 42:13 43:5,7 54:17 63:5,24,25 64:14,21 65:8 71:21,22 73:12 73:16,20,23 74:2 82:4,7 83:12 85:12,14 108:19,22,24 109:25 110:1 111:7 112:6
**fell** 92:15
**felt** 9:23
**fianchino** 102:12
**field** 10:14 26:22 37:2 41:16 44:15 51:24 52:7 53:23 54:1 55:18 56:16,22 56:24 58:16 59:24 68:22,24 104:20 105:4 109:9 110:3,8 111:17
**fifteen** 54:13
**figure** 7:13 9:2 35:3,11,15,19 35:24 36:23 37:9 79:25
**file** 8:5
**final** 14:1
**finalize** 89:20
**find** 9:14 33:23 47:6,7
**fine** 51:13
**finished** 104:10
**firm** 2:9 94:17
**first** 3:6 35:5,5 36:16,17 53:1 61:13 72:18 88:17 105:13
**fit** 9:23 55:23 56:1,5,8,16,25 57:7 59:25 60:23 65:23 66:16,19 117:18
**five** 66:25 91:5 102:10
**fixed** 20:2
**follow** 59:13 106:11
**follows** 3:6
**foot** 4:19 5:13 7:15,18 12:16 12:16 42:7,11 42:15 53:19 54:10,13,15,18 54:22,23 55:3 55:7 60:20,24 61:11,21 62:3 62:23 63:2,2 64:23 65:1 72:1,12 73:14 73:18,21,25,25 74:3,10,15,15 76:3,6,10 85:4 96:9,10 97:15

97:16 108:23
**forbid** 29:5
**foregoing** 115:6 116:6
**forget** 31:6
**form** 5:8 11:1 11:21 13:6 17:23 23:2 25:12 33:12 39:18 41:18 47:22 48:19 49:8 80:23 81:18 86:14 89:10 99:25 103:4 104:15 110:9
**formal** 68:21 69:14
**forming** 79:6
**formulating** 13:16
**forward** 28:23 56:20 68:6
**foster** 3:2 12:25 13:11,11 14:1 14:2,3,19 117:24
**foster's** 13:18
**foul** 17:11 33:11 65:6 69:17 82:6,12 89:9 106:3
**fouled** 17:16 89:15
**fouling** 17:14 17:15 26:4,11 27:2 105:8,11 105:14
**found** 43:15
**four** 65:8 91:5
**fra** 40:5 55:25 59:4,9,22 65:21 82:22 84:2,3 92:2 98:2 99:22 100:25 102:1,8 102:19 103:6 103:14,17 105:23 106:14 106:18,20,22 106:23,24 107:1,4,5,8,15
**fra's** 107:7
**freight** 31:1 96:12 97:18
**full** 3:9 96:24
**function** 100:16
**functioned** 105:20,22
**functioning** 99:3
**funny** 89:3
**further** 5:4 21:13 24:10,17 85:9 109:19 116:8

**g**

**gallivan** 1:14 2:3 93:19
**gather** 76:18
**gathered** 67:22
**gauge** 19:18 20:8 24:23 36:24 38:4
**gauged** 25:25
**gear** 68:10
**gears** 68:8,9
**general** 58:11
**generally** 19:3 19:14,17,20 20:4,7 24:21 36:5 38:11 46:22 48:13 72:7 88:4 99:11 106:20 107:5
**getting** 29:23 44:16 56:1,5 64:9 101:1
**give** 48:13 58:5 65:18
**given** 14:15 87:8 89:24 115:10
**gives** 65:12
**giving** 69:22
**go** 4:16 5:8 10:12,20 11:1 11:21 17:23 18:4 23:2 25:12,18 31:8 39:18 40:23 44:3,9 46:23 47:7 48:3,9,11 48:11 49:3 55:21 56:13,15 56:19 57:2 58:4 59:2,2 60:2,20 61:24 67:1,9 73:19 74:25 80:23 81:11,18 85:8 85:9 87:23 90:5 94:23 99:22 110:22
**god** 29:5
**goes** 27:25 28:24 31:2 57:19 61:16 66:15 86:7 91:6
**going** 3:22 6:19 9:13 12:15 17:7 18:21 22:4 24:10,18 27:14 28:9 29:22 31:5,16 31:19,23 32:8 32:10 33:9 36:5 41:25 44:18 48:9 49:7,18 50:5 50:13,14,15,17

51:6,11 56:25 59:16,18 63:10 65:5 69:2,5 78:10,13 79:15 80:9 83:4,14 88:3,7 91:11 95:16 99:23 100:2,4,6 104:3 110:18 112:5
**good** 51:8,9 57:7 65:24 78:13
**google** 43:11,11 63:8 72:20
**grade** 27:14,19 56:17 75:24
**gravel** 86:24 87:23
**greenville** 2:5
**ground** 18:18 21:4,8 23:9 24:24 35:4 79:16 80:1,5 86:4,5,13,15,16 86:17,18 88:25 89:2 105:12
**grouping** 19:21
**guarantee** 106:1
**guess** 28:21 29:3,24 102:4
**guessing** 99:23
**guidance** 105:23
**guideline** 78:18 118:11
**guidelines** 77:15 78:24 95:24 97:6
**guiding** 22:18 22:19,21,22
**guy** 29:5,6 91:18
**guys** 48:5 51:9
**gwblawfirm....** 2:6 113:2

**h**

**h** 114:4 117:20
**hall** 45:3 118:5
**hand** 7:21 9:8 20:25 21:1 78:6 110:18 116:11
**handed** 94:14
**handing** 45:14
**handling** 13:19
**happen** 18:21 28:4 29:2 30:1
**happened** 17:5 27:24 83:2,16 89:4
**happening** 68:13
**happens** 18:2 18:16 19:16
21:11,20 22:10 22:20 24:22,25 25:5 26:20 31:25 81:10 83:11,11 87:9 88:1,15,16,19 89:1 106:1,5
**head** 4:19 6:17 56:10
**heart** 29:5
**heel** 70:11,14 70:15,18,21,22 70:24 71:1,2,3 71:9 98:19
**help** 72:17
**hereto** 115:8
**hereunto** 116:11
**highest** 30:25 32:1,5,5
**highlight** 53:18
**highlighted** 53:17 55:5
**hinge** 20:2
**hinged** 19:13 19:13 20:3 83:7
**hired** 90:2,15
**historical** 43:12
**hit** 28:24 79:16
**hits** 21:8 23:9 24:24
**hmm** 46:15
**hold** 107:15
**homework** 58:4 58:4
**hood** 2:9
**hoodlaw.com** 2:12
**hopefully** 18:12 67:1,2
**hour** 30:24 31:8,9,17 32:4 51:6
**human** 68:17 68:20,22
**hypothetically** 82:4

**i**

**identification** 3:3 45:4,8,12 78:21 94:10,12 95:21 111:2
**ignore** 18:23
**ii** 95:19 118:22
**iii** 2:4 113:1
**illustration** 53:20
**images** 72:19
**important** 23:13,14,15,24 24:1 39:16
**improper** 49:19
**improperly** 87:21 100:9,10 100:13

