UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

NORFOLK SOUTHERN RAILWAY COMPANY,
Plaintiff,
vs. CIVIL ACTION NO. 3:25-cv-06618-SAL
AMERICAN ITALIAN PASTA COMPANY,
Defendant.

DEPOSITION OF: FOSTER J. PETERSON
DATE: August 4, 2026
TIME: 11:40 A.M.

LOCATION: Law Offices of
Gallivan, White & Boyd, PA
1201 Main Street, Suite 1200
Columbia, SC
TAKEN BY: Counsel for the Defendant
REPORTED BY: LORI S. MORTGE,
Certified Court
Reporter, CCR

APPEARANCES OF COUNSEL:

ATTORNEYS FOR THE PLAINTIFF
NORFOLK SOUTHERN RAILWAY COMPANY:

GALLIVAN, WHITE & BOYD, PA
BY: RONALD K. WRAY, II
WILLIAM E. WHITNEY, III
55 Beattie Place
Suite 1200
Greenville, SC 29601
(864) 271-9580
rwray@gwblawfirm.com
wwhitney#gwblawfirm.com

ATTORNEYS FOR THE DEFENDANT
AMERICAN ITALIAN PASTA COMPANY:
HOOD LAW FIRM, LLC
BY: JOHN O. RADECK, JR.
172 Meeting Street
Charleston, SC 29401
(843) 577-4435
john.radeck@hoodlaw.com

(INDEX AT REAR OF TRANSCRIPT)



* * * * * * * * * * *

FOSTER J. PETERSON
being first duly sworn, testified as follows:

EXAMINATION

BY MR. RADECK:
Q. Will you state your full name for the record?
A. Foster Joseph Peterson.
Q. Foster, I'm John Radeck. I represent AIPC. We met just briefly before this deposition started. You're here because you're a paid consultant on behalf of Norfolk Southern in this case; is that right?
A. That's correct.
Q. Okay. And there were -- prior to this property claim there were other cases where your colleague who was just deposed, Dustin Bell, was named an expert but I don't see where you were actually named an expert in those cases; is that right?
A. Are you talking about relative to this particular collision?
Q. Right.
A. Correct. I was never needed as a testifying expert.



Q. Okay. But you did bill some time and we see invoices related to both those prior matters and this matter; right?
A. Correct. I was retained on the other but I wasn't asked to be a testifier.
Q. Do you know why that is?
A. No.
Q. Okay. So we know that -- I've got your file, we've got your report. I've marked the supplemental report as an exhibit to Dustin's deposition, I don't see the need to mark it again for yours. But to the extent we reference your supplemental report my understanding is that contains all of your opinions in this case; correct?
A. That is correct.
Q. And you had an original report and you issued your supplemental to rebut some of the opinions from my experts; is that right?
A. That's correct. And it also included some -- or at least for my opinions it included some of the 30(b)(6) witness, Mr. Marshall, from AIPC as well. So I included some discussion on that, too.
Q. Have you ever testified in cases where you were critical of railroad employees who had claims against the railroad?



A. Yes.
Q. Okay. And have you -- in those -- have you done that in cases where you've represented -- not represented, where you've consulted on behalf of Norfolk Southern?
A. Yes.
Q. Do you know how many times?
A. I really don't as I sit here.
Q. Okay. And you've listed a list of cases as part of your report; is that right?
A. Yes.
Q. Okay. Which page of the report is that? Do you have that handy?
A. It's Appendix B, as in bravo, towards the end. I'm not sure what page it is in the pdf.
Q. There it is, I found it. So this has cases from 2026 until 2022 to comply with the Federal Court requirements to provide cases in the past four years; is that right?
A. Yes, sir.
Q. You've had other cases prior to 2024; right?
A. Oh, yes.
Q. How many years have you been testifying?
A. As an expert since 1999, so what does

that make it? Twenty-seven almost now.
Q. Okay. And what percentage of your work is testifying? Is it 100 percent?
A. No -- well, I mean, testimony itself --
Q. Or reviewing -- consulting in a litigation context.
A. Just to clarify, you mean, like, litigation-based consulting?
Q. Yes.
A. Depends a little bit, you know, what's going on, where I am. But of my consulting practice generally 80 to 85 percent is probably litigation-related somehow. It's -- it's been the majority for some time.
Q. And in the list of cases that you've provided from 2022 to 2026 in Appendix B of your report how many of those, if any, were you critical of a railroad employee for not keeping a proper lookout?
A. (Reading.) From this list there's one that I see that I recall would fit that category.
Q. Which one is that?
A. It's the bottom of the first page, Fairman versus Norfolk Southern.
Q. Do you remember what the -- any more



details about your opinions in that case as far as why you said they were not keeping a proper lookout?
A. I do.
Q. What is that?
A. That was at a shoving movement in an inner mobile yard in Chicago. The conductor who was leading into that shoving movement and doing so in a vehicle, which is allowed in certain situations under the rules, did not comply with a specific Chicago terminal instruction which was that you effectively always have eyes on the -- physical leading into the movement. She drove ahead of it and missed the fact that there was a vehicle parked on -- on the track that the train was coming down and so that contributed to that collision.
Q. Okay. And so did you testify as to distance that she was -- that that was involved in whether or not she should have seen something at a certain distance?
A. Not really, because she drove past things on the location and substantially away from -- basically the other end of the inner mobile track. So she just wasn't even trying to look in that area at the time. She wasn't on the locomotive when it happened.



Q. Have you ever had a case like this case where you've given opinions that, you know, an engineer or conductor did not -- but your opinions were that they did not keep a proper lookout? I understand in this case you say that they do keep a proper lookout, but in a case where you say they do not where they're going down a track straightaway and there's some kind of object that could be in the foul?
A. In terms of cases on, you know, on my list where I've given testimony I don't recall ever having done that, no.
Q. What about the ones that aren't on your list here?
A. I can think of a handful where one employee of the two or more in the cab weren't -- you know, just weren't looking when the collision occurred. So I certainly have had that opinion before, but I don't recall ever giving testimony on it.
Q. When you say they weren't looking, what were they doing?
A. Well, that case is where one of them is in the restroom down in the nose while they're moving, which is allowed, so they clearly can't be



keeping one. I've had a couple where, for example, one of the employees -- all the ones I can think of have been the conductor are turned around and getting something out of their grip or their bag or doing something else related to -- even their paperwork when -- when the collision occurs.
Q. Have you ever had a case where your opinion was you guys, or girls, should have -- should have seen this thing down the track? I know y'all claim that y'all didn't see it but we think you should have seen it, have you ever had an opinion like that?
A. Not that I can recall, no.
Q. Have you ever given any testimony that an employee should have seen something down the track 800 feet or more distance away?
A. I don't know about the should have. But in terms of could have physically, just from having, for example, done a reconstruction, I imagine that I have, yes.
Q. Have you given opinions that employees could have seen something as far as 4,000 feet away?
A. I think depending on what it is that -- I don't recall that opinion specifically. But I think depending on what you're looking for and what

Page 10

you're trying to resolve and the physical characteristics of the scene it's possible.
Q. Okay. As you sit here you can't recall a case where you've done that?
A. No.
Q. Okay. You're not offering any human factors opinions, are you?
A. No, I don't hold myself as a human factors expert per se.
Q. Have you ever received any formal education in the field of human factors?
A. Not as I would describe it -- what that means to be a human factors expert, no.
Q. Are you familiar with the literature related to perception or reaction time?
A. I am with some of it, yes.
Q. Is there any certain literature that you rely on?
A. As I sit here, no, because I wasn't offering those opinions. But I've seen studies that talk about -- whether it's from motor vehicle operators or in a few cases rail equipment operators of various types and studies around -- around perception or reaction time.
Q. You're not offering opinions as to how

Page 11

these employees reacted to the AIPC locomotive that was fouled on the main line?
A. In terms of, like, calculating or saying their perception reaction time was X number of seconds, no, I'm not. I'm offering opinions from the railroad operation perspective and from the inward facing locomotive video that we have about when they reacted because I can see that and that's something I relate to as an operating manager and as an engineer myself. But I'm not offering a human factors opinion to say their perception or reaction time was X number of seconds.
Q. You're not offering the opinion that they could or could not have reacted sooner, are you?
A. Well, I mean, the way you phrase that, you know, could have in terms of are there site lines -- if you just ask can someone see to an object. I didn't calculate that but that could be determined based on just the geometry of the -- and the characteristics of the specific location. But in terms of was there any requirement to or do I think they should have, in my opinion, no, they reacted when they reacted based on the information that they had in real-time.

Page 12

Q. Okay. We'll get into that a little bit more but I just want to make sure I'm clear. As we sit here today there's no literature in the field of perception, reaction, human factors that you're -- that you're citing as a part of your opinions?
A. Correct.
Q. Okay. And you've done no actual calculation, you know, taking measurements, things like that as it relates to perception; right?
A. I would disagree only because, again, from my review of the locomotive video my -- my opinion is that the crew was reacting to the proximity of the track of the AIPC derailed movement approximately nine seconds prior. Something in terms of saying what that is in terms of time or distance to impact I can calculate that, but I'm not doing anything beyond that.
Q. Okay. So as to things like perception what -- what they perceived in the cab, what they saw, visibility, whether or not they were paying attention or not, whether they were distracted or not, how they reacted, any opinions you have on that would be based on the video?
MR. WRAY: Object to form.
THE WITNESS: The video and their

Page 13

testimony but predominantly the video because I can see what they're doing -- and, I'm sorry, let me just add in the event recorder data, too, because that backs up and shows me in detail what the engineer was actually commanding the locomotives to do.
BY MR. RADECK:
Q. Okay. So other than the event recorder, the testimony of the engineer and the conductor and the video itself, what else are you basing any of your opinions on as it regards to the behavior actions of the Norfolk Southern crew?
MR. WRAY: Object to the form.
THE WITNESS: I would say in terms of -- for discovery that would be it. But I'm also basing that on my experience as an engineer and conductor and someone who trains and certifies them as well. But in terms of the provided evidence, that -- that covers it.
BY MR. RADECK:
Q. Well, your opinion is that they kept a proper lookout; right?
A. Correct.
Q. And that's based on your experience?
A. Part of it because I know --

Page 14

MR. WRAY: Object to the form.
THE WITNESS: I apologize, Mr. Wray. It is, but part of my experience is -- is supervising and riding with train crews. So when I can see what this train crew was doing physically in the cab and how the train is being operated, in my opinion when I put all that together is that they're keeping a proper lookout.
BY MR. RADECK:
Q. Your experience and the video and the data recorder. Anything else as far as how they're reacting to this incident?
A. Well, I think I already said it would include their testimony as well.
Q. Okay. Any courses, education, training on how to estimate perception or reaction time?
A. No.
Q. Did you perform any calculations on stopping distance in this case?
A. I did not, no.
Q. You've done that in other cases; right?
A. I have.
Q. Were you asked to do that in this case or were you just not asked to do that?
A. I wasn't asked to, but I wasn't not to either.

Page 15

Q. Okay. Is there a reason why you didn't do it in this case?
A. Because I knew based on the way the collision developed and my review of the video, I knew without even calculating the train wasn't going to stop prior to the collision.
Q. Well, I mean, in a case like this where you have a collision, don't you think it's important to -- if you've done it in other cases to try to calculate what distance they could have stopped at? Particularly when you said in your opinion that you've assessed based on the video that they reacted around the nine second mark, don't you think that's important to do?
MR. WRAY: Object to the form.
THE WITNESS: No, because within that distance, which is less than 500 feet, I already knew from my experience, both running a lot of trains and calculating and determining stop distances in a myriad of ways, that the train wasn't going to stop prior to the collision.
BY MR. RADECK:
Q. Have you ever had cases where you've assessed stopping distance not only to determine whether or not an accident can be avoided but also to determine whether the extent of the impact could have been mitigated? Have you ever done that?

Page 16

A. I wouldn't say that I'm ever calculating to look at the extent of the impact. I guess you're talking about with respect to the equipment, the people? What's your question?
Q. Well, my question is -- I mean, there's -- I don't think it takes an expert to know that there's probably a difference between the collision happening at, I don't know, 40 miles an hour and ten miles per hour.
So I guess my question is have you ever had a situation or a case where you've -- maybe your opinion is that the accident could not have been avoided all together, but you still want to calculate stopping distance to determine the speed at which the impact would have happened at?
MR. WRAY: Object to the form.
BY MR. RADECK:
Q. Have you ever made that type of a calculation?
A. Well, I know I have just in the fact I have determined whether, through event recorder analysis or simulation analysis or simply testing, in some cases what stopping distance would be so that tells me that. If someone then says if the train has traveled X number of feet in a service or emergency stop what is the speed of impact I know I've done that before.

Page 17

Q. You just haven't done it in this case?
A. Correct.
Q. Do you disagree with the stopping distances of Allen Powers?
A. Well, his methodology isn't -- isn't appropriate. I mean, the numbers for -- that he has for, you know, if the speed is a certain speed versus the collision speed, you know, what's the kinetic energy, that's all -- that was all correct just because it's math.
But he uses a constant deceleration rate for the stops which is not the -- not the way the trains brake. There's a -- well, it's not appropriate. There's a nonlinear component as the brakes apply and build up brakes under pressure. The way he did it, again, I understand the math but it's not quite appropriate. The actual stop would be -- would be longer.
Q. Well, I mean, how would -- how would you calculate it in this case if you were asked to do

Page 18

that? What's the proper -- if he's using a constant decelerate, how do you get the correct rate?
A. Well, it's just a more complex equation that takes into account, you know, actual trained weights of both the loaded train and the empty train, the grade that you're on. And then there's a time component -- I'm sorry, there's a distance component when the brake application is both propagating through the train and then as the brake pressure builds up that the speed is not materially reduced. So you go for a certain time at a -- essentially at the initial speed and then you start to see the substantive braking.
So, you know, you can calculate it that way, we can simulate it -- there's multiple ways to approach it if I wanted to know what the actual number was.
Q. When you say simulate it how would you -- how would you know the propagation rate I believe you called it in this case, how would you get that?
A. Well, it's just based on the way air propagates in the brake pipe in an emergency or service, but in this case emergency braking and the length of the train.

Page 19

Q. Okay. So where -- where is that -- is there a standard? I mean, when you have service application the air propagates slower than an emergency situation; right?
A. Right.
Q. The emergency situation basically -- it's almost like full board opens up, it propagates faster. That's the point; right?
A. Well, that --
MR. WRAY: Object to form.
THE WITNESS: It's faster but, I mean, you're limited by the way air moves in the -- in the brake line.
BY MR. RADECK:
Q. So how do I -- how do I get those -- is there, like, an average propagation rate for, say, a full service brake application versus an emergency application that's out there?
A. There is. Full service anywhere from 550 to 600 feet per second and emergency is about 930 feet per second.
Q. Okay.
A. I mean, they're just -- there's standard air brake railroad texts that have it.
Q. I mean, if my expert decided to use

Page 20

those numbers and do calculations would that be a reasonable way to do it?
A. Well, the calculations aren't just put out in any book that I'm aware of, but those of us who do this for a long time know what they are.
Q. Okay. Do we have records that indicate the weight -- the total weight of the consist involved?
A. We do.
Q. Okay. Is that in your report anywhere?
A. It is. I mean, I talk about you take the weight of the cars plus the weight of the locomotives. That was in there.
Q. Okay. Is the actual number in your report? If not, that's okay. I just didn't know if it was actually in there and if you can point me to it.
A. I don't know if my report I say what the locomotive weights are. But I know I have the number of cars in the consist and the trailing tonnage, the weight of the cars. If you're doing the whole calculation you would have the total weight of the train including the locomotives, you have the tare -- empty weight of the cars because that makes a difference in how it brakes. You know,

Page 21

you have to know about the propagation time, brake cylinder buildup time. You have to know -- or go to the tables that give you the numbers or friction for braking rate -- friction of the brake shoes, braking ratio. It's just not a one simple here's one number formula for a freight train.
Q. Okay. But you can't -- I mean, you haven't done the calculations so you can't testify in this case, as you sit here today, that this train would not have stopped, can you?
MR. WRAY: Object to form.
THE WITNESS: Sure I can, because even from the distance -- the roughly nine seconds away we're already inside what Powers calculates for stopping distance even though I know it's short based on his methodology. The train wasn't going to stop from the point that they even -- they, being the crew starts reacting.
BY MR. RADECK:
Q. I'm talking about further back. Let's just -- for the sake of argument, I know you disagree, but let's just say a jury believes they should have seen this a thousand feet away or more. You can't -- you can't say based on those numbers, as we sit here today, whether or not the train would

Page 22

have stopped, can you?
MR. WRAY: Object to form.
THE WITNESS: That's correct only because I didn't make a specific calculation so I don't have the final stopping distance number as an opinion.
BY MR. RADECK:
Q. Have your stopping distance opinions ever been excluded before in a court that you're aware of?
A. Not that I'm aware of.
Q. Have your opinions on keeping a proper lookout or not, have those ever been excluded before?
A. Not that I'm aware of.
Q. Have you ever been -- have you ever had a Daubert challenge where you've been partially or fully restricted to give testimony in the field of human factors?
A. I think I had one Federal Court case early in my career out in New Mexico where the answer is yes, but it was -- I already testified I didn't have human factors opinions. But there was still a challenge on that and, like, road construction and several things. I didn't have

Page 23

opinions to be excluded, but there's an order out there that says it.
Q. Have you ever had a case in South Carolina where your opinions are based on the testimony of the event data recorder and the video of the accident I think that people kept a proper lookout? Have you ever had a court exclude you from offering those kind of opinions?
A. Not that I'm aware of.
Q. Okay. Have you ever had a case in South Carolina where you've been qualified to testify as to proper lookout?
A. I believe I had a couple of grade crossing cases early in my career in South Carolina, but I couldn't tell you where -- when or where.
Q. How many times have you been retained by Gallivan White & Boyd?
A. Actually, I don't know as I sit here. I mean, I have worked for them but I don't know the number.
Q. Is it in dozens, hundreds? I mean, I...
A. I'd say it's five to ten at the most.
Q. Have you ever testified for Norfolk Southern at trial in South Carolina?
A. I don't recall Norfolk Southern in South

Page 24

Carolina.
MR. RADECK: Just a quick housekeeping thing to change up the pace. Let me mark what I believe to be all your invoices in this case, Exhibits 1A and B. You can do ESi as 1A.
(EXHIBIT 1A, ESi Invoices, was marked for identification.)
(EXHIBIT 1B, Secretariat Invoices, was marked for identification.)
BY MR. RADECK:
Q. So, Foster, those are the invoices I received from your attorneys. Feel free to look through them. Is that the total of the work you've billed so far to date?
A. (Reading.) I recognize this Secretariat only because they're more recent, but it looks like that could be the total just from what I have a recall on. And I guess, to be clear, it's for the two related matters.
Q. And you and -- you and Dustin Bell are on those invoices because y'all both worked together at ESi and now you're both at Secretariat?
A. Correct.
Q. Did y'all go over together at the same time?

Page 25

A. We did not.
Q. Did he come after you or before you?
A. Dustin went after me.
Q. How often do y'all work together on reports like in this case where y'all kind of issued a joint report?
A. I mean, there's no set rate but when the case calls for it we've done it probably five, ten times at this point.
Q. And how does it work with the report itself? Are y'all both filling out, like, a shared document and filling in what you -- what each aspect of the case that y'all are opining about?
A. Generally, yes. There's only one report and so we both work in the same one.
Q. Okay. And he's -- his lane that he told me he was testifying about, I was asking him about, was the derails; right?
A. I would say it's a little wider. It's the engineering of the track component as opposed to the operational end.
Q. And you're not offering opinions as to the track components; is that right?
A. I am not in this case, that's correct.
Q. Okay. A few more general questions.

Page 26

What train regulations, if any, apply to AIPC?
A. You said what train regulations?
Q. Correct.
MR. WRAY: Object to form. Go ahead.
THE WITNESS: AIPC, in my opinion and it's in my report, is a -- we consider a plant railroad by the Federal Railroad Administration. So, in general, the FRA regulations do not apply to the plant although FRA, with any rail operation of any sort in this country, can -- can exercise its regulatory authority. But, just in general, the FRA regulations do not apply to AIPC.
BY MR. RADECK:
Q. Yeah. AIPC is not held to the same railroad safety standards as Norfolk Southern; correct?
A. Correct, because Norfolk Southern is regulated by the FRA.
Q. And it would follow that Rightmier and Small, the engineer and conductor in this case, should be held to a higher standard in terms of train operation than the AIPC employee Rico Blanchett; is that fair?
MR. WRAY: Object to form.
THE WITNESS: No, I would say they're

Page 27

held to a different one. They have rules that are in place by Norfolk Southern that comply with the Federally mandated or the FRA regulations and they are certified as engineers and conductors under the FRA regulations by Norfolk Southern. They're doing different things because they operate on main tracks with longer trains and higher speeds than anyone at AIPC ever would, so they're doing different things. But I wouldn't say potentially a higher standard. It's a different standard.
BY MR. RADECK:
Q. Do you -- I mean, do you not think that Rightmier and Small were more qualified in train operations than Mr. Blanchett?
MR. WRAY: Object to form.
THE WITNESS: In a global sense, yes, because they -- they have far more territory over which to operate and far different types of trains to operate. Frankly, Blanchett doesn't operate a train, period. He makes switching movements. So Small and Rightmier have to be trained and qualified to do things well beyond -- AIPC physically doesn't have the capability to do much of what Norfolk Southern does.
BY MR. RADECK:

Page 28

Q. So switching movements are distinct from train operations?
MR. WRAY: Object to form.
BY MR. RADECK:
Q. Is that what you just said?
A. From a regulatory standpoint, yes. They're covered by different regulations.
Q. That leads to my next question. What standard or what regulation are you using as part of your criticisms of Mr. Blanchett in this case?
A. I wasn't. I mean, I state in my report that the FRA regulations didn't apply to -- to their movements.
Q. Okay. You're -- you're critical of Mr. Blanchett's actions; right?
A. Sure. Based on the way that he was trained by AIPC and Mr. Marshall.
Q. Okay. My question is what -- are you critical of him just based on Foster Peterson's standard and your experience, or is there some other standard regulation, industry standard that you're citing to?
A. Well, it's not just my experience. It's Mr. Blanchett and AIPC's corporate testimony, Mr. -- I'm sorry, I think I said Blanchett. Mr. Marshall's

Page 29

testimony as the 30(b)(6) witness for AIPC because Mr. Blanchett, even by AIPC's own testimony, failed to do a number of things that he was trained to do by the industry. So Mr. Blanchett wasn't complying with his own employer's obligations. That doesn't mean he violated an FRA regulation because he wasn't governed by them.
Q. Yeah. So my question is, you know, Mr. Marshall testified to all the training and things that he did and then Rico said, yeah, I was trained to do those things, I just didn't do them; right? That was essentially his testimony?
MR. WRAY: Object to form.
THE WITNESS: Essentially. I mean, he clearly failed to do them, yes.
BY MR. RADECK:
Q. So, again, your criticisms of Blanchett that he failed to do these things is based on what? What's your -- what's the standard that you're judging him against?
MR. WRAY: Object to form.
THE WITNESS: AIPC's own training and own policies, which both he and Mr. Marshall, as the corporate representative, agreed he violated.
BY MR. RADECK:

Page 30

Q. Okay. All right.
A. And -- but I would add also just general rail industry operation, not regulated railroad. Just general operation, you know, not using the air, not protecting the shoving movement in the proper spot causing derailment and failure to report I would say are also general -- those things all violate general rail industry operations that I've seen all over North America.
Q. Okay. That's all I'm trying to figure out. So you're critical of Blanchett's actions because he violated AIPC's policies, and then you're critical of him because of some general industry standard? That's what I'm trying to figure out. What's the standard?
MR. WRAY: Object to form. Go ahead.
THE WITNESS: Causing derailment and failing to report it, in my opinion, is something that -- that shouldn't be accepted in any industry.
BY MR. RADECK:
Q. And that's your -- again, that's the Foster Peterson standard; right? That's what I'm trying to figure out. It's based on your experience, you're saying this is why I think it's wrong, or is there an actual written standard in the