**incapacitated** 29:6
**inches** 17:17
**incident** 17:10 34:25 51:20,25 52:25 61:2 65:4 70:2 74:8 75:5 77:24 88:14 90:14 102:5,9,11,14 102:16 111:20
**include** 93:13
**included** 14:4,5 93:12
**incorrect** 6:20
**index** 2:25 117:14
**indicate** 67:20
**indicating** 36:17 48:12 50:25 70:25 71:4 77:18
**individual's** 52:5
**industry** 8:1 15:19 16:11 18:10 27:14 40:13 50:21 57:10 58:13 59:21 75:23,23 77:17 78:19,25 93:22 95:25 97:7 105:2,24 118:13
**information** 58:7 67:18,19 67:23 95:12 108:15 117:14
**initially** 100:13
**initials** 13:22
**injured** 90:9 92:14,15,16
**injury** 3:23 90:21,22
**inside** 24:23 25:23,25 34:17 35:13 36:11,15 36:19,19,24 37:5 38:3,4,7 46:17 47:14,14 47:18 49:21 50:20 53:2,11 65:11 85:24,24 88:6,18 89:6 103:18 105:13 109:14 111:22
**inspect** 100:3
**inspected** 102:8 102:11,13,15 102:16 106:21
**inspecting** 56:13 57:18
**inspection** 12:2 12:8 37:20,23 71:15 98:18,22 98:23,24 102:2 102:5
**inspections** 98:2,3 102:20 106:15,18 107:1
**inspector** 100:12,15 102:13
**inspectors** 99:12,22 100:25 103:6 107:9
**install** 27:8,18 40:22 55:21,22 56:13 59:7 66:16 109:5
**installation** 52:18,22 77:4 104:24
**installed** 15:18 15:18 31:23 32:2 34:5 52:2 53:7 61:11,18 62:22 64:4 65:17 70:2,23 71:1 75:4,21 76:2,4,7 79:9 81:1,2,21 83:22 84:4 103:23 104:7 104:14,21 107:2,5 108:17 109:6
**installing** 9:22 54:2 55:17 56:12 104:18 105:1
**instructions** 34:8 107:10
**intend** 101:9
**intended** 16:3,7 16:15 17:21,25 18:1 20:23,25 21:13 22:3,6 23:23 24:11 27:3 30:10 31:18 35:21 40:3 66:9,13 80:18 81:23 83:20,24 87:9 100:16,17 103:8,13 105:21,22
**intent** 18:6,7,14 29:12
**intentionally** 16:22 17:8
**interchangea...** 32:14
**interested** 116:10
**internal** 59:8
**interpret** 61:23
**interpreting** 55:15
**investigated** 82:23
**invoices** 94:9 94:11,14,20,24

118:19,21
**involved** 17:10 107:25
**irrelevant** 17:6
**issue** 12:16 15:15 39:23 41:7 82:21 83:1,3 100:8 102:20
**issued** 13:12 94:20
**italian** 1:7 2:8 3:16 9:9 113:5 114:2 115:2

**j**

**job** 98:7,8
**joe** 63:18 64:20 72:7
**john** 2:10 3:16
**john.radeck** 2:12
**joint** 13:12 71:3,9
**jr** 2:10
**julie** 91:11,13
**jumped** 72:15 72:16
**justifiable** 10:3
**justin** 42:20 43:18 44:24 45:18 48:15 62:6 64:20,22 110:19
**justin's** 43:8 63:4

**k**

**keep** 51:11
**ken** 52:15 71:18
**ken's** 62:9 71:24
**kept** 83:14
**kind** 15:9 19:20 29:18 30:22 32:21 63:10 69:11 72:15,16 79:15 83:16 90:1 95:8 98:25 99:3 110:7
**knew** 17:1
**know** 3:16 5:1 10:9 11:25 12:1,24 13:4 13:19 14:6,9 15:6 16:16,19 17:2,3,4 18:8 18:18,21 20:6 22:21 23:17,22 23:23,25 24:3 24:4,4,7,13,13 24:21,22,25 25:1,3,3,4,19 26:5,19 27:4 27:13,16,17,17 27:20 28:12,13 28:14,15 29:5 29:14,17 30:10 30:10 31:7 32:7,8,10,12,17 32:23 33:1,8 33:17,19 34:2 34:11,15,19 35:9 36:13 37:1 39:16 40:2,25 41:4,7 41:8 42:14,15 43:8,11,11,12 43:13,16 44:7 44:8,9,17 45:21 46:7,9 46:13,21,23,25 46:25 48:5,21 48:23 49:3,15 50:2 51:2,3,19 52:4,4,24 53:8 53:20,23,24 54:2 55:5 56:14,17,18,19 57:1,17,20,25 58:5,20,21,22 58:24,24 59:3 59:3,7,9,10,10 59:12,14,14 60:7 62:17,18 63:7 65:22 66:8,12,12,19 67:16,19 68:4 68:8 71:5 72:2 72:9,11 76:5,8 76:9 78:12 80:18,19 81:10 82:22 83:15 84:5,13 85:10 87:9,10 88:4 88:13 89:2 91:7 92:23 93:3,6 97:22 99:18,20 100:9 100:21 105:13 106:7,23 107:9 107:11,12,17 109:10 112:2,3 112:5
**knowing** 39:15
**knowledge** 14:10 76:22 92:20,22 99:14 99:18,20 107:11,13

**l**

**laid** 50:12
**land** 86:23 88:1 88:3,4
**landed** 86:21 86:25 87:13,15 87:16
**landing** 87:23 87:25
**lands** 88:3
**lane** 14:22
**language** 34:13 53:17,18 56:4

56:10 57:24 58:20 76:14 106:6
**laptop** 97:3
**large** 116:5
**laser** 44:7,8,17
**law** 1:13 2:9
**lawsuit** 3:17
**lead** 20:10,15 20:15,18,22 21:1,10,25 22:4,9,11,17,25 23:7,12,19 25:22 26:2,10 27:1 35:13,17 36:9,11,11 37:5,6 38:7 46:17 48:16 49:5 51:17 53:2,4,12,13 85:24,25 87:13 88:7,18,23 111:15,22
**left** 8:1 20:25 21:1,2,2,16,18 22:4,5,12 23:20,21 24:18 24:19,20 38:10 38:12 40:3 89:13 96:22
**legal** 113:24
**length** 23:12,21 26:3,11 27:1 39:6,6 53:2 54:20,24 103:18
**level** 99:13
**lexington** 116:13
**liability** 91:15
**likely** 82:7
**line** 5:14 6:8,8 17:22 18:13,15 21:13 22:13 25:8 27:15 32:11 45:2,7 45:11 65:6 66:10 69:17 71:20 73:14 80:15 81:23 89:13,16 100:17 105:9 105:15 106:3 114:5,8,11,14 114:17,20 117:3,16,22 118:3,8,17
**lines** 100:18
**list** 91:6
**listed** 12:9,10
**listen** 10:15
**literature** 117:17
**litigation** 94:2 112:10
**little** 4:12 9:24 24:5,7 25:1,2 29:23 38:11 46:22 67:2 72:10 88:20
**llc** 2:9
**located** 75:9 100:14 103:7
**location** 1:13 8:12,13,18 9:14,23 10:5,9 10:10,13 27:12 27:20 32:16 36:14 37:1,22 40:8 41:17 42:1 54:3,8 55:18,20,23 56:8,16,21,23 57:4 58:16 59:25 60:21 61:19 65:23 66:17,19 71:13 74:5,7 76:21 76:24 79:16 81:15,21 99:24 100:24 101:3 102:21 108:16 108:18 109:3,6 109:8,19
**locations** 58:22 59:7
**locomotive** 15:7 16:17 17:17 27:25 32:7 65:5 68:6 68:7,14 69:12 69:16
**locomotives** 96:12 97:18
**long** 25:7 55:23 60:7 75:11 76:10
**longer** 22:21 38:7 53:3,12 88:6,21 111:23 111:23
**look** 6:21 8:14 46:4 48:22,24 49:3 50:1 51:4 52:19 57:22 62:15 67:21 68:15 70:13 71:10 73:3 78:1 79:2 80:19 81:15 85:14 87:16 88:2 90:25 96:25 100:6 108:21,25
**looked** 27:12 40:11 43:12,15 62:10,10 82:19 84:7
**looking** 8:11,15 27:19 36:13 37:9 38:13 39:25 41:4,5 49:4,17 50:16 53:11 55:2 56:23 71:3 75:15 79:14