Page 31

railroad industry that you're judging him against? That's all I'm asking.
MR. WRAY: Object to form.
THE WITNESS: The written standard procedures would come from AIPC and agreed to by both Blanchett and Marshall. There's not a -- there is no specific generic railroad standard that floats out there.
BY MR. RADECK:
Q. And --
MR. WRAY: Are you finished?
THE WITNESS: Yeah.
MR. WRAY: Okay.
BY MR. RADECK:
Q. And Marshall testified he trained him to not ride on the railroad movement but that's what Blanchett did; right?
A. Correct.
Q. Did Marshall testify that he walked him through and knew how to apply the air brakes but Blanchett, in your opinion, he didn't fully apply -- set the air brakes; right?
A. Correct. He didn't fully open that angle cock on the locomotive so the air was not properly either charged or controlled by the

Page 32

locomotive.
Q. Okay. Do you have evidence of what the angle cock was before the derailment and collision with the NS train?
A. No, but we have -- what we have is the photograph after -- so in terms of documentation or photo from before, no.
Q. Okay.
A. But we also had Mr. Blanchett's testimony that he didn't have the air cut in correctly.
Q. Could the collision have affected the angle of the cock there to the air?
MR. WRAY: Object to form.
THE WITNESS: In my opinion, based on the --
MR. RADECK: How is that an objectionable question?
MR. WRAY: Because you asked him if it could have. That calls for speculation, John.
MR. RADECK: He's an expert.
MR. WRAY: I don't care. You still can't ask --
MR. RADECK: It's just -- it's improper.
MR. WRAY: It's completely proper. You

Page 33

asked for a question that calls for speculation. I didn't tell him not to answer it, but I objected to the form because your form was improper.
MR. RADECK: Could --
MR. WRAY: Hold on -- hold on. There was a question that he was responding to before you interjected. Go ahead.
THE WITNESS: Now I forgot exactly how it was phrased. Can you rephrase or read it back?
BY MR. RADECK:
Q. I'm happy to try again. If he wants to object, it's not the same question.
My question is could -- I'll say this. Based on your experience could -- could the collision itself have affected the angle of the cock for the air brakes?
MR. WRAY: Object to form.
THE WITNESS: In my experience with the way the single cocks operate, no.
BY MR. RADECK:
Q. Okay. And you read the testimony where AIPC's policies and the testimony of Mr. Marshall and how he -- what he expressly told Rico Blanchett in the training was that if there was any kind of problem he should to let him know but, obviously,

Page 34

Rico did not do that; right?
A. That's pretty clear from the evidence, yes.
Q. Okay. So I just want to make sure I'm clear. Your testimony is critical of Mr. Blanchett, it's not critical of AIPC; correct?
MR. WRAY: Object to form.
THE WITNESS: I feel like that's calling for a legal opinion because Mr. Blanchett is AIPC's employee so I don't -- I don't know how to answer that from a legal perspective.
The person who caused the actual derailment that led to the collision was Mr. Blanchett physically based on his action. I mean, that's what I know from the testimony.
BY MR. RADECK:
Q. Okay. I'm just trying to figure out -- I don't think it's in your report but I just want to make sure I was clear that you weren't going to be going into trial and testifying that AIPC's policies were ineffective or that they didn't properly train Mr. Blanchett. I'm trying to figure that out. Do you have those opinions?
A. (Reading.) No. My opinion, Conclusion Number 6 on Page 43 of my report, supplemental

Page 35

report, is that: AIPC failed to adequately and supervise operator Blanchett.
To me, the fact that you have an employee who is clearly not following the procedures that you supposedly have trained him on means that there's inadequate supervision.
Q. Okay. So your opinion, AIPC failed to adequately train and supervise operator Blanchett, is that based on just the effect of -- based on Mr. Blanchett's actions itself?
A. I would say yes. Demonstrable action that led to the derailment.
Q. Anything else?
A. No, I think that's it.
Q. Now, on -- I think the report talks about how your opinion is that the AIPC locomotive was under power when it went through the derailment, the derailer?
A. Yes.
Q. And how do you know that?
A. That was based on -- I think it's Exhibit 16 to Justin Brooks' deposition which is the letter from -- or it's a combination of a few things, but the letter from Mr. Brooks to the FRA and based on Norfolk Southern's, you know, the

Page 36

hands-on investigation after the derailment -- I'm sorry, after the collision was that the power axles were still generating tractive effort. So that was based on -- based on Norfolk Southern's investigation.
Q. Do you know the speed in which the AIPC locomotive traveled through the derail?
A. No, we don't, because I'm not aware that there was any kind of event recording device on that locomotive.
Q. Are you aware of how much tractive effort was being applied?
A. No. Again, there was no event recorder so we don't know -- no way to say that objectively.
Q. And do you know how long the tractive effort was applied as it went through the derail?
A. No. Again, without the event recorder data we don't know that.
Q. Once it -- once the AIPC locomotive traveled past the point of derailment have you done any calculations or analysis to determine what -- what happened to the train, why it ended up in the foul of the main line?
MR. WRAY: Object to form.
THE WITNESS: No, no kind of

Page 37

calculations. I mean, we have the photographic evidence that shows where it ended up, but I didn't attempt to calculate anything beyond that.
BY MR. RADECK:
Q. Okay. So are you just -- are you assuming that it was because -- have you made a determination of why despite going through the derail the train still ended in -- up in the foul?
A. Well, it's because physically, ultimately, the forward motion of the movement and my opinion the combination of the locomotive still being in power and creating tractive effort and the weight of the cars behind it caused the -- caused -- continued not to stop -- stop and it continued, you know, over an engine length and past the actual point of the derail.
Q. Okay. But you're assuming -- you're assuming that the tractive effort that was being applied, which you don't know, and you're assuming that the weight of the AIPC consist was combined was enough to get to the point of foul?
A. Yes. That's my opinion exactly what happened when you look at the physical evidence.
Q. What physical evidence?
A. We have photos showing the lead

Page 38

locomotive was completely off the derail points and the first axle of the first car is also past it. So we know -- we know how far the entire movement went past the -- not only the switch points but where it comes off the derail rail itself.
Q. You're talking about --
A. I mean, I could -- I could --
Q. -- the marks on the ties and things like that?
A. I'm looking more for -- looking at Page 5 of my report of Exhibit -- or Figure 4. That's the first car behind the locomotive and there's -- that lead axle is off the left-hand derail point of the switch point derail. So that tells me exactly how far that it went.
Q. You're talking about this picture taken at the point of rest -- final point of rest?
A. Right. And that would have been how Mr. Blanchett left it.
Q. Right. I understand we have -- we have where it ended up and we have -- obviously we can go back and look at the point of derail based on the end of the curved rail; right, lead curved rail?
A. Right. It's right in that photograph.
Q. The point of derailment. And so that's

Page 39

my point, though, as far as how we get from Point A to Point B. There's -- I'm just trying to figure out if you've done those calculations or anything like that to figure out how it happened, how it -- how it didn't go more left, how it continued to keep going more straight and things like that. You haven't made that analysis?
MR. WRAY: Object to form.
THE WITNESS: Well, it didn't go straight. It did go left away from the main line but the momentum from -- again, my opinion being in power-generated tractive effort and the fact that you have six loaded cars that are not being braked due to the failure to condition the brakes properly caused the movement ultimately to go that far longitudinally past the point of derailment. So an entire locomotive length and then to the first axle of the first car.
BY MR. RADECK:
Q. Did you -- did you look at to whether or not the construction or location of the derail had anything to do with how the train ended up in the foul?
A. Just from a high level perspective. That's back to the engineering side of things is

Page 40

more Mr. Bell than the derail construction. But, in general, just from doing derailment analysis in an investigation it's because the -- there was enough power to continue the locomotives past the derailed locomotive -- excuse me, past the derail point and continue on to two more lengths effectively parallel to the track and then getting to that -- in that point. But the derail -- the derail itself is a normal double point switch derail.
Q. So Figure 4, is that what you're -- is that what you're still looking at there?
A. Yes.
Q. Okay. That -- that point of derailment with the little arrow pointing to it, that's the end of the outside curve -- lead curved rail; right?
A. Correct. And you can see the lead axle is off that -- that -- that left-hand derail point.
Q. And that's the point of derailment?
A. Well, the point of derailment is ultimately where the wheels leave the -- the derail rails. So that's where it leaves the left-hand derail point.
Q. If it leaves the -- I'm sorry, did I cut you off?
A. Yeah. That's the point of derailment on

Page 41

that rail because it's -- I mean, that's where it left it's normal contact with the wheel -- or the wheels left its normal contact with the rail at that point.
Q. And the point of derailment on the inside curved rails is further back because it's shorter; right?
A. Well, it's a little bit shorter on that right handrail, yes.
Q. Okay. When -- kind of shifting gears a little bit to -- I want to go back to the proper lookout kind of bucket of opinions; all right? Just to get your mind in that space. Did you ever review any of Mr. Small or Mr. Rightmier's employment records?
A. I'm sorry.
Q. To be honest, I didn't see them in your list of records but you can let me know.
A. I'm going to have to look, give me a moment. (Reading.) Looks like I did have at least the -- like a rules testing file or some personnel information for Rightmier. I don't see for Small.
Q. Personal information for Small? Is that what you...
A. I don't -- I see it for Rightmier. For

Page 42

me at least it was called Rightmier's -- Rightmier Rules Testing - PR, so I think it was personnel file. It's got a bunch of rules tests and that kind of information for Mr. Rightmier.
Q. Okay. Did you -- would it be important to look at Rightmier's and Small's employment and training records to determine whether or not they were properly trained to keep a lookout?
A. Not in particular, no. I mean, I've got testimony that they were certified. And I know from both my own experience but also Norfolk Southern in the way that they perform locomotive engineer/conductor certification under 49 CFR Parts 240 and 242 that that means that they're trained in accordance with the Federal regulations and the FRA-approved program. So that, in and of itself, means that they're trained.
Q. Okay. So just so I'm clear, as we sit here today you had not gone through and looked at their training and employment records for the purpose of determining whether or not they were qualified to keep a proper lookout?
A. Correct only to the extent that I didn't go through and look, for example, at particular rules classes or all the materials that go with each

Page 43

one. But I know they were -- but I know that they were certified under the FRA regulations and that, in my opinion, means that you're trained to keep a lookout because you're trained and qualified on the entire operating rules.
Q. Okay. So, I mean, have you had other cases where someone's been certified but you still had the opinion that they weren't properly trained?
A. Not that I recall.
Q. That's not a common -- that's not a common opinion of yours in cases where the employee is suing the railroad is that -- well, you're certified but we don't think that you're properly trained or that you're following a train or anything like that?
MR. WRAY: Object to form.
THE WITNESS: Well, those are two entirely different things. To say that you're not following, which Mr. Blanchett didn't follow AIPC's internal instructions. Yet, you can have people who failed to follow or comply with the various rules, but that doesn't mean they weren't trained.
BY MR. RADECK:
Q. I guess leading into my point, though, is that because you haven't assessed their training

Page 44

in detail you can't say whether or not they complied with their training; is that fair?
MR. WRAY: Object to form.
THE WITNESS: No. Seeing 800-something pages of rules tests and operational tests for Rightmier, for example, tells me that he was -- I know because I've taken the same -- or been tested on those same operating rules during that same timeline. I know that's one of the things that gets covered is being alert and attentive, taking a safe course, what do you do when you're in the cab, duties of conductors, engineers. All those things are not only in the operating rules and in some cases the system time tables and special instructions, but they're also in the testing materials I've personally taken and seen.
BY MR. RADECK:
Q. Okay. But --
A. But, ultimately, I still start from a case where I have the testimony that they were properly certified. I also know that means that if they were certified that means that Norfolk Southern is giving certain training which includes the operating rules to comply with the FRA program -- I'm sorry, the FRA-approved program. So my -- my

Page 45

opinion is that that means it's being covered during their training without having to see the specific, like, class PowerPoint.
Q. Okay. I mean, so just for Small, at least, you're -- based on the fact that he's certified you're assuming he was properly trained?
A. Yes.
Q. Did -- did Rightmier or Small have an obligation to look out for other trains that could be found on the track?
A. The way you ask it, no. In a general sense they have an obligation to both be alert and attentive and keep a lookout, which is predominantly in the direction of movement. They had exclusive occupancy of that track both via a track authority and the PDC, three letters, overlay that they were operating under, so they had no reason to expect there was anything that prevented them from operating at maximum authorized speed on that main track.
Q. But they still have an obligation to look out for things that could be on the track ahead. I mean, that's one of the main reasons why they're inside; right, is to keep a proper lookout?
MR. WRAY: Object to form.

Page 46

BY MR. RADECK:
Q. Agreed?
A. They have that general obligation to look ahead as I just testified to, but they had -- they had no expectation that someone was putting equipment in the foul of their track because they had -- they literally had exclusive occupancy of that track. And I just have to make it clear under -- under the rules and under the underlying FRA regulations.
Q. Are they operating with the expectation that Norfolk Southern's derail was going to protect the main line track?
MR. WRAY: Object to form.
THE WITNESS: I would agree that the crew would have general expectations, not just here but in any location that a derail in general would protect against rail cars or rail movements moving out on the main track. I mean, that's their general purpose.
BY MR. RADECK:
Q. Because, I mean, is your opinion that this -- I mean, I think you just said it. Your opinion is that the fact that AIPC locomotive was fouling the main line was unexpected for them? Is

Page 47

that what you said?
A. Absolutely.
Q. Okay. Is part of the reason is because they expected the Norfolk Southern derail to prevent that from happening?
MR. WRAY: Object to form.
THE WITNESS: I'd say a combination of the derail itself and the -- in this case an industry that's operating a real operation on the tracks adjacent to the main track, yes.
BY MR. RADECK:
Q. Do you agree that -- that Rightmier and Small were required to be alert?
A. And attentive, yes.
Q. They were required to keep a vigilant lookout. You'd agree with that; right?
A. I don't -- hang on, let me look at something. (Reading.)
Q. So --
A. I'm looking at something.
Q. Yeah. I just want to put on the record. So you're looking something up to respond to my last question?
A. Yes.
Q. Okay.

Page 48

A. I just want to see that terminology. Yes, in general part of the lookout is a vigilant lookout for single incident conditions along the track that affect their movement.
Q. And conditions that could affect their movement would certainly include a train fouling the main line; right?
A. It could.
Q. Okay. They're expected to monitor track conditions including the track ahead of them; right?
A. Yes. The train behind them as well in some cases.
Q. Did you review any of the NS operating rules in preparation of your opinions?
A. I did.
Q. Okay.
A. And I'm qualified on them myself, too.
Q. Okay. And there's -- I mean, a lot of the things that we're talking about, a lot is in their operating rules; right?
A. Yes.
Q. Can you look to the crew's actions to determine if they're keeping a proper lookout?
MR. WRAY: Object to form.
THE WITNESS: We can. I think I already

Page 49

testified to that from my view of the inward facing video, so yes.
BY MR. RADECK:
Q. Okay. Do you agree that Rightmier and Small would have a duty to see and react to something if it's within their range of vision whether or not they actually see it or not -- see it or not?
MR. WRAY: Object to form.
THE WITNESS: I don't understand that question.
BY MR. RADECK:
Q. Okay. Let me see if I can rephrase it to make it more understandable. So if we know they're supposed to keep a proper lookout to include monitoring track conditions ahead of them and they're supposed to look out for dangers ahead, all those things we agreed on; right?
A. I don't recall agreeing to dangers ahead terminology. Those conditions that affect movement.
Q. Okay. I didn't mean to add something, I thought I asked you that. Are they required to look out for dangers ahead?
A. I would say it's conditions that can affect the train's movement.

Page 50

Q. Okay. And if there's a condition on the track ahead that could affect the train's movement, if it's determined to be within their range of vision, whether or not they actually see it or not, is it -- it doesn't affect whether or not they actually had a duty to see it; correct?
MR. WRAY: Object to the form.
THE WITNESS: I don't agree with that at all. I mean, you still have to -- just because something is there to be seen, the train crew has to make a determination that it's something that affects the movement, not just that it's there.
BY MR. RADECK:
Q. Okay. And how do they determine whether it's something that affects the movement?
A. By keeping that proper vigilant lookout to make the determination.
Q. How are they -- I mean, how are they trained to distinguish between things that can affect the movement or not?
A. Well, it's going to depend on what the condition is and where it is. But if you see something that's not in the foul of the track, for example, that's likely not a condition that affects movement. But in some cases it might be because,

Page 51

for example, in the case of a potential washout or high water there are times when the train crew may be observing that even though it's not on the track and adjust the operation of the train accordingly.
Both that general condition would also -- approaching bridges and culverts, that sort of thing, that's under the rules. If there's something that's over the track that's clearly not moving that's, obviously, a problem. And short of that it's whether or not something -- whatever that condition is is in a position to potentially affect the safe movement. You have -- in the case of something near the track you have to look at it and make the determination whether it is or not.
Q. And as we sit here today, I mean, what specific training, based on your experience, would Rightmier and Small have received in being able to distinguish between something that could be in the foul or could not be in the foul?
A. There's a substantial amount of training in my experience around what it means to be in the foul, whether it's an individual or a piece of rail equipment and there's rules that go with that. So I would say that's what it is.
Q. Is there a general distance on each side

Page 52

of the actual rails that they're trained to kind of look for as far as say what it is, four feet on each side something like that?
A. The most general number that we use is four feet on either side of the outside rail that relates to a number of other operating rules. So, in general, that's the -- that's the number.
Q. Okay. So in trucking cases, which I'm guessing you don't do, there's stopping distances, there's ways to gauge how to keep a six-second following distance, things like that that are in regulations and there's ways to kind of calculate that.
My question is, is there any kind of similar standard of calculation done in training to help these people realize, hey, here's how you identify if something is in this general four feet rule? Do you see what I'm asking you?
A. No, because calculating a distance for a vehicle moving at higher speeds to be able to stop is something different than physically -- I mean, we're trained, when we first get on the railroad, how to understand what being in the foul just as a person and what that four feet looks like.
Q. Again, what does that mean?

Page 53

A. We train operating crews to estimate distances in various ways, whether it's using a car length which is every 50 feet or to be in the foul of the track, which is within four feet. So we're showing them and then we see that and practice as engineers and conductors routinely. But to say that there needs to be specific training to understand what four feet is for someone who already knows how to estimate to the nearest 50 feet, I don't understand what there would be to train beyond that.
Q. I guess when you're -- my question, though, is when you're riding -- and I appreciate that answer. But my question is when you're riding along with them and training them, I'm guessing there's some ride-along and there's some observation; right? With the person who's training them?
A. Correct. When you're a conductor trainee you have to have a certain number of hours as a trainee with a qualified conductor that includes time in -- on road jobs like this.
Q. Okay.
A. So, yes, some -- I mean, you get used to and you learn to see from the locomotive's perspective, whether you're on the engineer or

Page 54

conductor side, what it looks like to, Number 1, estimate distances in front of you from the locomotive but also, you know, what your overall clearance envelope looks from the side because you're sitting on the side of the locomotive and you can see it.
Q. Do you have an opinion that Rightmier and Small were not properly trained to know how to identify whether something is in the foul or not?
A. I have no opinion that they were not trained, no.
Q. Do y'all ever do anything like -- not on a train but just, like, maybe out on a rail where you stand and you have something put -- just in four feet any kind of visual thing where you have people walk back distances and try to say, okay, this is something that looks at a foul in the distance? Anything like that to try to give someone some visual cues as to, like, this is what it looks like in the foul from 500 feet, this is what it looks like in the foul from 1000 feet? Anything like that?
A. I don't recall having done it at varying distances like that. It's just really more on-the-job training and experience from being in

Page 55

locomotives and going past the railroad's own employees, past, you know, vehicles, past objects -- whether those are temporary ones near the track or permanent ones like bridges and other structures. You're really learning to do it from -- from the cab to see what it looks like. But I've never seen, like, a curriculum like for go certain distances and do that.
Q. And both those guys, Rightmier and Small, they've been working for Norfolk Southern roughly 20 years or more; right?
A. Roughly 20. Small is a little longer than Rightmier, obviously.
Q. Do you have an opinion as to how far an engineer or conductor should be able to see on a clear day with an unobstructed view?
MR. WRAY: Object to form.
THE WITNESS: See -- what, see to something? See and make a determination? I guess what -- I'm not sure I fully understand what your question is asking.
BY MR. RADECK:
Q. Yeah. Well, I guess -- yeah. Is that something -- have you ever testified to that or do you have an opinion as to how far someone inside the

Page 56

train, whether they're an engineer or conductor, should be able to see a track condition ahead of them on a clear day with an unobstructed view?
MR. WRAY: Object to form.
THE WITNESS: I don't recall giving, like, here's my absolute number. It -- it depends in my experience, both as a crew member myself but also as a consultant and probably looking at things, there are times when you're seeing to something that's ahead, you know, substantial -- many thousands of feet. Recognizing, for example, how close it is to the track in my experience you're going to be substantially closer.
So I think ultimately my answer is it's going to depend on what you're trying to resolve and see physically and what you're trying to determine, as in is there just something up ahead versus where it is relative to the track.
BY MR. RADECK:
Q. Do you believe this incident happened on a clear day?
A. It was generally clear, yes, sir.
Q. Do you agree that Rightmier and Small's view was unobstructed?
A. In the forward sense generally. I mean,

Page 57

they're looking out the windshield. If you start looking to the sides or across the cab there's -- there's portions of the locomotive that would restrict it at times. But the general view straight down the track, or the general direction of the train, was -- was not obstructed.
Q. Okay. And I don't need to pull up a Google Earth image but, I mean, this was a pretty straight part of the track; right, coming out of Andrews Yard?
A. Except for the one degree curve that's based at the collision location, yes.
Q. Okay. Do you think that that one degree curve had any impact on their ability to perceive this -- this AIPC train?
MR. WRAY: Object to form.
THE WITNESS: In terms of perceiving its -- its proximity and ultimately the fact that it was in the foul of the main track, I absolutely do.
BY MR. RADECK:
Q. Okay. How so?
A. Because the track in the direction of motion is curving to the right away from the AIPC tracking switch. And so when we're looking out the cab, whether it's in the rail view video images, the

Page 58

video itself, whether it's in the visualization work that Powers did and what I've seen from him so far just contained in his report, the track is essentially straight until you get just before to the AIPC switch.

And so as the track curves away to the right that's where the train is going, so it's not obvious from the cab when you're at a further distance away; where in this case the derailed AIPC locomotive has gone past the derail into the foul is -- actually is relative to the track itself.

And let me make that clear. Where it is relative to the Norfolk Southern main track itself.

Q. Okay. And how did you -- how did you calculate this one percent curve?

A. I didn't calculate it. It's on the track profile.

Q. Okay. Does the track profile indicate -- is that in your report anywhere, the opinion that the one percent curve affects their sight?

A. One degree, just to --

Q. Sorry, one degree.

A. That's okay. No, I don't -- I didn't offer a specific opinion on it. I was just saying

Page 59

in response to your questioning now.

Q. Okay.

A. But the important point -- thing from my end, when being asked questions about this, is this track is not straight at the incident location. There's a curve.

Q. Okay. And how close to the impact location does the curve start? Do you know?

A. (Reading.) I didn't measure specifically, but it's basically -- it's basically bracketing the -- that switch at the end of the east end of the AIPC industry tracks. If you look at Page 4, Figure 3 it's where I was coming from.

Q. Can you show me on here? I just -- talking about this? (Indicating.)

A. Yes. Look at kind of middle of the page there's a -- it's sideways. Go down, down right -- okay. Just to your left a little bit. You have to turn it on its side it says one degree and then I think it says .5, which is the elevation.