83:17 87:22 99:8 101:1,6 102:25 103:6,9 111:11,16
**looks** 36:25 45:20,23 55:1 88:12 91:5 92:17
**lori** 1:17 116:3 116:21
**lot** 59:11 86:3
**lydick** 63:17,18 74:11
**lydick's** 72:7

**m**

**machine** 63:11
**made** 10:13 11:4 26:19,21 27:11 38:6,9 41:15 49:13 51:23 52:7,13 53:25 82:18 105:10 108:13 108:17 109:12 109:17 110:16 115:6
**main** 1:14 16:10,14 17:12 17:15,16,20,22 18:1,13,15 21:13,18 22:5 22:13 27:15 32:11 35:8 36:2 39:2 40:12 45:1,6 45:10 46:2,14 47:16 65:6 66:10 69:17 71:20 73:14 80:6,7,15 81:2 81:5,23 83:23 84:1 89:13,15 93:22 96:10 97:15 100:17 105:8,12,15 106:3 109:19 118:3,8,17
**maintained** 15:24 98:11 107:6
**maintaining** 56:12 57:18
**maintenance** 4:23 5:13,14 6:8,8 7:1,24,25 12:16
**make** 6:20 7:5 14:11 22:16 25:6 29:13,17 32:11 53:6,7 54:5 55:17,18 55:22 56:6 58:15 59:23,24 60:6 65:24 66:17 67:3 76:22 97:1 99:4 100:8,8 103:6,25 104:19,22,23 105:3 109:8,15
**making** 17:2 52:10 56:24 57:3 66:18 69:7 99:1
**manager** 55:16 55:21
**managers** 57:17 59:1
**manual** 93:12
**manually** 98:25
**mark** 5:13 6:25 7:15,19 42:11 44:18 47:7,8 60:24 76:3 78:14 110:23
**marked** 3:3 9:25 45:3,8,12 78:20,23 94:9 94:12 95:21,23 111:2,4
**marks** 7:1
**material** 53:21 53:24 55:9
**materials** 8:5 8:24 39:22 41:5,8 55:13 79:6 82:20 89:18 105:1
**mathematically** 112:4
**matter** 106:1
**matters** 63:11
**mean** 7:4 9:20 18:7 24:9,9,15 24:16 25:6,9 26:23 28:19,22 30:3,8,11 32:13 34:16 41:3 45:23 47:12 49:2 54:15,17 55:15 57:13 58:4,19 61:24 62:1 66:4 68:1 71:8 74:21 75:1 82:18 86:5 96:21 98:10,15 99:15 100:5 105:20 112:1,4 112:7
**meaning** 36:19
**means** 30:22
**meant** 26:4
**measure** 29:15 34:2 37:14,16 37:18,21 38:16 38:19 42:17 44:4,11,12,17 46:9,12 47:6,8 49:6,24 50:18 51:16,17,21 109:22 111:24
**measured** 37:11 38:16,18

39:3,4 43:18 43:19,22,23 63:23 64:15 73:20 74:11 96:11 97:17
**measurement** 4:19 37:17 38:21 39:2,8,9 40:12 44:13,16 48:14,17,23 49:5,20 50:3 50:14 54:21 62:5,9,14 63:4 63:6 64:2,5,20 64:23,24 65:1 72:12 73:8,15 73:22,22,25 109:22
**measurements** 6:14 38:15 42:13,20 43:9 43:10 44:1 45:1,6,10 46:10 47:1,3 62:11,12,18,19 63:3 71:23 72:2,6,7,9,14 72:19 73:4,5,9 73:11,12,24 112:2,3 118:2 118:7,16
**measures** 46:8
**measuring** 33:24 38:25 42:1 45:18,24 45:25,25 46:1 74:15,18
**medical** 29:10 29:22 93:10
**meet** 34:22
**meeting** 2:10 40:4 106:24
**mention** 82:20 83:1
**mentioned** 33:22,22 46:4 60:16 84:15 90:19 98:1
**met** 3:15
**method** 46:5 48:7,7 50:3
**middle** 44:9 46:24,24,24 47:5,5,7,8 101:1
**mile** 32:4
**miles** 30:24 31:8,9,16
**mine** 14:11
**minimum** 61:11 62:22
**minor** 108:9,12
**minute** 64:19
**minutes** 51:7 67:1 95:16
**mistake** 29:18
**mistakes** 7:5
**mm** 46:15
**moment** 96:24
**mortge** 1:17 116:3,21
**move** 5:22 6:1 16:20 18:22 20:24 24:14 47:13 56:20 59:17 65:24 83:5 85:18 89:3
**moved** 5:3,4 16:17 65:8,9 82:4,11 83:12 89:14
**movement** 16:11 29:15,25 83:16 84:9,11 84:18
**movements** 28:4 30:11 32:18
**moving** 21:16 21:17 22:2,5 68:5,6 72:24 99:1
**mw&s** 26:9,13 27:5 55:24 60:25 76:18

**n**

**n** 117:1
**name** 3:9 52:5 63:16 102:12
**names** 13:21
**near** 17:20 92:6
**necessarily** 25:14
**necessary** 56:2 56:7 59:23 66:18 115:8 117:18
**need** 5:22 6:15 50:7,10 53:25 89:19 96:23
**needed** 52:23 59:24 82:18 110:16
**needs** 26:21 53:24
**neither** 116:8
**never** 41:6 51:1 51:1 86:11
**new** 38:14 64:3 64:16 95:12 112:2
**nine** 63:25 64:14 74:15
**non** 75:22 112:10
**nonresponsive** 18:23 83:5
**norfolk** 1:4 2:2 3:17,19 5:2,21 6:9 8:9 9:21 10:4 12:19,22 15:18,23 16:10 17:11 26:13,15

27:11 32:23 34:22 36:2 38:2,6 40:16 52:22 57:11 58:13 59:4,22 60:19 65:6 77:15,21 78:17 80:2,6,15 81:5 81:6,13,20,22 81:25 84:1,1,8 90:24 92:4 98:6 99:19 100:24 101:2,7 105:8,24 106:14,17,19 106:19,21,25 107:12 108:13 110:6 112:13 113:4 114:1 115:1 118:10
**normal** 61:18
**normally** 88:1
**notary** 115:14 115:20 116:4
**note** 100:8 113:11
**noted** 42:2 62:20 71:25 115:8
**notes** 95:17
**ns** 4:22 9:1 15:1 17:2,13,15 36:1 40:5 41:12,15 42:6 42:7,9 55:24 57:9 62:21 72:3 73:2,13 75:7 79:17 89:15 92:1 96:14,20 99:6 99:7,9,14,24 105:15
**number** 54:19 55:8 75:18 78:20 95:20 96:1 118:14,24
**numbers** 96:21