Q. Okay.

A. Looking at that block you see how it says curvature alignment and elevation. And so that's 1.00 or a one degree curve, I think that says .5 which would be the super elevation or basically

Page 60

how the outer was banked. So I would say one degree curve with a half-inch super elevation.

Q. Okay. Well, I mean, is the fact that the track is not -- has no curve at all or the fact it has a one degree curve, is that material?

MR. WRAY: Object to form.

THE WITNESS: It is to me because the track isn't straight. When people start saying the track is straight, you should have seen, should have done, should have recognized, the track isn't straight. There's a curve right near the location -- or basically bracketing or around the end of the AIPC siding where that switch is where the collision occurs. And that means when you're looking down the track you're not looking down the track, it's not straight.

You can see that -- you can see it from the video, you can see it from the photos. If you look at the track, you can see it from Powers' animations -- or visualization.

BY MR. RADECK:

Q. Okay. And if you're not looking -- you're saying you're not looking straight, there's a one degree curve. How does that affect -- are you opining that that affects the visual cues of the

Page 61

crew?

MR. WRAY: Object to form.

THE WITNESS: From a practical perspective and from my experience as an operating manager and engineer myself, yes.

BY MR. RADECK:

Q. Okay. Can you cite me any -- any literature, research, any analysis that you've done that support the opinion that the one degree curve in this affected how they could perceive the AIPC train?

A. No. I'm telling you from the objective evidence that we have, from the Powers-created evidence and from my experience as both as an engineer conductor and someone who trains and certifies them, running a whole bunch of trainings in my career.

Q. Okay.

A. Well, just this is before. To make it clear, I wasn't offering human factors opinions. But when you're asking me about straight track and now what is curvature, I'm telling you what it means from the railroad operation's perspective.

Q. Yeah, but that -- no, that's different. That's totally fair if you want to tell me it's not

straight, it's a one degree curve. I get it; okay? We can -- I'm not here to argue whether it's material or not.

My point is if your opinion -- if you have an opinion that you intend to offer in front of a jury that that somehow affects how they can perceive whether this train was in the foul? I think it should be in your report but it's not. Is that -- is that an opinion that you're going to tell this jury?

MR. WRAY: Object to form. Go ahead.

THE WITNESS: You asked me the question and I was responsive. So I would say now if Mr. Wray wanted to ask me at trial I would say yes because that -- you know, that, to me, is yet further indication that they're keeping a proper lookout. It's hard to appreciate where the -- from where that AIPC locomotive is because of how the track is curving away from it. I can tell you that's from my -- you know, as the person in the case who has real railroad experience, that's my operation experience.

BY MR. RADECK:

Q. Did you -- did you determine -- go to -- if we go to Figure 11, which is on Page 17 of your



report.

A. Okay.

Q. You noted that approximately 22 to 23 seconds prior to collision at this time you say the AIPC locomotive and cars were visible but not yet obvious that they have been -- that they run through the derail; is that right?

A. Correct.

Q. Okay. So is that -- and then if you look at Figure 12 you say: Crew recognition of possible fouling.

Do you see that?

A. Yes.

Q. Okay. So is your -- so first as to the Figure 12 image, is your opinion at that point, you know, based on where that nine seconds prior to collision -- you're saying even at that point there's not certainty that it's in the foul?

A. I would say in real-time from a moving train it wasn't certain. We obviously now know in hindsight that it was. But the reason I included Figure 12 at that point in the video where I can see the crew reacting on the inward facing video was consistent with what -- I was watching, obviously, a much larger than we have on the written page here.



The rail view video and also going, oh, that's starting to look like it might actually be in the foul.

That, you know, that -- my independent observation of the forward facing video was -- came up with the same time that the crew in real-time was making the visible reaction that, again, as I've said, there's possible fouling at that point.

Q. If there's possible fouling is -- is the safer course of action to try to brake at that point?

MR. WRAY: Object to form.

THE WITNESS: The safe course of action is to keep that vigilant lookout we talked about, the way the rules call for it. And if you make a determination that in this case the AIPC equipment is in the foul and the collision is imminent then -- then, yes. The response at that point would be braking.

BY MR. RADECK:

Q. Okay. So, in your opinion, the crew's not supposed to apply braking until they're certain that something is in the foul?

A. In -- in general, yes. You don't go off -- making brake applications when you have



exclusive track occupancy unless there's a reason to do so. So once you make a determination that you need to do so, that's when the process would start.

Q. But given the choice between braking and when there's certainty that there's a foul or there's a possible foul, isn't it a safer choice to start applying brake even when there's just a possibility of a foul?

MR. WRAY: Object to form.

THE WITNESS: With no afore knowledge of AIPC's negligence with exclusive track occupancy under the rules, there is no reason just to start braking. The safest way to operate trains is not to change the energy state, frankly, unless there's a reason to but also -- well, unless there's a reason to.

So just saying well, okay, there's something that's up close to the track that, in and of itself, is not causing me to brake. When I make a determination that something is potentially in the foul, then I'm going to brake.

BY MR. RADECK:

Q. So given the choice between a possible foul situation and certainly -- certain -- certainty situation where there is a foul, you don't think

Page 66

it's safer to start reducing speed or braking when there's a possibility of a foul?
MR. WRAY: Object to form. Asked and answered.
THE WITNESS: In this situation, no. Just to start braking without knowledge that you need to is not -- only not normal train operation, but I wouldn't say that it would be increasing safety.
BY MR. RADECK:
Q. Okay. And as to Figure 11, you said it's not yet obvious that they've run through the derail. What's the basis of that opinion?
A. Based on my own personal review of the video, having been at the scene, seen it and also then the crew -- the way the crew reacts, again, without having all the post-incident knowledge that we have.
Q. What do you mean when you were at the scene and saw it or seen it?
A. Just I'm saying having seen the video is consistent with, you know, when I went to the scene I walked down through it just to look in that direction. So I'm familiar with and, my opinion, the video gives me a reasonable example of what it

Page 67

looks like out there.
But it's certainly more based on seeing the video itself where I can -- I can see that there's rail equipment up there but I -- you know, I could not make, in my opinion and on the crew based on their actions, doesn't make a determination until they're closer that it's potentially in the foul.
There -- there are AIPC tracks adjacent to the Norfolk Southern main track for over a mile. Seeing rail equipment on -- on those tracks near the main track is not, in my opinion, unusual and it's certainly not an emergency.
Q. Okay. I mean, you can tell by looking at Figure -- sorry, Figure 11 that the AIPC train is past the grass line there and is into the gravel near the rail; right? Do you need to blow it up? Or I can show you on mine.
A. (Looking at computer.) I've got it. I'll say from that angle it's in -- in the vicinity, but I wouldn't say I know that for certain yet.
Q. Okay.
A. Or where -- or where that is relative to the actual track.
Q. Okay. So -- but your opinion is based on Figure 11 that the screen grab that you took you

Page 68

don't think how that train's position would be unusual to Rightmier or Small?
MR. WRAY: Object to form.
THE WITNESS: In terms of my opinion based on it. Both of their reactions and my review of the evidence I would say that that would not, on its -- that would not, just in that situation, Figure 11, necessarily be perceived as unusual.
BY MR. RADECK:
Q. Even if there's only a one percent chance of something being an obstruction on the track don't you agree that they should -- whoever is operating the train should choose the side of safety and slow the train down?
A. If the crew makes a judgment without all the post-incident knowledge that there's a potential situation then, yes, they are certainly within their rights as engineer and conductor to -- to take those actions.
Q. Okay. So -- okay. Let me back up.
MR. WRAY: Are you finished?
THE WITNESS: I was just -- we've been going an hour and 15. I just need a break, whenever you get to a good break in your question.
BY MR. RADECK:

Page 69

Q. Yeah. Let me finish this last question and we can take a break.
I mean, have you ever had -- I mean, have you ever had situations where there have been obstructions on the track in places you don't expect it to happen?
A. Yes.
Q. Okay. And isn't that within the realm of knowledge and training that these guys are expected to be able to react to?
A. When they have enough information they can make a judgment that there is so. Expecting obstructions like this from the wildly improper operation of the industry railroad when you have, again, this train crew is operating with exclusive track occupancy, with the track authority, positive train control over lane enabled. There's nothing that gives them an expectation that there's any rail movement that's going to be on or foul in their track.
So there is no -- that expectation is not there. The general expectation that something might be close to the track or across the track is what they're watching for, and in my opinion that's what the evidence indicates that they did as they

got closer and can appreciate just how close the AIPC locomotive now was in its derail condition to the NS main track.

Q. So are these railroad guys always supposed to able to react to conditions like at road crossings where they're expecting cars to potentially cross? Is that what you're saying?

MR. WRAY: Object to form.

THE WITNESS: No. But when you say expectation that there's going to be a derailed train from an industry track adjacent under their method of operation, there's not that expectation. There's a general requirement, as we've been over I think in detail now, to keep a vigilant lookout for conditions generally. But to expect a locomotive to be in this condition is -- is not something you'd expect.

BY MR. RADECK:

Q. Yeah. I'm not sure I'm saying that it is something they should expect. What I'm saying is they're supposed to expect the unexpected to some degree. You agree with that; right?

MR. WRAY: Object to form.

THE WITNESS: With the rail operation here I don't expect a rail operator to run through a



derail, foul the main track and then in the case where I have exclusive occupancy to operate over it.

BY MR. RADECK:

Q. Well, these guys -- these guys have been through this area many times before. They testified to that; right?

A. Right. Regular run for both of them.

Q. Okay. And they knew -- they knew that there's industry cars doing -- pushing full movements and industry track near them; right?

A. Right. Industry railroad -- or rail operation doing industry rail things.

Q. Right. And they know that there's an NS -- they testified they knew that there was a Norfolk Southern derail in that spot to protect the main line; right?

A. Sure. I mean, there is on both ends as I recall. They're going past the AIPC tracks for basically the Pineview Road crossing is where the west AIPC switch. They're going past those tracks. We know there's cars on one of those tracks that -- or, actually, being switched and were involved in the derailment before.

So yes, I mean, they're seeing cars on the AIPC tracks, and in this case there's a



locomotive and cars near the east end of the AIPC tracks. And I don't -- in my opinion, that wouldn't have been unusual for them to see. That's where the industry -- industry part of the rail operations occur.

Q. Well, you would agree, though, that the fact that there are other rail cars operating on tracks nearby and that there's derails that are designed to prevent them from going onto the main track, the fact that they're going through an area like that that they know that they're entering, if anything, that should make them keep an even more of a lookout; fair?

MR. WRAY: Object to form.

THE WITNESS: No. I don't -- in my opinion, it doesn't change the lookout.

MR. RADECK: Let's take a little short break.

(A recess transpired.)

BY MR. RADECK:

Q. Foster, I want to just clarify a few things on your report as far as the kind of distances and things. So when looking back at Figure 11 you're talking about -- that is capturing about 22, 23 seconds before. Did you calculate how



many feet back that was from the impact point?

A. That, you know, depending exactly where you're going, that's approximately a thousand feet.

Q. Okay. Was that --

A. I mean, that's consistent with what -- what Allen Powers used.

Q. Okay. Is that why you chose that point, was because that's kind of the number they were using as far as they believed is when they should have reacted?

MR. WRAY: Object to form.

THE WITNESS: No, I was -- I was first. I think that they -- that Powers chose it because that's where -- that wasn't where they reacted either. That was where I'm saying that he --

BY MR. RADECK:

Q. No, I understand.

A. You could see that the AIPC movement was visible, but not necessarily in the foul. But, again, I produced first so I think Powers -- it felt to me like he was adopting that position that he did in some of his visualization work --

Q. May be coincidences. But I guess my -- I'm not trying to put words in your mouth. I'm just trying to figure out to -- okay. So that's about a

Page 74

thousand feet and, you know, obviously my expert says that's when they should have seen it and should have started braking but, obviously, you disagree with that; right?
MR. WRAY: Object to form, but go ahead.
THE WITNESS: Correct. I don't -- I don't -- in my opinion it wasn't obvious that AIPC was fouling at that point. So no -- no requirement to brake at that point.
BY MR. RADECK:
Q. Okay. And, again, the brake -- the requirement to brake is when it's obvious?
A. Well, it's when one or both crew members make a judgment that there is a collision that's imminent. In this case it would be because something is in the foul and then that's the point that that would arise, yes.
Q. Okay. And then so -- so we go from Figure 11 not obvious, we go to Figure 12 to possible fouling, and then we get down to Figure 13 and that's when you're noting that -- you're noting what, this is five to six seconds prior to collision? What are you seeing the guys do here?
A. Well, what I'm noticing is that the conductor, Mr. Rightmier, is now getting out of his

Page 75

seat to get away -- consistent with his testimony, to get away from that side of the locomotive if there ultimately is a collision. And Engineer Small has reached his hand down -- his left hand and he's put it on the automatic brake valve so that's, ultimately, in preparation for being able to brake.
Q. Well, is it your opinion at this point in Figure 13, five to six seconds prior to collision, that it was obvious that it was in the foul?
A. It's still not necessarily obvious but you're -- I mean, you're -- well, this collision is like sometimes we have more often in the yard where it's close enough that it's not obvious that it's in the foul or fouling the track but it's -- it turns out that it is.
On a moving train, again, I wouldn't say it's necessarily crystal clear that it is in the foul but it's certainly -- it's certainly close.
Q. Okay. And then Figure 14 is the point of collision?
A. Approximate point of collision, yes.
Q. Okay. So from any -- any point, if we sort of rewind the tape back from the point of collision, do you have an opinion that they should

Page 76

have braked at any point prior to collision?
A. If they're making a determination that they -- that they thought a collision was imminent then the process of braking is what I would expect after that.
Q. Okay. That's a little different than my question. My question is, in your opinion, do you believe that they should have braked at any point in time prior to impact?
A. Should have still ultimately comes back to the two crew members' judgment as to what they were seeing. Could -- could they have based on the progression that I see? I would say yes, they could have, you know, probably from Figure 13 or thereabouts in. But in my opinion, given that it's 300 feet at the most away at that point it's, in my opinion, not going to make any substantive difference.
Q. Well, the terms could or should is definitely different. I mean, they could have hit the brakes five miles back before Andrews Yard and that wouldn't have made any difference? I'm not trying to be snarky with my question, I'm just trying to figure out -- I think we may have flipped the term so I guess the -- my question is -- let me

Page 77

start with the last thing you said.
Figure 13, you're saying at that point you believe that it would have been appropriate to apply braking or not?
A. If the crew judged at that point that braking was necessary because a collision was imminent, I wouldn't have taken any exception to it.
Q. But are you -- you're not critical of them not applying braking at that point as shown in Figure 13?
A. Not particularly because, in my opinion, based on the overall progression of the video they were going through a process of determining what was going on with the AIPC movement.
Q. What is -- I mean, not particularly, what does that mean? Are you in some way critical, are you not critical at all? What's the criticism there, if any, of their lack of braking at this point?
A. Put that way I don't have any because, again, this crew in realtime, without knowing that the movement had derailed and been left and certainly not notified didn't know that there was going to be a collision. We know it because we're all here and we're investigating it. So I don't

Page 78

have criticism if the crew did not yet make the judgment that the equipment was in the foul and they were going to hit it.
Q. Well, so you're not giving us an objective -- I mean, what it sounds like is you're not giving us an objective opinion of when they should or should not have seen it. You're telling me that based on -- you're relying on their testimony as to what they saw and you're saying it's just up to them because it's what they knew so I'm not going to be critical of them not braking. Is that what you're saying?
MR. WRAY: Object to form.
THE WITNESS: I'm not critical based on -- it's not just what they say. It's what I can see in terms of their reaction and what I can see from the forward facing video in terms of the approach to the ultimate point of collision is that I ultimately don't take exception to their judgment and I don't have, nor do I think anyone else in this case can say, where they should have based on the way a train crew operates.
BY MR. RADECK:
Q. And we know they did not at all apply -- apply any braking prior to impact; is that right?

Page 79

A. Correct. The actual braking was about a second after impact, so that's correct.
Q. Okay. And we know that -- that Small -- I mean, you read his deposition; right?
A. Yes, sir.
Q. When asked about why he didn't brake he said he froze; right?
MR. WRAY: Object to form. Go ahead.
THE WITNESS: Panicked and that he didn't think it would make a difference.
BY MR. RADECK:
Q. Okay. And then we know that the train at the time was on trip optimizer; right?
A. Yes, it was being run on trip optimizer.
Q. Okay. In fact, it was accelerating from the point of leaving Andrews Yard all the way through impact. It continued to accelerate; is that true?
A. Right. Once it started to accelerate, yes. The trip optimizer was trying to pull it back towards track speed.
Q. Right. And my question -- my point is not only did they not brake prior to impact, they didn't even slow down the train. It was actually speeding until the point of impact; correct?

Page 80

A. Correct. It was gradually accelerating out of Andrews.
Q. And there's no evidence that they communicated with each other at all about the impact before it happened; right?
A. They being the two crew members?
Q. Correct.
A. I don't recall -- I think it was Rightmier's testimony that they -- I think there were expletives involved but there was some discussion as they -- as they got closer and certainly as they got out of the scene.
Q. Are you aware of any discussion of -- any kind of back and forth about whether they thought this object was in the foul or not, anything like that? Was there any communication like that?
A. I don't recall any testimony as to specifically having a back and forth, no.
Q. There's no testimony about the obstruction and assessing the risk level of it between the two crew members at all before impact; right?
A. I don't recall either specific questioning or answers in that regard in their testimony.

Page 81

Q. Have you ever testified in a case where you claimed the crew kept a proper lookout where they didn't apply any braking whatsoever?
A. I have, yes.
Q. Can you tell me which one?
A. No. But it's not -- they've been crossing cases and it's ones where the crew is keeping a lookout. But when they're able to or when they determine that the vehicle is approaching -- or I probably had a pedestrian one like that one, too. By the time they then react by getting the brakes on, the point of impact has occurred.
In other words, the visibility of the crew for the vehicle is close enough in time to the crossing that they simply don't have time to -- to react.
Q. That sounds like that's different than what we have here. This object -- let me ask -- let me restate that.
What we have here is we know that the obstruction in the track that AIPC locomotive -- it didn't happen moments before impact; right?
A. Correct.
Q. It had been there for how long, roughly?
A. A little over an hour if you believe

Page 82

Blanchett's testimony.
Q. Okay. What's the other testimony? Thirty, 45 minutes?
A. Well, Blanchett says 6:15 a.m. is when he did it and got back to the -- I don't know if I'm off on my times. (Reading.) Yeah, Blanchett had said about 6:15 but it was actually closer to two hours, because the clock on the rail view is an hour different.
Q. So this, again, this isn't a situation where something's getting in front of them and they're just not having time to react. There's a question of whether or not they should or should not have seen the obstruction that was definitely there well before they got to that point; right?
MR. WRAY: Object to form.
THE WITNESS: The AIPC locomotive cars were not moving and had been in position for some time. So I had been responsive to your last question which -- about reacting. That happened to be a situation where there was a vehicle that was moving. This is not a crossing accident, not a grade crossing, and this is not a -- in this case only the train -- the Norfolk Southern train is moving.

Page 83

BY MR. RADECK:
Q. Okay.
A. Different -- different collision scenarios.
Q. And I was clumsily trying to get there, but my point was this situation is different than the one you just told me about where you testified that they were keeping a proper lookout but did not apply brakes at all?
A. Well, it's a different type of collision but it still was a train versus another vehicle collision.
Q. You've testified -- I think I asked you this before but let me ask it in a little bit finer point.
You testified in a case where you had the opinion that a crew had views of an obstruction up to 4,500 feet away; true?
MR. WRAY: Object to form.
THE WITNESS: I don't recall being anything quite that long but I would say at least in the 3, 4,000 range. But I don't -- I don't recall specifics as I sit here.
BY MR. RADECK:
Q. You don't remember the Robertson --

Page 84

Robertson versus Union Pacific in 2017?
A. I don't.
Q. If your testimony is that you testified that the crew members could see an obstruction 4,500 feet away, any reason to dispute that as we sit here today?
A. I have to go back to the specific case and see what kind of obstruction we're talking about. But I just don't recall the testimony or the case as we sit here.
Q. Let me ask you a little bit more about the process for braking. Let's assume for the purposes of my question that Rightmier and Small did notice -- or, you know, did notice the AIPC locomotive was in the foul from a thousand feet away. What would their -- what would their steps be? What would the process be in reacting to that?
MR. WRAY: Object to form.
THE WITNESS: So just to clarify, you mean if -- if the crew sees the AIPC movement and makes a determination that it's in the foul?
BY MR. RADECK:
Q. Correct.
A. If that judgment is made, then the -- really, the most efficient way to stop the train is

Page 85

for the engineer just to make an emergency application of the train's automatic brakes. So it would mean he moves his hand down, as we see in Figure 13, to the automatic brake valve and you rotate that all the way to the right or to the front of the locomotive and that causes the emergency brake application. So if you wanted to stop an emergency, that's the -- that's the fastest way to do it.
Q. Well, I mean, would you sound the horn first at all?
A. In the case of a rail movement in the track they might but I -- again, the predicate or the -- sorry. The basis for that response was you determine that it's in the foul so at that point I want to stop. That's different from a typical motor vehicle or pedestrian being near the track, in that case you would blow the horn.
But in this case if you've already made the judgment that, in your opinion, that movement is in the foul then the first thing I would do in that case is brake.
Q. Okay. And is that -- is that because they would understand that -- I mean, the train, they can't decide they're just going to try to back

Page 86

it up real fast, unlike a car or person they can maybe react to the horn. Is that what you're getting at in this situation, to know there would be no reaction to a horn? Is that -- is that the distinction there?
A. Or from that close that there's -- they're unlikely to have much of a response. Again, you've already made the judgment you think you're going to collide. I mean, another rail movement isn't going to move very quickly. That's actually different than a highway rail grade crossing where there's a motor vehicle or pedestrian crossing at the place where you expect them to cross and if they haven't otherwise noticed your approach to the train, blowing the horn is a reaction in that case to have the motor vehicle or person exit the crossing.
Q. All right. Well, let me just -- all right. So we know in this case they never -- I just want to make sure I'm clear. They never did sound the horn prior to impact; right?
A. Let me confirm that, but that's my recollection.
Q. And they never -- there's no --
A. No, no, no.