**o**

**o** 2:10
**oath** 4:8
**object** 5:8 11:1 11:21 13:6 17:23 23:2 25:12 33:12 39:18 41:18 47:22 48:19 49:8 80:23 81:18 83:5 86:14 89:10 99:25 103:4 104:15 110:9
**objection** 18:24 49:13 60:1
**objectionable** 49:11
**obviously** 16:16 17:10 47:5 58:3 82:6 85:2,2 87:19 111:22
**occurred** 39:24 42:8 67:13 79:19 81:8 83:2 89:14
**occurs** 21:6,19 25:4 35:23 80:14
**offer** 101:9
**offering** 68:17 69:5
**office** 14:14
**offices** 1:13
**official** 116:12
**okay** 4:7,16,25 5:19 6:14 7:7 9:4,19 10:1 11:25 12:14 13:15 14:21 15:23 16:21 20:14,21 23:16 26:2 30:22 32:1 33:7,21 33:23 34:1 35:15 39:11,15 41:13 42:19 43:2 44:3 45:17,24 50:9 50:24 51:12 52:24 54:10,25 55:4 58:2 60:25 63:15 64:8,8,9,10 65:4 66:20 67:6,11,16 68:1,21 69:5 70:5,10 71:14 71:18 72:15 74:3,9,12,19,23 75:6 79:5,8,13 82:5 83:4,18 87:18,24,25 90:11 91:6,10 92:20 94:4,19 94:23 95:7 96:3,6 97:14 97:21 98:1 99:12 101:2,13 108:12,25 109:7,15,21 110:22
**old** 112:3
**once** 21:10 24:24 25:4 69:12 92:18,19 105:3
**operate** 80:7
**operating** 29:6 29:19 68:4,5 75:2 90:13 107:10,13
**operations** 15:8 18:9,10
**opinion** 30:16 60:19 69:22 72:12 75:7

79:22 80:8,17 93:6 101:9
**opinions** 13:16 13:17,18,22 14:7,13,22 39:17 58:5 63:12,20,21 68:17 69:6 73:2 79:6 89:20,25 90:16 92:21 93:1,4,5 93:11,11,12,13 101:11,16
**opposing** 32:16 90:16
**opposite** 53:14
**option** 29:14
**ordinary** 100:7
**original** 5:11 5:12 6:19,24 39:6 40:10 42:25 51:20 64:4,24,25 65:2,3 93:15
**originally** 4:13 9:24 27:18 52:2
**outline** 77:9
**outlined** 13:19 63:12
**outside** 19:15 20:5 27:16 33:7 34:5 35:17 36:11,18 37:6 44:14 47:13,17 48:11 48:14,14 50:19 53:3,12 75:10 87:13 88:16,17 95:5
**own** 26:24
**owned** 15:23 77:16 78:19,25 95:25 97:7 118:13
**ownership** 4:21 4:22 5:13 6:25 7:24

**p**

**pa** 1:14 2:3
**page** 7:16,17 8:22 35:2,2 36:23 58:7 60:15 67:10 69:25 70:1 72:5,6,17,18 74:4 75:6 77:21 78:24 79:1,1,13,14 91:1 97:8 104:2,4,6 111:1 114:5,8 114:11,14,17 114:20 117:3 117:16,22 119:3
**pages** 97:9
**paid** 3:19
**paragraph** 104:11
**parallel** 61:20 61:25
**parks** 92:3,3
**part** 6:10 7:11 8:8 11:19 18:9 18:23 27:17 33:9 34:17 39:16 56:1,2 57:6 72:17 78:10 79:5 86:10,11 92:9 96:14,20 98:7 98:8 112:12
**particular** 50:4
**parties** 69:8 107:20,24 108:1
**parts** 70:6
**party** 116:9
**pass** 79:18 80:16,16 81:6 84:25
**passenger** 31:2
**passing** 96:12 97:17
**past** 33:10 82:4 82:11,14 83:9 84:16 85:7,18 90:24 94:16
**pasta** 1:7 2:8 3:17 9:9 113:5 114:2 115:2
**paying** 28:13 28:16,21
**pending** 116:10
**pennsylvania** 92:13
**people** 58:12 59:5
**percent** 94:3,4 105:25 112:8
**perception** 69:3,6
**perfect** 7:4
**perform** 103:8 103:11
**performs** 106:17
**permit** 61:12 62:23
**person** 105:4
**personal** 3:23
**peter** 12:25
**peterson** 3:2 12:25 13:11 117:24
**photo** 79:23
**photograph** 44:25 45:5,9 118:1,6,15
**photos** 41:5
**pick** 50:17

**picture** 37:12 47:15,18 49:2 49:18,20 50:2 50:4,11,17 70:23
**pictures** 19:6 43:25 44:19 45:15,19,21 70:1,13
**piece** 14:5,5
**place** 2:4 9:22 11:5 40:4 51:24 52:21 64:6 70:7,8 75:19 76:12,17 84:5,6 103:7
**placed** 9:15 51:25 55:8 75:12 81:14 100:9 106:16
**placement** 39:23,25 41:10
**plaintiff** 1:5 2:2
**plan** 5:11,12 6:5,6,7,10,13 6:21,25 7:1,8 7:10 8:3,14,16 8:17,20,21,21 8:23,25 9:2,3,4 9:7,13,17,18 10:10,12 11:5 11:7 41:11 52:14,16,17,18 52:20,20,21 53:1,3,7,11,17 54:1 55:6 58:21 75:18,19 76:9,12 79:10 88:2,2,6 100:23 108:22 109:1,3,4,4,6,9 109:16,24 110:12,14,15 110:20 111:6,8 111:12,17,18 111:20,24
**planned** 95:7
**plans** 8:18 9:15 9:25 10:6,17 10:24 11:12 26:20 40:10,11 40:23 41:13,17 41:22 42:2,5 56:14 59:24 95:10,14 103:1 104:14,20,25 108:3,4,5,6,9 108:13
**plate** 92:10,11
**plates** 53:20 54:14,19 55:8 92:6,9 98:19
**play** 56:19 57:2 57:19
**plenty** 80:5
**plus** 4:21 64:21
**point** 4:20,22 4:23,25 7:18 10:11 15:15,20 16:1,5 18:7,25 19:7,22 20:19 21:8,11,22,25 22:8,9,10,19,23 22:24 23:4,5,9 23:10,18 24:3 24:16,16 26:10 27:9,21,25 29:24,25 30:14 31:17,23 32:2 32:4,13,14,15 32:15,19,20,22 32:23 33:3,5,6 33:8,10,16,18 33:19,23 34:4 34:6,7,9,14,18 34:21 35:1,3,6 35:7,10,11,16 35:20,23,24 36:1,6,8,10,14 36:15,17 37:19 37:19,22 38:22 38:23 39:1,2,6 39:9,10,11,14 40:8,14,14,18 41:1,7 42:10 43:6 45:2,7,11 47:7,8 54:11 55:2,7 57:12 58:18 61:19 65:3,16 66:6,6 66:8,20 69:13 69:16 71:6 72:23 73:11,13 73:17,19,21 74:5,12,16,16 74:17,19,21,22 75:2,4,9,12,12 75:21,23 76:2 76:5 79:9,25 80:2,3,9,13,16 80:20 81:3,15 81:23,24 82:5 82:11,14 83:7 83:7,8,9,19,24 84:9,16,19,22 84:22,24,25 85:1,3,5,6,7,10 85:13,19,22 89:1,4,9 96:4,9 97:11,13,14 105:7,9,14 108:16 118:4,9 118:18
**pointed** 35:12 35:17
**pointer** 44:7
**points** 34:9,10 34:11 36:4 50:17 66:11 70:16 71:19,20 81:1,1 82:1 98:19 105:11
**policies** 12:19 12:21 34:12 40:5 41:12 42:6 57:5,24