Page 87

MR. WRAY: Hang on.
THE WITNESS: No, no.
MR. RADECK: Give me a second. I was going to let him -- he stopped.
THE WITNESS: (Reading.) Well, the horn -- pardon me. The horn in this case is basically coming on potentially at the time of collision, not prior.
BY MR. RADECK:
Q. Okay. So we know they didn't sound the horn prior to the collision in reaction to the AIPC train being in the track; right?
A. Correct. It's essentially at the collision, instead of prior.
Q. And they didn't -- we obviously know they didn't reduce the throttle at all prior to collision; right?
A. Correct. I mean, the throttle was just in -- was -- yeah, they did not. Still in trip optimizer.
Q. And they did not initiate any type of normal braking, like I think we talked about full service braking. They didn't do that; right?
A. Just to be clear, not necessarily full service. Service braking is -- is non-emergency

Page 88

braking. Full service is the maximum amount of service braking.
Q. They didn't do any level of service braking; right?
A. That's correct.
Q. And, obviously, we know they didn't do any emergency braking either; right?
A. Correct.
Q. Now, your testimony is that, again, assuming for the purposes of my question that they see, okay, this is a train that's in the foul, your testimony is the proper first step is just to immediately apply the emergency brake?
A. If you determine that it's in the foul and thus a collision is imminent, yes.
Q. Okay. And does any -- once you apply the emergency braking, other than the propagation -- the air that needs to travel, we talked about that, does anything else happen to the train to help it slow down faster?
For example, I've seen in some cases where they, like, talk about sand dropping down on the locomotive to get more traction, things like that. Anything like that happen?
A. That actually did not make an

Page 89

appreciable difference in the stopping distance. Purely from a -- you know, how quickly and how -- I'm sorry. In terms of how quickly you can generate braking effort and how much braking effort, it's -- the emergency brake application is what does it.
Q. Okay. So just to be clear --
A. Sand --
Q. I'm sorry.
A. Sand is not required to be dropped, most locomotives don't do it anymore. And, again, it doesn't make any appreciable difference in stopping distance and certainly not in the first couple of hundred feet of the stop.
Q. Would the train have that ability, though, is all I'm trying to figure out.
A. I'd have to go and look it up. I don't -- my opinion, as I sit here it would not just based on its age, but I'd have to look to be sure.
Q. I've seen maybe in your report, maybe somewhere else, that braking -- emergency braking causes EIE. Is that how y'all refer to it as?
A. That's specifically engineer initiated emergency.
Q. Engineer initiated emergency?
A. It's all emergency braking, but an

Page 90

emergency brake application can occur from the engineer's automatic brake value, so that's an EIE, or engineer initiated emergency. It can occur from the conductor's valve or it can occur because it's happened in the -- with a separation of the brake pipe.
Q. And how does the brake pipe separate?
A. Well, in this case it doesn't. But that's when a train comes apart or an air hose is dragging too low and hits a crossing or hits a turnout, that can cause the hoses to come apart. But any -- any loss of continuity of the brake pipe causes an emergency brake application.
(EXHIBIT 2, Screen Grab Photograph of In-Cab Camera of Rightmier and Small at 7:19:15, was marked for identification.)
BY MR. RADECK:
Q. Okay, Foster. What's marked as Exhibit 2 is a screen grab of the in-cab camera. And I'll report to you that, you know, there's no particular rhyme or reason into this. It looks like it's at the 19:25 -- 25 second mark and it's, you know, my intent -- I believe it's when Small kind of first shifts. Do you remember him sort of shifting in his chair in the video and sort of going and grabbing

Page 91

these things to his left here?
I believe it's a little -- I think it might be a little bit before your Figure 14, to be honest, but it's close if you look at the time. At least I thought it was.
A. If that's -- let's see.
Q. I'm sorry. 7:19.15 and your Figure 14 has 7:19. So it's basically a little over a tenth of a second after your Figure 14. Do you see that? Am I making this clear as mud?
A. You're saying --
Q. 15 --
A. That's what's throwing me off because Figure 13 is 7:19:17. That's why I'm trying to figure out what --
Q. Yeah, I'm sorry. I was looking at Figure 14. Either one --
A. Oh, sorry.
Q. This is just a screen grab I took. I just happened to notice it appears to be extremely close. I mean, this is at 7:19.15. Do you see the time?
A. I do. Well, it's throwing me off because when I do the screen grabs I look at the tool tip differently so it's...

Page 92

Q. It doesn't matter. Okay.
A. I would agree the engineer has his right hand on the master controller, which is the throttle, and his left hand looks like it's on the -- actually, he's got it down I think near the -- the bell.
Q. Yeah. So, I mean, all I was -- I didn't really have a question. All I was trying to do was orient you to what this is and I was just trying to say this is about the same time as your Figure 13 and 14, not claiming it's the exact same time.
My question -- my first question on this exhibit is, when you started answering, but first where -- what is Mr. Small's right hand grabbing? Mr. Small is the black individual; right?
A. He's the locomotive engineer on the right side of the cab.
Q. Okay. What's his right hand on?
A. That's a little grainy but it looks like his right hand is on -- it's called the master controller but the throttle -- I take that back. It's on the throttle.
Q. Okay. Can you just put -- can you take this and put a T next to his right hand or next to that throttle?

Page 93

A. With the slight caveat that it's hard to -- well, it's a little grainy. (Marking.)
Q. And what is his left hand on there?
A. (Looking at computer.) Hang on just a second, I'm just trying to orient myself a little more. (Reading.)
It's not actually in this Exhibit 2 on anything yet. He's brought his left hand over in front of him to he's coming over towards the brake valves, but he's not -- but he's not there yet because the automatic and independent handles are above his hand. He hasn't gotten there yet.
Q. Okay. What -- okay. So you see -- there appear to be, like, two sort of almost like joysticks that are sticking out, one has got a little bit of orange and red?
A. It's red.
Q. What are those two things?
A. That's the automatic brake valve.
Q. Okay. So there's two of them?
A. No. The independent brake valve was below that. The handle to it.
Q. Okay. So if he's trying to hit emergency braking, which one is he...
A. The top one is the automatic brake valve

Page 94

handle, the red one. You have to move that all the way from left to right on the valve, but his hand is not on it yet.
Q. I understand. What is the one below it? What kind of braking does that do?
A. It's the independent brake valve handle. That controls the locomotive brakes independently of the train. There's times you want to use the locomotive brakes by themselves, there's times in brake applications you actuate or what's called bail off independent brakes from a train perspective so you're able to control your locomotives separately from the cars.
Q. And during -- and EIE, would he activate both?
A. No. An EIE means that he has moved that automatic brake valve handle all the way to the right or towards the front of the engine. That causes the entire train, including the locomotives, to go into emergency. He can control the independent on top of that.
The standard, when you're pulling like we are here, empowers or you would actually bail off or actually the independent brake first to prevent wheel slide or to prevent a big run-in of the slack.

Page 95

But you can also just not touch it at all and let the locomotive brakes apply.
Q. Can you circle the automatic brake valve in that picture, please?
A. I wasn't -- it's automatic brake valve handle. That's what you can see. Well -- (marking.) The whole automatic brake is kind of this and then the handle is what you see in red and it goes back into the control stand.
Q. So if you were to identify that so it's clear would you put like -- I'm trying to decide if we should mark it, like, ATV, automatic brake valve, or should we put emergency brake? What do you -- what's more appropriate?
A. It's not the emergency brake. It's the automatic brake valve.
Q. What's the emergency brake?
A. Well, emergency is just a position on that valve. That gives you service braking positions and it gives you suppression, handle off, emergency.
Q. So it's the service level and emergency?
A. Right.
Q. Got you. So just put -- if you want to put ABV maybe?

Page 96

A. Or auto.
Q. Sure. Whatever, that's fine.
A. (Marking.)
Q. So we've identified the throttle and the automatic brake in Mr. Small's engineer cab. Is there any other way for him to control speed or braking that we haven't identified where he's located?
A. Well, it's not going to come into play here because once -- once you go to emergency you can't activate it. But the locomotives themselves have what's called dynamic braking which in very basic terms you take the traction motors of the locomotive -- instead of letting it propel the locomotive you reverse the polarity and you let them act as generators to resist the forward movement of the locomotive.
Once you go -- if your are in power, meaning you're in a throttle setting like we know they were and you go into emergency, it won't let you go into dynamic braking. So, practically speaking, it doesn't matter.
Q. Where would that be located if we just wanted to know?
A. I'm just trying to see if -- because

Page 97

it's a little grainy here. (Looking at computer.) Well, it's on the same overall controller is where the throttle handle is. I can't -- the picture is too grainy to make out to be able to distinguish the handles for you. Basically there's one handle for the throttle and there's one for the dynamic brake.
Q. Can I see it for a second?
A. (Tendering.)
Q. Do you want to put DB next to the ABV just so we know --
A. Well, that's not where it is. It's over -- it's over -- it's in the same...
Q. That's what I'm saying. I'm not trying to trick you. I'm just saying if you can identify let me know, if you can't --
A. I'm just saying in the graininess of the picture I can't quite make it out.
Q. Okay.
A. But it's on -- there's a -- the very bottom there's the reverser handle so that's, you know, forward, neutral and reverse. And there's a throttle handle and there's a dynamic brake handle. The picture is grainy enough to where --
Q. It's in his arm's -- hand's reach, I assume; right?

Page 98

A. Oh, sure. You have to close the throttle. You can't have both open at the same time. How about we just put DB right above the T, because they're both on the same --
Q. Okay. That's fine. Thank you.
A. (Marking.)
Q. All right. Let's move to Mr. Rightmier there. Do you agree, like, his hand is on something? Do you know what it is?
A. His right hand is just on the corner of the desktop of the console.
Q. Okay. Can you identify where he's got -- does he have a throttle or any braking on his side?
A. No throttle. He just has a conductor's valve.
Q. And what is that?
A. That's a valve that allows the conductor in this case -- whoever is on the left side of the cab to put the train in emergency.
Q. Where is that located? Once you find it, just circle it.
A. (Marking.) It's kind of set off. There's sort of a silver backing and there's a red handle that you pull up.

Page 99

Q. Do you want to put CV next to that? Or how would that -- is that a good way to identify conductor valve?
A. CVE is how --
Q. Okay.
A. -- it shows up now, conductor valve. (Marking.)
MR. RADECK: Okay. That's all for that exhibit.
THE COURT REPORTER: Exhibit 3.
MR. RADECK: Are you sure about that?
THE WITNESS: You had a 1A and 1B and 2.
MR. RADECK: I shouldn't question you.
THE COURT REPORTER: No, question me every time.
(EXHIBIT 3, Screen Grab Photograph of In-Cab Camera of Rightmier and Small at 7:19:19, was marked for identification.)
BY MR. RADECK:
Q. This is another screen grab -- I think I misspoke earlier. It happens. But I think the time stamp we have 7:19:19, I think it's seven hours 19 minutes and then 19 seconds on the recording but it is what it is.
So in this screen grab, which appears to

Page 100

be similar to -- let me ask you this. Obviously at this point this is -- appears to be just prior to impact -- I mean, close to impact.
A. If it's 7:19:19 it's about three seconds before but, I mean, you can see Small is -- I'm sorry, Rightmier is up out of his chair and you can see the AIPC equipment coming into view through the windshield.
Q. You would agree the fact that Rightmier got up where he's located, he has forfeited all control of the train; is that right?
MR. WRAY: Object to the form.
THE WITNESS: No. Where he is he's still in reach of the conductor's valve but, yeah, he has less control than the engineer does to begin with. But he -- I mean, he's still got his left hand on the conductor's console.
BY MR. RADECK:
Q. How -- do you see his left hand in the screen grab?
A. The way he's -- well, it's my estimation based on the way he's holding his body relative to it. But his arm would be in that vicinity where you actually put your hand.
Q. Did he ever -- okay. And we know

Page 101

Rightmier never applied his conductor valve, his emergency brake; right?
A. Correct.
Q. All right.
A. Just to be clear around this time, if you look at the actual video, you can -- his left hand is on the corner of the console still.
Q. Do you have the video?
A. I do.
Q. Is that what you're looking at in front of you?
A. (Witness moves head up and down.)
Q. Let's -- I've got it, too, but if you've got it do you mind if I come over there and just ask you a quick question?
A. That's fine: 7:19:20 is the time.
Q. Just go back like three or four seconds before -- maybe a little further back.
A. See, that is 7 -- that's about -- that's sixish seconds prior. You said you want, like, three to four?
Q. You can play it from there, that's fine.
A. Okay. (Video playing.)
Q. Let me know -- keep an eye on Small's hands, if you don't mind. Right there, do you see

Page 102

he has his left hand on the brake?
A. It's -- yeah. It's either still moving or has moved over onto the -- I'm backing it up now. So his left hand hits the automatic at 7:19 and 17 -- basically 18 seconds.
Q. Tell me -- play it through impact and tell me if you can see where he initiates the emergency braking.
A. Right there. (Indicating.)
Q. So that -- that movement from his left to his right?
A. Correct.
Q. That's consistent with the data that shows it applied about a second after impact?
A. Right. That's the action of rotating left to right. Put the automatic hand -- brake valve handle into emergency. (Video stopped.)
Q. And based on the video we obviously can see Rightmier's right hand never left the corner of the desk there?
A. Right.
Q. And based on the actions of Rightmier and Small in that video you believe they acted reasonably?
A. I do, based on everything they were

Page 103

presented that day.
Q. The fact that the train was on trip optimizer, that doesn't change the level of, you know, attention or lookout that they're supposed to do; right?
A. No, nor the engineer's requirement to monitor that the trip optimizer is doing what you want it to do and in compliance with the rules and the speed limits.
Q. In prior testimony have you ever used the fact that employees in a train did not apply braking prior to collision as a data point to conclude that they did not maintain a proper lookout?
A. Not that I recall.
Q. Do you agree that that would be one point in favor of arguing that they did not keep a proper lookout?
MR. WRAY: Object to form.
THE WITNESS: I could foresee some situations but not in this case.
MR. RADECK: Let's take just a few minutes, I think I'm about to wrap up.
(A recess transpired.)
BY MR. RADECK:

Page 104

Q. Foster, just a few more questions. On Page 41 of your report you say that: While the AIPC locomotive and connected cars are visible from the locomotive at approximately 1,000 feet away, it is not apparent, due to the position of the equipment and the curvature of the NS main track, that the AIPC engine is in the foul of the track.
Have we discussed the complete basis for that opinion as far as what you're relying upon?
A. From what I recall the testimony earlier, yes.
Q. And you did not make any assessment, even going back further -- 1500 feet, 2000 feet, did you make any assessment going further back whether it was visible or not, the AIPC train?
MR. WRAY: Are you asking whether it was visible period or whether -- obviously it was in the foul of the track?
MR. RADECK: Just object to form, Ron.
MR. WRAY: Well, you asked a question.
MR. RADECK: It's an improper objection. It's a speaking objection.
Q. So my question was -- is did you make any analysis whatsoever -- I think I said visible. Did you make any analysis whatsoever whether or not

Page 105

the train was visible at all farther back than a thousand feet?
A. (Reading.) I didn't quantify any more locations further back. Say from the analysis of the forward facing video that some portion of the AIPC movement could have likely been seen for longer, but certainly not substantively and certainly not, in my opinion, in the foul at that point. But I don't have any specific opinions beyond the thousand feet.
Q. On Page 42 you said again, without the benefit of hindsight, they both appreciated the emergency situation created by Blanchett and AIPC at a location from impact that did not allow the mechanics of the collision to be appreciably changed.
Have we talked about the full basis of that opinion?
A. I believe we did earlier, yes.
Q. Okay. And, again, can you just clarify for me, again, at what point did they appreciate the emergency situation?
A. In my opinion, somewhere between my Figures 13 and 14. So somewhere between five to six seconds prior to impact and -- and the collision.

Page 106

Q. And --
A. Based on their actions and their movements that I can objectively see on the inward facing video.
Q. And you're not -- you're not critical of any actions of either Rightmier or Small; is that your testimony?
A. In this case I'm really not, no.
Q. Have you expressed all your opinions in this case, whether through deposition or your report?
A. Okay. That was going to be my caveat, yes.
Q. Is there anything you intend to tell the jury, as far your opinions as we sit here today, that we have not discussed in your testimony or that are not included in your report?
A. Nothing I'm aware of at this time, no.
Q. At this point you mentioned potentially looking at any of -- I mean, when Ken Rusk and our experts are deposed and they produce their files I'm sure you'll look at their files; right?
A. I would think so, yes.
Q. Okay. And if Mr. Rusk has animations -- I'm sorry, Mr. Powers has animations how would you

Page 107

expect that to change your opinions, if any?
MR. WRAY: Object to form.
THE WITNESS: I think I'll just have to review what's provided and make a determination at that point.
BY MR. RADECK:
Q. Yeah. I guess let me ask it a better way. What I was really asking was as we sit here today I'm sure you -- in other cases you reviewed opposing experts' animations before; right?
A. Sure.
Q. And do you typically have a certain process? Do you always do a competing animation? Is there a certain process you know you're going to do? I know your opinions may or may not change, but what's the process in response to that?
A. I don't think there's one answer to that. It's going to depend on what's provided and what's available to see. As I sit here today, just looking at the stills from what purports to be the animation, I don't know that I'll need to do anything other than just review it. But I need to see it and go from there.
Q. You made a site inspection; right?
A. Yes, I did visit the site.

Page 108

Q. And did you -- did you take any of the measurements or calculations specifically related to the track? Like track center, clearance point, anything like that?
A. I did not. I just looked at it visually and took the photos that were in my file.
Q. Are there any other criticisms of Stephanie Bor -- Borzendowski in her report that we haven't discussed?
A. Is that either discussed or are contained in the report?
Q. Both, yes.
A. Well, the main ones -- we didn't get into all her criticism of Rightmier for doing paperwork which is something conductors have to do. That's in my report but that's -- I think -- let me double-check, but that's the only thing that I'm recalling that we hadn't hit point wise.
Q. I mean, as far as her opinions of perception or reactions or things like that, you're not qualified to rebut her on those points; fair?
A. Well, in terms of, like, calculating perception or reaction time I agree because I'm not offering that. In terms of saying that Rightmier's attention was somehow taken away from keeping a

Page 109

lookout, I categorically disagree with that because, as I put in my report from 7:18:48 to the time of collision, which is 34 seconds, the paperwork is up and both crew members can be seen looking ahead. So I disagree that his other duties under the rules had anything to do with lookout.
Q. Okay. I mean, other than the paperwork thing anything else that you would disagree with her or that you feel like you're qualified to disagree about?
A. I think that's the substance of the disagreement, plus my other testimony today.
Q. And we talked about -- we talked about Allen Powers' calculation of stopping distance and the differences -- I guess you're disagreeing on that point. Any other disagreements with Allen Powers?
A. (Reading.) I believe I already testified earlier when it came to just the math of, you know, at different speeds what does that mean for kinetic energy, that's all -- that was all accurate because that's simple math. I mean, I think we've been through the rest of it but, you know, I don't agree with the overall calculation method. Other than that, you know, with his

Page 110

assumptions the math looked to be correct.
Q. You agree to the extent you formulate new opinions you will let your attorneys know so we can have a chance to ask you about it?
A. That's fair, yes.
(This page contains information to be supplied by counsel and/or the deponent.)
BY MR. RADECK:
Q. Did you understand all my questions?
A. Or clarified them, yes.
MR. RADECK: That's all the questions I have. Thank you, sir.
MR. WRAY: Mr. Peterson, just a few follow-ups.
EXAMINATION
BY MR. WRAY:
Q. Is the AIPC facility the only place you're aware of that operates its own locomotive engine or are there other industries that operate engines at their plants like AIPC did here?
A. I'm aware of numerous industries that have their own locomotives for doing switching.
Q. And --
A. Sorry, inside their facilities.
Q. In this case I believe you did review

Page 111

the deposition testimony of Rhen Marshall that was given as the corporate representative for AIPC; is that correct?
A. I did.
Q. Did you see in that deposition that Mr. Marshall set forth certain standards that applied to AIPC to operation of their locomotive engine?
A. Yes, and I -- even go more broad to just the rail operations generally.
Q. Can you tell us generally what Mr. Marshall said or his standards or expectations in terms of operation of the engine at that facility?
A. For starters, that it was -- the expectation that it was done with one mill operator like Mr. Blanchett using a remote control system. They use them from Control Chief, which is one of those manufacturers.
There was an expectation I would say and certainly as it relates to this incident that when a movement was being made that the mill operator would be on the leading end of a move and not on the rear-end of the movement. So, in other words, they could see the leading end of whether the locomotive

Page 112

was pulling or whether the locomotive was shoving, they're on the leading end. That the automatic brakes or the air would be used to switch cars, meaning that whenever they're handling cars at all with their locomotive that they would cut the air improperly.
Certainly related to the -- this incident that he expected that there was an event like the one -- well, not going over the derail expectation or not derailing. And then, finally, that if there was an incident like we had here that he would have expect that the operator would notify either himself or someone at the mill of that incident.
Q. Are those standards that you just identified, the AIPC representative testified apply to AIPC, are those consistent with standards you've seen applied at other industries that operate engines at their facilities?
MR. RADECK: Object to form.
THE WITNESS: I'd say they are very typical operating practices for an industry that has a rail operation with the potential exception that some places, depending on how they're switching, may use equipment such as a track mobile rather than a

Page 113

locomotive. And in that case they're typically handling less cars, less weight, so in that case may not have to have the air cut in on the cars.
But for an operation like this with a locomotive and these loaded cars my -- what I've seen at other industries is that they would use the air.
BY MR. WRAY:
Q. And with that one exception was the expectations set at AIPC consistent with the standard of care in the industry?
MR. RADECK: Object to the form.
BY MR. WRAY:
Q. An industrial facility operate a locomotive?
A. I would say they are, yes, generally consistent with how industrial rail operations perform in this country.
Q. Based upon your training, education and experience are you familiar with operations of engines in an industry facility like occurred here?
A. Yes.
Q. You were asked a question about the train running on a trip optimizer and the speed of the train. Do you recall that question?

Page 114

A. I do.
Q. At any time during the trip on the day this incident occurred did the speed of the train ever exceed the allowed operating speed for that track?
A. It did not.
Q. Mr. Radeck also asked you about some prior case, I don't know what case it was or what the issue was in that case, but he asked you if you testified whether an obstruction might be visible from 4500 feet away and I think you said you didn't recall that specifically but whatever your testimony was in that case be what it is; is that correct?
A. Yes.
Q. Is there a difference between seeing an obstruction and realizing that you need to take some action with respect to the obstruction?
A. Yes, depends on how it affects the safety movement of the train.
Q. Do you have an opinion in this case as to -- at the particular point in time that Mr. Rightmier and Small realized that the AIPC engine was, in fact, in the foul of the track whether they had started braking at that precise moment or they could have stopped their train at a

Page 115

shorter impact at the AIPC engine?
A. Yes, and that opinion would be at that point where they made that determination in my opinion, or maybe a couple of seconds to make it a little more of a range, that there was not sufficient distance for them to be able to stop prior to the collision.
Q. And what is the basis for that opinion?
A. Well, because, as I testified earlier to Mr. Radeck, it's really at best five to six seconds away in my opinion when that is occurring and the train is approximately 300 feet away and the required stopping distance is longer than that even using Mr. Powers' calculations which, again, I think are shorter than they would be.
But also based on my experience both operating trains and doing train dynamics, including train stops.
Q. Based upon your review of the evidence in this case do you have an opinion as to whether or not this crew kept a proper lookout on the day of this accident?
A. I do and in my opinion they did.
Q. What's the basis for that or what evidence did you see in the case that led you to

Page 116

that opinion?
A. A combination of their testimony but also my review of the -- both the forward facing and inward facing rail view video and the event recorder data, and then applying my experience both as an engineer and conductor and an operating officer who trains and certifies engineers and conductors.
MR. WRAY: That's all I have.
MR. RADECK: Nothing else.
(The witness, after having been advised of his right to read and sign this transcript, does not waive that right.)
(The deposition was concluded at 2:20 p.m.)
THE COURT REPORTER: For transcript requests do you want them like the last time?
MR. RADECK: Yes.
MR. WRAY: Yes.

Page 117

Ronald K. Wray, II.
rwray@gwblawfirm.com
August 13, 2026
RE: Norfolk Southern Railway Company v. American Italian Pasta Company
August 4, 2026, Foster J. Peterson (#8350045)
The above-referenced transcript is available for review.
Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.
The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-carolinas@veritext.com.

Return completed errata within 30 days from receipt of testimony.
If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

Norfolk Southern Railway Company vs. American Italian Pasta Company
Foster J. Peterson (#8350045)

E R R A T A S H E E T

Page_____ Line_____ Change______________________
_______________________________________________
REASON__________________________________________
Page_____ Line_____ Change______________________
_______________________________________________
REASON__________________________________________
Page_____ Line_____ Change______________________
_______________________________________________
REASON__________________________________________
Page_____ Line_____ Change______________________
_______________________________________________
REASON__________________________________________
Page_____ Line_____ Change______________________
_______________________________________________
REASON__________________________________________
Page_____ Line_____ Change______________________
_______________________________________________
REASON__________________________________________

______________________________ _______________
Foster J. Peterson Date



Norfolk Southern Railway Company vs. American Italian Pasta Company
Foster J. Peterson (#8350045)

ACKNOWLEDGEMENT OF DEPONENT

I, Foster J. Peterson, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_______________________ ________________
Foster J. Peterson Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF ________________, 20____.

______________________________
NOTARY PUBLIC



CERTIFICATE OF REPORTER

I, Lori S. Mortge, Certified Court Reporter and Notary Public for the State of South Carolina at Large, do hereby certify that the foregoing transcript is a true, accurate, and complete record.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal this 9th day of August, 2026 at West Columbia, Lexington County, South Carolina.