59:8,12 60:8 65:19,20 84:2 92:2 99:6,7,10 99:14 105:24 105:25 106:19 106:20 107:14 107:17
**policy** 26:6,8 57:10 58:13 59:22 61:1,1,4 61:5,6,7,10 78:11 96:14,20 107:15
**polities** 99:9
**portable** 20:3
**portion** 6:8 14:1,3,4,18,19 14:19 34:10 93:4 95:23
**position** 5:21 11:18 22:24 87:20 89:15
**possible** 25:19 26:22
**potentially** 10:20 24:13 33:19 82:10
**power** 28:25 29:17 67:12,24 68:2,5,10 79:18
**powering** 28:23 30:5
**practice** 105:2
**practices** 107:14
**predict** 18:20 18:21 24:25 89:1
**predictable** 106:5
**preliminary** 103:1 104:14 108:3,4,6
**premises** 91:15 91:21
**prep** 95:5
**preparation** 4:5
**presentation** 95:9
**presumably** 28:21
**pretty** 44:15 47:12 50:16 59:19
**prevent** 29:25
**primarily** 31:8
**prior** 3:23 17:1 37:2 102:11,14
**privately** 77:16 78:19,25 95:25 97:6 118:12
**probably** 15:14 27:21 68:8
**procedure** 55:24
**procedures** 40:5 41:12 57:5,24 59:12 60:8 65:20,21 76:19 84:2 94:7 107:14,18
**process** 6:18 13:24 62:16 102:2 112:12 112:15
**processes** 59:3
**produced** 77:21
**profile** 111:1 119:2
**proper** 81:15 82:15 83:13
**properly** 45:22 70:7 81:14 98:10 99:2,3 103:22 104:21 106:16 107:2,6
**property** 15:10 60:6
**proposed** 6:24 7:1 8:18,25 9:1 9:2,3,4,5,8,12 9:13,17,18 10:6,10,12,18 10:19 11:5,7 11:12 58:19,21 108:6,6,16,18 110:25 119:1
**protect** 16:3,6 16:7,10,15 17:21 18:2,12 18:16 20:7,25 21:14 22:6 23:23 24:11 26:4,12 27:3 30:9,10 66:14 103:13
**protected** 105:18
**protection** 66:13
**provide** 66:12 84:13
**provided** 93:11 94:15
**proxies** 94:7
**public** 115:20 116:4
**pull** 46:16 73:6 97:2
**purpose** 16:9 16:13 20:21
**purposes** 10:22
**push** 22:12
**put** 9:22 10:8 10:12 11:4 14:18 19:22 27:21 29:21 32:20 40:18 44:8 46:11,12 46:13,23 47:6 55:5 56:8 57:4

99:24 101:2

**q**

**qualification** 59:3
**question** 8:12 10:16,23 17:6 22:7 36:3,22 41:6 42:5 43:17 48:8,9 49:11 50:16 53:10 59:19 66:5 72:16 86:22 107:1
**questions** 58:3 58:10 67:10 101:14,21 106:9 111:5
**quick** 95:15 106:10
**quickly** 15:14 94:23
**quite** 44:11

**r**

**r** 114:4,4
**radar** 38:18
**radeck** 2:10 3:8 3:16 5:16 11:6 11:24 13:10 18:5,22 23:11 25:21 33:14 37:4 40:6 41:21 44:18,22 45:13 48:1 49:1,10,15 51:11,15 58:9 59:16 60:10 66:25 67:8 78:9,14,22 81:12 82:2 83:4 86:19 89:17 94:13 95:15,22 97:4 100:11,19 101:20 103:4 104:2,15 106:10,13 110:17,22 111:3 112:17 117:6,10
**rail** 18:17 19:11,15 20:6 21:4,7,23 22:22 23:6,7,8 25:8,15,16,18 25:18,23,24,25 27:9 30:4,5 31:2 35:13,17 36:9,11,12,24 36:24 37:6,6 37:20,20 38:3 38:3,4 39:7 46:17,25 47:1 47:1,6,10,10,13 47:14,17,18,21 47:21 48:3,3,6 48:6,9,9,11,12 48:16 49:5,7,7 49:19,19,21,25 50:20,25 53:2 53:4,12 65:11 65:11 70:25 71:1,7 85:24 85:25 86:6,7 87:13,14 88:7 88:19,20,23 103:18,19,23 104:8 106:2 109:11,14 111:1,23 112:2 112:3 119:2
**railroad** 8:1 31:1 58:25 61:17 89:23,24 89:25 90:3,13 90:13,15,16,17 107:11,15,16
**railroads** 90:12 94:6 99:10 107:13
**rails** 19:16 20:11,11,15,15 20:16,18,22,23 21:1,10,15,17 22:1,4,10,11,17 22:18,21 23:1 23:12,19 25:17 26:3,5,10 27:1 51:18 53:13 69:13 70:12,17 70:19,20 81:3 86:21 88:8 109:23,23 111:15
**railway** 1:4 2:2 113:4 114:1 115:1
**range** 42:15
**rated** 30:22
**reaction** 69:3,7
**read** 41:23 50:10 112:20 113:10 115:6
**reading** 26:7 41:6 50:5 55:3 61:4 76:23 77:2 91:4 95:1 104:1 110:21
**realize** 28:23
**really** 28:15 90:20,20 109:10
**rear** 2:25
**reason** 41:15 48:15 62:13 93:8 97:22 113:12 114:7 114:10,13,16 114:19,22
**reasons** 10:22 93:10
**rebutted** 63:20
**recall** 70:10,11
**receipt** 113:19
**received** 8:6 67:18 89:19