LORI S. MORTGE NOTARY PUBLIC SOUTH CAROLINA

Lori S. Mortge, CCR

Lori S. Mortge
Certified Court Reporter, CCR
My Commission expires December 13, 2026



I N D E X


| | Page | Line |
|---|---|---|
| FOSTER J. PETERSON | 3 | 2 |
| EXAMINATION | 3 | 4 |
| BY MR. RADECK | | |
| EXAMINATION | 110 | 15 |
| BY MR. WRAY | | |
| CERTIFICATE OF REPORTER | 120 | 1 |


REQUESTED INFORMATION INDEX


| | Page | Line |
|---|---|---|
| New Opinions | 110 | 6 |


E X H I B I T S


| DEFENDANT EXHIBITS | Page | Line |
|---|---|---|
| EXHIBIT 1A, ESi Invoices | 24 | 6 |
| EXHIBIT 1B, Secretariat Invoices | 24 | 8 |

Page 122

| | | |
|---|---|---|
| EXHIBIT 2, Screen Grab Photograph of In-Cab Camera of Rightmier and Small at 7:19:15 | 90 | 14 |
| EXHIBIT 3, Screen Grab Photograph of In-Cab Camera of Rightmier and Small at 7:19:19 | 99 | 16 |

**&**

**&** 1:14 2:3 23:17

**0**

**06618** 1:6

**1**

**1** 54:1 121:9
**1,000** 104:4
**1.00** 59:24
**100** 6:3
**1000** 54:21
**11** 62:25 66:11 67:14,25 68:8 72:24 74:19
**110** 121:7,16
**11:40** 1:12
**12** 63:10,15,22 74:19
**120** 121:9
**1200** 1:14 2:5
**1201** 1:14
**13** 74:20 75:8 76:14 77:2,10 85:4 91:14 92:10 105:24 117:3 120:23
**14** 75:20 91:3,7 91:9,17 92:11 105:24 122:1
**15** 68:23 91:12 121:7
**1500** 104:13
**16** 35:22 122:4
**17** 62:25 102:5
**172** 2:11
**18** 102:5
**19** 99:22,23
**1999** 5:25
**19:25** 90:22
**1a** 24:5,5,6 99:12 121:23
**1b** 24:8 99:12 121:24

**2**

**2** 90:14,19 93:7 99:12 121:4 122:1
**20** 55:11,12 119:16
**2000** 104:13
**2017** 84:1
**2022** 5:17 6:16
**2024** 5:21
**2026** 1:11 5:17 6:16 117:3,6 120:12,23
**21889** 120:21
**22** 63:3 72:25
**23** 63:3 72:25
**24** 121:23,24
**240** 42:14
**242** 42:14
**25** 90:22
**271-9580** 2:6
**29401** 2:11
**29601** 2:6

**3**

**3** 59:13 83:22 99:10,16 121:4 121:5 122:4
**30** 4:21 29:1 117:18
**300** 76:16 115:12
**34** 109:3
**3:25** 1:6

**4**

**4** 1:11 38:11 40:10 59:13 117:6 121:5
**4,000** 9:22 83:22
**4,500** 83:18 84:4
**40** 16:11
**41** 104:2
**42** 105:11
**43** 34:25
**45** 82:3
**4500** 114:11
**49** 42:13

**5**

**5** 38:11 59:20 59:25
**50** 53:3,9
**500** 15:18 54:20
**55** 2:5
**550** 19:20
**577-4435** 2:12

**6**

**6** 4:21 29:1 34:25 121:16 121:23
**600** 19:20
**6:15** 82:4,7

**7**

**7** 101:19
**7:18:48** 109:2
**7:19** 91:8 102:4
**7:19.15** 91:7
**7:19.15.** 91:21
**7:19:17** 91:14
**7:19:20** 101:16

**8**

**8** 121:24
**80** 6:12
**800** 9:16 44:4
**8350045** 117:6 118:3 119:3
**843** 2:12
**85** 6:12
**864** 2:6

**9**

**90** 122:1
**930** 19:21
**99** 122:4
**9th** 120:12

**a**

**a.m.** 1:12 82:4
**ability** 57:14 89:14
**able** 51:17 52:20 55:15 56:2 69:10 70:5 75:6 81:8 94:12 97:4 115:6
**above** 93:12 98:3 117:7 119:8
**absolute** 56:6
**absolutely** 47:2 57:19
**abv** 95:25 97:9
**accelerate** 79:17,19
**accelerating** 79:15 80:1
**accepted** 30:19
**accident** 16:1 16:15 23:6 82:22 115:22
**accordance** 42:15
**account** 18:4
**accuracy** 117:10
**accurate** 109:22 120:6
**acknowledge...** 119:4
**acknowledg...** 117:13
**act** 96:16
**acted** 102:23
**action** 1:6 34:14 35:11 64:10,13 102:15 114:17
**actions** 13:12 28:15 30:11 35:10 48:22 67:6 68:19 102:22 106:2,6
**activate** 94:14 96:11
**actual** 12:7 17:22 18:4,16 20:14 30:25 34:12 37:15 52:1 67:23 79:1 101:6
**actually** 3:19 13:5 20:16 23:18 49:7 50:4,6 58:11 64:2 71:22 79:24 82:7 86:10 88:25 92:5 93:7 94:23,24 100:24
**actuate** 94:10
**add** 13:3 30:2 49:21
**additions** 119:7
**adequately** 35:1,8
**adjacent** 47:10 67:8 70:11
**adjust** 51:4
**administration** 26:7
**adopting** 73:21
**advised** 116:10
**affect** 48:4,5 49:20,25 50:2 50:5,20 51:11 60:24
**affected** 32:12 33:15 61:10
**affects** 50:12,15 50:24 58:20 60:25 62:6 114:18
**affixed** 120:11
**afore** 65:10
**age** 89:18
**agree** 46:15 47:12,16 49:4 50:8 56:23 68:12 70:22 72:6 92:2 98:8 100:9 103:16 108:23 109:24 110:2
**agreed** 29:24 31:5 46:2 49:18
**agreeing** 49:19
**ahead** 7:12 26:4 30:16 33:7 45:23 46:4 48:10 49:16,17,19,23 50:2 56:2,10 56:17 62:11 74:5 79:8 109:4
**aipc** 3:10 4:21 11:1 12:13 26:1,5,12,14,22 27:8,22 28:17 29:1 31:5 34:6 35:1,7,16 36:6 36:19 37:20 46:24 57:15,23 58:5,9 59:12 60:13 61:10 62:18 63:5 64:16 67:8,14 70:2 71:18,20 71:25 72:1 73:18 74:7 77:14 81:21 82:17 84:14,20

87:11 100:7 104:2,7,15 105:6,13 110:17,20 111:2,7 112:16 112:17 113:10 114:22 115:1
**aipc's** 28:24 29:2,22 30:12 33:22 34:9,20 43:19 65:11
**air** 18:22 19:3 19:12,24 30:4 31:20,22,24 32:10,13 33:16 88:18 90:9 112:3,5 113:3 113:7
**alert** 44:10 45:12 47:13
**alignment** 59:23
**allen** 17:9 73:6 109:14,16
**allotted** 117:21
**allow** 105:14
**allowed** 7:8 8:25 114:4
**allows** 98:18
**america** 30:9
**american** 1:7 2:9 117:4 118:1 119:1
**amount** 51:20 88:1
**analysis** 16:25 16:25 36:21 39:7 40:2 61:8 104:24,25 105:4
**andrews** 57:10 76:21 79:16 80:2
**angle** 31:24 32:3,13 33:15 67:19
**animation** 107:13,21
**animations** 60:20 106:24 106:25 107:10
**answer** 22:22 33:2 34:10 53:13 56:14 107:17
**answered** 66:4
**answering** 92:13
**answers** 80:24
**anymore** 89:10
**apart** 90:9,11
**apologize** 14:2
**apparent** 104:5
**appear** 93:14
**appearances** 2:1
**appears** 91:20 99:25 100:2
**appended** 119:8
**appendix** 5:14 6:16
**applicable** 117:9
**application** 18:8 19:3,17 19:18 85:2,7 89:5 90:1,13
**applications** 64:25 94:10
**applied** 36:12 36:16 37:19 101:1 102:14 111:7 112:18
**apply** 17:20 26:1,8,12 28:12 31:20,21 64:22 77:4 78:24,25 81:3 83:9 88:13,16 95:2 103:11 112:16
**applying** 65:7 77:9 116:5
**appreciable** 89:1,11
**appreciably** 105:15
**appreciate** 53:12 62:17 70:1 105:21
**appreciated** 105:12
**approach** 18:16 78:18 86:14
**approaching** 51:6 81:9
**appropriate** 17:11,19,22 77:3 95:14
**approved** 42:16 44:25
**approximate** 75:22
**approximately** 12:14 63:3 73:3 104:4 115:12
**area** 7:24 71:5 72:10
**argue** 62:2
**arguing** 103:17
**argument** 21:21
**arm** 100:23
**arm's** 97:24
**arrow** 40:14
**asked** 4:5 14:23 14:24,25 17:25 32:19 33:1 49:22 59:4 62:12 66:3 79:6 83:13

104:20 113:23 114:7,9
**asking** 25:17 31:2 52:18 55:21 61:21 104:16 107:8
**aspect** 25:12
**assessed** 15:13 15:25 43:25
**assessing** 80:20
**assessment** 104:12,14
**assume** 84:12 97:25
**assuming** 37:6 37:17,18,19 45:6 88:10
**assumptions** 110:1
**attached** 117:12
**attempt** 37:3
**attention** 12:21 103:4 108:25
**attentive** 44:10 45:13 47:14
**attorney** 117:15
**attorneys** 2:2,8 24:12 110:3
**atv** 95:12
**august** 1:11 117:3,6 120:12
**authority** 26:11 45:15 69:16
**authorized** 45:19
**auto** 96:1
**automatic** 75:5 85:2,4 90:2 93:11,19,25 94:17 95:3,5,7 95:12,16 96:5 102:4,16 112:2
**available** 107:19 117:7
**average** 19:16
**avoided** 16:1 16:16
**aware** 20:4 22:10,11,15 23:9 36:8,11 80:13 106:18 110:18,21
**axle** 38:2,13 39:17 40:16
**axles** 36:2

**b**

**b** 4:21 5:14 6:16 24:5 29:1 39:2 121:20
**back** 21:20 33:9 38:22 39:25 41:6,11 54:16 68:20 72:23 73:1 75:24 76:10,21 79:20 80:14,18 82:5 84:7 85:25 92:21 95:9 101:17,18 104:13,14 105:1,4
**backing** 98:24 102:3
**backs** 13:4
**bag** 9:4
**bail** 94:10,23
**banked** 60:1
**based** 6:8 11:20 11:24 12:23 13:24 15:4,13 18:22 21:16,24 23:4 28:16,19 29:18 30:23 32:15 33:14 34:14 35:9,9 35:21,25 36:4 36:4 38:22 45:5 51:16 57:12 63:16 66:14 67:2,5 67:24 68:5 76:12 77:12 78:8,14,21 89:18 100:22 102:18,22,25 106:2 113:19 115:16,19
**basic** 96:13
**basically** 7:22 19:6 59:10,10 59:25 60:12 71:19 87:7 91:8 97:5 102:5
**basing** 13:10 13:15
**basis** 66:13 85:14 104:8 105:17 115:8 115:24
**beattie** 2:5
**behalf** 3:12 5:4
**behavior** 13:11
**believe** 18:20 23:13 24:4 56:20 76:8 77:3 81:25 90:23 91:2 102:23 105:19 109:18 110:25
**believed** 73:9
**believes** 21:22
**bell** 3:17 24:20 40:1 92:6
**benefit** 105:12
**best** 115:10
**better** 107:7
**beyond** 12:17 27:22 37:3 53:10 105:10

**big** 94:25
**bill** 4:1
**billed** 24:14
**bit** 6:10 12:1 41:8,11 59:18 83:14 84:11 91:3 93:16
**black** 92:15
**blanchett** 26:23 27:14,19 28:10 28:24,25 29:2 29:4,17 31:6 31:17,21 33:23 34:5,9,14,22 35:2,8 38:19 43:19 82:4,6 105:13 111:17
**blanchett's** 28:15 30:11 32:9 35:10 82:1
**block** 59:22
**blow** 67:16 85:18
**blowing** 86:15
**board** 19:7
**body** 100:22
**book** 20:4
**bor** 108:8
**borzendowski** 108:8
**bottom** 6:23 97:20
**boyd** 1:14 2:3 23:17
**bracketing** 59:11 60:12
**brake** 17:18 18:8,9,23 19:13,17,24 21:1,4 64:10 64:25 65:7,19 65:21 74:9,11 74:12 75:5,6 79:6,23 85:4,7 85:22 88:13 89:5 90:1,2,5,7 90:12,13 93:9 93:19,21,25 94:6,10,17,24 95:3,5,7,12,13 95:15,16,17 96:5 97:6,22 101:2 102:1,16
**braked** 39:13 76:1,8
**brakes** 17:20 17:20 20:25 31:20,22 33:16 39:14 76:21 81:11 83:9 85:2 94:7,9,11 95:2 112:3
**braking** 18:13 18:24 21:4,4 64:19,22 65:4 65:13 66:1,6 74:3 76:4 77:4 77:6,9,18 78:11,25 79:1 81:3 84:12 87:22,23,25 88:1,2,4,7,17 89:4,4,20,20,25 93:24 94:5 95:19 96:7,12 96:21 98:13 102:8 103:12 114:24
**bravo** 5:14
**break** 68:23,24 69:2 72:18
**bridges** 51:6 55:4
**briefly** 3:10
**broad** 111:9
**brooks** 35:22 35:24
**brought** 93:8
**bucket** 41:12
**build** 17:20
**builds** 18:10
**buildup** 21:2
**bunch** 42:3 61:16

**c**

**cab** 8:16 12:19 14:5 44:11 55:5 57:2,25 58:8 90:15,19 92:17 96:5 98:20 99:17 122:2,5
**calculate** 11:19 12:16 15:11 16:17 17:25 18:14 37:3 52:12 58:15,16 72:25
**calculates** 21:14
**calculating** 11:3 15:6,20 16:4 52:19 108:22
**calculation** 12:8 16:22 20:22 22:4 52:15 109:14 109:24
**calculations** 14:18 20:1,3 21:8 36:21 37:1 39:3 108:2 115:14
**call** 64:15
**called** 18:20 42:1 92:20 94:10 96:12
**calling** 34:8
**calls** 25:8 32:20 33:1
**camera** 90:15 90:19 99:17

122:2,5
**capability** 27:23
**capturing** 72:24
**car** 38:2,12 39:18 53:2 86:1
**care** 32:22 113:11
**career** 22:21 23:14 61:17
**carolina** 1:1 23:4,11,14,24 24:1 120:5,13
**carolinas** 117:16
**cars** 20:12,20 20:21,24 37:13 39:13 46:18 63:5 70:6 71:9 71:21,24 72:1 72:7 82:17 94:13 104:3 112:3,4 113:2 113:3,5
**case** 3:13 4:14 7:1 8:1,1,5,6,23 9:7 10:4 14:19 14:23 15:3,8 16:14 17:6,25 18:20,24 21:9 22:20 23:3,10 24:4 25:5,8,13 25:24 26:20 28:10 44:20 47:8 51:1,12 58:9 62:21 64:16 71:1,25 74:15 78:21 81:1 82:23 83:16 84:7,10 85:12,18,19,22 86:15,19 87:6 90:8 98:19 103:21 106:8 106:10 110:25 113:1,2 114:8 114:8,9,13,20 115:20,25
**cases** 3:16,19 4:23 5:3,9,17 5:18,21 6:15 8:10 10:22 14:21 15:10,24 17:1 23:14 43:7,11 44:14 48:12 50:25 52:8 81:7 88:21 107:9
**categorically** 109:1
**category** 6:21
**cause** 90:11 120:9
**caused** 34:12 37:13,13 39:15
**causes** 85:6 89:21 90:13 94:19
**causing** 30:6,17 65:19
**caveat** 93:1 106:12
**ccr** 1:18 120:22
**center** 108:3
**certain** 7:8,19 10:17 17:12 18:11 44:23 53:19 55:7 63:20 64:22 65:24 67:20 107:12,14 111:6
**certainly** 8:18 48:6 65:24 67:2,12 68:17 75:19,19 77:23 80:12 89:12 105:7,8 111:21 112:7
**certainty** 63:18 65:5,24
**certificate** 120:1 121:9
**certification** 42:13
**certified** 1:17 27:4 42:10 43:2,7,13 44:21,22 45:6 120:3,22
**certifies** 13:17 61:16 116:7
**certify** 120:5,8
**cfr** 42:13
**chair** 90:25 100:6
**challenge** 22:17 22:24
**chance** 68:11 110:4
**change** 24:3 65:14 72:16 103:3 107:1,15 118:5,8,11,14 118:17,20
**changed** 105:16
**changes** 117:11 119:7
**characteristics** 10:2 11:21
**charged** 31:25
**charleston** 2:11
**check** 108:17
**chicago** 7:6,10
**chief** 111:18
**choice** 65:4,6 65:23
**choose** 68:13
**chose** 73:7,13
**circle** 95:3 98:22

**cite** 61:7
**citing** 12:5 28:22
**civil** 1:6
**claim** 3:16 9:10
**claimed** 81:2
**claiming** 92:11
**claims** 4:25
**clarified** 110:10
**clarify** 6:7 72:21 84:19 105:20
**class** 45:3
**classes** 42:25
**clear** 12:2 24:18 34:2,5 34:19 42:18 46:8 55:16 56:3,21,22 58:12 61:20 75:18 86:20 87:24 89:6 91:10 95:11 101:5
**clearance** 54:4 108:3
**clearly** 8:25 29:15 35:4 51:8
**clock** 82:8
**close** 56:12 59:7 65:18 69:23 70:1 75:14,19 81:14 86:6 91:4,21 98:1 100:3
**closer** 56:13 67:7 70:1 80:11 82:7
**clumsily** 83:5
**cock** 31:24 32:3 32:13 33:15
**cocks** 33:19
**coincidences** 73:23
**colleague** 3:17
**collide** 86:9
**collision** 3:22 7:15 8:17 9:6 15:5,7,9,22 16:11 17:13 32:3,12 33:15 34:13 36:2 57:12 60:14 63:4,17 64:17 74:14,23 75:3 75:9,12,21,22 75:25 76:1,3 77:6,24 78:18 83:3,10,12 87:8,11,14,17 88:15 103:12 105:15,25 109:3 115:7
**columbia** 1:2 1:15 120:13
**combination** 35:23 37:11 47:7 116:2
**combined** 37:20
**come** 25:2 31:5 90:11 96:9 101:14
**comes** 38:5 76:10 90:9
**coming** 7:14 57:9 59:13 87:7 93:9 100:7
**commanding** 13:5
**commission** 120:23
**common** 43:10 43:11
**communicated** 80:4
**communication** 80:16
**company** 1:4,7 2:2,9 117:4,5 118:1,2 119:1 119:2
**competing** 107:13
**complete** 104:8 119:9 120:7
**completed** 117:18
**completely** 32:25 38:1
**complex** 18:3
**compliance** 103:8
**complied** 44:1
**comply** 5:17 7:9 27:2 43:21 44:24
**complying** 29:4
**component** 17:19 18:7,8 25:20
**components** 25:23
**computer** 67:18 93:4 97:1
**conclude** 103:13
**concluded** 116:13
**conclusion** 34:24
**condition** 39:14 50:1,22,24 51:5,11 56:2 70:2,16
**conditions** 48:3 48:5,10 49:16 49:20,24 70:5 70:15
**conductor** 7:6 8:3 9:3 13:9,16

26:20 42:13 53:18,20 54:1 55:15 56:1 61:15 68:18 74:25 98:18 99:3,6 101:1 116:6
**conductor's** 90:4 98:15 100:14,17
**conductors** 27:4 44:12 53:6 108:15 116:7
**confirm** 86:22
**connected** 104:3
**consider** 26:6
**consist** 20:7,20 37:20
**consistent** 63:24 66:22 73:5 75:1 102:13 112:17 113:10,17
**console** 98:11 100:17 101:7
**constant** 17:16 18:1
**construction** 22:25 39:21 40:1
**consultant** 3:12 56:8
**consulted** 5:4
**consulting** 6:5 6:8,11
**contact** 41:2,3
**contained** 58:3 108:11
**contains** 4:14 110:6
**context** 6:6
**continue** 40:4,6
**continued** 37:14,14 39:5 79:17
**continuity** 90:12
**contributed** 7:15
**control** 69:17 94:12,20 95:9 96:6 100:11,15 111:17,18
**controlled** 31:25
**controller** 92:3 92:21 97:2
**controls** 94:7
**copies** 117:15
**corner** 98:10 101:7 102:19
**corporate** 28:24 29:24 111:2
**correct** 3:14,24 4:4,14,15,19 12:6 13:23 17:7,14 18:2 22:3 24:23 25:24 26:3,16 26:17 31:18,23 34:6 40:16 42:23 50:6 53:18 63:8 74:6 79:1,2,25 80:1,7 81:23 84:23 87:13,18 88:5,8 101:3 102:12 110:1 111:3 114:13 119:9
**corrections** 119:7
**correctly** 32:11
**counsel** 1:16 2:1 110:7 117:15 120:9
**country** 26:10 113:18
**county** 120:13
**couple** 9:1 23:13 89:12 115:4
**course** 44:11 64:10,13
**courses** 14:15
**court** 1:1,17 5:18 22:9,20 23:7 99:10,14 116:15 120:3 120:22
**covered** 28:7 44:10 45:1
**covers** 13:19
**created** 61:13 105:13
**creating** 37:12
**crew** 12:12 13:12 14:5 21:18 46:16 50:10 51:2 56:7 61:1 63:10,23 64:6 66:16,16 67:5 68:15 69:15 74:13 76:11 77:5,21 78:1 78:22 80:6,21 81:2,7,14 83:17 84:4,20 109:4 115:21
**crew's** 48:22 64:21
**crews** 14:4 53:1
**critical** 4:24 6:17 28:14,19 30:11,13 34:5 34:6 77:8,16 77:17 78:11,14 106:5
**criticism** 77:17 78:1 108:14
**criticisms** 28:10 29:17

108:7
**cross** 70:7 86:13
**crossing** 23:14 71:19 81:7,15 82:22,23 86:11 86:12,17 90:10
**crossings** 70:6
**crystal** 75:18
**cs** 117:16
**cues** 54:19 60:25
**culverts** 51:6
**curriculum** 55:7
**curvature** 59:23 61:22 104:6
**curve** 40:15 57:11,14 58:15 58:20 59:6,8 59:24 60:2,4,5 60:11,24 61:9 62:1
**curved** 38:23 38:23 40:15 41:6
**curves** 58:6
**curving** 57:23 62:19
**cut** 32:10 40:23 112:5 113:3
**cv** 1:6 99:1
**cve** 99:4
**cylinder** 21:2