**recess** 67:7 95:18
**recognize** 62:4 96:21
**reconstructed** 65:7 112:13
**record** 3:10 51:22 110:24 116:7
**records** 12:8
**red** 55:5
**reference** 4:24 35:1,2,25 50:10 52:14,23 73:6,11,21 83:10 92:10
**referenced** 4:11 6:5,12 8:16,17 9:3,16 53:16 72:8 98:2 110:24 113:7
**referencing** 7:9 7:10 50:5 76:9 76:16 110:20
**referred** 108:2
**referring** 31:10 35:19,20 75:18
**regulated** 110:6
**regulation** 58:14 59:21,22 77:3,7 103:21
**regulations** 40:5 55:25 57:6 59:9 65:21 84:3,3 92:2 99:5 100:5 103:10 103:11 105:24 106:18,21,24
**related** 13:17 116:9
**relates** 69:20
**relation** 66:3
**relationship** 18:17 21:7 22:22 23:6
**rely** 106:14,22
**relying** 42:20 107:1,4
**remember** 31:6 43:21,22 62:16 63:17 85:11 86:1,2 108:10
**repaired** 37:24
**report** 3:1 7:11 7:16 8:22,24 12:9,10,11 13:13,21,23,25 14:16,17,18,20 14:20 19:5 35:2 36:8,8 52:6,13,15 53:16 56:7 60:16 61:5 62:19 63:12,15 67:2,10 69:25 72:17,19 73:4 73:5,6,7 75:6 77:15 79:14 86:3 101:17 104:5 117:23
**reported** 1:17 4:13 17:1
**reporter** 1:18 44:21 51:13 78:16 116:1,4 116:22 117:11
**reports** 41:6
**represent** 3:16
**requested** 117:14
**required** 10:8 26:23 79:9 115:14
**requirement** 34:23 42:7
**response** 75:14 75:16
**restrictive** 106:20 107:15
**retained** 3:19 3:22 13:5 93:18
**return** 113:14 113:18
**review** 4:4 14:6 14:11 41:14,22 67:17,17 68:11 79:5 96:24 113:8
**reviewed** 6:23 8:24 16:25 51:23 67:23 82:20,21
**reviewing** 6:24 12:7,8,9,19 14:2 41:9 92:1
**revised** 97:5
**rico** 15:4 16:22
**ride** 87:14
**riding** 88:18
**right** 3:12,20 3:24 4:2 5:24 6:17 7:5,6,21 7:23 8:1,4,7,9 9:8 10:7,18,25 11:9,14,16 12:2,16,24 13:2,13 15:1,2 15:4,13,16,21 15:24 16:3,7 16:18 17:12,18 18:13 19:7,11 19:16,17 20:5 20:12,13,19 21:5,9,14,21 22:1,7,13 23:8 24:11,20 25:9 25:15,22 26:16 26:24 28:7,17 28:25 30:7,23 31:19 34:3 35:8,13,14,18 36:3 37:7,8

38:7,10,22 39:17 40:21 42:3,17 43:20 47:18 48:18 49:7,16,23 50:21 51:11 52:7,11 53:4 53:14 54:7 55:12 59:15,16 60:13 61:6,14 61:21 62:2,6 63:13,21,22 64:17,21 65:15 66:25 67:5,9 69:3,4 70:3,25 71:3,9,16,21 72:20 77:8,12 79:3,11,25 80:4,17,21 82:3,6,9,16 83:21 84:23 85:7 86:1,2 88:23 89:9 91:19 94:3,17 94:21 96:15 97:8 98:7 99:19,24 100:14 101:4,8 101:20 102:2,6 103:2,3 106:25 107:3,19,21 108:2,5 111:9 111:12,17 112:20,21

**rightmier** 82:22
**rigid** 70:24 71:1
**rode** 89:7,7
**rods** 98:20
**rolling** 28:5 105:17 106:5 109:18
**rule** 73:3 75:8 75:15 76:13,13 93:16
**rules** 93:12,15
**run** 16:23 28:11 29:12 87:7
**running** 25:16 25:17,18 49:20
**rusk** 71:19 73:1 73:20 74:11
**rusk's** 52:15 62:4 75:7

**s**

**s** 1:17 114:4 116:3,21 117:20
**safely** 80:16 84:25 96:13 97:18
**safer** 66:1
**safety** 17:21 18:12 29:14 33:9
**sake** 7:7 110:23 110:23
**sal** 1:6
**saw** 39:21 60:22
**saying** 5:5 6:2 21:21 28:20 43:4 50:13 52:15 56:6 57:8 62:22 72:3 80:21,22 80:25 81:17,20 83:20,21 102:17
**says** 7:20,21,23 7:25 8:2 9:6,6 9:7,8,10 26:7,9 34:11 54:13,18 55:10 56:7 57:10,25 58:15 59:23 60:4,5,9 60:11 61:10 62:1,2 79:8,11 96:8 97:11,13 97:14,19,20 104:8,11 105:25
**sc** 1:15 2:5,11
**scale** 7:22 9:11
**scenarios** 27:24 28:7 82:10
**seal** 116:12
**second** 77:14 99:23
**secretariat** 94:11,21 118:20
**section** 7:22 9:11 95:19 96:18 118:22
**sections** 61:16
**see** 7:12 35:3,4 35:7,9 36:18 36:24 37:12 43:24 46:4 48:22,22,25 50:1 51:4 52:19 55:2 57:23 62:15 66:18 67:21 75:13 78:1 79:20 85:15 87:16 88:3 90:25 95:13 96:4 98:10 100:6 103:16 105:4
**seeing** 70:11
**seen** 16:21 28:8 29:1,1 32:3,21 34:8 43:24 44:2 45:15 52:11 77:17,19 85:18,23,25 108:5 110:2
**sense** 68:9
**sent** 113:15

**sentence** 61:13
**september** 104:12
**serve** 9:9
**set** 10:19 28:12 28:14,16 29:16 33:17 34:9,10 34:13,20,25 40:25 41:1,16 42:9 44:8 60:23 64:25 65:1 66:11 68:3 94:15,19
**seven** 4:19 5:4 6:1 12:16 108:23,23,24 108:24
**sheet** 113:12
**shorter** 37:6 85:24 89:6 109:16
**shot** 52:15
**show** 35:21 51:23 72:23,24
**showed** 6:7 108:22
**showing** 9:12 35:24 53:22 54:4 61:7 70:1 70:1,5 73:17 74:1,4 76:8
**shown** 49:20 79:23
**shows** 7:14 53:11 54:18 55:6 88:5,6 89:5 109:24
**sic** 77:22
**side** 19:16,17 19:24 37:3 46:13 71:3,9 88:8
**sides** 70:12,15
**siding** 6:11,13 7:9 8:8 11:8,13 99:18,21 102:25
**sign** 112:20 113:13
**signature** 116:21
**signed** 113:21
**similar** 61:8 63:19 72:7 76:17 111:18
**simple** 30:11 50:16 59:19
**single** 19:13
**sinkhole** 92:15
**sir** 15:25 91:9 93:25
**sit** 58:18 95:2
**site** 6:20 12:1,4 12:8 37:19 41:3 71:14
**sits** 74:14 86:17
**sitting** 85:1
**situation** 21:17 23:7,19 26:25 27:3 82:6 86:7 87:18 98:13
**situations** 26:18 29:4 31:16 77:9 90:8
**size** 92:10
**slightly** 9:18,19 36:25 109:16 109:21
**slip** 91:13
**solutions** 113:24
**somewhat** 72:10
**sorry** 44:20 50:9 57:21 64:8 83:8 85:3 90:5
**sort** 13:12 33:8
**sounds** 42:19 78:13
**south** 1:1 116:4 116:13
**southern** 1:4 2:2 3:18,20 5:2 5:21 6:9 8:9 9:21 10:4 12:19 15:18,23 16:10 26:13,15 27:11 32:24 34:22 36:2 38:2,6 40:17 52:22 57:11 58:13 59:4,22 60:19 65:7 77:15,21 78:17 80:3,6,15 81:5 81:6,14,21,22 81:25 84:1,8 90:24 92:4 98:6 99:19 100:24 101:2,7 105:8,24 106:14,17,19 106:21,25 107:12 108:13 110:6 112:13 113:4 114:1 115:1 118:10
**southern's** 12:22 17:11 84:2 106:19
**space** 35:7 79:17 80:2,14 80:19,21 81:4 81:16 84:16 85:3,5
**speak** 46:6,20 50:4 99:13
**speaking** 107:19
**specific** 12:18 13:22 29:24 67:19 73:4,9