**d**

**d** 121:1
**dangers** 49:17 49:19,23
**data** 13:3 14:11 23:5 36:18 102:13 103:12 116:5
**date** 1:11 24:14 118:25 119:13
**daubert** 22:17
**day** 55:16 56:3 56:21 103:1 114:2 115:21 119:16 120:12
**days** 117:18
**db** 97:9 98:3
**decelerate** 18:2
**deceleration** 17:16
**december** 120:23
**decide** 85:25 95:11
**decided** 19:25
**declare** 119:5
**deemed** 119:7
**defendant** 1:8 1:16 2:8 121:22
**definitely** 76:20 82:14
**degree** 57:11 57:13 58:22,23 59:19,24 60:1 60:5,24 61:9 62:1 70:22
**demonstrable** 35:11
**depend** 50:21 56:15 107:18
**depending** 9:23 9:25 73:2 112:24
**depends** 6:10 56:6 114:18
**deponent** 110:7 117:14 119:4
**deposed** 3:17 106:21
**deposing** 117:14
**deposition** 1:10 3:10 4:11 35:22 79:4 106:10 111:1,5 116:13
**derail** 36:7,16 37:8,16 38:1,5 38:13,14,22 39:21 40:1,5,8 40:8,9,17,20,22 46:12,17 47:4 47:8 58:10 63:7 66:13 70:2 71:1,15 112:9
**derailed** 12:13 40:4 58:9 70:10 77:22
**derailer** 35:18
**derailing** 112:10
**derailment** 30:6,17 32:3 34:13 35:12,17 36:1,20 38:25 39:16 40:2,13 40:18,19,25 41:5 71:23
**derails** 25:18 72:8
**describe** 10:12
**designed** 72:9
**desk** 102:20
**desktop** 98:11
**despite** 37:7
**detail** 13:4 44:1 70:14
**details** 7:1
**determination** 37:7 50:11,17 51:14 55:19 64:16 65:2,20 67:6 76:2 84:21 107:4 115:3

**determine** 15:25 16:2,17 36:21 42:7 48:23 50:14 56:16 62:24 81:9 85:15 88:14
**determined** 11:20 16:24 50:3
**determining** 15:20 42:21 77:13
**developed** 15:5
**device** 36:9
**difference** 16:10 20:25 76:18,22 79:10 89:1,11 114:15
**differences** 109:15
**different** 27:1,6 27:8,10,18 28:7 43:18 52:21 61:24 76:6,20 81:17 82:9 83:3,3,6 83:10 85:16 86:11 109:20
**differently** 91:25
**direction** 45:14 57:5,22 66:24
**disagree** 12:10 17:8 21:22 74:3 109:1,5,8 109:9
**disagreeing** 109:15
**disagreement** 109:12
**disagreements** 109:16
**discovery** 13:15
**discussed** 104:8 106:16 108:9 108:10
**discussion** 4:22 80:11,13
**dispute** 84:5
**distance** 7:17 7:19 9:16 12:16 14:19 15:11,18,25 16:17 17:1 18:7 21:13,15 22:5,8 51:25 52:11,19 54:17 58:9 89:1,12 109:14 115:6 115:13
**distances** 15:21 17:9 52:9 53:2 54:2,16,24 55:7 72:23
**distinct** 28:1
**distinction** 86:5
**distinguish** 50:19 51:18 97:4
**distracted** 12:21
**district** 1:1,1
**division** 1:2
**document** 25:12
**documentation** 32:6
**doing** 7:7 8:22 9:5 12:17 13:2 14:5 20:21 27:5,8 40:2 71:9,12 103:7 108:14 110:22 115:17
**double** 40:9 108:17
**dozens** 23:21
**dragging** 90:10
**dropped** 89:9
**dropping** 88:22
**drove** 7:12,20
**due** 39:14 104:5
**duly** 3:3
**dustin** 3:17 24:20 25:3
**dustin's** 4:10
**duties** 44:12 109:5
**duty** 49:5 50:6
**dynamic** 96:12 96:21 97:6,22
**dynamics** 115:17

**e**

**e** 2:4 118:4,4,4 121:1,20
**earlier** 99:21 104:11 105:19 109:19 115:9
**early** 22:21 23:14
**earth** 57:8
**east** 59:11 72:1
**education** 10:11 14:15 113:19
**effect** 35:9
**effectively** 7:11 40:6
**efficient** 84:25
**effort** 36:3,12 36:16 37:12,18 39:12 89:4,4
**eie** 89:21 90:2 94:14,16
**either** 15:1 31:25 52:5 73:15 80:23 88:7 91:17

102:2 106:6 108:10 112:13
**elevation** 59:20 59:23,25 60:2
**emergency** 17:4 18:23,24 19:4,6,17,20 67:12 85:1,6,8 87:25 88:7,13 88:17 89:5,20 89:23,24,25 90:1,3,13 93:24 94:20 95:13,15,17,18 95:21,22 96:10 96:20 98:20 101:2 102:8,17 105:13,22
**employee** 6:18 8:16 9:15 26:22 34:10 35:4 43:11
**employees** 4:24 9:2,21 11:1 55:2 103:11
**employer's** 29:5
**employment** 41:14 42:6,20
**empowers** 94:23
**empty** 18:5 20:24
**enabled** 69:17
**ended** 36:22 37:2,8 38:21 39:22
**ends** 71:17
**energy** 17:14 65:14 109:21
**engine** 37:15 94:18 104:7 110:19 111:8 111:13 114:23 115:1
**engineer** 8:3 11:10 13:5,9 13:16 26:20 42:13 53:25 55:15 56:1 61:5,15 68:18 75:3 85:1 89:22,24 90:3 92:2,16 96:5 100:15 116:6
**engineer's** 90:2 103:6
**engineering** 25:20 39:25
**engineers** 27:4 44:12 53:6 116:7
**engines** 110:20 112:19 113:21
**entering** 72:11
**entire** 38:3 39:17 43:5 94:19
**entirely** 43:18
**envelope** 54:4
**equation** 18:3
**equipment** 10:22 16:6 46:6 51:23 64:16 67:4,10 78:2 100:7 104:5 112:25
**errata** 117:12 117:14,18
**esi** 24:5,6,22 121:23
**essentially** 18:12 29:12,14 58:4 87:13
**estimate** 14:16 53:1,9 54:2
**estimation** 100:21
**event** 13:3,8 16:24 23:5 36:9,13,17 112:8 116:4
**events** 120:10
**evidence** 13:18 32:2 34:2 37:2 37:23,24 61:13 61:14 68:6 69:25 80:3 115:19,25
**exact** 92:11
**exactly** 33:8 37:22 38:14 73:2
**examination** 3:4 110:15 121:5,7
**example** 9:1,19 42:24 44:6 50:24 51:1 56:11 66:25 88:21
**exceed** 114:4
**except** 57:11
**exception** 77:7 78:19 112:23 113:9
**exclude** 23:7
**excluded** 22:9 22:13 23:1
**exclusive** 45:14 46:7 65:1,11 69:15 71:2
**excuse** 40:5
**exercise** 26:10
**exhibit** 4:10 24:6,8 35:22 38:11 90:14,18 92:13 93:7 99:9,10,16 121:23,24 122:1,4
**exhibits** 24:5 121:22

**exit** 86:16
**expect** 45:17 69:5 70:15,17 70:20,21,25 76:4 86:13 107:1 112:12
**expectation** 46:5,11 69:18 69:21,22 70:10 70:12 111:16 111:20 112:10
**expectations** 46:16 111:12 113:10
**expected** 47:4 48:9 69:10 112:8
**expecting** 69:12 70:6
**experience** 13:16,24 14:3 14:10 15:19 28:20,23 30:24 33:14,18 42:11 51:16,21 54:25 56:7,12 61:4 61:14 62:21,22 113:20 115:16 116:5
**expert** 3:18,19 3:25 5:25 10:9 10:13 16:9 19:25 32:21 74:1
**experts** 4:18 106:21 107:10
**expires** 120:23
**expletives** 80:10
**expressed** 106:9
**expressly** 33:23
**extent** 4:12 16:2,5 42:23 110:2
**extremely** 91:20
**eye** 101:24
**eyes** 7:11

**f**

**facilities** 110:24 112:19
**facility** 110:17 111:14 113:14 113:21
**facing** 11:7 49:1 63:23 64:5 78:17 105:5 106:4 116:3,4
**fact** 7:13 16:23 35:3 39:12 45:5 46:24 57:18 60:3,4 72:7,10 79:15 100:9 103:2,11 114:23
**factors** 10:7,9 10:11,13 11:11 12:4 22:19,23 61:20
**failed** 29:2,15 29:18 35:1,7 43:21
**failing** 30:18
**fails** 117:20
**failure** 30:6 39:14
**fair** 26:23 44:2 61:25 72:13 108:21 110:5
**fairman** 6:24
**familiar** 10:14 66:24 113:20
**far** 7:1 9:22 14:11 24:14 27:17,18 38:3 38:15 39:1,15 52:2 55:14,25 58:2 72:22 73:9 104:9 106:15 108:19
**farther** 105:1
**fast** 86:1
**faster** 19:8,11 88:20
**fastest** 85:8
**favor** 103:17
**federal** 5:18 22:20 26:7 42:15
**federally** 27:3
**feel** 24:12 34:8 109:9
**feet** 9:16,22 15:18 17:3 19:20,21 21:23 52:2,5,17,24 53:3,4,8,9 54:15,20,21 56:11 73:1,3 74:1 76:16 83:18 84:5,15 89:13 104:4,13 104:13 105:2 105:10 114:11 115:12
**felt** 73:20
**field** 10:11 12:3 22:18
**figure** 30:10,14 30:23 34:17,22 38:11 39:2,4 40:10 59:13 62:25 63:10,15 63:22 66:11 67:14,14,25 68:8 72:24 73:25 74:19,19 74:20 75:8,20 76:14,24 77:2 77:10 85:4 89:15 91:3,7,9 91:14,15,17 92:10

**figures** 105:24
**file** 4:9 41:21 42:3 108:6
**files** 106:21,22
**filling** 25:11,12
**final** 22:5 38:17
**finally** 112:10
**find** 98:21
**fine** 96:2 98:5 101:16,22
**finer** 83:14
**finish** 69:1
**finished** 31:11 68:21
**firm** 2:10
**first** 3:3 6:23 38:2,2,12 39:17,18 52:22 63:14 73:12,20 85:11,21 88:12 89:12 90:23 92:12,13 94:24
**fit** 6:21
**five** 23:22 25:8 74:22 75:8 76:21 105:24 115:10
**flipped** 76:24
**floats** 31:7
**follow** 26:19 43:19,21 110:14
**following** 35:4 43:14,19 52:11
**follows** 3:3
**foregoing** 119:6 120:6
**foresee** 103:20
**forfeited** 100:10
**forgot** 33:8
**form** 12:24 13:13 14:1 15:16 16:19 19:10 21:11 22:2 26:4,24 27:15 28:3 29:13,21 30:16 31:3 32:14 33:3,3,17 34:7 36:24 39:8 43:16 44:3 45:25 46:14 47:6 48:24 49:9 50:7 55:17 56:4 57:16 60:6 61:2 62:11 64:12 65:9 66:3 68:3 70:8 70:23 72:14 73:11 74:5 78:13 79:8 82:16 83:19 84:18 100:12 103:19 104:19 107:2 112:20 113:12
**formal** 10:10
**formula** 21:6
**formulate** 110:2
**forth** 80:14,18 111:6
**forward** 37:10 56:25 64:5 78:17 96:16 97:21 105:5 116:3
**foster** 1:10 3:2 3:8,9 24:11 28:19 30:22 72:21 90:18 104:1 117:6 118:3,25 119:3 119:5,13 121:4
**foul** 8:9 36:23 37:8,21 39:23 46:6 50:23 51:19,19,22 52:23 53:3 54:9,17,20,21 57:19 58:10 62:7 63:18 64:3,17,23 65:5,6,8,21,24 65:25 66:2 67:7 69:19 71:1 73:19 74:16 75:10,15 75:19 78:2 80:15 84:15,21 85:15,21 88:11 88:14 104:7,18 105:8 114:23
**fouled** 11:2
**fouling** 46:25 48:6 63:11 64:8,9 74:8,20 75:15
**found** 5:16 45:10
**four** 5:19 52:2 52:5,17,24 53:4,8 54:14 101:17,21
**fra** 26:8,9,11,18 27:3,5 28:12 29:6 35:24 42:16 43:2 44:24,25 46:10
**frankly** 27:19 65:14
**free** 24:12
**freight** 21:6
**friction** 21:3,4
**front** 54:2 62:5 82:11 85:5 93:9 94:18 101:10
**froze** 79:7
**full** 3:6 19:7,17 19:19 71:9 87:22,24 88:1 105:17

**fully** 22:18 31:21,23 55:20
**further** 21:20 41:6 58:8 62:16 101:18 104:13,14 105:4 120:8

**g**

**gallivan** 1:14 2:3 23:17
**gauge** 52:10
**gears** 41:10
**general** 25:25 26:8,11 30:2,4 30:7,8,13 40:2 45:11 46:3,16 46:17,19 48:2 51:5,25 52:4,7 52:17 57:4,5 64:24 69:22 70:13
**generally** 6:12 25:14 56:22,25 70:15 111:10 111:11 113:16
**generate** 89:3
**generated** 39:12
**generating** 36:3
**generators** 96:16
**generic** 31:7
**geometry** 11:20
**getting** 9:4 40:7 74:25 81:11 82:11 86:3
**girls** 9:8
**give** 21:3 22:18 41:19 54:18 87:3
**given** 8:2,11 9:14,21 65:4 65:23 76:15 111:2 119:10
**gives** 66:25 69:18 95:19,20
**giving** 8:19 44:23 56:5 78:4,6
**global** 27:16
**go** 18:11 21:2 24:24 26:4 30:16 33:7 38:21 39:5,9 39:10,15 41:11 42:24,25 51:23 55:7 59:17 62:11,24,25 64:24 74:5,18 74:19 79:8 84:7 89:16 94:20 96:10,18 96:20,21 101:17 107:23 111:9
**goes** 95:9
**going** 6:11 8:7 15:6,22 21:16 34:19,20 37:7 39:6 41:19 46:12 50:21 55:1 56:13,15 58:7 62:9 64:1 65:21 68:23 69:19 70:10 71:18,20 72:9 72:10 73:3 76:17 77:13,14 77:24 78:3,11 85:25 86:9,10 87:4 90:25 96:9 104:13,14 106:12 107:14 107:18 112:9
**good** 68:24 99:2
**google** 57:8
**gotten** 93:12
**governed** 29:7
**grab** 67:25 90:14,19 91:19 99:16,20,25 100:20 122:1,4
**grabbing** 90:25 92:14
**grabs** 91:24
**grade** 18:6 23:13 82:23 86:11
**gradually** 80:1
**graininess** 97:16
**grainy** 92:19 93:2 97:1,4,23
**grass** 67:15
**gravel** 67:15
**greenville** 2:6
**grip** 9:4
**guess** 16:5,13 24:18 43:24 53:11 55:19,23 73:23 76:25 107:7 109:15
**guessing** 52:9 53:14
**guys** 9:8 55:9 69:9 70:4 71:4 71:4 74:23
**gwblawfirm....** 2:7,7 117:2

**h**

**h** 118:4 121:20
**half** 60:2
**hand** 38:13 40:17,21 75:4 75:4 85:3 92:3 92:4,14,18,20 92:24 93:3,8 93:12 94:2 98:8,10 100:17 100:19,24 101:7 102:1,4

102:16,19 120:11
**hand's** 97:24
**handful** 8:15
**handle** 93:22 94:1,6,17 95:6 95:8,20 97:3,5 97:20,22,22 98:25 102:17
**handles** 93:11 97:5
**handling** 112:4 113:2
**handrail** 41:9
**hands** 36:1 101:25
**handy** 5:13
**hang** 47:17 87:1 93:4
**happen** 69:6 81:22 88:19,24
**happened** 7:25 16:18 36:22 37:23 39:4 56:20 80:5 82:20 90:5 91:20
**happening** 16:11 47:5
**happens** 99:21
**happy** 33:11
**hard** 62:17 93:1
**head** 101:12
**held** 26:14,21 27:1
**help** 52:16 88:19
**hereto** 119:8
**hereunto** 120:11
**hey** 52:16
**high** 39:24 51:2
**higher** 26:21 27:7,9 52:20
**highway** 86:11
**hindsight** 63:21 105:12
**hit** 76:20 78:3 93:23 108:18
**hits** 90:10,10 102:4
**hold** 10:8 33:5 33:5
**holding** 100:22
**honest** 41:17 91:4
**hood** 2:10
**hoodlaw.com** 2:12
**horn** 85:10,18 86:2,4,15,21 87:6,6,11
**hose** 90:9
**hoses** 90:11
**hour** 16:12,12 68:23 81:25 82:8
**hours** 53:19 82:8 99:22
**housekeeping** 24:2
**human** 10:6,8 10:11,13 11:10 12:4 22:19,23 61:20
**hundred** 89:13
**hundreds** 23:21

**i**

**identification** 24:7,9 90:16 99:18
**identified** 96:4 96:7 112:16
**identify** 52:17 54:9 95:10 97:14 98:12 99:2
**ii** 2:4 117:1
**iii** 2:4
**image** 57:8 63:15
**images** 57:25
**imagine** 9:19
**immediately** 88:13
**imminent** 64:17 74:15 76:3 77:7 88:15
**impact** 12:16 16:2,5,18 17:4 57:14 59:7 73:1 76:9 78:25 79:2,17 79:23,25 80:4 80:21 81:12,22 86:21 100:3,3 102:6,14 105:14,25 115:1
**important** 15:9 15:15 42:5 59:3
**improper** 32:24 33:3 69:13 104:21
**improperly** 112:6
**inadequate** 35:6
**inch** 60:2
**incident** 14:12 48:3 56:20 59:5 66:17 68:16 111:21 112:8,11,14 114:3
**include** 14:14 48:6 49:15
**included** 4:19 4:20,22 63:21 106:17

**includes** 44:23 53:21
**including** 20:23 48:10 94:19 115:17
**increasing** 66:8
**independent** 64:4 93:11,21 94:6,11,21,24
**independently** 94:7
**index** 2:25 121:13
**indicate** 20:6 58:19
**indicates** 69:25
**indicating** 59:15 102:9
**indication** 62:16
**individual** 51:22 92:15
**industrial** 113:14,17
**industries** 110:19,21 112:18 113:6
**industry** 28:21 29:4 30:3,8,13 30:19 31:1 47:9 59:12 69:14 70:11 71:9,10,11,12 72:4,4 112:22 113:11,21
**ineffective** 34:21
**information** 11:24 41:22,23 42:4 69:11 110:6 121:13
**initial** 18:12
**initiate** 87:21
**initiated** 89:22 89:24 90:3
**initiates** 102:7
**inner** 7:6,22
**inside** 21:14 41:6 45:24 55:25 110:24
**inspection** 107:24
**instruction** 7:10
**instructions** 43:20 44:15
**intend** 62:5 106:14
**intent** 90:23
**interested** 120:10
**interjected** 33:7
**internal** 43:20
**investigating** 77:25
**investigation** 36:1,5 40:3
**invoices** 4:2 24:4,6,8,11,21 121:23,25
**involved** 7:17 20:8 71:22 80:10
**inward** 11:7 49:1 63:23 106:3 116:4
**issue** 114:9
**issued** 4:17 25:5
**italian** 1:7 2:9 117:5 118:2 119:2

**j**

**j** 1:10 3:2 117:6 118:3,25 119:3 119:5,13 121:4
**job** 54:25
**jobs** 53:21
**john** 2:10 3:9 32:20
**john.radeck** 2:12
**joint** 25:6
**joseph** 3:8
**joysticks** 93:15
**jr** 2:10
**judged** 77:5
**judging** 29:20 31:1
**judgment** 68:15 69:12 74:14 76:11 78:2,19 84:24 85:20 86:8
**jury** 21:22 62:6 62:10 106:15
**justin** 35:22

**k**

**k** 2:4 117:1
**keep** 8:4,5 39:5 42:8,22 43:3 45:13,24 47:15 49:15 52:10 64:14 70:14 72:12 101:24 103:17
**keeping** 6:18 7:2 9:1 14:7 22:12 48:23 50:16 62:16 81:8 83:8 108:25
**ken** 106:20
**kept** 13:21 23:6 81:2 115:21
**kind** 8:8 23:8 25:5 33:24 36:9,25 41:10 41:12 42:3 52:1,12,14 54:15 59:16 72:22 73:8

80:14 84:8 90:23 94:5 95:7 98:23
**kinetic** 17:14 109:21
**knew** 15:4,6,19 31:20 71:8,8 71:14 78:10
**know** 4:6,8 5:7 6:10 8:2,10,17 9:9,17 11:17 12:8 13:25 16:9,11,23 17:4,12,13 18:4,14,16,19 20:5,15,18,19 20:25 21:1,2 21:15,21 23:18 23:19 29:8 30:4 33:25 34:10,15 35:20 35:25 36:6,14 36:15,18 37:15 37:19 38:3,3 41:18 42:10 43:1,1 44:7,9 44:21 49:14 54:3,8 55:2 56:10 59:8 62:15,20 63:16 63:20 64:4 66:22 67:4,20 71:13,21 72:11 73:2 74:1 76:14 77:23,24 78:24 79:3,12 81:20 82:5 84:14 86:3,19 87:10,15 88:6 89:2 90:20,22 96:19,24 97:10 97:15,21 98:9 100:25 101:24 103:4 107:14 107:15,21 109:20,24,25 110:3 114:8
**knowing** 77:21
**knowledge** 65:10 66:6,17 68:16 69:9
**knows** 53:8

**l**

**lack** 77:18
**lane** 25:16 69:17
**large** 120:5
**larger** 63:25
**law** 1:13 2:10
**lead** 37:25 38:13,23 40:15 40:16
**leading** 7:7,12 43:24 111:23 111:25 112:2
**leads** 28:8
**learn** 53:24
**learning** 55:5
**leave** 40:20
**leaves** 40:21,23
**leaving** 79:16
**led** 34:13 35:12 115:25
**left** 38:13,19 39:5,10 40:17 40:21 41:2,3 59:18 75:4 77:22 91:1 92:4 93:3,8 94:2 98:19 100:16,19 101:6 102:1,4 102:10,16,19
**legal** 34:9,11 117:24
**length** 18:25 37:15 39:17 53:3
**lengths** 40:6
**letter** 35:23,24
**letters** 45:16
**letting** 96:14
**level** 39:24 80:20 88:3 95:22 103:3
**lexington** 120:13
**likely** 50:24 105:6
**limited** 19:12
**limits** 103:9
**line** 11:2 19:13 36:23 39:10 46:13,25 48:7 67:15 71:16 118:5,8,11,14 118:17,20 121:3,15,22
**lines** 11:18
**list** 5:9 6:15,20 8:11,14 41:18
**listed** 5:9
**literally** 46:7
**literature** 10:14,17 12:3 61:8
**litigation** 6:6,8 6:13
**little** 6:10 12:1 25:19 40:14 41:8,11 55:12 59:18 72:17 76:6 81:25 83:14 84:11 91:2,3,8 92:19 93:2,5,16 97:1 101:18 115:5
**llc** 2:10
**loaded** 18:5 39:13 113:5
**located** 96:8,23 98:21 100:10

**location** 1:13 7:21 11:21 39:21 46:17 57:12 59:5,8 60:12 105:14
**locations** 105:4
**locomotive** 7:24 11:1,7 12:11 20:19 31:24 32:1 35:16 36:7,10 36:19 37:11 38:1,12 39:17 40:5 42:12 46:24 54:3,5 57:3 58:10 62:18 63:5 70:2,15 72:1 75:2 81:21 82:17 84:15 85:6 88:23 92:16 94:7,9 95:2 96:14,15 96:17 104:3,4 110:18 111:7 111:25 112:1,5 113:1,5,15
**locomotive's** 53:24
**locomotives** 13:5 20:13,23 40:4 55:1 89:10 94:12,19 96:11 110:22
**long** 20:5 36:15 81:24 83:21
**longer** 17:23 27:7 55:12 105:7 115:13
**longitudinally** 39:16
**look** 7:23 16:5 24:12 37:23 38:22 39:20 41:19 42:6,24 45:9,22 46:4 47:17 48:22 49:17,22 51:13 52:2 59:12,16 60:19 63:10 64:2 66:23 89:16,18 91:4 91:24 101:6 106:22
**looked** 42:19 108:5 110:1
**looking** 8:17,21 9:25 38:10,10 40:11 47:20,22 56:8 57:1,2,24 59:22 60:15,15 60:22,23 67:13 67:18 72:23 91:16 93:4 97:1 101:10 106:20 107:20 109:4
**lookout** 6:19 7:2 8:4,6 13:22 14:8 22:13 23:7,12 41:12 42:8,22 43:4 45:13,24 47:16 48:2,3,23 49:15 50:16 62:17 64:14 70:14 72:13,16 81:2,8 83:8 103:4,14,18 109:1,6 115:21
**looks** 24:16 41:20 52:24 54:1,4,17,19,20 55:6 67:1 90:21 92:4,19
**lori** 1:17 120:3 120:21
**loss** 90:12
**lot** 15:19 48:18 48:19
**low** 90:10