86:23
**specifically** 15:5 27:4 57:25 58:11 76:23 77:13 80:12
**speed** 30:23 31:7 68:3 69:19
**speeds** 31:4
**spend** 62:11
**spent** 59:11
**spot** 65:2 87:11
**spread** 96:9 97:15
**sta200** 8:2
**stall** 27:8
**stamp** 78:20 95:20 118:14 118:23
**stand** 98:18
**standard** 19:1 19:6,9,12,12,19 19:21 20:1,9 26:9,16,17,19 26:24 27:5,9 41:1 55:24 57:10 58:14 60:25 76:18 92:25 104:25 105:2 110:12 110:14,15
**standards** 12:19,21 38:24 65:19 106:22 107:7,9
**stands** 84:6
**started** 3:15 12:25 75:5
**state** 3:9 76:23 77:2 79:25 116:4
**stated** 72:13
**states** 1:1 26:6 75:20 76:1 104:7
**stating** 62:21 73:2 80:12
**stay** 25:7
**staying** 14:22
**stays** 88:20
**stock** 70:25 71:1 105:17 106:5 109:18
**stop** 25:15 80:9 85:14
**stopped** 79:19
**stopping** 40:14
**stops** 80:4
**storage** 81:5 111:1 119:2
**straightforward** 10:16
**street** 1:14 2:10
**stretched** 49:24
**stricken** 93:5,7
**strict** 110:6
**strike** 18:22 59:17 83:5
**stronger** 24:9 24:12
**structure** 34:17 86:10,12,17,21 92:9
**stuff** 95:9
**subscribed** 115:15
**sufficient** 23:21 26:3,11 27:1 79:17 80:2,5 80:14,21 81:4 81:16,25 83:25
**suggest** 17:7
**suggests** 16:22
**suite** 1:14 2:5
**supplement** 7:14
**supplemental** 3:1 117:23
**supplied** 58:8
**supposed** 26:15 28:20 29:7 30:2,6 33:8 34:5,17 54:11 58:3 71:8 99:2 101:3
**sure** 4:18 13:9 22:16 42:4,24 46:3 51:12 67:3 76:23 91:20,20 96:16 97:1 99:1,4 103:7,25
**switch** 4:20 10:11 15:15,20 16:1,5 18:11 18:25 19:7,22 20:19,25 22:9 23:18 24:3 25:3 26:10 27:9,21,25 30:14 31:17,22 32:2,3 34:4,7 39:2,3,5 40:1,2 40:4,8,8,13,14 40:15,18 42:9 45:2,7,11 53:19,20,21 54:9,10,14,14 54:17,18,19,24 55:1,2,7,7,7,8 55:13 70:16 71:6,19,20 72:23 73:11,13 73:17,19 74:5 74:12,13,14,16 74:17,19,22 75:2,3,4,9,12 75:21,22 79:8 84:6 85:19,22 87:7 98:14,16 98:18,19,20,21 105:11 108:16 118:4,9,18

**switched** 24:6
**sworn** 3:6 115:15

**t**

**t** 114:4,4 117:20
**take** 19:14 20:5 21:1 29:10 47:13 48:17 49:19 50:14,14 50:19,20,24 51:7,9 66:25 73:19 81:7 84:17 95:15 96:23
**taken** 1:16 72:8 72:20
**talk** 10:21 19:5 42:21 50:9 60:16 67:4
**talked** 12:24 41:13 60:17 62:20 71:14 79:14 96:19 107:20 108:8 111:10,14 112:7
**talking** 6:6 14:25 15:3 28:5 40:16,19 54:16,21 67:13 69:2 74:10 76:3 79:15 80:12 84:19 109:6
**talks** 52:6 54:9 79:2 86:3
**tangent** 75:10
**tank** 111:1 119:3
**tape** 44:10,12 44:17 46:8,9 46:12 47:6 49:24 50:18
**target** 84:5
**targets** 98:19
**technically** 25:9
**tell** 4:17 5:1 33:15 37:10 45:25 91:1 95:25 96:6 104:2 106:15 107:2,5 111:22
**telling** 36:7 55:6 70:8 89:3 111:6
**template** 14:17 14:20
**ten** 30:24 94:4 110:1 112:8
**term** 9:5 20:14 32:13,19
**terrain** 56:18
**territories** 90:14
**testified** 3:6 4:8 5:3 89:22 90:23 93:21,23
**testify** 95:4
**testifying** 15:9 36:22 91:12
**testimony** 5:1 5:20 67:4 92:18 113:10 113:19 115:10
**thank** 51:13 101:21
**thanks** 112:17
**theoretically** 25:6 35:5
**thereof** 116:10
**thing** 4:10 20:4 32:20 63:19
**things** 15:8,14 27:13 28:20 29:11 30:6 44:14 46:21 50:13 58:17 59:13 69:20 75:17 81:11 92:11 94:8 99:1 101:17
**think** 5:21 27:6 28:14,17 36:21 52:13,14 60:13 63:16 84:20,20 84:22 95:17 98:1 102:12 108:9
**thinking** 29:21
**three** 44:19 78:16 82:4,7 91:5
**thrown** 21:3
**tie** 86:6
**ties** 35:9 86:7,9 86:21,25 87:4 87:13,16,23,25 88:1,4 89:8
**timber** 75:11
**time** 1:12 5:3 12:20 28:18 39:21 48:24 50:8 51:25 52:1,18,22,25 59:11 60:14 61:2 62:12 63:11,15 64:1 66:22,24 69:3 69:7 70:2 72:9 74:8 75:19 76:12,15 77:23 78:3 88:12 89:21,25 91:9 95:6,10 96:15 97:23 101:10 101:19 110:4 113:20
**timeframe** 113:9
**times** 77:11 90:23 91:5 93:18 102:10

102:14,16
**today** 3:18 44:4 58:11,18 61:9 74:14 95:2 101:18 108:3
**today's** 4:5
**together** 14:13 90:14
**told** 59:20 64:19
**took** 39:4,5,20 40:12 42:13 43:10,10,25 48:23 52:14 62:18 64:5,23 65:2 70:14 72:2,6 73:24
**top** 4:19 6:17 19:11 21:4,23 69:13 87:14 110:25 119:2
**tossed** 93:16
**total** 54:24
**towards** 27:14 73:13 75:24 85:4
**track** 11:10,11 13:18 14:24 15:19 16:2,6 16:10,14 17:12 17:15,16,21 18:1 19:18 20:6,8,24 21:18 22:6 24:11,14,24 26:4,12 27:2 30:9,18,25 31:24 32:1,4,6 32:25 33:9,22 33:24 34:3 35:8 36:2,25 37:10,11,13,14 37:17,18 38:4 38:14,17,21,21 38:25 39:7,9 39:15,19,22 40:12,19 41:16 41:24,25 42:5 42:7,7,10,15,17 42:21,22 43:2 43:5,16 44:4,9 44:12,16,25 45:5,9,18 46:1 46:1,2,10,14,24 48:17 49:6 50:18,19,21 54:12,22 60:20 61:11,19,21,25 62:3,5,14,20,23 63:1,2,23 64:3 64:5,11 65:14 65:18 66:2,2,3 66:13 70:20 72:1,12 73:10 73:14,18 74:1 74:3,10,15 75:10,23,24,25 77:17 78:19,25 80:7,9 81:2,5,6 81:24,25 83:23 84:25 85:2 86:10,17,21 88:11,13 91:18 91:23,25 92:1 92:8,9 93:22 95:25 96:10,10 97:15,16 103:12 105:1 105:17 106:3 109:20 118:2,7 118:13,16
**tracks** 9:9,13 31:9 32:16,17 32:25 38:19 58:23 61:17 96:11 97:7,16
**train** 13:19 15:6 17:2,13 21:1 22:3,5 23:18,21 28:23 31:16 67:12,14 67:23,24 68:1 68:6 79:18 80:3,6,15 81:6 82:4,10 83:12 83:14 84:25 85:13,18 87:6 89:14 112:9
**trained** 48:2 59:1,6,6 68:19 68:19
**training** 46:21 48:4 49:17 57:3,13,13,15 57:19 58:12 59:2,10,11,20 94:5,6
**trains** 29:19 31:5,19 79:17 80:20
**transcript** 2:25 112:20 113:7 113:21 115:6 115:10 116:6
**transitioned** 70:16
**transitions** 71:6
**transpired** 67:7 95:18
**travel** 88:22,24
**tree** 25:8
**trial** 92:17 95:4 95:9
**tried** 16:22
**trip** 91:13
**tripped** 91:23
**true** 19:2 36:10 115:9 116:6
**trusting** 29:18
**try** 7:8 14:6 15:13 21:12 24:17
**trying** 19:24 24:18 28:14