**m**

**made** 16:21 37:6 39:7 76:22 84:24 85:19 86:8 107:24 111:22 115:3 119:6
**main** 1:14 11:2 27:6 36:23 39:10 45:19,23 46:13,19,25 47:10 48:7 57:19 58:13 67:9,11 70:3 71:1,16 72:9 104:6 108:13
**maintain** 103:13
**majority** 6:14
**make** 6:1 12:2 22:4 34:4,19 46:8 49:14 50:11,17 51:14 55:19 58:12 61:19 64:15 65:2,19 67:5,6 69:12 72:12 74:14 76:17 78:1 79:10 85:1 86:20 88:25 89:11 97:4,17 104:12 104:14,23,25 107:4 115:4
**makes** 20:25 27:20 68:15 84:21
**making** 64:7,25 76:2 91:10
**manager** 11:9 61:5
**mandated** 27:3

**manufacturers** 111:19
**mark** 4:11 15:14 24:3 90:22 95:12
**marked** 4:9 24:6,9 90:16 90:18 99:18
**marking** 93:2 95:7 96:3 98:6 98:23 99:7
**marks** 38:8
**marshall** 4:21 28:17 29:9,23 31:6,15,19 33:22 111:1,6 111:12
**marshall's** 28:25
**master** 92:3,20
**material** 60:5 62:3
**materially** 18:10
**materials** 42:25 44:16
**math** 17:15,21 109:19,22 110:1
**matter** 4:3 92:1 96:22
**matters** 4:2 24:19
**maximum** 45:19 88:1
**mean** 6:4,7 11:16 15:8 16:8 17:11,24 19:2,11,23,25 20:11 21:7 23:19,21 25:7 27:12 28:11 29:6,14 34:15 37:1 38:7 41:1 42:9 43:6,22 45:4,23 46:19 46:22,23 48:18 49:21 50:9,18 51:15 52:21,25 53:23 56:25 57:8 60:3 66:19 67:13 69:3,3 71:17 71:24 73:5 75:12 76:20 77:15,16 78:5 79:4 84:20 85:3,10,24 86:9 87:18 91:21 92:7 100:3,5,16 106:20 108:19 109:7,20,22
**meaning** 96:19 112:4
**means** 10:13 35:5 42:14,17 43:3 44:21,22 45:1 51:21 60:14 61:22 94:16
**measure** 59:9
**measurements** 12:8 108:2
**mechanics** 105:15
**meeting** 2:11
**member** 56:7
**members** 74:13 76:11 80:6,21 84:4 109:4
**mentioned** 106:19
**met** 3:10
**method** 70:12 109:25
**methodology** 17:10 21:16
**mexico** 22:21
**middle** 59:16
**mile** 67:9
**miles** 16:11,12 76:21
**mill** 111:16,22 112:13
**mind** 41:13 101:14,25
**mine** 67:17
**minutes** 82:3 99:23 103:23
**missed** 7:13
**misspoke** 99:21
**mitigated** 16:3
**mobile** 7:6,22 112:25
**moment** 41:20 114:25
**moments** 81:22
**momentum** 39:11
**monitor** 48:9 103:7
**monitoring** 49:16
**mortge** 1:17 120:3,21
**motion** 37:10 57:23
**motor** 10:21 85:16 86:12,16
**motors** 96:13
**mouth** 73:24
**move** 86:10 94:1 98:7 111:23
**moved** 94:16 102:3
**movement** 7:5 7:7,12 12:13 30:5 31:16 37:10 38:3 39:15 45:14 48:4,6 49:20 49:25 50:2,12

50:15,20,25 51:12 69:19 73:18 77:14,22 84:20 85:12,20 86:9 96:16 102:10 105:6 111:22,24 114:19
**movements** 27:20 28:1,13 46:18 71:10 106:3
**moves** 19:12 85:3 101:12
**moving** 8:25 46:18 51:9 52:20 63:19 75:17 82:18,22 82:25 102:2
**mud** 91:10
**multiple** 18:15
**myriad** 15:21

**n**

**n** 121:1
**name** 3:6
**named** 3:18,19
**near** 51:13 55:3 60:11 67:10,16 71:10 72:1 85:17 92:5
**nearby** 72:8
**nearest** 53:9
**necessarily** 68:8 73:19 75:11,18 87:24
**necessary** 77:6 119:8
**need** 4:11 57:7 65:3 66:7 67:16 68:23 107:21,22 114:16
**needed** 3:24
**needs** 53:7 88:18
**negligence** 65:11
**neither** 120:8
**neutral** 97:21
**never** 3:24 55:6 86:19,20,24 101:1 102:19
**new** 22:21 110:3 121:16
**nine** 12:14 15:14 21:13 63:16
**non** 87:25
**nonlinear** 17:19
**norfolk** 1:4 2:2 3:12 5:5 6:24 13:12 23:23,25 26:15,17 27:2 27:5,23 35:25 36:4 42:11 44:22 46:12 47:4 55:10 58:13 67:9 71:15 82:24 117:4 118:1 119:1
**normal** 40:9 41:2,3 66:7 87:22
**north** 30:9
**nose** 8:24
**notary** 119:14 119:20 120:4
**note** 117:11
**noted** 63:3 119:8
**notice** 84:14,14 91:20
**noticed** 86:14
**noticing** 74:24
**notified** 77:23
**notify** 112:12
**noting** 74:21,21
**ns** 32:4 48:13 70:3 71:14 104:6
**number** 11:4 11:12 17:3 18:17 20:14,20 21:5 22:5 23:20 29:3 34:25 52:4,6,7 53:19 54:1 56:6 73:8
**numbers** 17:11 20:1 21:3,24
**numerous** 110:21

**o**

**o** 2:10
**object** 8:8 11:19 12:24 13:13 14:1 15:16 16:19 19:10 21:11 22:2 26:4,24 27:15 28:3 29:13,21 30:16 31:3 32:14 33:12,17 34:7 36:24 39:8 43:16 44:3 45:25 46:14 47:6 48:24 49:9 50:7 55:17 56:4 57:16 60:6 61:2 62:11 64:12 65:9 66:3 68:3 70:8 70:23 72:14 73:11 74:5 78:13 79:8 80:15 81:18 82:16 83:19 84:18 100:12 103:19 104:19

107:2 112:20 113:12
**objected** 33:2
**objection** 104:21,22
**objectionable** 32:18
**objective** 61:12 78:5,6
**objectively** 36:14 106:3
**objects** 55:2
**obligation** 45:9 45:12,21 46:3
**obligations** 29:5
**observation** 53:16 64:5
**observing** 51:3
**obstructed** 57:6
**obstruction** 68:11 80:20 81:21 82:14 83:17 84:4,8 114:10,16,17
**obstructions** 69:5,13
**obvious** 58:8 63:6 66:12 74:7,12,19 75:9,11,14
**obviously** 33:25 38:21 51:9 55:13 63:20,24 74:1 74:3 87:15 88:6 100:1 102:18 104:17
**occupancy** 45:15 46:7 65:1,11 69:16 71:2
**occur** 72:5 90:1 90:3,4
**occurred** 8:18 81:12 113:21 114:3
**occurring** 115:11
**occurs** 9:6 60:14
**offer** 58:25 62:5
**offering** 10:6 10:20,25 11:5 11:10,13 23:8 25:22 61:20 108:24
**officer** 116:6
**offices** 1:13
**official** 120:12
**oh** 5:23 64:1 91:18 98:1
**okay** 3:15 4:1,8 5:2,9,12 6:2 7:16 10:3,6 12:1,7,18 13:8 14:15 15:2 19:1,22 20:6 20:10,14,15 21:7 23:10 25:16,25 28:14 28:18 30:1,10 31:13 32:2,8 33:21 34:4,17 35:7 37:5,17 40:13 41:10 42:5,18 43:6 44:18 45:4 47:3,25 48:9 48:16,18 49:4 49:13,21 50:1 50:14 52:8 53:22 54:16 57:7,13,21 58:14,18,24 59:2,7,18,21 60:3,22 61:7 61:18 62:1 63:2,9,14 64:21 65:17 66:11 67:13,21 67:24 68:20,20 69:8 71:8 73:4 73:7,25 74:11 74:18 75:20,23 76:6 79:3,12 79:15 82:2 83:2 85:23 87:10 88:11,16 89:6 90:18 92:1,18,23 93:13,13,20,23 97:18 98:5,12 99:5,8 100:25 101:23 105:20 106:12,24 109:7
**once** 36:19,19 65:2 79:19 88:16 96:10,10 96:18 98:21
**ones** 8:13 9:2 55:3,4 81:7 108:13
**open** 31:23 98:2
**opens** 19:7
**operate** 27:6,18 27:19,19 33:19 65:13 71:2 110:19 112:18 113:14
**operated** 14:6
**operates** 78:22 110:18
**operating** 11:9 43:5 44:8,13 44:24 45:17,19 46:11 47:9 48:13,20 52:6 53:1 61:4 68:13 69:15 72:7 112:22 114:4 115:17

116:6
**operation** 11:6 26:9,22 30:3,4 47:9 51:4 62:22 66:7 69:14 70:12,24 71:12 111:7,13 112:23 113:4
**operation's** 61:23
**operational** 25:21 44:5
**operations** 27:14 28:2 30:8 72:4 111:10 113:17 113:20
**operator** 35:2,8 70:25 111:16 111:22 112:12
**operators** 10:22,22
**opining** 25:13 60:25
**opinion** 8:18 9:8,12,24 11:11,13,23 12:12 13:21 14:6 15:12 16:15 22:6 26:5 30:18 31:21 32:15 34:9,24 35:7 35:16 37:11,22 39:11 43:3,8 43:11 45:1 46:22,24 54:7 54:10 55:14,25 58:20,25 61:9 62:4,5,9 63:15 64:21 66:13,24 67:5,11,24 68:4 69:24 72:2,16 74:7 75:7,25 76:7 76:15,17 77:11 78:6 83:17 85:20 89:17 104:9 105:8,18 105:23 114:20 115:2,4,8,11,20 115:23 116:1
**opinions** 4:14 4:18,20 7:1 8:2 8:3 9:21 10:7 10:20,25 11:5 12:5,22 13:11 22:8,12,23 23:1,4,8 25:22 34:23 41:12 48:14 61:20 105:9 106:9,15 107:1,15 108:19 110:3 121:16
**opposed** 25:20
**opposing** 107:10
**optimizer** 79:13,14,20 87:20 103:3,7 113:24
**orange** 93:16
**order** 23:1
**orient** 92:9 93:5
**original** 4:16
**outer** 60:1
**outside** 40:15 52:5
**overall** 54:3 77:12 97:2 109:24
**overlay** 45:16
**own** 29:2,5,22 29:23 42:11 55:1 66:14 110:18,22

**p**

**p.m.** 116:14
**pa** 1:14 2:3
**pace** 24:3
**pacific** 84:1
**page** 5:12,15 6:23 34:25 38:10 59:13,16 62:25 63:25 104:2 105:11 110:6 118:5,8 118:11,14,17 118:20 121:3 121:15,22
**pages** 44:5
**paid** 3:11
**panicked** 79:9
**paperwork** 9:6 108:15 109:3,7
**parallel** 40:6
**pardon** 87:6
**parked** 7:13
**part** 5:10 12:5 13:25 14:3 28:9 47:3 48:2 57:9 72:4
**partially** 22:17
**particular** 3:22 42:9,24 90:20 114:21
**particularly** 15:12 77:11,15
**parts** 42:13
**party** 120:9
**past** 5:19 7:20 36:20 37:15 38:2,4 39:16 40:4,5 55:1,2,2 58:10 67:15 71:18,20
**pasta** 1:7 2:9 117:5 118:2 119:2
**paying** 12:20
**pdc** 45:16
**pdf** 5:15

**pedestrian** 81:10 85:17 86:12
**pending** 120:10
**people** 16:7 23:6 43:20 52:16 54:15 60:8
**perceive** 57:14 61:10 62:7
**perceived** 12:19 68:8
**perceiving** 57:17
**percent** 6:3,12 58:15,20 68:10
**percentage** 6:2
**perception** 10:15,24 11:4 11:11 12:4,9 12:18 14:16 108:20,23
**perform** 14:18 42:12 113:18
**period** 27:20 104:17
**permanent** 55:4
**person** 34:12 52:24 53:16 62:20 86:1,16
**personal** 41:23 66:14
**personally** 44:16
**personnel** 41:21 42:2
**perspective** 11:6 34:11 39:24 53:25 61:4,23 94:11
**peterson** 1:10 3:2,8 30:22 110:13 117:6 118:3,25 119:3 119:5,13 121:4
**peterson's** 28:19
**photo** 32:7
**photograph** 32:6 38:24 90:14 99:16 122:2,5
**photographic** 37:1
**photos** 37:25 60:18 108:6
**phrase** 11:16
**phrased** 33:9
**physical** 7:11 10:1 37:23,24
**physically** 9:18 14:5 27:22 34:14 37:9 52:21 56:16
**picture** 38:16 95:4 97:3,17 97:23
**piece** 51:22
**pineview** 71:19
**pipe** 18:23 90:6 90:7,12
**place** 2:5 27:2 86:13 110:17
**places** 69:5 112:24
**plaintiff** 1:5 2:2
**plant** 26:6,9
**plants** 110:20
**play** 96:9 101:22 102:6
**playing** 101:23
**please** 95:4
**plus** 20:12 109:12
**point** 19:8 20:16 21:17 25:9 36:20 37:16,21 38:13 38:14,17,17,22 38:25 39:1,1,2 39:16 40:5,8,9 40:13,17,18,19 40:22,25 41:4 41:5 43:24 59:3 62:4 63:15,17,22 64:8,11,18 73:1,7 74:8,9 74:16 75:7,20 75:22,23,24 76:1,8,16 77:2 77:5,9,19 78:18 79:16,22 79:25 81:12 82:15 83:6,15 85:15 100:2 103:12,17 105:9,21 106:19 107:5 108:3,18 109:16 114:21 115:3
**pointing** 40:14
**points** 38:1,4 108:21
**polarity** 96:15
**policies** 29:23 30:12 33:22 34:20
**portion** 105:5
**portions** 57:3
**position** 51:11 68:1 73:21 82:18 95:18 104:5
**positions** 95:20
**positive** 69:16
**possibility** 65:8 66:2
**possible** 10:2 63:11 64:8,9 65:6,23 74:20
**post** 66:17 68:16

**potential** 51:1 68:16 112:23
**potentially** 27:9 51:11 65:20 67:7 70:7 87:7 106:19
**power** 35:17 36:2 37:12 39:12 40:4 96:18
**powerpoint** 45:3
**powers** 17:9 21:14 58:2 60:19 61:13 73:6,13,20 106:25 109:14 109:17 115:14
**pr** 42:2
**practical** 61:3
**practically** 96:21
**practice** 6:11 53:5
**practices** 112:22
**precise** 114:24
**predicate** 85:13
**predominantly** 13:1 45:13
**preparation** 48:14 75:6
**presented** 103:1
**pressure** 17:20 18:10
**pretty** 34:2 57:8
**prevent** 47:4 72:9 94:24,25
**prevented** 45:18
**prior** 3:15 4:2 5:21 12:14 15:7,22 63:4 63:16 74:22 75:8 76:1,9 78:25 79:23 86:21 87:8,11 87:14,16 100:2 101:20 103:10 103:12 105:25 114:8 115:7
**probably** 6:12 16:10 25:8 56:8 76:14 81:10
**problem** 33:25 51:9
**procedures** 31:5 35:4
**process** 65:3 76:4 77:13 84:12,17 107:13,14,16
**produce** 106:21
**produced** 73:20
**profile** 58:17 58:18
**program** 42:16 44:24,25
**progression** 76:13 77:12
**propagates** 18:23 19:3,7
**propagating** 18:9
**propagation** 18:19 19:16 21:1 88:17
**propel** 96:14
**proper** 6:18 7:2 8:4,6 13:22 14:8 18:1 22:12 23:6,12 30:5 32:25 41:11 42:22 45:24 48:23 49:15 50:16 62:16 81:2 83:8 88:12 103:13,18 115:21
**properly** 31:25 34:21 39:14 42:8 43:8,13 44:21 45:6 54:8
**property** 3:16
**protect** 46:12 46:18 71:15
**protecting** 30:5
**provide** 5:18
**provided** 6:16 13:18 107:4,18
**proximity** 12:13 57:18
**public** 119:20 120:4
**pull** 57:7 79:20 98:25
**pulling** 94:22 112:1
**purely** 89:2
**purports** 107:20
**purpose** 42:21 46:20
**purposes** 84:13 88:10
**pushing** 71:9
**put** 14:7 20:3 47:21 54:14 73:24 75:5 77:20 92:23,24 95:11,13,24,25 97:9 98:3,20 99:1 100:24 102:16 109:2
**putting** 46:5

**q**

**qualified** 23:11 27:13,21 42:22 43:4 48:17 53:20 108:21 109:9
**quantify** 105:3
**question** 16:7,8 16:13 28:8,18 29:8 32:18 33:1,6,12,13 47:23 49:11 52:14 53:11,13 55:21 62:12 68:24 69:1 76:7,7,23,25 79:22 82:13,20 84:13 88:10 92:8,12,12 99:13,14 101:15 104:20 104:23 113:23 113:25
**questioning** 59:1 80:24
**questions** 25:25 59:4 104:1 110:9,11
**quick** 24:2 101:15
**quickly** 86:10 89:2,3
**quite** 17:22 83:21 97:17

**r**

**r** 118:4,4
**radeck** 2:10 3:5 3:9 13:7,20 14:9 15:23 16:20 19:14 21:19 22:7 24:2,10 26:13 27:11,25 28:4 29:16,25 30:20 31:9,14 32:17 32:21,24 33:4 33:10,20 34:16 37:4 39:19 43:23 44:17 46:1,21 47:11 49:3,12 50:13 55:22 56:19 57:20 60:21 61:6 62:23 64:20 65:22 66:10 68:9,25 70:18 71:3 72:17,20 73:16 74:10 78:23 79:11 83:1,24 84:22 87:3,9 90:17 99:8,11 99:13,19 100:18 103:22 103:25 104:19 104:21 107:6 110:8,11 112:20 113:12 114:7 115:10 116:9,17 121:6
**rail** 10:22 26:9 30:3,8 38:5,23 38:23 40:15 41:1,3 46:18 46:18 51:22 52:5 54:13 57:25 64:1 67:4,10,16 69:18 70:24,25 71:11,12 72:4 72:7 82:8 85:12 86:9,11 111:10 112:23 113:17 116:4
**railroad** 4:24 4:25 6:18 11:6 19:24 26:7,7 26:15 30:3 31:1,7,16 43:12 52:22 61:23 62:21 69:14 70:4 71:11
**railroad's** 55:1
**rails** 40:21 41:6 52:1
**railway** 1:4 2:2 117:4 118:1 119:1
**range** 49:6 50:3 83:22 115:5
**rate** 17:16 18:2 18:19 19:16 21:4 25:7
**rather** 112:25
**ratio** 21:5
**reach** 97:24 100:14
**reached** 75:4
**react** 49:5 69:10 70:5 81:11,16 82:12 86:2
**reacted** 11:1,8 11:14,24,24 12:22 15:13 73:10,14
**reacting** 12:12 14:12 21:18 63:23 82:20 84:17
**reaction** 10:15 10:24 11:4,11 12:4 14:16 64:7 78:16 86:4,15 87:11 108:23
**reactions** 68:5 108:20
**reacts** 66:16
**read** 33:9,21 79:4 116:11 117:10 119:6

**reading** 6:20 24:15 34:24 41:20 47:18 59:9 82:6 87:5 93:6 105:3 109:18
**real** 11:25 47:9 62:21 63:19 64:6 86:1
**realize** 52:16
**realized** 114:22
**realizing** 114:16
**really** 5:8 7:20 54:24 55:5 84:25 92:8 106:8 107:8 115:10
**realm** 69:8
**realtime** 77:21
**rear** 2:25 111:24
**reason** 15:2 45:17 47:3 63:21 65:1,12 65:15,15 84:5 90:21 117:12 118:7,10,13,16 118:19,22
**reasonable** 20:2 66:25
**reasonably** 102:24
**reasons** 45:23
**rebut** 4:17 108:21
**recall** 6:21 8:11 8:19 9:13,24 10:3 23:25 24:18 43:9 49:19 54:23 56:5 71:18 80:8,17,23 83:20,22 84:9 103:15 104:10 113:25 114:12
**recalling** 108:18
**receipt** 117:19
**received** 10:10 24:12 51:17
**recent** 24:16
**recess** 72:19 103:24
**recognition** 63:10
**recognize** 24:15
**recognized** 60:10
**recognizing** 56:11
**recollection** 86:23
**reconstruction** 9:19
**record** 3:7 47:21 120:7
**recorder** 13:3,8 14:11 16:24 23:5 36:13,17 116:4
**recording** 36:9 99:23
**records** 20:6 41:15,18 42:7 42:20
**red** 93:16,17 94:1 95:8 98:24
**reduce** 87:16
**reduced** 18:11
**reducing** 66:1
**refer** 89:21
**reference** 4:12
**referenced** 117:7
**regard** 80:24
**regards** 13:11
**regular** 71:7
**regulated** 26:18 30:3
**regulation** 28:9 28:21 29:6
**regulations** 26:1,2,8,12 27:3,5 28:7,12 42:15 43:2 46:10 52:12
**regulatory** 26:11 28:6
**relate** 11:9
**related** 4:2 6:13 9:5 10:15 24:19 108:2 112:7 120:9
**relates** 12:9 52:6 111:21
**relative** 3:21 56:18 58:11,13 67:22 100:22
**rely** 10:18
**relying** 78:8 104:9
**remember** 6:25 83:25 90:24
**remote** 111:17
**rephrase** 33:9 49:13
**report** 4:9,10 4:13,16 5:10 5:12 6:17 20:10,15,18 25:6,10,14 26:6 28:11 30:6,18 34:18 34:25 35:1,15 38:11 58:3,19 62:8 63:1 72:22 89:19 90:20 104:2 106:11,17 108:8,11,16

109:2
**reported** 1:17
**reporter** 1:18 99:10,14 116:15 120:1,4 120:22 121:9
**reports** 25:5
**represent** 3:9
**representative** 29:24 111:2 112:16
**represented** 5:3 5:4
**requested** 121:13
**requests** 116:16
**required** 47:13 47:15 49:22 89:9 115:13 119:14
**requirement** 11:22 70:13 74:8,12 103:6
**requirements** 5:18
**research** 61:8
**resist** 96:16
**resolve** 10:1 56:15
**respect** 16:6 114:17
**respond** 47:22
**responding** 33:6
**response** 59:1 64:18 85:14 86:7 107:16
**responsive** 62:13 82:19
**rest** 38:17,17 109:23
**restate** 81:19
**restrict** 57:4
**restricted** 22:18
**restroom** 8:24
**retained** 4:4 23:16
**return** 117:14 117:18
**reverse** 96:15 97:21
**reverser** 97:20
**review** 12:11 15:5 41:13 48:13 66:14 68:5 107:4,22 110:25 115:19 116:3 117:8
**reviewed** 107:9
**reviewing** 6:5
**rewind** 75:24
**rhen** 111:1
**rhyme** 90:21
**rico** 26:22 29:10 33:23
34:1
**ride** 31:16 53:15
**riding** 14:4 53:12,13
**right** 3:13,20 3:23 4:3,18 5:10,19,22 12:9 13:22 14:21 19:4,5,8 25:18,23 28:15 29:12 30:1,22 31:17,22 34:1 38:18,20,23,24 38:24 40:15 41:7,9,12 45:24 47:16 48:7,10,20 49:18 53:16 55:11 57:9,23 58:7 59:17 60:11 63:7 67:16 70:22 71:6,7,10,11,13 71:16 74:4 78:25 79:4,7 79:13,19,22 80:5,22 81:22 82:15 85:5 86:18,19,21 87:12,17,23 88:4,7 92:2,14 92:15,17,18,20 92:24 94:2,18 95:23 97:25 98:3,7,10 100:11 101:2,4 101:25 102:9 102:11,15,16 102:19,21 103:5 106:22 107:10,24 116:11,12
**rightmier** 26:19 27:13,21 41:22,25 42:1 42:4 44:6 45:8 47:12 49:4 51:17 54:7 55:9,13 56:23 68:2 74:25 84:13 90:15 98:7 99:17 100:6,9 101:1 102:22 106:6 108:14 114:22 122:3,6
**rightmier's** 41:14 42:1,6 80:9 102:19 108:24
**rights** 68:18
**risk** 80:20
**road** 22:24 53:21 70:5 71:19
**robertson** 83:25 84:1