49:6 72:22,24 73:8
**turn** 98:22
**turning** 103:21 105:6
**turnout** 54:19 55:8 98:17,23 98:24 110:13 110:14
**turnouts** 110:12
**two** 8:18 9:15 10:24 11:12 32:16,16,25 35:4 36:4 43:14 44:14,15 44:21 50:17 70:22 74:2 82:1 91:5
**type** 19:1 50:2 57:23 71:13 82:24 92:10 105:3 112:10
**types** 19:4,20 20:2 30:6 59:13 70:22
**typical** 7:21 9:10

**u**

**ultimately** 17:14 18:12
**under** 4:8 7:13 15:20 28:25 29:19 67:12,23 68:2,5 79:18 92:24 93:2
**understand** 10:15 18:6 22:16 42:4 48:8,10 62:7 72:18 94:16 101:13
**understanding** 45:17 48:10
**undertook** 112:13
**undetermined** 18:19 21:19 25:5
**unintended** 16:11 28:3 29:15,25 30:10
**unintentional** 17:3
**unintentionally** 16:17,20
**united** 1:1
**unlocking** 98:25
**untrue** 4:9
**unusual** 110:5
**updated** 7:14
**ups** 59:13 106:11
**use** 17:3 20:14 44:11,12 48:6 77:6 93:16
**used** 18:9,12 19:4 31:13 39:7 48:7 53:21,25 55:9 55:13 77:5 93:15 109:5 113:21
**using** 18:11 28:22 46:5 50:3 52:23 76:18

**v**

**v** 113:4
**verified** 4:14
**verify** 5:15 62:8 113:10
**veritext** 113:16 113:24
**veritext.com.** 113:16
**verse** 99:15
**version** 77:20 77:20,22,23 78:2
**versus** 4:22 92:4
**vertical** 75:9,10
**view** 43:12 87:2
**violation** 82:24 106:3 107:16
**violations** 103:14,18
**virginia** 92:4
**visibility** 69:6
**visit** 6:20 38:13
**vs** 1:6 114:1 115:1

**w**

**waive** 112:21
**walking** 99:7
**want** 22:16 23:20 46:6 51:7,9 67:1,10 76:22 85:11 97:2
**wanted** 4:23 5:2,6,14,25 7:2 7:2 25:9 78:12
**wants** 87:19
**way** 3:23 12:16 19:22 25:8,10 32:21 44:10 46:7,16,19 47:20,25 48:6 48:10,16 49:6 49:12,21,25 50:22 51:2 60:18 61:25 73:7 83:14 87:15 89:3,8
**ways** 32:21 43:14,14 44:7 44:15 46:18 47:4

**we've** 51:6 54:21 76:3 94:15 97:5 101:11,18 111:10,14
**weights** 69:19
**went** 4:12 37:23 38:25 39:1 42:12 43:11 48:4,15 59:10 65:7 67:24,25 70:11 82:22 83:14 93:10 105:7
**west** 92:4 116:13
**wheel** 18:17,18 19:10,12,14 20:5,7 21:7,8 22:22 23:6,8,9 24:23,23,24 35:5 36:15,18 36:19 37:1 80:1,4 88:17 88:18,25 89:7 105:13 106:2
**wheel's** 89:2
**wheels** 19:16 19:24 21:3,22 22:15,17,18,19 22:20,23 34:14 35:4 79:16,19 79:24,24 80:8 86:4,20 87:3 87:10,12,12 89:7,12 105:12 105:13
**whichever** 19:24 54:12
**white** 1:14 2:3 93:19
**whitney** 2:4 5:8 11:1,21 13:6 17:23 23:2 25:12 33:12 36:21 39:18 41:18 47:22 48:19 49:8,13 51:12 60:1 78:7,12 80:23 81:18 86:14 89:10 96:23 97:2 99:25 101:22,25 103:5 104:4,9 104:17 106:8 110:9 112:18 113:1 117:8
**william** 2:4 113:1
**williams** 91:11 91:13
**witness** 5:10 11:3,23 13:8 17:25 23:4 25:14 36:23 39:19 41:20 47:24 48:21 60:3 67:6 80:25 81:20 86:15 89:12 96:25 100:2 104:6,16 110:11 112:19 113:9,11,13,20 116:11
**word** 7:25 16:19 17:3
**work** 12:11 13:25 14:18,19 21:12 22:11 31:13 58:12 94:1,2,7,16,24 95:3,5 112:8
**worked** 80:18 83:20
**working** 93:22
**write** 82:24 107:16
**written** 77:3 106:6
**wrong** 75:15,15
**wwhitney** 2:6 113:2

**x**

**x** 117:1,20

**y**

**y'all** 7:5 13:15 14:16 52:14
**yeah** 4:18 6:13 6:23 7:20 11:12 14:17 16:25 20:1,3 20:17 21:6 23:4,14 24:9 25:25 26:9,20 26:25 28:3,10 29:20,23 32:15 32:22 33:16 34:24 39:8 41:22 42:18 46:6,18 47:16 48:24 50:22 52:19 53:5 56:6 58:2 64:13 73:1 75:1 79:23 84:6,20 85:5 91:24 96:25 100:7 102:3 104:11 108:7 109:11 111:14
**year** 43:19

**z**

**zero** 73:13
**zone** 33:11

South Carolina Rules of Civil Procedure

Part V. Depositions and Discovery

Court Rule 30

(e) Submission to Witness; Changes; Signing. When the testimony is fully transcribed the deposition shall be submitted to the witness for examination and shall be read to or by him unless such examination and reading are waived by the witness and by the parties. Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness, unless the parties by stipulation waive the signing or the witness is ill or cannot be found or refuses to sign. If the deposition is not signed by the witness within 30 days of its submission to him, the officer shall sign it and state on the record the fact of the waiver or of the illness or absence of the witness or the fact of the refusal to sign together with the reason, if any, given therefor; and the deposition may then be used as fully as though signed unless on a motion to suppress under Rule 32(d)(4) the court holds

that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.