**ron** 104:19
**ronald** 2:4 117:1
**rotate** 85:5
**rotating** 102:15
**roughly** 21:13 55:11,12 81:24
**routinely** 53:6
**rule** 52:18
**rules** 7:9 27:1 41:21 42:2,3 42:25 43:5,21 44:5,8,13,24 46:9 48:14,20 51:7,23 52:6 64:15 65:12 103:8 109:5
**run** 63:6 66:12 70:25 71:7 79:14 94:25
**running** 15:19 61:16 113:24
**rusk** 106:20,24
**rwray** 2:7 117:2

**s**

**s** 1:17 118:4 120:3,21 121:20
**safe** 44:10 51:12 64:13
**safer** 64:10 65:6 66:1
**safest** 65:13
**safety** 26:15 66:9 68:13 114:19
**sake** 21:21
**sal** 1:6
**sand** 88:22 89:7,9
**saw** 12:20 66:20 78:9
**saying** 11:3 12:15 30:24 58:25 60:8,23 63:17 65:17 66:21 70:7,19 70:20 73:15 77:2 78:9,12 91:11 97:13,14 97:16 108:24
**says** 17:2 23:2 59:19,20,23,24 74:2 82:4
**sc** 1:15 2:6,11
**scenarios** 83:4
**scene** 10:2 66:15,20,22 80:12
**screen** 67:25 90:14,19 91:19 91:24 99:16,20 99:25 100:20 122:1,4
**se** 10:9
**seal** 120:12
**seat** 75:1
**second** 15:14 19:20,21 52:10 79:2 87:3 90:22 91:9 93:5 97:7 102:14
**seconds** 11:5,12 12:14 21:13 63:4,16 72:25 74:22 75:8 99:23 100:4 101:17,20 102:5 105:25 109:3 115:4,10
**secretariat** 24:8,15,22 121:24
**see** 3:18 4:2,11 6:21 9:10 11:8 11:18 13:2 14:4 18:13 40:16 41:17,22 41:25 45:2 48:1 49:5,7,7 49:13 50:4,6 50:22 52:18 53:5,24 54:6 55:6,15,18,18 55:19 56:2,16 59:22 60:17,17 60:18,19 63:12 63:22 67:3 72:3 73:18 76:13 78:16,16 84:4,8 85:3 88:11 91:6,9 91:21 93:13 95:6,8 96:25 97:7 100:5,7 100:19 101:19 101:25 102:7 102:19 106:3 107:19,23 111:5,25 115:25
**seeing** 44:4 56:9 67:2,10 71:24 74:23 76:12 114:15
**seen** 7:18 9:9 9:11,15,22 10:20 21:23 30:9 44:16 50:10 55:6 58:2 60:9 66:15,20,21 74:2 78:7 82:14 88:21 89:19 105:6 109:4 112:18 113:6
**sees** 84:20
**sense** 27:16 45:12 56:25
**sent** 117:15

**separate** 90:7
**separately** 94:12
**separation** 90:5
**service** 17:3 18:24 19:2,17 19:19 87:23,25 87:25 88:1,2,3 95:19,22
**set** 25:7 31:22 98:23 111:6 113:10
**setting** 96:19
**seven** 6:1 99:22
**several** 22:25
**shared** 25:11
**sheet** 117:12
**shifting** 41:10 90:24
**shifts** 90:24
**shoes** 21:4
**short** 21:15 51:9 72:17
**shorter** 41:7,8 115:1,15
**shoving** 7:5,7 30:5 112:1
**show** 59:14 67:17
**showing** 37:25 53:5
**shown** 77:9
**shows** 13:4 37:2 99:6 102:14
**side** 39:25 51:25 52:3,5 54:1,4,5 59:19 68:13 75:2 92:17 98:14,19
**sides** 57:2
**sideways** 59:17
**siding** 60:13
**sight** 58:21
**sign** 116:11 117:13
**signature** 120:21
**signed** 117:21
**silver** 98:24
**similar** 52:15 100:1
**simple** 21:5 109:22
**simply** 16:25 81:15
**simulate** 18:15 18:18
**simulation** 16:25
**single** 33:19 48:3
**sir** 5:20 56:22 79:5 110:12
**sit** 5:8 10:3,19 12:3 21:9,25 23:18 42:18 51:15 83:23 84:5,10 89:17 106:15 107:8 107:19
**site** 11:17 107:24,25
**sitting** 54:5
**situation** 16:14 19:4,6 65:24 65:25 66:5 68:7,17 82:10 82:21 83:6 86:3 105:13,22
**situations** 7:8 69:4 103:21
**six** 39:13 52:10 74:22 75:8 105:24 115:10
**sixish** 101:20
**slack** 94:25
**slide** 94:25
**slight** 93:1
**slow** 68:14 79:24 88:20
**slower** 19:3
**small** 26:20 27:13,21 41:14 41:22,23 45:4 45:8 47:13 49:5 51:17 54:8 55:10,12 68:2 75:3 79:3 84:13 90:15,23 92:15 99:17 100:5 102:23 106:6 114:22 122:3,6
**small's** 42:6 56:23 92:14 96:5 101:24
**snarky** 76:23
**solutions** 117:24
**someone's** 43:7
**something's** 82:11
**sooner** 11:14
**sorry** 13:2 18:7 28:25 36:2 40:23 41:16 44:25 58:23 67:14 85:14 89:3,8 91:7,16 91:18 100:6 106:25 110:24
**sort** 26:10 51:6 75:24 90:24,25 93:14 98:24
**sound** 85:10 86:20 87:10
**sounds** 78:5 81:17
**south** 1:1 23:3 23:10,14,24,25 120:4,13
**southern** 1:4 2:2 3:12 5:5 6:24 13:12 23:24,25 26:15

26:17 27:2,5 27:24 42:11 44:22 47:4 55:10 58:13 67:9 71:15 82:24 117:4 118:1 119:1
**southern's** 35:25 36:4 46:12
**space** 41:13
**speaking** 96:22 104:22
**special** 44:14
**specific** 7:9 11:21 22:4 31:7 45:2 51:16 53:7 58:25 80:23 84:7 105:9
**specifically** 9:24 59:10 80:18 89:22 108:2 114:12
**specifics** 83:23
**speculation** 32:20 33:1
**speed** 16:17 17:4,12,12,13 18:10,12 36:6 45:19 66:1 79:21 96:6 103:9 113:24 114:3,4
**speeding** 79:25
**speeds** 27:7 52:20 109:20
**spot** 30:6 71:15
**stamp** 99:22
**stand** 54:14 95:9
**standard** 19:2 19:23 26:21 27:9,10 28:9 28:20,21,21 29:19 30:14,15 30:22,25 31:4 31:7 52:15 94:22 113:11
**standards** 26:15 111:6,12 112:15,17
**standpoint** 28:6
**start** 18:12 44:19 57:1 59:8 60:8 65:3 65:7,12 66:1,6 77:1
**started** 3:11 74:3 79:19 92:13 114:24
**starters** 111:15
**starting** 64:2
**starts** 21:18
**state** 3:6 28:11 65:14 120:4
**states** 1:1
**step** 88:12
**stephanie** 108:8
**steps** 84:16
**sticking** 93:15
**stills** 107:20
**stop** 15:7,20,22 17:4,22 21:17 37:14,14 52:20 84:25 85:7,16 89:13 115:6
**stopped** 15:11 21:10 22:1 87:4 102:17 114:25
**stopping** 14:19 15:25 16:17 17:1,8 21:15 22:5,8 52:9 89:1,11 109:14 115:13
**stops** 17:17 115:18
**straight** 39:6 39:10 57:4,9 58:4 59:5 60:8 60:9,11,16,23 61:21 62:1
**straightaway** 8:7
**street** 1:14 2:11
**structures** 55:4
**studies** 10:20 10:23
**subscribed** 119:15
**substance** 109:11
**substantial** 51:20 56:10
**substantially** 7:21 56:13
**substantive** 18:13 76:17
**substantively** 105:7
**sufficient** 115:6
**suing** 43:12
**suite** 1:14 2:5
**super** 59:25 60:2
**supervise** 35:2 35:8
**supervising** 14:3
**supervision** 35:6
**supplemental** 4:10,13,17 34:25
**supplied** 110:7
**support** 61:9
**supposed** 49:15 49:17 64:22 70:5,21 103:4

**supposedly** 35:5
**suppression** 95:20
**sure** 5:15 12:2 21:12 28:16 34:4,19 55:20 70:19 71:17 86:20 89:18 96:2 98:1 99:11 106:22 107:9,11
**switch** 38:4,14 40:9 57:24 58:5 59:11 60:13 71:20 112:3
**switched** 71:22
**switching** 27:20 28:1 110:22 112:24
**sworn** 3:3 119:15
**system** 44:14 111:17

**t**

**t** 92:24 98:3 118:4,4 121:20
**tables** 21:3 44:14
**take** 20:11 68:18 69:2 72:17 78:19 92:21,23 96:13 103:22 108:1 114:16
**taken** 1:16 38:16 44:7,16 77:7 108:25
**takes** 16:9 18:4
**talk** 10:21 20:11 88:22
**talked** 64:14 87:22 88:18 105:17 109:13 109:13
**talking** 3:21 16:6 21:20 38:6,16 48:19 59:15 72:24 84:8
**talks** 35:15
**tape** 75:24
**tare** 20:24
**tell** 23:15 33:2 61:25 62:9,19 67:13 81:5 102:6,7 106:14 111:11
**telling** 61:12,22 78:7
**tells** 17:2 38:14 44:6
**temporary** 55:3
**ten** 16:12 23:22 25:8
**tendering** 97:8
**tenth** 91:8
**term** 76:25
**terminal** 7:10
**terminology** 48:1 49:20
**terms** 8:10 9:18 11:3,17,22 12:15,15 13:14 13:18 26:21 32:6 57:17 68:4 76:19 78:16,17 89:3 96:13 108:22 108:24 111:13
**territory** 27:17
**tested** 44:7
**testified** 3:3 4:23 22:22 23:23 29:9 31:15 46:4 49:1 55:24 71:5,14 81:1 83:7,13,16 84:3 109:19 112:16 114:10 115:9
**testifier** 4:5
**testify** 7:16 21:8 23:11 31:19
**testifying** 3:25 5:24 6:3 25:17 34:20
**testimony** 6:4 8:11,19 9:14 13:1,9 14:14 22:18 23:5 28:24 29:1,2 29:12 32:10 33:21,22 34:5 34:15 42:10 44:20 75:1 78:9 80:9,17 80:19,25 82:1 82:2 84:3,9 88:9,12 103:10 104:10 106:7 106:16 109:12 111:1 114:12 116:2 117:10 117:19 119:10
**testing** 16:25 41:21 42:2 44:15
**tests** 42:3 44:5 44:5
**texts** 19:24
**thank** 98:5 110:12
**thereabouts** 76:15
**thereof** 120:10
**thing** 9:9 24:3 51:7 54:15 59:3 77:1 85:21 108:17 109:8

**things** 7:21 12:8,18 22:25 27:6,8,22 29:3 29:10,11,18 30:7 35:24 38:8 39:6,25 43:18 44:9,12 45:22 48:19 49:18 50:19 52:11 56:8 71:12 72:22,23 88:23 91:1 93:18 108:20
**think** 8:15 9:2 9:10,23,25 11:23 14:13 15:9,14 16:9 22:20 23:6 27:12 28:25 30:24 34:18 35:14,15,21 42:2 43:13 46:23 48:25 56:14 57:13 59:20,24 62:8 65:25 68:1 70:14 73:13,20 76:24 78:20 79:10 80:8,9 83:13 86:8 87:22 91:2 92:5 99:20,21 99:22 103:23 104:24 106:23 107:3,17 108:16 109:11 109:23 114:11 115:14
**thirty** 82:3
**thought** 49:22 76:3 80:15 91:5
**thousand** 21:23 73:3 74:1 84:15 105:2,10
**thousands** 56:11
**three** 45:16 100:4 101:17 101:21
**throttle** 87:16 87:18 92:4,21 92:22,25 96:4 96:19 97:3,6 97:22 98:2,13 98:15
**throwing** 91:13 91:23
**ties** 38:8
**time** 1:12 4:1 6:14 7:24 10:15,24 11:4 11:12,25 12:15 14:16 18:7,11 20:5 21:1,2 24:25 44:14 53:21 63:4,19 64:6,6 76:9 79:13 81:11,14 81:15 82:12,19 87:7 91:4,22 92:10,11 98:3 99:15,21 101:5 101:16 106:18 108:23 109:2 114:2,21 116:16 117:20
**timeframe** 117:9
**timeline** 44:9
**times** 5:7 23:16 25:9 51:2 56:9 57:4 71:5 82:6 94:8,9
**tip** 91:25
**today** 12:3 21:9 21:25 42:19 51:15 84:6 106:15 107:9 107:19 109:12
**together** 14:7 16:16 24:21,24 25:4
**told** 25:16 33:23 83:7
**tonnage** 20:21
**took** 67:25 91:19 108:6
**tool** 91:25
**top** 93:25 94:21
**total** 20:7,22 24:13,17
**totally** 61:25
**touch** 95:1
**towards** 5:14 79:21 93:9 94:18
**track** 7:14,23 8:7 9:9,16 12:13 25:20,23 40:7 45:10,15 45:15,20,22 46:6,8,13,19 47:10 48:4,9 48:10 49:16 50:2,23 51:3,8 51:13 53:4 55:3 56:2,12 56:18 57:5,9 57:19,22 58:3 58:6,11,13,17 58:18 59:5 60:4,8,9,10,15 60:16,19 61:21 62:19 65:1,11 65:18 67:9,11 67:23 68:12 69:5,16,16,20 69:23,23 70:3 70:11 71:1,10 72:10 75:15 79:21 81:21 85:13,17 87:12 104:6,7,18 108:3,3 112:25 114:5,23

**tracking** 57:24
**tracks** 27:6 47:10 59:12 67:8,10 71:18 71:20,21,25 72:2,8
**traction** 88:23 96:13
**tractive** 36:3,11 36:15 37:12,18 39:12
**trailing** 20:20
**train** 7:14 14:4 14:5,6 15:6,21 17:3 18:5,6,9 18:25 20:23 21:6,9,16,25 26:1,2,22 27:13,20 28:2 32:4 34:21 35:8 36:22 37:8 39:22 43:14 48:6,11 50:10 51:2,4 53:1,10 54:13 56:1 57:6,15 58:7 61:11 62:7 63:20 66:7 67:14 68:13,14 69:15 69:17 70:11 75:17 78:22 79:12,24 82:24 82:24 83:11 84:25 85:24 86:15 87:12 88:11,19 89:14 90:9 94:8,11 94:19 98:20 100:11 103:2 103:11 104:15 105:1 113:24 113:25 114:3 114:19,25 115:12,17,18
**train's** 49:25 50:2 68:1 85:2
**trained** 18:4 27:21 28:17 29:3,11 31:15 35:5 42:8,14 42:17 43:3,4,8 43:14,22 45:6 50:19 52:1,22 54:8,11
**trainee** 53:19 53:20
**training** 14:15 29:9,22 33:24 42:7,20 43:25 44:2,23 45:2 51:16,20 52:15 53:7,14,16 54:25 69:9 113:19
**trainings** 61:16
**trains** 13:17 15:20 17:18 27:7,18 45:9 61:15 65:13 115:17 116:7
**transcript** 2:25 116:11,15 117:7,21 119:6 119:10 120:6
**transpired** 72:19 103:24
**travel** 88:18
**traveled** 17:3 36:7,20
**trial** 23:24 34:20 62:14
**trick** 97:14
**trip** 79:13,14 79:20 87:19 103:2,7 113:24 114:2
**trucking** 52:8
**true** 79:18 83:18 119:9 120:6
**try** 15:10 33:11 54:16,18 64:10 85:25
**trying** 7:23 10:1 30:10,14 30:23 34:17,22 39:2 56:15,16 73:24,25 76:23 76:24 79:20 83:5 89:15 91:14 92:8,9 93:5,23 95:11 96:25 97:13
**turn** 59:19
**turned** 9:3
**turnout** 90:11
**turns** 75:15
**twenty** 6:1
**two** 8:16 24:19 40:6 43:17 76:11 80:6,21 82:7 93:14,18 93:20
**type** 16:21 83:10 87:21
**types** 10:23 27:18
**typical** 85:16 112:22
**typically** 107:12 113:1

**u**

**ultimate** 78:18
**ultimately** 37:10 39:15 40:20 44:19 56:14 57:18 75:3,6 76:10 78:19
**under** 7:9 17:20 27:4 35:17 42:13 43:2 45:17 46:9,9,9 51:7

65:12 70:11 109:5
**underlying** 46:9
**understand** 8:5 17:21 38:20 49:10 52:23 53:7,10 55:20 73:17 85:24 94:4 110:9
**understandable** 49:14
**understanding** 4:13
**unexpected** 46:25 70:21
**union** 84:1
**united** 1:1
**unobstructed** 55:16 56:3,24
**unusual** 67:11 68:2,8 72:3
**ups** 110:14
**use** 19:25 52:4 94:8 111:18 112:25 113:6
**used** 53:23 73:6 103:10 112:3 117:21
**uses** 17:16
**using** 18:1 28:9 30:4 53:2 73:9 111:17 115:14

**v**

**v** 117:4
**value** 90:2
**valve** 75:5 85:4 90:4 93:19,21 93:25 94:2,6 94:17 95:3,5 95:12,16,19 98:16,18 99:3 99:6 100:14 101:1 102:17
**valves** 93:10
**various** 10:23 43:21 53:2
**varying** 54:23
**vehicle** 7:8,13 10:21 52:20 81:9,14 82:21 83:11 85:17 86:12,16
**vehicles** 55:2
**verify** 117:10
**veritext** 117:16 117:24
**veritext.com.** 117:16
**versus** 6:24 17:13 19:17 56:17 83:11 84:1
**vicinity** 67:19 100:23
**video** 11:7 12:11,23,25 13:1,10 14:10 15:5,13 23:5 49:2 57:25 58:1 60:18 63:22,23 64:1 64:5 66:15,21 66:25 67:3 77:12 78:17 90:25 101:6,8 101:23 102:17 102:18,23 105:5 106:4 116:4
**view** 49:1 55:16 56:3,24 57:4 57:25 64:1 82:8 100:7 116:4
**views** 83:17
**vigilant** 47:15 48:2 50:16 64:14 70:14
**violate** 30:8
**violated** 29:6 29:24 30:12
**visibility** 12:20 81:13
**visible** 63:5 64:7 73:19 104:3,15,17,24 105:1 114:10
**vision** 49:6 50:4
**visit** 107:25
**visual** 54:15,19 60:25
**visualization** 58:1 60:20 73:22
**visually** 108:5
**vs** 1:6 118:1 119:1

**w**

**waive** 116:12
**walk** 54:16
**walked** 31:19 66:23
**want** 12:2 16:16 34:4,18 41:11 47:21 48:1 61:25 72:21 85:16 86:20 94:8 95:24 97:9 99:1 101:20 103:8 116:16
**wanted** 18:16 62:14 85:7 96:24
**wants** 33:11
**washout** 51:1
**watching** 63:24 69:24

**water** 51:2
**way** 11:16 15:4 17:17,21 18:15 18:22 19:12 20:2 28:16 33:19 36:14 42:12 45:11 64:15 65:13 66:16 77:16,20 78:22 79:16 84:25 85:5,8 94:2,17 96:6 99:2 100:21,22 107:8
**ways** 15:21 18:15 52:10,12 53:2
**we've** 4:9 25:8 68:22 70:13 96:4 109:23
**weight** 20:7,7 20:12,12,21,23 20:24 37:13,20 113:2
**weights** 18:5 20:19
**went** 25:3 35:17 36:16 38:3,15 66:22
**west** 71:20 120:13
**whatsoever** 81:3 104:24,25
**wheel** 41:2 94:25
**wheels** 40:20 41:3
**white** 1:14 2:3 23:17
**whitney** 2:4
**wider** 25:19
**wildly** 69:13
**william** 2:4
**windshield** 57:1 100:8
**wise** 108:18
**witness** 4:21 12:25 13:14 14:2 15:17 19:11 21:12 22:3 26:5,25 27:16 29:1,14 29:22 30:17 31:4,12 32:15 33:8,18 34:8 36:25 39:9 43:17 44:4 46:15 47:7 48:25 49:10 50:8 55:18 56:5 57:17 60:7 61:3 62:12 64:13 65:10 66:5 68:4,22 70:9 70:24 72:15 73:12 74:6 78:14 79:9 82:17 83:20 84:19 87:2,5 99:12 100:13 101:12 103:20 107:3 112:21 116:10 117:9 117:11,13,20 120:11
**words** 73:24 81:13 111:24
**work** 6:2 24:13 25:4,10,15 58:1 73:22
**worked** 23:19 24:21
**working** 55:10
**wrap** 103:23
**wray** 2:4 12:24 13:13 14:1,2 15:16 16:19 19:10 21:11 22:2 26:4,24 27:15 28:3 29:13,21 30:16 31:3,11,13 32:14,19,22,25 33:5,17 34:7 36:24 39:8 43:16 44:3 45:25 46:14 47:6 48:24 49:9 50:7 55:17 56:4 57:16 60:6 61:2 62:11,14 64:12 65:9 66:3 68:3,21 70:8,23 72:14 73:11 74:5 78:13 79:8 82:16 83:19 84:18 87:1 100:12 103:19 104:16,20 107:2 110:13 110:16 113:8 113:13 116:8 116:18 117:1 121:8
**written** 30:25 31:4 63:25
**wrong** 30:25
**wwhitney** 2:7

**x**

**x** 11:4,12 17:3 121:1,20

**y**

**y'all** 9:10,10 24:21,24 25:4 25:5,11,13 54:12 89:21
**yard** 7:6 57:10 75:13 76:21 79:16
**yeah** 26:14 29:8,10 31:12

40:25 47:21 55:23,23 61:24 69:1 70:19 82:6 87:19 91:16 92:7 100:14 102:2 107:7
**years** 5:19,24 55:11

South Carolina Rules of Civil Procedure

Part V. Depositions and Discovery

Court Rule 30

(e) Submission to Witness; Changes; Signing. When the testimony is fully transcribed the deposition shall be submitted to the witness for examination and shall be read to or by him unless such examination and reading are waived by the witness and by the parties. Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness, unless the parties by stipulation waive the signing or the witness is ill or cannot be found or refuses to sign. If the deposition is not signed by the witness within 30 days of its submission to him, the officer shall sign it and state on the record the fact of the waiver or of the illness or absence of the witness or the fact of the refusal to sign together with the reason, if any, given therefor; and the deposition may then be used as fully as though signed unless on a motion to suppress under Rule 32(d)(4) the court holds

that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.